EXHIBIT C

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 1999 WL 301648 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
[Briefs and Other Related Documents](#)
Only the Westlaw citation is available.
United States District Court, D. Delaware.
AMERICAN ENERGY TECHNOLOGIES, INC.,
Plaintiff,
v.
COLLEY & MCCOY CO. and MCDONALD'S
CORPORATION, Defendants.
**No. CIV. A. 98-398 MMS.**

April 15, 1999.

[Joseph J. Longobardi, III, Esq.](#), Wilmington,
Delaware; Of Counsel: Daniel L. McCaughan, Esq.,
Exton, Pennsylvania; attorneys for plaintiff.
[Richard K. Herrmann, Esq.](#), and [Mary B. Matterer,](#)
[Esq.](#), of Blank Rome Comisky & McCauley LLP,
Wilmington, Delaware; attorneys for defendants.

MEMORANDUM OPINION

[SCHWARTZ](#), Senior District J.

I. INTRODUCTION

**\*1** Defendants Colley & McCoy Company
("Colley") and McDonald Corporation ("McDonald")
move for summary judgment on the grounds that
plaintiff American Energy Technologies, Inc.'s
("American") breach of contract claim is barred by
Delaware's statute of limitations. Plaintiff in opposing
defendants' motion argues that choice of law
provision in the contract agreed to by the parties calls
for the contract to be interpreted according to the
laws of the Commonwealth of Virginia. Therefore,
the plaintiff asserts Virginia and not Delaware's
statute of limitations governs the relevant limitation
period. Under the Virginia statute of limitations the
lawsuit is timely.

The Court has diversity jurisdiction under [28 U.S.C.](#)
[§ 1332](#) and supplemental jurisdiction over the state
law claims pursuant to [28 U .S.C. § 1367](#). For
reasons that follow, the Court will grant defendants'
motion for summary judgment.

II. FACTS

The facts are undisputed. Plaintiff American offered
to install energy saving equipment in defendant
Colley's restaurants, which plaintiff asserted would
help reduce energy costs. Colley accepted American's
offer and the parties entered into a contract on August
3, 1993 (the "Contract"). The Contract specified that
Colley would be in default in the event that it failed
to make the required payments within 10 days of
receiving an invoice. Soon after the equipment was
installed disputes arose between the parties. By letter
dated July 19, 1994, Colley returned American's July
12 invoice unpaid, setting forth the reasons for
disputing the amounts American claimed to be due.

On June 6, 1995, American's attorneys sent a letter of
default to Colley stating in relevant part:
At this point, my client has instructed me to notify
you that you are in default ....
.... I have been instructed to offer you a settlement
under which you pay to my client the sum of
$92,000. If you would like to accept this offer, please
notify me in writing within 5 business days of receipt
of this letter. If I do not receive a written response, I
have been instructed to begin litigation at once.

More than three years after sending the notice of
default, and almost four years after the July 12 bill
was contested, American filed this lawsuit on July 8,
1998, claiming damages for breach of contract and
unjust enrichment.

III. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the court
may grant summary judgment if "there is no genuine
issue as to any material fact and ... the moving party
is entitled to judgment as a matter of law."
[Fed.R.Civ.P. 56(c)](#). "Only disputes over facts that
might affect the outcome of the suit under the
governing law will properly preclude the entry of
summary judgment." [Anderson v.. Liberty Lobby,](#)
[Inc., 477 U.S. 242, 248 (1986)](#). A dispute is genuine
only if a reasonable jury could return a verdict for the
nonmoving party. *See id.* When considering a motion
for summary judgment, the court must "view all facts
and inferences in the light most favorable to the party
opposing the motion." [Stephens v. Kerrigan, 122](#)
[F.3d 171, 176-177 (3d Cir.1997)](#). The Supreme Court
has clarified that the moving party must "bear the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 301648 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

initial responsibility of informing the Court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." *Id. at 324.* The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson, 477 U.S. at 249 (1986)* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)*). *See also Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989)* (stating that a non-moving party must "adduce more than a scintilla of evidence in its favor ... and cannot simply reassert factually unsupported allegations contained in its pleadings").

IV. DISCUSSION

**\*2** The dispositive legal issue before the Court is which state's statute of limitations to apply: Delaware or Virginia. American asserts that the Court is required to apply the Virginia statute of limitations. In support of its assertion, American points to the choice of law provision in the contract that states in relevant part:
VENUE: The agreement shall be interpreted according to the laws of the Commonwealth of Virginia. It is further agreed that should legal action be filed to enforce any part of the agreement, the parties hereto expressly agree that the jurisdiction shall be in the Commonwealth of Virginia for Federal purposes, and Henrico County for State purposes and the venu [sic] for state purposes shall be exclusively [the] Commonwealth of Virginia.

American decided to initiate legal action to enforce the agreement in a federal court in Delaware rather than in Virginia, as the terms of the choice of law provision that it relies upon calls for. Notwithstanding this dichotomy, American argues this Court should apply Virginia's five-year statue of limitation in contract disputes, because the choice of law provision calls for the contract to be interpreted in accordance with the laws of the Commonwealth of Virginia. [FN1] American cites to numerous cases in support of its assertion that courts are required to give

legal effect to choice of law provisions that are the products of arms length bargaining between sophisticated parties. [FN2]

> FN1. The relevant portion of applicable Virginia law relating to statutes of limitations states the following:
> In action on any contract which is not otherwise specified and which is in writing signed by the party to be charged thereby, or by his agent, action must be brought within five years whether such writing be under seal or not.
> Code of Virginia, Chapter IV-Section 8.01-246.

> FN2. The Court notes that American is barred from bringing this lawsuit in Delaware by the express terms of the choice of law provision. American asserted during oral argument that it brought suit in Delaware because it no longer resided in Virginia. Inconvenience to American is not reason enough to excuse its noncompliance with the express terms of the choice of law provision.

While this proposition of law is sound, it is only applicable to the statutes of limitations if the choice of law provision states with specificity that it applies to them. Statutes of limitations are generally considered to be procedural rather than substantive law. *Kalmich v. Bruno, 553 F.2d 549, 553, (7th Cir.1977), cert. denied 434 U.S. 940 (1977).* Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation. *Des Brisay v. Goldfield Corp., 637 F.2d 680, 682 (9th Cir.1981).* The United States Court of Appeals for the Third Circuit in *Gluck v. Unisys Corp., 960 F.2d 1168, 1179 (3d Cir.1991),* has held that "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." *See also Federal Deposit Ins. Corp. v. Peterson, 770 F.2d 141, 142 (10th Cir.1985)* (absent an express statement of intent, a choice of law provision will not be interpreted as covering a statute of limitations); *Des Brisay, 637 F.2d at 682* (the intention of the parties to contractually agree upon a limitation period must be clearly expressed if a court has to give it effect). The choice of law provision does not expressly provide for the laws of the Commonwealth of Virginia to apply to the statute of limitations. [FN3] Therefore, the Court holds that Virginia's five-year

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 1999 WL 301648 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

statute of limitations for contract cases to be inapplicable.

> FN3. American wants to conduct discovery so that it can ascertain the implicit understanding of the parties with respect to the choice of law provision vis-a-vis the statute of limitations. American's discovery request will be denied. The relevant inquiry is whether the choice of law provision expressly states that it applies to the statute of limitations. Moreover, American wants to conduct discovery in order to determine the implicit understanding of the parties, when at the same time it is breaching the express terms of the choice of law provision that bars it from bringing suit in Delaware.

Further, in determining the applicable limitations period, this Court, guided by the Erie doctrine, must apply the statutes of limitations of the forum state in diversity cases. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed.2079 (1945); *see Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. (1938). A federal court sitting in diversity is required to apply Delaware's borrowing statute, 10 Del.C. § 8121, when the cause of action arises outside of Delaware. *See Ontario Hydro v. Zallea Systems, Inc.,* 569 F.Supp. 1261, 1264 (D.Del.1983). Since the litigants agree the breach of Contract occurred outside of Delaware, the Court is required to apply the Delaware borrowing statute, which states in pertinent part:

**\*3** Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such a cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del.C. § 8121.

The borrowing statute by its terms requires the Court to apply the shorter of Delaware's statute of limitations [FN4] or the statute of limitations of the state where the cause of action arose. The parties are not in agreement as to whether the cause of action arose in Virginia or New Hampshire. The Court need not decide whether the cause of action arose in Virginia or New Hampshire because in either case this lawsuit had to be filed, at the most, within a period of three years from the time American learned of the Contract breach, so as too not run afoul of Delaware's three-

year statute of limitations.

> FN4. Delaware's three-year statute of limitations set forth in 10 Del.C. § 8106 applies as this a breach of contract claim.

Whether the statute of limitation began to run when Colley refused to pay the invoice on July 19, 1994 or when American's letter dated June 6, 1995 was received is not dispositive. It is clear that at least as of June 6, 1995, American had notice that Colley had breached the Contract. Either date is more than three years before American filed this lawsuit on July 8, 1998. Therefore, the Court holds that this lawsuit is time barred.

### V. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment will be granted.

D.Del.,1999.
American Energy Technologies, Inc. v. Colley & McCoy Co.
Not Reported in F.Supp.2d, 1999 WL 301648 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:98CV00398 (Docket) (Jul. 08, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 1
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
FLEET NATIONAL BANK, as agent for a syndicate
of lenders Plaintiff,
v.
John P. BOYLE, et al., Defendants.
**No. Civ.A. 04CV1277LDD.**

Sept. 12, 2005.

