# UNREPORTED
# CASES

LEXSEE 1999 US DIST LEXIS 7097

**AMERICAN ENERGY TECHNOLOGIES, INC., Plaintiff, v. COLLEY & MCCOY CO. AND MCDONALD'S CORPORATION, Defendants.**

**Civil Action No. 98-398 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 7097*

**April 6, 1999, Argued**
**April 15, 1999, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendants' motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporations filed a motion for summary judgment asserting plaintiff electric company's breach of contract claim was barred by the Delaware statute of limitations, *Del. Code tit. 10, § 8121*.

**OVERVIEW:** Plaintiff electric company agreed to install energy saving equipment in defendant corporations' restaurants. After the equipment was installed, disputes arose between the parties, and defendants failed to make the contractually required payments. More than three years after notifying defendants of their default, plaintiff filed suit for breach of contract. Defendants filed a motion for summary judgment, asserting plaintiff's claim was barred by the Delaware statute of limitations, *Del. Code tit. 10, § 8121*. Plaintiff argued the Virginia statute of limitations, *Va. Code § 8.01-246*, applied based on a choice of law provision in the contract. The court found the choice of law clause did not expressly apply to the statute of limitations. The Virginia statute of limitations was thus inapplicable. The court applied the Delaware statute of limitations because Delaware was the forum state and determined plaintiff's suit was untimely. Defendants' motion for summary judgment was granted.

**OUTCOME:** Defendant corporations' motion for summary judgment was granted because the choice of law provision in the parties' contract did not expressly apply to the statute of limitations, and plaintiff electric company's breach of contract suit was barred by the Delaware statute of limitations.

**CORE TERMS:** statute of limitations, choice of law, summary judgment, lawsuit, cause of action arose, cause of action, borrowing statute, nonmoving party, breach of contract, express terms, default, invoice, substantive law, genuine issue, moving party, diversity, shorter, statute of limitation, limitation period, conduct discovery, legal action, energy, dispositive, three-year, five-year, notify

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Under *Fed. R. Civ. P. 56(c)*, the court may grant summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. When considering a motion for summary judgment, the court must view all facts and inferences in the light most favorable to the party opposing the motion.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] The moving party must bear the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate specific facts showing that there is a genuine issue for trial. The nonmoving party cannot rest on his allegations without any significant probative evidence tending to support the complaint.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN3] See *Va. Code § 8.01-246.*

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Contracts Law > Contract Conditions & Provisions > Conditional Duties Generally*
[HN4] While the proposition of law that courts are required to give legal effect to choice of law provisions that are the products of arms length bargaining between sophisticated parties is sound, it is only applicable to the statutes of limitations if the choice of law provision states with specificity that it applies to them.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Contracts Law > Contract Conditions & Provisions > Conditional Duties Generally*
[HN5] Statutes of limitations are generally considered to be procedural rather than substantive law. Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation. Choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Civil Procedure > State & Federal Interrelationships > Application of State Law*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN6] In determining the applicable limitations period, the court, guided by the Erie doctrine, must apply the statutes of limitations of the forum state in diversity cases. A federal court sitting in diversity is required to apply Delaware's borrowing statute, *Del. Code tit. 10, § 8121*, when the cause of action arises outside of Delaware.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Civil Procedure > State & Federal Interrelationships > Application of State Law*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN7] See *Del. Code tit. 10, § 8121.*

**COUNSEL:** For plaintiff: Joseph J. Longobardi, III, Esq., Wilmington, Delaware.

For plaintiff: Daniel L. McCaughan, Esq., Of Counsel, Exton, Pennsylvania.

For defendants: Richard K. Herrmann, Esq., Mary B. Matterer, Esq., Blank Rome Comisky & McCauley LLP, Wilmington, Delaware.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

**MEMORANDUM OPINION**

Argued: April 6, 1999
Dated: April 15, 1999
Wilmington, Delaware

**SCHWARTZ, Senior District Judge**

**I. INTRODUCTION**

Defendants Colley & McCoy Company ("Colley") and McDonald Corporation ("McDonald") move for summary judgment on the grounds that plaintiff American Energy Technologies, Inc.'s ("American") breach of

contract claim is barred by Delaware's statute of limitations. Plaintiff in opposing defendants' motion argues that choice of law provision in the contract agreed to by the parties calls for the contract to be interpreted according to the laws of the Commonwealth of Virginia. Therefore, the plaintiff asserts Virginia and not Delaware's statute of limitations governs the relevant limitation [*2] period. Under the Virginia statute of limitations the lawsuit is timely.

The Court has diversity jurisdiction under *28 U.S.C. § 1332* and supplemental jurisdiction over the state law claims pursuant to *28 U.S.C. § 1367.* For reasons that follow, the Court will grant defendants' motion for summary judgment.

## II. FACTS

The facts are undisputed. Plaintiff American offered to install energy saving equipment in defendant Colley's restaurants, which plaintiff asserted would help reduce energy costs. Colley accepted American's offer and the parties entered into a contract on August 3, 1993 (the "Contract"). The Contract specified that Colley would be in default in the event that it failed to make the required payments within 10 days of receiving an invoice. Soon after the equipment was installed disputes arose between the parties. By letter dated July 19, 1994, Colley returned American's July 12 invoice unpaid, setting forth the reasons for disputing the amounts American claimed to be due.

On June 6, 1995, American's attorneys sent a letter of default to Colley stating in relevant part:

> At this point, my client has instructed me to notify you that you are in default . . . [*3] .
>
> . . . . I have been instructed to offer you a settlement under which you pay to my client the sum of $ 92,000. If you would like to accept this offer, please notify me in writing within 5 business days of receipt of this letter. If I do not receive a written response, I have been instructed to begin litigation at once.

More than three years after sending the notice of default, and almost four years after the July 12 bill was contested, American filed this lawsuit on July 8, 1998, claiming damages for breach of contract and unjust enrichment.

## III. STANDARD OF REVIEW

[HN1] Under the Federal Rules of Civil Procedure, the court may grant summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. *See id.* When considering a motion for summary [*4] judgment, the court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan, 122 F.3d 171, 176-177 (3d Cir. 1997).* The Supreme Court has clarified that [HN2] the moving party must "bear the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." *Id. at 324.* The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson, 477 U.S. at 249 (1986)* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).* See also *Williams* [*5] *v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)* (stating that a non-moving party must "adduce more than a scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings").

## IV. DISCUSSION

The dispositive legal issue before the Court is which state's statute of limitations to apply: Delaware or Virginia. American asserts that the Court is required to apply the Virginia statute of limitations. In support of its assertion, American points to the choice of law provision in the contract that states in relevant part:

> VENUE: The agreement shall be interpreted according to the laws of the Commonwealth of Virginia. It is further agreed that should legal action be filed to enforce any part of the agreement, the parties hereto expressly agree that the jurisdiction shall be in the Commonwealth of Virginia for Federal purposes, and Henrico County for State purposes and the venu [sic] for

state purposes shall be exclusively [the] Commonwealth of Virginia.

American decided to initiate legal action to enforce the agreement in a federal court in Delaware rather than in Virginia, as the terms of the [*6] choice of law provision that it relies upon calls for. Notwithstanding this dichotomy, American argues this Court should apply Virginia's five-year statute of limitation in contract disputes, because the choice of law provision calls for the contract to be interpreted in accordance with the laws of the Commonwealth of Virginia. n1 American cites to numerous cases in support of its assertion that courts are required to give legal effect to choice of law provisions that are the products of arms length bargaining between sophisticated parties. n2

n1 The relevant portion of applicable Virginia law relating to statutes of limitations states the following:

[HN3] In action on any contract which is not otherwise specified and which is in writing signed by the party to be charged thereby, or by his agent, action must be brought within five years whether such writing be under seal or not.

Code of Virginia, Chapter IV - Section 8.01-246.

n2 The Court notes that American is barred from bringing this lawsuit in Delaware by the express terms of the choice of law provision. American asserted during oral argument that it brought suit in Delaware because it no longer resided in Virginia. Inconvenience to American is not reason enough to excuse its noncompliance with the express terms of the choice of law provision.

