LEXSEE 2005 US DIST LEXIS 34444

**OPTEUM FINANCIAL SERVICES, LLC, f/k/a HOMESTAR MORTGAGE
SERVICES, LLC, Plaintiff, V. KEITH SPAIN and MARKET STREET
MORTGAGE CORPORATION, Defendants.**

**CIVIL ACTION NO. 1:05-CV-02073-MHS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
GEORGIA, ATLANTA DIVISION**

*2005 U.S. Dist. LEXIS 34444*

**December 8, 2005, Decided
December 9, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employer sued defendants, its former employee and his new employer, alleging violations of the Georgia Trade Secrets Act (GTSA), *O.C.G.A. § 10-1-760* et seq., conversion, misappropriation of personal property, unjust enrichment, and quantum meruit in connection with their use of the former employer's confidential information to negotiate loans for the former employer's customers. Defendants moved for judgment on the pleadings.

**OVERVIEW:** The new employer and the employee argued, inter alia, that the former employer's claims of conversion, unjust enrichment, quantum meruit and civil theft were superseded by the GTSA. The court agreed, finding that the GTSA was the exclusive remedy for misappropriation of trade secrets, and the former employer could not plead an alternative theory of recovery should the information in question ultimately not qualify as trade secrets. Further, although the former employer sought the return of the loan files, this tangible property had little value apart from the information contained therein. This was just another way of charging that the employee took the former employer's confidential information; therefore, the conversion and civil theft claims were preempted by the GTSA. The court also found that the nondisclosure clause of the former employer's agreement was not unenforceable per se to the extent that the information qualified as a trade secret. Accordingly, the court was unable to dismiss this claim because the former employer might have been able to prove facts which would have allowed it to prevail on its breach of contract claim against the employee.

**OUTCOME:** The motion for partial judgment on the pleadings was granted as to the conversion, misappropriation, unjust enrichment, quantum merit, and civil theft claims, but denied as to the breach of contract claim.

**CORE TERMS:** misappropriation, trade secret, trade secrets, customer, conversion, theft, confidential information, breach of contract, unjust enrichment, personal property, common law, preempted, non-disclosure, unenforceable, quantum meruit, qualify, partial judgment, loan-in-process, durational, tort cause of action, exclusive remedy, civil remedies, little value, time limit, state law, misappropriating, nondisclosure, individually, comprise, quantum

**LexisNexis(R) Headnotes**

*Civil Procedure > Early Pretrial Judgments > Judgment on the Pleadings*
[HN1] Pursuant to *Fed. R. Civ. P. 12(c)*, judgment on the pleadings is appropriate when there are no material facts in dispute and the movant is entitled to judgment as a matter of law. The court views the facts in the light most favorable

to the nonmoving party and will grant the motion only if the nonmovant can prove no set of facts which would allow it to prevail.

*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN2] The Georgia Trade Secrets Act, *O.C.G.A. § 10-1-760* et seq., preserves a single tort cause of action under state law for misappropriation and eliminates other state causes of action founded on allegations of trade secret misappropriation. *O.C.G.A. § 10-1-767.*

*Trade Secrets Law > Ownership Rights > Covenants Not to Compete*
[HN3] Although a nondisclosure clause with no time limit is unenforceable as to information that is not a trade secret, the Georgia Trade Secrets Act, *O.C.G.A. § 10-1-760* et seq., carves out an exception for written agreements that do not contain a time limit for maintaining the trade secret. *O.C.G.A. § 10-1-767(b)(1).*

*Trade Secrets Law > Ownership Rights > Covenants Not to Compete*
[HN4] See *O.C.G.A. § 10-1-767(b)(1).*

COUNSEL: [*1]  For Opteum Financial Services, LLC formerly known as Homestar Mortgage Services LLC, Plaintiff: Thomas G. Tidwell, Kasowitz Benson Torres & Friedman, Atlanta, GA; Frank Welzer, John K. Crossman, Zukerman, Gore & Brandeis, LLP, New York, NY.

For Keith Spain, Defendant: C. Andrew Head, Crowley & Clarida, Atlanta, GA.

For Market Street Mortgage Corporation, Defendant: Susan W. Housen, Nicole A. Richardson, Tiffani Z. Moody, Holland & Knight, Atlanta, GA.

For Keith Spain, Counter Claimant: C. Andrew Head, Crowley & Clarida, Atlanta, GA.

For Opteum Financial Services, LLC, Counter Defendant: Thomas G. Tidwell, Kasowitz Benson Torres & Friedman, Atlanta, GA.

JUDGES: Marvin H. Shoob, Senior Judge.

OPINIONBY: Marvin H. Shoob

OPINION:

### ORDER

Presently before the Court are defendant Market Street Mortgage Corporation's and defendant Keith Spain's motions for partial judgment on the pleadings. The Court's reasoning and conclusions are set forth below.

Background

Beginning on or around May 1, 2003, defendant Keith Spain ("Spain") was employed by plaintiff Opteum Financial Services, LLC, as a loan officer. Spain signed an employment agreement containing a non-disclosure [*2] clause and an employee acknowledgment form whereby he acknowledged that he read and understood plaintiff's written policies on confidentiality.

In May of 2005, plaintiff had approved and underwritten loans for nine customers. Plaintiff's loan files and computerized loan-in-process system contained confidential information related to the loan applications for these nine customers.

Plaintiff alleges that on May 15, 2005, Spain deleted loan information from plaintiff's computer system relating to each of the nine customers, took one of the original customer loan files, and made copies of the remaining customer loan files to take with him. On May 16, 2005, Spain resigned from his position with plaintiff effective immediately.

Plaintiff alleges that Spain brought the original and copied loan files to Market Street Mortgage Corporation ("Market Street") where he is employed as a loan officer. Plaintiff contends that Spain and Market Street used plaintiff's confidential information in the loan files in order to negotiate loans for the nine customers. Plaintiff claims that Market Street and Spain have refused to return or refrain from using plaintiffs confidential information and that Market [*3]  Street has used plaintiff's loan files to help it underwrite and close loans for the nine customers.

Plaintiff brought suit against both Spain and Market Street alleging the following claims: violations of the Georgia Trade Secrets Act ("GTSA"), *O.C.G.A. § 10-1-760 et seq.*, conversion, misappropriation of personal

property, unjust enrichment, quantum meruit, attorneys' fees, and punitive damages. Plaintiff makes the following additional claims against Spain individually: breach of contract and civil theft. Each defendant has now moved for judgment on the pleadings.

Discussion

[HN1] Pursuant to *Fed. R. Civ. P. 12(c)*, judgment on the pleadings is appropriate when there are no material facts in dispute and the movant is entitled to judgment as a matter of law. The Court views the facts "in the light most favorable to the nonmoving party" and will grant the motion only if the nonmovant "can prove no set of facts which would allow it to prevail." *Palmer & Cay, Inc. v. Marsh & McLennan Companies, 404 F.3d 1297, 1303 (11th Cir. 2005)*.

Defendants argue that plaintiffs claims of conversion, unjust enrichment, [*4] and quantum meruit are superseded by the GTSA, and Spain argues that plaintiff's claim against him individually for civil theft is also superseded by the GTSA. Defendants aver that even if the information does not rise to the level of trade secrets, plaintiff's claims still fail. Spain also contends that plaintiff's claim against him for breach of contract is unenforceable as it lacks a durational limitation. Finally, defendants aver that plaintiff's claim of misappropriation of personal property is merely a restatement of its claim for conversion and does not stand as a separate cause of action.

Plaintiff argues in response that whether the information rises to the level of trade secrets is a disputed issue of fact and therefore judgment on the pleadings is inappropriate. Plaintiff contends its claims for conversion, misappropriation, unjust enrichment, quantum merit, and civil theft are properly pled as alternative claims and provide alternate remedies even if the information does not rise to the level of trade secrets. Plaintiff avers that its claim for breach of contract against Spain is proper because non-disclosure convenants [*5] without durational restrictions are enforceable to protect information that is a trade secret or tangible property. In addition, plaintiff contends that the extra-contractual claims of tort, quasi-contract, and civil theft stand on their own and do not succeed or fail with the contract claim. Finally, plaintiff argues that Georgia courts have routinely allowed claims for conversion and misappropriation to proceed simultaneously and that these claims are not duplicative but distinct.

The Court can determine whether the GTSA supersedes plaintiffs common law claims on a motion for judgment on the pleadings even though the issue of whether the information qualifies as trade secrets under the GTSA remains disputed and unresolved. *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943, 948-49 (W.D. Mich. 2003)* (where defendant moved for judgment on the pleadings arguing preemption of plaintiff's common law claims under the Michigan Uniform Trade Secrets Act, the court concluded that it was not precluded from deciding whether plaintiff's claims were preempted simply because the status of the information as trade secrets was disputed); see also *Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc., 388 F. Supp. 2d 426, 433 (D. Del. 2005).* [*6]

[HN2] The GTSA preserves a single tort cause of action under state law for misappropriation and eliminates other state causes of action founded on allegations of trade secret misappropriation. *O.C.G.A. § 10-1-767* (GTSA supersedes conflicting "tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret" and allows "civil remedies that are not based upon misappropriation of a trade secret"). Therefore, the GTSA is the exclusive remedy for misappropriation of trade secrets, and plaintiff cannot plead an alternative theory of recovery should the information ultimately not qualify as trade secrets. *Automed Technologies. Inc. v. Eller, 160 F. Supp. 2d 915, 921-22 (N.D. Ill. 2001)* (plaintiff could not plead in the alternative and argue that these theories would apply if the court ultimately concluded that the information did not amount to trade secrets because the state's trade secrets act was the exclusive remedy).

The issue for the Court is whether plaintiff's common law claims are "clearly based upon a trade secret" and "are all based on the same facts that comprise the trade secret misappropriation [*7] claim." *Penalty Kick Management Ltd. v. Coca Cola Co., 318 F.3d 1284, 1297 n.13 & 1298 (11th Cir. 2003)*; see *Ethypharm S.A. France, 388 F. Supp. 2d at 433* (because the purpose of Delware's Uniform Trade Secrets Act was to preserve a single tort cause of action under state law, the issue is whether the claims are founded on allegations of trade secret misappropriation). If so, then the GTSA will supersede plaintiff's common law claims.

Plaintiff contends that the loan files Spain took with him as well as the loan-in-process system contained confidential information related to the customers' loan applications such as financial information and information pertaining to the loans plaintiff had agreed to provide to each customer. Plaintiff alleges that Spain and Market Street used this confidential information to negotiate loans for these customers. Plaintiff states that information about its actual and potential customers contained in these loan files and the loan-in-process system constitute trade secrets under the GTSA.

Plaintiff's claims for conversion and civil theft are based on its right to possession of the loan files and defendants' intentional [*8] copying, taking, and misappropriating plaintiff's loan files. Although plaintiff seeks the return of the loan files, this tangible property has little value apart from the information contained therein. This is just another way of charging that defendants took plaintiff's confidential information, and therefore plaintiff's conversion and civil theft claims are preempted by the GTSA. Compare *Bliss, 270 F. Supp. 2d at 950-51* (although plaintiff alleged wrongful retention and use of blueprints and drawings, focus of the claim was upon trade secrets) and *Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 973 (N.D. Ill. 2000)* (actual computers, disks, and papers had little value apart from the information therein and therefore allegations amounted to misappropriation of trade secrets) with *Tronitec, Inc. v. Shealy, 249 Ga. App. 442, 447, 547 S.E.2d 749 (2001)* overruled on other grounds by *Williams General Corp. v. Stone, 279 Ga. 428, 614 S.E.2d 758 (2005)*, (conversion and theft of a personal computer not preempted by GTSA because computer was personal property and not a trade secret)

Plaintiffs claim for misappropriation of personal property [*9] is based on its property right, its protectable interest in its loan files, and its confidential information. Plaintiff's claims for unjust enrichment and quantum meruit are based on plaintiff rendering valuable services in the form of developing its loan files, underwriting the loans, and closing the loans with the expectation of being paid, and defendants misappropriating the benefits of plaintiff's services and being enriched by such services. These claims are predicated on defendants' taking and using plaintiffs confidential information and are all based on the same facts that comprise the trade secrets claims. Thus, because these claims are clearly based upon a trade secret, they are preempted by the GTSA. See *Penalty Kick Management Ltd., 318 F.3d at 1297-98*; *Ethypharm S.A. France, 388 F. Supp. 2d at 433*; *Bliss, 270 F. Supp. 2d at 951*; *Automed Technologies, Inc., 160 F. Supp. 2d at 922.*

Regarding plaintiff's claim for breach of contract against Spain, plaintiff alleges that Spain breached the non-disclosure covenant of his employment agreement by taking and disclosing plaintiff's loan files and the information [*10] therein. [HN3] Although a nondisclosure clause with no time limit is unenforceable as to information that is not a trade secret, the GTSA carves out an exception for written agreements that do not contain a time limit for maintaining the trade secret. *O.C.G.A. § 10-1-767(b)(1)*; n1 *Wright v. Power Industry Consultants, Inc., 234 Ga. App. 833, 837-38, 508 S.E.2d 191 (1998)*, overruled on other grounds by *Advance Tech. Consultants v. RoadTrac, LLC, 250 Ga. App. 317, 551 S.E.2d 735 (2001)*. Therefore, the nondisclosure clause of plaintiff's agreement is not unenforceable per se to the extent that the information qualifies as a trade secret. Accordingly, the Court is unable to dismiss this claim at this stage of the proceedings because plaintiff may be able to prove facts which would allow it to prevail on its breach of contract claim.

n1 This section of the GTSA provides: [HN4] "This article shall not affect: (1) Contractual duties or remedies, whether or not based upon misappropriation of a trade secret; provided, however, that a contractual duty to maintain a trade secret or limit its use of a trade secret shall not be deemed void or unenforceable solely for lack of a durational or geographical limitation on the duty."

[*11]

Conclusion

For the foregoing reasons, the Court GRANTS defendant Market Street Mortgage Corporation's motion for partial judgment on the pleadings [# 12] and GRANTS IN PART AND DENIES IN PART defendant Keith Spain's motion for partial judgment on the pleadings [# 17]. The Court DISMISSES plaintiffs claims for conversion, misappropriation, unjust enrichment, quantum merit, and civil theft.

IT IS SO ORDERED, this 8 day of December, 2005.

Marvin H. Shoob, Senior Judge

United States District Court

Northern District of Georgia

LEXSEE 2004 US DIST LEXIS 4952

**In Re: STUDENT FINANCE CORPORATION, Debtor. STUDENT FINANCE
CORPORATION, Plaintiff, v. ROYAL INDEMNITY CO., Defendant.**

**Civil Action No. 03-507 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 4952*

**March 23, 2004, Decided**

**PRIOR HISTORY:** [*1] Chapter 11, Bankruptcy Case
No. 02-11620, Adversary Proceeding No. No. 02-6803
LK.

**DISPOSITION:** Defendant's motion to dismiss granted
in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff bankruptcy debtor brought an adversary proceeding against defendant insurer
alleging, inter alia, fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, and unjust en-
richment and seeking rescission and declaratory relief. The insurer moved to dismiss under Fed. R. Civ. P. 9(b) and
12(b)(6).

**OVERVIEW:** The insurer provided the debtor with credit risk insurance. The insurer announced that it was leaving the
credit risk insurance business but allegedly assured the debtor that the insurer would issue one last policy. The insurer
then allegedly told the debtor that it would issue the policy if the debtor provided the insurer with promissory notes cov-
ering forbearance payments to a third party. The debtor claimed that it complied with the request but that the insurer did
not issue the policy. The court found that the fraud and negligent misrepresentation claims did not satisfy Fed. R. Civ.
P. 9(b), as neither the speaker of the alleged misrepresentations nor the facts allegedly withheld were identified. The
debtor did state a claim for fraud and negligent misrepresentation; the alleged assertions constituted more than mere
opinions as to probable future results. The debtor alleged bad faith in negotiation, so there could be no breach of the
duty of good faith and fair dealing. As the debtor sought to rescind the promissory notes, it adequately pleaded unjust
enrichment, and the complaint adequately stated claims for rescission and declaratory relief based on fraudulent in-
ducement.

