# EXHIBIT A

SAFEPAPER COPY

**Agreement Between**
**Research Corporation Technologies, Inc. ("RCT")**
**and**

## UNIVERSITY OF DELAWARE

**("Institution")**
**For Disclosure, Evaluation**
**and Commercialization of Inventions**

Effective _____ April 1 _____, 19 90 (the "Effective Date"), *Institution* and *RCT* agree as follows (the definitions of terms appear in Article VI):

### I. DISCLOSURE, EVALUATION AND ACCEPTANCE OF INVENTIONS

1.1. In its discretion, *Institution* shall submit to *RCT*, for evaluation and possible commercialization by *RCT*, the *Inventions* of its *Faculty* which *Institution* owns or shall be entitled to own or license to others.

1.2. *RCT* shall treat any *Invention* disclosed to it under 1.1 above, that has not been published or which is not the subject of an issued *Patent* or a pending *Patent Application*, as proprietary and with the requisite degree of confidentiality necessary to preclude jeopardizing the patentability of such *Invention*. If *RCT* discloses any *Invention* to any third party, *RCT* shall require such third party to exercise its best efforts to hold the same confidential.

1.3. *RCT* shall evaluate all such submitted *Inventions*. Within a reasonable time after *RCT's* receipt of any submitted *Invention*, *RCT* shall advise *Institution* in writing of its decision to accept or decline to accept such submitted *Invention* for commercialization under this Agreement. If *RCT* declines to accept any *Invention*, *Institution* shall, upon receipt of such written decision from *RCT*, be free to take steps to protect and commercialize such *Invention* as *Institution* may see fit to do, without further obligation under this Agreement. If *RCT* accepts any *Invention*, *Institution* shall promptly comply with the provisions of 1.5 below.

1.4. At any time after three (3) months from the date of receipt by *RCT* of any submitted *Invention*, *Institution* may notify *RCT* in writing that *RCT* must accept or decline to accept such *Invention* on or before the date thirty (30) days after *RCT's* receipt of such notice. If *RCT* fails to accept or decline such *Invention* on or before the expiration of such thirty (30) day period, *RCT* shall be deemed to have declined such *Invention*. The provisions of this paragraph shall not apply to an *Invention* so long as *RCT* has submitted such *Invention* to a third party for screening or other evaluation, with approval of *Institution*, in the course of evaluation of such *Invention*.

1.5. Upon *RCT's* acceptance of any submitted *Invention*, *Institution* shall assign or arrange for assignment to *RCT* of all rights, title and interest in and to any such *Invention* and its corresponding *Patent Rights* (foreign and domestic), employing *RCT's* customary forms of assignment.

### II. PATENTS

2.1. Upon *RCT's* acceptance of any submitted *Invention*, and *Institution's* assignment in accordance with 1.5 above, *RCT* shall file United States and foreign *Patent Application(s)* on each such accepted *Invention* as *RCT* may deem appropriate and prosecute such *Patent Application(s)* to the extent *RCT* determines that such prosecution will result in *Patent(s)* that have reasonable commercial potential.

2.2. *RCT* shall maintain such *Patents* to the extent *RCT* may deem desirable for its commercialization efforts. *RCT* may abandon or take no further action as to any such *Patent Application or Patent* subject to this Agreement and thereafter abandon same if *RCT* determines that corresponding commercialization efforts are no longer justified, or that patent protection is no longer desired. On or before the date sixty (60) days before *RCT* abandons same, *RCT* shall notify *Institution* that it will abandon such *Patent* or *Patent Application*. If, on or before the expiration of such sixty (60) day period, *Institution* requests, in writing, *RCT*

to assign such *Patent Application* or *Patent* to *Institution* or its nominee, *RCT* shall so assign such *Patent Application* or *Patent* as requested. In the case of foreign filed *Patent Applications*, only the perfected filing of a *Patent Application* under the Patent Cooperation Treaty or in the European Patent Office (to extend the time for filing *Patent Applications* which may be perfected in certain countries) in a country shall be regarded as the filing of such a *Patent Application* which requires such notice and only in the country of such perfected filing.

## III. COMMERCIALIZATION

3.1. *RCT* shall expend reasonable efforts to commercialize each accepted *Invention* and corresponding *Patent Applications* and *Patents* and secure reasonable revenue from such commercialization in the manner *RCT* deems appropriate.

3.2. On or about March 15 of each year, *RCT* shall pay to *Institution* fifty-seven and one-half percent (57-1/2%) of *Gross Income*, if any, received during the prior calendar year in respect of each accepted *Invention*. *RCT* shall retain, for its own benefit, the remaining *Gross Income*. *Gross Income* and *Institution's* share of *Gross Income* shall be separately computed and reported for each such *Invention*, although payment of *Institution's* share of *Gross Income* for all *Institution's Inventions* commercialized under this Agreement may be aggregated and made in one check. If *Institution* has approved the deduction from *Gross Income* of *Special Expenses* pertaining to a particular *Invention* (the "*Invention's Special Expenses*"), *RCT* shall make the following adjustments to *Gross Income* attributable to such *Invention* and received in the prior calendar year (the "*Invention's Gross Income*"):

(a) subtract from the *Invention's Gross Income* the *Invention's Special Expenses* incurred during the prior calendar year and any excess of the *Invention's Special Expenses* carried forward from earlier calendar years; and

(b) if the *Invention's Special Expenses* incurred during the prior calendar year and the excess, if any, of the *Invention's Special Expenses* carried forward from earlier calendar years together do not exceed the *Invention's Gross Income*, *RCT* shall pay to *Institution* fifty-seven and one-half percent (57-1/2%) of the remainder.

