**1**

**Westlaw.**

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
**(Cite as: 2000 WL 193117 (Del.Ch.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
AZURIX CORP., Plaintiff,
v.
SYNAGRO TECHNOLOGIES, INC., Defendant.
**No. C.A. 17509.**

Feb. 3, 2000.

Alan J. Stone and David J. Teklits of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Plaintiff.

P. Clarkson Collins, Jr., Joseph R. Slights, III and James E. Drnec of Morris, James Hitchens & Williams, Wilmington, Delaware, for Defendant.

STEELE, Vice Chancellor.

*1 Two Delaware corporations, Azurix Corp. and Synagro Technologies, Inc., began merger talks that eventually proved fruitless. Before those talks began, Synagro was allegedly in the midst of upwards of seventeen separate acquisition negotiations. As part of a "Standstill" Agreement reached between the two companies, Azurix purportedly agreed not to use information it gathered from its merger discussions with Synagro in order to acquire any of the companies with which Synagro was allegedly negotiating. Seemingly laying the foundation for a merger, Synagro also agreed to make certain acquisitions in return for Azurix's promise to inject much-needed capital into Synagro. According to Azurix, Synagro breached the Standstill Agreement and also wrongfully impeded Azurix's attempts to acquire a third company. According to Synagro, it was Azurix that breached the Standstill Agreement by using confidential information, which it gleaned from Synagro, in its attempt to acquire that third company and by wrongfully refusing to invest in Synagro as agreed.

Azurix filed its complaint in this Court, on a Friday afternoon. The following Monday, Synagro sued Azurix in a Texas court over essentially the same disputes. Synagro moved to dismiss or stay Azurix's

Delaware action arguing that the Delaware Court of Chancery lacked subject matter jurisdiction and that based on *forum non conveniens* grounds this action should be litigated in Texas.

Because the Delaware and Texas actions must be considered to be contemporaneously filed and because after the application of the *forum non conveniens* factors, it appears that Texas will be the more convenient as well as the more logical forum to resolve the parties' dispute, I grant a stay.

I. Background
While both Azurix and Synagro are Delaware corporations, each has their respective corporate offices in Houston, Texas. Azurix is in the wastewater service industry. Synagro is in the bio-solids waste disposal business.

In early 1999, Azurix and Synagro began exploratory discussions regarding possible collaborative efforts or strategic alliances between the two companies. On February 1, 1999, Azurix and Synagro entered into a confidentiality agreement in order for the parties to be able to exchange non-public information.

Synagro was, at the time of these talks, purportedly negotiating to acquire approximately seventeen different companies. [FN1] The acquisition of some or all of those companies would seemingly make Synagro a more attractive partner. As a result of Synagro's ongoing negotiations, Azurix and Synagro supplemented the February 1 confidentiality agreement to allow Azurix to gain access to information regarding the companies Synagro claimed it was negotiating to acquire. In return, Azurix agreed to refrain for a period of time from acquiring, offering to acquire or negotiating to acquire the companies that Synagro purportedly sought to acquire.

> FN1. Azurix claims that it was given a list of twenty-two different companies, not seventeen, with which Synagro was purportedly negotiating.

Azurix filed its complaint in this Court under the belief that any merger with Synagro would occur only after Synagro completed the acquisition of eight of the companies on Synagro's target list. Azurix maintains that in mid-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
**(Cite as: 2000 WL 193117 (Del.Ch.))**

September 1999, Synagro finally disclosed to Azurix that it did not have sufficient funds or credit available to purchase any of the companies on its target list. Synagro then proposed that Azurix buy Synagro preferred stock, an infusion of capital that would presumably enable Synagro to effect the planned acquisitions. A merger between Synagro and Azurix would then be completed. Azurix consented to the investment plan, but contends the parties agreed that Azurix would be free to begin discussions with Waste Management about acquiring BioGro.

*2 By late September 1999, after initial discussions with Azurix, Waste Management was purportedly anxious to begin formal negotiations regarding a sale of BioGro to Azurix. Waste Management was not ready to begin formal negotiations until it received confirmation from Synagro that Azurix was free to make a deal, however. Synagro refused to confirm Azurix's ability to deal. In fact, Synagro considered Azurix still bound by their Standstill Agreement, which Synagro believed prevented Azurix from acquiring BioGro.

Anxious to acquire BioGro, Azurix filed this Action on Friday, October, 29, 1999, seeking to enjoin Synagro from interfering with Azurix's consummation of the purchase of BioGro and a declaratory judgment stating that Azurix had no obligation to purchase Synagro's preferred stock. Synagro filed a similar action against Azurix in a Texas court early the following Monday, November 1, 1999. In the Texas Action, Synagro sought a temporary restraining order enjoining Azurix from allegedly misusing Synagro's confidential and propriety information and from acquiring BioGro. Both actions focused on the language of the Standstill Agreement and the parties' actions surrounding it.

The Texas court has stayed the Texas Action awaiting this Court's decision on Synagro's motion to dismiss or stay. Waste Management has informed Azurix that it plans to auction BioGro and sell it to the highest bidder.

## II. Parties Contentions

Synagro moves to dismiss this Action arguing that Azurix has adequate remedies at law and that this Court lacks subject matter jurisdiction. Alternatively, Synagro moves to dismiss or stay this Action in favor of the Texas Action on *forum non conveniens* grounds. Azurix opposes Synagro's motion to dismiss or stay, and contends that the Delaware Court of Chancery is the appropriate forum in which to resolve the parties' disputes.

## III. Analysis
### A. The challenge to Delaware's equity jurisdiction

Equity jurisdiction can arise in two ways: (1) from the invocation of an equitable right, or (2) from the request for an equitable remedy when there is no adequate remedy at law. As Azurix's request for equitable remedies is the purported basis for this Court's jurisdiction, I will focus on that source of equity jurisdiction.

Even though a contract is legal in nature, equity jurisdiction may still exist in the event of a breach. This is so when the only full and adequate remedy, "likely relating to the special nature of the obligation or the unique nature to which it relates, may be an injunction or an equitable rescission or an order compelling specific performance, remedies that are available only in a court of equity." [FN2] If a party seeks equity jurisdiction on the basis of asserting a claim to an equitable remedy, it must show that any alternate legal remedy would be inadequate.

> FN2. DONALD J WOLFE, JR. AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 2-3(b), at 36 (1998).

When deciding whether equity has jurisdiction, the Court looks at the face of the complaint, as of the time of filing, with all material factual allegations taken to be true. [FN3] Therefore, events occurring after the complaint is filed are generally irrelevant to this determination.

> FN3. *See Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,* Del.Supr., 267 A.2d 586, 590-91. (1970).

*3 A plaintiff can not simply creatively plead for an equitable remedy in order to coax an equity court into hearing its case. Unless there is an underlying equitable right, the exercise of equity jurisdiction is inappropriate "where a complete remedy otherwise exists but where plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery." [FN4]

> FN4. *IBM Corp. v. Comdisco, Inc.,* Del. Ch., 602 A.2d 74, 78 (1991).

Azurix's complaint does more than simply incant traditional equity liturgy. Azurix seeks specific

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
**(Cite as: 2000 WL 193117 (Del.Ch.))**

Page 3

enforcement of Synagro's purported agreement to waive the restriction on Azurix's acquisition of BioGro and an injunction to prevent Synagro's interference with that acquisition. Synagro contends that Azurix had an adequate remedy at law at the time it filed the complaint because Azurix could assert the alleged waiver agreement as a defense to Synagro's attempt to enforce the confidentiality and standstill agreements. Synagro, however, forgets that jurisdiction is determined at the time the complaint is filed. When Azurix filed in Delaware there was not a pre-existing case, in Texas or anywhere else, in which Azurix could have asserted such a defense.

Further, Azurix's attempted acquisition of BioGro was unique and time sensitive. Azurix purportedly brought this action to thwart interference from Synagro in that endeavor. Finally, it is irrelevant that Waste Management has since decided to auction BioGro because, as stated above, jurisdiction attaches, or fails to attach, at the time of filing.

I find that this Court has subject matter jurisdiction over this action. Since jurisdiction over this claim attached when Azurix filed, this Court maintains jurisdiction through the course of this litigation.

B. Is Azurix's Delaware action first-filed or merely contemporaneously filed?

Synagro argues that this action should be dismissed or stayed under the doctrine of *forum non conveniens.* Under that doctrine, a court may decline to hear a case before it "whenever considerations of convenience, expense and the interests of justice dictate that litigation in the forum selected by the plaintiff would be unduly inconvenient, expensive and otherwise inappropriate." [FN5]

> FN5. *Sumner Sports, Inc. v. Remington Arms Co.,* Del. Ch., C.A. No. 11841, Chandler, V.C. (Mar. 4, 1993), mem. op. at 15 (quoting *Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Super., 559 A.2d 1301, 1304 (1988)).

Before engaging in a *forum non conveniens* analysis, however, a Delaware court must first determine whether application of the so-called first-filed rule is more appropriate. [FN6] The first-filed rule applies when a party seeks to stay or dismiss a Delaware action in favor of a first-filed action pending in federal or another state jurisdiction. [FN7] In contrast, the doctrine of *forum non conveniens* applies when there is no other action with similar

parties involving similar issues pending in another jurisdiction, or when the action filed elsewhere is filed later than or contemporaneously with the filing in Delaware. [FN8]

> FN6. *See* DONALD J. WOLFE, JR. AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 5-2, at 213 (1998) (discussing the competing analyses).

> FN7. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281, 284 (1970).