H. Marc Tepper, Robert B. Evre, Buchanan Ingersoll,
P.C., Philadelphia, PA, for Plaintiff.
Kelly D. Eckel, Matthew A. Taylor, Patrick Loftus,
Robert E. Kelly, Duane Morris LLP, Thomas A.
Leonard, William J. Leonard, Obermayer Rebmann
Maxwell & Hippel LLP, Michael J. Dolan, Kittredge,
Donley, Elson, Fullem & Embick, LLP, Karen
Pieslak Pohlmann, Marc J. Sonnenfeld, John H.
McHugh, Morgan, Lewis & Bockius LLP, Andrew
Hanan, Patricia M. Hamill, Conrad, O'Brien, Gellman
& Rohn, P.C., Richard L. Scheff, Jeffrey S. Feldman,
Montgomery McCracken Walker & Rhoads LLP,
Daniel J. McGravey, David M. Laigaie, Gregory P.
Miller, Michael A. Morse, James G. Stroup, Miller
Alfano & Raspanti PC, William J. Taylor, Kevin F.
Berry, Cozen O'Connor, Bruce S. Haines, Daniel
Segal, Matthew Hamermesh, Paul W. Kaufman,
Hangley, Aronchick, Segal and Pudlin, Marc Durant,
Shari Amster, Law Offices Durant & Durant, Richard
A. Levan, Richard A. Levan and Associates, PC,
Robert L. Hickok, Pepper Hamilton LLP, William J.
Murray, Jr., Vaira and Riley, P.C., William J.
O'Brien, Delaney & O'Brien, Philadelphia, PA, Julian
Friedman, Maureen N. Kaply, Stillman & Friedman,
New York, NY, Bruce M. Cohen, Robert G. Martin,
Sapna Kanoor, Cohen & Lord, Scott Richard Lord,
P.C., Marina Del Rey, CA, for Defendants.

MEMORANDUM & ORDER

DAVIS, J.

I. INTRODUCTION

**\*1** This case is one of three related civil actions
pending before this Court arising out of the
bankruptcy of DVI, Inc. in which the Court held oral
arguments on the pending Motions to Dismiss on

March 4, 2005. *See WM High Yield v. O'Hanlon,* No.
04-3423 (E.D. Pa. filed July 19, 2004); *In re DVI
Securities Litigation,* No. 03-5336 (E.D. Pa. filed
Sept. 23, 2003); *see also Federal Ins. Co. v.
O'Hanlon,* No. 04-5068 (E.D. Pa. filed Oct. 28,
2004). Presently before the Court are Defendants'
Motions to Dismiss (Doc. Nos. 72, 74, 75, 79, 80, 81,
82, 83, 85, 86, 87, 89, 91, 111, and 112) ("Mots. to
Dismiss") and Plaintiff's Amended Omnibus
Response in Opposition (Doc. No. 125) ("Pl.'s
Opp."). For the reasons set forth herein, Defendants'
Motions to Dismiss will be granted in part and denied
in part.

II. FACTUAL BACKGROUND AND
PROCEDURAL HISTORY

This action is brought by Fleet National Bank, as
agent to a syndicate of lenders comprised of Fleet;
U.S. Bank National Association; Bank One, N.A.;
Bank of America, N.A.; Sovereign Bank; and CDC
Mortgage Capital Inc., who provided lines of credit
and other credit facilities to DVI for the operation of
its financing business and who alleges that it was
injured by a fraudulent scheme perpetrated by DVI,
its subsidiaries, officers, directors, shareholders,
employees, and third parties to obfuscate DVI's true
financial performance.

Defendants in this action and the positions they are
alleged to have held at DVI are: (1) DVI Executives
Michael O'Hanlon, President, Chief Executive
Officer ("CEO"), and Chairman of the Board of DVI,
CEO and a Director of subsidiary DVIB, Member of
DVI's Executive and Audit Committees, and CEO,
President, and a Director of subsidiary DVIBC;
Stephen Garfinkel, Executive Vice President and
Chief Financial Officer ('CFO") of DVI, CFO of
DVIFS and DVIBC, Executive Vice President of
DVIFS and DVIBC, a Director of DVIFS, and
Member of the DVIFS Executive Committee;
Richard Miller, Executive Vice President of DVI,
President of subsidiary DVIFS, and a Member of the
DVI Executive Committee; Anthony Turek,
Executive Vice President, Chief Credit Officer, and a
Member of the Executive Committee of DVI,
Executive Vice President of DVIFS, and a Director
of DVIBC; John Boyle, Vice President, Secretary,
and Chief Accounting Officer of DVI, DVIFS, and
DVIBC; Terry Cady, Senior Vice President of DVI

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

and DVIFS and President and a Director of subsidiary DVIBC; Matthew Goldenberg, Vice President of Securitization of DVI, and a Director of Structured Finance at DVIFS; Philip Jackson, Vice President of Banking and Finance of DVI, and a Senior Vice President and Treasurer for DVIBC; Lisa Cruikshank, until May 2001, Vice President of the Treasury Department of DVIFS; Matthew Colisanti, an internal consultant for DVI and the head of DVI's internal workout group; and Raymond Fear, Vice President of Credit for DVI; (2) Members of DVI's Board of Directors Gerald Cohn, a Member of the Compensation, Credit, Executive, and Audit Committees and a Director of DVIFS; Harry Roberts, a Member of the Compensation, Audit, and Executive Committees, and an employee of DVI; William Goldberg, a Member of the Audit and Compensation Committees; John McHugh, a Member of the Audit and Compensation Committees; Nathan Shapiro, a Member of the Audit Committee; and (3) outside entities PresGar Imaging LLC, an owner and operator of imaging facilities; Radnet Management, Inc., a manager of medical imaging centers; and Dolphin Medical Inc., an owner of cancer treatment centers. [FN1]

> **FN1.** Plaintiff voluntarily dismissed this action as against OnCure Medical Corp. on May 17, 2005 (Doc. No. 127). Adopting the language used by the parties, named executives and board members may be collectively referred to as "the Individual Defendants," while PresGar, Radnet and Dolphin may be collectively referred to as "the Special Relationship Entities" or "SREs." Fleet also identifies certain of the so-called Individual Defendants as the "Individual RICO Defendants," including O'Hanlon, Garfinkel, Boyle, Cady, Miller, Turek, Cohn, Shapiro, Goldberg, Roberts and McHugh.

**\*2** Nonparty DVI is a now-bankrupt public Delaware corporation that operated primarily as a finance company for healthcare providers, through its subsidiaries, DVI Financial Service, Inc. ("DVIFS") and DVI Business Credit ("DVIBC"). (Compl.¶¶ 2, 5.) More specifically, DVIFS financed the acquisition or lease of medical equipment, while DVIBC extended lines of credit for operating costs to healthcare providers, secured by a provider's accounts receivable. (*Id.* ¶¶ 6, 7.) The funds used by DVIFS to extend financing to its customers were provided through lines of credit and other credit facilities from

banks and other institutional lenders, including the Fleet-agented syndicate of lenders, to whom the DVIFS Financed Contracts were pledged as collateral to secure the repayment of the loans by DVIFS. (*Id.* ¶ 8.)

According to Plaintiff, beginning in 1995, DVI perpetrated fraudulent schemes and devices that, included repeated and continuous misrepresentations and omissions of material facts to Fleet and the lenders it represented (the "Fleet Lenders") regarding: (i) the quality and amount of DVIFS Financed Contracts pledged to secure the loans advanced under the Fleet Line of Credit Facility; and (ii) the finances, credit and accounting policies and practices of the DVI companies generally and DVIFS in particular.

(Compl.¶¶ 9, 10.) Plaintiff alleges that as a result of these fraudulent operations, Fleet and the Fleet Lenders suffered damages in excess of $50 million. (*Id.* ¶ 11.)

DVI, DVIFS, and DVIBC filed joint petitions for bankruptcy on August 25, 2003. (Compl.¶ 12.) On October 14, 2003, the Bankruptcy Court appointed an Examiner, R. Todd Neilson (the "Examiner"), to investigate the circumstances surrounding DVI's demise. (Compl.¶ 13.) The Examiner conducted a five plus month investigation, culminating in the issuance of a detailed report (the "Examiner's Report" or "ER") on April 7, 2004, attached to Plaintiff's Complaint, which described "the fraudulent activities, precarious financial condition, faulty, inaccurate and fraudulent credit and accounting practices, and other fraud and mismanagement in the operation of the DVI Enterprise over the course of at least four years." (Comp.¶ 13.)

Plaintiff filed the instant action on March 24, 2004 and subsequently amended its Complaint on September 20, 2004, alleging violations of RICO, Fraud, Conspiracy to Commit Fraud, Aiding and Abetting Fraud, Breach of Fiduciary Duty, Negligent Tortious Interference with Contract, Conspiracy to Commit Tortious Interference with Contract, Violation of Mass. Gen. Laws Ch. 93A, Sec. 11, Conversion, Conspiracy to Commit Conversion, and Unjust Enrichment.

### III. LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleged in the complaint and its attachments. *Jordan v. Fox Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb v. City of Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). Such a motion tests the legal sufficiency of a claim while accepting the veracity of the claimant's allegations. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987); *Winterberg v. CNA Ins. Co.,* 868 F.Supp. 713, 718 (E.D.Pa.1994), *aff'd,* 72 F.3d 318 (3d Cir.1995). A court, however, need not credit conclusory allegations or legal conclusions in deciding a motion to dismiss. *See General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 333 (3d Cir.2001); *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997); *L.S.T., Inc. v. Crow,* 49 F.3d 679, 683-84 (11th Cir.1995). A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. *See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173, 179 (3d Cir.1988).

## IV. DISCUSSION

A. *Count I: Violations of RICO,* 18 U.S.C. § § 1961, et seq.

**\*3** Plaintiff's Count I asserts that Defendants, O'Hanlon, Garfinkel, Boyle, Cady, Miller, Turek, Cohn, Shapiro, Goldberg, Roberts and McHugh ("the Individual RICO Defendants") and the Special Relationship Entity Defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § § 1961, *et seq.* by "engaging in a pattern of racketeering activity consisting of ... multiple instances of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1344)." (Comp.¶ 394.) Defendants assert that Plaintiff's RICO claim fails for lack of specificity. [FN2] Plaintiff asserts that it has sufficiently pled a RICO claim.