[*7]

While this [HN4] proposition of law is sound, it is only applicable to the statutes of limitations if the choice of law provision states with specificity that it applies to them. [HN5] Statutes of limitations are generally considered to be procedural rather than substantive law. *Kalmich v. Bruno, 553 F.2d 549, 553,* (7th Cir. 1977), *cert. denied 434 U.S. 940, 54 L. Ed. 2d 300, 98 S. Ct. 432 (1977).* Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation. *Des Brisay v. Goldfield Corp., 637 F.2d 680, 682 (9th Cir. 1981).* The United States Court of Appeals for the Third Circuit

in *Gluck v. Unisys Corp., 960 F.2d 1168, 1179 (3d Cir. 1991),* has held that "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." *See also Federal Deposit Ins. Corp. v. Petersen, 770 F.2d 141, 142 (10th Cir. 1985)* (absent an express statement of intent, a choice of law provision will not be interpreted as covering a statute of limitations); *Des Brisay, 637 F.2d at 682* (the intention of the parties to contractually agree upon a limitation period must [*8] be clearly expressed if a court has to give it effect). The choice of law provision does not expressly provide for the laws of the Commonwealth of Virginia to apply to the statute of limitations. n3 Therefore, the Court holds that Virginia's five-year statute of limitations for contract cases to be inapplicable.

n3 American wants to conduct discovery so that it can ascertain the implicit understanding of the parties with respect to the choice of law provision vis-a-vis the statute of limitations. American's discovery request will be denied. The relevant inquiry is whether the choice of law provision expressly states that it applies to the statute of limitations. Moreover, American wants to conduct discovery in order to determine the implicit understanding of the parties, when at the same time it is breaching the express terms of the choice of law provision that bars it from bringing suit in Delaware.

Further, [HN6] in determining the applicable limitations period, this Court, guided by the Erie doctrine, must apply [*9] the statutes of limitations of the forum state in diversity cases. *Guaranty Trust Co. v. York, 326 U.S. 99, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945); see Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).* A federal court sitting in diversity is required to apply Delaware's borrowing statute, *10 Del.C. § 8121,* when the cause of action arises outside of Delaware. *See Ontario Hydro v. Zallea Systems, Inc., 569 F. Supp. 1261, 1264 (D. Del. 1983).* Since the litigants agree the breach of Contract occurred outside of Delaware, the Court is required to apply the Delaware borrowing statute, which states in pertinent part:

[HN7]
Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such a cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of

action arose, for bringing an action upon such cause of action.

*10 Del.C. § 8121.*

The borrowing statute by its terms requires the Court to apply the shorter of Delaware's statute of limitations n4 or the statute of limitations [*10] of the state where the cause of action arose. The parties are not in agreement as to whether the cause of action arose in Virginia or New Hampshire. The Court need not decide whether the cause of action arose in Virginia or New Hampshire because in either case this lawsuit had to be filed, at the most, within a period of three years from the time American learned of the Contract breach, so as too not run afoul of Delaware's three-year statute of limitations.

> n4 Delaware's three-year statute of limitations set forth in *10 Del.C. § 8106* applies as this a breach of contract claim.

Whether the statute of limitation began to run when Colley refused to pay the invoice on July 19, 1994 or when American's letter dated June 6, 1995 was received is not dispositive. It is clear that at least as of June 6, 1995, American had notice that Colley had breached the Contract. Either date is more than three years before American filed this lawsuit on July 8, 1998. Therefore, the Court holds that this lawsuit is time barred. [*11]

**V. CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment will be granted.

ORDER

At Wilmington this 15th day of April, 1999, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS ORDERED THAT defendants' motion for summary judgment is granted.

Murray M. Schwartz

United States District Judge

LEXSEE 1996 DEL CH LEXIS 112

**WILLIAM C. DEMETREE and JACK C. DEMETREE, Plaintiffs, v.**
**COMMONWEALTH TRUST CO., Trustee of Trust 896 U/A dated November 29,**
**1962, Defendant.**

**Civil Action No. 14354**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1996 Del. Ch. LEXIS 112*

**August 13, 1996, Date Submitted**
**August 27, 1996, Date Decided**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court September 20,
1996.

**DISPOSITION:**
**CASE SUMMARY:**

Demetrees entitled to summary judgment as matter
of law and order granting above stated appropriate spe-
cific performance.

**PROCEDURAL POSTURE:** Plaintiff sublessees and defendant lessor cross-appealed for summary judgment in plain-
tiff's action for specific performance of a contract for the continued lease of defendant's property.

**OVERVIEW:** Plaintiff sublessees subleased property from a third party lessee and entered into a triparty agreement
with defendant lessor and the third party under which plaintiffs had a conditional right to enter into a direct lease with
defendant if the third party terminated its prime lease with defendant. The third party eventually filed for bankruptcy
and terminated its renewal rights with defendant, without informing plaintiffs. When defendant notified plaintiffs that
both the prime lease and sublease would terminate, plaintiffs sought to renew and filed an action seeking specific per-
formance when defendant refused. The court granted plaintiffs' motion for summary judgment and denied defendant's
motion. The court held that the triparty agreement obligated defendant to enter into a direct lease with plaintiffs, as pro-
vided by the terms of the sublease. The interpretation of a provision in the sublease was subjectively shared by the par-
ties and was well within the bounds of a commercially reasonable agreement. Therefore, specific performance was an
appropriate remedy for enforcement.

**OUTCOME:** The court granted plaintiff sublessees' motion for summary judgment and denied defendant lessors' mo-
tion for summary judgment, because specific performance was the proper remedy to enforce a term of the parties'
agreement that permitted plaintiffs to renew their lease with defendant.

**CORE TERMS:** lease, sublease, prime, new lease, option to renew, renewal, terminated, renew, right to enter, termi-
nate, specific performance, motel, year term, renewal option, lessee, lessor, default, extrinsic evidence, plain meaning,
expiration, execute, notice, set forth, renewed, italics, parol evidence rule, legal obligation, unambiguous, subjective,
termination date

**LexisNexis(R) Headnotes**

_Contracts Law > Contract Interpretation > Interpretation Generally_

[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words. Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN3] In cases where the language of a contract is clear and unambiguous, the court may not consider parol evidence to interpret the intent of the parties. Deviation from this rule is only required where a literal reading of a contractual provision would be clearly unreasonable and yield an arbitrary result. The parol evidence rule is based on the principle that the dear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN4] If there is uncertainty concerning the meaning of contractual language, the court should consider the context and circumstances in which the words were used in order to determine the intended meaning. When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Contracts Law > Remedies > Specific Performance*
[HN5] Specific performance is appropriate where a clear and definite agreement can be enforced without requiring the court to supply essential additional or inconsistent contractual terms.

**COUNSEL:**

Richard A. Levine, Esquire, Richard H. Morse, Esquire and Janet Z. Charlton, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

Richard P. Beck, Esquire and Barbara MacDonald, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware; Attorneys for Defendant.

**JUDGES:** ALLEN, Chancellor

**OPINIONBY:** ALLEN

**OPINION:**

MEMORANDUM OPINION

ALLEN, Chancellor

Pending are cross-motions for summary judgment in this action for specific performance of a contract. The determination of these motions requires an interpretation of two contracts executed contemporaneously on July 22, 1966. Summary judgment has been requested on the basis of those contracts and other documents executed by and between the parties, as well as affidavits and deposition testimony.

The first contract ("Sublease"), entered into between plaintiffs, William C. Demetree and Jack C. Demetree ("Demetrees"), and Horne's Enterprises, Inc. ("Horne's"), granted the Demetrees a Sublease for a portion [*2] of a parcel of land leased by Horne's from defendant, Commonwealth Trust Co. ("Commonwealth"), in a prior contract ("Prime Lease"): The Prime Lease provided for an initial term of fifteen years and granted Horne's an option to renew for four additional successive ten year periods. As contemplated under the Prime Lease, the subsequent Sublease required the Demetrees to construct a motel on

the premises and granted a conditional option to renew the Sublease in the event that the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"), executed contemporaneously by the Demetrees, Horne's, and Commonwealth, both extended the initial termination date of the Prime Lease from 1981 to 1985, and granted the Demetrees a conditional right to enter into a direct lease with Commonwealth if the Prime Lease were terminated by Horne's "prior to the expiration of the four renewal periods" provided for in the Prime Lease. An interpretation of this right to enter into a new direct lease "on the same terms, provisions, and conditions" *as the Sublease* is the subject of this dispute.

In 1985 the original term of the Prime Lease expired and the Prime Lease was extended until [*3] 1995. In 1990 Horne's sought protection of the bankruptcy court and in that connection entered into a release with Commonwealth in which it waived its right to extend the Prime Lease. The Demetrees did not learn of this at the time; they continued to occupy the premises pursuant to their Sublease. On May 18, 1995, the Demetrees received notice that both the Prime Lease and Sublease would terminate on December 31, 1995. Commonwealth informed the Demetrees that, in its view, the Demetrees had no right to renew the Sublease or require Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific performance compelling Commonwealth to enter into a new lease term which the Demetrees contend is required by the Triparty Agreement. According to the Demetrees' interpretation of the Triparty Agreement, Commonwealth is contractually obligated to enter into a direct lease for a term ending December 31, 2005, with an option to renew for two additional ten year terms.