**OUTCOME:** The insurer's motion to dismiss was granted as to the claims for fraud, negligent misrepresentation, and
breach of the duty of good faith and fair dealing. The motion was otherwise denied.

**CORE TERMS:** sfc, plead, duty, justifiable reliance, misrepresentation, fraudulent, unjust enrichment, fair dealing,
omissions, inducement, pled, negligent misrepresentation, particularity, funding, speaker, insurance policy, securitiza-
tion, facts sufficient, declaratory judgment, motion to dismiss, insurance business, rescission, forbearance, allegations of
fraud, standard of review, written contract, borrow money, reply brief, disclosure, retention

**LexisNexis(R) Headnotes**

.

―

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN1] Fed. R. Civ. P. 9(b) requires a party alleging fraud or mistake to plead with particularity the circumstances con-
stituting its claims. The intent behind Rule 9(b) is to give defendants notice of the claims against them and to reduce the
number of frivolous actions. Rule 9(b) does not require the recitation of every material detail of the fraud such as date,

2004 U.S. Dist. LEXIS 4952, *

location and time; however, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] A motion to dismiss tests the legal sufficiency of the complaint. In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN3] Fed. R. Civ. P. 9(b) requires, at a minimum, that the plaintiff identify the speaker of the fraudulent statements.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN4] Although courts cannot expect plaintiffs to have access to information sufficient to satisfy a detailed application of Fed. R. Civ. P. 9(b) in all cases, where a plaintiff does not contend that information it needs to satisfy Rule 9(b)'s particularity requirements is exclusively within the defendant's control, the plaintiff gives the court no reason to relax the normally rigorous particularity rule based upon lack of knowledge or control.

*Civil Procedure > Pleading & Practice > Motion Practice Generally > Content & Format of Motions*
[HN5] See U.S. Dist. Ct., D. Del, R. 7.1.3.

*Civil Procedure > Pleading & Practice > Motion Practice Generally > Content & Format of Motions*
[HN6] The practice of reserving arguments for reply briefs amounts to impermissible "sandbagging."

*Torts > Business & Employment Torts > Deceit & Fraud*
*Torts > Business & Employment Torts > Negligent Misrepresentation*
[HN7] Under Delaware law, to state a claim of common law fraud a plaintiff must plead: (1) a false representation made by the defendant, usually one of fact; (2) the defendant's knowledge or belief that the statement was false; (3) an intent to induce the plaintiff to act; (4) the plaintiff's justifiable reliance upon the representation; and (5) damage to the plaintiff as a result. The only difference between an action for fraud and negligent misrepresentation is that, with a claim of negligent misrepresentation, the plaintiff need not plead that the defendant knew or believed that his or her statement was false or that he or she proceeded in a reckless disregard for the truth.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN8] Under Delaware law, opinions and statements as to probable future results are not generally fraudulent even though they relate to material matters.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN9] In order to plead justifiable reliance based on a statement of intention, a plaintiff must allege facts demonstrating that the intention is material and the recipient has reason to believe that it will be carried out.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN10] In Delaware, a duty to speak may arise from circumstances other than a fiduciary or confidential relationship.

*Torts > Business & Employment Torts > Deceit & Fraud*

[HN11] A party to a business transaction has a duty to exercise reasonable care to disclose: (1) information known due to the existence of a confidential or fiduciary relationship; (2) information that if undisclosed will cause its partial statements of facts to be misleading; or (3) facts basic to the transaction if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts. A duty to speak may arise from a pre-existing relationship between the parties or from a partial disclosure of facts that requires further disclosure to prevent a misleading impression.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN12] Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward the other party with respect to their contract. A party must act reasonably to fulfill the intent of the parties to the agreement.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN13] Complaints about a defendant's bad faith in bargaining or negotiation do not fall within the scope of the duty of good faith and fair dealing in contracts. The duty of good faith is not imposed on parties until they have reached agreement and does not bind them during their earlier negotiations.

*Contracts Law > Remedies > Equitable Relief*
[HN14] Under Delaware law, unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.

*Contracts Law > Remedies > Rescission & Redhibition*
*Contracts Law > Defenses > Fraud & Misrepresentation*
[HN15] Delaware law recognizes fraudulent inducement as one means by which a party may rescind an agreement. The elements of fraudulent inducement are (1) a false statement or misrepresentation; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement induced the plaintiff to enter the agreement; (4) the plaintiff's reliance was reasonable; and (5) the plaintiff was injured as a result.

**COUNSEL:** L. Jason Cornell, Esquire of FOX ROTHSCHILD LLP, Wilmington, Delaware.

Of Counsel: Hal Baume, Esquire of FOX ROTHSCHILD LLP, Lawrenceville, New Jersey.

David A. Gradwohl, Esquire, Andrew W. Bonekemper, Esquire, and Anthony P. DeMichele, Esquire of FOX ROTHSCHILD LLP, Lansdale, Pennsylvania, Attorneys for Plaintiff/Debtor Student Finance Corporation.

Lawrence C. Ashby, Esquire, Philip Trainer, Jr., Esquire, and Gregory A. Taylor, Esquire of ASHBY & GEDDES, Wilmington, Delaware. Of Counsel: Michael H. Barr, Esquire, Peter D. Wolfson, Esquire, and Kenneth J. Pfaehler, Esquire of SONNENSCHEIN NATH & ROSENTHAL, New York, New York.

Alan S. Gilbert, Esquire of SONNENCHEIN NATH & ROSENTHAL, Chicago, Illinois, Attorneys for Defendant Royal Indemnity Company.

**JUDGES:** JOSEPH [*2] J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:** Wilmington, Delaware

### Farnan, District Judge.

Presently before the Court is Defendant Royal Indemnity Company's ("Royal") Motion To Dismiss. (D.I. 6.) n1 For the reasons set forth below, the Court will grant in part and deny in part Royal's Motion.

n1 The docket item numbers referenced herein are the docket items in the adversary pro-

ceeding Student Finance Corporation v. Royal Indemnity Co., Adversary Proceeding Number 02-06803 LK.

## BACKGROUND

This is an adversary proceeding arising from the Chapter 11 bankruptcy filing In re Student Finance Corporation. The parties to this adversary proceeding stipulated to the withdrawal of the reference to the bankruptcy court, which was granted by Chief Judge Robinson. The instant action was subsequently assigned to this Court.

Student Finance Corporation ("SFC") engages in the origination and purchasing of student loans, primarily for truck driving school students. [*3] n2 SFC, along with its affiliates, obtained funds to purchase and originate student loans from warehouse lines of credit provided by the Wilmington Trust Co. and PNC Bank. Once SFC exhausted these warehouse lines of credit, SFC and its affiliates packaged loans it purchased or originated into portfolios and sold them on the secondary market (the "securitizations") to financial institutions or insurance companies. To continue selling its portfolios on the secondary market, SFC required credit risk insurance which it obtained from AIG. In 1999, AIG discontinued this line of insurance. Thereafter, SFC obtained credit risk insurance from Royal.

n2 As the instant motion is a motion to dismiss, the Court has taken the facts from SFC's Complaint.

Royal continued to provide SFC with credit risk insurance for its securitizations through November of 2001. In December of 2001, SFC alleges that Royal verbally agreed to issue it one more credit risk insurance policy. In February of 2002, Royal was told by its parent company [*4] to discontinue issuing credit risk insurance. Royal subsequently announced that it was exiting the credit risk insurance business; however, SFC alleges that Royal assured it that Royal would issue one last policy. SFC alleges that Royal later stated that it would only consider doing so if SFC executed two promissory notes (the "Notes") whereby SFC agreed to borrow approximately twelve million dollars from Royal that would be used to make forbearance payments to Wells Fargo, who was the trustee of the securitizations. All the proceeds of the Notes went directly to Wells Fargo.

SFC alleges that after it complied with Royal's request Royal never issued SFC the credit risk insurance policy as promised. SFC alleges that, in reliance on Royal's promises, it continued to approve and fund student loans. In its Complaint (D.I. 1), SFC asserts six

claims against Royal. This is Royal's Motion to Dismiss Counts I and II pursuant to *Rule 9(b)* and Counts I-VI pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*.

## STANDARDS OF REVIEW

### I. *Rule 9(b)*

*Rule 9(b)* [HN1] requires a party alleging fraud or mistake to plead with particularity the circumstances [*5] constituting its claims. *Fed. R. Civ. P. 9(b)*. The intent behind *Rule 9(b)* is to give defendants notice of the claims against them and to reduce the number of frivolous actions. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)*. *Rule 9(b)* does not require the recitation of "every material detail of the fraud such as date, location and time[; however,] plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002)* (quoting *In re Nice Sys., 135 F. Supp. 2d 551, 557 (D. N.J. 2001))*.

### II. *Rule 12(b)(6)*

[HN2] A motion to dismiss tests the legal sufficiency of the complaint. *Conley v. Gibson, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In reviewing a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, courts "must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000)*. [*6] A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief. Id.

## DISCUSSION

### I. Whether SFC Has Pled With Particularity Fraud And Negligent Misrepresentation

Royal contends that Counts I, negligent misrepresentation, and II, fraud, of SFC's Complaint should be dismissed because SFC has failed to plead these claims with particularity as required by *Rule 9(b)*. Royal contends that SFC's Complaint does not identify the speaker of the alleged misrepresentations nor, with one exception, to whom the false statements were made. Royal also contends that SFC asserts only generalized and conclusory descriptions of misrepresentations made by Royal. SFC responds that the *Rule 9(b)* standard is generous in the Third Circuit and that its allegations of fraud and negligent misrepresentation satisfy *Rule 9(b)*'s requirements. In addition, SFC requests, in the event the Court agrees with Royal, that it be granted leave to amend its Complaint.

After reviewing the Complaint in light of the *Rule 9(b)* standards recited above, the Court concludes that SFC has failed to satisfy the pleading requirements of [\*7] *Rule 9(b)*. Nowhere in its Complaint does SFC identify the speaker of Royal's alleged misrepresentations. This is a failure to satisfy the particularity requirements of *Rule 9(b)*. See *Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338, 345 (3d Cir. 1999)*(stating that *Rule 9(b)* [HN3] "requires, at a minimum, that the plaintiff identify the speaker of the fraudulent statements.") Although SFC contends that, according to *Brown v. SAP America, Inc., 1999 U.S. Dist. LEXIS 15525, 1999 WL 803888 (D. Del. Sept. 13, 1999)*, a plaintiff need not identify the speaker of the alleged misrepresentation to satisfy *Rule 9(b)*'s requirements, to the extent Brown's holding conflicts with *Klein v. General Nutrition Co., Inc.,* the Court declines to extend *Brown* to the facts in this case. See also *FDIC v. Bathgate, 27 F.3d 850, 876 (3d Cir. 1994)*(holding that a failure to identify the speaker of alleged misrepresentations amounted to a failure to satisfy *Rule 9(b)*); *Liafail, Inc. v. Learning 2000, Inc., 2002 U.S. Dist. LEXIS 22620, 2002 WL 31667861, at \*4 (D. Del. Nov. 25, 2002)*.

The Court also concludes that SFC's allegations of material omissions fail to satisfy *Rule 9(b)*'s pleading requirements. [\*8] SFC bases, in part, its fraud and negligent misrepresentation claims on material omissions by Royal, yet never identifies what facts withheld by Royal induced SFC to act. Moreover, [HN4] although courts cannot expect plaintiffs to have access to information sufficient to satisfy a detailed application of *Rule 9(b)* in all cases, in the instant case, SFC does not contend that information it needs to satisfy *Rule 9(b)*'s particularity requirements is exclusively within Royal's control. See *FDIC, 27 F.3d at 876*. Therefore, SFC has given the Court no reason to relax "the normally rigorous particularity rule" based upon lack of knowledge or control. *Burlington, 114 F.3d at 1418*. Accordingly, to the extent Counts I and II of SFC's Complaint are based on material omissions by Royal, the Court concludes that SFC has failed to satisfy *Rule 9(b)*. n3

n3 Royal also contends that *Brug v. The Enstar Group, Inc., 755 F. Supp. 1247 (D. Del. 1991)*, and *Brown v. The Buschman Co., 2002 U.S. Dist. LEXIS 4087, 2002 WL 389139 (D. Del. 2002)*, compel the Court to dismiss Counts I and II of SFC's Complaint for failure to adequately plead scienter. Because the Court concludes that *Brug* and *Brown* are distinguishable from the facts in this case, the Court disagrees. The plaintiffs in Brug and Brown made only general averments, without any supporting facts, of intent or scienter. *Brug, 755 F. Supp. at 1254-55*; *Brown,*

*2002 U.S. Dist. LEXIS 4087, 2002 WL 389139, at \*8*. Therefore, the *Brug* and *Brown* courts concluded that they had no choice but to dismiss the plaintiffs' claims. In this case, however, SFC has identified facts by which the Court infers intent. In paragraphs 31 and 33 of its Complaint (D.I. 1), SFC alleges that Royal indicated that it would extend additional credit risk insurance following its announcement that it was leaving the credit risk insurance business if SFC would agree to borrow money from Royal to be used in making forbearance payments to Wells Fargo. SFC alleges that it complied with Royal's condition, but that Royal never extended additional credit risk insurance. The Court concludes that these facts are sufficient by which to infer intent or scienter.

[\*9]

In sum, the Court concludes that Counts I and II of SFC's Complaint fail to satisfy the pleading requirements of *Rule 9(b)*. n4

n4 In its reply brief (D.I. 18), Royal contends for the first time that all of SFC's claims are based on allegations of fraud, and therefore, if the Court finds that SFC has failed to properly plead Counts I and II, then all of SFC's claims must be dismissed. Without addressing the merits of Royal's arguments, the Court concludes that Royal is not entitled to dismissal of the remaining claims of SFC's Complaint on *Rule 9(b)* grounds.

Rule 7.1.3 of the Local Rules for the District of Delaware ("Local Rule 7.1.3") provides that [HN5] "the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D. Del. L.R. 7.1.3(c)(2). [HN6] The practice of reserving arguments for reply briefs "amounts to impermissible 'sandbagging.'" *Rockwell Techs. LLC v. Spectra-Physics Lasers, Inc., 2002 U.S. Dist. LEXIS 5180, 2002 WL 531555 (D. Del. March 26, 2002)*(quoting *Jordan v. Bellinger, 2000 U.S. Dist. LEXIS 19233, \*18 (D. Del. April 28, 2000)*). By waiting until its reply brief to assert that all of SFC's claims should be dismissed pursuant to *Rule 9(b)*, Royal has violated Local Rule 7.1.3. Accordingly, the Court rejects Royal's attempt to dismiss SFC's remaining claims under *Rule 9(b)*.

[\*10]

## II. Whether Counts I-VI State A Claim Upon Which Relief May Be Granted

A. Counts I And II, Negligent Misrepresentation And Fraud

[HN7] Under Delaware law, to state a claim of common law fraud a plaintiff must plead: 1) a false representation made by the defendant, usually one of fact; 2) the defendant's knowledge or belief that the statement was false; 3) an intent to induce the plaintiff to act; 4) the plaintiff's justifiable reliance upon the representation; and 5) damage to the plaintiff as a result. *Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).* The only difference between an action for fraud and negligent misrepresentation is that, with a claim of negligent misrepresentation, the plaintiff need not plead that the defendant knew or believed that his or her statement was false or that he or she proceeded in a reckless disregard for the truth. Id. By its Motion, Royal seeks to dismiss Counts I and II for failure to plead elements 1, 4, and 5.

1. Statement Of A Material Fact

Royal contends that SFC has not adequately pled the existence of a material fact because the statements SFC alleges were false or negligent concern future [*11] undertakings. (D.I. 7 at 8.) SFC responds that the Court should not be persuaded by Royal's arguments because a claim for fraud may be based upon statements of future results.