*RCT* shall furnish a computation of all payments made to *Institution*. *RCT* shall maintain at its offices, in usual form, books of record, ledgers and accounts relating to its activities under this Agreement, which shall be open to examination by *Institution* or its nominees during usual business hours. *RCT* shall also annually report on its previous year's efforts to commercialize each accepted *Invention*.

3.3. *RCT* shall have the right to abandon its commercialization efforts for any accepted *Invention*, *Patent Application* or *Patent* if *RCT* determines, in its discretion, that such efforts are no longer justified. *RCT* shall notify *Institution* of such abandonment. Upon written request by *Institution*, *RCT* shall assign such *Invention*, *Patent Application* or *Patent* to *Institution* or its nominee. *RCT* shall continue as licensor, grantor or contracting party (or licensee, if applicable) as to licenses, grants, working rights, agreements or other contracts to which any accepted *Invention*, *Patent Application* or *Patents* is then subject if *RCT* reassigns to *Institution* such *Invention*, *Patent Application* or *Patent*. *RCT* shall also continue to compute, pay and retain *Gross Income* and to make reports under 3.2 above with respect to such *Invention*, *Patent Application* or *Patent*.

## IV. TERMINATION

Either party may terminate this Agreement upon three (3) months' written notice to the other party, although any *Invention Institution* has submitted to *RCT* under this Agreement before the effective date of termination shall be subject to this Agreement. Such termination shall not relieve *RCT* of its duty or affect its rights under 3.2 above. Termination of this Agreement shall not prejudice or affect the tenor, validity, effectiveness or scope of any rights *RCT* may have in any submitted or accepted *Invention* or its corresponding *Patent Rights* or any agreement between *RCT* and any third party concerning any submitted or accepted *Invention*. Any such agreement shall survive termination of this Agreement or the assignment, if any, of such *Invention* and its corresponding *Patent Rights* from *RCT* to *Institution*. Any such agreement shall continue to be managed by *RCT* under this Agreement.

## V. GENERAL

5.1. Any controversy or claim arising out of or relating to this Agreement or the breach of this Agreement shall be settled by arbitration, in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction.

5.2. This agreement is expressly subject to and conditioned upon any rights the United States Government may have in any *Invention* administered under this Agreement or the *Patent Rights* to such *Invention* as a result of any contract, grant or funding related to the research or other work that resulted in such *Invention* or *Patent Rights*.

5.3. All notices, requests, and other communications provided for in this Agreement shall be directed to the respective parties at the address provided below, shall be in writing, and shall be deemed to have been made or given: (a) when delivered, if delivered by hand or sent by telex, telegram, telecopier or facsimile, (b) on the day following deposit with an overnight courier, if sent via overnight courier; or (c) on the date three (3) days following deposit with the United States Mail, certified or registered. Each party reserves the right to change such address for notification, by notice so given.

If to *RCT*: Research Corporation Technologies, Inc.  
6840 East Broadway Boulevard  
Tucson, AZ 85710-2815

If to *Institution*: at the address indicated below on the signature block.

5.4. This Agreement constitutes the entire agreement and understanding of the parties concerning the subject matter of this Agreement. All prior understandings are merged into and extinguished by this document. This agreement shall be governed and construed according to the laws of the State of Arizona without regard to laws of Arizona concerning any conflicts of laws.

5.5. This Agreement shall apply to *Inventions* of *Faculty* which are submitted or assigned to *RCT* after the Effective Date and shall be in lieu of any earlier invention administration agreement, if any, between *RCT* and *Institution* (the "Superseded IAA") with respect to such *Inventions*. The Superseded IAA shall, nevertheless, continue in full force and effect as to any *Inventions* submitted and accepted by *RCT* before the Effective Date except to the extent *RCT* and *Institution* agree to treat any such previously submitted *Invention* under this Agreement.

5.6. Each party shall exercise due diligence and good faith in performing all acts required or contemplated by this Agreement.

## VI. DEFINITIONS

6.1. When printed in italic letters in this Agreement, the following terms shall have the meanings set forth below:

"*Faculty*" shall mean the members of *Institution's* faculty, staff, fellows, associates, students, employees or others covered by the *Patent Policy*.

"*Gross Income*" shall mean money and other consideration received by *RCT* by reason of its assignment or licensing of any *Invention*, *Patent* or *Patent Rights* to which *RCT* has rights under this Agreement, but shall not include any amounts paid to *RCT* or to *Institution*: (i) for developmental research, feasibility or market studies, or other work undertaken to enhance the *Invention* or its commercialization; or (ii) for the expenses of filing or prosecuting any *Patent Application* or maintaining or working any *Patent* on such *Invention*; or (iii) in respect of, or as a return on, any equity interest *RCT* may have in an entity licensed to practice the *Invention* (although the parties understand and agree that any license agreement between *RCT* and any entity in which it has an equity interest must be approved in writing by *Institution*).

"*Invention*" shall mean invention or discovery or novel plant variety. An *Invention* shall be "made" when it is conceived.

"*Inventor*" shall mean one who makes an *Invention* or one who is a breeder of a novel plant variety eligible for protection by means of a Plant Variety Protection Certificate or the like.

"*Patent*" shall mean a patent or Certificate of Invention or Utility Model or Design Registration or Plant Variety Protection Certificate or other form of protection for an *Invention* issued by a government or governmental agency.

"*Patent Application*" shall mean an application for a *Patent*.

"*Patent Policy*" shall mean the applicable policies, programs, regulations and contracts, expressed or implied, governing or determining the rights of *Institution* in and to *Inventions*, *Patent Applications* and *Patents* and other intellectual property of its professors, teachers, assistants, researchers, staff, fellows, associates, students, employees or others who may be subject to same.