> FN8. *Id.*

The procedural facts determine whether this Action should be considered first-filed or contemporaneously filed. Azurix filed this Action at 4:28 P.M., EST on Friday, October 29, 1999. [FN9] Early the following Monday, Synagro filed the Texas Action. The parties filed only scant minutes apart, if one excludes the time the respective court offices were closed. It would be inequitable to count the weekend hours against Synagro because it was impossible for it to have filed during those hours. Since the difference in time of filing is so close, it is fair to treat the competing actions as contemporaneously filed. [FN10] Support for my finding is borne out of this Court's desire to avoid rewarding the winner of a race to the courthouse. [FN11]

> FN9. Our Register in Chancery stops stamping to acknowledge filings at 4:30 P.M. daily and does not acknowledge weekend filings.

> FN10. *See Texas Instruments, Inc. v. Cyrix Corp.,* Del. Ch., C.A. No. 13288, 1994 WL 96983, at *3-4, Jacobs, V.C. (Mar. 22, 1994) (actions treated as simultaneously-filed when five hours intervened between filing of competing complaints); *In re Chambers Dev. Co. Shareholders Litig.,* Del. Ch., C.A. No. 12508, mem. op. at 14, Chandler, V.C. (May 20, 1993) (treating actions filed within the same general time period as simultaneously-filed).

> FN11. *Texas Instruments, Inc., supra,* at *4.

*4   "Since the actions must be considered

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
(Cite as: 2000 WL 193117 (Del.Ch.))

simultaneously filed, neither action commands the high ground which would otherwise force the court to approach the analysis in a manner which defers to a plaintiff's choice of forum." [FN12] I must, therefore, employ a traditional *forum non conveniens* analysis.

> FN12. *Friedman v. Alcatel Alsthom,* Del. Ch., C.A. No. 16650, slip op. at 14, Steele, V.C. (December 10, 1999).

In evaluating either a motion to dismiss or a motion to stay on the grounds of *forum non conveniens,* Delaware courts consider six factors: (1) the applicability of Delaware law in the action; (2) the relative ease of access to proof; (3) the availability of compulsory process for witnesses; (4) the pendency or non-pendency of any similar actions in other jurisdictions; (5) the possibility of a need to view the premises; and (6) all other practical considerations which would serve to make the trial easy, expeditious and inexpensive. [FN13] These six factors should be used as a guide to the Court's exercise of discretion. [FN14]

> FN13. *General Foods Corporation v. Cyro-Maid, Inc.,* Del.Supr., 198 A.2d 681, 684 (1964); *Miller v. Phillips Petroleum Co. Norway,* Del.Supr., 537 A.2d 190, 202 (1988).

> FN14. *Sumner Sports Inc. v. Remington Arms Co.,* Del. Ch., C.A. No. 11841, slip op. at 6, Chandler, V.C. (Mar. 4, 1993).

The Supreme Court has provided direction on how these six factors are to be applied:
> (i) Only in a rare case should a plaintiff's choice of forum be defeated in favor of a later-filed action in another jurisdiction; (ii) in order to prevail on a forum non conveniens motion, a defendant must establish, with particularity, that it will be subjected to undue hardship and inconvenience if required to litigate in Delaware; (iii) the factors to be considered in evaluating a *forum non conveniens* motion are those [discussed above]; and (iv) a defendant must establish that one or more of [the discussed-above] factors actually causes such significant hardship and inconvenience. [FN15]

> FN15. *Chrysler First Business Credit Corp. v. 1500 Locust L.P.,* Del.Supr., 669 A.2d 104, 107 (1995).

Despite occasional references to the trial courts' discretion, little room for exercising that discretion exists given the above strictures. When a party urges a court to stay or dismiss a Delaware action in favor of a later filed action in another jurisdiction, these standards make perfect sense. As I have previously noted in another case, however, these criteria are far less helpful in evaluating contemporaneously filed actions. [FN16] If there are contemporaneous filings, the trial judge should be afforded more discretion "to determine whether the courts and the public's interest really necessitates trial in multiple jurisdictions given the limited resources of the courts and the enormous expense of litigation." [FN17]

> FN16. *See Friedman, supra,* at 15.

> FN17. *Friedman, supra,* at 16-17.

The key issue when dealing with contemporaneously filed actions is whether the moving party seeks a dismissal or a stay, and, in either instance what is the burden of persuasion? [FN18]

> FN18. *See HFTP Investments v. ARIAD Pharmaceuticals,* Del. Ch., C. A. No. 17501, Jacobs, V.C. (Dec. 9, 1999) (stating "the second issue (after determining that neither case is "first filed" and that a *forum non conveniens* analysis is required) is what standard or burden of persuasion applies").

Here, Synagro seeks either dismissal or, in the alternative, a stay. To justify dismissal, Synagro must "establish that defendant[s] will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware." [FN19] The burden is on the defendant to prove hardship and inconvenience. [FN20] "Absent such a showing, plaintiff[s'] choice of forum must be respected." [FN21] When, on the other hand, a party seeks only to stay the contemporaneously filed action, the issue is simply "whether on balance, the *forum non conveniens* factors warrant the grant of a stay." [FN22] For this claim to be dismissed, Synagro would have to demonstrate that it would suffer undue, overwhelming or significant hardship if it is required to litigate in Delaware. As explained in detail below, within the context of the *Cryo-Maid* factors, Synagro can not meet that burden.

> FN19. *Id.* at 108.

> FN20. *ANR Pipeline Co. v. Shell Oil Co.,* Del.Supr., 525 A.2d 991, 992 (1997).

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
(Cite as: 2000 WL 193117 (Del.Ch.))

Page 5

FN21. *Chrysler First, supra,* at 108.

FN22. *HFTP Investments, supra,* at 13.

**\*5** Synagro bears a much lighter burden, however, in order to justify a stay. Here, to warrant a stay of Azurix's contemporaneously filed action, the *Cryo-Maid* factors must on balance simply tip in favor of Synagro's Texas action.

1. Applicability of Delaware law

The agreements at issue contain choice of law provisions stating that Texas law will govern any disputes. While Delaware courts are capable of applying the law of another state, or even another country, [FN23] the parties to the agreements clearly wish Texas law to be the focus of the Court's attention. Given that intention, a Texas court should be afforded the edge in any analysis regarding what court is best suited to resolve this dispute. Conversely, neither party can, "absent unusual circumstances, claim surprise or inconvenience of litigating against another Delaware corporation in the state of incorporation of both parties." [FN24] Therefore, while this factor offers no evidence of undue, overwhelming or significant hardship to Synagro if it litigates in Delaware, one should fairly suspect that Texas law could be more conveniently applied by a Texas Court.

FN23. *Taylor v. LSI Logic,* Del.Supr., 689 A.2d 1196, 1199 (1997).

FN24. *Asten v. Wangner,* Del. Ch., C.A. No. 15617, ltr. op. at 2, Steele, V.C. (Oct. 3, 1997).

2. Relative ease of access to proof

Myriad boxes of documents already produced, additional evidence that may still be produced, and almost all the relevant witnesses are located in Texas. The relevant negotiations also took place in Houston with the assistance of Houston law firms. Synagro does clearly face some logistical burden in defending itself in Delaware, but when a defendant possesses substantial resources such burdens are "substantially attenuate[d]." [FN25]

FN25. *Monsanto Co. v. Aetna Casualty & Surety Co.,* Del.Super., 559 A.2d 1301, 1307 (1988).

There has been much debate over whether Synagro does indeed possess substantial resources. In his affidavit, the Executive Vice-President and General Counsel for Synagro, Alvin L. Thomas II, states that Synagro has historically grown by acquiring other bio-solids companies. As a "roll-up" company, Synagro maintains a high debt to equity ratio, which requires a large percentage of Synagro's cash flow to service. Thomas implies that this strategy does not afford Synagro discretionary liquid funds to spend on unexpected contingencies, like protracted litigation in Delaware. He notes that "[b]ecause of Azurix's filing, Synagro has been forced to hire a second set of lawyers in Delaware, which it cannot afford to do. In addition, the cost of plane tickets, hotel bills, rental cars, conference rooms, shipping fees for documents, etc. is likely to exceed several hundred thousand dollars." [FN26]

FN26. Thomas, Aff. at ¶ 19.

Azurix is skeptical of Thomas's bleak financial portrait of Synagro. It points out that Synagro filed a Form 10-Q with the SEC late in 1999 which reported gross revenues of over \$15.8 million, net income of over \$1.6 million for the three months ending September 30, 1999, and total assets of over \$93 million. Synagro argues those statistics are not telling and that Azurix overlooked the most relevant numbers in that filing: namely, that Synagro's cash on hand for the present period is only \$337,261.00. Synagro also adds that the Form 10-Q does not reflect the financial hardships that Synagro is presently suffering as a result of Azurix's failure to inject capital into Synagro as Azurix had purportedly promised.

**\*6** Only a few months ago, I was faced with an analogous case in which a French company, Alcatel Alsthom, advanced an argument similar to the one Synagro now makes. [FN27] I could not find that Alcatel Alsthom lacked substantial resources because it was a large multinational corporation that operated not only in Europe but also throughout the world. [FN28] Synagro is undeniably not Alcatel Alsthom, but neither is Synagro a sole proprietorship running a single Houston car wash. Synagro falls somewhere in between those two extremes, but in my opinion, absent extraordinary circumstances any company incorporating in Delaware does so with the expectation that it might be forced to muster the resources necessary to defend litigation in Delaware. Synagro fails to convince me that defending here constitutes "undue" or "overwhelming" hardship. On the other hand, the presence of the contending parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
**(Cite as: 2000 WL 193117 (Del.Ch.))**

corporate offices "just down the street" from the Texas courthouse and the presence of most witnesses and documents in Texas mitigates in favor of Synagro's Texas Action going forward and this action being stayed.

> FN27. *See Friedman, supra,* at 18.

> FN28. In 1998, Alcatel Alsthom had net sales of 21.26 billion Euros.