> FN2. The Court notes that Defendants have, in several instances, adopted by reference each other's arguments for dismissal. As distinguishing amongst the Defendants in

this context will not affect the analysis, the Court for simplicity purposes declines to so do.

### 1. Statutory Framework

Plaintiff asserts violations of subsections (a)-(d) of 18 U.S.C. § 1962. (Compl.¶ 402.) Plaintiffs asserting claim under subsection (a) must establish: (1) the existence of an enterprise, (2) the acquisition of income by a defendant from a pattern of racketeering activity, (3) use of any part or all of that income in acquiring an interest in or operating the enterprise, and (4) a nexus between the investment and plaintiff's injury. 18 U.S.C.A. § 1962(a); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 284 F.Supp.2d 511, 541 n. 41 (S.D.Tex.2003) (citation omitted).

In order to recover under subsection (b), a plaintiff must show (1) injury from the defendant's acquisition or control of an interest in a RICO enterprise, (2) injury from the predicate acts, and (3) a firmly established nexus between the interest in the RICO enterprise and the alleged racketeering activities. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1190 (3d Cir.1993). "It is not enough for the plaintiff merely to show that a person engaged in racketeering has an otherwise legitimate interest in an enterprise." *Id.*

To set forth a prima facie case of a RICO violation under section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. [FN3] *Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004) (citations omitted). "A pattern of racketeering activity requires at least two predicate acts of racketeering." *Id.* (citing 18 U.S.C. § 1961(5)). These predicate acts may include, *inter alia,* mail fraud under 18 U.S.C. § 1341, [FN4] wire fraud under 18 U.S.C. § 1343, [FN5] and financial institution fraud under 18 U.S.C. § 1344. [FN6] 18 U.S.C. § 1961(1). [FN7]

> FN3. The relevant portion of the RICO statute, 18 U.S.C. § 1962, provides:
> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

FN4. 18 U.S.C. § 1341 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do,

places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

FN5. 18 U.S.C. § 1343 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

FN6. 18 U.S.C. § 1344 provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice-
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

FN7. 18 U.S.C. § 1961(1) defines "racketeering activity" as *inter alia* "...(B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 5

mail fraud), section 1343 (relating to wire fraud), or section 1344 (relating to financial institution fraud)...."

Finally, to set out a cause of action under subsection (d), a plaintiff must demonstrate that the defendant agreed to conduct the affairs of the RICO enterprise through a pattern of racketeering activity to be accomplished through the acts of coconspirators. *United States v. Pungitore,* 910 F.2d 1084, 1135 (3d Cir.1990).

"The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." *Id.* (citations omitted). While "[a] scheme or artifice to defraud need not be fraudulent on its face," it must "involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 528 (3d Cir.1998) (citation omitted). Moreover, because Plaintiff alleges that the predicate acts in this case are comprised of instances of wire fraud, mail fraud, and financial institution fraud, Plaintiff's averments must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which applies to averments of fraud. Federal Rule of Civil Procedure 9(b) requires that plaintiffs allege with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." [FN8] *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). According to the Third Circuit, "[p]laintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " *Lum v. Bank of America,* 361 F.3d at 224 (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d at 791). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* (citations omitted).

FN8. Conspiracy claims under subsection (d), however, are not held to the Rule 9(b) pleading standards. *Odesser v. Continental Bank,* 676 F.Supp. 1305 (E.D.Pa.1987).

**\*4** In the present case, the RICO cause of action consists of the following allegation of mail and wire

fraud:

2. RICO and the PSLRA

Defendants Shapiro, Goldberg, McHugh, and Cohn (by reference) argue that Plaintiff's RICO claims against them are preempted by section 107 the Private Securities Litigation Reform Act. (Shapiro, Goldberg, McHugh Dismiss at 18.) Section 107 amended 18 U.S.C. § 1964(c) to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."

Moving Defendants rely primarily on *Bald Eagle Area School District v. Keystone Financial, Inc.,* 189 F.3d 321 (3d Cir.1999), to support their argument that the signing of Form 10-K annual reports cannot form the predicate acts of fraud for a RICO action following the enactment of the PSLRA. In *Bald Eagle Area School District,* investors brought suit against their investment managers alleging securities fraud as the RICO predicate acts. The Third Circuit held that section 107 of the PSLRA prohibited the pleading of conduct that is otherwise actionable as securities fraud as RICO predicate offenses and that, therefore, the RICO action was barred. 189 F.3d 321, 329. In the instant matter, however, Plaintiff did not engage in the purchase or sale of securities nor base its RICO action thereon. Instead, Plaintiff alleges that the 10-Ks were among the fraudulent financial reports and certifications provided to the Fleet Lenders upon which Fleet relied in making credit decisions in continuing to extend credit to DVIFS. While courts have cautioned that defendants should not be permitted to artfully plead around section 107, *see e.g. Gatz v. Ponsoldt,* 297 F.Supp.2d 719, 730 (D.Del.2003), to implicate section 107 in the instant case would stretch the PSLRA beyond its plain meaning that the fraud that may not be relied upon in a RICO action is that which involves "the purchase or sale of securities." 18 U.S.C. § 1964(c) (emphasis added). The parties do not cite, and this Court is not aware of, any cases wherein a plaintiff who had not bought or sold securities brought a RICO action alleging as a predicate offense fraud that was held to be barred as securities fraud preempted by the PSLRA. That an act of fraud could be considered securities fraud where committed in connection with the buying or selling of securities does not mean that where documents such as 10-Ks are supplied, not in connection with securities, but as financial information to a lender, that this is not fraud that may form a predicate act under RICO.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 6
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

Therefore, this Court will not bar Plaintiff's RICO claim on this ground.

### 3. Standing

Defendants Shapiro, Goldberg, McHugh, and Cohn (by reference) further argue that Plaintiff lacks standing to bring its RICO claim. (Shapiro, Goldberg, McHugh Dismiss at 20.) These Defendants argue that this Court should adopt the standard used by the Second Circuit and therefore, that "Fleet must exhaust its collateral remedies in contract and tort " before it can properly bring this action. (*Id.*) Plaintiff maintains that the Second Circuit standard is not applicable and, moreover, even if it was, that Plaintiff has satisfied it.

**\*5** The Second Circuit has held that a RICO injury does not occur until a debt becomes uncollectible and the note holder exhausts his contractual remedies. *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767-68 (2d Cir.1994).* Plaintiff notes, however, that it *has* exhausted its contractual rights against the DVI entities in the bankruptcy court "by ultimately resolving its contract claims in the form of a Support and Option Agreement to which no Defendants were a party or any intended third-party beneficiary." (Pl.'s Opp. at 66.) Moreover, the Third Circuit has stated merely that a plaintiff must at least demonstrate that damages are sufficiently concrete. *Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 246, n. 9 (3d Cir.2001)* (citing *Maio v. Aetna, Inc., 221 F.3d 472 (3d Cir.2000)*). Plaintiff avers that it meets this standard because it has "expressly pled the manner in which DVIFS and DVI breached their contractual agreements ... with Fleet and the various ways in which Fleet's financial losses were concrete and distinct...."

This Court agrees with the Plaintiff. The Support and Option Agreement is the means chosen by Plaintiff to assert, and therefore exhaust, its contractual remedies. Moreover, Plaintiff's Complaint sets forth its concrete financial losses. That Plaintiff may not be able to set forth an exact amount that it might eventually recover under the Support and Option Agreement does not deprive it of standing against the present Defendants. The Court will not dismiss this action for want of standing.

### 4. Sufficiency

The RICO Defendants argue that Plaintiff's Complaint does not sufficiently plead nor plead with sufficient particularity its RICO claim. A review of Plaintiff's Complaint elucidates that it has sufficiently stated a cause of action to survive a Motion to Dismiss. Pages 31-101 of Plaintiff's Complaint allege a massive fraud on the part of the Individual Defendants and the SREs, supported by the Examiner's Report. Pages 102-103 outline the transfer of this fraudulent information via U.S. Mail or wire. Pages 103-104 outline Fleet's allegation of financial institution fraud. Pages 104-105 allege a pattern of racketeering activity. Finally, Plaintiff's Count I at pages 106-109 set forth its specific claims against Fleet.

The specificity with which Fleet outlines its allegations of Defendants' fraudulent acts, some seventy pages, is sufficient to meet the particularity requirements of *Federal Rule of Civil Procedure 9(b)*. Likewise, Plaintiff's allegations of the additional elements to set forth its RICO claim satisfy the notice requirement of Rule 8(a). Therefore, Defendants' Motions to Dismiss are DENIED as to Count I.

### B. Choice of Law as to Common Law Claims

Plaintiff asserts in its Response that Massachusetts law should apply to the common law claims it has asserted because (1) it is a citizen of Massachusetts, (2) damaged in Massachusetts by (3) fraudulent and/or negligent representations made to it in Massachusetts and (4) reasonably relied on by Plaintiff in Massachusetts. [FN9] (Pl.'s Opp. at 111.) Defendants argue that Pennsylvania law should apply because the DVI entities are located in Pennsylvania, most of the Individual Defendants are Pennsylvania citizens and because the allegedly fraudulent conduct took place in Pennsylvania. ( *See e.g.* Cohn Dismiss at 19; PresGar Dismiss at 27; Roberts Dismiss at 24.)

> FN9. Recalling that in deciding a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments, *Jordan v. Fox Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994)*, it is notable that Plaintiff's Complaint alleges only that "Fleet is a national banking association with its principal place of business in Boston, Massachusetts." (Compl.¶ 17.)