For the following reasons, I conclude that the Triparty Agreement did not create a legal obligation for Commonwealth to enter into the demanded new direct lease. The Triparty Agreement, however, [*4] obligates Commonwealth to enter into a direct lease with the Demetrees for a single seventeen year term, without an option to renew, as provided by the terms of the Sublease. n1 The Demetrees' motion for summary judgment should be granted as a matter of law pursuant to Court of Chancery Rule 56 since there is no dispute as to the material facts set forth below. *See Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Commonwealth's motion for summary judgment is denied because the Demetrees are entitled to the above stated specific performance.

n1 Although neither of the parties argued that the contracts entitle the Demetrees to a direct

lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

## I. FACTS

### 1. THE PRIME LEASE

On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along [*5] Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant. The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

### 2. THE SUBLEASE

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor lodge on the subleased premises. n2 The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease. Section 18 of the Sublease stated that:

> in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option.

The Sublease [*6] specified rents payable for the initial period and four renewal periods.

n2 Construction of the motel was to be completed within eighteen months. At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

### 3. THE TRIPARTY AGREEMENT

Contemporaneously, on July 22, 1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. n3 The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed. In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

> n3 Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

[*7]

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's. In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms. Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:

> execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease. (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:

> execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that [*8] all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. n4 (italics added)

> n4 According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $ 500,000 loan to the Demetrees to construct the motel on the premises. n5 In addition to the $ 500,000 loan, the Demetrees invested approximately $ 275,000 for the construction of the motel.

> n5 The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off approximately three years before the end of the initial term of the Prime Lease and Sublease.

> An assignment of the sub-sublease agreement with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years and options for renewal terms expiring December 31, 1985.

[*9]

### 4. *SUBSEQUENT EVENTS*

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. n6 During this time period, there were other communications between the parties concerning the property. n7

> n6 Commonwealth's attorney asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease. According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) Judgment Order).

[*10]

> n7 In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever having made that statement. As will become clear, however, neither this factual dispute nor the notice issue is relevant to the determination of this contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime Lease and Sublease would expire on December 31, 1995. Subsequent to receiving this notice, the Demetrees initiated this action requesting [*11] specific performance of paragraphs of the Triparty Agreement, construed by the

Demetrees to provide a right to enter into a new lease directly with Commonwealth.

## II RULES OF CONTRACT CONSTRUCTION

[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. *See* CORBIN ON CONTRACTS § 1 (1960); *Bell Atlantic Meridian Systems v. Octel Communications Corp., 1995 Del. Ch. LEXIS 156,* C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem. Op. at 12. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time. *See* WILLISTON ON CONTRACTS § 601 (1961); *RESTATEMENT (SECOND) OF CONTRACTS § 201* cmt. c (1981); *Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del. 1994); Klair v. Reese, 531 A.2d 219, 223 (Del. 1987).*

[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words. *See Myers v. Myers, 408 A.2d 279, 281 (Del. 1979).* Where parties have entered into an unambiguous integrated written contract, the contract's construction should [*12] be that which would be understood by an objective reasonable third party. *See City Investing Co. v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del. 1993); US West, Inc. v. Time Warner Inc., 1996 Del. Ch. LEXIS 55,* C.A. No. 14555 (Del.Ch. May 6, 1996), Mem. Op. at 21. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. *See Bell Atlantic,* Mem. Op. at 13, n.4.

[HN3] In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties. n8 *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).* Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly unreasonable and yield an arbitrary result." *Citadel Holding, 603 A.2d at 822.* The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at [*13] the time of their contract; extrinsic evidence reflecting a different potential meaning should not be considered. *See Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch. 1984).* The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testi-

mony concerning expectations of the parties at the time potentially less reliable. *See* 32A C.J.S., EVIDENCE § 851, p.216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

> n8 A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist. *See U.S. West* at n.10; *Bell Atlantic* at n.5; WILLISTON ON CONTRACTS § 601 (1961).

[*14]

Of course, [HN4] if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning. *Klair, 531 A.2d at 223.* n9 When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the:

> one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Holland v. National Automotive Fibres, 194 A. 123, 127 (Del. Ch. 1937).* As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared. That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

> n9 Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry practices. In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely

contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966. Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

[*15]

### III. PLAIN MEANING ANALYSIS

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning. Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts. Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement. As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees would have a right to:

> execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, [*16] the Demetrees have a right "to execute a new lease with lessor." What are the terms of the new lease to which they are entitled? They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease." As to term, the Sublease referred to *seventeen* "remaining years" of rental payments under the Sublease. In light of that fact and the fact that the Sublease did not contain any other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights. The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed. Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a

direct lease with Commonwealth for a non-renewable seventeen year lease term. n10 If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. n11

> n10 Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason. This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

[*17]

> n11 Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might he terminated by the prime lessee. This provision recognizes that the Prime Lease had an option to renew. Paragraphs, however, does not create a right to enter into a direct lease with a right to renew. The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right. Section 18 provided that:

> in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

This argument is not sound however. The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain [*18] a provision in the form of Section 18. (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable parties would spell out clearly in such an agreement if it were an intended, agreed upon term. n12 It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraphs to state that the lease would be on the same terms as the Sublease which contains no such right. Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

> n12 Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the 'same terms and conditions' requires only that it be upon 'the same material terms and conditions.' *498 A.2d 151, 159 (1985).* While this may be true, it does not help Demetree in this matter because the renewal option would appear to be a highly material term in this context.

[*19]

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods. The material sections of the Sublease set out a seventeen year term lease with no option to renew. This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant. The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

## IV. CONCLUSION

The Demetrees are not entitled to their requested specific performance because there is no legal obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement. Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific [*20] performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option. [HN5] Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual

terms. *MF v. F, 172 A.2d 274, 176 (Del. Ch. 1961).* Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

-

LEXSEE 2001 DEL CH LEXIS 37

**MADISON REALTY PARTNERS 7, LLC, a Delaware Limited Liability Company, individually and derivatively as a General Partner of ISA Partnership Liquidity Investors, MADISON AVENUE INVESTMENT PARTNERS, LLC, a Delaware Limited Liability Company, INVESTMENT SERVICES OF AMERICA, LLC, a Delaware Limited Liability Company, and THE MADISON AVENUE CAPITAL GROUP II, LLC, a Delaware Limited Liability Company, Plaintiffs, and ISA PARTNERSHIP LIQUIDITY INVESTORS, a Delaware General Partnership, Nominal Plaintiff, v. AG ISA, LLC, a Delaware Limited Liability Company, and ANGELO GORDON & CO., L.P., a Delaware Limited Partnership, Defendants.**

**C.A. No. 18094**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2001 Del. Ch. LEXIS 37*

**January 12, 2001, Submitted**
**April 17, 2001, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1] Motion to dismiss GRANTED as to those portions of Counts I and V that allege claims by

**CASE SUMMARY:**

the non-signatory plaintiffs for breach of the Partnership and Umbrella Agreements; and also GRANTED as to the entirety of Counts II, III, VI and VII. Motion DENIED as to the entirety of Counts IV and VIII, and as to those portions of Counts I and V that allege claims by the signatory plaintiffs.

**PROCEDURAL POSTURE:** Plaintiffs, a general partner and two affiliates hired by the general partner to provide personnel, services, and infrastructure, sued defendants, the other general partner and its corporate parent, alleging breach of contract, breach of fiduciary duty, and tortious interference with contract. Defendants moved to dismiss for failure to state claims upon which relief could be granted.

**OVERVIEW:** Two businesses entered an agreement to purchase and manage limited partnership interests. One general partner managed the partnership, and the other provided investment capital. The managing partner hired third parties to provide personnel, services, and infrastructure. The managing partner claimed breach of the agreement after the investment partner stopped providing funds. In support of their motion to dismiss, defendants offered a written, unsigned draft partnership agreement. The court noted the absence of an executed partnership agreement, and held that (1) in considering a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, the court was required to take the facts pled as true, and could not consider the unsigned partnership agreement because the parties disputed its validity; (2) plaintiffs could not prosecute a claim for breach of fiduciary duty that essentially restated their claim for breach of contract; (3) third parties hired by the managing partner where incidental beneficiaries of the partnership agreement, and could not sue for its breach; and (4) managing partner had stated a claim against investment partner's parent corporation for tortious interference with contract.

**OUTCOME:** The court granted defendants' motion to dismiss plaintiffs' breach of fiduciary duty claim, and also dismissed third-party service agencies the managing party had hired. However, the court denied the motion to dismiss the managing partner's claims for breach of contract, and tortious interference with a contract.