[HN8] Under Delaware law, "opinions and statements as to probable future results are not generally fraudulent even though they relate to material matters." *Esso Standard Oil Co. v. Cunningham, 35 Del. Ch. 210, 114 A.2d 380, 383 (Del. Ch. 1955); Craft v. Bariglio, 1984 Del. Ch. LEXIS 421, 1984 WL 8207, at *8 (Del. Ch. March 1, 1984).* Applying this principle and the *Rule 12(b)(6)* standard of review to the allegations in SFC's Complaint, the Court concludes that it would be premature to dismiss Counts I and II for failure to plead a material fact.

In its Complaint, SFC alleges that after Royal made a public announcement that it was leaving the credit risk insurance business, "Royal continued to represent to SFC that one more policy would be issued to SFC." (D.I. 1 at P 31) (emphasis added). Further, SFC alleges that Royal contacted SFC's CEO and "told him that Royal would consider providing credit risk insurance for another securitization if SFC agreed to borrow money from Royal to be used to make 'forbearance [*12] payments' to Wells Fargo." Id. at P 33. Taken as true, SFC's assertions constitute more than mere "opinions and statements as to probable future results." See *Esso Standard, 114 A.2d at 383.* Thus, the Court concludes that the combined effect on SFC of Royal's statements of intent to issue a new

policy suffice, for the purposes of this Motion, to plead the existence of misstatements or negligent misrepresentations made to induce SFC to borrow money from Royal.

2. Justifiable Reliance

Royal contends that SFC has not pled justifiable reliance because, in the circumstances of this case, a reasonable person would not have relied upon a verbal commitment that Royal would issue an additional credit risk insurance policy. In response, SFC contends that its reliance upon Royal's misrepresentations was justifiable because, unlike the precedent relied upon by Royal, in this case there was no written agreement between the parties that made Royal's oral assurances unworthy of SFC's reliance.

Delaware courts follow the Restatement's definition of justifiable reliance. See *Lock v. Schreppler, 426 A.2d 856, 863 (Del. Super. 1981),* superceded by statute [*13] in part on other grounds as stated in, *Amato & Stella Assoc. v. Florida North Inv., Ltd., 678 F. Supp. 445, 448 (D. Del. 1988).* [HN9] In order to plead justifiable reliance based on a statement of intention, a plaintiff must allege facts demonstrating that "the intention is material and the recipient has reason to believe that it will be carried out." *Restatement (Second) of Torts § 544 (1977).* Applying these standards to SFC's Complaint, the Court concludes that SFC has adequately pled justifiable reliance in order to survive dismissal.

Royal directs the Court to *Debakey Corp. v. Raytheon Service Co., 2000 Del. Ch. LEXIS 129, 2000 WL 1273317 (Del. Ch. Aug. 25, 2000),* for support of its contention that SFC failed to adequately plead justifiable reliance. n5 In Debakey, the plaintiff sued for fraudulent inducement because of an oral promise by defendants that they would provide funding in excess of $ 2 million to the parties' joint venture. *2000 Del. Ch. LEXIS 129, 2000 WL 1273317, at *22.* A subsequent written contract, however, stated that the defendants had the right to unilaterally decide not to extend funding once the $ 2 million limit was reached. [*14] Id. Once the $ 2 million limit was reached, the defendants declined to extend the plaintiffs additional funding. Id.

n5 Royal does not contest that the statements at issue are material.

Following a bench trial, the Debakey court concluded that the written contract precluded the plaintiff from establishing justifiable reliance. Id. The court reasoned that reliance on the defendants' prior oral representations that they would provide funding in excess of $ 2 million when a subsequent express contract "unambigu-

ously" permitted the defendants to terminate the joint venture "once the $ 2 million funding limit was reached" was unreasonable. Id.

The Court concludes that *Debakey* is both factually and procedurally distinguishable from the instant case. Here, unlike *Debakey*, there is no express contract that would make SFC's reliance on Royal's oral representations unjustifiable. Further, the *Debakey* court reached its conclusions after a bench trial and post-trial briefing, clearly not [*15] subject to the liberal *12(b)(6)* standard of review. When reviewing SFC's Complaint under the correct standard of review, the Court concludes that SFC has adequately pled justifiable reliance. As noted above, SFC alleges that Royal made two statements to it indicating Royal's intent to issue a new credit risk insurance policy. (D.I. 1 at P 31, 33.) Further, SFC alleges that Royal made these two representations following Royal's public announcement that it was exiting the credit risk insurance business (D.I. 1 at P 29), thereby justifying SFC's belief that Royal would issue one more policy despite its announcement.

Based on these allegations, the Court cannot conclude that SFC could prove no set of facts establishing justifiable reliance. See *Langford, 235 F.3d at 47*. Accordingly, the Court will deny Royal's Motion to Dismiss Counts I and II for failure to plead justifiable reliance.

3. Damages

The Court is not persuaded by Royal's contention that SFC has failed to plead damages as a result of Royal's allegedly fraudulent and negligent misrepresentations. In paragraph 36, SFC alleges that it borrowed over $ 12 million from Royal "that provided no benefit to SFC. [*16] " (D.I. 1.) Further, in paragraph 45, SFC alleges that based on Royal's misrepresentations, Royal continued to receive pecuniary benefits that it was not entitled to from SFC's business. Id. Based on these allegations, the Court concludes that SFC has pled damages that are a consequence of Royal's alleged misrepresentations and false statements.

4. Duty To Speak

Royal also contends that SFC has failed to state a claim of fraud or negligent misrepresentation because, to the extent SFC bases Counts I and II on material omissions by Royal, SFC has not alleged that Royal had a duty to speak. [HN10] In Delaware, a duty to speak may arise from circumstances other than a fiduciary or confidential relationship. See *Matthews Office Designs, Inc. v. Taub Invs., 1994 Del. LEXIS 182*, [reported in full-text format at] *647 A.2d 382* (Del. 1993) (relying on the *Restatement (Second) of Torts § 551(2)* (1976) for the circumstances in which a duty to speak may arise). In relevant part, the *Restatement (Second) of Torts § 551* pro-

vides that [HN11] a party to a business transaction has a duty to exercise reasonable care to disclose: 1) information known due to the existence of [*17] a confidential or fiduciary relationship; 2) information that if undisclosed will cause its partial statements of facts to be misleading; or 3) facts basic to the transaction "if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Id.; see also *Mentis v. Delaware Am. Life Ins. Co., 1999 Del. Super. LEXIS 419, 1999 WL 744430 (Del. Super. July 28, 1999)* (holding that a duty to speak may arise from a pre-existing relationship between the parties or from a partial disclosure of facts that requires further disclosure to prevent a misleading impression) (citations omitted).

Royal moves to dismiss Counts I and II only on the basis that SFC has not alleged the existence of a confidential or fiduciary relationship between the parties. Therefore, the Court will deny Royal's Motion because Royal has not established, under all the circumstances articulated by *Section 551 of the Restatement (Second) of Torts*, that SFC has failed to plead facts sufficient to establish a duty [*18] to speak.

B. Count III, Breach of the Duty Of Good Faith And Fair Dealing

Royal contends that Count III of SFC's Complaint, breach of the duty of good faith and fair dealing, should be dismissed because there was no contract by which a covenant of good faith and fair dealing may be implied. In response, SFC contends that it has alleged facts sufficient to support its breach of the duty of good faith and fair dealing claim because the case Royal relies upon implied a covenant of good faith and fair dealing before the execution of any written contract. Further, SFC contends that part of its good faith and fair dealing claim involves actions that took place after the Notes were executed.

[HN12] Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward the other party with respect to their contract. *Katz v. Oak Indus. Inc., 508 A.2d 873, 880 (Del. Ch. 1986)* (citing *Restatement (Second) of Contracts, § 205 (1981)*). A party must "act reasonably to fulfill the intent of the parties to the agreement." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC, 832 A.2d 116, 128 (Del. Ch. 2003)* [*19] (quoting *Kelly v. McKesson HBOC, Inc., 2002 Del. Super. LEXIS 39, 2002 WL 88939 at *10 (Del. Super. Jan. 16, 2002)*). Applying these principles to the allegations in SFC's Complaint, the Court will grant Royal's Motion to Dismiss SFC's claim for breach of the duty of good faith and fair dealing.

SFC contends that it has sufficiently alleged a claim for breach of the duty of good faith and fair dealing because it alleged in its Complaint that "at the time the parties negotiated the Notes, SFC reasonably expected Royal to issue the new policy based on Royal's misrepresentations and omissions." (D.I. 14 at 21.) SFC alleges that its reasonable expectations are based upon Royal's representations to SFC's CEO that Royal would consider providing additional credit risk insurance for another securitization if SFC executed the Notes that Royal would use to make forbearance payments to Wells Fargo. (D.I. 1 at P 33.) SFC further alleges that it executed the Notes requested by Royal, but that Royal never fulfilled its promise to issue a new credit risk insurance policy. Id. at P 59-60.

The Court concludes that SFC's allegations are [HN13] complaints about Royal's bad faith in bargaining or negotiation, and [*20] therefore, do not fall within the scope of the duty of good faith and fair dealing in contracts. See Restatement (Second) of Contracts § 205 comment (c) (1981). "The duty of good faith is ... not imposed on parties until they have reached agreement and does not bind them during their earlier negotiations." E. Allen Farnsworth, 2 Farnsworth on Contracts § 7.17 (2d ed. 2001). SFC's allegations involve contract invalidating claims dealing with fraudulent inducement or fraud, not breach of the duty of good faith and fair dealing. Accordingly, the Court will grant Royal's Motion to Dismiss Count III of SFC's Complaint for failure to state a claim upon which relief may be granted on grounds of breach of the duty of good faith and fair dealing.

C. Count IV, Unjust Enrichment

Royal contends that Count IV, unjust enrichment, should be dismissed because payment of the loan proceeds was carried out as contemplated by the parties. Further, Royal contends that because unjust enrichment is a quasi-contract claim, it is not available when, as here, an express contract covers the same subject matter. SFC responds that it has sufficiently pled [*21] an action for unjust enrichment because actions for unjust enrichment are permitted when the validity of a contract is challenged, as in the instant case.

[HN14] "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1056 (Del. Super. 2001)(quoting Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)). "'The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided

by law.'" Id. (quoting Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1993). Applying these principles to the facts alleged in SFC's Complaint, the Court concludes that SFC has adequately alleged facts in support of its unjust enrichment claim to survive Royal's Motion to Dismiss.

The Court is not persuaded by Royal's contention that SFC may not maintain a claim for unjust enrichment [*22] because the parties executed documents, i.e. the Notes, providing for payment to Wells Fargo. Although the Court agrees with the general contract principle cited by Royal, in this case, SFC alleges that the Notes should be rescinded because of fraudulent statements and omissions made by Royal. Therefore, accepting SFC's factual allegations, the Court concludes that SFC's unjust enrichment claim must survive the instant motion because if the Notes are rescinded due to fraudulent conduct or omissions, there is no valid contract that would preclude SFC's unjust enrichment theory.

Further, the Court rejects Royal's assertion that SFC has failed to allege that Royal received any unjust retention of a benefit. Royal contends that because the parties specifically contemplated that the proceeds from the Notes would be paid to Wells Fargo, SFC cannot now complain of any unfairness that may have resulted from that agreement. SFC is not, however, merely complaining that Wells Fargo received the benefit of the proceeds of the Notes; instead, SFC asserts that Royal was unjustly enriched because Royal induced SFC to act by making promises Royal never intended to keep. Accordingly, the Court will [*23] deny Royal's Motion to Dismiss Count IV.

D. Counts V, Rescission, and VI, Declaratory Judgment

Royal contends that Counts V, rescission, and VI, declaratory judgment, should be dismissed because these claims are based upon previous paragraphs in the Complaint that are defective for reasons it stated with respect to Counts I-IV. The Court disagrees.

[HN15] Delaware law recognizes fraudulent inducement as one means by which a party may rescind an agreement. Norton v. Poplos, 443 A.2d 1, 4 (Del. 1982). The elements of fraudulent inducement are 1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result. Lord v. Souder, 748 A.2d 393, 402 (Del. 2000) (citing Stephenson, 462 A.2d at 1074.

The Court concludes that SFC has alleged facts sufficient to support its claim for rescission due to fraudu-

lent inducement. In its Complaint, SFC alleges that Royal knew that representations and omissions it made to SFC were false, that [*24] it acted reasonably in reliance on these representations, and that it was injured. (D.I. 1 at P 30-36.) These allegations support a claim for rescission due to fraudulent inducement. n6

> n6 As noted above, the Court has concluded that SFC's Complaint, for the purposes of the *Rule 12(b)(6)* Motion, alleges a material fact, justifiable reliance, and the damages elements of an action for fraud.

The Court also concludes that SFC has alleged facts sufficient to support its declaratory judgment claim. Count VI of SFC's Complaint asserts that SFC is entitled to a declaratory judgment that the Notes are null and void because it was fraudulently induced into their execution. As the Court has concluded, SFC has alleged facts adequate to support a claim for fraudulent inducement, and therefore, the Court will deny Royal's Motion to Dismiss Count VI of SFC's Complaint.

## CONCLUSION

For the reasons discussed, the Court concludes that Counts I and II of SFC's Complaint do not satisfy *Rule 9(b)*'s pleading requirements, [*25] and therefore, must be dismissed. Further, the Court concludes that Count III of SFC's Complaint must be dismissed pursuant to *Rule 12(b)(6)*. The Court also concludes that Counts I, II, and IV-VI state a claim for which relief may be granted.

An Order consistent with this Opinion will be entered.

## ORDER

At Wilmington, this 23rd day of March, 2004, for the reasons discussed in the Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that:

> 1) Royal Indemnity Co.'s ("Royal") Motion to Dismiss (D.I. 6) Counts I and II of Student Finance Corporation's ("SFC") Complaint pursuant to *Rule 9(b)* is **GRANTED;**
>
> 2) Royal's Motion to Dismiss (D.I. 6), pursuant to *Rule 12(b)(6)*, with respect to:
>
> > a) Count III of SFC's Complaint is **GRANTED;**
> >
> > b) Counts I, II, IV-VI of SFC's Complaint is **DENIED.**
>
> 3) SFC shall file an Amended Complaint within twenty (20) days of this Order.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

-

LEXSEE 2001 US DIST LEXIS 17656

**SUNTEX INDUSTRIAL CORP., LTD. and RNB GARMENTS PHILIPPINES, INC., Plaintiffs, v. THE CIT GROUP/BBC, INC. n/k/a/ THE CIT GROUP COMMERCIAL SERVICES, INC., Defendant.**

**Civil Action No. 99-81-RRM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 17656*

**September 28, 2001, Decided**

**DISPOSITION:** [*1] Defendant's supplemental motion for summary judgment was granted.
**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff fabric suppliers sued defendant bank for tortious interference with supply contracts, breach of a letter of credit agreement (as alleged third party beneficiaries), negligent and intentional interference with prospective economic advantage, and unjust enrichment. The bank moved for summary judgment.

**OVERVIEW:** The bank had issued a letter of credit on behalf of a third party for materials provided to the third party by the suppliers. The third party subsequently filed bankruptcy. The court held that North Carolina law applied to the suppliers' tort claims since North Carolina was both the place of the conduct causing the injury and the place where the relationship between the parties was centered. Further, since the bank's conduct under the terms of the letter of credit was governed by North Carolina law, the court applied North Carolina law to the breach of contract claim. As to the tortious interference claim, the terms of the letter of credit agreement (agreement) gave the bank the right to reject discrepant provisions in the agreement with the third party. The bank's actions were reasonably related to their legitimate business interest that the third party would have been unable to pay the bank. No evidence indicated that the parties to the agreement intended for the suppliers to be able to enforce the terms of the agreement. As to the interference with economic advantage claim, no evidence demonstrated that the bank acted for the purpose of maliciously injuring the suppliers.