"*Patent Rights*" shall mean:

(a) all right, title and interest in and to an *Invention*, any *Patent Application* filed or to be filed on the *Invention*, any *Patent* issued or issuing on such *Patent Application*;

(b) the right to file for any such *Patent* and to have any such *Patent* issued in the name of the owner or assignee; and

(c) the right to claim any priority right to which the *Inventor* or anyone claiming under him may be entitled.

"*Special Expenses*" shall mean any expenses incurred by *RCT* for litigation or other legal proceedings concerning the infringement, enforceability, validity or scope of any *Patent* or *Patent Application* or any license agreement concerning same, including attorney's fees and disbursements and court costs.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed, and their corporate seals to be affixed, by their duly authorized corporate officers on the date(s) indicated below to be effective as of and on the Effective Date.

RESEARCH CORPORATION
TECHNOLOGIES, INC.

By: _Gary M. Munsinger_
President

Date: 3-13-90

Attest:

By: _Timothy J. Richard_
Secretary

(Seal of *RCT*)

UNIVERSITY OF DELAWARE

Newark, Delaware 19716

By: _____
Title President

Date: 3/22/90

Attest:

By: _____
Title Secretary

(Seal of *Institution*)

# EXHIBIT B

SMS           Materials Treatment Agreement
MTAG006       Project No. 243-1611; Wirth et al.; 08/19/92

## MATERIALS TREATMENT AGREEMENT

Effective August 28, 1992, Research Corporation Technologies, Inc., 6840 E. Broadway Blvd., Tucson AZ 85710 ("RCT") and PHENOMENEX, INC. ("COMPANY"), agree as follows:

1.      Drs. M.J. Wirth and H.O. Fatunmbi ("INVENTORS") of the University of Delaware have invented a Multiple-Substituted Polysiloxane Monolayer ("INVENTION") as described in U.S. Patent Application No. 900,215, filed 06/17/92 ("APPLICATION").  The INVENTORS have assigned the INVENTION and APPLICATION to RCT.

2.      COMPANY shall provide to INVENTORS certain materials to be treated according to the INVENTION. RCT shall request INVENTORS to treat such materials for COMPANY.

3.      RCT consents to the treatment of such materials according to the INVENTION solely for research purposes.  Upon receipt of the treated materials by COMPANY, the following shall apply:

      a.      COMPANY shall:

            (i)  Use the treated materials solely for noncommercial research purposes, specifically including internal direct comparisons of separation processes;

            (ii)  Within thirty (30) days of first receipt of the treated materials, advise RCT and the INVENTORS of the results of COMPANY's evaluation; and

            (iii)  Upon completion of its research, destroy or return to INVENTORS any unused portions of the treated materials, including derivatives, fragments or modifications.

      b.      COMPANY shall not:

            (i)  Use, cause to be used, or permit to be used the treated materials in any study other than those in direct furtherance of its research under this Agreement;

            (ii)  Transfer the treated materials from its facility to any other site owned or controlled by another person; or

            (iii)  Use the treated materials for any commercial or nonacademic purposes.

4.      If, during the course of its research with the treated materials, COMPANY makes an invention using the treated materials (such as a new use for the treated materials), COMPANY shall grant RCT a first right of negotiation for any license COMPANY elects to grant to practice such invention.

5.      THE MATERIALS TREATED ACCORDING TO THE INVENTION ARE EXPERIMENTAL IN NATURE AND NEITHER RCT NOR INVENTORS MAKE ANY REPRESENTATIONS OR EXTEND ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE USE OF THE TREATED MATERIALS WILL NOT INFRINGE ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER RIGHT.

SMS            Materials Treatment Agreement
MTAG006        Project No. 243-1611; Wirth et al.; 08/19/92

6.    In no event shall RCT or INVENTORS be liable for any use of the treated materials, and COMPANY shall defend, indemnify and hold harmless RCT and INVENTORS from any loss, claim, or liability, of whatever nature, that may arise from or in connection with the shipment of or COMPANY's use of the treated materials.

7.    This Agreement shall not be construed to grant to COMPANY any express or implied option, license or other right, title or interest in or to the INVENTION or materials treated according to the INVENTION.

PHENOMENEX, INC.

Signature

By:

Title:

RESEARCH CORPORATION
TECHNOLOGIES, INC.

Gary M. Munsinger

President

Appv'd
LAW
S.M.S.

# EXHIBIT C

EVALUATION  LICENSE  AGREEMENT
and RIGHT  OF FIRST  NEGOTIATION

Effective _March   29_____, 1993 ("EFFECTIVE DATE"), RESEARCH  CORPORATION
TECHNOLOGIES,  INC., 101 North Wilmot Road, Suite 600, Tucson, Arizona 85711-3335 ("LICENSOR") and
PHENOMENEX,  INC., 2320 West 205th Street, Torrance, California 90501 ("LICENSEE") agree as follows:

ARTICLE  I
RECITALS

SECTION  1.1.  The INVE,;TORS made the INVENTION described in the LICENSED  PATENTS.
LICENSOR  represents that the INVENTORS have assigned the INVENTION and LICENSED  PATENTS to
LICENSOR.

SECTION  1.2.  LICENSOR  would like to enter into agreements for the further development of
INVENTION  so that it might be utilized in the public interest.

SECTION  1.3.  LICENSEE desires to obtain a license under the LICENSED  PATENTS to evaluate the
INVENTION  for possible commercialization.  LICENSEE  would also like a right of first negotiation with
LICENSOR  for a license under the LICENSED  PATENTS in the LICENSED  FIELD  during the term of the
Evaluation License.