3. Compulsory process

For this prong, I must evaluate whether "another forum would provide a substantial improvement as to the number of witnesses who would be subject to compulsory process." [FN29] The majority of witnesses, the respective corporate offices, and the relevant documents are all located in Texas. Synagro also tells me that a witness, whose testimony it regards as pivotal, Rod Gray, is no longer affiliated with Azurix. Synagro states that Gray is a Texas resident and is subject to compulsory process there, but not in Delaware. While there are mechanisms to resolve similar evidentiary problems employed every day in Delaware litigation, Texas would indeed have an edge over Delaware in the ease with which Synagro could compel the witnesses necessary to its case.

> FN29. *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.,* Del.Super., 668 A.2d 763, 769 (1985).

4. Pendency of similar actions

The facts underlying this Action and the Texas Action are remarkably similar. To my knowledge there are no issues before me now on which the Texas Court could not provide full, final and complete relief. Since this Action does not differ significantly from the Texas Action nor can this Court provide relief that the Texas court cannot, this factor cuts in favor of neither jurisdiction. The Texas' Court's courtesy in allowing Delaware to first analyze *forum non conveniens* issues does not demonstrate reluctance on its part to entertain the parties' dispute.

5. Need to view the premises

This factor is not applicable and is given no weight.

6. Other practical considerations

Under this prong, Delaware courts have examined a wide array of considerations including judicial

economy, [FN30] the motives of the parties in filing suit in the respective jurisdictions, [FN31] and public interest. [FN32]

> FN30. *See id.*

> FN31. *See GTE Mobilnet, Inc. v. Nehalem Cellular, Inc.,* Del. Ch., C.A. No. 13072, 1994 WL 116194, at *5, Chandler, V.C. (Mar. 17, 1994).

> FN32. *See Monsanto,* Del. Super. 559 A.2d at 1314-15.

Perhaps judicial economy considerations may be slightly better served if this matter is litigated in Texas because the parties and the parties' primary counsel are located in Texas. Conceivably, the closer proximity of the parties, their counsel, the documents and witnesses to the Houston courthouse could make litigating this matter more efficient in Texas.

*7 But, since the Texas court has pragmatically deferred to this Court's pending resolution of the *forum non conveniens* based motion to dismiss or stay, there is no real risk of duplicative efforts. In effect, I will spend more time on this case *or* my counterpart in Texas will spend more time on this case depending on where it is ultimately litigated, but in no scenario would we both be expending equal and duplicative efforts to resolve the matter.

Synagro alleges that Azurix filed in a Delaware equity court in order to avoid having to try this matter in front of a jury. For reasons not entirely clear to me, Synagro implies its arguments would be better received by a jury than would Azurix's arguments. While I wonder why any business would prefer a jury trial, the parties relative taste for lay resolution of their purely commercial dispute, is not relevant to my decision. [FN33]

> FN33. *See Asten v. Wangner,* Del. Ch., C.A. No. 15617, ltr. op. at 5, Steele, V.C. (Oct. 3, 1997) (stating "I can find no Delaware case that says that our non-jury Court of Chancery should yield dispute resolution between its Delaware corporate citizens to jury trials in other jurisdiction"); *Dimeling, Schreiber & Park v. Packaging Industry Group,* Del. Ch., C.A. No. 1157, 1991 WL 260762, at *6, Chandler, V.C. (Nov. 15, 1991) (stating "[a]s far as defendant's argument that it cannot argue before a jury in this action or obtain punitive damages, I

Not Reported in A.2d                                                                                        Page 7
Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)
**(Cite as: 2000 WL 193117 (Del.Ch.))**

find it to be meritless")

I turn next to public interest considerations. The consequences of this litigation will be first and foremost felt in Texas. Presumably, most if not all of the employees of the two parties are Texas residents. Further, the companies operate primarily in Texas.

On the other hand, Delaware has a very legitimate interest in making its courts available to citizens who have elected to incorporate here. Both Azurix and Synagro chose Delaware as their place of incorporation in order to avail themselves of our laws and courts. While I can not lightly disregard their decisions to incorporate here, I do note that no issues of Delaware law or corporate governance dominate this dispute.

In short, there are no practical considerations to support Synagro's claim of undue hardship. As a purely "practical" matter, Synagro may find it more expensive to litigate this dispute in its state of incorporation, but this does not constitute the kind of undue hardship or overwhelming burden contemplated under our test.

A much lesser burden must be met to support a stay, however. The practical considerations flowing from the fact that the principal offices of these Delaware corporations are in Texas and the fact that most witnesses and documents are located in Texas clearly mitigate in favor of staying this action and allowing the parties to litigate similar factual and legal issues in Texas.

### IV. Conclusion

An analysis of the *Cryo-Maid* factors here fails to demonstrate that the defendant carried its burden of establishing the "undue," "significant" and/or "overwhelming" burden necessary to dismiss this simultaneously filed action. The analyses does, for the reasons explained above, demonstrate that the *Cryo-Maid* factors preponderate in favor of staying this Delaware action while the Texas action proceeds to a conclusion.

Accordingly, Synagro's *motion to stay is granted* and its *motion to dismiss is denied.*

IT IS SO ORDERED.

Not Reported in A.2d, 2000 WL 193117 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

Page 1

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
BELL ATLANTIC MERIDIAN SYSTEMS,
Plaintiff,
v.
OCTEL COMMUNICATIONS CORPORATION,
Defendant.
**No. Civ. A. 14348.**

Submitted: Nov. 6, 1995.
Decided: Nov. 28, 1995.
M. Duncan Grant, and Daniel V. Folt of Pepper, Hamilton & Scheetz, Wilmington, George A. Lehner and John Will Ongman of Pepper, Hamilton & Scheetz, Washington, DC, for plaintiff.

Richard H. Morse, Melanie K. Sharp and Matthew P. Denn of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 This contract action turns on an interpretation of the phrase "new systems" in a contract between Octel Communications Corp. ("Octel"), a designer and manufacturer of computer systems that provide voice mail services and one of its distributors, plaintiff, Bell Atlantic Meridian Systems ("BA Meridian"). The Distribution Agreement between the parties has been terminated and the suit concerns the extent of negotiated post-termination rights and duties. BA Meridian contends that Octel has a post-termination obligation to provide it with Octel's latest voice mail product system, the Overture 250 for a period of seven years following the termination of the Distribution Agreement. This contention is based upon the language of a December 17, 1992 amendment to the Distribution Agreement (the "Letter Amendment").

The Letter Amendment provided upon termination and expiration of the Distribution Agreement, for certain obligations on the part of Octel including the

obligation to provide BA Meridian with "new systems where [BA Meridian] has a binding obligation to provide such systems or where the provision of such systems is reasonably necessary to maintain [BA Meridian's] business relationship with particular existing customers." BA Meridian asserts that Octel's new voice mail device, the Overture 250, is such a "new system" because it can substitute or replace some of the products that BA Meridian was specifically entitled to distribute pursuant to the Distribution Agreement. Octel, on the other hand, argues that the phrase "new systems" only entitles BA Meridian to buy additional units of products covered by the Distribution Agreement and does not expand, after termination, the products which BA Meridian has a right to distribute.

BA Meridian seeks specific performance compelling Octel to provide the post-termination support that it contends is required by the Letter Amendment. [FN1]

> FN1. BA Meridian also sought a declaration that Octel and BA Meridian orally agreed to extend the Distribution Agreement until September 30, 1995, but voluntarily dismissed this request before trial.

For the reasons that follow I conclude that the Letter Amendment did not create the legal obligation for Octel to supply to BA Meridian during the seven year post-termination period newly designed voice mail products, such as the Overture 250, but does create an obligation to sell additional units of products covered by the Distribution Agreement, as set forth in the Letter Amendment.

I. Facts

The parties stipulated to an extensive statement of undisputed facts. Absent from the stipulation, are the communications that took place during the actual negotiation and drafting of the Letter Amendment. The following facts represent both facts as agreed upon by the parties and this Court's determination, based upon a preponderance of the evidence, of the facts necessary to resolve this dispute.

1. The parties.

Octel, a Delaware corporation with its principal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

offices in Milpitas, California, is engaged in the design, manufacture, marketing, and servicing of voice mail systems.    Octel sells its voice mail systems through both authorized distributors and direct sales offices.    BA Meridian is a general partnership formed in 1992 and consisting of two general partners, Bell Atlanticom Systems, Inc. ("Bell Atlanticom") and Northern Telecom, both of which are Delaware corporations.    BA Meridian markets, installs, and maintains private telecommunication systems (including voice mail systems) primarily in the mid-Atlantic region.    It is a distributor of Northern Telecom voice mail and private branch exchange (PBX) switching systems and until recently was also a distributor of Octel voice mail products. Bell    Atlanticom    agreed    to    the    Distribution Agreement with Octel in January of 1992.    In December of 1992, after the BA Meridian partnership was forged between Bell Atlanticom and Northern Telecom, Bell Atlanticom assigned its rights under the Distribution Agreement to BA Meridian.    BA Meridian however negotiated some adjustments to the Distribution Agreement with Octel.    The December 1992 Letter Amendment resulting from these    negotiations    provided    additional    post-termination support obligations on the part of Octel.

2. The Distribution Agreement.

*2    Under the January 1, 1992 Distribution Agreement Octel appointed Bell Atlanticom as its primary distributor within a stated territory, (Delaware, Maryland, New Jersey, Pennsylvania, Virginia, Washington, D.C., and West Virginia).    As a primary distributor, Bell Atlanticom made a volume purchase commitment commensurate with the expected volume to be generated within the territory; Bell Atlanticom agreed to sell a minimum of $8 million of Octel voice mail systems in 1992 and a minimum of $12 million in 1993.    Octel, in turn, agreed, while the agreement was in effect, not to engage in direct sales, installation, or maintenance activity in the territory, or to appoint additional distributors in the territory.    The Distribution Agreement had an expiration date of December 31, 1993, and was renewable for one year upon written agreement.