**\*6** To determine which state's substantive law

Slip Copy                                                                Page 7
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

applies, the Court applies the conflict rules of the State in which it sits, here Pennsylvania. [FN10] *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assur. Co.,* 584 F.2d 1306, 1308 (3d Cir.1978).* Under Pennsylvania choice of law, the Court must first conduct an "interest analysis" of the policies of the interested states and then, based on the result, characterizes the choice of law problem as a true conflict, false conflict, or unprovided-for case. *Budget Rent-a-Car System, Inc. v. Chappell,* 407 F.3d 166, 170 (3d Cir.2005).* If there is no difference between the laws of the forum state and those of the foreign jurisdiction, "the court may bypass the choice of law issue and rely interchangeably on the law of both states, although presumably the law of the forum state applies." *Liebman v. Prudential Fin., Inc.,* 2003 WL 22741415, at *2 (E.D.Pa. Nov.14, 2003) (citations omitted). A "true conflict" exists where multiple jurisdictions have an interest in the litigation that would be impaired if their law were not applied. *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 & n. 15 (3d Cir.1991). In such a case, the court must determine which state has the greater interest in the application of its law. *Normann v. Johns-Manville Corp.,* 406 Pa.Super. 103, 593 A.2d 890, 893 (Pa.Super.1991).

> FN10. Plaintiff improperly cites *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356 (3d Cir.2004), for the proposition that application of Pennsylvania conflicts of law principles would be proper only where there is diversity jurisdiction-not where, as here, a court is exercising supplemental jurisdiction over state law common law claims. *J.C. Penney Life Insurance,* however, does not stand for such a proposition. *See* 393 F.3d 356, 360 (stating simply: "Where federal jurisdiction is based on diversity of citizenship, as it is here, we apply the choice of law rules of the state in which the District Court sat."). Courts in this District have made clear that whether jurisdiction is pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) or 28 U.S.C. 1367(a) (supplemental jurisdiction) courts should apply the choice of law rules of the forum state. *See Apple Corps. Ltd. v. Button Master, P.C.P., Inc.,* 1998 WL 126935, at *13 n. 15 (E.D.Pa. Mar.19, 1998); *Ramsey v. AT & T Corp.,* 1997 WL 560183, at *2 (E.D.Pa. Aug.27, 1997); *Beckwith v. Medex, Inc.,* 1995 WL 612938, at *3 n. 1 (E.D.Pa. Oct.11, 1995) (all holding that a court

exercising supplemental jurisdiction over state law claims should apply the choice of law rules of the forum state).

In determining which state has the greater interest, Pennsylvania uses a combination of the "government interest" approach and the "significant relationship" approach of Section 145 of the Restatement (Second) of Conflicts. [FN11] *Troxel v. A.I. duPont Inst.,* 431 Pa.Super. 464, 636 A.2d 1179, 1180 (Pa.Super.1994) (citing *Norman v. Johns-Manville Corp.,* 406 Pa.Super. 103, 593 A.2d 890, 893 (Pa.Super.1991)). In doing so, each state's contacts to the litigation must be considered qualitatively rather than quantitatively. *Id.* at 1181; *Norman v. Johns-Manville Corp.,* 593 A.2d at 893. In making its decision, the court must analyze "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *Id.* (citation omitted).

> FN11. The Restatement (Second) of Conflicts § 145 provides:
>
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> The Restatement (Second) of Conflicts § 6 provides:
>
> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
> (a) the needs of the interstate and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

A "false conflict" exists where only one jurisdiction's governmental interest would be impaired by the application of the other jurisdiction's law, in such a case the law of the state that would be harmed must be applied. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170 (3d Cir.1991). In such a case the law of the only interested jurisdiction is applied. *Budget Rent-a-Car System, Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir.2005).

An "unprovided-for case" arises when no jurisdiction's interests would be impaired if its laws were not applied. In that case, the law of the place of the wrong governs. *Id.* (citing *Miller v. Gay*, 323 Pa.Super. 466, 470, 470 A.2d 1353 (Pa.Super.1983)).

As a preliminary point of analysis, faced with a true conflict, the relevant contacts to be taken into account in applying the principles of section 6, pursuant to section 145(2), of the Restatement (Second) of Conflicts include that: (a) the injury occurred in Massachusetts, Fleet's principle place of business (*See* Pl.'s Opp. at 113); (b) the conduct that allegedly caused the injury occurred in Pennsylvania (*See* Cohn Dismiss at 19; Roberts Dismiss at 24; Pl.'s Opp. at 113.); (c) the Plaintiff's principle place of business is located in Massachusetts (Pl.'s Opp. at 111; Compl. ¶ 17), while the DVI entities and most of the Individual Defendants are Pennsylvania citizens (*See* Cohn Dismiss at 19; PresGar Dismiss at 27; Roberts Dismiss at 24; and (d) the place where the relationship between the parties is centered, while difficult to discern, is in Pennsylvania, as the money borrowed pursuant to the Fleet Credit Agreement was used by DVIFS for business purposes in Pennsylvania (*See* Com pl. ¶ ¶ 1-8 (describing DVIFS as a Pennsylvania-based business whose primary purpose was the financing of healthcare equipment purchases with funds provided through lines of credit from banks and lenders in cluding the Fleet-agented syndicate).)

*7 Qualitatively, citizenship and locus of the injury are weaker contacts in this instance. As Plaintiff noted in its complaint, it is acting as agent for an entire syndicate of banks, none of whom, besides Plaintiff, is alleged to be a citizen of Massachusetts. Moreover, Plaintiff is a national bank with substantial operations outside the state of Massachusetts. (*See e.g.* Compl. Exh. B at 25 (defining Fleet's "principle office" as being located in New York).) As such, it cannot be said that Plaintiff was in fact injured more in Massachusetts than it was in New York or any other state in which it operated, nor can it be said that Plaintiff would be justified in an expectation that Massachusetts law would govern any act ions arising out of its relationship with DVI. A much qualitatively stronger contact is the locus of the conduct giving rise to the alleged injury, Pennsylvania, where Defendants engaged in the performance of DVIFS's reporting obligations to Fleet pursuant to the terms of their contractual relationship. Therefore, the Pennsylvania has the greater contacts to the instant litigation.

Moreover, under the factors of section 6, the principles implicated generally favor Pennsylvania. Neither party can be said to have a justified expectation that its state law would apply, having contracted with a party from another state. The considerations of certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied the relevant policies favor Pennsylvania, the forum state. The general policy interests of the states likewise favor Pennsylvania. In this case, Pennsylvania has a interest in regulating injury-causing conduct occurring nonfortuitously within its borders undertaken by its citizens engaged in business within its borders, while Massachusetts has an interest in protecting its citizens from fraud and misrepresentation result ing in damage within the state. Generally, the conflicting state laws at issue evince a policy in Massachusetts of providing its citizens with broad protections from wrongful acts, while Pennsylvania's law demonstrates an interest in more narrowly-tailored standards to ensure that its citizens are not held liable without an appropriate showing of mens rea and corresponding acts.

As a whole, then, the laws of Pennsylvania are favored over those of Massachusetts. This Court will, however, further analyze choice of law issue-by-issue, a process known as *dépeçage*. While the Pennsylvania Supreme Court has not addressed *dépeçage* directly, this Court is guided by other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 9
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

courts that have addressed this issue:

"In the absence of controlling authority from the Pennsylvania Supreme Court, this Court is guided by the interpretation of Pennsylvania choice of law principles articulated by the Court of Appeals for the Third Circuit, which has repeatedly recognized that the choice of law process is issue-specific."

*Manor Care Inc. v. Continental Ins. Co.,* 2003 WL 22436225 at n.5 (E.D.Pa. Oct. 27, 2003) (quoting *Chemetron Inv., Inc. v. Fidelity & Cas. Co. of New York,* 886 F.Supp. 1194, 1199 (W.D.Pa.1994) (citing *Compagnie des Bauxites Guinee v. Argonaut-Midwest Ins. Co.,* 880 F.2d 685, 691 (3d Cir.1989))). This process permits a court to outline the conflicting laws and consider, where articulated, the competing policies underlying a particular area of law, as required by section 6. For the reasons set forth above, however, where no such specific policies have been outlined by the courts and a true conflict exists, Pennsylvania law applies.

**\*8** With this background, the Court turns to the competing state laws at issue. As outlined below, true conflicts exist with regard to Plaintiff's Conspiracy, Aiding and Abetting Fraud, Negligent Misrepresentation, Tortious Interference, and Conversion claims.

1. *Counts II and IV:* Fraud and Aiding and Abetting Fraud

There is no conflict between the laws of Pennsylvania and Massachusetts as they relate to common law fraud. *Compare Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994) (enumerating the elements of common law fraud in Pennsylvania) *with Reisman v. KPMG Peat Marwick LLP,* 965 F.Supp. 165, 172 (D.Mass.1997) (enumerating the elements of common law fraud in Massachusetts). Accordingly, the law of the forum state, Pennsylvania, will be applied.

The law regarding aiding and abetting fraud, however, differs as between Pennsylvania and Massachusetts. The Pennsylvania Supreme Court has never recognized a cause of action for aiding and abetting fraud. *See Klein v. Boyd,* 1996 WL 675554, at \*33 (E.D.Pa. Nov.19, 1996); *S. Kane & Son Profit Sharing Trust v. Marine Midland Bank,* 1996 WL 325894, at \*9 (E.D.Pa. June 13, 1996). In Massachusetts, "liability for aiding and abetting a tort attaches where: (1) the defendant provides 'substantial assistance or encouragement to the other

party;' and (2) the defendant has 'unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions.'" *Austin v. Bradley, Barry & Tarlow, P.C.,* 836 F.Supp. 36, 40 (D.Mass.1993) (citations omitted).

Both states have an interest in having their laws applied in this instance, therefore a true conflict exists. As discussed above, Pennsylvania has a interest in regulating conduct occurring nonfortuitously within its borders undertaken by its citizens engaged in business within its borders, while Massachusetts has an interest in protecting its citizens from fraud and misrepresentation resulting in damage within the state. Neither state, however, has elucidated a specific policy reason why it does or does not permit claims of aiding or abetting fraud. Applying the conclusions reached by this court, above, then, Pennsylvania law applies.