2001 Del. Ch. LEXIS 37, *

**CORE TERMS:** partnership agreement, partnership, beneficiary, affiliate, breach of contract, partner, funding, third party, non-signatory, breach of fiduciary duty, tortious interference, pled, fiduciary, cease, notice, urge, notice provision, incidental, motion to dismiss, enforceable, third-party, cognizable, breached, legally sufficient, contractual, signatory, unsigned, lawsuit, illus, aiding and abetting

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] Under Del. Ch. Ct. R. 12(b)(6), a complaint must be dismissed if the facts alleged in the complaint, when taken as true and considered in a light most favorable to the plaintiff, fail to state a cognizable legal claim that would entitle the plaintiff to the relief sought.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN2] On a motion to dismiss, documents that are incorporated by reference into the complaint will normally be considered.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN3] When evaluating a motion to dismiss, the Delaware chancery court is required to take the pled facts as true in deciding whether a legally valid claim is stated.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN4] As a general matter, only a party to a contract has enforceable rights under, and may sue for breach of, that contract. To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

*Contracts Law > Third Parties*
[HN5] Non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN6] In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose.

*Contracts Law > Third Parties > Beneficiaries > Types of Beneficiaries*
[HN7] Under Delaware law, expected creditors of a partnership are incidental beneficiaries, and are not entitled to sue for breach of the partnership agreement.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
[HN8] To allow a fiduciary duty claim to coexist in parallel with a contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving contractual rights and obligations.

*Contracts Law > Breach > Causes of Action*

[HN9] If a dispute relates to obligations expressly treated by contract, it will be governed by contract principles.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN10] To state a claim for tortious interference with contract, a plaintiff must plead facts that demonstrate the existence of: (1) a valid contract, (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the contract, (4) done without justification, and (5) which causes injury.

**COUNSEL:** David C. McBride, Richard H. Morse and Melanie K. Sharp, Esquires, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

James F. Burnett, Esquire of POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; and Peter N. Wang and Aimee E. Nassau, Esquires, of FRIEDMAN, WANG BLEIBERG, P.C., New York, New York; Attorneys for Defendants.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINIONBY:** JACOBS

**OPINION:**

### MEMORANDUM OPINION

#### JACOBS, VICE CHANCELLOR

A general partnership had two general partners, one responsible for managing the partnership, and the other for providing the capital funding. In March 2000, the funding partner refused to provide any further capital. The managing partner claimed that that refusal was wrongful, because the partnership agreement required 120 days [*2] advance notice before funding could be terminated, and no such notice had been given. The funding partner contended that no such notice was required, because the partnership agreement entitled the funding partner to cease making capital contributions without notice once its funding reached the $ 10 million level. The managing partner brought this lawsuit against the funding partner and others, asserting (inter alia) claims for breaches of contract and fiduciary duty. The funding partner and its co-defendant moved to dismiss the complaint for failure to state a claim upon which relief may be granted. This is the Opinion of the Court on that motion.

### I. BACKGROUND FACTS

This factual background is taken from the well-pled allegations of the complaint. ISA Partnership Liquidity Investors (the "Partnership") is a Delaware general partnership formed to purchase, hold, and manage limited partnership interests and similar securities ("Investment Interests"). The Partnership's two general partners entered into a partnership agreement (the "Partnership Agreement"), setting forth the rules governing the Partnership. Madison Realty Partners 7, LLC ("Madison"), is the primary plaintiff [*3] and the managing general partner responsible for managing the Partnership, including selecting Investment Interests for the Partnership. The primary defendant is AG ISA, LLC ("AGGP"), which is the other (non-managing) general partner. AGGP, which is a subsidiary of Angelo Gordon & Co., L.P. ("Angelo Gordon"), a Delaware limited liability company, n1 was also the exclusive provider of capital to the Partnership. Under the Partnership Agreement, AGGP was required to make such capital contributions as Madison requested. The Partnership Agreement provided, however, that AGGP could cease making capital contributions upon 120 days advance notice to Madison (the "120-Day notice provision").

> n1 Angelo Gordon is a New York based hedge fund with approximately $ 3 billion under management.

In connection with the formation of the Partnership, Madison caused the Partnership to enter into certain agreements with two affiliates, Investment Services of America, LLC ("ISA") and The Madison Avenue Capital Group II, LLC ("MACG [*4] II"). Those affiliates are Madison's co-plaintiffs in this lawsuit. These Agreements (the "Services Agreements") required ISA and MACG II to furnish the Partnership with personnel, services, and infrastructure that were essential both to operate, and to acquire Investment Interests for, the Partnership. As a condition of entering into the Services Agreements, ISA and MACG II required AGGP to agree to the 120-Day notice provision described above.

In September 1997, Madison Avenue Investment Partners, LLC ("MAIP"), which is a Madison affiliate, and defendant Angelo Gordon, which holds a controlling interest in AGGP, entered into an agreement (the "ISA Umbrella Agreement") in which Angelo Gordon undertook to cause AGGP to fulfill its obligations under the Partnership Agreement. n2

n2 MAIP is a Madison affiliate. Madison, MAIP, ISA, MACG II and the Partnership are referred to collectively as the "plaintiffs." AGGP and Angelo Gordon are collectively referred to as the "defendants."

During March 2000, affiliates of [*5] the plaintiffs and the defendants met to negotiate a possible investment, unrelated to the Partnership, in a MAIP affiliate. During those negotiations, the defendants demanded that the MAIP affiliates permit them to invest on terms that were unacceptable to the MAIP affiliates, and to which the MAIP affiliates refused to accede. According to the complaint, in an effort to exert wrongful pressure on MAIP's affiliates, Angelo Gordon responded by causing AGGP to threaten that it (AGGP) would immediately cease making capital contributions to the Partnership, despite the 120-Day notice requirement. From and after that point, AGGP refused to make capital contributions to the Partnership, and Angelo Gordon failed to cause AGGP to make the required capital contributions.

Although the plaintiffs claim that the 120-Day notice provision has no exceptions, the defendants assert that the Partnership Agreement permitted them to cease providing capital funding when their total contribution reached the $ 10 million level, as occurred here. That latter contention gives rise to a threshold issue, which is addressed in Part III A, infra, of this Opinion.

## II. THE PARTIES' CONTENTIONS AND THE [*6] APPLICABLE LAW

The complaint alleges eight claims. The first four are based on AGGP's refusal to make capital contributions without first having given the 120-Day notice allegedly required by the Partnership Agreement. That conduct is claimed to have violated AGGP's contractual duties under the Partnership Agreement (Count I), AGGP's fiduciary obligations to Madison (Count II), AGGP's fiduciary obligations to the Partnership (Count III), and AGGP's contractual duties to ISA and MACG II under the Services Agreements (Count IV).

The remaining four claims are asserted against Angelo Gordon. The plaintiffs claim that by failing to cause AGGP to fulfill its funding obligations under the Partnership Agreement, and/or by causing AGGP to cease contributing capital without giving the required 120 days notice, Angelo Gordon (1) breached the Umbrella Agreement (Count V), (2) aided and abetted AGGP's breach of fiduciary duty to Madison (Count VI) and to the Partnership (Count VII), and (3) tortiously interfered with the Services Agreements (Count VIII).

The defendants respond that none of these Counts states an actionable claim. Defendants urge that because

Counts I, III, IV, V, VII and [*7] VIII are claims on behalf of the Partnership, they are expressly foreclosed by the Partnership Agreement, which prohibits either partner from commencing a lawsuit on behalf of the Partnership without the other partner's permission. For that reason, defendants urge, those Counts must be dismissed.

Alternatively, the defendants argue that Counts I and V fail to state a cognizable claim for breach of contract, because neither the Partnership Agreement nor the Umbrella Agreement confers any enforceable rights upon the plaintiffs as a group. Counts II and III are also claimed to be dismissible, because they are improper attempts to seek relief based on breach of fiduciary duty theories for conduct that is specifically addressed by the Partnership Agreement and is covered by the breach of contract claims alleged in the complaint. Under Delaware law, defendants argue, fiduciary duty claims cannot proceed where the underlying conduct is addressed by parallel breach of contract claims.

The defendants further argue that Count IV must be dismissed, because the defendants were not parties to the Services Agreements, and therefore could not have breached them. Moreover, the defendants urge, the [*8] claims against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty fail as a matter of law, because the complaint alleges no cognizable underlying claim for breach of fiduciary duty. Lastly, the defendants contend that the complaint fails to state a legally sufficient claim for tortious interference with contract.

\* \* \*

[HN1] Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the facts alleged in the complaint, when taken as true and considered in a light most favorable to the plaintiff, fail to state a cognizable legal claim that would entitle the plaintiff to the relief sought. n3 All eight claims alleged in the complaint are evaluated in light of that procedural standard.

n3 *Solomon v. Pathe Communications Corp., Del. Supr., 672 A.2d 35, 38-39 (1996).*

In this Opinion, the issues are analyzed in the following order: first, the Court considers the threshold issue of whether a written draft of the Partnership Agreement submitted by the defendants can be considered [*9] on this motion. Second, the Court addresses the question of the plaintiffs' standing to bring this action. Finally, the Court considers each of the defendants' specific arguments for dismissal.