**OUTCOME:** The bank's supplemental motion for summary judgment was granted.

**CORE TERMS:** letter of credit, letters of credit, third party, discrepancy, beneficiary, waive, summary judgment, discrepant, presentation, shipped, matter of law, tortious interference, legitimate business, discovery, domicile, issuer, choice of law, intentional interference, unjust enrichment, garments, shipment, breach of contract, fair dealing, non-moving, breached, centered, genuine, unjustly enriched, prospective economic advantage, contractual right

**LexisNexis(R) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN1] A court reviews the choice of law rules applicable to each of a parties claims separately.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN2] In determining what state law governs tort claims in a diversity action, Delaware courts use the "most significant contacts" test. Under this test, courts review four types of contacts in evaluating which forum has the most significant

relationship to the conduct and the parties. These contacts are: place of the injury, place of the conduct causing the injury, domicile and place of business of the parties, and place where the relationship, if any, between the parties is centered. The relevant factors in this context are the domiciles of the parties, the place of the conduct causing the injury and the place where the relationship between the parties is centered.


*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN3] Delaware courts will enforce a choice of law provision as long as the jurisdiction selected bears some material relationship to the transaction.


*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] A court may grant a motion for summary judgment if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. The moving party bears the burden of establishing the absence of any genuine issue of material fact. Rule 56(c). Once this burden is met, the non-moving party must demonstrate specific facts that indicate a genuine material issue for trial. Fed. R. Civ. P. 56(e). Summary judgment should only be granted if the court finds, in consideration of all of the evidence, that no reasonable trier of fact could find for the non-moving party.


*Torts > Business & Employment Torts > Interference With a Contract*
[HN5] To succeed on a claim for tortious interference with contract, the plaintiff must prove five elements: (1) the existence of a valid contract between the plaintiff and a third party, conferring upon the plaintiff some contractual right against the third party; (2) the defendant had knowledge of the plaintiff's contract with the third party; (3) the defendant intentionally induced the third party not to perform his contract with the plaintiff; (4) that in so doing, the defendant acted without justification; (5) the defendant's act caused the plaintiff actual damages.


*Torts > Business & Employment Torts > Interference With a Contract*
[HN6] North Carolina authority is clear that complaints alleging tortious interference with contract should be dismissed as a matter of law when the alleged interference is justified or privileged. Naturally, if a defendant's sole motive is a malicious wish to injure the plaintiff, his actions are not justified. If, however, the defendant is acting for a legitimate business purpose, his actions are privileged. Actions taken in the natural course of doing business inevitably interfere in the business relations of others. That interference, however, is legally justifiable and non-actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful.


*Commercial Law (UCC) > Letters of Credit (Article 5) > Issuer Obligations & Rights*
[HN7] The duties and liabilities of an issuer of a letter of credit, or a guarantor of that issuer, are governed exclusively by the terms of the letter of credit.


*Contracts Law > Third Parties > Beneficiaries > Vesting of Rights*
*Contracts Law > Third Parties > Beneficiaries > Types of Beneficiaries*
[HN8] The test to be applied for determining third party beneficiary status is whether the parties to the contract intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental. In making this determination, North Carolina courts consider the circumstances surrounding the transaction and the terms of the contract as a whole on a case by case basis. Moreover, it must be clearly apparent that the contract was intended to benefit the third party and any doubt should be resolved against such intent.


*Commercial Law (UCC) > Letters of Credit (Article 5)*

2001 U.S. Dist. LEXIS 17656, *

[HN9] General principles of the commercial law concerning letters of credit stress that the letter of credit is essentially a contract between the issuer and the beneficiary and is recognized as independent of the underlying contract between the customer and the beneficiary. U.C.C. § 5-114 cmt. 1.

*Commercial Law (UCC) > Letters of Credit (Article 5) > Remedies*
*Commercial Law (UCC) > Letters of Credit (Article 5) > Confirmer, Nominated Person & Adviser*
[HN10] Transactions that utilize letters of credit necessarily involve two independent contracts: the underlying purchase and sale agreement between buyer and seller and the letter of credit between the issuer and the buyer, which is the bank's promise to pay the seller when the proper documentation is submitted. The seller has no contractual rights against the bank that issues the letter of credit.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN11] While a contracting party or an intended beneficiary to a contract can raise claims for breach of contract founded in the common law and statutory duties of good faith and fair dealing, the plaintiffs, unintended third party beneficiaries do not have the standing to assert such claims.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN12] No North Carolina case recognizes a claim for negligent interference with prospective economic advantage.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN13] In order to successfully assert a claim for intentional interference with prospective economic advantage, under North Carolina law, the plaintiff must prove that (1) the defendant induced a third party to refrain from entering a contract; (2) the contract would have ensued but for the interference; (3) the defendant lacked justification and acted with malicious design to injure the plaintiff or gain some advantage at his expense; and (4) the plaintiff was damaged as a result of the defendant's actions.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN14] To maintain a cause of action for unjust enrichment, the plaintiffs must prove: (1) a benefit was conferred on the defendant by the plaintiffs; (2) the acceptance of that benefit by the defendant; and (3) circumstances that make it inequitable for the defendant to retain the benefit. Courts have consistently dismissed unjust enrichment claims brought by beneficiaries of letters of credit agreements against financial institutions when the beneficiary could have avoided the loss by submitting documents that conformed to the terms of the letter of credit.

COUNSEL: For SUNTEX INDUSTRIAL CORP., LTD, RNB GARMENTS PHILIPPINES, INC., plaintiffs: Robert A. Penza, Gordon, Fournaris & Mammarella, Wilmington, DE.

For CIT GROUP/BBC INC., defendant: Steven L. Caponi, Blank, Rome, Comisky & McCauley, Wilmington, DE.

JUDGES: Roderick R. McKelvie, UNITED STATE DISTRICT JUDGE.

OPINIONBY: Roderick R. McKelvie

OPINION:

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a commercial dispute. Plaintiff Suntex Industrial Corp., Ltd. is a corporation organized under the laws of the Kingdom of Thailand, with its principal office in Bangkok. Plaintiff RNB Garments Philippines, Inc. is a corporation organized under the laws of the Republic of the Philippines, with its principal offices in Manila. Defendant, CIT Group/BBC Inc., n/k/a The CIT Group Commercial Services, Inc. ("CIT"), is a financial services company organized under the laws of the state of North Carolina. CIT has offices in North Carolina and New York.

Plaintiffs commenced this action on July 21, 1998, by filing their verified complaint in the United States District Court for the Southern District of New York [*2] against Chase Manhattan Bank and CIT. The claims against Chase and CIT sought to recover payments that

allegedly were due under letters of credit established by Ruff Hewn, Inc., a corporation with its offices in North Carolina, that were issued to secure payment of goods supplied to Ruff Hewn by Suntex and RNB. On February 9, 1999, the District Court in New York dismissed the action against Chase, and transferred the action against CIT to the District of Delaware, because Ruff Hewn's Chapter 11 petition under the U.S. Bankruptcy Code was pending in this district.

In their complaint, Suntex and RNB seek to hold CIT liable for the outstanding amount payable to the plaintiffs under the letters of credit and assert the following specific claims against CIT: (i) tortious interference with supply contracts between the plaintiffs and Ruff Hewn; (ii) breach of the Letter of Credit Agreement that existed between CIT and Ruff Hewn (as alleged third party beneficiaries) (iii) negligent and intentional interference with prospective economic advantage; and (iv) unjust enrichment.

On April 27, 1999, after the action was transferred, CIT answered the plaintiffs' complaint, raised certain affirmative [*3] defenses, and moved to dismiss the complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* asserting that the complaint failed to state a claim upon which relief could be granted. On June 10, 1999, pursuant to a June 8, 1999 stipulation between the parties relating to the filing of CIT's amended answer, CIT withdrew its motion to dismiss. On June 14, 1999, CIT amended its answer to the complaint. The parties then proceeded to take discovery. On March 31, 2000, CIT moved for summary judgment. The court granted the plaintiffs' request to conduct additional discovery and denied the defendant's summary judgment motion without prejudice, noting that it would allow CIT to re-file its motion after the close of the extended discovery period. On December 15, 2000, upon the conclusion of the extended discovery period, CIT filed a Supplemental Motion for Summary Judgment. The motion was briefed and argued before the court in a teleconference on February 5, 2001.

On February 6, 2001, the court informed the parties' counsel that the court would grant the defendant's motion for summary judgment. The following memorandum of law will describe the reasoning behind the court's decision [*4] to grant summary judgment in favor of CIT.

## I. FACTUAL BACKGROUND

The court draws the following facts from the plaintiffs' complaint and from documents and declarations attached in the appendices to the parties' briefing.

On December 29, 1994, CIT entered into a Factoring Agreement with Ruff Hewn in connection with Ruff Hewn's accounts receivables. Under that agreement CIT purchased certain of Ruff Hewn's accounts receivable and agreed to advance funds to Ruff Hewn upon submission of qualified accounts less a specified reserve amount. CIT retained the right to revise the reserve amount from time to time if, in its judgment, such revisions were necessary to protect CIT with regard to any indebtedness owed by Ruff Hewn. On the same date, CIT entered into a Letter of Credit Agreement with Ruff Hewn whereby CIT promised to guarantee payment or performance of letters of credit in conjunction with the purchase of foreign goods and inventories. CIT retained the right to reject any discrepant presentation under a letter of credit issued with CIT's assistance. Pursuant to the Letter of Credit Agreement, CIT arranged for the issuance of letters of credit by Chase to cover transactions [*5] entered into by Ruff Hewn.

Between April and October 1997, Suntex entered into several contracts with Ruff Hewn under which Suntex sold ladies' garments to Ruff Hewn. As a precondition to the sales contracts, Ruff Hewn procured and delivered to Suntex five letters of credit issued by Chase in amounts varying from $ 217,777.48 to $ 405,523,20, each payable against delivery of documents. Each letter of credit identified specific goods to be shipped, specified the date by which the goods must be shipped, listed specific documents that must be presented with the letter of credit for the letter of credit to be honored, and specified an expiration date. Each letter of credit was guaranteed by CIT.

During the months of August, September, and October of 1997, RNB entered into several contracts with Ruff Hewn under which RNB sold, and Ruff Hewn purchased, articles of clothing. On July 1, 1997, as required by the sales contract, Ruff Hewn procured and delivered to RNB a letter of credit issued by Chase in the amount of $ 187,914.96 payable against delivery of the documents. This letter of credit also identified specific goods to be shipped, specified the date by which the goods must be shipped, [*6] listed specific documents that must be presented with the letter of credit for the letter of credit to be honored, and specified an expiration date. The RNB letter of credit was also guaranteed by CIT.

After securing their respective letters of credit, both Suntex and RNB manufactured and shipped garments to Ruff Hewn by air and sea freight and informed Ruff Hewn of the name of the shippers. When the freight carriers arrived, Ruff Hewn unloaded the garments and accepted the garments as conforming goods. Both Suntex and RNB presented to Chase the letters of credit and supporting documents, demanding that Chase pay the full amount due from Ruff Hewn. For each of the shipments at issue in this case, however, Chase determined that the presentations contained discrepancies that did not conform to the terms of the letters of credit. After

reviewing each discrepant presentation, Chase prepared a list of the discrepancies, which it forwarded to CIT for review. It was Chase's business practice not to satisfy a discrepant presentation or pay the beneficiary unless CIT notified Chase that the discrepancies were waived.

On October 24, 1997, Ruff Hewn notified Chase and CIT that it agreed to [*7] waive any discrepancies in the shipments. However, in light of its determination that Ruff Hewn did not have the money to reimburse CIT for the payments, CIT exercised its contractual right not to waive the discrepancies in this case. While Chase has paid portions of the Suntex and RNB letters of credit, plaintiffs allege that they are still owed the respective sums of $ 748,287.09 and $ 106,927.31, plus interest.

Under the terms of the letters of credit, if the goods are shipped by sea, the freight forwarder's cargo receipt must indicate that the goods are consigned to Ruff Hewn. If the goods are shipped by air, then the original bill of lading for the shipment of the goods must be delivered to Ruff Hewn. As a consequence, Ruff Hewn could and did take complete possession of the goods at customs and subsequently dispose of the goods even if the letters of credit were dishonored. Neither Chase nor CIT had control or possession of the goods in question.

There is no evidence on the record as to what happened to the goods at issue in this case after Ruff Hewn took possession of them. They are no longer in Ruff Hewn's possession. On January 21, 1998, Ruff Hewn filed a petition for bankruptcy [*8] in the United States Bankruptcy Court for the District of Delaware. As the District Count in New York has granted summary judgment in favor of Chase, CIT is the only remaining defendant in the case.

## II. DISCUSSION

### A. Choice of Law

Plaintiffs' contend that New York law should apply to each of their claims. Defendant, however, believes that North Carolina law should govern each of the asserted claims. [HN1] The court reviews the choice of law rules applicable to each of the claims separately.

[HN2] In determining what law governs tort claims, Delaware courts use the "most significant contacts" test, as set forth in the *Restatement (Second) of Conflicts § 145. See Travelers Indemnity Co. v. Lake, 594 A.2d 38 (Del. 1990)*. Under this test, courts review four types of contacts in evaluating which forum has the most significant relationship to the conduct and the parties. These contacts are: place of the injury, place of the conduct causing the injury, domicile and place of business of the parties, and place where the relationship, if any, between

the parties is centered. *Restatement (Second) of Conflicts § 145(2)*.

The relevant contacts with North Carolina are: (i) [*9] Ruff Hewn's principal place of business was located in North Carolina; (ii) CIT's agreements and relationships with Ruff Hewn, including the Factoring Agreement and Letter of Credit Agreement, originated out of and were managed by CIT executive and management personnel located in Charlotte, North Carolina; (iii) all funds received by CIT in connection with the Ruff Hewn relationship were received in Charlotte, North Carolina. The relevant contacts with New York are: (i) the physical location of CIT's letter of credit department is located in New York; (ii) New York is Chase's and CIT's domicile and is the site of those companies' principal offices.

As both plaintiffs are foreign corporations and the place of the alleged injuries to Suntex and RNB are located in Thailand and the Philippines respectively, that factor does not impact the choice between New York and North Carolina law. Rather, the relevant factors in this context are the domiciles of the parties, the place of the conduct causing the injury and the place where the relationship between the parties is centered. The domiciles of the parties are Thailand, the Phillippines, and North Carolina. CIT's actions and decisions that [*10] allegedly give rise to liability were controlled and performed by CIT management and account executives in North Carolina. Thus, North Carolina is both the place of the conduct causing the injury and the place where the relationship between the parties is centered. Accordingly, the court finds that these factors favor choosing to apply North Carolina law to plaintiffs' tort claims. The same reasoning compels the court to apply North Carolina law to plaintiffs' unjust enrichment claim.

With respect to the breach of contract claim, plaintiffs' claims arise out of a Letter of Credit Agreement that was executed in North Carolina. According to its terms, that agreement is considered part of the Ruff Hewn-CIT Factoring Agreement. The Factoring Agreement contains an explicit choice of law provision in paragraph 21, which provides that "this agreement and all transactions hereunder shall be governed as to validity, enforcement, interpretation, and construction and in all other respects by the laws of the State of North Carolina. . . ." [HN3] Delaware courts will enforce a choice of law provision as long as the jurisdiction selected, in this case North Carolina, bears some material relationship [*11] to the transaction. *Annan v. Wilmington Trust Co., 559 A.2d 1289, 1293 (Del. 1989)*. Because CIT's conduct under the terms of the contract is to be governed by North Carolina law, the court will apply North Carolina law to plaintiffs' breach of contract claim as well.

### B. Summary Judgment Standard

[HN4] A court may grant a motion for summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once this burden is met, the non-moving party must demonstrate specific facts that indicate a genuine material issue for trial. *Fed. R. Civ. P. 56(e)*; *Celotex Corp., 477 U.S. at 324*. [*12] Summary judgment should only be granted if the court finds, in consideration of all of the evidence, that no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co., 475 U.S. at 587*.

C. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That Defendant Tortiously Interfered With Plaintiffs' Supply Contracts With Ruff Hewn?