SECTION  1.4.  LICENSOR  is willing to grant to LICENSEE a right of first negotiation and an evaluation
license to evaluate the INVENTION  free from suit by LICENSOR  for infringement of the PATENT  CLAIMS,
pursuant to the terms and conditions of this Agreement.

ARTICLE  II
EVALUATION  LICENSE

SECTION  2.1.  Grant  of Evaluation License.  LICENSOR  hereby grants to LICENSEE a license to do
the following in the United States, in the LICENSED  FIELD  free from suit by LICENSOR  for infringement of
the PATENT  CLAIMS:  to make and use LICENSED  PRODUCTS  for evaluation of the INVENTION; and to
practice LICENSED  PROCESSES  for evaluation of the INVENTION  ("Evaluation License").  No other license
or right is granted or implied under this Agreement.  The Evaluation License does not give LICENSEE  the right
to sell LICENSED  PRODUCTS  or to use LICENSED  PRODUCTS  or LICENSED  PROCESSES  for any purpose
other than evaluation of the INVENTION.

SECTION  2.2.  Exclusivity.  The Evaluation License shall be exclusive to LICENSEE  in that, during the
term of the Evaluation License, LICENSOR  shall not grant to any third party a concurrently effective license under
the LICENSED  PATENTS  to make, use or SELL  LICENSED  PRODUCTS  or to practice LICENSED
PROCESSES,  in the LICENSED  FIELD.  However, LICENSOR  may grant INSTITUTION  a nonexclusive license
under the LICENSED  PATENTS  for educational and noncommercial research purposes.

SECTION  2.3.  License Issue Fee.  LICENSEE  shall pay to LICENSOR  a license issue fee of Two
Thousand Dollars ($2,000), payable upon execution and delivery of this Agreement.  The license issue fee is
nonrefundable, but may credited against future license issue fees negotiated under SECTION  3.2.

SECTION  2.4.  Expiration.  The Evaluation License shall expire and have no further effect on the date
six (6) months after the EFFECTIVE  DATE.

SECTION 2.5. Progress Reports. To keep LICENSOR apprised of LICENSEE's evaluation efforts, LICENSEE shall submit progress reports on its activities. The first report shall be due on the date one month after the EFFECTIVE DATE. Subsequent reports shall be due each month thereafter. A final report shall be due within ten (10) days after expiration or termination of this Agreement. Each such report shall include summaries of tests conducted, specifically including test conditions, results and data, and interpretation of results, and identification of the next step in the development process. LICENSEE shall direct each report to the attention of Joseph S. Stumpf, Director, Physical Sciences Group.

### ARTICLE III
### RIGHT OF FIRST NEGOTIATION

SECTION 3.1. Grant of Right. During the term of the Evaluation License, the parties shall negotiate in good faith the terms of an agreement under which LICENSOR would license LICENSEE to make, use and sell LICENSED PRODUCTS under the LICENSED PATENTS in the LICENSED FIELD ("Commercial License"). LICENSOR agrees that during the term of the Evaluation License, LICENSOR shall not negotiate with any other party regarding a commercial license under the LICENSED PATENTS in the LICENSED FIELD.

SECTION 3.2. Elements of Commercial License. The Commercial License shall include: a license issue fee, royalties based on net sales value of licensed products, annual minimum royalty payments, diligence requirements by LICENSEE, exclusivity protection in the LICENSED FIELD.

### ARTICLE IV
### PROPRIETARY INFORMATION

SECTION 4.1. Disclosure to LICENSEE. LICENSEE acknowledges that certain PROPRIETARY INFORMATION belonging to LICENSOR will be disclosed to LICENSEE pursuant to this Agreement.

SECTION 4.2. Non-Use and Non-Disclosure. LICENSEE agrees that, for a period of five (5) years after the date of LICENSEE's receipt of PROPRIETARY INFORMATION, it shall not: (i) commercially use any PROPRIETARY INFORMATION; or (ii) disclose to any third party any PROPRIETARY INFORMATION disclosed to it under this Agreement. The foregoing restrictions on use and disclosure shall not apply to any PROPRIETARY INFORMATION that:

(a) RCT, in its sole discretion, has granted written consent for LICENSEE to use or disclose;

(b) at the time of such receipt by LICENSEE was independently known by LICENSEE;

(c) at the time of such disclosure or use by LICENSEE is generally known to the public through no fault of LICENSEE; or

(d) at the time of such disclosure or use by LICENSEE has been made available to LICENSEE by a person, other than LICENSOR or anyone acting on behalf of LICENSOR having the right to do so without breaching any obligation of nonuse or confidentiality.

SECTION 4.3. Limited Access. LICENSEE shall limit access to PROPRIETARY INFORMATION solely to those of its employees who have a need to know for evaluation of the INVENTION, and who, as employees of LICENSEE, are aware of, and are bound by, this Agreement.

SECTION 4.4. Return of Material. Upon expiration of this Agreement, and upon request by LICENSOR, LICENSEE shall return to LICENSOR all PROPRIETARY INFORMATION disclosed in writing, or reduced to writing, although LICENSEE shall be entitled to retain one copy of such written PROPRIETARY INFORMATION in its legal files for archival purposes only.

2

SMS:mjr        Evaluation License Agreement between RCT and Phenomenex, Inc.
LiAg364       RCT Project Number 243-1611; Wirth & Fatunmbi; 3/29/93.

## ARTICLE V
## TERMINATION

SECTION 5.1. At LICENSEE's Election. LICENSEE may terminate the Evaluation License and this Agreement at any time by giving LICENSOR written notice of LICENSEE's election to so terminate.

SECTION 5.2. LICENSEE's Breach of Agreement.