The Distribution Agreement also established the terms for the post-termination relationship between Octel and Bell Atlanticom.    In the event of termination, Section 12.2 of the Distribution Agreement required Octel to provide Bell Atlanticom "for a period of seven (7) years (or less if [Bell Atlanticom] so specifies) from the date of

termination, hardware, Software and information ... generally available to distributors ... which will enable [Bell Atlanticom] *to maintain and support its installed base systems at the location existing as of the date of termination.*"    [FN2]    Section 11.4, however, provided that Octel "shall have no obligation to fill any orders *for new systems* placed by [Bell Atlanticom] after the termination of this Agreement; however, *Octel will honor any order for new systems accepted by Octel prior to the date of termination if delivery under such order is called for within sixty (60) days* of termination."    In addition, pursuant to Section 9.2, Octel agreed to provide software updates and software enhancements in the post-termination period.

> FN2. Emphasis supplied throughout unless otherwise noted.

In late 1992, Bell Atlanticom and Northern Telecom agreed to establish BA Meridian as a joint venture partnership to sell and service voice mail systems and other telecommunication products.    BA Meridian was formed as of January 1, 1993, with Northern Telecom acquiring 80% ownership and Bell Atlanticom acquiring 20% ownership.    Substantially all of Bell Atlanticom's telecommunication products sales and service business, including employees, customer contracts, vendor agreements, inventory, and other assets, was transferred to BA Meridian. Northern Telecom is a manufacturer of voice mail systems that compete with those of Octel.

3. The Letter Amendment.

In anticipation of the formation of BA Meridian, Northern Telecom, Octel, and Bell Atlanticom negotiated and executed the Letter Amendment dated December 17, 1992.    BA Meridian then signed it on January 1, 1993.    Through the Letter Amendment, Octel consented in writing to the assignment and transfer of the Distribution Agreement from Bell Atlanticom to BA Meridian.

*3 In the Letter Amendment, Octel and BA Meridian agreed that, upon assignment of the Distribution Agreement by Bell Atlanticom to BA Meridian, BA Meridian would assume all of Bell Atlanticom's obligations, including the $12 million annual volume purchase commitment for 1993.    The Letter Amendment modified the post-termination support obligations that Octel had undertaken in the Distribution Agreement.    Under paragraph 4 of the Letter    Amendment,    Octel's    post-termination obligations were modified to be as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 3
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

Upon the termination and expiration of the Agreement on December 31, 1993, or at the end of any extension of the term of the Agreement, Octel will provide to [BA Meridian] (or any successor to [BA Meridian] ) support (as outlined in the Agreement) with respect to [BA Meridian's] installed customer base of Octel CPE product for at least the time periods specified in the Agreement. Such support shall include, without limitation, spare parts, repair parts, Software upgrades and new Software features and applications (including both Software Updates and Software Enhancements), hardware upgrades and extensions, new systems where [BA Meridian] has a binding obligation to provide such systems or where the provision of such systems is reasonably necessary to maintain [BA Meridian's] business relationship with particular existing customers for Octel CPE Product, training for technicians of [BA Meridian] or its subcontractors, customer training, support services, application development and support, and technical assistance (both by telephone and on-site) (collectively, "Post Termination Support").

4. The negotiation of the Letter Amendment.

Because Octel products accounted for a substantial portion of Bell Atlanticom's revenues, Northern Telecom felt it was important, in order to make the joint venture between Bell Atlanticom and Northern Telecom work, for the joint venture to maintain a distributor relationship with Octel. Thus, in late 1992, before proceeding with the formation of BA Meridian, John Losier, the contemplated President of the future joint venture, was assigned the responsibility of reaching an agreement with Octel.

In considering the viability and profitability of the anticipated joint venture, John Losier's primary concern in dealing with Octel was the joint venture's ability to maintain the revenue streams from customers using Octel systems. Given this objective, he felt that assumption of the Distribution Agreement without change was inadequate; the Distribution Agreement was due to expire at the end of 1993 and did not provide, in Losier's mind, sufficient post-termination support rights in order for him to maintain the joint venture's relationship with its installed base of Octel customers.

Octel was also convinced of the propriety of maintaining a relationship with the new joint venture and appointed James Jennings to head up the negotiations with Bell Atlanticom and Northern Telecom. Although Octel would be taking on a

competitor as a distributor, it would also be continuing one of its most successful distributorships and sales forces--a distributorship committed to at least $12 million in purchases for the following year. The negotiations between Losier and Jennings resulted in the Letter Amendment to the Distribution Agreement.

*4 At the first meeting between Losier and Jennings, Losier communicated his business concerns about being able to maintain relationships with his existing Octel customers during the seven year post-termination period contemplated in the Distribution Agreement. Jennings, in turn, indicated a willingness to address Losier's business concerns and on November 16, 1992, faxed a letter to Losier proposing certain post-termination support obligations. Upon receiving this fax, Losier made a notation on it that he "also need[ed] [the] ability to sell new systems to the base." Losier then instructed John Woods, senior counsel at Northern Telecom and anticipated counsel to BA Meridian, to draft an amendment to the Distribution Agreement that would enable BA Meridian to fully support its existing Octel customers in the post-termination period; including the ability to sell "new systems."

Woods' draft of the Letter Amendment containing a provision addressing "new systems" was sent to Jennings and Susan Thornton, general counsel of Octel, for review. Woods' proposed language modifying Octel's post-termination support obligations apparently was not controversial and the Letter Amendment to the Distribution Agreement was agreed upon by Losier and Jennings after only a couple of telephone conversations and without any significant debate over the meaning of the revised post-termination support obligations.

5. The renegotiation period.

Following execution of the Letter Amendment, BA Meridian acted as a distributor for Octel in the Mid-Atlantic territory. Despite the fact that BA Meridian was 80% owned by a competitor of Octel's, the relationship progressed smoothly for the first year and in November 1993, BA Meridian and Octel began negotiations to extend the Distribution Agreement (which was to expire at the end of 1993) for an additional two-year period. For more than a year, the parties discussed various draft versions of an amendment for a two-year extension. During this time, the Distribution Agreement was repeatedly extended on a month-to-month basis, beginning in January of 1994.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 4
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

As these on-going negotiations were taking place, changes in the business context of their relationship began to make that relationship more problematic. In February 1994, Octel announced that it had agreed to merge with VMX, a competing voice mail manufacturer. BA Meridian became concerned not only about the way in which the Octel and VMX product lines would be integrated, but also because Octel had begun using the former VMX direct sales office in BA Meridian's territory to sell VMX voice mail systems. In fact, in November 1994, Octel began considering cross-training its direct sales personnel in BA Meridian's territory (acquired from VMX) to sell the same type of voice mail systems that BA Meridian was selling under the terms of the Distribution Agreement. Then, in January 1995, in the parties' monthly agreement to extend the Distribution Agreement, Octel stated that it would no longer agree to refrain from engaging in direct sales of voice mail systems sold by BA Meridian in BA Meridian's territory. In February 1995, Octel initiated a "competitive replacement program" designed to assist its sales force in displacing competitive voice mail systems.

*5 On the BA Meridian side of the relationship, as early as August 1994, BA Meridian began encouraging the sale of Meridian Mail (a voice mail system manufactured by Northern Telecom) over Octel to new customers. Sales personnel had to obtain management approval to make proposals to new customers for the sale of Octel voice mail but not Meridian Mail. By March 1995, a subsidiary of Northern Telecom was offering to provide Meridian Mail at its cost to BA Meridian for displacement of Octel voice mail systems.

6. Termination of the Distribution Agreement and introduction of the Overture 250.

On April 25, 1995, Octel informed BA Meridian in writing that Octel would not extend the Distribution Agreement further and thus it would terminate. In May, Octel notified several distributors and customers that it would be introducing a new product (the Overture 250) at a July 11, 1995 customer or user group meeting in San Francisco. Octel also notified BA Meridian that according to the terms of the Distribution Agreement as amended by the Letter Amendment, BA Meridian would not be entitled to sell new voice mail products that become available to the market for the first time after June 14, 1995, including, but not limited to, the Overture 250. BA Meridian initiated this suit on June 7, 1995.

On July 11, 1995, Octel announced the introduction of the Octel Overture 250 message server. Octel described the Overture 250 as a "new mid-level system designed for medium-sized businesses or large branch offices." The Overture 250 is a newly designed product incorporating new technology and an entirely new logic design. It has been designed to have an identical user interface as have other Octel products. Thus while it will seem the same in many respects to users, it will offer new utilities to buyers of voice mail systems.

The trade press reported that the "Octel Overture 250 is designed to replace the former Branch XP, Aspen, Maxum, and Maxum SE" voice mail systems (*Business Wire* ). *Infoworld* similarly reported that the "Overture 250 replaces the Aspen line of servers and will use the Aria software. Users must purchase the new system to upgrade Aspen servers." In fact, Octel's own internal marketing reports project that many Maxum-Aspen voice mail units (which have been distributed by BA Meridian under the Distribution Agreement) will convert to the Overture 250 in the next two years. Octel is also developing new features for the Overture 250 (including visual mailboxes, hot-plug cards and drives, system back-up, and global message redundancy) that it will not make available for the Aspen-Maxum line of voice mail systems.

II. Rules of Contract Construction  [FN3]

> FN3. A choice of law provision in the Distribution Agreement provides that New York law will apply to its construction. The parties, however, have not suggested that New York law should be applied. Although I decide the issue as a matter of Delaware law, I note that New York law with respect to the interpretation of contracts is consistent with the general principles and applicable law of Delaware and have cited, where possible, New York authority for these propositions.