2. *Counts III, X, and XIII:* Conspiracy to Commit Fraud, Conspiracy to Commit Tortious Interference with Contract, and Conspiracy to Commit Conversion

The laws regarding conspiracy are not the same in Pennsylvania and Massachusetts. Although the basic elements of civil conspiracy are the same in both states, Pennsylvania law further requires proof of "malice or intent to injure." *Compare Becker v. Chicago Title Ins. Co.,* 2004 WL 228672, at \*13 (E.D.Pa. Feb.4, 2004) (stating that conspiracy requires 1) "a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;" 2) "an overt act done in pursuance of the common purpose;" 3) "actual legal damage" and 4) malice or intent to injure, found only "when the sole purpose of the conspiracy is to cause harm to the party who has been injured") *with Johnson v. Brown & Williamson Tobacco Corp.,* 122 F.Supp.2d 194, 208 (D.Mass.2000) (citations omitted) (stating that conspiracy requires "1) a common design or agreement between the defendants to commit a wrongful act, and 2) a tortious act done in furtherance of their plan"). Moreover, in cases involving coercion, Massachusetts, unlike Pennsylvania, permits a claim for conspiracy where no underlying tort is otherwise pled. *Kurker v. Hill,* 44 Mass.App.Ct. 184, 689 N.E.2d 833, 836-37 (Mass.App.Ct.1998).

**\*9** Again, while Massachusetts' law regarding conspiracy evinces a policy of providing its citizens

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 10
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

with broad protections from concerted wrongful acts, Pennsylvania's malice requirement demonstrates an interest in a more narrowly-tailored standard to ensure that its citizens are not held liable without an appropriate showing of mens rea and a corresponding act. This is a true conflict. For the reasons stated above in subpart 2, *supra,* Pennsylvania law applies.

### 3. *Counts V-VII:* Breach of Fiduciary Duty

The parties agree that Delaware law, the state of DVI's incorporation, applies to Plaintiff's breach of fiduciary duty claims. (*See e.g.* Roberts Dismiss at 36; Shapiro, Goldberg, McHugh Dismiss at 30 n. 16; Cruikshank Dismiss at 17; Plaintiff's Response at 45-49.) Indeed, breaches of fiduciary duties that involve the internal affairs of a Delaware corporation are controlled by Delaware law. *See Coleman v. Taub, 638 F.2d 628, 629 n. 1 (3d Cir.1981)* (citations omitted).

### 4. *Count VIII:* Negligent Misrepresentation

Pennsylvania and Massachusetts law differ on claims of negligent misrepresentation. Although both states draw upon Section 552 of the Restatement (Second) of Torts, Pennsylvania law bars claims of negligent misrepresentation that seek to recover for purely economic losses, while Massachusetts recognizes an exception to the so-called economic loss doctrine for claims of negligent misrepresentation. *Compare David Pflumm Paving & Excavating, Inc. v. Foundation Servs. Co., 816 A.2d 1164, 1171 (Pa.Super.2003)* ("the economic loss doctrine bars claims under Section 552 which result in solely economic loss") *with Josefek v. Loitherstein Envtl. Eng'g, Inc., 2004 WL 3218004, at *2 (Mass.Super.2004)* ("While it is true that Massachusetts applies the economic loss doctrine and prohibits purely pecuniary recovery in tort absent personal or property damage, the Commonwealth has adopted an exception that permits recovery for pecuniary losses resulting from negligent misrepresentation.").[FN12]

FN12. Notably, however, the Pennsylvania Supreme Court recently adopted an exception from the economic loss doctrine "where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that

the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." *Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 287 (Pa.2005).* In doing so, the Court cited *Nota Construction Corp. v. Keyes Assoc., 45 Mass.App.Ct. 15, 694 N.E.2d 401 (Mass.App.Ct.1998). See Bilt-Rite, 866 A.2d at 284-85.* Because the Court stressed the narrowness of its holding, this Court concludes that the exception recognized in *Bilt-Rite* does not apply in the instant case.

Pennsylvania has clearly articulated its interest in the application of the economic loss doctrine in claims of negligent misrepresentation, stating that it

reflects the concern that tort law (unlike contract law) is not generally intended to compensate parties for losses suffered as a result of a breach of duties which are assumed only by agreement; to recover in tort, there must be a breach of a duty of care imposed by law and a resulting injury.

*Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 273 (Pa.2005).* The policy underlying the exception to the economic loss doctrine, by contrast, is the recognition that reliance upon a negligent misrepresentation by a party not in privity with the maker of the misrepresentation may be both justified and foreseeable.

Here, Pennsylvania has an interest in protecting its citizens from liability in a situation that the Pennsylvania courts would likely view as a mischaracterization of DVI's potential breaches of its contractual duties to Fleet as negligent misrepresentations by the Individual Defendants. Such a scenario is precisely what the Pennsylvania law seeks to avoid. Given the strength of this policy reason, and for the reasons elucidated above, Pennsylvania law applies.

### 5. *Counts IX:* Tortious Interference with Contract

**\*10** While the elements of tortious interference are substantially similar in both Pennsylvania and Massachusetts, *compare Pawlowski v. Smorto, 403 Pa.Super. 71, 588 A.2d 36, 39-40 (Pa.Super.1991) with Kelley v. LaForce, 288 F.3d 1, 13 (1st Cir.2002),* under Pennsylvania law, agents, officers and directors of a corporation cannot be held liable for

tortious interference with the corporation's contracts. *Michelson v. Exxon Research and Eng'g Co.,* 808 F.2d 1005, 1007-08 (3d Cir., 1987); *Nix v. Temple Univ.,* 408 Pa.Super. 369, 596 A.2d 1132, 1137 (Pa.Super.Ct.1991). For the reasons discussed, *supra,* Pennsylvania law applies.

### 6. *Counts XII:* Conversion

The elements of a claim for conversion under Pennsylvania Law are: (1) the deprivation of another's right in, or use or possession of, property, (2) without the owner's consent, and (3) without lawful justification. *Joyce v. Alti America, Inc.,* 2001 WL 1251489, at *5 (E.D.Pa.2001) (citations omitted). In Massachusetts the elements of conversion require an intentional or wrongfully exercised act of ownership, control or dominion over personal property to which a defendant has no right of possession at the time. *Bleicken v. Stark,* 61 Mass.App.Ct. 619, 813 N.E.2d 572, 576 n. 2 (Mass.App.Ct.2004) (citations omitted). Despite these similarities, however, Pennsylvania law, unlike Massachusetts law, requires that a conversion defendant actually appropriate property for her own use. *Chrysler Credit Corp. v. Smith,* 434 Pa.Super. 429, 643 A.2d 1098, 1100 (Pa.Super.Ct.1994). As discussed above, Pennsylvania law applies.

### 7. *Count XIV:* Unjust Enrichment

There is no conflict between the laws of Pennsylvania and Massachusetts regarding claims of unjust enrichment. *Compare Bunnion v. Consol. Rail Corp.,* 108 F.Supp.2d 403, 427 (E.D.Pa.1999) *with Hessleton v. BankNorth, N.A.,* 2004 WL 1588255, at *3 (Mass.Super. May 11, 2004). Therefore, the law of Pennsylvania, the forum state, applies.

### C. *Counts II-IV:* Fraud, Conspiracy to Commit Fraud, and Aiding and Abetting Fraud

### 1. Fraud

Defendants argue that Count II of Plaintiff's Complaint does not allege with the necessary particularity under Federal Rule of Civil Procedure 9(b) the elements of a fraud claim under Pennsylvania law, which are: (1) a material misrepresentation; (2) made with scienter; (3) resulting in justifiable reliance by a plaintiff thereon;

and (4) damages. *See* Fed.R.Civ.P. 9(b) (requiring that averments of fraud be made with particularity); *Booze v. Allstate Ins. Co.,* 750 A.2d 877, 800 (Pa.Super.2000) (citing *Hammer v. Nikol,* 659 A.2d 617, 620 (Pa.Commw.Ct.1995)). [FN13] In addition, Defendants object to the use of so-called "group pleading" to attribute fraud to the individual Defendants, given Rule 9(b)'s particularity requirement. (*See e.g.* Goldenberg Dismiss at 12-15; Colasanti Dismiss at 14.) Defendants further argue that the "gist of the action" doctrine and the "economic loss" doctrine bar Plaintiff's claim. (*See e.g.* Cruikshank Dismiss at 11-13; O'Hanlon Dismiss at 10-13.)

> FN13. Defendant Philip Jackson does not put forth an argument to dismiss Count II.

**\*11** A review of the Complaint elucidates that the following Individual Defendants are not alleged to have made any misrepresentations, either by signing a materially misleading document or making a misleading statement: Turek, Cady, Colisanti, Fear, Miller, Goldenberg and Cruikshank. [FN14] Plaintiff asserts that these Defendants are liable for statements made because they "knew that the fraudulent misrepresentations were false when made and intended that Plaintiff would be induced by such false and fraudulent representations to cause Plaintiff to lend DVIFS more money...." (Compl.¶ 408.) Such general or "group" pleading is not sufficient to maintain a cause of action under the requirements of Rule 9(b). Therefore, Count II is DISMISSED as to Defendants Turek, Cady, Colisanti, Fear, Miller, and Goldenberg.

> FN14. With regard to Defendant Cruikshank, the Complaint does allege that some Borrowing Notices were signed "in prior years" by Defendant Cruikshank. (Compl.¶ 90.) This alone, however, is not sufficient under Rule 9(b) to allege a misstatement.