## III. ANALYSIS

2001 Del. Ch. LEXIS 37, *

## A. May the Court Consider the Partnership Agreement in Deciding This Motion?

A threshold issue that must first be decided (because it could be outcome determinative) is whether a written, unsigned draft of the Partnership Agreement, submitted by the defendants but disputed by the plaintiffs, can be considered on this Rule 12(b)(6) dismissal motion. What appears to give rise to this issue is the (apparent) fact that no fully executed original or copy of the Partnership Agreement is available.

[HN2] On a motion to dismiss, documents that are incorporated by reference into the complaint will normally be considered. n4 The question is whether the alleged unsigned copy of the Partnership Agreement submitted by the defendants was "incorporated by reference." The defendants argue that it was, because the document they submitted is the only available written evidence of the Partnership Agreement. Moreover, defendants urge, it would be inequitable to allow the plaintiffs to [*10] plead the Partnership Agreement in their complaint as a basis for asserting claims against the defendants, while at the same time prohibiting the defendants from relying on the same document to challenge the legal sufficiency of those claims. The plaintiffs concede that the Partnership Agreement, as executed, is integral to their claims, but they insist that the unsigned draft submitted by the defendants does not accurately reflect the Partnership Agreement as finally executed. Because the submitted draft does not accurately memorialize the Partnership Agreement actually agreed to by Madison and AGGP, the plaintiffs argue that it cannot be deemed "incorporated by reference" into the complaint, and therefore cannot be considered on this motion to dismiss. n5

n4 *In re Santa Fe Pacific Shareholder Litig., Del. Supr., 669 A.2d 59 (1995).*

n5 *In re Santa Fe Pacific Shareholder Litig., 669 A.2d at 69-70.*

On this issue, the plaintiffs are correct. In their complaint the plaintiffs [*11] allege certain terms of the Partnership Agreement, but they also dispute the defendants' contention that the submitted draft constitutes the definitive Partnership Agreement. Whether the defendants' draft constitutes the actual, definitive Partnership Agreement presents a fact dispute that cannot be resolved without an evidentiary hearing. But, we are not yet at that stage. Because the plaintiffs claim not to be relying on the submitted draft agreement, I must assume for purposes of this motion that the plaintiffs' pled version of the Partnership Agreement is the correct one. That is because [HN3] at this procedural stage the Court is required to take the pled facts as true in deciding whether a legally valid claim is stated. n6 Accordingly, on this motion the Court will not take cognizance of the draft Partnership Agreement submitted by the defendants. n7

n6 See *Solomon, Del. Supr., 672 A.2d at 38-39.*

n7 I recognize the potential inequity in allowing the plaintiffs to rely on their alleged version of the Partnership Agreement to support their claim that the defendants breached the 120-day provision, while simultaneously disregarding what is claimed to be the only written evidence of other asserted terms of the contract upon which the defendants rely in challenging the sufficiency of that claim. As stated, however, the procedural rules that apply at the pleading stage dictate that result. If at a later stage the Court finds that the plaintiffs' position is not forthright and that the draft Partnership Agreement is, in fact, the definitive Partnership Agreement, the defendants have remedies, including the imposition of appropriate sanctions by this Court.

[*12]

## B. Do the Plaintiffs Have Standing To Commence This Litigation?

The defendants next argue that the plaintiffs lack standing because the Partnership Agreement prohibits one partner from bringing a lawsuit on behalf of the Partnership without the consent of all (in this case, both) partners. Because AGGP never consented to the filing of this action, the defendants urge that Counts I, III, IV, V, VII and VIII must be dismissed. That argument, however, rests on terms that are claimed to exist in the draft Partnership Agreement which, as previously held, can not be considered in deciding this motion. Because it cannot be inferred from the complaint that the "consent-of-all-partners" provision is a term of the Partnership Agreement, the defendants' standing argument predicated on that provision must fail at this stage.

## C. Are the Non-Signatory Plaintiffs Third Party Beneficiaries of the Partnership and Umbrella Agreements?

It is undisputed that Madison, as a signatory to the Partnership Agreement, has standing to sue for a breach of that Agreement. Similarly, MAIP, as a signatory to the

Umbrella Agreement, has standing to sue for a breach of the Umbrella Agreement. [*13] For that reason, Counts I and V, which allege that AGGP breached the Partnership and Umbrella Agreements, cannot be dismissed. Remaining in dispute, however, is whether the complaint alleges facts from which it can be inferred that the *non-signatory* plaintiffs have standing to enforce those agreements as intended third party beneficiaries. I conclude that it does not.

The defendants argue that the non-signatory plaintiffs are not third-party beneficiaries. Rather, because they are at most incidental beneficiaries, Counts I and V fail to state cognizable breach of contract claims by the non-signatory plaintiffs. In addition, the defendants contend that because the complaint avers that some but not all of the plaintiffs were parties to the agreements, the plaintiffs as a group are not a protected class of beneficiaries having enforceable rights under the Partnership Agreement or the Umbrella Agreement. Therefore, defendants conclude, the plaintiffs cannot claim a breach of either contract. n8

> n8 The defendants claim that both contract claims must be dismissed in their entirety because in order for a claim to be adequately pled, *all* of the plaintiffs must have a right to advance the claim. The defendants cite no case law supporting this contention, and because the plaintiffs which were signatories to the relevant documents have a clear right to assert a claim against the defendants for breach thereof, the claims will not be dismissed. For that reason, the only issue that the Court need address is whether the non-signatory plaintiffs have a legally cognizable claim to occupy third-party beneficiary status.

[*14]

The plaintiffs respond that although the non-signatory plaintiffs are not direct parties to the Agreements, they nonetheless have enforceable rights as third party beneficiaries. In addition (plaintiffs urge), Madison's claim for breach of the Partnership Agreement and MAIP's claim for breach of the Umbrella Agreement are not dismissible on this ground, since Madison and MAIP are parties to those agreements.

[HN4] As a general matter, only a party to a contract has enforceable rights under, and may sue for breach of, that contract. n9 To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a

material part of the parties' purpose in entering into the contract. n10

> n9 *Insituform of N. Am., Inc. v. Chandler, Del. Ch., 534 A.2d 257, 270 (1987)* (holding that [HN5] non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract).

[*15]

> n10 See *Guardian Constr. Co. v. Tetra Tech Richardson, Inc., Del. Supr., 583 A.2d 1378, 1386-87 (1990)* ("[HN6] In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose").

In this context, Illustration 3 to Comment b to *§ 302 of the Restatement (Second) of Contracts* is helpful in understanding the difference between an intended and an incidental beneficiary:

> B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is . . . a promise that B will pay C, D and E, they are intended beneficiaries. . .; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries. n11

> n11 *Restatement (Second) of Contracts § 302* cmt. b, illus. 3 (1979).

[*16]

That analytical framework aids the Court's assessment of the third-party beneficiary status of the non-signatory plaintiffs under the Partnership and the Umbrella Agreements, respectively.

1. The Partnership Agreement

With respect to the contract claims based on the Partnership Agreement, I conclude that the non-signatory plaintiffs, ISA and MACG II, have not alleged facts

showing that they occupied any status other than as incidental beneficiaries of that agreement. The complaint does not allege that those entities were intended third party beneficiaries, nor can that conclusion be inferred from the facts that are pled. The Partnership Agreement was entered into to create and establish the terms for governing the Partnership, which "was organized with the limited purpose to purchase . . . hold and otherwise manage and exercise all the rights of an owner of limited partnership interests and other similar equity or any debt securities . . . . n12 It may be the case that all the parties knew that the Partnership would rely on the capital calls as a source of payment of monies owed to ISA and MACG II under the Services Agreements. But, that fact, without more, does not make ISA [*17] and MACG II third party beneficiaries under the Partnership Agreement. At best, those entities were expected creditors of the Partnership, and as such, they would have no more standing to sue AGGP for breach of the Partnership Agreement than would the local utility company or the office supply store. [HN7] Under Delaware law, expected creditors of a partnership are incidental beneficiaries, and are not entitled to sue for breach of the Partnership Agreement. n13

n12 Complaint, at P2.

n13 *Guardian Constr. Co., 583 A.2d at 1386-87; Restatement (Second) of Contracts § 302* cmt. b, illus. 3 (1979). The claim that MAIP is an intended beneficiary of the Partnership Agreement also fails. The complaint does not allege that MAIP was specifically intended to receive a benefit that resulted from the Partnership, nor does it identify any such benefit. For these reasons, ISA, MACG II and MAIP are not third party beneficiaries of the Partnership Agreement.

2. The Umbrella Agreement

The Umbrella Agreement [*18] presents the same issue, i.e., were Madison, ISA and MACG II intended third party beneficiaries of Angelo Gordon's promise to cause AGGP to make capital contributions to the Partnership? I find, for the reasons previously discussed, that they were not.