[HN5] To succeed on a claim for tortious interference with contract, the plaintiffs must prove five elements: (1) the existence of a valid contract between the plaintiff and a third party, conferring upon the plaintiff some contractual right against the third party; (2) the defendant had knowledge of the plaintiff's contract with the third party; (3) the defendant intentionally induced the third party not to perform his contract with the plaintiff; (4) that in so doing, the defendant acted without justification; (5) the defendant's act caused the plaintiff actual damages. See *Peoples Sec. Ins. Co. v. Hooks, 322 N.C. 216, 367 S.E.2d 647, 649-50 (N.C. 1988)*.

The plaintiffs allege that CIT tortiously interfered with their supply agreements by refusing to waive the discrepant [*13] provisions and by failing to advise Chase to pay the letters of credit. CIT contends that the plaintiffs' claim is deficient with respect to three of the five elements of the claim. First, CIT claims that the plaintiffs cannot as a matter of law establish intentional inducement. Second, CIT claims that the plaintiffs have no evidence that CIT acted without justification when it refused to waive the discrepancies. Last, CIT argues that there is no evidence that CIT's actions proximately caused the plaintiffs' damages.

The court's analysis will focus on the lack of justification element because that element is most central to the parties' dispute and because the parties' arguments regarding the other disputed elements, inducement and causation, directly relate to whether CIT was justified in

refusing to authorize payment by Chase. CIT contends that its action does not amount to a tort because it was justified by a legitimate business interest and because CIT expressly reserved the independent right to approve or disapprove all waivers. Plaintiffs argue in opposition that CIT's refusal to waive discrepancies was without justification because it violated CIT's implied obligation to deal [*14] in good faith with the plaintiffs. See *U.C.C. § 5-109* cmt. 1. They submit that the issue of whether CIT acted without justification is a genuine material fact that should be determined by a jury.

[HN6] North Carolina authority is clear that complaints alleging tortious interference with contract should be dismissed as a matter of law when the alleged interference is justified or privileged. See, e.g., *Peoples Sec. Life Ins., 367 S.E.2d at 650*; *Smith v. Ford Motor Co., 289 N.C. 71, 221 S.E.2d 282 (1976)*. Naturally, if the a defendant's sole motive is a malicious wish to injure the plaintiff, his actions are not justified. If, however, the defendant is acting for a legitimate business purpose, his actions are privileged. Actions taken in the natural course of doing business inevitably interfere in the business relations of others. That interference, however, is legally justifiable and non-actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful. *Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176 (N.C. 1954)*.

[HN7] The duties and liabilities of an issuer of a letter of credit, or a guarantor of [*15] that issuer, are governed exclusively by the terms of the letter of credit. *Courtaulds North America, Inc. v. North Carolina Nat'l Bank, 528 F.2d 802 (4th Cir. 1975)* (applying North Carolina law). There is no dispute between the parties that the express terms of the Letter of Credit Agreement give CIT the right to waive or to reject discrepant provisions and that the presentations made to Chase by the plaintiffs were indeed discrepant. Applicable commercial law requires strict compliance with those terms. Any discrepancy, however seemingly minor, permits dishonor of a letter of credit. *Id. at 805-06*.

Plaintiffs seek to establish lack of justification by alleging that CIT breached the implied contractual duties of good faith and fair dealing. "Good faith" means honesty in fact in the conduct or transaction concerned. *U.C.C. § 1-201(19)*. Plaintiffs have not set forth any evidence that shows that CIT was dishonest in any transaction in this action. The dishonor of a demand for payment when that demand does not comply with the terms of the Letter of Credit cannot constitute bad faith.

Moreover, plaintiffs set forth no facts to support their contention [*16] that CIT's actions were unjustified. Rather, the factual record demonstrates that CIT's actions were reasonably related to their legitimate busi-

ness interest. CIT, as Ruff Hewn's lender, had a direct interest in the subject matter of Ruff Hewn's supply contracts with the plaintiffs and by refusing to waive the discrepancies, was acting out of a concern that Ruff Hewn would be unable to pay CIT. Accordingly, the plaintiffs cannot demonstrate, as a matter of law, that CIT tortiously interfered with their supply contracts.

D. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim, as Third Party Beneficiary. That CIT Breached the Letter of Credit Agreements Between Itself and Ruff Hewn?

Although plaintiffs' have no contractual relationship with CIT, the plaintiffs next allege that CIT breached the Letter of Credit Agreement between CIT and Ruff Hewn. Plaintiffs argue that CIT violated the covenant of good faith and fair dealing that was due to them when it refused to waive discrepancies under the Agreement. As a prerequisite to asserting this claim, plaintiffs must demonstrate that they have standing as third party beneficiaries of that agreement.

To establish their [*17] standing to assert this claim under North Carolina law, plaintiffs must prove that they were intended third party beneficiaries of the Letter of Credit Agreement. *Chemical Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood, 84 N.C. App. 27, 351 S.E.2d 786, 790 (N.C. App. 1987)* (citations omitted). [HN8] The test to be applied is whether the parties to the contract, CIT and Ruff Hewn, intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental. *Vogel v. Supply Co., 277 N.C. 119, 177 S.E.2d 273 (N.C. 1970).* In making this determination, North Carolina courts consider the circumstances surrounding the transaction and the terms of the contract as a whole on a case by case basis. *Raritan River Steel Co. v. Cherry Bekaert & Holland, 329 N.C. 646, 407 S.E.2d 178, 182 (N.C. 1991).* Moreover, it must be "clearly apparent" that the contract was intended to benefit the third party and any doubt should be resolved against such intent. *Chemical Realty Corp., 351 S.E.2d at 791.*

The court cannot glean any evidence from the record that the parties to the Letter of Credit [*18] Agreement intended for the plaintiffs, as third parties, to be able to enforce the terms of that Agreement. Moreover, [HN9] general principles of the commercial law concerning letters of credit stress that "the letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary." *U.C.C. § 5-114* cmt. 1; see also *Alaska Textile Co. v. Chase Manhattan Bank, 982 F.2d 813, 815-16 (2d Cir. 1992)* (noting that "this independence principle in-

fuses the credit transaction with the simplicity and certainty that are its hallmarks").

[HN10] Transactions that utilize letters of credit necessarily involve two independent contracts: the underlying purchase and sale agreement between buyer and seller and the letter of credit between the issuer and the buyer, which is the bank's promise to pay the seller when the proper documentation is submitted. The seller has no contractual rights against the bank that issues the letter of credit. In this case, there is a third independent contract: CIT's Letter of Credit Agreement with the buyer Ruff Hewn, under which CIT promised [*19] to guarantee the bank's payment of the letters of credit, subject to certain terms. Like the bank's letter of credit agreements, CIT's agreement to act as guarantor of those letters of credit is presumptively independent from the underlying purchase and sale agreements between the Ruff Hewn and the plaintiffs. Because plaintiffs have failed to point out any reason to depart from the well accepted independence principle in this case, the plaintiffs have no contractual right to proceed against CIT.

Accordingly, the court finds that the plaintiffs cannot, as a matter of law, establish that they were intended third party beneficiaries of CIT's financing agreements with Ruff Hewn. [HN11] While a contracting party or an intended beneficiary to a contract can raise claims for breach of contract founded in the common law and statutory duties of good faith and fair dealing, the plaintiffs, as unintended third party beneficiaries do not have the standing to assert such claims.

E. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That CIT Negligently and Intentionally Interfered With Plaintiffs' Prospective Economic Advantage?

Because the court can find [HN12] no North Carolina case [*20] recognizing a claim for negligent interference with prospective economic advantage, it will only address the plaintiffs' claim for intentional interference with economic advantage. [HN13] In order to successfully assert a claim for intentional interference with prospective economic advantage, under North Carolina law, the plaintiff must prove that (1) the defendant induced a third party to refrain from entering a contract; (2) the contract would have ensued but for the interference; (3) the defendant lacked justification and acted with "malicious design to injure the [plaintiff] or gain some advantage at his expense;" and (4) the plaintiff was damaged as a result of the defendant's actions. *Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 140 S.E.2d 3, 11 (N.C. 1965); Cameron v. New Hanover Mem'l Hosp., Inc., 58 N.C. App. 414, 293 S.E.2d 901, 916-17 (N.C. App. 1982).*

Because this claim is analogous to a claim for tortious interference with contract, the court's reasoning regarding the plaintiffs' inability to satisfy the lack of justification element in plaintiffs' tortious interference claim, found in Section II.C. of this order, applies [*21] with equal force to this claim. Plaintiffs have not produced any evidence that shows that CIT acted for the purpose of maliciously injuring the plaintiffs and not for a justifiable reason related to its legitimate business interest. Therefore, they cannot make out their intentional interference with prospective advantage claim as a matter of law.

F. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That Defendant Was Unjustly Enriched?

Plaintiffs assert that CIT was unjustly enriched by refusing to waive the discrepant presentations. [HN14] To maintain a cause of action for unjust enrichment, the plaintiffs must prove: (1) a benefit was conferred on the defendant by the plaintiffs; (2) the acceptance of that benefit by the defendant; and (3) circumstances that make it inequitable for the defendant to retain the benefit. *FDIC v. British-American, Corp., 755 F. Supp. 1314, 1324 (E.D.N.C. 1991).*

Courts have consistently dismissed similar unjust enrichment claims brought by beneficiaries of letters of credit agreements against financial institutions when the beneficiary could have avoided the loss by submitting documents that conformed to the terms of the [*22] letter of credit. See, e.g., *Alpargatas v. Century Bus. Credit Corp., 183 A.D.2d 491, 583 N.Y.S.2d 441, 442 (App. Div. 1992).* The parties agree that the presentations at issue were discrepant under the terms of the letters of credit. Moreover, it is undisputed that CIT expressly retained the right to decide whether to waive discrepancies in the shipments. Under the terms of their agreement, even the slightest discrepancy justified CIT's refusal to authorize payment. Simply put, CIT cannot be said to have been unjustly enriched at plaintiffs' expense for justifiably acting within the terms of its agreement.

III. CONCLUSION

The court finds that defendants have met their burden in establishing that there is no genuine material issue for trial with respect to each of the plaintiffs' claims. Accordingly, summary judgment in CIT's favor is proper with respect to all claims.

It is therefore,

**ORDERED** that Defendant's Supplemental Motion for Summary Judgment (Docket Item 94) is hereby granted.

Roderick R. McKelvie

UNITED STATE DISTRICT JUDGE

Dated: September 28, 2001

LEXSEE 2005 DEL CH LEXIS 59

**VLIW TECHNOLOGY, LLC, a Delaware limited liability company, Plaintiff, v. HEWLETT-PACKARD COMPANY and STMICROELECTRONICS, INC., Delaware corporations, Defendants.**

**C.A. No. 20069**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2005 Del. Ch. LEXIS 59*

**March 23, 2005, Submitted**
**May 4, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 2003 Del. LEXIS 615 (Del., 2003)*

**DISPOSITION:** Defendants' motion for summary judgment is granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant purchaser filed a motion for summary judgment with regard to the cause of action brought by plaintiff transferee, which claimed that the purchaser violated a license agreement that was made between the purchaser and the transferee's predecessor, a software development company. The transferee asserted breach of contract, misuse of trade secrets, breach of the confidentiality provisions, and willful misappropriation.

**OVERVIEW:** The software development company sold a perpetual license to certain of its technology in return for a single lump sum payment. As part of that license agreement, the purchaser expressly agreed to maintain the confidentiality of the company's trade secret information for a period of five years. The company went out of business and sold all of its assets, including its remaining intellectual property rights, to another entity, who in turn transferred those rights to the transferee. The transferee asserted that the purchaser violated the license agreement by entering into a research and development project with another firm in 1999 that entailed disclosure of the licensed technology. Most of the transferee's claims had already been dismissed, and only the misappropriation claims remained. The court held that summary judgment in favor of the purchaser was proper because the claim was untimely. The court found that the license agreement contained a single five-year confidentiality agreement that became effective on May 30, 1990. As such, the court concluded that the confidentiality obligations under the license agreement expired on May 30, 1995.

**OUTCOME:** The court granted the purchaser's motion for summary judgment and dismissed the case.

**CORE TERMS:** license agreement, confidentiality, multiflow, duty, technology, confidential information, license, statute of limitations, perpetual, negotiation, summary judgment, misappropriation, trade secrets, intellectual property, confidential, licensed, chip, disclosure, five-year, compiler, confidence, software, email, time-barred, expired, confidentiality agreement, breach of contract, matter of law, trade secret, discovery

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

2005 Del. Ch. LEXIS 59, *

[HN1] On a motion for summary judgment pursuant to Del. Ch. Ct. R. 56, judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] The burden is on the moving party to prove an absence of a material issue of fact and the court must review all evidence in the light most favorable to the non-moving party with regard to a motion for summary judgment pursuant to Del. Ch. Ct. R. 56. If the moving party puts facts into the record which, if unrebutted, entitle it to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight; for example, the party opposing summary judgment is obliged to adduce some evidence showing the existence of a dispute of material fact.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] See Del. Ch. Ct. R. 56(e).

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN4] Under State of Connecticut law, when a contract is formed between two parties of relatively equal bargaining power, it must be construed to effectuate the intent of the parties. The intent of the parties is ascertained by a fair and reasonable construction of the language used in the contract, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The language of the contract must be given its ordinary meaning and usage where it can be sensibly applied to the contract's subject matter.

*Civil Procedure > Jury Trials > Province of Court & Jury*
*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN5] Connecticut case law does not set forth a test by which to determine whether a contract should be reviewed as a question of law rather than as a question of fact. The fact that a disputed agreement was a commercial contract between sophisticated, commercial parties with relatively equal bargaining power creates a presumption that the contract should be interpreted as a matter of law.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6] A court of equity may grant a motion to dismiss on the ground that the plaintiff's claims are barred by the applicable statute of limitations.

*Contracts Law > Breach > Causes of Action*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN7] Under State of Delaware law, the appropriate statute of limitations applied to contracts and misappropriation of trade secrets is three years. The statute of limitations for misappropriation of trade secrets in the State of Connecticut is, likewise, three years.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN8] A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches. The statutory period may create a presumptive time period for ap-

plication of laches to bar a claim. In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff will be barred from bringing suit without the necessity of the court engaging in a traditional laches analysis. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.

*Antitrust & Trade Law > Trade Practices & Unfair Competition*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN9] The statute of limitations period for a claim under the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110g(f)*, is three years.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN10] An analogous statute of limitations period applicable at law is to be given great weight in determining whether a suit is to be time-barred in equity by laches and will be applied in the absence of unusual or mitigating circumstances.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN11] With respect to questions of which state's statute of limitations applies to a cause of action, a court is to apply the statute of limitations of the forum. Limitations questions are generally settled by the law of the forum.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN12] In the State of Delaware, the statute of limitations begins to run at the time of the alleged wrongful act, regardless of whether the plaintiff is aware of the injury.

*Contracts Law > Breach > Causes of Action*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN13] An action for breach of contract accrues at the time of the alleged breach of the contract.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN14] Under the so-called discovery rule, claims for the misappropriation of trade secrets accrue at the time the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. It does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets as long as the party knew the facts which could give rise to such a claim. Therefore, the cause of action accrues when the claimant knows or should know the relevant facts.

*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > General Overview*
[HN15] The Uniform Trade Secrets Act (UTSA), *Del. Code Ann. tit. 6, § § 2001-09*, codifies the basic principles of common law trade secret protection and has been adopted by over 40 states, including the State of Delaware and the State of Connecticut. *Conn. Gen. Stat. § § 35-50* through 35-58. Due to the dearth of Delaware cases interpreting the UTSA, a Delaware court looks to other states' decisions interpreting the UTSA for guidance. *Del. Code Ann. tit. 6, § 2008*. The UTSA shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it. *Conn. Gen. Stat. § 35-58*.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN16] Negotiations do not toll the statute of limitations, unless the parties agree to do so. It does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets as long as the party knew the facts which could give rise to such a claim.