Subsection 5.2.1. Curable Breach. LICENSEE's failure to submit any monthly report due under SECTION 2.5 shall be considered a curable breach of this Agreement. Upon such breach by LICENSEE, LICENSOR may elect to terminate this Agreement by giving LICENSEE written notice of LICENSOR's election to terminate this Agreement. Unless LICENSEE cures such breach by ten (10) days after receipt of LICENSOR's notice, this Agreement shall terminate immediately.

Subsection 5.2.2. Non-Curable Breach. If LICENSEE uses the INVENTION for any purposes except those provided under this Agreement (e.g., use of LICENSED PROCESSES for LICENSEE's internal operations, commercial use, or commercial sale), such use by LICENSEE shall be a non-curable breach and LICENSOR may terminate this Agreement immediately by giving LICENSEE written notice of termination of Agreement. Such termination shall be effective as of the date of LICENSOR's notice.

SECTION 5.3. Survival of Obligation. LICENSEE's obligations under SECTION 2.5 to submit progress reports shall survive expiration or termination of this Agreement.

## ARTICLE VI
## GOVERNMENT RIGHTS

SECTION 6.1. Prior Rights. This Agreement is subject to the rights of the U.S. Government in and to the LICENSED PATENTS, including those derived through the National Science Foundation pursuant to Grant No. CHE-8814602, and through the Department of Energy pursuant to Grant No. DE FG02-91ER-14187. Such rights include a nonexclusive, nontransferable, royalty-free, irrevocable license to the U.S. Government for governmental purposes and on behalf of any foreign government pursuant to any treaty or agreement with the U.S. Such license to the U.S. Government shall remain unaffected by this Agreement.

SECTION 6.2. License to Conform. Any inconsistency between this Agreement and the pertinent provisions of any law, regulation, or executive order by the U.S. Government shall be resolved by conforming this Agreement to such provisions of any such law, regulation, or executive order. This Agreement shall be subject to applicable governmental laws relating to compulsory licensing.

## ARTICLE VII
## GENERAL

SECTION 7.1. Compliance with Law; Severability. Nothing in this Agreement shall be construed to require the commission of any act contrary to law. If this Agreement conflicts with any statute, law, ordinance or treaty, the latter shall prevail. In such event, the affected provisions of this Agreement shall be limited to the extent necessary to bring it within the applicable legal requirements and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected thereby.

SECTION 7.2. No Representations. Nothing in this Agreement shall be construed as a representation (a) as to the scope or validity of any LICENSED PATENT; or (b) that any performance, or practice under any LICENSED PATENT is not an infringement of any patent of others.

SECTION 7.3. <u>Independent Contractor</u>. In its performance under this Agreement, each party shall be an independent contractor and neither party (nor any employee or agent thereof) shall be an agent or partner of the other party.

SECTION 7.4. <u>No Third-Party Beneficiaries</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any third-party.

SECTION 7.5. <u>Assignment</u>. This Agreement shall not be assigned by LICENSEE except as part of a sale of all of LICENSEE's business and, in such event, only in its entirety, upon prior written notice to LICENSOR, and upon LICENSEE'S assignee's agreement to abide by the terms of this Agreement and assume all of LICENSEE's obligations under this Agreement. Upon such assignment, the term "LICENSEE" as used in this Agreement shall thereafter mean the assignee of LICENSEE.

SECTION 7.6. <u>Non-Use of Names</u>. LICENSEE shall not use the names of INVENTORS, INSTITUTION, LICENSOR, or any adaptation of any of them, in any advertising, promotional or sales literature, without prior written consent obtained from INVENTORS, INSTITUTION or LICENSOR, as applicable.

SECTION 7.7. <u>Authority and Binding Agreement</u>. Each party represents to the other that this Agreement constitutes a valid and binding agreement of the representing party, that execution, delivery and performance of this Agreement by the representing party are within the representing party's corporate power, and have been duly authorized by all necessary corporate action.

SECTION 7.8. <u>Arizona Law</u>. This Agreement shall be construed and enforced under the laws of the State of Arizona.

### ARTICLE VIII
### DEFINITIONS

SECTION 8.1. "INSTITUTION" means the University of Delaware.

SECTION 8.2. "INVENTION" means "Products Having Multiple-Substituted Polysiloxane Monolayer" as described in the LICENSED PATENTS.

SECTION 8.3. "INVENTORS" means Mary J. Wirth and Hafeez O. Fatunmbi.

SECTION 8.4. "LICENSED FIELD" means column chromatography, for analytical applications, using silica particles having a particle size of less than ten (10) microns.

SECTION 8.5. "LICENSED PATENTS" means:

(a) U.S. Patent Application Number 900,215, filed June 17, 1992;

(b) all divisional or continuation applications based on U.S. Patent Application Number 900,215;

(c) all issued, unexpired patents resulting from any of the applications described in paragraphs (a) or (b); and

(c) all reissue or reexamination patents that may be based on any of the patents described in paragraph (c).

SECTION 8.6. "LICENSED PROCESS" means a method or process, the practice of which directly infringes, contributorily infringes or induces the infringement, literally or by the doctrine of equivalents, of a PATENT CLAIM but for this License Agreement.

4

SMS:mjr
LiAg364

Evaluation License Agreement between RCT and Phenomenex, Inc.
RCT Project Number 243-1611; Wirth & Fatunmbi; 3/29/93.

SECTION 8.7. "LICENSED PRODUCT" means a product, the manufacture, use, or sale of which directly infringes, contributorily infringes or induces the infringement, literally or by the doctrine of equivalents, of a PATENT CLAIM, but for this License Agreement.