The primary consideration in the construction of contract language is to fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted. *See Corbin on Contracts* § 1 (1960); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977); *cf. Steigler v. Ins. Co. of North America,* Del.Supr., 384 A.2d 398, 401 (1978) (stating that insurance contracts should be read to fulfill the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
(Cite as: 1995 WL 707916 (Del.Ch.))

reasonable expectations of the purchaser). This is often stated as giving effect to the intent or shared understanding of the parties. *See Restatement (Second) of Contracts § 201* cmt. c (1981) ("The objective of interpretation in the general law of contracts is to carry out the understanding of the parties...."); *Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987); *Burge v. Fidelity Bond & Mortgage Co.,* Del.Supr., 648 A.2d 414, 420 (1994); *Deering Milliken, Inc. v. Georgette Juniors, Inc.,* 235 N.Y.S.2d 72 (N.Y.App.Div.1962). In this process, Delaware courts adhere to an "objective" theory of contracts. [FN4] *See "Industrial America", Inc. v. Fulton Indus., Inc.,* Del.Supr., 285 A.2d 412, 415 (1971); *Leeds v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095, 1097 (1986). *See also Mencher v. Weiss,* 114 N.E.2d 177, 181 (N.Y.1953); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that it is the objective manifestations of a party's intentions that ordinarily is controlling).

> FN4. Although one might be inclined to think otherwise, giving primacy to the parties' intent is not inconsistent with objective theory. Objective theory simply recognizes that only objective indicia of the parties' intent or expectations should be considered. In other words, it is generally not the parties' unexpressed intent or understanding that is relevant. *See Leeds v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095, 1097 (1986); *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 361 N.E.2d 999, 1001 (N.Y.1977) (both stating that subjective intention of party is irrelevant in determining whether party intended to bind himself contractually). This is reflected in the requirement that the parties' expectations be reasonable. That is, only expectations reasonably induced by the other parties' overt words and acts under the circumstances and business context will be recognized.

*6 Under the objective approach, the court must first determine whether the contractual language in dispute is ambiguous. When the contract language, read in the context of the entire contract, is not reasonably susceptible to more than one meaning, this "objective" meaning will govern. *Rainbow Navigation, Inc. v. Yonge,* Del.Ch., C.A. No. 9432, Allen, C. (April 24, 1989); *Levco Construction Corp. v. New York,* 350 N.Y.S.2d 219, 221 (N.Y.App.Div.1973). Moreover, parol evidence (that is evidence pertaining to antecedent agreements, communications of the parties, commercial usage in the industry, etc ...) that contradicts or varies this meaning will not be considered. [FN5] *City Investing Co. v. Continental Cas. Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993); *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 478 (1991); *W.W.W. Assoc., Inc. v. Giancontieri,* 566 N.E.2d 639, 641 (N.Y.1990).

> FN5. In some cases, the meaning of the words to a contract can only be known through an understanding of the context and business circumstances under which they were negotiated, and extrinsic evidence must necessarily be evaluated. *See Klair v. Reese,* Del.Supr., 531 A.2d 219, 223 (1987). While it is unlikely that the contractual language under these circumstances evokes a plain and clear meaning on its face, there is a small minority of cases where seemingly unequivocal language becomes reasonably susceptible to more than one meaning when considered in conjunction with the context in which the negotiation and contracting occurred. This kind of hidden ambiguity is often referred to as a latent ambiguity, and in these cases, extrinsic evidence to discern the real meaning and intention of the parties is not excluded. *See, e.g., Corbin on Contracts § 537* fn. 30 (Cunningham & Jacobson Supp.1994); *Northeastern Life Ins. Co. of N.Y. v. Leach,* 213 N.Y.S.2d 357 (N.Y.Sup.Ct.1961). Thus, a preliminary consideration of extrinsic evidence may be necessary to determine whether language is ambiguous. This is not to say, however, that contract language is rendered ambiguous simply because the parties disagree over its meaning in litigation; the objective theory of contract demands that any understanding of the meaning of the language be reasonable given the objective evidence as known by the party arguing for that meaning. *See Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992).

When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and

usage in the industry. _Klair v. Reese,_ 531 A.2d 219, 223 (1987). Given all this evidence, the court construes the language in the way that best carries out the reasonable expectations of the parties that contracted in those circumstances. _Id._ To do so, Professor Corbin advocates the following analysis: "The court will give legal effect to the words of a contract in accordance with the meaning actually given to them by one of the parties, if the other knew or had reason to know that he did so." _Corbin on Contracts_ § 543 (1960). _See also Restatement (Second) of Contracts_ § 201 (1981) (setting forth the same test); _Klair v. Reese,_ Del.Supr., 531 A.2d 219, 223 (1987) (citing § 201 of the Restatement as a proper rule of analysis). [FN6]

> FN6. Aside: Imagine a case in which contractual language is susceptible to two different meanings, each reasonable and imagine that each party expressed in terms sufficiently clear, his or her subjective understanding of the meaning of the term. What result? Two possibilities appear: the court might accept one or the other as the more reasonable or it may conclude that despite the "objective" manifestation of contract, when viewed in context the parties have failed to contract on that point.

Under this analysis, then, it becomes incumbent upon the party seeking judicial enforcement of their interpretation of the ambiguous language to show by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language. As necessitated under an objective theory of contract, a party will be legally responsible for a contractual obligation if a reasonable person in the same circumstances would have understood that they were taking on such an obligation; a subjective belief to the contrary is not relevant. _Cf. Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,_ Del.Supr., 616 A.2d 1192, 1196 (1992) (stating that the "true test is ... what a reasonable person in the position of the part[y] would have thought it meant.").

For BA Meridian to obtain judicial enforcement of its interpretation of "new systems", the preponderance of the evidence must indicate that the language of the Letter Amendment was ambiguous and that Octel knew or had reason to know that BA Meridian understood "new systems" to entitle it to successor systems in the post-termination period. As discussed below, the language of the contract was ambiguous and although I assume that BA Meridian

in good faith understood "new systems" to entitle it to successor products, I conclude that Octel did not know and did not have reason to know of this understanding. As a result, BA Meridian is not entitled to enforce upon Octel its interpretation of the Letter Amendment.

III. The Letter Agreement is Ambiguous

*7 Examining the language of the Letter Amendment in conjunction with the Distribution Agreement, it cannot be said that there is one plain meaning that must govern. Consequently, all relevant extrinsic evidence will be examined in attempting to give legal effect to the language of the Letter Amendment.

Certainly in a literal sense, "new systems", as used in the Letter Amendment, could refer either to (1) additional units of the commercial products covered by the Distribution Agreement (new voice mail units); or, alternatively, it might refer to new future products (new voice mail products). Either meaning is possible viewing the language used in isolation.

When considered in light of the language of the entire Distribution Agreement, however, the more limited interpretation asserted by Octel appears very reasonable. First, the Letter Amendment did not purport to change provisions in the Distribution Agreement that specifically enumerated the voice mail systems BA Meridian was entitled to purchase; suggesting that the Letter Amendment was not intended to expand the menu of voice mail systems that BA Meridian was entitled to purchase. Second, the phrase "new systems" is used in other places in the Distribution Agreement where the context clearly suggests it is referring to additional units of the systems BA Meridian already had a right to purchase.

The Distribution Agreement appears to enumerate the products BA Meridian was to distribute. The Agreement defines "Products" to be the voice mail systems listed in Exhibits A and B. The Agreement goes on to state that such "Products ... are hereby offered for sale by Octel." The Distribution Agreement also provides that "specifications for Products are listed in Exhibit D." The first page of Exhibit D, entitled "Products Identified," states that "[t]he following are identified as customer premise equipment voice information processing products ("CPE Products") and no others" and then lists the voice mail systems identified in Exhibit A.

One would expect the provisions of the Distribution

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

Agreement to be altered if the Letter Amendment was to give BA Meridian the right to subsequently develop voice mail systems that serve as a substitute or replacement for the systems listed in these Exhibits. Either the Letter Amendment would have made reference to these Exhibits as not limiting BA Meridian's right to successor systems or the Distribution Agreement would have been amended to specifically include successor systems. Because no changes were made to these provisions at the time the Letter Amendment was executed, the more limited interpretation of "new systems" is consistent (arguably more consistent) with the entire contract, as amended.

Furthermore, the phrase "new systems" appears in several places in the Distribution Agreement. Although it is not a defined term, the context in which it is used in these other instances is consistent with the concept of additional units of existing systems. Section 11.4 of the Distribution Agreement stated that Octel was not obligated to fill orders "for new systems placed by [BA Meridian] after the termination of [the] Agreement." *See* p. 6 above. In addition, Exhibit A of the Distribution Agreement, which lists and prices the products Octel was offering to sell to BA Meridian, repeatedly refers to "new systems" in the context of new orders for the systems listed in the Exhibit. "New systems" in both of these instances appears to be consistent with the concept of additional units.

**\*8** Reading the contract as a whole, I find that the language of the Letter Amendment referring to "new systems" could reasonably be given either asserted interpretation and is therefore ambiguous.

IV. Octel Did Not Know or Have Reason to Know of BA Meridian's Understanding of the Letter Amendment

After examining the commercial context in which the Letter Amendment was negotiated, the prior dealings between the parties, the practices within the voice mail industry, and the statements made by the parties before and during their negotiations, I conclude that the preponderance of the evidence requires the conclusion that Octel did not know or have reason to know that BA Meridian understood the Letter Amendment to entitle it to new products, whether limited to "successor systems" or not. [FN7]

> FN7. There is no meaningful evidence in the record of any statements made by Octel or conduct on the part of Octel to indicate that

Octel knew that BA Meridian understood "new systems" in the broader sense. The analysis therefore focuses exclusively on whether Octel had reason to know.