Defendants Cruikshank and O'Hanlon argue that the "gist of the action" doctrine bars Fleet's claim for fraud. Under Pennsylvania law, tort claims, including fraud, predicated entirely upon the contractual relationship of the parties are not viable causes of action. *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 (3d Cir.2002); *Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc.,* 123 F.Supp.2d 826 (E.D.Pa.2000). To determine if the alleged tort

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 12
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

committed in the course of carrying out a contractual agreement is merely a "breach of contract claim in disguise" and thus not-actionable courts examine the claim to assess whether the "gist of the claims sounds in contract or tort." *Caudill Seed and Warehouse Co., Inc., 123 F.Supp.2d at 833 (E.D.Pa.2000)*. As articulated by this Court, "a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." *Id.* (citations omitted); *Quorum Health Resources, Inc.,* 49 F.Supp.2d at 432 (E.D.Pa.1999). The test adopted by Pennsylvania courts to characterize the "gist" of a claim looks to the source of the duty imposed on the parties. *Id.* Mutual consensus imposes a duty on the parties in a contract claim while a party's duty in a tort action is imposed as a matter of social policy. *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir.2001)* (adopting Pennsylvania state courts' interpretation that the important difference between contract and tort actions is that the latter stems from the breach of duties imposed as a matter of social policy, while the former stems from the breach of duties imposed by mutual consensus). Here, however, the Individual Defendants were not party to the contract and Defendants O'Hanlon and Cruikshank cite no authority for the proposition that they, as nonparties to the contract, are subject to the gist of the action doctrine. Moreover, Plaintiff's claim does sound in tort. While DVI may have breached its contract with the Fleet lenders when its financial situation deteriorated and fell below the requirements of the credit agreement (Compl.Exh. B.), the Individual Defendants' alleged perpetration of an improper scheme to hide that fact -for reasons above and beyond its relationship with the Fleet lenders-is totally separate from the agreement itself. Therefore, the gist of the action doctrine does not bar Plaintiff's fraud claim.

**\*12** Because this Court concludes, above, that Plaintiff's fraud claim is based in tort, it need not address Defendants' "economic loss doctrine" claims.

Plaintiff has, with regard to the remaining Individual Defendants, adequately pled fraud. While Pennsylvania law does require a material misrepresentation to set forth a prima facie cause of action, all Defendants against whom Plaintiff asserts Count II are Defendants who, as discussed above, are alleged to have made a misstatement. Therefore, remaining Defendants' Motions to Dismiss Plaintiff's claims for common law fraud are DENIED.

2. Conspiracy to Commit Fraud

To make out a claim for common law civil conspiracy under Pennsylvania law, Plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Chantilly Farms, Inc. v. W. Pikeland Twp., 2001 WL 290645, at \*12 (E.D.Pa. Mar.23, 2001)* (quoting *Smith v. Wagner, 403 Pa.Super. 316, 588 A.2d 1308, 1311-12 (Pa.Super.1991)*). "Proof of malice, i.e., an intent to injure, is an essential proof of a conspiracy." *Skipworth v. Lead Industries Ass'n, Inc., 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997)* (citation omitted). The element of malice requires a showing that "the sole purpose of the conspiracy is to cause harm to the party who has been injured." *Becker v. Chicago Title Ins. Co., 2004 WL 228672, at \*13 (E.D.Pa. Feb.4, 2000)* (citing *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (Pa.1979)*).

Defendants argue that (1) Plaintiff has failed to plead a prima facie case with particularity; (2) Plaintiff has failed to make specific allegations that Defendants acted with the required "malicious intention" solely to injure Plaintiff; (3) a corporation cannot conspire with its employees and agents; and (4) the conspiracy count must be dismissed because the underlying tort must be dismissed.

In light of the finding, below, that Plaintiff did not sufficiently allege that the sole purpose of the conspiracy was to harm the it, the Court does not reach Defendants' other objections.

In *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466 (Pa.1979)* the Supreme Court of Pennsylvania held that where the facts show that a person acted to advance his own business interests, those facts constitute justification and negate any alleged intent to injure. Likewise, here, Plaintiff's Amended Complaint makes clear that the Defendants' purpose in entering into the alleged conspiracy was to enable DVI to raise new capital to fund its growth, to avoid an adverse impact on DVI's reported financial condition, and to insure its continued access to the Securitizations market and the Fleet line of credit. The fact that it may have been necessary to deceive Plaintiff in order to carry out their scheme in no way indicates that they acted with malice solely to injure Plaintiff. Therefore, the Defendants' Motions to Dismiss are GRANTED with regard to Count III for Civil Conspiracy to Commit Fraud.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 13

### 3. Aiding and Abetting Fraud

**\*13** Defendants argue, and Plaintiff admits, that no Pennsylvania court has recognized a cause of action Aiding and Abetting Fraud.

This Court follows the lead of the majority of other courts in this district, in declining to expand Pennsylvania law, and holds that the Pennsylvania Supreme Court would not permit such an action. *See Klein v. Boyd, 1996 WL 675554, at \*33 (E.D.Pa. Nov.19, 1996); S. Kane & Son Profit Sharing Trust v. Marine Midland Bank, 1996 WL 325894, at \*9 (E.D.Pa. June 13, 1996).* Therefore, Defendants' Motions to Dismiss are GRANTED with respect to Count IV, which is hereby DISMISSED.

### D. *Counts V-VII*: Breach of Fiduciary Duty, Breach of Fiduciary Duty, and Breach of Fiduciary Duty-Failure to File for Bankruptcy Protection Earlier

As discussed above, Delaware law applies to Counts V-VII. Under Delaware law, directors owe fiduciary duties to creditors when an entity is in the zone of insolvency. *Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del.Ch.1992).* Defendants contend that Plaintiff's Breach of Fiduciary Duty claims must be dismissed because (1) Defendants have not engaged in self-dealing; (2) DVI's Restated Certificate of Incorporation contains an exculpatory provision that shelters the Defendants from the duty of care claims; (3) Fleet has not overcome the protections of the business judgment rule; and (4) Fleet misconstrues the duty owed by a creditor. In addition, Defendants Goldenberg and Colisanti argue that they cannot be held liable because they were not officers or directors of DVI or DVIFS. Finally, Defendant Cruikshank argues that Fleet has not alleged that DVI was insolvent or in the zone of insolvency prior to her departure in 2001. (Cruikshank Dismiss at 19.) Plaintiff asserts that none of the Defendants' objections are valid because its claims are for direct, rather than derivative, harm.

As set forth below, this Court concludes that Plaintiff's Breach of Fiduciary Duty Claims are derivative, not direct, and do not overcome the exculpatory provision of the DVI Certificate of Incorporation nor the presumptions of the Business Judgment Rule. Therefore the Court need not reach the Defendants' remaining arguments.

### 1. Direct versus Derivative claims by Creditors

A creditor's right to maintain an action for breach of fiduciary duty arises when a director of an insolvent corporation, through a breach of fiduciary duty, injures the corporation itself. In that case, the claim against the director for breach of fiduciary duty belongs to the corporation, but the class of persons who may press the fiduciary claim derivatively expands, to include creditors of the corporation. *Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 792-93 (Del.Ch.2004).* However, the Delaware Chancery Court has explained that there may be some circumstances wherein when a firm is insolvent, not only do the directors take on a fiduciary relationship to the company's creditors, but there might possibly exist "circumstances in which the directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor." *Id.* Fleet relies on this statement in bringing its breach of fiduciary duty claims.

**\*14** In finding that a direct fiduciary duty claim might exist, the court in *Production Resources Group* explained the alleged wrongdoing as follows,

the complaint alleges that the NCT board has: 1) not convened an annual stockholder meeting for several years; 2) caused NCT to issue or pledge billions of shares more than are authorized by its charter; 3) permitted Salkind [NCT's primary creditor and wife of a former director] to obtain liens on the assets of the corporation; 4) retained no less than 8 companies affiliated with Salkind under substantial consulting contracts while refusing to cause the company to pay its [5 year old] debt to PRG; 5) placed funds from Salkind into a company subsidiary, rather than NCT itself, in order to avoid collection efforts by PRG; and 6) paid substantial salaries and bonuses to Parrella and Lebovics [NCT's CEO and President, respectively] while refusing to cause the company to pay its debt to PRG.

*Id.* at 799-800. The court concluded that these facts "raise a sufficient inference of scienter to fall outside the reach of the exculpatory charter provision especially given the extreme financial distress NCT has been suffering for several years." *Id.* at 799. And concluded that "[t]his strange method of proceeding is suggestive of self-interest on the part of Salkind, Parrella, and Lebovics and of bad faith on the part of the NCT board members who are putatively independent." *Id.* at 800.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

Page 14

*Production Resources Group,* however, is readily distinguished from the facts before this Court. Indeed, the court in *Production Resources Group* stressed multiple times the unusual and particularized facts that gave rise to its holding.

The court in *Production Resources Group* based its conclusion that Plaintiff's direct breach of fiduciary duty claim survived the motion to dismiss on the fact that "NCT's board has taken particular steps to disadvantage PRG as a creditor and to frustrate its efforts at collection." The court concluded that "[i]n view of the odd facts pled and the flavor of self-dealing they generate, [the court is] not prepared to rule out the possibility that PRG can prove that the NCT board has engaged in conduct towards PRG that might support a direct claim for breach of fiduciary duty by it as a particular creditor" where "NCT breached specific promises made to PRG and has taken steps to accept new capital in a manner that was intentionally designed to hinder PRG's effort to obtain payment." *Id.* (emphasis added). The court raised "the legitimate concern that the NCT board is not pursuing the best interests of NCT's creditors as a class with claims on a pool of insufficient assets, but engaging in preferential treatment of the company's primary creditor and de facto controlling stockholder (and perhaps of its top officers, who are also directors) without any legitimate basis for the favoritism." *Id.*

In the case before this Court, Plaintiff does assert that Merrill Lynch was given preferential treatment as a creditor. However, Plaintiff does not make allegations of self-dealing or allege that these actions were "intentionally designed to hinder [Fleet's] effort to obtain payment." *Id.* Because Fleet does not established the facts upon which the *Production Resources Group* court relied in permitting a direct claim, Fleet's breach of fiduciary duty claims must proceed derivatively and, therefore, fail.