The parties to the Umbrella Agreement were MAIP and Angelo Gordon. That Agreement required Angelo Gordon to cause AGGP to fulfill its obligations under the Partnership Agreement, specifically, to make the required capital contributions. Madison, as the other general partner of the Partnership, would share in the proceeds of those contributions, and ISA and MACG II would receive some of those proceeds in the form of

payments under the Services Agreements. Those facts, however, do not elevate Madison, ISA and MACG II to a status other than incidental beneficiary. n14 Because Madison, ISA and MACG II are not intended third party beneficiaries of the Umbrella Agreement, they have no enforceable claims for breach of that contract.

n14 See *Restatement (Second) of Contracts § 302* cmt. b, illus. 3 (1979).

[*19]

### D. May the Plaintiffs Prosecute Breach of Fiduciary Duty Claims That Restate Their Claims For Breach of Contract?

The plaintiffs next claim that AGGP's failure to make capital contributions without giving the 120-Day notice required by the Partnership Agreement was a breach of the fiduciary obligation that AGGP owed to both Madison (Count II) and to the Partnership (Count III).

The defendants contend that these breach of fiduciary duty claims amount to improper attempts to seek a recovery under alternative theories for AGGP's alleged breach of the Partnership Agreement. Those alternative theories, defendants say, cannot coexist with the breach of contract claims. The plaintiffs respond that the two sets of claims can coexist, because the fiduciary claims in Counts II and III are independent from the breach of contract claims. The issue presented is whether the breach of fiduciary duty claims asserted in Counts II and III can be maintained independently of the breach of contract claims alleged in Counts I and V. I conclude that they cannot.

In Gale v. Bershad, n15 this Court dismissed a breach of fiduciary duty claim in circumstances where the defendants' alleged wrongdoing [*20] was already addressed by a breach of contract claim. The Bershad Court held that [HN8] "to allow a fiduciary duty claim to coexist in parallel with [a contractual] claim, would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations." n16 In this case, the contract and fiduciary claims overlap completely since they are based on the same underlying conduct. Indeed, the complaint uses identical conduct as the basis for both legal claims. n17 As this Court has held, [HN9] if the dispute "relate[s] to obligations 'expressly treated . . .' by contract [, it] will be governed by contract principles." n18 Here, the fiduciary claims relate to obligations that are expressly treated by the Partnership Agreement and are the subject of breach of contract claims in the complaint. Accordingly, the

fiduciary claims alleged in Counts II and III must be dismissed. n19

> n15 *1998 Del. Ch. LEXIS 37,* Del. Ch., C.A. No. 15714, Jacobs, V.C. (Mar. 3, 1998).

> n16 Id.

> n17 Compare Complaint, at P17 (The refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a violation of the Partnership Agreement) with Complaint, at P20 (the refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a breach of the fiduciary obligations owed by [AGGP] to [Madison].

[*21]

> n18 *Moore Bus. Forms, Inc. v. Cordant Holdings, Corp.,* 1995 Del. Ch. LEXIS 134, *17, Del. Ch., C.A. No. 13911, Jacobs, V.C. (Nov. 2, 1995).

> n19 The plaintiffs' claim against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty must also be dismissed because there is no legally sufficient underlying claim for breach of fiduciary duty against AGGP. Moore Business Forms, Inc., at 12 (dismissing claim for aiding and abetting breach of fiduciary duty because "no cognizable breach of fiduciary duty is stated").

### E. Have the Plaintiffs Pled Adequate Claims For Tortious Interference?

#### 1. Count VIII

Count VIII alleges that Angelo Gordon caused AGGP to cease making capital contributions without providing the 120-day notice in order to further Angelo Gordon's own goals and objectives. That conduct, plaintiffs claim, tortiously interfered with the Services Agreements between the Partnership and ISA and MACG. The defendants argue that those allegations do not state a legally sufficient claim for tortious interference.

[HN10] To state a claim for tortious interference with contract, [*22] a plaintiff must plead facts that demonstrate the existence of: "(1) a valid contract, (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the [contract], (4) done without justification, and (5) which causes injury." n20 The defendants argue that the plaintiffs have not pled facts sufficient to demonstrate that (a) the defendants' conduct was a significant factor in causing the Partnership to breach the Services Agreements, and that (b) the defendants ceased contributing capital without justification.

> n20 *Boyer v. Wilmington Materials, Inc.,* 1997 Del. Ch. LEXIS 97, Del. Ch., C.A. No. 12549, Allen, C. (June 27, 1997).

The plaintiffs respond that they have adequately pled each and all of the elements of tortious interference. They argue specifically that the complaint can be fairly read to show that the Partnership relied on the continued capital contributions as a source from which to pay ISA and MACG II for conducting the Partnership's day-to-day operations [*23] under the Services Agreements. Because the Partnership lost its funding without the 120-day notice, it lacked sufficient time to search for an alternate funding source. As a result, the Partnership was unable to meet its payment requirements under the Services Agreements, and ISA and MACG II lost income. Those facts, the plaintiffs urge, establish that the cessation of capital contributions was a significant factor in causing that economic loss. n21

> n21 See generally, Complaint at PP6, 9, 10, 13, 14, 15.

Moreover, the plaintiffs contend that they have pled facts establishing that the defendants' actions were without justification. The plaintiffs point to paragraphs 12 and 13 of the complaint, which allege that the defendants attempted to coerce MAIP's affiliates during the negotiations, and acted in retaliation for the affiliates' refusal to grant the defendants the investment terms they demanded.

I conclude that the complaint sufficiently alleges that the defendants' termination of capital contributions [*24] was a significant factor causing the Partnership to breach the Services Agreement. The complaint alleges that Angelo Gordon caused AGGP to advise Madison that it would cease making capital contributions, and that thereafter AGGP refused to make the capital contributions. The complaint further alleges that (i) AGGP was the exclusive provider of capital to the Partnership, (ii) AGGP's provision of capital and the 120-day notice provision were essential to enable the Partnership to pay for

2001 Del. Ch. LEXIS 37, *

the services being rendered to it under the Services Agreements, (iii) the funding ceased, and (iv) as a result, the Partnership, ISA and MACG II lost the full benefits of the Services Agreements.

The absence of "justification" for Angelo Gordon's refusal to require AGGP to continue making the capital contributions and to respect the 120-Day notice provision, is also adequately pled. The defendants' justification argument is that once AGGP had furnished $ 10 million of capital to the Partnership, it was legally entitled to cease making contributions, irrespective of the 120-day notice provision. This argument, however, is predicated upon the unsigned draft Partnership Agreement which the Court has [*25] found cannot be considered on this motion. If at a later stage it is determined that that provision was applicable and gave the defendants that termination right, the tortious interference claim against Angelo Gordon will ultimately fail. At this stage, however, the claim must be allowed to proceed.

Because the plaintiffs have pled legally sufficient tortious interference claims, the defendants motion to dismiss those claims is denied.

2. Count IV

In Count IV, the Partnership, ISA and MACG II seek money damages for AGGP's alleged breach of the Partnership Agreement. The basis of their claim is that "the failure of [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement has caused the Partnership to be in breach of its obligation to ISA and MACG II under the Services Agreements." n22 The plaintiffs characterize this claim as one for tortious interference with contract, and argue, for the reasons previously discussed, that it should not be dismissed.

n22 Complaint, at P26.

[*26]

The defendants characterize Count IV as a claim for breach of contract, and argue that (as thus characterized) the claim must fail as a matter of law for three reasons. First, the defendants contend that the complaint does not allege that AGGP or Angelo Gordon are parties to the Services Agreements; therefore, AGGP and Angelo Gordon cannot be held liable to the Partnership, ISA or MACG II for any breach of those Agreements. Second, ISA and MACG II are not alleged to be parties to the Partnership Agreement, for which reason their claims (which in essence are claims for breach of the Partnership Agreement) must fail as a matter of law. Third, the only possible wrongdoing alleged in Count IV involves an alleged breach of the Partnership Agreement by AGGP alone, but the plaintiffs' claim on that Count is directed against all "defendants." Defendants argue that the plaintiffs cannot seek a recovery from all of the defendants where only one of them is a party to the contract allegedly breached.

I find that Count IV is fairly characterized as a claim for tortious interference with contract, essentially identical to that alleged in Count VIII. The only difference is that the Count IV claim [*27] is directed against AGGP instead of Angelo Gordon. The analysis that governs Count VIII applies equally to Count IV, for which reason the defendants' motion to dismiss Count IV will be denied.

IV. CONCLUSION

For the reasons discussed, the defendants' motion to dismiss is GRANTED as to those portions of Counts I and V that allege claims by the non-signatory plaintiffs for breach of the Partnership and Umbrella Agreements; and is also GRANTED as to the entirety of Counts II, III, VI and VII. The motion is DENIED as to the entirety of Counts IV and VIII, and as to those portions of Counts I and V that allege claims by the signatory plaintiffs. Counsel shall submit an implementing form of order.