*Trade Secrets Law > Civil Actions > Remedies > Damages > General Overview*
*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*
[HN17] The Uniform Trade Secret Act, *Del. Code Ann. tit. 6, § 2533*, and *Conn. Gen. Stat. § 35-52*, allows an aggrieved party to not only sue for damages, but also for injunctive relief.

COUNSEL: Attorneys for the Plaintiff: Arthur G. Connolly, III, Esquire, CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware; Michael O. Warnecke, Esquire, Robert Unikel, Esquire, Margaret A. O'Connor, Esquire, MAYER BROWN ROWE & MAW, LLP, Chicago, Illinois; Kevin M. McGovern, Esquire, Brian T. Foley, Esquire, McGOVERN & ASSOCIATES, Greenwich, Connecticut.

Attorneys for Defendant Hewlett-Packard Company: Robert K. Payson, Esquire, Philip A. Rovner, Esquire, Brian C. Ralston, Esquire, POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware; Roger D.Taylor, Esquire, William B. Dyer III, Esquire, Douglas S. Weinstein, Esquire, FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP, Atlanta, Georgia.

Attorneys for Defendant STMicroelectronics, Inc.: Allen M. Terrell, Jr., Esquire, Jeffrey L. Moyer, Esquire, Brock E. Czeschin, Esquire, Kelly E. Farnan, Esquire, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware.

OPINION:

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

In 1990, a software development company sold a perpetual license to certain of its technology [*2] in return for a single lump sum payment. As part of the license agreement, the purchaser expressly agreed to maintain the confidentiality of the seller's trade secret information for a period of five years. Shortly after the sale, the software company went out of business and, as part of that process, sold all of its assets (including its remaining intellectual property rights) to another entity. A subsequent transferee of those rights now sues, claim-

ing that the purchaser violated the license agreement by entering into a research and development project with another firm in 1999 that entailed disclosure of the licensed technology. Although alleging multiple theories of recovery, all counts of the complaint rest on the premise that the purchaser had no right to disclose the technology in the course of the joint exploitation. This premise depends on reading the license agreement to provide that, in addition to the express five-year confidentiality agreement, there was a further, implied undertaking to maintain the confidentiality of the licensed technology in perpetuity.

After discovery, the defendants now move for summary judgment. For the following reasons, the court concludes that [*3] the license agreement is properly construed to contain a single five-year confidentiality agreement and that the claims against the transferee are untimely. Therefore, the court grants the defendants' motion for summary judgment.

II.

A. The Parties

Plaintiff VLIW Technology, LLC ("VLIW") is a Delaware limited liability company formed in November of 2000, with its principal place of business in Connecticut. VLIW is the successor-in-interest to the rights of Technology Licensing, Inc. ("TLI") and Multiflow Computer, Inc. ("Multiflow") with respect to various intellectual property originally developed by Multiflow. The intellectual property at issue relates to a compiler initially developed by Multiflow for use in a computer that utilized a special type of programming known as "very long instruction words" (the "VLIW Technology").

Defendant Hewlett-Packard Company ("H-P"), formerly a California corporation, is now a Delaware corporation with its principal place of business in Palo Alto, California. Defendant STMicroelectronics, Inc. ("STM") is a Delaware corporation with its principal place of

business in Texas. STM is controlled by STMicroelectronics, N.V., a Netherlands [*4] holding company.

B. Background

1. VLIW And The Trace Compiler

Between 1985 and 1990, Multiflow worked on developing computer hardware and software that could take advantage of the VLIW Technology. The VLIW Technology utilizes parallel processing capabilities to speed up computer operations and make them more efficient. The VLIW Technology includes the use of hardware capable of performing more than one operation at a time (i.e. in parallel) and software components capable of identifying tasks in a program that can be performed in parallel and then translating the program into a combination of parallel-processing and sequential-processing instructions, so as to enable the program to run as quickly as possible. By 1990, Multiflow had developed a computer and the associated software components that utilized the VLIW Technology. That computer was known as the Trace 200/300 series computer. The software associated with that computer included what is known as the "Trace Compiler."

A compiler is a piece of computer software typically used to translate a computer program written in a generalized, high level computer language (usually by a human being) into lower level binary [*5] code that the machine can execute. The Trace Compiler was especially innovative because it not only translated higher-level languages (such as Fortran and C), it also created an intermediate code level. At this intermediate level, optimization processes were employed to identify and maximize the number of instructions that were capable of being executed in parallel. These instructions were then translated into machine executable binary code in VLIW Technology form. In the case of the Trace Compiler, the VLIW Technology instruction word was as long as 28 instructions (1028 bytes). This permitted various operations to be performed in parallel rather than in series, to take advantage of the parallel processing capabilities of a given computer.

The Trace Compiler was especially versatile because it could be configured to work with a variety of computers and computer chips that had varying abilities to perform operations in parallel. The Trace Compiler also combined a number of different methodologies and software routines for identifying, maximizing, and reconfiguring programs to take full advantage of a given computer's or computer chip's parallel processing capabilities. The nature [*6] of many of the methodologies utilized in the Trace Compiler and the way they were combined in the Trace Compiler were not generally known in the industry and had value.

2. Multiflow's Successors

In or about June of 1991, Multiflow went out of business. At that point, Multiflow sold all of its remaining assets, including its remaining intellectual property assets, to TLI. TLI was a Connecticut corporation formed in May of 1991 to succeed to and pursue licensing of Multiflow's intellectual property rights. In November of 2000, all TLI's assets were transferred to VLIW. Pursuant to these transfers, VLIW is the successor-in-interest to Multiflow's intellectual property, including information related to the Trace Compiler.

3. The May 1990 Multiflow/H-P Agreement

In May of 1990, Multiflow and H-P entered into a license agreement (the "License Agreement"). Under the License Agreement, Multiflow perpetually licensed H-P to use certain of Multiflow's "Intellectual Property Rights," including information relating to Multiflow's Trace Compiler. In exchange for these licensing rights, H-P made a lump sum payment to Multiflow.

Section 2.1 of the License Agreement (which is governed [*7] by Connecticut law) granted H-P a "worldwide, irrevocable, perpetual, royalty-free, non-exclusive license to use and sublicense the use of" Multiflow's intellectual property (including information relating to the Trace Compiler) "for the purpose of making, using, having made, selling and otherwise disposing of" H-P products. The License Agreement does not define what an H-P product actually is.

Article 6 of the License Agreement is titled "Confidentiality Provisions" and contains the only express contractual provisions dealing with obligations of the parties to maintain information in confidence. Section 6.1 states that the parties to the license do not contemplate that any H-P confidential information would be disclosed to Multiflow. Section 6.2 designates the source code for the Trace Compiler, as well as associated materials, as "Confidential Information." Section 6.3 affirmatively obligates H-P for a period of five years to use the same level of care as it uses with its own confidential information to avoid disclosing any Confidential Information other than as authorized pursuant to the licenses granted under the License Agreement.

Article 6 also contains several exceptions designed [*8] to allow H-P to exploit the licensed technology. Section 6.4 states that H-P shall not be liable for disclosure of any Confidential Information pursuant to a valid court order or similar compulsion. Section 6.5 provides, as follows: "Hewlett-Packard shall not be obligated to hold in confidence, and shall not be subject to the confidentiality obligations of this Article 6 with respect to any Confidential Information" in a number of situations in which the information becomes known to H-P outside

2005 Del. Ch. LEXIS 59, *

the scope of the License Agreement without breach of any independent confidentiality action by a third party. For example, Section 6.5 applies where information was known to H-P prior to its receipt from Multiflow, or is, or becomes, public knowledge without breach of the License Agreement by H-P.

### 4. H-P's Development Of The H-P LX Compiler And The H-P LX Architecture

After obtaining the License to the Trace Compiler, H-P invested a great deal of money and manpower developing a new compiler based on the Trace Compiler, which it calls the LX Compiler. The LX Compiler is a result of changes (H-P argues fundamental improvements) made to the Trace Compiler between 1990 and 2002 by a team [*9] of H-P scientists. n1 According to an expert that compared the LX Compiler and the Trace Compiler, the LX Compiler is almost 50% larger than the original Trace Compiler and it contains at least 120,000 lines of additional source code. n2 These additions allowed the LX Compiler to compile code for microprocessors (i.e. chips), while the Trace Compiler could only run on room-sized Trace computers. n3 H-P also developed an "architecture," i.e. the model for processor programming, using the LX Compiler, which it calls the LX Architecture.

n1 Faraboschi Dep. at 20, 69.
n2 Expert Report of Dr. John R. Levine P 56-57.
n3 *Id.* P 58.

### 5. STM's Status

Throughout the 1990s, various companies manufactured the integrated circuits or computer chips that form the heart of any computer. STM is one such computer chip manufacturer. These computer chip designers explored possibilities of utilizing the VLIW Technology in future generations of computer chips to speed up the performance of various tasks [*10] (such as video processing) by those chips. Some of those manufacturers executed license agreements with Multiflow and its successors, others (including STM) did not.

H-P and STM formed a research and development partnership sometime in late 1999 to work on the design and development of computer chips and other computer products. In the course of the joint R&D work, H-P shared the LX Compiler and the LX Architecture with STM. STM then used the LX Compiler and the LX Architecture in designing chips. Pursuant to this business arrangement, H-P and STM entered into a Technology License Development Agreement (the "H-P/STM

Agreement"). In sharing the LX Compiler and the LX Architecture with STM, H-P required that STM keep this technology confidential. The H-P/STM Agreement contained extensive restrictions on the use and transfer of confidential information (basically the LX Compiler and the LX Architecture), which H-P has consistently enforced.

### 6. Procedural History

On December 9, 2002, VLIW filed its complaint in this action against H-P and STM. In general, the six-count complaint alleges breach of contract and misuse of trade secrets by H-P. Count 1 alleges a breach of the confidentiality [*11] provisions of the License Agreement by H-P. Count 2 alleges a violation of the Connecticut Trade Secrets Act n4 by H-P and STM. Count 3 alleges that H-P and STM willfully misappropriated VLIW's intellectual property. Count 4 alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA") n5 by H-P and STM by breaching the License Agreement. Count 5 alleges a violation of Delaware's Uniform Trade Secrets Act n6 by H-P and STM. Finally, Count 6 alleges a violation of Delaware's Deceptive Trade Practices Act ("DTPA") n7 by H-P and STM by breaching the License Agreement. n8

n4 *CON. GEN. STAT. § § 35-50 through 35-58.*
n5 *CON. GEN. STAT. § § 42-110a through 42-110q.*
n6 *6 Del. C. § § 2001-2009.*
n7 *6 Del. C. § § 2531-2536.*
n8 VLIW has agreed to a voluntary dismissal with prejudice with respect to Count 6 of its complaint. *See* Pl. Ans. Br. at 3 n.3.

On June 16, 2003, the court dismissed the complaint [*12] pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. n9 In ruling on the defendants' motion to dismiss, this court held that VLIW's complaint did not state a claim for breach of contract because the confidentiality provisions found in Section 6.3 of the contract had expired, and dismissed the trade secret and unfair practice claims on the basis that those claims were premised on, and dependent upon, the breach of contract claim. n10 Based on a plain reading of Section 6.3 as creating a single, five-year duty of confidentiality, and the fact that the effective date of thē License Agreement was May 30, 1990, the court concluded that H-P's confidentiality obligations under the License Agreement expired on May 30, 1995. Therefore, the allegation of the complaint that H-P shared confidential information regarding the Trace

2005 Del. Ch. LEXIS 59, *

Compiler with STM in 1999 did not state a claim for breach of the License Agreement.

n9 *VLIW Tech., LLC v. Hewlett-Packard Co., 2003 Del. Ch. LEXIS 65, at \*2 (Del. Ch. June 16, 2003).*
n10 *2003 Del. Ch. LEXIS 65 at \*20.*

[*13]

VLIW argued on appeal (as it had argued in opposition to the motion to dismiss) that there is another reasonable reading of the scope of the confidentiality provisions in the License Agreement: i.e. that Section 6.3 imposes a heightened level of confidentiality on the part of H-P for a period of five years, following which H-P has a lessened duty of confidentiality in perpetuity. This reading of the License Agreement is premised on the argument that an additional, lower level, but perpetual, confidentiality obligation can be inferred from the language of Sections 2.1 and 6.5 of the License Agreement.

Section 2.1 of the License Agreement grants H-P a perpetual license to use (and to sublicense the use of) the licensed technology in H-P products. VLIW argues that this perpetual license is meaningless if the License Agreement requires H-P to keep information regarding the licensed technology confidential for only five years. VLIW also argues that Section 6.5 of the License Agreement distinguishes between H-P's general obligation to keep the licensed technology confidential and its enhanced duties under Section 6.3 to use the same level of care it employs to protect its own trade secrets. [*14]

Section 6.5 begins, "HEWLETT PACKARD shall not be obligated to hold in confidence, and shall not be subject to the confidentiality obligations of this Article 6 [Confidentiality Provisions] with respect to any Confidential Information . . . ." Despite the fact that both clauses are expressed in the negative, VLIW argues that the placement of a comma before the conjunction "and" implies the existence of two distinct confidentiality obligations. The first is an otherwise unexpressed obligation that H-P "hold in confidence" the Confidential Information, while the second is the heightened duty of confidentiality expressly found in Section 6.3.

The Delaware Supreme Court concluded that this reading was reasonable and that the License Agreement was ambiguous. Therefore, that court held that dismissal on the pleadings was not appropriate because "the Court of Chancery's analysis did not resolve in favor of the plaintiff all reasonable inferences from the facts alleged in the complaint and its attachments." n11

n11 *VLIW, 840 A.2d at 613.*

[*15]

On remand, the parties engaged in discovery, including discovery related to the proper construction of the confidentiality terms of the License Agreement. In that regard, in particular, they deposed the surviving witnesses who have some knowledge of the 1990 negotiations. They also discovered into the practices of the parties and the terms of other more or less contemporaneous Multiflow license agreements.

Following discovery, H-P and STM moved for summary judgment on three separate grounds. First, H-P and STM argue that the confidentiality obligation contained in the License Agreement expired before H-P shared any confidential information with STM. Specifically, they argue that the License Agreement must be construed to limit H-P's confidentiality obligation to the five-year term expressly contained in Section 6.3. Because that five-year period expired years before H-P disclosed any information to STM, they argue that H-P was within its rights when it shared the LX Compiler and the LX Architecture with STM, notwithstanding that such disclosure necessarily included the disclosure of derivatives of the Trace Compiler. Since all counts of the complaint rest on the claim that H-P wrongfully [*16] disclosed confidential trade secrets to STM, H-P and STM contend that they are entitled to judgment on all claims asserted by VLIW.

Second, H-P and STM argue that the LX Compiler and the LX Architecture are H-P "products," as that term is used in the License Agreement, such that even if H-P was bound by a confidentiality agreement, H-P did not violate it by sharing the LX Compiler and the LX Architecture with STM. n12

n12 After reviewing the evidence in the record, the court finds that there are disputed issues of fact as to the proper interpretation of H-P "product," as that phrase is used in the License Agreement. Therefore, granting summary judgment on these grounds would be inappropriate. Because the court disposes of the case on other grounds, it is unnecessary to address these arguments more fully.

Third, STM argues that the claims against it were brought more than three years after the factual basis of

VLIW's claims occurred, i.e. more than three years after H-P shared the LX Compiler and the LX Architecture [*17] with STM. STM also argues that VLIW was on inquiry notice that this occurred. Therefore, it argues, all claims against STM are time-barred. This is the court's disposition of the summary judgment motion.

### 7. Testimonial And Documentary Evidence

The evidence relating to the proper construction of the License Agreement now before the court on the motion for summary judgment focuses on three areas. First is the deposition testimony of Alan Donahue, one of the principals of TLI and formerly Multiflow's CFO, who was questioned about the negotiation of the License Agreement. Donahue testified that he "did not take direct part in the negotiation," but, instead, "was background in support of Don [Eckdahl]." n13 According to Donahue, Eckdahl, a former officer of Multiflow (now deceased), negotiated the License Agreement with Richard Lampman, a H-P executive. n14

n13 Donahue Dep. of 01/11/2005 at 106.
n14 Donahue Dep. of 12/07/2004 at 75-77.