SECTION 8.8. "PATENT CLAIM" means a claim in a LICENSED PATENT. A PATENT CLAIM shall be presumed to be valid unless and until it has been held to be invalid by a final judgment of a court of competent jurisdiction from which no appeal can be or is taken. Any claim in a pending patent application shall be deemed to be the equivalent of a valid claim of an issued, unexpired patent.

SECTION 8.9. "PROPRIETARY INFORMATION" means: the content of the LICENSED PATENTS; all written information and data relating to the INVENTION disclosed to LICENSEE by or on behalf of LICENSOR, whether or not documents containing such information and data are marked as confidential or proprietary; and all information, data or know-how relating to the INVENTION communicated orally or visually to LICENSEE by or on behalf of LICENSOR.

RESEARCH CORPORATION TECHNOLOGIES, INC.

_Gary M. Munsinger_
Gary M. Munsinger
President

_March 29, 1993_
Date Signed

PHENOMENEX, INC.

_[signature]_
Name

_PRESIDENT_
Title

_APR. 6. 93_
Date Signed

# EXHIBIT D

*Stetina Brunda Garred & Brucker*
A PROFESSIONAL CORPORATION
PATENT, TRADEMARK, COPYRIGHT AND UNFAIR COMPETITION CAUSES

RECEIVED

75 ENTERPRISE, SUITE 250
ALISO VIEJO, CALIFORNIA 92656

JAN 09 2006
McCARTER & ENGLISH
WILMINGTON, DE

KIT M. STETINA
BRUCE B. BRUNDA
WILLIAM J. BRUCKER
MARK B. GARRED
MATTHEW A. NEWBOLES
ERIC L. TANEZAKI
LOWELL ANDERSON

SEAN O'NEILL
JAMES C. YANG
NATHAN S. SMITH
STEPHEN Z. VEGH

JESSIE WANG *
SHUNSUKE S. SUMITANI *
BENJAMIN N. DIEDERICH *

TELEPHONE        (949) 855-1246
FACSIMILE I       (949) 855-6371
FACSIMILE II      (949) 716-8197
www.stetinalaw.com
Writer's Direct E-mail:
landerson@stetinalaw.com

January 3, 2006

Michael P. Kelly.
McCarter & English
919 N. Market St., 19th Floor
Wilmington, DE 19801

RE:   UD Technology Corp. v. Phenomenex, Inc. et al.
Our Ref. MAJOR.1221

Dear Mr. Kelly

I renew the request for UD Technology to voluntarily dismiss the Complaint against Phenomenex. You ignored my request for a courtesy copy of the contracts which you claim were breached by Phenomenex. But I obtained them elsewhere and was shocked to see how they show there is no basis for the contract claims or for the trade secret claims.

In short, the alleged secrets were published in 1992 and 1993 and thus could not be secrets when they were allegedly disclosed to Phenomenex. Any remaining doubts are dispelled by publication of the '625 patent application in December, 1993. All of those public disclosure occurred many years before the 1997 introduction of the Jupiter product which is accused of using this publicly disclosed information.

The **Materials Treatment Agreement** is dated Aug. 25, 1992, between Phenomenex and Research Corporation Technologies, Inc. ("RCT"). Neither UD Technologies nor the University of Delaware was a party to that agreement. Further, neither UD Technologies nor the University of Delaware was contemplated as a beneficiary because if Phenomenex found a new use for that treated column, any invention would be assigned to RCT, not UD Technology and not the University of Delaware. UD Technology has not rights under that agreement, and lacks standing to assert any rights for breach of that Materials Treatment Agreement. Since UD Technologies lacks standing, please withdraw the claims regarding this Agreement.

Further, the Materials Testing Agreement focuses on use of the treated column, not on a broad technology prohibition as alleged in your Complaint. Phenomenex was to test the column, but was limited on what it could do with the column thereafter. The alleged acts of breach identified in paragraph 47 are believed to be based on wishful thinking and speculation, not

January 3, 2006
Page 2

based on any reasonable investigation as required by Rule 11. Speculation and hopes do not satisfy Rule 11. As reflected by the agreement, Phenomenex was not told how the material was treated. But as discussed below, numerous publications in 1992 and 1993, and later, describe the coating process apparently used. There is no reasonable basis to believe that Phenomenex used the material from the initial 1992 testing, coated by an unknown process, when the numerous publications from 1992 and 1993 (and onward) described how to make such coatings.

Please withdraw the allegations regarding the Materials Treatment Agreement. If you maintain these allegations, be prepared to show the evidentiary results of the reasonable investigation required by Rule 11, and to explain how UD Technologies has any rights under a 13 year old agreement to which it is not a party.

The **Evaluation Agreement** is between Phenomenex and RCT. Neither UD Technologies nor the University of Delaware was a party to that agreement. Indeed, the University of Delaware is identified as a potential RCT nonexclusive licensee. Thus, UD Technology has no rights under this agreement, and lacks standing. Since there is no standing, please withdraw the claims arising from this agreement.

By the express terms of Section 2.1, the Evaluation Agreement "shall expire and have no further effect on the date six (6) months after the EFFECTIVE DATE" of March 29, 1993. That date passed long ago. There is no basis to allege breach base on later actions, and there is no basis for the remedies requested which far exceed those specified in the Evaluation Agreement. Please drop the claims based on this Evaluation Agreement.

Moreover, the Evaluation Agreement only involves the 1992 patent application, an application which lacks the additional information filed in the Continuation in Part application, information which was critical to obtaining allowance of Patent No. 5,599,625. Please dismiss any claims based on technology not covered by the Evaluation Agreement.

Significantly, the Evaluation Agreement does not apply to any information which, at the time of disclosure or use by Phenomenex, was publicly available. Section 4.2. The Evaluation Agreement is dated March 29, 1993 with Mr. Fatunmbi's visit occurring later. Before the agreement was even signed and before Mr. Fatunmbi arrived at Phenomenex, the inventors had disclosed everything in several publications, and further disclosed it shortly after his visit.