1. BA Meridian did not convey their understanding of the scope of the phrase "new systems" to Octel.

In deciding whether a reasonable person in Octel's position would have reason to know that BA Meridian understood "new systems" to include successor systems, the court must consider all extrinsic evidence known by Octel prior to and during the negotiations. The most critical extrinsic evidence in making this determination are the statements made by BA Meridian representatives to Octel representatives prior to or at the time the language was being negotiated. If one in the position of Octel should have understood that BA Meridian understood the meaning of the term "new systems" to create an obligation to provide newly created "successor" products, then, where the phrase is itself ambiguous, BA Meridian's understanding would be given legal effect. Although there is conflicting testimony on this point, I conclude that Losier did not convey to Jennings a view that "new systems" would encompass any newly developed voice mail systems that in effect replaced the systems BA Meridian currently was able to sell and that Jennings' understanding that "new systems" meant new units of covered products was reasonable.

*a. The conflicting testimony.*

Resolution of this case is not aided by the utter lack of communication over the phrase "new systems" in the negotiation of the Letter Amendment. From the testimony, it appears that there was no negotiation or debate over the language of the Letter Amendment as drafted by Woods and submitted by Losier to Octel. This means that if, based on communications between the parties, Octel had reason to know that BA Meridian understood "new systems" in the broader sense, such reason would have to stem from the statements Losier made in communicating his reasons for wanting to expand BA Meridian's post-termination support rights. On this crucial point, Jennings' and Losier's testimonies are conflicting.

Losier testified at trial that he told Jennings during their discussions that "new systems" included the concept of successor systems. (Tr. T. 44). He also testified that he conveyed to Jennings, that he needed access to the latest products offered by Octel in order to maintain his relationship with the installed customer base during the post-termination period.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

(Tr. T. 45). Jennings, on the other hand, testified in his deposition that Losier never specifically asked for the right to purchase successor systems and that there was no discussion about the possibility that after termination Octel would introduce a new product or system and BA Meridian would want to purchase it. (Dep. T. 14). Although Jennings admitted that Losier conveyed to him his concern that the original agreement did not provide Bell Atlanticom any rights in terms of selling them additional new systems in the sense of additional units of voice mail systems, he testified that the specific example Losier used in conveying his desire for additional post-termination rights was a scenario in which an account opened a new office and BA Meridian would not be able to sell them additional equipment. (Dep. T. 11-12). He further testified that Losier used the specific example of Johnson & Johnson opening a new office. (Tr. T. 12). To the contrary, Losier testified that they only talked about "new systems" in terms of successor products. (Tr. T. 47).

*b. The better interpretation of the evidence is that Mr. Losier did not*
*explicitly tell Mr. Jennings that "new systems" included successor systems.*

\*9 I do not find that either party in this case is more or less trustworthy than the other. Rather, in light of all the evidence in the record, I find that while Losier may have understood his language to entail successor systems and even may have thought without good grounds that Mr. Jennings understood the same, Losier who was proposing the creation of a contract right, did not in fact successfully convey that understanding to Jennings. That is, although he testified otherwise, I find that Losier did not explicitly refer to "new systems" as encompassing successor systems. This conclusion is based on the evidence as set forth below.

*i. No one could remember what specifically Losier said about "new systems" and*
*Losier thought the phrase "new systems" conveyed only one meaning.*

With regard to his own testimony on this issue, Losier could not recall his or Jennings' statements with any specificity. When asked if he told Jennings that he wanted the right to purchase any voice mail systems developed by Octel within the seven-year time frame, he stated that he did not use those exact words. (Tr. T. 45). Moreover, he could not recall the exact words he used. (Tr. T. 63). He also did not recall what Jennings response was when he informed Jennings of his view that "new systems" included successor products. (Tr. T. 63). Similarly, John

Woods, who was purportedly present during most of the conversations between Losier and Jennings, could not remember what was said by Losier or Jennings in regards to "new systems." (Tr. T. 255).

In addition, the evidence is clear that Losier felt that the phrase "new systems" unequivocally included newly developed or successor systems. He specifically testified that he thought the phrase "successor systems," "future systems," and "new systems" meant the same thing. (Tr. T. 45-46). Thus, Losier could have thought that by telling Jennings he wanted access to "new systems" in the post-termination period, Jennings would understand this meant newly developed systems.

This is understandable when one considers that Losier was not familiar with the language of the Distribution Agreement, and in fact did not even recall reading it or the Exhibits to it. (Tr. T. 64-66). This is not to condemn him for not doing so, because he did ask his counsel (John Woods) what BA Meridian would be entitled to in the way of post-termination support. (Tr. T. 64-66). However, without being familiar with the Distribution Agreement, Losier had no reason to know that his use of the phrase "new systems" might not convey his understanding that it covered successor systems. [FN8]

> FN8. As explained previously, in the context of the Distribution Agreement and its Exhibits, "new systems" could easily, and probably would be, understood in a more narrow sense.

From this evidence, I am inclined to think that Losier, thinking to himself that he wanted access to Octel's latest products, included the phrase "new systems" in the first draft of the Letter Amendment and then explained to Jennings that he wanted to be able to purchase "new systems." He then used as an example, a customer opening a new account (again possibly thinking in his mind that the new account would want the latest technology). Jennings could easily have understood this to be limited to additional out-of-the-box systems. This establishes some consistency between Losier's and Jennings' testimonies. Other evidence suggests this may have been the case.

*ii. The absence of controversy over the phrase "new systems" suggests Losier*
*did not explicitly explain to Jennings that he thought it meant successor*

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

*systems.*

*10 Losier testified at trial that Woods was on the telephone during the initial discussions with Jennings about the language of the Letter Amendment. (Tr. T. 59). Woods, however, did not recall any specific discussions about "new systems." (Tr. T. 255-56). He only recalled that the language was not controversial. (Tr. T. 255-56). Yet, had Losier specifically asked for access to entirely new technology during a lengthy post-termination period, one would predict it to be controversial under the circumstances.

The Distribution Agreement had specifically limited the products that Octel was obligated to provide. Although the reason for that specificity may or may not have been a concern over access to future technology, that concern was certainly present after formation of the joint venture--when Octel would be faced with a distributor that was 80% owned by a competitor. Giving that competitor access to newly developed proprietary systems for seven years after the parties' on-going relationship had terminated would surely be controversial. The lack of controversy tends to prove that Losier did not convey to Jennings that he sought access to such technology.

The preponderance of the evidence indicates that although Losier may have told Jennings that he needed access to new systems in order maintain his relationships with his installed customer base, he did not provide to Octel reasonable grounds to understand he intended by "new systems" to include access to future "successor" technologies.

2. Extrinsic evidence indicates that Octel did not have reason to know that "new systems" was intended to include successor systems.

Even though BA Meridian did not convey its understanding of the scope of the phrase "new systems" to Octel, BA Meridian's broader interpretation could nevertheless be given legal effect if other extrinsic evidence showed that a reasonable person would have understood that "new systems" was intended to include successor systems. However, taking into account the business setting and the commercial practices and usage in the industry, I find that a reasonable person in Octel's position would not have such reason to know.

*a. "New systems" does not convey an unequivocal meaning based on usage in the industry.*

It is clear from the evidence in the record, that "new systems" has been used in the industry to refer to newly developed products. BA Meridian introduced into evidence several articles from trade journals that refer to Octel's most recently developed voice mail system, the Overture 250, as a new system. Indeed, Octel has used the phrase in its own internal communications to refer to the Overture 250. There is no evidence in the record, however, that indicates the phrase is generally understood in the industry to only mean newly developed systems. No experts on trade usage testified and the testimony based on first-hand experiences in the business simply established that "new products" and "new systems" are sometimes used interchangeably.

*b. BA Meridian's business concerns were not, in and of themselves, enough to give notice to Octel that the term "new systems" was intended to include successor systems.*

*11 The evidence shows that Losier communicated to Jennings his primary business concern; maintaining business relationships with BA Meridian's installed customer base during the entire post-termination period. There is also evidence in the record that the voice mail industry is subject to ever-quickening technological change. Based on this, one might argue that Octel had reason to know that BA Meridian understood "new systems" to include successor systems.

*i. Access to successor systems was not necessary in order for BA Meridian to satisfy its business concern expressed to Mr. Jennings.*

In light of the other significant post-termination rights to which BA Meridian was entitled under the Letter Amendment, access to successor systems was not so crucial that a reasonable person in Octel's position should be charged with the knowledge that BA Meridian must have been asking for this right.

Under the Letter Amendment, BA Meridian was entitled to software and hardware upgrades and new features. This would presumably go a long way towards meeting the installed customer base's on-going needs; it enabled BA Meridian to keep them technologically up to date, *with respect to covered products.* Although being able to provide these customers with the successor system not covered by the Distribution Agreement would be valuable, such future non-covered products were not the subject of the Distribution Agreement or any discussions in connection with the Letter Amendment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)
**(Cite as: 1995 WL 707916 (Del.Ch.))**

When a negotiating party proposes ambiguous language to address a business concern, a reasonable person is not automatically charged with the automatically charged with the broadest interpretation possible simply because the broadest interpretation would best enable the opposing party to satisfy their business concern.   Other interpretations may be and here are possible.

ii. *The relationship between the parties gave Octel no reason to think that BA Meridian sought to substantially extend its rights to covered products by reason of a termination of the Distribution Agreement.*

It is a termination period right the parties were negotiating about.    Surely BA Meridian interests would be best protected by giving it a continuing ability to access *any* new products that Octel might innovate over the period, but absent some explicit indication, a reasonable negotiator would not assume that an ambiguous term was intended to go so far.   It is important to keep in mind that BA Meridian was 80% owned by a direct competitor of Octel's.   These are relevant factors in considering what a reasonable person would have understood.

I assume that BA Meridian in good faith understood the Letter Amendment to entitle it to successor systems.   Read in the context of the entire contract, however, the language purportedly entitling BA Meridian to this right is susceptible to two reasonable interpretations.    The preponderance of the evidence indicates that Octel neither knew nor had reason to know that BA Meridian understood the ambiguous language to allow it to expand the Distribution Agreement list of covered products after termination to include new products or "successor systems." Plaintiffs requested relief is therefore denied.