### 2. Exculpatory Charter Provision

**\*15** The Individual Defendants argue that DVI's certificate of incorporation contained an exculpatory charter provision established pursuant to 8 Del. C. § 102(b)(7) (authorizing a certificate of incorporation to contain "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director...."). However, "[o]nly claims of the corporation asserted derivatively by

creditors fall within the charter defense." *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 794 (Del.Ch.2004). An exculpatory charter provision does not protect directors from liability for various acts of disloyalty towards the firm. "Thus, to the extent that directors have engaged in conscious wrongdoing or in unfair self-dealing, the exculpatory charter provision does not insulate them from fiduciary duty claims asserted on the firm's behalf by creditors." *Id.* at 397. *See* 8 Del. C. § 102(b)(7) (prohibiting exculpation for a variety of faithless acts including "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under section 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.").

Plaintiff does not deny that an exculpatory clause exists, but instead argues that under *Production Resources Group* it does not apply. Because this Court concluded, above, that Plaintiff may not bring a "direct" breach of fiduciary duty claim, the rationale suggested in *Production Resources Group* does not apply. However, because, as noted above "affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)" we consider the other grounds on which Plaintiff's claim fail. As set forth below, Plaintiff has not made such a showing of bad faith or self-dealing as to exempt the conduct of the Defendants from the exculpatory clause.

### 3. The Business Judgment Rule and Self Dealing

Under Delaware law, the business judgment rule "is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *In re: Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir.2005) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). Therefore, Plaintiff must plead that it overcomes the presumption created by that rule-that DVI's directors and officers acted in good faith and on an informed basis. *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 286 (Del.Ch.2003).

Delaware courts have said that overcoming the presumptions of the business judgment rule may be accomplished by showing either irrationality or inattention. A plaintiff may overcome the presumption that directors and officers acted in good faith by establishing that a decision was so egregious

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 15
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

as to constitute corporate waste. *In re: Tower Air, Inc., 416 F.3d at 238* (citing *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1053 (Del.Ch.1996)*). To show irrationality a plaintiff must demonstrate that no reasonable businessperson could possibly authorize the action in good faith, such that the only explanation is bad faith. *Id.* Alternatively, a plaintiff may overcome the presumption that directors and officers acted on an informed basis by establishing that a decision was the product of an irrational process or that directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance, resulting in liability. *In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967-70 (Del.Ch.1996)*. According to the Third Circuit, "[V]iewing these methods along a different axis, action may lead to liability where the action or the process that led to it were irrational; inaction may lead to liability where no red flag monitoring system is installed and non-compliance with applicable legal standards results." *In re: Tower Air, Inc., 416 F.3d at 239*.

**\*16** To overcome the presumption of the business judgment rule, then, Plaintiff must allege bad faith, self dealing, waste, or irrationality. Plaintiff has sufficiently demonstrated none of these. Plaintiff does not deny that it has made no allegations of self dealing. And, instead, mistakenly argues that Defendants must make an affirmative evidentiary showing that they properly exercised their business judgment. (Pl.'s Opp. at 55.) Plaintiff also misconstrues the nature of fiduciary duty in insolvency. Plaintiff argues that Defendants must demonstrate that they made decisions for the benefit of the creditors. As discussed above and in *Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772 (Del.Ch.2004)*, except in the limited circumstance set forth in *Production Resources Group,* officers and directors *always* owe a fiduciary duty to the corporation. Insolvency merely widens that circle of potential plaintiffs who may bring a derivative claim to include creditors. As *Production Resources Group* makes clear, it does not transfer the duty once owed to the corporation over to the creditors. Nor does it place an affirmative burden on officers and directors that reverses the presumption of the business judgment rule.

Generally, affirmative defenses such as the business judgment rule and the exculpatory clause do not trigger dismissal of a complaint under Rule 12(b)(6), unless an unanswered affirmative defense appears on

its face. *Id.* Here, however, Plaintiff does not directly deny those affirmative defenses. Because this Court concludes that Plaintiff's Breach of Fiduciary Duty Claims are derivative and do not overcome the exculpatory provision of the DVI Certificate of Incorporation nor the presumptions of the Business Judgment Rule, Counts V, VI, and VII are hereby DISMISSED.

**E.** *Count VIII:* Negligent Misrepresentation

Defendants argue that the economic loss doctrine bars this claim. Plaintiff contend that under the Pennsylvania Supreme Court's decision in *Bilt-Rite Contractors, Inc. v. The Architectural Studio,* 866 A.2d 270,287 (Pa.2005), it can maintain its negligent misrepresentation claim. Plaintiff does not deny, however, that its losses are purely economic.

**1. The Economic Loss Doctrine**

Pennsylvania law generally bars claims of negligent misrepresentation that seek to recover for purely economic losses. *David Pflumm Paving & Excavating, Inc. v. Foundation Servs. Co., 816 A.2d 1164, 1171 (Pa.Super.2003)* ("the economic loss doctrine bars claims under Section 552 which result in solely economic loss"). As stated above, the doctrine
reflects the concern that tort law (unlike contract law) is not generally intended to compensate parties for losses suffered as a result of a breach of duties which are assumed only by agreement; to recover in tort, there must be a breach of a duty of care imposed by law and a resulting injury.

*Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 273 (Pa.2005)*.

**\*17** Recently, in *Bilt-Rite,* the Pennsylvania Supreme Court adopted an exception from the economic loss doctrine "where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." *Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 866 A.2d 270, 287 (Pa.2005)*. In *Bilt-Rite,* a general contractor sued an architect for alleged negligent misrepresentations in plans and specifications upon which the contractor relied in submitting the winning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

bid for construction of a school. This holding recognized that reliance upon a negligent misrepresentation by a party not in privity with the maker of the misrepresentation is both justified and foreseeable in the particular context. Because the Court stressed the narrowness of its holding, and the parties do not contend that Defendants are "in the business of providing information" this Court concludes that the *Bilt-Rite* is not applicable in the instant case. Accordingly, Plaintiff's Negligent Misrepresentation claim is DISMISSED.

F. *Counts IX-X:* Tortious Interference with Contract and Conspiracy to Commit Tortious Interference with Contract

Defendants argue that (1) Fleet's claim is barred by its loan agreement with DVIFS because DVIFS cannot tortiously interfere with a contract to which it is a party and officers are deemed to act on behalf of the corporation; (2) Fleet has not adequately pled malice; and (3) Fleet has failed to allege any intentional act by the Defendants.

In order to prevail on a claim for intentional interference with contractual relations under Pennsylvania law, a plaintiff must prove: (1) existence of a contractual relation bet ween itself and a third party; (2) purposeful action on the part of defendant, specifically intended to harm existing relation; (3) absence of privilege or justification on part of defendant; (4) occasioning of actual legal damage as result of defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that relationship would have occurred but for the interference of defendant. Restatement (Second) of Torts § 768; *Pelagatti v. Cohen, 370 Pa.Super. 422, 536 A.2d 1337, 1343 (1988).*

Under Pennsylvania law, agents officers and directors of a corporation cannot be held liable for tortious interference with the corporation's contracts. *See Nix v. Temple Univ., 408 Pa.Super. 369, 596 A.2d 1132, 1137 (Pa.Super.1991).* The only exception arises if the officer's sole motive in causing the corporation to breach the contract is actual malice directed toward the Plaintiff or the officer's conduct is against the interest of the corporation. *American Trade Partners, L.P. v. A-I International Importing Enterprises, Inc., 757 F.Supp. 545, 555 (E.D.Pa.1991); Avins v. Moll, 610 F.Supp. 308, 318 (E.D.Pa.1984).*

**\*18** Plaintiff does not outline what "purposeful action" each Defendant took that was "specifically intended to harm existing relation." Nor does it allege malice as the Individual Defendants' sole motive. (*See* Compl.) Therefore, Count IX, Tortious Interference with Contract is DISMISSED. Likewise, Count X, Conspiracy to Commit Tortious Interference with Contract is DISMISSED. *See Boyanowski v. Capital Area Intermeiate Unit,* 215 F.3d 395, 405-06 (3d Cir.2000) (holding that "when a party fails to sufficiently allege in other counts any unlawful act or unlawful means, the conspiracy claim must also fail").

G. *Count XI:* Violation of Mass. Gen. Laws Ch. 93A, Sec. 11

Section 11 of the Massachusetts Consumer Protection Act provides a remedy to:
Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice....

However, the Act further provides that:No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Mass. Gen. Laws. Ch. 93A, § 11. As discussed above, Massachusetts' contacts to the instant litigation are tenuous. Plaintiff has not demonstrat ed that the alleged culpable behavior occurred primarily and substantially within Massachusetts. Therefore, Plaintiff's claim under the Consumer Protection Act is DISMISSED.

H. *Counts XII-XIII:* Conversion and Conspiracy to Commit Conversion

Conversion is a deprivation, by a defendant, of a plaintiff's right to a chattel or an interference with a plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification. *Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 581-*

Slip Copy                                                    Page 17
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

82 (Pa.Super.2003) (citing *Chrysler Credit Corporation v. Smith,* 434 Pa.Super. 429, 643 A.2d 1098, 1100 (Pa.1994)). "A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion." *Id.* Money may be the subject of conversion. *Francis J. Bernhardt, III, P.C. v. Needleman,* 705 A.2d 875, 878 (Pa.Super.1997) (quoting *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (Pa.Super.1987)). However, the failure to pay a debt is not conversion. *Id.*

As discussed above, the gist of the action doctrine does not bar Plaintiff's claims as they properly sound in tort. However, Plaintiff's Complaint does not allege that any of the Defendants appropriated the lenders' property for their own use. Therefore, Plaintiff's Conversion and Conspiracy to Commit Conversion claims are DISMISSED.