LEXSEE 2002 US DIST LEXIS 1771

**DEREK J. OATWAY, Plaintiff, v. AMERICAN INT'L GROUP, INC., Plan Administrator of Stock Option Plan, AMERICAN INT'L GROUP, INC., a Delaware Corporation, and 1987 EMPLOYEE STOCK OPTION PLAN, an Employee Welfare Benefit Plan, Defendants.**

**C.A. No. 01-033-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 1771; 27 Employee Benefits Cas. (BNA) 2404*

**February 5, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by Oatway v. Am. Int'l Group, 2003 U.S. App. LEXIS 7051* (3d Cir. Del., Apr. 14, 2003)

**DISPOSITION:** [*1] Defendants' Motion to Dismiss GRANTED; and Plaintiff's Motion for Summary Judgment declared MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved to dismiss plaintiff's amended complaint on the ground that the complaint failed to state a claim under § 502(a)(1)(B) of the Employee Retirement Income Security Act. Plaintiff moved for summary judgment.

**OVERVIEW:** Plaintiff was given stock options as performance incentives. The stock options were good for 10 years. Plaintiff resigned and was told that the stock options had to be exercised by a certain date, well before the 10 year period. Plaintiff failed to exercise the stock option by the new deadline, but attempted to exercise within the 10 year period. However, defendants declined to honor the stock option, so plaintiff brought suit under § 502(a)(1)(B) of the Employee Retirement Income Security Act. Defendants moved to dismiss and plaintiff moved for summary judgment. The court granted defendants' motion to dismiss because under the plain language of the plan, the purpose of the stock plan was not to provide severance, retirement, death or disability benefits. Instead, its purpose was to provide a financial incentive for plaintiff to remain with defendants and to improve his work performance. Furthermore, the express purpose of the stock plan was a bonus plan. While plaintiff may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the stock plan was to provide additional benefits during the course of employment.

**OUTCOME:** Defendants' motion to dismiss was granted. Plaintiff's motion for summary judgment was declared moot.

**CORE TERMS:** retirement, motion to dismiss, employee welfare benefit plan, disability, stock option, employee pension benefit plan, purpose of providing, summary judgment, pension, retirement income, subject matter jurisdiction, employee benefit plan, fiduciary duties, state law, stock, bonus, per share, termination, subsidiary, training, supplemental jurisdiction, method of calculating, statutory definition, breach of contract, covered employment, express purpose, welfare benefit, systematically, administrator, incidentally

**LexisNexis(R) Headnotes**

---

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] A motion to dismiss pursuant to the provisions of *Fed. R. Civ. P. 12(b)(6)* should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

the plaintiff is not entitled to relief as a matter of law. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN2] The Employee Retirement Income Security Act (ERISA) gives federal courts subject matter jurisdiction over claims brought pursuant to *29 U.S.C.S. § 1132*(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. Because an ERISA plan is necessary before ERISA's provisions apply, the court must first determine whether an employer's plan is, in fact, an ERISA employee welfare benefit plan. If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Accrual, Vesting & Forfeitures*
[HN3] See *29 U.S.C.S. § 1002*(1).

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN4] *29 U.S.C.S. § 186*(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. *29 C.F.R. § 2510.3-1(a)(3)*.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN5] To constitute an employee welfare plan, a plan must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of the Employee Retirement Income Security Act. The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. Thus, merely because a plan may in some circumstances continue to pay proceeds after an employee's death or disability does not make it a welfare benefit plan.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN6] The Employee Retirement Income Security Act applies only to an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN7] Plans that might incidentally result in payment of benefits after retirement, death or disability only fall under the Employee Retirement Income Security Act if they were established or maintained for the express purpose of doing so.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN8] The Employee Retirement Income Security Act pension plans include any plan established or maintained by an employer that, by its express terms results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. *29 U.S.C.S. § 1002*(2)(A)(ii).

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions*
[HN9] The Employee Retirement Income Security Act pension plans exclude bonuses for work performed, unless such bonuses are systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees. *29 C.F.R. § 2510.3-2(c)*.

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

**COUNSEL:** For DEREK J. OATWAY, plaintiff: Richard R. Wier, Jr., Law Offices of Richard R. Wier, Jr., Wilmington, DE.

For AMERICAN INTERNATIONAL GROUP, INC., AMERICAN INTERNATIONAL GROUP, INC., 1987 EMPLOYEE STOCK OPTION PLAN, defendants: Regina A. Iorii, Stephen E. Jenkins, Carolyn Shelly Hake, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On January 17, 2001, the plaintiff, Derek J. Oatway ("Oatway"), filed a complaint in the above-captioned action. He amended his complaint on February 13, 2001. In his amended complaint, he alleges that American International Group, Inc. ("AIG") wrongfully denied him benefits under the 1987 Employee Stock Option Plan (the "Plan"). He now seeks to recover those benefits pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See 29 U.S.C. § 1132*(a)(1)(B). He further claims that AIG, as the Plan administrator, breached its fiduciary duties by failing to [*2] properly administer the Plan in violation of *29 U.S.C. § 1133*. Finally, Oatway asserts state law claims against AIG based on breach of contract and estoppel.

Presently before the court are the defendants' motion to dismiss Oatway's amended complaint on the grounds that it fails to state a claim under ERISA and Oatway's motion for summary judgment. For the following reasons, the court will grant the defendants' motion to dismiss.

### II. BACKGROUND

Oatway was employed by AIG until approximately August 26, 1992. On various occasions from 1983 through 1990, AIG and Oatway entered into written Incentive Stock Option Agreements (the "Agreements"). These Agreements granted Oatway the right to purchase certain numbers of shares of AIG common stock at set exercise prices per share. Specifically, on January 18, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 96 per share. On October 11, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 58.625 per share. n1 These options were granted under the AIG Plan in consideration of Oatway's performance as an employee of AIG.

> n1 Oatway refers to the terms of the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements and the 1987 Employee Stock Option Plan throughout his Amended Complaint. He has therefore incorporated these documents by reference into his pleading. The court may rely on such documents in deciding a motion to dismiss. *See In re Rockefeller Ctr. Properties, Inc. Securities Litig., 184 F.3d 280, 287 (3d Cir. 1999)* (noting that, on a motion to dismiss, "a court can consider a document integral to or explicitly relied upon in the complaint."). Neither party objects to the court relying on these documents.

[*3]

AIG's Plan provides selected employees of AIG, including its parent or subsidiary corporations, with the options to purchase shares of AIG common stock. The purpose of the Plan is:

> To advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

Options granted under the Plan may normally be exercised beginning one year after they are granted, in set installments. AIG's board of directors determine the amount of the installments at the time of the grant. To the extent that an optionee does not purchase the maximum number of shares permitted under an option in any one year, he or she may purchase such shares in a subsequent year during the term of the option. Each of the option grants at issue provided that it expired ten years from the date of its issuance. Each of the option grants further [*4] specified that, in the event of termination of employment prior to the normal retirement age, the option must be exercised within three months after such termination.

On or about August 26, 1992, Oatway retired from AIG. Since he retired prior to the normal retirement age,

Case 1:05-cv-00842-GMS    Document 23-5    Filed 02/07/2006    Page 30 of 33

Page 4

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

AIG advised him that he was required to exercise all his remaining stock options by November 1992. Oatway alleges that after he complained about being denied the ten-year period to exercise his options, AIG agreed to allow him to exercise the options over the ten-year period, rather than within three months of his retirement.

On or about January 25, 2000, Oatway discovered that the option exercise date under the January 18, 1990 Incentive Stock Agreement had already expired. He claims that he immediately notified AIG via facsimile of his "intention and desire" to exercise this grant. AIG refused to allow him to do so.

On October 1, 2000, Oatway finally "exercised" the options under both the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements, but AIG refused to accept either exercise. He asserts that he appealed the denial to AIG as the "Plan Administrator." AIG rejected his appeal.

Oatway [*5] subsequently filed this complaint on January 17, 2001. On March 13, 2001, the defendants filed a motion to dismiss Oatway's Amended Complaint. On April 10, 2001, Oatway filed a motion for summary judgment.