Donahue testified as follows about the structure of H-P's [*18] confidentiality obligations: "As I understand the intent, the five-year period [in Section 6.3] is to be a higher duty to keep the technology secret or confidential to raise the standard to that of their own intellectual property." n15 He further testified to his understanding that "following the five-year confidentiality provision there is still some confidentiality requirement, but at a lower level." n16 Donahue's testimony does not, however, connect his "understanding" to any of the language found in the License Agreement. For example, when asked to describe the standard of care for the second, lower and supposedly perpetual duty of confidentiality, Donahue could do so only metaphorically:

> I'm not sure what the standard is. As I have had it described to me, it was the reference of your children versus my children. The higher standard is you taking care of my children as if they were yours and the next level you're taking care of them as they're mine. n17

n15 Id. at 82.

n16 Id. at 88.
n17 Id.

[*19]

Second, the summary judgment record includes a license agreement between Intel Corp. and Multiflow dated December 18, 1989 (the "1989 Intel Contract") and a second license agreement between Intel and Multiflow (the "1990 Intel Contract"). The 1989 Intel Contract contains an express confidentiality clause, with a bifurcated duty of confidentiality, although different from that which VLIW argues is contained in the License Agreement at issue here. Section 6.3 of the 1989 Intel Contract states:

> For a period of five (5) years from the date of disclosure under this Agreement for all Confidential Information, the receiving Party agrees to use the same care and discretion to prevent disclosure, publication, or dissemination outside of itself or its subsidiaries, of received "Intel Confidential Information" or "Multiflow Confidential Information", as the case may be, as the receiving Party employs with similar information of its own which it seeks to maintain and protect as confidential. . . . Notwithstanding any provision of this Agreement or the Escrow Agreement set forth as Annex "C" hereto, Intel's obligations of confidentiality (as set forth in this Section 6.0) with respect [*20] to the Escrowed Material (as defined in the Escrow Agreement) shall extend for a period of fifteen (15) years from the Effective Date.

The 1990 Intel Contract, by contrast, contains a confidentiality agreement essentially the same as that in Article 6.3 of the License Agreement. Section 5.3 of the 1990 Intel Contract states:

> For a period of five years from the Effective Date, Intel shall use the same level of care Intel employs with its own confidential information of like importance in avoiding any unauthorized disclosure or use of confidential Licensed Technology.

Third, the record contains the deposition testimony of Richard Lampman, a H-P executive, who negotiated and drafted the License Agreement on behalf of H-P. Lampman is the only deponent to participate directly in the negotiation of the License Agreement. He did not recall many of the details of the 1990 negotiation of the

2005 Del. Ch. LEXIS 59, *

License Agreement. But he did testify that it was H-P's common practice, when it licensed technology, to negotiate time limits on the confidentiality requirements in those license agreements. As Lampman explained, this is because H-P typically made substantial changes to the technology it [*21] acquired and, therefore, had an interest in both using the technology it was able to develop under the license and in protecting the confidentiality of its own technology. Lampman testified:

> There were also restrictions or time caps, as we call them, about disclosure of information and that -- that element's quite critical because in any case when intellectual property is coming in from a company, typically there are restrictions about the use of it, but as we make investments in that technology, as things are obsoleted or updated, the normal issue is, at some point, it becomes very difficult to figure out how much intellectual property actually is from the original stream and how much is new investment. And, certainly, given the scale of investment we were making in this, that was, in fact, an issue. *So, I believe in the contract, as every contract I've ever signed for technology acquisition, there's time restrictions about what happens at some point in terms of the original terms and conditions.* n18

n18 Lampman Dep. at 35 (emphasis added).

[*22]

### III.

[HN1] On a motion for summary judgment pursuant to Court of Chancery Rule 56, judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. n19 [HN2] The burden is on the moving party to prove an absence of a material issue of fact and the court must review all evidence in the light most favorable to the non-moving party. n20 However, if the moving party puts facts into the record which, if unrebutted, entitle it to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight; n21 i.e. the party opposing summary judgment is obliged to adduce some evidence showing the existence

of a dispute of material fact. n22 Rule 56(e) states in relevant part:

> [HN3] When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary [*23] judgment, if appropriate, shall be entered against him.

n19 *Scureman v. Judge, 626 A.2d 5, 10 (Del. Ch. 1992).*
n20 *Id. at 10-11.*
n21 *Tanzer v. Int'l Gen. Indus., Inc., 402 A.2d 382, 385 (Del. Ch. 1979).*
n22 *Id.*

### IV.

A. Standard Of Contract Interpretation Under Connecticut Law

[HN4] Under Connecticut law, when a contract is formed between two parties of relatively equal bargaining power, it must be construed to effectuate the intent of the parties. n23 The intent of the parties is ascertained by a "fair and reasonable" construction of the language used in the contract, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. n24 The language of the contract must be given its ordinary meaning and usage where it can be sensibly applied to the contract's subject matter. n25

n23 *Poole v. City of Waterbury, 266 Conn. 68, 831 A.2d 211, 224 (Conn. 2003); Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P., 252 Conn. 479, 746 A.2d 1277, 1287 (Conn. 2000).*

[*24]

n24 *Poole, 831 A.2d at 224.*

n25 *Id.*

[HN5] Connecticut case law does not set forth a test by which to determine whether a contract should be reviewed as a question of law rather than as a question of fact. n26 However, in *Tallmadge Brothers*, the Connecticut Supreme Court held that the fact that a disputed agreement was a commercial contract between sophisticated, commercial parties with relatively equal bargaining power created a presumption that the contract should be interpreted as a matter of law. n27

n26 *Tallmadge Bros., 746 A.2d at 1287.*
n27 *Id.*

In this case, just as in *Tallmadge Brothers*, "the contracts at issue are commercial in nature and were made by sophisticated commercial parties with the advice of counsel during an extensive drafting process." n28 Furthermore, as discussed more fully *infra*, the summary judgment record demonstrates that [*25] there is no actual dispute about a material issue of fact. Therefore, this case is properly resolved on summary judgment.

n28 *Id.*

With this standard in mind, viewed in light of the undisputed record, the court will now undertake to construe the confidentiality provisions of the License Agreement on this summary judgment motion.

B. The Additional Evidence

1. Donahue's Deposition Testimony

While for the purposes of this motion the court accepts everything that Donahue said as true, his testimony is of little probative value. As stated, *supra*, contract interpretation under Connecticut law looks to the reasonable expectations of the parties to the contract. n29 While Donahue stated that he had a "review role" in the negotiation with H-P, he was not active in drafting or negotiating the License Agreement and "did not take direct part in the negotiation." n30

n29 *See Poole, 831 A.2d at 224.*
[*26]

n30 Donahue Dep. of 01/11/2005 at 106.

Apart from Donahue's lack of first-hand knowledge about the negotiation, there is the additional problem that VLIW makes no effort to tie Donahue's testimony about Multiflow's supposed intent to the language employed by the parties to express their agreement. Under Connecticut law, a "fair and reasonable" construction of the contract begins with the language of the document, n31 and not with the party's testimony of intent that is unrelated to the actual language used by the parties to express their agreement. In this case, the contract contains *no language* (not a single word or phrase) that VLIW can point to that expressly creates a perpetual confidentiality obligation. Instead, the only language in the contract affirmatively describing any confidentiality duty is found in Section 6.3 and is expressly limited to five years.

n31 *See Poole, 831 A.2d at 224.*

[*27]

Similarly, the court notes that Donahue was unable to articulate a sensible standard of care that would differentiate the claimed perpetual duty of confidentiality from the duty expressly found in Section 6.3. This is a crucial point because, if there were a second, implied confidentiality obligation, it would necessarily need to be governed by a different standard than that expressly contained in Section 6.3. Otherwise, the second, implied obligation would be nothing more than a continuation of the first, in obvious contradiction to the express five-year term of Section 6.3. In his disposition, Donahue testified:

> I'm not sure what the standard is. As I have had it described to me, it was the reference of your children versus my children. The higher standard is you taking care of my children as if they were yours and the next level you're taking care of them as they're mine.

This "standard" is no standard at all and is entirely divorced from the actual language found in the License Agreement. The court is at a loss for how it would interpret or enforce such a standard. While for purposes of this motion the court accepts that Donahue testified truthfully and candidly, [*28] the court cannot read the License Agreement as containing such a vague, amor-

phous standard. n32 For these reasons, Donahue's testimony as to the meaning of the contract does not give rise to a disputed issue of material fact.

> n32 At oral arguments, counsel for VLIW argued that the court should apply a "reasonableness" standard to the second, lower confidentiality requirement. While this standard has the benefit of being intelligible, it is likewise utterly unsupported by any contractual provision in the License Agreement, and there is no other evidence, testimonial or otherwise, showing that the parties ever contemplated such a standard.

2. Multiflow's Other Contracts

The 1989 Intel Contract and the 1990 Intel Contract bolster H-P's argument that the License Agreement does not contain a second, implied confidentiality duty.

First, neither of these contracts creates *any* implied confidentiality duty. Section 6.3 of the 1989 Intel Contract created a *mutual* duty of confidentiality for the first [*29] five years, i.e. Intel was required to maintain as confidential information it received from Multiflow, as well as vice versa. This same section of the 1989 Intel Contract additionally provides that Intel keep confidential the information in Annex "C" (essentially, the Compiler technology) for fifteen years. Thus, the two express confidentiality duties are applied to different sets of information. In contrast, the alleged implied confidentiality obligations in the License Agreement are claimed to apply to the same set of information, just for different periods of time.

Second, even in the 1989 Intel Contract, Intel's second express confidentiality duty is not perpetual, but is limited to fifteen years. Thus, there is nothing in that contract that implies the existence of a perpetual confidentiality duty in the License Agreement.

Third, when one compares the confidentiality provisions of the two Intel contracts it is strikingly obvious that Intel's confidentiality obligations under the 1990 Contract are narrower than those under the 1989 Contract, and are limited to five years. n33 The fifteen-year period of confidentiality with respect to Annex "C" information is gone and is replaced [*30] with nothing.

> n33 For an example of express contractual language that would create a bifurcated duty of confidentiality, *see BIEC Int'l, Inc. v. Global Steel*

*Serv., Ltd., 791 F. Supp. 489, 544 (E.D. Pa. 1992)* (holding that the language "Furthermore, Licensee shall not, except as provided under this Agreement, disclose such information to a third party or use such information for Licensee's own benefit except for the production of Licensed Products or research work related thereto[]" created a perpetual duty of confidentiality).

VLIW argues that the changes in the confidentiality provision from one Intel contract to the next should be interpreted to be the result of Multiflow's having bargained to extend the express second-tier, fifteen-year obligation to an implied one of infinite duration. The court cannot accept this argument. By 1990, Multiflow was experiencing great financial difficulties and was out of business shortly thereafter. n34 This tenuous financial condition surely reduced [*31] Multiflow's bargaining position. The only reasonable inference is that the change from one contact to the next is the result of Intel having bargained to limit its duty of confidentiality to five years.

> n34 Donahue Dep. of 12/07/2004 at 63-64.

3. Lampman's Deposition Testimony

H-P introduced the deposition testimony of Lampman, who negotiated and drafted the License Agreement on its behalf. Although he did not have a clear recollection of the particular negotiation with Multiflow, he did recollect that it was H-P's practice to limit the duration of all confidentiality undertakings. Unlike Donahue's testimony that is unrelated to the actual language of the contract, Lampman's testimony is consistent with the language employed by the parties to express their understanding in the License Agreement. In that agreement, there is only one express confidentiality duty, found in Section 6.3, and this duty is limited to five years.

C. The Court's Contract Interpretation

Having considered the language [*32] of the License Agreement and the evidence relating to its formation, the court concludes, as a matter of law, that the only reasonable reading of the License Agreement is that a single duty of confidentiality was created, and that duty expired after five years.

The court begins its analysis with the plain language of the contract. The sole provision affirmatively imposing a duty of confidentiality on H-P is found in Section 6.3 and is clearly and unambiguously limited to five

years. There is no other language that expressly imposes any additional duty of confidentiality on H-P.

VLIW argues that Section 2.1 of the License Agreement would be meaningless if the License Agreement only requires H-P to keep information regarding the licensed technology confidential for five years. Section 2.1, in pertinent part, states:

> MULTIFLOW grants HEWLETT PACKARD a worldwide, irrevocable, perpetual, royalty-free, non-exclusive license under MULTIFLOW's Intellectual Property Rights to use and sublicense the use of License Technology for the purpose of making, using, having made, selling and otherwise disposing of HEWLETT PACKARD products.

VLIW argues that the confidentiality requirement [*33] is of infinite duration because the license is "perpetual." This provision makes no mention, however, of any confidentiality duty. Even if H-P undertook no duty of confidentiality, this section of the agreement would still have meaning because it would describe the duration of H-P's license. Therefore, VLIW's argument that a restrictive reading of H-P's duty of confidentiality renders this section of the agreement meaningless is simply wrong.

VLIW also argues that Section 6.5 of the License Agreement distinguishes between H-P's general obligation to keep the licensed technology confidential and its enhanced duties under Section 6.3 to use the same level of care it employs to protect its own trade secrets. The first alleged obligation is that H-P "hold in confidence" the Confidential Information, while the second is the heightened duty of confidentiality under Section 6.3. VLIW apparently argues that, coupled with the fact that the license is perpetual, the (albeit negative) language of Section 6.5 supports an inference that the parties agreed to a concomitant obligation on the part of H-P to hold the trade secrets in confidence in perpetuity. The reasoning seems to be that a perpetual [*34] confidentiality obligation protects VLIW's interests in the perpetual license.

While the Supreme Court regarded this as a possible interpretation of the contract in the context of a motion to dismiss, on the record now before this court, that interpretation is not the most "fair and reasonable" construction "interpreted in the light of the situation of the parties and the circumstances connected with the transaction" required by Connecticut law. n35 First, this argument rests on a false premise. VLIW had no "perpetual" rights under the License Agreement, since H-P's royalty obligation was structured as a single, up-front payment. Once

paid, VLIW had no interest in ensuring that H-P exploited the technology and received no money from H-P's efforts, no matter how successful H-P might be. Thus, while VLIW had a generalized interest in preventing future disclosure of its technology, that interest was unrelated to the duration of H-P's license. The "perpetual" term benefitted only H-P, and corresponded with the single payment royalty term.

n35 *Poole, 831 A.2d at 224.*

[*35]

Second, VLIW's reading of the License Agreement is not the most fair and reasonable because both clauses in Section 6.5 that VLIW argues imply confidentiality duties-begin with the word "not." Section 6.5 states, "HEWLETT PACKARD shall *not* be obligated to hold in confidence, and shall *not* be subject to the confidentiality obligations of this Article 6 with respect to any Confidential Information . . . ." (Emphasis added). The use of the negative in both clauses is simply inconsistent with VLIW's suggestion that this language implies the existence of an affirmative duty nowhere else expressed in the License Agreement. No one intending to express an affirmative contract duty would use the phrases "shall *not* be obligated" or "shall *not* be subject to" to do so.

Third, this reading of the License Agreement is not the most fair and reasonable because, as discussed *supra*, there is no intelligible standard by which to judge the supposed second, lower standard of confidentiality. Neither suggestion put forward by VLIW-Donahue's unintelligible "your children versus my children" standard nor VLIW's counsel's "reasonableness" standard-finds any support in the actual language [*36] of the License Agreement.

In light of the record now before the court and the clear language of the document, the "fair and reasonable" interpretation of the License Agreement is that the only duty of confidentiality is found in Section 6.3 and expired in 1995. Section 6.5 is simply an exception to Section 6.3, and, as such, has no relevance to the treatment of confidential information after the five-year period found in Section 6.3 has lapsed.