1.  November, 1992: Horizontal Polymerization of Mixed Trifunctional Silanes on Silica: A Potential Chromatographic Stationary Phase, Mary J. Wirth and Hafeez O. Fatunmbi, *Anal Chem.*, 64, 2783 (1992) (copy attached).

2.  At least by March 28, 1993: Horizontal Polymerization of Mixed Trifunctional Silanes on Mary J. 'Wirth and Hafeez O. Fatunmbi, Silica 2, Application to Chromatographic Silica Gel, *Anal. Chem.*, 1992, 65, 822-826 (copy attached).

3.  June 16-18, 1993 Symposium: Spectroscopic and Chromatographic Characterization of a Self-Assembled Monolayer as a Stationary Phase, published in 1994 by the Royal Society of Chemistry (copy attached) (other disclosures on attached sheet).

January 3, 2006
Page 3

Any claims based on alleged misuse of trade secret information or breach of contract must exclude anything shown or suggested by any paper which was published **before** the Evaluation Agreement was even entered. The Uniform Trade Secrets Act of both Delaware and Arizona provide no protection to information that is published and thus generally known or readily ascertainable.

Moreover, the Jupiter product accused of infringement and of misusing trade secrets was introduced in 1997, and there were numerous other publications between 1993 and 1997. But more importantly, the entire contents of U.S. Patent 5,599,625 were published years earlier in Dec. 23, 1993, as application PCT/US93/05816, publication no. WO 93/25307.

As of December 23, 1993, Phenomenex could use any information in the 1992 patent application covered by the Evaluation Agreement, as well as any additional information in the continuation-in-part application that issued as the '625 patent. The Evaluation Agreement expired Sept. 29, 1993, and the publication of the patent application effectively destroyed any potentially remaining obligations not to use anything disclosed by Mr. Fatunmbi. The same applies as of the publication dates of the numerous other articles published by Wirth and Fatunmbi on these coating materials, including the 1992 and 1993 publications by Wirth and Fatunmbi, as well as later publications. A list is attached.

The publication of the patent application is especially pertinent because the inventors (Wirth and Fatunmbi) were obligated to disclose the best mode contemplated for carrying out the invention. 35 U.S.C. §112 ¶1. Thus, because of the disclosure obligations under §112, there is nothing beyond the '625 application which could be a trade secret without invalidating the '625 patent for failure to comply with §112. To the extent you maintain otherwise, I do not see how UD Technologies can prove it since the alleged disclosure occurred some 13 years ago in 1993.

Please withdraw the allegations based on the breach of contract and alleged misappropriation of trade secrets based on a disclosure occurring in 1993, some 13 years ago.

The Trade Secrets Acts of both Delaware and Arizona allow recovery of Phenomenex's attorney fees when UD Technologies maintains these claims of misappropriation in bad faith. The claims here should never have been filed, let alone filed 13 years after the alleged disclosure, and filed by a party which lacks any rights to assert misappropriation of trade secrets. To continue with these claims in the face of documented knowledge of the massive public disclosure of the allegedly secret technology as evidenced by this letter and the attached publication list, will constitute bad faith. Rule 11 provides similar relief for the non-trade secret claims.

Sincerely,

Lowell Anderson

enclosures

cc: M. Rusing
    F. Mahjoor

January 3, 2006
Page 4

1.   Horizontal Polymerization of Mixed Trifunctional Silanes on Silica: A Potential Chromatographic Stationary Phase, Mary J. Wirth and Hafeez O. Fatunmbi, *Analytical Chemistry*, 64, 2783 (1992).

2.   Horizontal Polymerization of Mixed Trifunctional Silanes on Silica II: Application to Chromatographic Silica Gel, Mary J. Wirth and Hafeez O. Fatunmbi, *Analytical Chemistry*, 65, 822 (1993).

3.   $^{13}$C and $^{29}$Si NMR Investigations of Mixed Horizontal Polymerization on Chromatographic Silica Gel, Hafeez O. Fatunmbi, Martha D. Burch and Mary J. Wirth, *Analytical Chemistry*, 65, 2048 (1993).

4.   Products Having Multiple-Substituted Polysiloxane Monolayers, Wirth, Mary J, Fatunmbi, Hafeez, O., application no. PCT/US93/05816, International Publication No. WO 93/25307, published Dec. 23, 1993.

5.   Self Assembled Monolayers in Separations, Mary J. Wirth and Hafeez O. Fatunmbi, *LC/GC*, 12, 222 (1994).

6.   Spectroscopic and Chromatographic Characterization of a Self-Assembled Monolayer as a Stationary Phase, M.J. Wirth and H.O. Fatunmbi, in "Chemically Modified Surfaces", J.J. Pesek and I.E. Leigh, Eds. (Royal Society of Chemistry, Cambridge, UK, 1994).

7.   Horizontally Polymerized Chromatographic Stationary Phases, Hafeez. O. Fatunmbi and Mary J. Wirth, in Chemically Modified Surfaces, JJ. Pesek, Ed. (Royal Society of Chemistry, Cambridge, UK, 1996).

8.   Preparation of Mixed C18/DC1 Horizontally Polymerized Chromatographic Phases, Mary J. Wirth and R.W. Peter Fairbank, *Journal of Liquid Chromatography*, 19, 2799 (1996).

9.   Mixed Self-Assembled Monolayers in Chemical Separations, Mary J. Wirth, R.W. Peter Fairbank, and H.O. Fatunmbi, *Science*, 275, 44-47 (1997).