Not Reported in A.2d, 1995 WL 707916 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Not Reported in A.2d                                                                                   Page 1
Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)
**(Cite as: 2003 WL 21314499 (Del.Ch.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
CHRISTIANA TOWN CENTER, LLC, a Delaware
limited liability company, Plaintiff,
v.
NEW CASTLE COUNTY, a political subdivision of
the State of Delaware, Defendant.
**No. Civ.A. 20215.**

Submitted May 16, 2003.
Decided June 6, 2003.
Richard L. Abbott, the Bayard Firm, Wilmington,
Delaware, for Plaintiff.

Scott G. Wilcox, New Castle County Law
Department, New Castle, Delaware, for Defendant.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.
*1 A developer seeks an injunction against the
County government barring the application of the
"unclean hands" provision of the County
development code based on violations of other
chapters of County ordinances. The court concludes
that the injunction action must be dismissed both
because the complaint does not properly invoke this
court's equity jurisdiction and because the plaintiff
has failed to exhaust its administrative remedies.

II.
The following facts have been stipulated to by both
parties. Christiana Town Center, LLC ("Christiana")
is a Delaware limited liability company. Christiana is
the owner of approximately seventy acres of land
located in White Clay Creek Hundred, New Castle
County, at the intersection of Maine Street and
Delaware Route 273 near the village of Christiana.
The land is zoned Commercial Regional. It is
approved for the development of 452,842 square feet
of commercial space (the "Shopping Center").

Christiana is owned and operated by Frank E.

Acierno. Acierno also owns and operates 395
Associates, LLC ("395") and Estate Homes, Inc.
("EHI"). 395 is a Delaware limited liability company.
EHI is a Delaware corporation. 395 and EHI are the
respondents in the Home Warranty Decisions
referenced hereinafter.

On March 19, 2002, Christiana entered into a lease
agreement with Bertucci's Restaurant Corp. to locate
a restaurant at the Shopping Center. Christiana
received a building permit from the County to
construct the Bertucci's restaurant building shell (the
"Building") on November 7, 2002. Christiana
completed construction of the shell of the Building
by the beginning of March 2003.

On Thursday, March 13, 2003, a Bertucci's
representative attempted to apply to the County for a
building permit in order to perform finishing work
and improvements to the Building (hereinafter, the
"Tenant Fit-Out Permit"). The County refused to
accept Bertucci's application for the Tenant Fit-Out
Permit based on a note in the Christiana file that the
provisions of § 40.31.901D of the County's Unified
Development Code (the "UDC Clean Hands
Provision") prohibited acceptance of the application.
[FN1]

> FN1. The UDC is Chapter 40 of the New
> Castle County Code.

Christiana believed that the County may have
refused to accept the Tenant Fit-Out Permit
application from Bertucci's based on a decision dated
January 30, 2003 finding Christiana in violation of
the County Drainage Code (Chapter 12 of the New
Castle County Code), and a decision dated February
10, 2003 finding Christiana in violation of the County
Building Code (Chapter 6 of the New Castle County
Code) (collectively, the "Decisions"). The Decisions
were appealed to the New Castle County Board of
License, Inspection & Review in late February and
early March 2003.

On March 17, 2003, Christiana's counsel and counsel
for the County discussed the County's ability to
refuse applications at the Shopping Center site. The
parties agreed that the appeal of the Decisions should
have stayed any application of the UDC Clean Hands
Provision that was predicated on them. Counsel for
the County stated that he would discuss the matter

with the County and advise it that applications for the Christiana Town Center should not legally be denied.

**\*2** On March 18, 2003, a representative of Christiana went to the County's offices and attempted to submit an engineering report for the footings and foundation for the Building and requested final inspections for the purpose of ultimately obtaining a Certificate of Occupancy for the building itself. The County refused to accept the submission or provide inspections based on: (1) a January 22, 2003 decision finding that 395 and EHI failed to obtain home warranties for new houses constructed in the subdivision of Farmington in violation of the County Building Code ("Home Warranty Decision I"); and (2) the UDC Clean Hands Provision.

On that same day, counsel for the County advised counsel for Christiana that Home Warranty Decision I had been overlooked during their March 17 discussions. According to the County, the UDC Clean Hands Provision precluded the County from accepting or granting any land use applications, including issuing any permits or certificates of occupancy or performing any inspections, based upon the violations found in Home Warranty Decision I.

On Thursday, March 20, 2003, a representative of Bertucci's once again attempted to make application to the County for the Tenant Fit-Out Permit. The County again refused to accept Bertucci's application. The basis for the County's refusal was: (1) Home Warranty Decision I; (2) a March 19, 2003 decision finding 395 and EHI in violation of the County Building Code home warranty requirements for new homes ("Home Warranty Decision II"; and collectively with Home Warranty Decision I, the "Home Warranty Decisions"); and (3) the UDC Clean Hands Provision.

On Friday, March 21, 2003, a representative of Christiana and its counsel went to the County's offices and again sought to submit an engineering report for the footings and foundation for the Building and requested inspections necessary to ultimately obtain a Certificate of Occupancy. At that time, counsel for the County refused to accept the application or conduct any inspections. The County's counsel stated that the basis for his refusal was the Home Warranty Decisions and the UDC Clean Hands Provision. Christiana filed suit on March 28, 2003.

III.

Christiana seeks a preliminary and permanent injunction prohibiting the County from applying the UDC Clean Hands provision against it in situations where the UDC has not been violated (as, for example, in the case of Building Code violations) and where violations do not involve Christiana (but some other entity affiliated with Acierno). The standard for granting a permanent injunction requires Christiana to demonstrate that: (1) it has proven actual success on the merits of the claims; [FN2] (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result if an injunction is not entered outweighs the harm that would befall the County if an injunction is granted. [FN3] Before reaching any of these questions, however, the court must determine that it has subject matter jurisdiction to hear a dispute. Here, the court finds that it lacks subject matter jurisdiction, and, therefore, Christiana's motion for permanent injunctive relief will be denied.

> FN2. The standard for preliminary injunction requires a reasonable probability of success on the merits. *See Next Level Communications, Inc. v. Motorola, Inc.,* 2003 WL 549083, at \*13 (Del. Ch. Feb. 26, 2003).

> FN3. *Draper Communications, Inc. v. Delaware Valley Broadcasters LP,* 505 A.2d 1282, 1288 (Del. Ch.1985) (citations omitted).

IV.

A. *Subject Matter Jurisdiction May Be Raised* Sua Sponte *By The Court And May Not Be Waived By The Parties*

**\*3** Some states, while recognizing the traditional common law limitations on equitable jurisdiction, nonetheless permit their courts of equity to decide causes of action even where a full and sufficient remedy exists at law so long as no jurisdictional objection is raised by either party. [FN4] "In other words, such an objection may be waived, and equitable subject matter jurisdiction in effect may be conferred upon a court of equity by explicit, implicit or constructive agreement of the parties." [FN5] This is not the rule in Delaware. Rather, "it is clear that, unlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties." [FN6]

> FN4. *See, e.g., Moore v. McAllister,* 141 A.2d 176 (Md.1958); *Kornstein v. Almac's,*

Not Reported in A.2d                                                    Page 3
Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)
**(Cite as: 2003 WL 21314499 (Del.Ch.))**

*Inc., 201 A.2d 645 (R.I.1964).*

FN5. Donald J. Wolfe, Jr, & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 2-3[a] (2001 ed.) (hereinafter, "Wolf & Pittenger").

FN6. *IBM Corp. v. Comdisco, Inc.,* 602 A.2d 74, 77 n. 5 (Del. Ch.1991) (citing *DuPont v. DuPont,* 85 A.2d 724 (Del.1951); *Wife v. Husband,* 285 A.2d 824 (Del. Ch.1974); *Timmons v. Cropper,* 172 A.2d 757 (Del. Ch.1961)). *But see Clark v. Teeven Holding Co., Inc.,* 625 A.2d 869, 877 (Del. Ch.1992) ("[A] decision by the Court of Chancery that it will assume 'equity jurisdiction' over a particular controversy because there is no adequate remedy at law is not void if wrong and is subject only to direct attack. An objection to the exercise of equity jurisdiction may therefore be waived") (citations omitted).

When the issue of subject matter jurisdiction is raised, by the court or the parties, the plaintiff bears the burden of establishing such jurisdiction. [FN7] In this connection, the court must review the allegations of the complaint as a whole to determine the true nature of the claim. [FN8] As Chancellor Allen once observed:

FN7. *See Wilmington Fraternal Order of Police Lodge No. 1 v. Bostrom,* 1999 WL 39546, at *4 (Del. Ch. Jan. 22, 1999) ("The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff") (citing *Scattered Corp. v. Chicago Stock Exchange,* 671 A.2d 874, 877 (Del. Ch.1994); *Yancey v. Nat'l Trust Co.,* 1993 WL 155492, at * 6 (Del. Ch. May 7, 1993), *aff'd,* 633 A.2d 372 (Del.1993)).

FN8. *See Diebold Computer Leasing, Inc. v. Commercial Credit Corp.,* 267 A.2d 586, 590 (Del.1970); *Western Airlines, Inc. v. Allegheny Airlines, Inc.,* 313 A.2d 145, 149 (Del.1973).

Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will excuse the court ... from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate. If a realistic evaluation leads to the conclusion that an adequate remedy is available, this court, in conformity with the command of Section 342 of Title 10 of the Delaware Code, will not accept jurisdiction over the matter. [FN9]

FN9. *McMahon v. New Castle Assocs.,* 532 A.2d 601, 603 (Del. Ch.1987) (citation omitted); *see also Zeneca, Inc. v. Monsanto Co.,* 1996 WL 104254, at *4 ("this Court must examine the pleadings to determine the true substance of the relief [plaintiff] actually seeks, and will not be bound by the form of relief as describe [by plaintiff]"); *New Castle County Vocational Technical Sch. Dist. v. Bd. of Educ.,* 451 A.2d 1156, 1164 (Del. Ch.1982) (noting that "if there is an adequate remedy existing at law, it is at best unlikely that this court has jurisdiction over this matter").

"Equity jurisdiction can arise in two ways: (1) from the invocation of an equitable right, or (2) from the request for an equitable remedy when there is no adequate remedy at law." [FN10] Equitable rights are rights that have traditionally not been recognized at common law. [FN11] The most common example of equitable rights in this court are fiduciary rights and duties that arise in the context of trusts, corporations, other forms of business organizations, guardianships, and the administration of estates. [FN12] Equitable remedies, by contrast, may be applied even where the right sued on "is essentially legal in nature, but with respect to which the available remedy at law is not fully sufficient to protect or redress the resulting injury under the circumstances." [FN13] In the current case, Christiana seeks the equitable remedy of an injunction to enforce the legal rights related to its (and Bertucci's) construction of a restaurant.

FN10. *Azurix Corp. v. Synagro Technologies, Inc.,* 2000 WL 193117, at *2 (Del. Ch. Feb. 3, 2000), *appeal denied,* 748 A.2d 406 (Del.2000) (TABLE).

FN11. *See* Wolf & Pittenger, § 2-3[b].

FN12. *See id.*

FN13. *Id.*

If the court is asked to exercise its equitable jurisdiction to remedy a legal wrong, the critical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)
**(Cite as: 2003 WL 21314499 (Del.Ch.))**

jurisdictional question is whether an adequate remedy at law exists. [FN14] If a litigant can seek a remedy in a law court, or other adequate venue, that would provide full, fair, and practical relief, the Court of Chancery is without subject matter jurisdiction to hear the matter. [FN15] In this regard, the Court of Chancery will not exercise subject matter jurisdiction "where a complete remedy otherwise exists but where plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery." [FN16]

> FN14. *See Comdisco,* 602 A.2d at 78.

> FN15. *See* 10 *Del. C.* § 342; *Comdisco,* 602 A.2d at 78; *In re Real Property of Wife, K,* 297 A.2d 424, 425-26 (Del. Ch.1972); *Hughes Tool Co. v. Fawcett Publications, Inc.,* 315 A.2d 577, 579 (Del.1974).

> FN16. *Comdisco,* 602 A.2d at 78; *see also City of Wilmington v. Delaware Coach Co.,* 230 A.2d 762, 766-67 (Del. Ch.1967).

B. *An Adequate Remedy At Law Exists*

**\*4** Turning to Christiana's complaint, a plain reading shows that all Christiana realistically seeks is a declaratory judgment as to the meaning and scope of the UDC Clean Hands Provision. [FN17] Generally speaking, an adequate remedy at law exists under the Declaratory Judgment Act [FN18] for Christiana to obtain such a determination in the Superior Court. Armed with a declaration that the UDC Clean Hands Provision is not triggered by the Home Warranty Decisions, Christiana should have no need for an injunction from this court. Christiana suggests that even if a court of law were to issue a declaratory judgment in its favor, the County would disregard such a judgment and continue to act with hostility towards Christiana. Thus, the argument goes, a coercive remedy in the form of an injunction will be required to enforce any declaratory judgment. This argument cannot succeed, as the court must presume that the County will respect any decision rendered by any competent court of this State. [FN19]

> FN17. Verified Comp. at ¶ 17.

> FN18. 10 *Del. C.* § 6501 *et seq.*

> FN19. *See Delaware Coach,* 230 A.2d at 767 ("It follows that the prospective possibility that injunctive relief may be required is not the basis for equity

jurisdiction in this action for a declaration of rights under a contract"). *But see Diebold,* 267 A.2d at 591 (holding that a declaratory judgment action to determine the rights of the parties under a contract could be brought in equity because, in that case, a declaratory judgment rendered by the Superior Court might well require a return to the Court of Chancery for enforcement, and "ultimate coercive relief would be injunctive"). The concerns of the Supreme Court in *Diebold* are not present here. It would be anathema to our form of government to believe, as a baseline principle, that after a court renders a declaratory judgment another governmental agency would not follow that decision. It may actually be the case that a particular agency does not follow such a judgment, but a party should only seek injunctive relief if that agency *actually* refuses to comply with the judicial declaration.

C. *Christiana Failed to Exhaust Its Administrative Remedies*

Moreover, Christiana has, or had, administrative avenues of redress that it may have failed to exhaust. The County's denial of Christiana's application was appealable to the New Castle County Planning Board (the "Planning Board"). [FN20] Further, any decision of the Planning Board can also be appealed by writ of certiorari to the Superior Court. [FN21]

> FN20. *See* County Code § § 40.31.510 and 40.30.110. Section 40.31.510 provides:
> An applicant pursuing approval of a land use application who is aggrieved by a finding, decision, or interpretation of a decision maker made in response to a review of such application may appeal such action to the jurisdictionally approved agency pursuant to Table 40.30.110 [which in this case is the Planning Board]. Appeals may only be taken based upon a final decision, not the recommendation of an agency. All appeals from the final decision of an administrative body or the [New Castle County Department of Land Use] shall be filed with the [New Castle County Department of Land Use] within twenty (20) days of the date the written decision is issued by the body or [the New Castle County Department of Land Use].... Unless otherwise provided by law, any appeal to a court of law or equity shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)
(Cite as: 2003 WL 21314499 (Del.Ch.))

be made within twenty (20) days of the issuance of a written final decision. Unless otherwise provided by law, no appeal to a court of law or equity may be taken until all remedies made available by this Chapter have been exhausted.

FN21. *See* 10 Del. C. § 562.

Delaware law strongly favors the exhaustion of administrative remedies before resorting to judicial intervention. [FN22] Pursuant to this doctrine, "where a remedy before an administrative agency is provided, relief must be sought by exhausting this remedy before the courts will either review any action by the agency or provide an independent remedy." [FN23] The purpose of the exhaustion-of-remedies requirement is to prevent judicial interference in the administrative process and to allow the administrative agency to apply its expertise and discretion, and possibly resolve the conflict without judicial intervention. [FN24]

FN22. *Levinson v. Delaware Compensation Rating Bureau,* 616 A.2d 1182, 1186 (Del.1992); *Hundley v. O'Donnell,* 1998 WL 842293, at *2-*5 (Del. Ch. Dec. 1, 1998) (Finding that where, pursuant to the New Castle County Code, plaintiff had an effective administrative remedy available pursuant to the New Castle Department of Land Use's denial of a subdivision plan, the court denied injunctive relief and granted defendant's motion to dismiss); *Smith v. Christiana Sch. Dist.,* 1996 WL 757282, at *2 (Del. Ch. Jan. 2, 1997) ("judicial review cannot be had until the aggrieved party has first resorted to the appropriate administrative bodies and procedures designed to address his claims").

FN23. *Levinson,* 616 A.2d at 1186.

FN24. *Id.* at 1187.

The administrative remedy available to Christiana with respect to the denial of its application is an appeal to the Planning Board. [FN25] Applicants who are aggrieved by a finding, decision, or interpretation of a decision-maker made in response to review of land use application can appeal such decision to the appropriate administrative agency. [FN26] The County concedes that the proper body from which to seek appeal in this instance is the Planning Board. As such, appeals to a court of law

cannot occur until after the Planning Board has rendered a decision. [FN27] Therefore, a statutory remedy at law exists by which Christiana can appeal the County's decision to deny its application to the Planning Board, and thereafter, to a court of law.

FN25. *See* County Code § § 40.31.510 and 40.30.110.

FN26. County Code § 40.31.510.

FN27. *Id.*

Christiana claims that it "could not have pursued an administrative appeal pursuant to County Code § 40.31.510 because the County refused to accept the land use application and never provided a 'written decision,' therefore no appealable 'final decision' or 'written decision' on a 'land use application' was ever rendered by the County." [FN28] It may be true that the County refused to accept Christiana's land use application, but Christiana did receive a written decision on its application from which it could have sought an appeal. On April 2, 2003, counsel for Christiana received a letter from the New Castle County Department of Land Use stating the basis for the County's refusal to accept Christiana's application. In particular, the letter provides:

FN28. Pl. Reply Br. at 20-21.

*5    [T]he Department refused to accept [Christiana's and Bertucci's applications] based upon prohibitions contained in the clean hands provisions of the UDC. Section 40.31.901(D) of the UDC states that "no land use application shall be granted by any board, Department, or Council if the applicant is not in good standing with New Castle County. Not in good standing means that at the time of the request, the applicant is ... in violation of the Code." Your client is currently in violation of Chapters 6 and 12 of the New Castle County Code. Therefore, the Department is precluded from granting the land use applications. [FN29]

FN29. Appendix To Pl. Op. Br. at Tab 10.

This letter satisfies the County's obligation to provide a final written decision, and likewise permits Christiana to appeal such decision to the Planning Board. [FN30]

FN30. It should be noted that Section 40.31.510 provides: "[a]ll appeals from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)
**(Cite as: 2003 WL 21314499 (Del.Ch.))**

final decision of an administrative body or the Department shall be filed with the Department within twenty (20) days of the date the written decision is issued by the body or Department." This is a small hurdle for Christiana to overcome, however. Even if the filing of this complaint did not toll the running of that 20-day period, Christiana could simply resubmit its applications and then appeal that written decision within 20 days.

### V.

For the foregoing reasons, Christiana's motion for a permanent injunction is DENIED and this action is DISMISSED without prejudice. IT IS SO ORDERED.

Not Reported in A.2d, 2003 WL 21314499 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.