                I. *Count XIV:* Unjust Enrichment

**\*19** Under Pennsylvania law the elements of an unjust enrichment claim are: (1) the plaintiff conferred benefits upon the defendant; (2) the defendant realized those benefits; and (3) the defendant accepted and retained the benefits under circumstances in which it would be inequitable for it to retain them without payment of value. *Bunnion v. Consolidated Rail Corp.,* 108 F.Supp.2d 403, 427 (E.D.Pa.1999) (citing *Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328 (Pa.Super.1995)).

Plaintiff fails to allege facts establishing any of the required elements for a claim of unjust enrichment, therefore its claim fails.

                        V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED with respect to Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XIV; DENIED with respect to Count I; GRANTED in part with respect to Count I as to Defendants Turek, Cady Colisanti, Fear, Miller, Goldenberg, and Cruikshank; and DENIED in part with respect to Count I as to Defendants O'Hanlon, Garfinkel, Boyle, Cohn, Shapiro, Goldberg, Roberts, McHugh, and Jackson. An appropriate order follows.

                            ORDER

AND NOW, this 12th day of September, 2005, upon consideration of Defendants' Motions to Dismiss (Doc. Nos. 72, 74, 75, 79, 80, 81, 82, 83, 85, 86, 87, 89, 91, 111, and 112) and Plaintiff's Amended Omnibus Response in Opposition (Doc. No. 125), it is hereby ORDERED that Defendants' Motions to Dismiss are GRANTED in part and DENIED in part. It is further ORDERED as follows:
1. Defendants' Motions to Dismiss Count I of the Complaint are DENIED;
2. Defendants' Motions to Dismiss Count II of the Complaint are GRANTED as to Defendants Turek, Cady Colisanti, Fear, Miller, Goldenberg, and Cruikshank;
3. Defendants' Motions to Dismiss Count II of the Complaint are DENIED as to Defendants O'Hanlon, Garfinkel, Boyle, Cohn, Shapiro, Goldberg, Roberts, McHugh, and Jackson;
4. Defendants' Motions to Dismiss Counts III-XIV of the Complaint are GRANTED;

The Clerk of Court is hereby directed to terminate the pending Motions to Dismiss (Doc. Nos. 72, 74, 75, 79, 80, 81, 82, 83, 85, 86, 87, 89, 91, 111, and 112) in this matter.

E.D.Pa.,2005.
Fleet Nat. Bank v. Boyle
Slip Copy, 2005 WL 2455673 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3134907 (Trial Pleading) Answer of Defendant Anthony J. Turek to Plaintiff's First Amended Complaint (Oct. 28, 2005)
• 2005 WL 3134901 (Trial Pleading) Answer of Defendant Presgar Imaging, Lc to Plaintiff's First Amended Complaint (Oct. 26, 2005)
• 2005 WL 3134905 (Trial Pleading) Defendant Radnet Management, Inc.'s Answer to Plaintiff's First Amended Complaint Answer (Oct. 26, 2005)
• 2005 WL 2849915 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of Nathan Shapiro, William S. Goldberg and John E. Mchugh for Reconsideration of Memorandum and Order Dated September 12, 2005 Or, in the Alternative, for Certification for Appeal Pursuant to 28 U.S.C. | 129 2(b) Concerning the Application of the Pslra to the Rico Claims (Sep. 26, 2005)
• 2005 WL 2849916 (Trial Motion, Memorandum and Affidavit) Plaintiff Fleet National Bank's Motion for Partial Reconsideration With Application for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2455673 (E.D.Pa.)
**(Cite as: Slip Copy)**

Certification of Interlocutory Appeal of the Court's
Order and Opinion Dated September 12, 2005 (Sep.
26, 2005)
• 2004 WL 2696049 (Trial Pleading) First Amended
Complaint (Sep. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                      Page 1
Not Reported in A.2d, 2005 WL 1953091 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
MARTINEZ
v.
GASTROENTEROLOGY ASSOCIATES
No. Civ.A. 04C-06-018THG.

Submitted May 20, 2005.
Decided July 5, 2005.

Dear Counsel:

GRAVES J.

**\*1** On July 30, 1997, Dr. Oscar J. Martinez
(hereinafter "Dr. Martinez") executed an employment
agreement in connection with his employment with
Gastroenterology Associates, P.A. (hereinafter
"GA"). Dr. Martinez began work on August 1, 1997
and remained a treating physician with GA until
December 31, 1999, when he retired and terminated
the employment agreement. On August 6, 2002, Dr.
Martinez requested that his final compensation under
the Agreement be paid to him. Later that month, GA
informed Dr. Martinez that no final compensation
was due to him.

On June 15, 2004, Dr. Martinez instituted this civil
action against GA seeking the final compensation
payment. In his pleadings, Dr. Martinez claims that
the failure of GA to make this final payment
constitutes a violation of the Delaware Wage
Payment and Collection Act. The Act requires final
payment to be made within 180 days of a former
employee's departure and the failure to make such
payment may warrant the application of liquidated
damages. Dr. Martinez also contends that the failure
to pay his "termination payment" is a violation of
Paragraph 16 of the employment agreement between
the parties.

GA contends that Dr. Martinez has not timely filed
this action for recovery of wages. According to the
Act, claims for unpaid wages must be made within
one year of the employer's failure to make payment.
10 Del. C. § 8111. GA requests that this Court grant
summary judgment based on Dr. Martinez's failure to
comply with the statute of limitations. For the
following reasons, the motion is GRANTED.

Dr. Martinez argues that the one year statute of
limitation requirement should not apply to this action
because the payment he is seeking does not constitute
wages or compensation as contemplated by the Act.
Wages are defined as "compensation for labor or
services rendered by an employee, whether the
amount is fixed or determined on a time, task, piece,
commission, or other basis of calculation." 19 Del. C.
1101(a)(2). Dr. Martinez contends that the
termination payment he seeks should not be
considered wages because it is not compensation paid
by his employer, but rather fees collected from the
services he provided to patients. This argument
seems to place professional pay, like doctor fees, in a
category apart from conventional wages collected by
employees. Dr. Martinez also contends that since the
employment agreement classifies the final payment
as "termination payment", then it should not be
considered compensation, but a separate payment
outlined by the employment contract. The Court is
not persuaded by either of these arguments.

When Dr. Martinez agreed to become a member of
GA's practice group, he agreed to the pay
arrangement used by that office. That pay
arrangement takes the fees paid by patients and
insurers, filters them through the practice and pays
the doctors a predetermined percentage. The fact that
the fees originated from individuals instead of a
company, or that the services Dr. Martinez provided
are of a professional nature does not change their
classification was wages. Because the payment Dr.
Martinez is seeking is directly related to the fees paid
by his patients for his services, the compensation will
be considered wages and the Wage Act will apply.
This is consistent with this Court's recent decision in
*Swier v. Del. Bay Surgical Servs.,* 2004 Del.Super.
LEXIS 395 (Del.Super.Ct., 2004).

**\*2** Second, the employment agreement sets forth the
compensation arrangement that governs departures
from the practice. The payments contemplated by
Paragraph 16(b) of the employment agreement are a
percentage of the accounts that are paid which are
attributable to Dr. Martinez's services. The
arrangement recognizes that in the medical practice,
billings for medical services rendered may take many
months to be processed and paid. The fact that the
employment agreement allows a practitioner to
collect the money due for his services, despite the
backlog in payment collections, does not remove the

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2005 WL 1953091 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

compensation from being considered wages. The monies that Dr. Martinez is attempting to collect are wages, despite their classification as termination pay under the agreement.

The parties agree that the employment agreement called for final compensation to be paid at the termination of an 18-month period following Dr. Martinez's employment. The parties agree that this date was June 30, 2001. Dr. Martinez filed this action on June 15, 2004. To bring an action for wages under the Act, a claim must be raised within one year of the employer's failure to pay. 10 *Del. C* . § 8111. Therefore, the statute of limitations for a wage claim under the Act expired on June 30, 2002. Even considering Dr. Martinez's request for payment on August 6, 2002 as the applicable date for non-payment of wages, the valid filing period for the case expired on August 6, 2003. Dr. Martinez did not file this action until the following year. Therefore, the action under the Wage Claim Act is barred by the applicable statute of limitations.

Dr. Martinez also filed a breach of contract claim arising out of GA's failure to comply with Paragraph 16(b) of the employment agreement. He argues that pleading breach of contract in the alternative permits him to rely on a broader statute of limitations. Typically, breach of contract actions must be raised within three years of the alleged breach. However, because this claim involves the payment of wages, it is preempted by the statute of limitations required by the Wage Act. 10 *Del. C.* § 8111. Breach of contract actions based on the non-payment of wages must be raised within one year following the employer's failure to pay. *Id.*

In *Rich v. Zeneca, Inc.*, the Federal District Court of Delaware found that 10 *Del. C.* § 8111 and its one year statute of limitations for wage, salary and benefit claims should not be read as being so comprehensive as to bar all claims arising out of the employer-employee relationship. Rather 10 *Del C.* § 8111 is directed to claims alleging a breach of a duty to pay wages, salary or overtime for work performed.

845 F.Supp. 162, 166 (D.Del.1994). The one year statute of limitations applies to all claims based on the recovery of payment for services rendered. Therefore, even claims based entirely on contractual agreements and not on the provisions of the Wage Act are subject to the shorter statute of limitations. *Compass v. American Mirrex Corp.,* 72 F.Supp.2d 462, 467 (D.Del.1999).

**\*3** Dr. Martinez's claim is directed solely at recovering the wages he earned during his employment with GA. Therefore it is subject to the one year statute of limitations and time barred. For the foregoing reasons, the summary judgment is GRANTED.

Del.Super.,2005.
Martinez v. Gastroenterology Associates, P.A.
Not Reported in A.2d, 2005 WL 1953091 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.