## III. STANDARD OF REVIEW: MOTION TO DISMISS

[HN1] A motion to dismiss pursuant to the provisions of Rule 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. *In re Fruehauf Trailer Corp., 250 B.R. 168, 183 (D. Del 2000)* (citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997); see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)* ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."). "The issue is not whether a plaintiff will ultimately prevail but whether [*6] the claimant is entitled to offer evidence to support the claims." *In re Burlington, 114 F.3d at 1420.*

## IV. DISCUSSION

[HN2] ERISA gives federal courts subject matter jurisdiction over claims brought pursuant to *29 U.S.C. § 1132*(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. *See 29 U.S.C. § 1132*(a)(1)(B). Because an ERISA "plan" is necessary before ERISA's provisions apply, the court must first determine whether AIG's 1987 Plan is, in fact,

an ERISA "employee welfare benefit plan." *See Long v. Excel Telecommunications Corp., 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2 (N.D. Tex. Oct. 18, 2000).* If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 395 (3d Cir. 1992)* (noting that a plaintiff's failure to prove the existence of an employee benefit plan, though it results in the dismissal of the claim, does not deprive the district court of subject matter jurisdiction [*7] to enter a judgment on the merits.")

### A. Is the 1987 Plan an Employee Welfare Benefit Plan Under ERISA?

Oatway contends that the 1987 Plan is an "employee welfare benefit plan" under which he is entitled to benefits pursuant to *29 U.S.C. § 1132*(a)(1)(B). The court disagrees.

[HN3] ERISA defines an "employee welfare benefit plan" as:

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care, or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). n2

> n2 [HN4] Section 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. *See 29 C.F.R. § 2510.3-1(a)(3).*

[*8]

*See 29 U.S.C. § 1002*(1).

Case 1:05-cv-00842-GMS    Document 23-5    Filed 02/07/2006    Page 31 of 33

Page 5

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

[HN5] To constitute an employee welfare plan, a plan "must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of ERISA." *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* at *4; *see also 29 U.S.C. § 1002*(1) (requiring that an ERISA plan be "established or maintained . . . for the purpose of providing" the benefits listed in the statute.). The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. *See Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* at *2; *Hagel v. United Land Co., 759 F. Supp. 1199, 1203 (E.D. Va. 1991).* Thus, merely because a plan "may in some circumstances continue to pay . . . proceeds after an employee's death or disability does not make it a welfare benefit plan." *Murphy v. Inexco Oil Co., 611 F.2d 570, 574 (5th Cir. 1980).*

Furthermore, these holdings are consistent with congressional findings and the declaration of policy that supported [*9] ERISA's enactment. In enacting ERISA, Congress did not intend "to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy, 611 F.2d at 574.* Rather, Congress "intended to protect employees with many years of service who were losing anticipated retirement benefits because of inadequate vesting provisions, lack of funding, or other problems." *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* *2. Because Congress "sought only to deal with those types of plans that had created the problems it sought to remedy . . . by its terms, [HN6] ERISA applies only to "an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both." *See Murphy, 611 F.2d at 574* (quoting *29 U.S.C. § 1002*(3)).

Although the Third Circuit has not addressed the issue of whether an incentive stock option plan is an employee benefit plan within the meaning of ERISA, other courts that have considered the question have uniformly held that it is not. *See Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* at *3-4; *Hahn v. National Westminster Bank, N.A., 99 F. Supp. 2d 275, 279-280 (E.D.N.Y. 2000);* [*10] *Goodrich v. CML Fiberoptics, Inc., 990 F. Supp. 48, 49-50 (D. Mass. 1998).* In *Long,* a former employee claimed that his employer terminated him for the purpose of depriving him of benefits under the company's stock option plan in violation of ERISA. *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* at *2. The court granted the former employer's motion for summary judgment, holding that the company's stock plan was not a benefit plan under ERISA. *See 2000 U.S. Dist. LEXIS 15479,* [WL] at *3-4. In its holding, the court examined the purpose of the company's stock option plan, which was:

> to provide a means by which selected Employees of and Consultants to the Company and its Affiliates may be given an opportunity to purchase stock of the Company. The Company, by means of the Plan, seeks to retain the services of the persons who are now Employees of or Consultants to the Company and its Affiliates, to secure and retain the services of new Employees and Consultants, and to provide incentives for such persons to exert maximum efforts for the success of the Company and its Affiliates.

*See 2000 U.S. Dist. LEXIS 15479,* *9 [WL] at *3. The court further noted that, "nowhere does [the company's] Stock Option Plan indicate that its [*11] purpose is to defer compensation. In fact, the plan itself indicated that it was intended to operate as an incentive and bonus program. *See id.*

Finally, the Department of Labor, which is the agency charged with interpreting and enforcing ERISA, has also recognized that stock option plans are not necessarily employee welfare benefit plans. *See U.S. Dep't of Labor Opinion Letter 79-80 A, 1979* WL 7016 (Nov. 13, 1979) (stating that stock option plans were not employee welfare benefit plans within the meaning of ERISA § 3(1) because they were not established or maintained for the purpose of providing any of the benefits listed in § 3(1) or 302(c) of the Labor Management Relations Act, 1947).

The court finds that the Plan at issue here does not meet the statutory definition of an employee welfare plan. The Plan was not created for the purpose of providing retirement income. Rather, the stated purpose of the 1987 Plan is:

> to advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct [*12] of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

Therefore, under the plain language of the Plan, its purpose is not to provide severance, retirement, death or disability benefits. Instead, its purpose is to provide a financial incentive for employees to remain with AIG and to improve their performance at AIG. Although the Plan provided that upon retirement, death, or disability, the option could still be exercised, subject to time restrictions, any payment of benefits at that time were merely incidental. Furthermore, it is clear that "[HN7] plans that might incidentally result in payment of benefits after retirement, death or disability . . . only fall under ERISA if they were established or maintained for the express purpose of doing so." *Long, 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808*, at *2 (citing *Murphy, 611 F.2d at 574-75*).

Accordingly, because the Plan itself is clearly an incentive plan, it is not an employee welfare benefit plan within the meaning of ERISA.

### B. Is the 1987 Plan an Employee Pension Benefit [*13] Plan Under ERISA?

Oatway suggests that the Plan "can also be characterized under ERISA as a pension plan or an employee pension benefit plan." [HN8] ERISA pension plans include any plan established or maintained by an employer that, by its express terms "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." *29 U.S.C. § 1002*(2)(A)(ii).

The Department of Labor has interpreted [HN9] ERISA pension plans to exclude bonuses for work performed, unless such bonuses are "systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees." *29 C.F.R. § 2510.3-2(c)*. By the express purpose of the Plan itself, it is clear that this is a bonus plan. Although Oatway alleges that his ability to exercise his options continued after his retirement from AIG, this does not transform the bonus plan into "one whose payments are systematically deferred to the termination [*14] of employment or one whose purpose is to provide retirement income." *See Hahn v. National Westminster Bank, N.A., 99 F. Supp. 2d 275, 276 (E.D.N.Y. 2000)*. Rather, this is a plan were "post-retirement payments [are] only incidental to the goal of providing current compensation." *See Hahn, 99 F. Supp. 2d at 279*. Thus, the court recognizes that, while Oatway may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the Plan as a whole was to provide additional benefits to employees during the course of their employment. *See Lafian v. Electronic Data Systems Corp., 856 F. Supp. 339, 345 (E.D. Mich. 1994).*

Accordingly, the court finds that the Plan at issue here is not an employee pension benefit plan within the meaning of ERISA.

### C. Does the Plan Administrator Owe Oatway a Fiduciary Duty Under ERISA?

Oatway next alleges that AIG, as the Plan's administrator, breached its fiduciary duties under ERISA § 503. *See 29 U.S.C. § 1133*. The basis for this claim is that AIG failed to set forth adequate factual reasons why it denied his benefits appeal. Oatway [*15] further claims that AIG failed to advise him of what further information he needed to meet options pay status requirements under the Plan.

As the court discussed at some length above, the Plan does not fall within the definition of a qualified ERISA plan. Therefore, the court finds that AIG could not owe Oatway any ERISA fiduciary duties under the Plan.

### D. State Law Claims

Oatway next asserts state law claims for breach of contract and estoppel. He notes that, "if the court were to determine that there is an ERISA plan, then this court's supplemental jurisdiction over Count III is appropriate." However, because this Plan is not covered by ERISA, there is no federal question jurisdiction under ERISA. Moreover, the court has merely focused on the jurisdictional issues presented by these claims, and has not devoted any resources to the merits of the claims. *See Voege v. The Magnavox, Co., 439 F. Supp. 935, 943 (D. Del. 1977)*. The court, therefore, declines to exercise supplemental jurisdiction over Oatway's remaining state law claims. *See 28 U.S.C. § 1367*(c)(3). Accordingly, the court will dismiss them for lack of subject matter jurisdiction. [*16]

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Defendants' Motion to Dismiss (D.I. 7) is GRANTED; and

2. Oatway's Motion for Summary Judgment (D.I. 10) is declared MOOT.

Date: February 5, 2002

Gregory M. Sleet

2002 U.S. Dist. LEXIS 1771, *; 27 Employee Benefits Cas. (BNA) 2404

UNITED STATES DISTRICT JUDGE