In sum, after extensive and time-consuming discovery, the record on this motion for summary judgment fully and unequivocally supports the conclusion that the only confidentiality obligation in the License Agreement expired four years before H-P disclosed any of Multiflow's confidential information to STM. Therefore, the court holds that H-P did not violate any confidentiality agreement by sharing the LX Compiler and the LX Ar-

chitecture with STM. Because this claim of breach of a nondisclosure obligation underlies all of the claims of the complaint, judgment must be entered in favor of the defendants.

## V.

### A. Statute Of Limitations

STM also argues that all claims against it are time-barred. [HN6] A court of equity may grant a motion [*37] to dismiss on the ground that the plaintiff's claims are barred by the applicable statute of limitations. n36 [HN7] Under Delaware law, the appropriate statute of limitations applied to contracts and misappropriation of trade secrets is three years. n37 The statute of limitations for misappropriation of trade secrets in Connecticut is, likewise, three years. n38 [HN8] A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches. However, the statutory period may create a presumptive time period for application of laches to bar a claim. n39 In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff will be barred from bringing suit without the necessity of the court engaging in a traditional laches analysis. n40

n36 *See In re Dean Witter Partnership Litig., 1998 Del. Ch. LEXIS 133, at *11 (Del. Ch. July 17, 1998)* ("Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.").

[*38]

n37 *See 10 Del. C. § 8106* (contract); *6 Del. C. § 2006* (misappropriation of trade secrets). In accordance with *10 Del. C. § 8121*, the court does not consider whether some other state's law would provide for a longer limitations period.

n38 *CONN. GEN. STAT. § § 35-56.* [HN9] The statute of limitations period for CUTPA is, likewise, three years. *See CONN. GEN. STAT. 42-110g(f).*

n39 *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., 677 A.2d 497, 502 (Del. 1996); see also Atlantis Plastics Corp. v. Sammons, 558 A.2d 1062, 1064 (Del. Ch. 1989)* [HN10] ("An analogous statute of limitations period applicable at law, however, is to be given great weight in determining whether a suit is to be time-barred in

equity by laches and will be applied in the absence of unusual or mitigating circumstances."). n40 *See United States Cellular, 677 A.2d at 502; Atlantis Plastics, 558 A.2d at 1064.*

[*39]

Where the law of two different states may apply to an action, Delaware courts apply the Restatement (Second) Conflict of Law to determine which state law applies. n41 [HN11] With respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum. n42 Thus, in this case, the court looks to the statute of limitations laws of Delaware.

n41 *Juran v. Bron, 2000 Del. Ch. LEXIS 143, at *33 (Del. Ch. Oct. 6, 2000); Asten, Inc. v. Wangner Systems Corp., 1999 Del. Ch. LEXIS 195, at *5 (Del. Ch. Sept. 23, 1999).*

n42 *RESTATEMENT (SECOND) CONFLICT OF LAWS § 142* (1971); *see also Lumb v. Cooper, 266 A.2d 196, 198 (Del. 1970)* ("Limitations questions are generally settled by the law of the forum.").

### 1. Savings Statute

On July 26, 2002, VLIW brought an action against H-P on substantially the same claims as those in this case [*40] in United States District Court for the District of Connecticut (the "Connecticut Action"). On December 12, 2002, VLIW voluntarily dismissed the Connecticut Action. n43 VLIW argues that the so-called Delaware "Savings Statute" n44 allows it to bring this claim within one year of the original Connecticut Action. n45 However, the Connecticut Action did not name STM as a defendant. n46 The Savings Statute cannot be used to lengthen the statute of limitations against a defendant not named in original suit. n47 Therefore, the proper date for applying the statute of limitations is December 9, 2002, the date that this action was brought against STM.

n43 *See* docket sheet for *VLIW Technology, LLC v. Hewlett-Packard, Inc.,* 3:02-CV-01292 WWE, filed in United States District Court, District of Connecticut, dated July 26, 2002.

n44 *10 Del. C. § 8118*

n45 H-P did not argue either in its briefs or at oral argument that the Savings Statute is inapplicable

to the claims against it. Therefore the court does not address this issue.

n46 *See* complaint filed in United States District Court, District of Connecticut, *VLIW Technology, LLC v. Hewlett-Packard, Inc.*, 3:02-CV-01292, dated July 26, 2002.

[*41]

n47 *See Vari v. Food Fair Stores, New Castle, Inc., 58 Del. 145, 205 A.2d 529, 8 Storey 145 (1964)* (applying the Savings Statute and holding that a plaintiff cannot substitute a second corporate defendant on the theory that second corporation is the same defendant due to common registered agent and some common officers.).

2. Contractual Claims n48

n48 The analysis under CUPTA is the same.

It is well-established law [HN12] in Delaware that the statute of limitations begins to run at the time of the alleged wrongful act, regardless of whether the plaintiff is aware of the injury. n49 [HN13] An action for breach of contract accrues at the time of the alleged breach of the contract. n50 VLIW first brought suit against STM on December 9, 2002. Thus, in order for its contract claim to be timely, the alleged breach must have occurred no earlier than December 9, 1999.

n49 *Wal-Mart Stores v. AIG Life Ins. Co., 860 A.2d 312, 319 (Del. 2004)* (per curiam); *Dean Witter, 1998 Del. Ch. LEXIS 133, at *15.*

[*42]

n50 *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc., 677 A.2d 497, 503 (Del. 1996).*

The factual basis of VLIW's contractual claims is that H-P shared the LX Compiler and the LX Architecture with STM and that STM used these to design microchips. n51 It is undisputed that H-P shared the LX Compiler and the LX Architecture with STM in June of 1998. n52 Therefore, any claims based on this alleged contractual breach are presumptively time-barred.

n51 Compl. P 28.

n52 *See* Memo. of Understanding between H-P and STM, dated June 1, 1998.

VLIW argued in its brief that the statute of limitations should not apply to it because it was engaged in negotiations to license the VLIW Technology to STM. This argument is untenable. The fact that the parties were engaged in negotiations to avoid the suit is not a proper ground for tolling the statute of limitations. n53 Nor should it be, as [*43] such a doctrine would obviously undermine the public policy behind the statute of limitations. n54

n53 For a discussion of several tolling doctrines, see *Dean Witter, 1998 Del. Ch. LEXIS 133, at *18 *25* (discussing the doctrines of inherently unknowable injuries, fraudulent concealment, and equitable tolling).

n54 In almost all disputes that end up in court, the parties attempt some sort of negotiation to avoid litigation. Tolling the statute of limitations during such negotiations, without agreement of the parties, would encourage potential plaintiffs to engage in bad faith negotiations to lengthen the time they would have to bring a suit. It would also discourage potential defendants from engaging in negotiations to avoid giving plaintiffs more time to bring their suits. This is to be avoided.

For the above reasons, VLIW's contract claims are time-barred.

2. Misappropriation Of Trade Secrets

[HN14] Under the so-called "discovery rule," claims for the misappropriation of trade secrets [*44] accrue at the time the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. n55 "The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." n56 It does not matter if an aggrieved party does not realize that the use "legally constituted a misappropriation of trade secrets . . . as long as [the party] knew *the facts* which could give rise to such a claim." n57 Therefore, "the cause of action accrues when the claimant knows or should know the relevant *facts*[.]" n58 The factual basis of VLIW's misappropriation claim is the same as for its contractual claim: H-P shared the LX Compiler and the LX Architecture with STM in June of 1998, and STM used them to design microchips. n59

Thus, the court must determine whether there are sufficient undisputed facts in the record to compel the conclusion that VLIW knew (or should have known) these facts, on or before December 9, 1999.

n55 *See 6 Del. C. § 2006; SmithKline Beecham Pharms. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000); CONN. GEN. STAT. § 35-56.*

[*45]

n56 *McLeod v. Northwest Alloys, Inc., 90 Wn. App. 30, 969 P.2d 1066, 1069 (Wash. Ct. App. 1998)* (quoting *Allen v. State, 118 Wn.2d 753, 826 P.2d 200 (Wash. 1992)* and applying the *Uniform Trade Secrets Act* ("UTSA")). The UTSA, which [HN15] codifies the basic principles of common law trade secret protection, has been adopted by over 40 states, including Delaware (*6 Del. C. § § 2001-09*) and Connecticut (*CONN. GEN. STAT. § § 35-50 through 35-58*). Due to the dearth of Delaware cases interpreting the UTSA, the court looks to other states' decisions interpreting the UTSA for guidance. *See 6 Del. C. § 2008* ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); *CONN. GEN. STAT. § 35-58* (same).

n57 *Chasteen v. UNISIA JECS Corp., 216 F.3d 1212, 1218 (10th Cir. 2000)* (applying the UTSA) (emphasis added).

n58 *McLeod, 969 P.2d at 1069-70* (emphasis added).

n59 *See, supra*, notes 51 & 52.

[*46]

The record is replete with evidence that Donahue, John Kikoski, and John O'Donnell n60 knew these two facts before December 9, 1999. It is undisputed that principals at VLIW were aware that H-P shared the LX Compiler and the LX Architecture with *someone* before this date, and that no later than August 2, 1999, VLIW knew that "someone" was STM.

. On June 28, 1999, Richard Lethin sent a letter to Donahue, telling him that "Hewlett Packard is working with a technology partner doing research on embedded architectures using the Multiflow compiler"

and that the partner was in need of a Trace Compiler License. n61

. On June 30, 1999, Donahue and Lethin exchanged a series of emails in which Lethin stated that he had spoken with Joseph (Josh) Fisher, n62 that "the exploratory research with the partner had come to the point where that partner would like to develop product, but that they now have some concerns about their ability to do so without a [Trace Compiler] license." n63

. On July 28, 1999, Donahue forwarded to Kikoski an email with the subject line: "did HP really have the right to pass the multiflow compiler through to ST without any other HP products?" n64 The [*47] email attached to this message replies to an original message written by O'Donnell which states, in pertinent part:

Josh [Fisher] is interested in getting licensing for ST because he passed the compiler through to them, claiming he had the right to sublicense. . . . *The entire ST organization is dirty with the technology and it's critical for their next mainstream processor/product.* n65

. On August 3, 1999, Donahue sent an email to O'Donnell indicating he had spoken to a lawyer and believed there was a "breach of contract issue." n66 Donahue indicated that they should decide what they want "before contacting H-P directly" and, in addition, should be sure to "know as much as possible about what *ST* and H-P are doing." n67

. On August 20, 1999, Donahue sent an email to O'Donnell outlining a strategy to address H-P's breach of the H-P/Multiflow license agreement. Specifically, Donahue proposed that "one strategy to get something started is for me to write the lawyer a letter . . . [which] could be in terms of We believe the following is true' . . . if true, then H-P is breach [sic] of contract'" n68

. On September 14, 1999, consistent with the strategy [*48] outlined above, Donahue sent an email to Kikoski and O'Donnell attaching a draft letter to H-P's coun-

sel for the purpose of "opening the HP breach issue." n69 In the letter, Donahue informs H-P that TLI has learned that "a European company may have received the compiler from HP." n70 The letter further states that TLI believes that "HP and the European company have entered into some form of joint development agreement" and that "HP has delivered the compiler to the partner." n71 Donahue argues that, if true, these actions could constitute a breach of the H-P/Multiflow license. n72

. On September 15, 1999, Donahue followed up his email with a fax to O'Donnell which conceded that Donahue knew that ST was involved: In discussing the draft HP letter I sent to you by e-mail with John Kikoski, he made the point that we should have notes of your conversations *with ST*, specifically identify the names of people present, titles or description of their roles, dates of meetings or phone calls in order to be prepared for a response by HP asking us to be more specific as to what company, and how do we know. n73

n60 O'Donnell was one of the co-founders of Multiflow and was co-founder, president, and chief technology officer of Equator Technologies (O'Donnell Dep. at 8-10) whose business was to provide consulting and technical support to licensees of the Trace Compiler (Donahue Dep. of 12/07/2004 at 102-06). In or around June of 1991, Kikoski entered into a finder's fee relationship with TLI and subsequently became a TLI stockholder (*id.* at 130-31).

[*49]

n61 Letter from Lethin to Donahue of 06/29/1999 at 1.
n62 Fisher was one of the co-founders of Multiflow and was later an employee of H-P.
n63 Emails between Lethin and Donahue of 06/20/1999 at 1-2.
n64 Email from Donahue to Kikoski of 07/28/1999 at 1.
n65 Email from Donahue to O'Donnell of 07/28/1999 at 1 (emphasis added).

n66 Email from Donahue to O'Donnell of 08/03/1999 at 1.
n67 *Id.* (emphasis added).
n68 Email from Donahue to O'Donnell of 08/20/1999 at 1.
n69 Email from Donahue to O'Donnell, Kikoski of 09/14/1999 at 1.
n70 Letter from Donahue to Lampman of 09/14/1999 at 1.
n71 *Id.*
n72 *Id.*
n73 Faxed letter from Donahue to O'Donnell of 09/15/1999 at 1.

Instead of arguing that it did not know these facts, VLIW argues that they were not (and should not have been) aware of the alleged misappropriation until December 20, 1999 -- the date that Donahue received the first H-P/STM press release announcing their partnership. VLIW argues that this is so because Fischer, on behalf [*50] of H-P, was negotiating with TLI (the then-owner of the intellectual property) to procure a license for STM. VLIW also argues that the claim could not have accrued, because it could not have brought the claim until it was sure that H-P would not (from VLIW's viewpoint) comply with its obligations under the License Agreement. In essence, VLIW argues that it could not have brought suit until it knew it had suffered harm, and that it did not know this until Donahue received the H-P/STM press release.

As already discussed, however, [HN16] negotiations do not toll the statute of limitations, unless the parties agree to do so. Moreover, it does not matter if an aggrieved party does not realize that the use "legally constituted a misappropriation of trade secrets . . . *as long as [the party] knew the facts* which could give rise to such a claim." n74 Courts have consistently rejected the notion that the "statute of limitations only begins running when a plaintiff can unassailably establish a legal claim for trade secret misappropriation, [as that] would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers smoking gun' evidence of misappropriation. [*51] " n75 For instance, in *Intermedics*, the District Court for the Northern District of California held that the "language of the UTSA makes no reference to an appreciable harm' requirement" and that mere use "gives rise to access to judicial relief." n76 The District Court further stated that "there is, as a matter of law, sufficient harm or threat of harm in disclosure [or use] of a real trade secret to a competitor for a cause of action to accrue." n77

n74 *Chasteen, 216 F.3d at 1218.*

n75 *Id.; see also Intermedics, Inc. v. Ventritex, Inc., 822 F. Supp. 634, 641-42 (N.D. Cal., 1993)* (rejecting the argument that a cause of action cannot accrue for statute of limitation purposes until the plaintiff has a winning claim as fundamentally wrong as a matter of law for it would prohibit defendants from using the statute for protection); *Sokol Crystal Prods., Inc. v. DSC Communications Corp., 15 F.3d 1427 (7th Cir. 1994)* (holding that misappropriation of trade secrets occurred not when the defendant sold a product that it developed using plaintiff's confidential information but when it used that information in developing the product).

[*52]

n76 *Intermedics, 822 F. Supp. at 642.*

n77 *Id.*

In addition, based on the facts known to VLIW, it did not have to wait until the H-P/STM press release to seek judicial relief. The UTSA [HN17] allows an ag-grieved party to not only sue for damages, but also for injunctive relief. n78 Therefore, VLIW need not have waited to bring suit until it suffered pecuniary harm (if this ever occurred).

n78 *See 6 Del. C. § 2533; CONN. GEN. STAT. § 35-52.*

As the plaintiff was aware of the alleged misappropriation of confidential information by September 15, 1999, at the latest, the three-year statute of limitation had run by the time VLIW filed its complaint. VLIW's claims under the UTSA for misappropriation of trade secrets against STM are thus untimely, and STM's motion for summary judgment must be granted as to these claims.

**VI.**

For the above [*53] reasons, the court GRANTS the defendants' motion for summary judgment and this case is DISMISSED. IT IS SO ORDERED.