# EXHIBIT E

ASNAG257    RCT Project No. 243-1611, Wirth - RCT to Institution

## Agreement to Assign

The PARTIES and other fully-capitalized terms are defined in SECTION 3.

Effective_____ July 24, 2001 _____, RCT and INSTITUTION agree as follows:

### SECTION 1. Recitals.

1.1.    The INVENTORS made the INVENTION described in the PATENT RIGHTS. The INSTITUTION submitted the INVENTION to RCT for evaluation and commercialization under the DECA.

1.2.    In accordance with the DECA, INSTITUTION has caused the assignment to RCT of the INSTITUTION's and the INVENTORS' entire right, title and interest in the INVENTION and PATENT RIGHTS in the DEED OF ASSIGNMENT.

1.3.    The INSTITUTION now desires that the INVENTION and PATENT RIGHTS be assigned to INSTITUTION or INSTITUTION's designee. RCT is willing to make such assignment under the following terms and conditions.

### SECTION 2. Agreements.

2.1.    RCT agrees to assign the INVENTION and PATENT RIGHTS to the INSTITUTION or INSTITUTION's designee by executing and delivering to INSTITUTION a certain deed of assignment from RCT in the form of Exhibit A, attached to this Agreement, promptly upon full execution of this Agreement.

2.2.    INSTITUTION agrees to accept the aforesaid assignment of the INVENTION and PATENT RIGHTS with the understanding that:

(a)    RCT shall have no further obligation with respect to the patenting of the INVENTION, including the filing, prosecution and maintenance of the PATENT RIGHTS or any other patent applications or patents covering the INVENTION; and

(b)    RCT shall have no further obligation with respect to the marketing or licensing of the INVENTION or PATENT RIGHTS, either under the DECA or otherwise; provided however that, this Agreement shall not release RCT from its obligation to pay INSTITUTION amounts payable to INSTITUTION out of moneys received or to be received by RCT and which is distributable to INSTITUTION under the DECA as a consequence of RCT's ownership or licensing of the INVENTION or PATENT RIGHTS.

### SECTION 3. Definitions.

3.1.    "DEED OF ASSIGNMENT" means that deed of assignment recorded in the U.S. Patent and Trademark Office on July 15, 1993 at Reel: 6938; Frames: 007, 008, 009 and 010.

3.2.    "DECA" means that Disclosure, Evaluation and Commercialization of Inventions Agreement between RCT and the INSTITUTION dated April 1, 1990.

3.3.    "INVENTION" means Products Having Multiple-Substituted Polysiloxane Monolayer.

3.4.    "INVENTORS" mean Mary J. Wirth and Hafeez O. Fatunmbi.

1

RCT/Phmx 00007

ASNAG257     RCT Project No. 243-1611, Wirth - RCT to Institution

3.5.   "PARTIES" mean RCT and INSTITUTION, where:

"RCT" means Research Corporation Technologies, Inc., 101 North Wilmot Road, Suite 600, Tucson, Arizona, 85711-3335.

"INSTITUTION" means the University of Delaware, Newark Delaware, 19716-1551.

3.6.   "PATENT RIGHTS" mean:
        U.S. Patent No. 5,599,625 issued February 4, 1997 and
        U.S. Patent No. 5,716,705 issued February 10, 1998.

SECTION 4.     Government Rights.   This Agreement and any assignment hereto are subject to the rights of the United States Government, if any, as set forth in Exhibit A hereof.

RCT                                                          INSTITUTION
Research Corporation Technologies, Inc.                      University of Delaware

By _____                          By _____
   Gary M. Munsinger                                         Title _ASSOCIATE PROVOST FOR RESEARCH_
   President

2

ASN537    RCT Project No. 243-1611 - RCT to Institution

### Deed of Assignment

"INVENTION" means Products Having Multiple-Substituted Polysiloxane Monolayer.

"PATENTS RIGHTS" mean:
U.S. Patent No. 5,599,625 issued February 4, 1997 and
U.S. Patent No. 5,716,705 issued February 10, 1998.

"ASSIGNEE" means University of Delaware, Newark Delaware, 19716-1551.

"RCT" means Research Corporation Technologies, Inc., 101 North Wilmot Road, Suite 600, Tucson, Arizona 85711-3335.

1.    RCT hereby assigns to ASSIGNEE RCT's entire right, title and interest in:
   (a)    the INVENTION;
   (b)    the PATENT RIGHTS;
   (c))    all reissues, extensions, renewals and reexaminations of the patent rights described in (b).

2.    RCT hereby authorizes and requests the United States Patent Office to issue to the ASSIGNEE all patents described in paragraph 1 that may be granted.

3.    RCT agrees to execute any further lawful documents that ASSIGNEE deems reasonably necessary to fully protect ASSIGNEE's interest in the INVENTION and the documents described in paragraph 1.

4.    Government rights mean National Science Foundation, Reference No. CHE-8814602.

(SEAL)
RESEARCH CORPORATION TECHNOLOGIES, INC.

By: _____    Date: August 10, 2001
Gary M. Munsinger
President

STATE OF ARIZONA    )
                )ss.
COUNTY OF PIMA    )

On this 10 day of August, 2001, before me personally came Gary M. Munsinger, to me known and known to be the President of Research Corporation Technologies, Inc., the assignor named above, and acknowledged that he executed the foregoing instrument on behalf of the assignor and pursuant to authority duly received; and he further acknowledged that the seal affixed to the foregoing instrument is the seal of the assignor and that it was affixed thereto pursuant to like authority.

_____    Commission Expires: Oct. 30, 2003
Notary Public

GRETCHEN LAWHEAD
Notary Public - Arizona
Pima County
My Comm. Expires Oct 30, 2003

RCT/Phmx 00006