**4**

Westlaw.

859 A.2d 1012                                                                                    Page 1
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

**H**

Court of Chancery of Delaware,
New Castle County.
Edward T. McGOWAN, Plaintiff,
v.
Peter A. FERRO, Jr., Robert W. Kegley, Sr., William
J. McEnery, Charles P.
Hammersmith, Jr., William J. Sabo, Thomas J.
Lambrecht, and Joseph Canfora,
Defendants.
**Civ. A. No. 18672.**

Submitted: June 29, 2004.
Decided: Oct. 8, 2004.

**Background:** Director of company brought action
against other six members of board of directors,
former president, and holding company, alleging that
directors breached their fiduciary duty, acted in bad
faith in approving merger extension, and converted
his equity interest in company. Both parties moved
for summary judgment.

**Holdings:** The Court of Chancery, New Castle
County, Parsons, Vice Chancellor, held that:

(1) defendants' decision to approve merger
extension did not conflict with defendants' interest in
starting new company without plaintiff;

(2) defendants did not act in bad faith in extending
merger agreement;

(3) defendants sold company's assets at the highest
reasonable value;

(4) any defect in notice of directors meeting to
plaintiff was cured by subsequent meetings;

(5) alleged misstatements by defendants to Illinois
Gaming Board did not amount to bad faith;

(6) unsuccessful acquisition of casino by new
company did not amount to a misappropriation of
corporate opportunities;

(7) genuine issue of material fact precluded
summary judgment on claim that casino management
agreements with defendants' new company amounted
to a misappropriation of corporate opportunities; and

(8) plaintiff's shares were not converted.
Ordered accordingly.

West Headnotes

**[1] Judgment ☞183**
228k183 Most Cited Cases
The presentation of cross-motions for summary

judgment does not, in itself, demonstrate the absence
of any genuine issue of material fact; instead, the
Chancery Court must apply the summary judgment
standard to each party's motion and, only after doing
so, grant summary judgment to one of the parties if
the record and the law justify that award. Chancery
Court Rule 56(c).

**[2] Corporations ☞320(11)**
101k320(11) Most Cited Cases
In order to rebut the presumption of director
disinterestedness and independence in corporate
transactions for purposes of breach of fiduciary duty
claims, a stockholder must show that the directors'
self-interest materially affected their independence;
to be disqualifying, the nature of the director interest
must be substantial, not merely incidental.

**[3] Corporations ☞310(1)**
101k310(1) Most Cited Cases
A de minimis departure from the requirement that all
stockholders be treated equally in corporate
transactions does not amount to an actionable breach
of fiduciary duty by the board of directors.

**[4] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Decision by defendant directors of merging company
to approve the second merger extension was not in
conflict with defendants' interest in starting another
company without plaintiff director, which company
had a one million dollar management agreement with
post merger company, so as to give the defendants an
incentive to close the transaction at less than full
value, and thus, the defendants' decision was entitled
to the presumptions of the business judgment rule
and they did not need to demonstrate the fairness of
the transaction, where the defendant directors' held
substantial stockholdings in the merging company,
and the one million dollar agreement and the
speculative potential profits of the directors' newly
formed company paled in comparison to the $230
million that plaintiff director claimed the defendants
gave up in the merger transaction.

**[5] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Bad faith conduct by the board of directors in a
corporate transaction is conduct that is so far beyond
the bounds of reasonable judgment that it seems
essentially inexplicable on any ground other than bad

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012                                                                                    Page 2
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

faith.

**[6] Corporations** ☞320(11)
101k320(11) Most Cited Cases
Evidence of alleged bad faith was insufficient to
rebut the presumption under the business judgment
rule that the defendant directors of merging company
approved second extension of merger agreement in
good faith, and thus, the directors were not required
to prove the entire fairness of their decision; director
defendants had a number of reasons for extending the
agreement, including potential regulatory delay that
would result from further changes, the effect of delay
on bond indentures, the oversight of regulatory
authorities, the potential adverse effect of terminating
the deal on company's reputation for purposes of
subsequent deals, and the lack of competing offers.

**[7] Corporations** ☞310(1)
101k310(1) Most Cited Cases
The *Revlon* doctrine requires that the directors seek
the maximum value reasonably obtainable for the
stockholders when there is a sale of the company or a
change in control transaction; this is not an additional
fiduciary duty, but rather an enhanced judicial review
applied to the directors' exercise of their fiduciary
duties in the context of a sale of control.

**[8] Corporations** ☞310(1)
101k310(1) Most Cited Cases
Where no market check has occurred, the analysis
under the *Revlon* doctrine, which requires that the
directors seek the maximum value reasonably
obtainable for the stockholders when there is a sale of
the company or a change in control transaction,
includes: (1) a judicial determination regarding the
adequacy of the decision-making process employed
by the directors, including the information on which
the directors based their decision, and (2) a judicial
examination of the reasonableness of the directors'
action in light of the circumstances then existing.

**[9] Corporations** ☞310(1)
101k310(1) Most Cited Cases

**[9] Corporations** ☞320(11)
101k320(11) Most Cited Cases
Under the enhanced judicial scrutiny of the *Revlon*
doctrine, which requires that the directors seek the
maximum value reasonably obtainable for the
stockholders when there is a sale of the company or a
change in control transaction, the directors have the
burden of proving that they were adequately
informed and acted reasonably.

**[10] Corporations** ☞310(1)
101k310(1) Most Cited Cases
Under the enhanced judicial scrutiny of the *Revlon*
doctrine, which requires that the directors seek the
maximum value reasonably obtainable for the
stockholders when there is a sale of the company or a
change in control transaction, the trial court may not
substitute its business judgment for that of the
directors, but must determine if the directors' decision
was on balance, within a range of reasonableness.

**[11] Corporations** ☞310(1)
101k310(1) Most Cited Cases
Director defendants were sufficiently informed as to
the adequacy of the price in the merger transaction
and sold company's assets at the highest value
reasonably available in accordance with the *Revlon*
doctrine, even though they failed to conduct a market
check or get a renewed fairness opinion prior to their
second extension of the merger agreement, where the
merger agreement was proceeded by an active
canvassing of the market, a supermajority of the
stockholders had approved the merger, the first
extension was unanimously approved by the board of
directors, directors sought informal advice from their
investment banker regarding the extensions, and six
of the seven directors, who held nearly 73% of the
company stock, approved the second extension.

**[12] Corporations** ☞310(1)
101k310(1) Most Cited Cases
The business judgment rule presumes that company
directors acted in the honest belief that the action
taken was in the best interests of the company.

**[13] Corporations** ☞310(1)
101k310(1) Most Cited Cases
Bad faith on the part of company directors is not
simply bad judgment or negligence, but rather
implies the conscious doing of a wrong because of
dishonest purpose or moral obliquity; it contemplates
a state of mind affirmatively operating with furtive
design or ill will.

**[14] Corporations** ☞320(11)
101k320(11) Most Cited Cases
Good faith is presumed and the party challenging
company director action bears the burden of rebutting
that presumption.

**[15] Corporations** ☞298(3)
101k298(3) Most Cited Cases
Any defect in the notice of the board of directors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

meeting regarding second extension of merger agreement to plaintiff director was cured at the second meeting, which plaintiff director attended, to approve the extension, and thus, directors did not act in bad faith in failing to provide plaintiff director with 24 hours notice of first meeting.

**[16] Corporations ☜310(1)**
101k310(1) Most Cited Cases
Assuming that defendant directors misled the Illinois Gaming Board by informing
the Board that all of the directors voiced their unanimous approval for the sale of certain company assets in merger, statements did not amount to bad faith, where plaintiff director who opposed sale knew of the comments before the Gaming Board took any action, but failed to communicate his objections to the statements.

**[17] Corporations ☜315**
101k315 Most Cited Cases
The elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation.

**[18] Corporations ☜315**
101k315 Most Cited Cases
Acquisition of casino by defendant directors' newly formed company, which acquisition defendant directors had considered as directors of former company but ultimately rejected, did not give rise to a claim that directors misappropriated corporate opportunities of the former company, where the acquisition was not successful.

**[19] Corporations ☜442**
101k442 Most Cited Cases
It is the right of the majority in a corporation to practically desert the corporate venture by selling out its assets and, thereby, in the case of a highly profitable concern, deprive their associates of the opportunity to reap gains in the future by continuing in the business, provided the terms and conditions of the sale are fair to the corporation.

**[20] Judgment ☜181(31)**
228k181(31) Most Cited Cases
Genuine issue of material fact as to whether defendant directors took the business opportunity presented by casino management agreements for their own, through their newly formed company, and thereby placed themselves in a position inimical to their fiduciary duties to former company, which management was within former company's line of business, so as to preclude summary judgment in plaintiff director's action alleging diversion of corporate opportunities.

**[21] Corporations ☜617(2)**
101k617(2) Most Cited Cases
Under the terms of shareholder agreement, any rights plaintiff director may have possessed regarding successor entities applied only so long as the director held shares, and thus, those rights expired upon the dissolution of the corporation.

**[22] Trover and Conversion ☜4**
389k4 Most Cited Cases
"Conversion" is the act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it.

**[23] Trover and Conversion ☜2**
389k2 Most Cited Cases

**[23] Trover and Conversion ☜4**
389k4 Most Cited Cases

**[23] Trover and Conversion ☜17**
389k17 Most Cited Cases
To prove conversion of an equity interest in an entity, a claimant must show cancellation or transfer of the shares in question in a statutorily invalid acquisition.

**[24] Trover and Conversion ☜11**
389k11 Most Cited Cases
Plaintiff director's corporate shares were never converted, where plaintiff received substantial consideration for his shares in the corporate merger and his equity interest in the corporation was cancelled as part of its orderly dissolution through the liquidating trust.

**[25] Fraud ☜30**
184k30 Most Cited Cases
To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead four elements: (1) the existence of a fiduciary relationship; (2) a breach of that relationship; (3) knowing participation in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach.
*1016 William D. Johnston, Danielle Gibbs of Young Conaway Stargatt & Taylor, L.L.P.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

Page 4

Wilmington; Richard B. Kapnick, Joel S. Feldman, Colleen M. Kenney of Sidley Austin Brown & Wood, L.L.P., Chicago, IL, for Plaintiff.

Kevin G. Abrams, Thomas A. Beck, Thad J. Bracegirdle, John D. Hendershot of Richards, Layton & Finger, P.A., Wilmington; Duane M. Kelley, W. Gordon Dobie, Lynn M. Ulrich of Winston & Strawn, L.L.P., Chicago, IL, for Defendants.

## OPINION

PARSONS, Vice Chancellor.

**\*\*1** Plaintiff, Edward T. McGowan ("McGowan"), a director and stockholder of Empress Entertainment, Inc. ("Empress"), brought this action against the other six members of Empress's Board of Directors, [FN1] all of whom were significant stockholders (the "director defendants"), and also against Empress's former President, Joseph Canfora ("Canfora"), and Horseshoe Gaming Holding Corp. ("Horseshoe"). Primarily, McGowan challenges the director defendants' decision to grant an extension of a merger agreement (the "second extension") between two significant subsidiaries of Empress and Horseshoe's predecessor, Horseshoe Gaming, L.L.C., that facilitated the eventual merger of those entities (the "merger" or "Horseshoe transaction"). In addition, McGowan also challenges the actions and corporate procedures surrounding that decision and the subsequent dissolution of Empress and formation of Empress Financial **\*1017** Group, LLC ("Empress Financial") by the director defendants to the exclusion of McGowan.

> FN1. The "director defendants" and their respective equity interests in Empress are Ferro (3.13%), Hammersmith (18.76%), Lambrecht (17.08%), Kegley (9.38%), Sabo (4.69%), and McEnery (18.76%). Lambrecht died in September 2003. McGowan owned 18.76% of Empress. Collectively, the directors of Empress, including McGowan, owned 90.58% of the Empress equity. The other equity owners are a trust for the benefit of Lambrecht's children (1.7%), Ferro's brother (6.25%), and another nonparty (1.5%). Unless otherwise noted, the facts recited in this Opinion are undisputed.

In his amended complaint, McGowan claims that the director defendants breached their fiduciary duties by failing to obtain the highest price reasonably available in the sale of Empress, acted in bad faith in approving an extension of the merger agreement, diverted corporate opportunities of Empress for the benefit of Empress Financial, breached a stockholders' agreement, and converted his equity interest in Empress. McGowan further alleges that Horseshoe and Canfora knowingly participated in those fiduciary breaches, and that Canfora also aided and abetted the bad faith acts and diversions of corporate opportunities.

The Horseshoe transaction closed on December 1, 1999. Empress was dissolved on December 30, 1999, with the remaining assets being held in a liquidating trust for the benefit of the stockholders. McGowan filed his initial complaint on February 13, 2001. Horseshoe moved to dismiss the aiding and abetting claim against it, and former Vice Chancellor Jacobs granted that motion. [FN2] McGowan filed an amended complaint (the "Complaint") on March 31, 2003. Discovery is complete. McGowan and the director defendants filed cross motions for summary judgment. The Court heard argument on those motions on June 29, 2004.

> FN2. *McGowan v. Ferro, et al.,* 2002 WL 77712 (Del.Ch. Jan.11, 2002).

This is the Court's Opinion on the motions for summary judgment. After a review of the extensive briefs and supporting record, the Court concludes that Defendants are entitled to partial summary judgment on all of McGowan's claims except for his claim for diversion of corporate opportunity based on the management agreements between Empress and Empress Financial. For the same reasons, the Court will deny McGowan's motion for summary judgment on his claims relating to the Horseshoe transaction.

## I. FACTS
Although the documentary record is voluminous, the facts are mostly undisputed. The parties' respective contentions concern the legal implications arising out of the undisputed facts.

### A. Nature of the Business
**\*\*2** Empress is a Delaware corporation that was formed as a holding company for several gaming businesses. It served as a parent corporation for entities that owned and operated riverboat casinos in Joliet, Illinois ("Empress Joliet") and in Hammond, Indiana ("Empress Hammond"), as well as two other entities formed to pursue gaming activities, Empress Mississippi L.L.C. ("Empress Mississippi") and Empress Kansas L.L.C. ("Empress Kansas"). A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012                                                                        Page 5
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

primary business of Empress, however, was owning and operating the two casinos.

### B. Stockholder Agreements

Relations among the stockholders of Empress were governed by an Amended and Restated Stockholder Agreement dated April 15, 1998 (the "Stockholder Agreement"). [FN3] It required all the stockholder-directors to vote their shares to ensure that the boards of Empress and its subsidiaries included the seven initial directors of Empress, each of whom was named in the Stockholder Agreement. [FN4] Section 3.7 of the Stockholder Agreement requires approval of at least 75% of the Empress *1018 shares to effect a transaction resulting in the sale of all or substantially all of the assets of Empress. [FN5] Before the second extension challenged in this action, McGowan and McEnery had blocked certain corporate actions requiring the 75% approval through their combined 37.52% ownership interest. McGowan alleges that, because of this, the director defendants grew frustrated with the super-majority requirement and hostile towards him. [FN6]

> FN3. Compl. Ex. H.

> FN4. *Id* § 3.4. The seven initial directors were the six director defendants and McGowan.

> FN5. There is no dispute that the Horseshoe transaction required the 75% approval. *See* Transcript of June 29, 2004 argument ("Tr.") at 11.

> FN6. Opening Brief of Plaintiff Edward T. McGowan In Support of His Motion for Summary Judgment on Liability ("POB") at 2, 7-8. The parties' opening, answering and reply briefs for their respective summary judgment motions are cited in similarly abbreviated form. Defendants dispute McGowan's allegations. *See* DAB at 3 n. 2. For purposes of evaluating Defendants' motion for summary judgment, however, the Court will assume *arguendo* that McGowan's characterization is correct.

### C. Decision to Sell Empress

During 1994-97, the board unsuccessfully attempted to sell Empress. The sale prospects for Empress were revived on December 9, 1997, when Grand Casinos, Inc. made an unsolicited offer to acquire the Company. In early 1998, it became clear that the sale of Empress was a distinct possibility. [FN7]

McGowan did not oppose such a sale. [FN8]

> FN7. *See* Ferro at 26-29; Canfora at 33-38. Citations in this form are to the deposition transcript(s) in this action of the individual named except as to Mr. Ferro who was deposed twice. Mr. Ferro's deposition on September 24-25, 2002 is designated as "Ferro" and his deposition on February 26, 2003 is designated as "Ferro II."

> FN8. McGowan was willing, for example, to accept an earlier offer from Hilton for less than the purchase price in the Horseshoe transaction the board accepted. *See* DX 18, 215; Ferro at 56. Citations in the form "DX ___" are to documents cited in Defendants' Opening Brief in Support of Their Motion for Summary Judgment.

In early 1998, while contemplating a sale of Empress, Defendants discussed the possibility of creating a new company they generally referred to as "Newco." [FN9] By at least March 1998, McGowan was aware of these discussions. In fact, certain director defendants advised McGowan that they did not wish to continue a business relationship with him in the new company. For example, on March 16, 1998, Ferro wrote to McGowan:

> FN9. Ferro at 26-29; Canfora at 33-38.

Based on your actions, behavior and attitude towards me, there is no way that I would want to enter into any future business relationship with you, be it in gaming or in any other business opportunity. While I only speak for myself, I am sure that some of the other Board members and Shareholders feel the same way. [FN10]

> FN10. PX 5. Citations in the form "PX ___" are to the compilations of documents cited in McGowan's opening brief which are attached to the declaration of Brian A. McAleenan filed November 18, 2003, and of documents cited in McGowan's reply brief.

Similarly, Ferro's diary entries from as early as February 5, 1998, reflect a willingness to "[g]o alone w/o [without] Ed McGowan." [FN11]

> FN11. PX 73.

### D. Horseshoe Merger Agreement

On August 31, 1998, after approximately six months

859 A.2d 1012                                                                                    Page 6
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

of negotiations with multiple parties, the Empress board met to discuss a proposed merger with Horseshoe. Outside counsel and Empress's investment *1019 banker, Merrill Lynch, participated in the meeting. [FN12] Merrill Lynch favorably recommended the proposed transaction. The board of directors, including McGowan, unanimously approved the merger agreement with Horseshoe (the "Merger Agreement").

> FN12. Merrill Lynch had extensive contacts in the casino business and was one of the top advisors in the gaming industry. Ferro at 172; Costello at 250-51; Kaplan at 5-6; Maier at 48-49; cf. McGowan at 24- 26. Todd Kaplan and Brian Maier were the two principal Merrill Lynch representatives to Empress. Kaplan at 4-5. Throughout the period relevant to this dispute, Merrill Lynch was "continuously talking with the entirety of the relevant group that could prospectively be a purchaser of [the] sort of business [represented by Empress Joliet and Empress Hammond]." Kaplan at 10.

**3 The Merger Agreement provided for Horseshoe to acquire the two Empress subsidiaries that owned the Empress Joliet and Empress Hammond riverboat casinos for a price of $609 million. The closing was conditioned upon obtaining regulatory approvals by the gaming authorities in Illinois and Indiana on or before June 30, 1999. The Merger Agreement included a no-shop clause that prohibited Empress, Merrill Lynch, or any other Empress agent, from soliciting, initiating or encouraging submission of any inquiry, proposal or offer concerning the purchase of Empress and from participating in any discussions with or furnishing any information to a third party with respect to any such transaction. [FN13]

> FN13. PX 13 ¶ 4.01.

McGowan voted for the Merger Agreement in 1998 and ratified that approval by voting for the first extension in March 1999. He did not challenge the no-shop clause on either occasion. McGowan also does not dispute that the $609 million price agreed to in September 1998 was the best price reasonably available. Indeed, he voted for it.

**E. First Extension of the Merger Agreement**
In March 1999, after it became clear that the merger would not receive regulatory approval before the termination date, Horseshoe requested a three-month

extension of the termination date until September 30, 1999. Empress leveraged the need for an extension to obtain additional concessions from Horseshoe before granting the request. [FN14] Those concessions included (1) a deadline of June 30, 1999 for Horseshoe to raise the financing to complete the Empress transaction, (2) Horseshoe's agreement to forfeit a $10 million deposit if it could not close by September 30, 1999, (3) Horseshoe's agreement to reimburse Empress for capital expenditures (which effectively allowed Empress to continue making capital expenditures without reducing the proceeds to Empress's stockholders from the Horseshoe transaction) and (4) Empress acquiring an equity interest in the "Big Black" casino development in Mississippi. [FN15] McGowan voted for this first extension. [FN16]

> FN14. See Costello at 257.

> FN15. Costello at 260-64, 366-70; McGowan at 83-87; DX 103-107 and 109. According to Defendants, the capital expenditure concession alone was worth $7.5-$7.8 million to the Empress stockholders. DOB at 18; DX 108 Ex. A.

> FN16. McGowan voted for the first extension knowing that Empress's 1999 EBITDA projections had increased by $10 million since the time the parties entered into the Merger Agreement. McGowan at 73-78, 132-33; DX 112.

**F. Second Extension of the Merger Agreement**
In April 1999, Horseshoe asked to extend the termination date of the Merger *1020 Agreement further because necessary regulatory approvals might not be obtained by September 30, 1999. Empress denied this request in the hope of gaining bargaining power against Horseshoe. [FN17] In July 1999, Horseshoe renewed its request for a further extension. At this point in time Empress's projected financial statements were strong and dockside gaming had been approved. Additionally, the board was aware of these developments and the general environment in the industry. [FN18] Ferro and Canfora entered into negotiations with Horseshoe regarding the extension (the "second extension").

> FN17. DX 113-116; Ferro at 310-11; Lambrecht at 14, 17.

> FN18. DX 137, 143; Kaplan at 17. See also DOB at 53-55 and portions of record cited

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012,  2004 WL 2423570 (Del.Ch.))**

Page 7

therein.

Ferro and Canfora met with Jack Thar, the Executive Director of the Indiana Gaming Commission, to discuss the regulatory concerns surrounding the Merger Agreement. The Indiana Commission Rules require that all transactions be at fair market value. Regulators were aware that Horseshoe was going to be highly leveraged after the transaction and were concerned. [FN19] Thar repeatedly told Ferro and Canfora that $609 million was "more than a fair price." [FN20] Also, Thar warned Ferro and Canfora that if Empress increased the purchase price, the entire transaction would have to be reanalyzed and would go back to the end of the line in his time schedule. [FN21] These comments influenced Empress in the negotiation of the second extension. Ferro commented that "[i]t was very very plain from [Thar's] comments to me during that meeting that his message was this is more than a fair deal, take the deal as it is and go on." [FN22]

> FN19. *See* Thar at 30-31, 42.
>
> FN20. Thar at 12-13; Ferro at 315-16.
>
> FN21. Ferro at 315-16, 318.
>
> FN22. *Id.*

**\*\*4** Ferro and Canfora also spoke with their Merrill Lynch advisors regarding an increase in the purchase price and potential alternatives for increasing the transaction value. The Merrill Lynch representatives advised the board that it would be "perfectly acceptable for Empress to move ahead without any additional consideration at all." [FN23] One relevant factor was Horseshoe's reliance on its bond indenture to fund the transaction. Merrill Lynch explained that if Empress increased the purchase price, Horseshoe would have to go back into the market to find new funding, which would increase their interest rates. [FN24] Merrill Lynch expressed concern that the resulting high leverage ratios would once again alarm the Indiana Gaming Commission and "probably kill the deal." [FN25]

> FN23. Kaplan at 33-34.
>
> FN24. Ferro at 165-66. *See also* Kaplan at 32.
>
> FN25. Ferro at 165-66.

**1. The issues and risks surrounding the decision**

**on the second extension**

The Empress board considered and weighed many different factors in deciding whether to grant the second extension. As explained above, they considered the Indiana Gaming Commission Rules and certain comments by the Commission's Executive Director Thar. [FN26] Empress also was concerned about the expiration on or about December 1, 1999 of the indentures for the bonds through which Horseshoe intended to fund the transaction. [FN27] If the **\*1021** Horseshoe transaction did not close by then, the indentures would expire. In addition to delaying the sale of the Empress casinos, the need to obtain a new bond issue was likely to be costly. [FN28] Furthermore, there was concern that if Empress failed to consummate the Horseshoe transaction, it would lose credibility in the market and be less attractive to prospective buyers. [FN29] Empress also considered Merrill Lynch's "informal" advice to grant the extension even without any additional consideration based, among other things, on the lack of competing offers in an insular industry. [FN30] Yet another relevant factor was the threat of possible tax increases and a competitive bidding process for gaming licenses in the future. [FN31]

> FN26. *See* Thar at 12-13; Ferro at 315-16, 318.
>
> FN27. *See* Ferro at 165-66.
>
> FN28. DX 129.
>
> FN29. Kaplan at 30-31; Ferro at 163-64.
>
> FN30. Kaplan at 33-34, 37; Ferro at 312-13; Matthews at 121.
>
> FN31. McEnery at 36-38; Sabo at 95.

Besides the above considerations, the director defendants recognized the appeal of a "bird in hand" at what they believed was a great price and what represented an exceptionally high return on investment. [FN32] In the words of director defendant Lambrecht, the $609 million price was a "deal of a lifetime." [FN33] As illustrated by the following chart, [FN34] the director defendants and McGowan reaped huge financial rewards from the Horseshoe transaction in comparison to their relatively modest investments in Empress:

> FN32. *See* Hammersmith at 28; Ferro at 328.

859 A.2d 1012                                                                                                    Page 8
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

FN33. Lambrecht at 48.

FN34. DX 2. The proceeds of the Horseshoe transaction were paid into an escrow account that paid winding-down expenses of Empress and received further post-closing payments from Horseshoe. The figures in the last column are pre-tax. Distributions to the Empress stockholders totaling approximately $535 million have been made, or are expected to be made, from this escrow. This chart also excludes the dividends paid by Empress to its stockholders before the signing of the Merger Agreement in September 1998, as well as the $50 million in dividends paid by Empress between September 1998 and the Horseshoe transaction's closing in December 1999. DX 4; Costello at 351-55.

| Director | Empress Equity Percentage | Initial Investment | Immediate Cash Distribution from Horseshoe Transaction |
|---|---|---|---|
| Peter A. Ferro, Jr. | 3.13% | $ 1,000,000 | $ 13,842,984 |
| Charles P. Hammersmith, Jr. | 18.76% | $ 2,000,000 | $ 83,054,189 |
| Robert W. Kegley, Sr. | 9.4% | $ 1,250,000 | $ 41,526,398 |
| Thomas J. Lambrecht | 17.07% | $ 2,000,000 | $ 75,578,761 |
| William J. McEnery | 18.76% | $ 2,000,000 | $ 83,054,189 |
| William J. Sabo | 4.7% | $   500,000 | $ 20,763,199 |
| Edward T. McGowan | 18.76% | $ 2,000,000 | $ 83,054,189 |
| All directors | 90.58% | $ 10,750,000 | $ 400,873,909 |

**5 As director defendant McEnery noted, "it was a very high-risk thing with $630 million sitting on the table not to--to cash in. The risk was too high." [FN35]

FN35. McEnery at 36-37.

*1022 2. Concessions negotiated and obtained
Ferro and Canfora negotiated for additional concessions in exchange for granting the second extension. Ultimately, Empress received a $20 million consulting agreement over five years (present value approximately $12 million), a $10 million reduction in certain escrows (which increased the immediate distribution to Empress stockholders by $10 million) and an additional 30% interest in the Big Black project. [FN36]

FN36. DX 146-149; Ferro at 254, 326-27.

3. McGowan's objections to the concessions obtained
McGowan does not dispute that the $609 million price agreed to in September 1998 was the best price reasonably available. Rather, McGowan contends that in July 1999, when Horseshoe was requesting a second extension, the impending expiration of the Merger Agreement on September 30, 1999, gave rise to a new duty to seek the best price reasonably

available as of the termination date, taking into account Empress's increased EBITDA [FN37] at the time and a projected savings of $10 million per year at Empress Joliet due to the recent passage of a law in Illinois permitting dockside gaming. [FN38] McGowan relies heavily on his averment that the $609 million price was derived by a formula of six times the EBITDA value around the time the parties entered into the Merger Agreement. [FN39] In support of this averment McGowan points to a diary entry by Ferro which states, "Purchase Price--6 x 101.5 [Empress's EBITDA] = 609." [FN40] Denying that the figure resulted from a formula, the director defendants argue that the $609 million reflected a negotiated price. [FN41]

FN37. Earnings before interest, taxes, depreciation and amortization.

FN38. See Compl. ¶ 33-42.

FN39. Id. ¶ ¶ 25, 33-41.

FN40. PX 11.

FN41. DOB at 13 n. 9.

McGowan acknowledges that the Merger Agreement did not contain a formula to increase the price and

859 A.2d 1012                                                                                            Page 9
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

that a potential buyer would not "automatically" pay the price produced by an earnings multiple calculation. [FN42] He argues, however, that Empress and Horseshoe did consider a six times EBITDA multiple as a guide in determining the value of the Empress casinos when they negotiated the Merger Agreement. For purposes of Defendants' summary judgment motion, the Court will assume that EBITDA and a six times multiple were among the factors, but not the only factors, that Defendants considered during the relevant time period to value the Empress casinos. The Court further concludes, based on the evidence adduced by the parties, that it would be unreasonable to infer that the parties attributed controlling weight to EBITDA values as McGowan implies.

FN42. PRB at 10.

Based on his allegations that (1) the projected EBITDA for the Empress casinos had increased by approximately $30 million per year by July 1999, (2) Empress was likely to save $10 million a year in costs due to the recent authorization of dockside gaming in Illinois and (3) a six times multiple should be applied to such improved operating results, McGowan argues that by July 1999 the Empress casinos were worth approximately $230 million more than their value at the time of the Merger Agreement. [FN43]

FN43. Compl. ¶¶ 33-40.

*1023 **6 McGowan alleges that both the Empress board and Horseshoe knew of the increase in value, and that Empress failed to negotiate any increase in the purchase price to account for the increased value. [FN44] Notably, McGowan does not allege that there were any competing bidders. He criticizes the director defendants, however, for relying on Merrill Lynch's statement that it was unaware of any other purchaser because they knew that the no-shop clause of the Merger Agreement severely constrained Merrill Lynch. [FN45] Defendants counter that Merrill Lynch had numerous clients and contacts within the gaming industry that it kept informed of developments in the industry, including profitability of competitors and potential acquisition targets. [FN46] Merrill Lynch provided its contacts with all publicly available information about Empress, including Empress's 1999 first quarter annualized EBITDA figure of $115.6 million. [FN47] Merrill Lynch representatives also believed that other gaming companies would have been aware of Empress's increased earnings in the first half of 1999.

[FN48] Based on the record presented, the Court concludes that Defendants were entitled to rely on Merrill Lynch's advice that it was not aware of other potential bidders and that there are no material facts from which a fact finder reasonably could conclude otherwise. [FN49]

FN44. *Id.* ¶¶ 33-42.

FN45. *Id.* ¶¶ 43-50.

FN46. Ferro at 172; Kaplan at 100-01.

FN47. Kaplan at 104-05.

FN48. Maier at 57-58.

FN49. McGowan also disputes Defendants' characterization of the Horseshoe transaction as a "deal of a lifetime." To support his position, McGowan points to the sale of the Empress Joliet casino alone for $465 less than a year and a half after the Horseshoe closing. POB at 25. The Court considers such after the fact evidence irrelevant, because it invites the use of 20-20 hindsight to review the director defendants' decision to grant the second extension. For the same reasons, the Court deems irrelevant the analogous evidence proffered by Defendants to the effect that their new venture Empress Financial lost money and never made any distributions to its members. *See* DOB at 38.

McGowan also objects to the Horseshoe transaction because both Ferro and Canfora, who were negotiating the second extension on behalf of the board, had employment contracts from Horseshoe, subject to ultimate board and stockholder approval. [FN50] McGowan alleges that this created a conflict of interest for Ferro and Canfora. The record, however, indicates that at the time the employment contracts were created, Empress believed it needed them to obtain the necessary regulatory approvals and close the deal. The Illinois Gaming Board director, Michael Belletire, expressed a preference for having Empress management involved after the Horseshoe transaction. The employment contracts satisfied that preference and also made Horseshoe's bond offering more appealing by providing for continuity in management. [FN51] In fact, McGowan endorsed the employment contracts at the time of their creation and recognized their financial and regulatory impact. [FN52]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN50. *See* Compl. ¶ ¶ 105, 107.

FN51. *See* Kaplan at 16.

FN52. McGowan at 270-73.

### 4. Actions taken to obtain approval of the second extension

In the absence of McGowan, the six director defendants purported to approve the second extension at an Empress board meeting on July 15, 1999. A stockholders *1024 meeting was held immediately thereafter at which the director defendants, representing the holders of over 75% of the stock, signed a purported written consent approving the second extension. [FN53] Empress, however, failed to give McGowan 24 hours notice of the telephonic board meeting and subsequent stockholders meeting on July 15, 1999, as required by the bylaws. Nevertheless, McGowan did learn about the board meeting on July 14, 1999, through a conversation with director defendant McEnery. McGowan was out of town at the time, but did not ask to be included in the July 15 board meeting by telephone or to have it rescheduled.

FN53. DX 155.

**7 Changes, however, had to be made to obtain regulatory approval of the Merger Agreement. [FN54] These changes necessitated another approval of the second extension by the Empress board. The board met on September 2, 1999 to re-approve the second extension. [FN55] McGowan does not complain about the procedures at the September 2, 1999 meeting. [FN56]

FN54. On July 23, 1999, Ferro had a telephone conversation with Jack Thar regarding the second extension. Ferro at 361-62. During this conversation, Thar expressed concern over the conflict that would arise if Ferro became an employee of Horseshoe while still receiving payments from Empress's consulting agreement with Horseshoe. *Id.* Ferro volunteered to cancel his employment contract with Horseshoe. *Id.*

FN55. Defendants claim that this meeting remedied any procedural defects in the board approval of the second extension at the July 15, 1999 "meeting." Ferro had tried to obtain re-approval of the second

extension on July 26, 1999, by collecting written consents from the director defendants. *Id.* ¶ ¶ 57-59. McGowan claims that because the approval of the second extension on July 26, 1999 occurred without a meeting, and because the director action was not unanimous, it violated 8 *Del. C.* § 141(f) (requiring that director action by written consent be unanimous). Compl. ¶ ¶ 59-60.

FN56. McGowan did have difficulty, however, obtaining the minutes for this and other board meetings relating to the second extension. McGowan therefore brought a successful § 220 action against Empress. In that action, the Court found bad faith on the part of Empress for its failure to provide McGowan with board meeting minutes and other documents after his timely requests. *McGowan v. Empress Entertainment, Inc.,* 791 A.2d 1 (Del.Ch.2000).

The Empress directors held another properly noticed board meeting on October 25, 1999, at which they ratified the second extension. All seven directors were noticed on October 22, 1999, and all attended. The board ratified its previous approvals of the Horseshoe transaction, including the second extension, and its previous recommendation to the stockholders to approve the second extension over McGowan's dissent. McGowan does not contest the validity of this ratification.

### G. Statements to Illinois Gaming Commission

McGowan alleges that Ferro wrote a deliberately false and misleading letter to the Chairman of the Illinois Gaming Commission on October 14, 1999, stating, "all of the owners and directors voiced their unanimous approval for the conclusion and consummation of the sale of Empress to Horseshoe." [FN57] According to McGowan, Ferro knew that he did not approve of the sale of Empress to Horseshoe at the price stated in the Merger Agreement because he opposed the second extension. [FN58] Defendants respond that Ferro's comments were appropriate because McGowan told Ferro *1025 that he would not "block the sale." [FN59] McGowan admits saying that he would not block the sale. [FN60] He emphasizes, however, that he never approved of the second extension. Hence, McGowan contends that Ferro's letter was false and misleading. Yet, McGowan did not contact the gaming board to voice his opposition. Instead, he had his attorney send a letter to the Empress board suggesting they

859 A.2d 1012                                                                                    Page 11
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012,  2004 WL 2423570 (Del.Ch.))

had a duty to correct the statement. [FN61]

> FN57. Compl. ¶ 62, Ex. B.
>
> FN58. *Id.* ¶ 64.
>
> FN59. DOB at 44 n. 26;   Ferro at 234;
> McGowan at 62, 119.
>
> FN60. *Id.*
>
> FN61. DX 200.

### H. The Formation of Empress Financial

Empress Financial was formed on October 18, 1999.
McGowan was not invited to participate in the new
company.

The purpose of Empress Financial, according to
Defendants, was to serve as a management company,
not to pursue another business directly. Investment
opportunities brought to the attention of Empress
Financial would be presented to Defendants and other
potential investors on an individual basis to be
rejected or pursued by them individually. [FN62]
Although it is not entirely clear, McGowan seems to
allege that Empress Financial was a "successor" of
Empress, if not legally then in an equitable sense.
Defendants dispute that characterization. Empress
Financial was formed as a management company
and, unlike Empress, did not serve as a parent
corporation for any casinos and had no operating
subsidiaries. Empress Financial expected to fund
approximately 50% of its payroll with management
fees for managing former Empress properties. [FN63]

> FN62. Costello at 137, 172, 181; Canfora at
> 36-37; Ferro at 30-31, 189-93, 340.
>
> FN63. Ferro at 270. McGowan asserts that
> he was the only nonconflicted member of
> the Empress board after the merger and was
> never asked to vote on the "management
> agreements" with Empress Financial until
> after the filing of this litigation. Compl. ¶ ¶
> 78-80.

The director defendants acknowledge that they did
not wish to associate with McGowan in their post-
Empress business ventures, including Empress
Financial. [FN64] As McGowan's counsel conceded
at argument, however, Defendants were entitled to
form a new company and exclude McGowan
provided they did not misappropriate Empress's
corporate opportunities. [FN65]   In addition, the

record indicates that throughout much of the relevant
period the director defendants went to some lengths
to exclude McGowan from discussions relating to the
contemplated formation of Empress Financial.

> FN64. *See, e.g.,* PX 5;   discussion *supra* p.
> 1018.
>
> FN65. Tr. at 11-13.

### I. Closing

**8** The Empress board of directors met on
November 17, 1999, pursuant to notice faxed to all
directors on November 10, 1999. The board adopted
a resolution to dissolve Empress that would be
effective after the closing of the Horseshoe
transaction. [FN66] The Merger closed on December
1, 1999. McGowan did not seek to enjoin the
transaction.

> FN66. DX 192, 193.

McGowan, as an 18.76% equity holder, walked
away from the Horseshoe transaction (without regard
to the substantial dividends he had received as an
Empress stockholder) with approximately $80
million for his $2 million investment--a return of 40
times his original investment in less **1026** than ten
years. After the merger, Empress had remaining
assets, including a significant interest in Empress
Kansas and the $20 million consulting agreement
with Horseshoe. These assets were put into a
liquidating trust for the benefit of the Empress
stockholders. Empress never owned any stock
interest in Empress Financial.

### J. Pursuit of Corporate Opportunities

McGowan accuses Defendants of diverting two
different categories of corporate opportunities from
Empress to Empress Financial. The first related to
certain management agreements that Empress
Financial entered into with Empress Kansas, Empress
Mississippi and the liquidating trust for Empress.
The second category involves certain specific
investment opportunities.

Under the management agreements McGowan
contends were a corporate opportunity, Empress
Financial agreed to provide management services
with respect to the former Empress properties that
were put into the liquidating trust. [FN67] Empress's
CFO, Costello, testified that Empress Financial
charged the management fees on a monthly basis to
cover accounting and legal services for the Kansas
and Mississippi subsidiaries and the management

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

services provided to operate the liquidating trust.
[FN68] The management agreements totaled almost
$1 million in value. [FN69]

> FN67. Answer ¶ 78; Costello at 44-45, 64-
> 70; Ferro at 190, 270.

> FN68. DOB at 38 n. 22; Costello at 42-70.
> The services provided by Empress Financial
> to Empress's liquidating trust included
> bookkeeping, receipts and disbursements,
> balancing the bank accounts, preparing
> financial statements and income tax returns,
> lobbying for the Kansas City racetrack, and
> reviewing contracts. Costello at 50, 60.

> FN69. DX 43; Costello at 25.

The main investment opportunity that McGowan
claims was usurped by the director defendants was
the Flamingo Hilton Kansas City casino opportunity.
[FN70] Empress devoted corporate assets to
investigating this opportunity prior to the Horseshoe
transaction. A presentation was made to the Empress
board on September 2, 1999, after which it
unanimously voted to discontinue all efforts to
acquire the Flamingo Hilton. [FN71] After the
Empress board voted to turn down the Flamingo
Hilton opportunity, Defendants called Bill Grace, a
Missouri licensed gaming operator, to express
interest in partnering in a bid for the Flamingo Hilton
through a joint venture called KC Entertainment. On
January 7, 2000, KC Entertainment made a bid for
the Flamingo Hilton and identified its lending sources
as Bill Grace and Empress Financial. [FN72] That
bid, however, was unsuccessful. [FN73]

> FN70. McGowan asserts that three other
> corporate opportunities were diverted--viz.,
> a Nevada casino, a Colorado casino and a
> Las Vegas gaming equipment refurbishing
> business. His briefs, however, refer to these
> opportunities only summarily.

> FN71. PX 85; McEnery at 66-67.

> FN72. PX 51; Ferro at 38-39.

> FN73. Ferro II at 40.

### K. Relief Sought

McGowan seeks declaratory relief and money
damages for alleged breaches of fiduciary duties and
conversion and the aiding and abetting thereof.
McGowan also seeks damages of 18.76% of (1) the

alleged difference of more than $200 million in the
"value" of Empress at the time the director
defendants approved the second extension compared
to when the Merger Agreement was executed, (2) a
$5.75 million incentive payment made to *1027
Canfora in connection with the closing of the
Horseshoe transaction, (3) all amounts paid as
"management fees" to Empress Financial, and (4) the
amount Empress spent investigating the potential
acquisition of the Flamingo Hilton and other
corporate opportunities "diverted from Empress" and
later investigated by Empress Financial. McGowan
further seeks an accounting of the amounts Empress
spent in investigating the potential acquisition of the
Flamingo Hilton and all other (unspecified)
opportunities diverted from Empress and later
investigated by Empress Financial. McGowan also
seeks a constructive trust on his 18.76% equity
interest in Empress that was "converted" and any
profits that Defendants have realized while excluding
him from participation in Empress Financial or any
other successor entities.

### II. STANDARD

**9 Summary judgment should be granted if the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with affidavits show
that no genuine issue exists as to any material fact
and that the moving party is entitled to judgment as a
matter of law. [FN74] The facts, and all reasonable
inferences drawn from them, must be viewed in the
light most favorable to the nonmoving party. [FN75]
The moving party has the burden of demonstrating
that no material question of fact exists. [FN76] In the
face of a properly supported motion for summary
judgment, the nonmoving party must produce
evidence that creates a triable issue of fact or suffer
the entry of summary judgment against it. [FN77]

> FN74. Ch. Ct. R. 56(c).

> FN75. *Newark Landlord Ass'n v. City of
> Newark,* 2003 WL 21448560, at *4 (Del.Ch.
> June 13, 2003).

> FN76. *Goodwin v. Live Entm't, Inc.,* 1999
> WL 64265, at *5 (Del.Ch. Jan. 25, 1999),
> *aff'd,* 741 A.2d 16 (Del.1999) (table)
> (granting summary judgment for director
> defendants on a *Revlon* claim).

> FN77. *See, e.g., id.; Burkhart v. Davies,* 602
> A.2d 56, 59 (Del.1991).

[1] The presentation of cross-motions for summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012                                                                                    Page 13
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

judgment does not, in itself, demonstrate the absence of any genuine issue of material fact. Instead, the Court must apply the summary judgment standard to each party's motion and, only after doing so, grant summary judgment to one of the parties if the record and the law justify that award. [FN78]

> FN78. See *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.,* 551 A.2d 433, 435 (Del.1988).

### III. ANALYSIS
#### A. Count I--Breach of Duty of Loyalty
#### 1. McGowan's claims

McGowan claims that the director defendants breached their fiduciary duty of loyalty by:

> (1) approving the second extension, knowing that the Empress entities were worth at least $230 million more than their value in August 1998 in order to remove McGowan from current and future business opportunities of Empress (the *Revlon* claim);
> (2) intentionally holding a board meeting to approve the second extension at a time when McGowan was unable to attend, thereby depriving McGowan of his right to voice his opinion and to vote on the second extension;
> (3) approving the second extension despite material conflicts of interest; and
> *1028 (4) preventing McGowan from participating in the vote on the second extension and agreeing to the second extension for less than 10% of the increased value of the casinos, in order to ensure that McGowan was not permitted to participate in opportunities that belonged to Empress.

#### 2. What is the proper standard of review?

The questions of whether the director defendants had a disabling conflict of interest or acted in bad faith are critical to the subsequent analysis of the transactions. If the director defendants had disabling conflicts of interest or acted in bad faith in approving the second extension, they would have to prove the fairness of the transaction. [FN79] Otherwise they are afforded the protections of the business judgment rule or subject simply to enhanced scrutiny under *Revlon.* [FN80]

> FN79. 8 *Del. C.* § 144(a)(3). To the extent that McGowan's *Revlon* claims arise out of the duty of care, Empress's 102(b)(7) provision would bar any claim for monetary damages and summary judgment for the director defendants would be appropriate. *Goodwin v. Live Entm't, Inc.,* 1999 WL

64265, at *5. The Court also finds that it would be inappropriate to award the requested injunctive relief of unwinding this merger, because McGowan never sought to enjoin the transaction before its consummation and has accepted proceeds of nearly $80 million from it. *See id.* at *6 n. 3.

> FN80. *Revlon v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986).

#### a. Was the approval of the second extension a conflicted transaction?

McGowan's theory is that the director defendants were willing to forego the opportunity to receive a substantially increased premium for their own shares in Empress because they wished to "advance their personal interest in misappropriating gaming opportunities that had previously been presented to Empress." [FN81] This allegedly would be accomplished through Empress Financial, a new company in which all of the Empress directors (except McGowan) were invited to participate. The first issue is whether the record facts are sufficient to support a reasonable inference that the director defendants' interest in Empress Financial tainted their decision-making in the Horseshoe transaction.

> FN81. Tr. at 7.

**10 As a preliminary matter, the Court notes that this is not a transaction in which the director defendants stood on both sides of the deal. The director defendants did not have an interest in Horseshoe. Perhaps recognizing this deficiency in his duty of loyalty claim, McGowan advances a more indirect and creative theory of how the director defendants breached their duty of loyalty by approving the second extension. He contends that the director defendants' decision to grant the second extension was conflicted as a result of their participation in a post-Empress business venture from which they stood to benefit personally in a way that was not shared by McGowan. [FN82]

> FN82. *See, e.g., Orman v. Cullman,* 794 A.2d 5, 22 (Del.Ch.2002) (explaining that "the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012                                                                                     Page 14
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

interest of its company and all of its shareholders"); *Rales v. Blasband*, 634 A.2d 927, 936 (Del.1993).

In paragraph 99 of his Complaint, McGowan purports to challenge the director defendants' receipt of personal benefits through Empress Financial. The Court presumes that McGowan is referring to the management agreements. McGowan, however, has not challenged the approval of those management agreements directly as a breach of the duty of loyalty. Instead, he has challenged the approval of the second extension based on a purported conflict of interest caused by the anticipated, future management agreements.

**\*1029** **[2][3]** In order to rebut the presumption of director disinterestedness and independence, a stockholder must show that the directors' self-interest materially affected their independence. [FN83] In other words "[t]o be disqualifying, the nature of the director interest must be substantial," not merely "incidental." [FN84] A "*de minimus* departure" from the requirement that all stockholders be treated equally does not "amount to an actionable breach of fiduciary duty." [FN85]

> FN83. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del.1993).

> FN84. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del.1995). *See also President & Fellows of Harvard Coll. v. Glancy*, 2003 WL 21026784, at \*21 (Del.Ch. Mar. 21, 2003) ("[I]t is not enough to establish the interest of a director by alleging that he received any benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director. Materiality means that the alleged benefit was significant enough '*in the context of the director's economic circumstances,* as to have made it improbable that the director could perform [his] ... duties....' ").

> FN85. *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 595 n. 7 (Del.Ch.1986); *In re Budget Rent A Car Corp. S'holder Litig.*, 1991 WL 36472, at \*4 (Del.Ch. Mar. 15, 1991).

**[4]** Due to the unique ownership and control structure of Empress, the director-stockholders'

interests in obtaining the highest value in a sale of the corporation were almost perfectly aligned with the interests of McGowan. McGowan urges the Court to infer that the director defendants had a conflict of interest based on their interest in starting Empress Financial without McGowan. The facts of record are insufficient, however, to support a reasonable inference that there was a material conflict of interests in the circumstances of this case.

In the *Technicolor* litigation, the Court of Chancery described the following situation in which the directors' interests would be insufficient to find a disabling conflict of interest.

An example will, I think, demonstrate the point. Consider the case of the sale of a public company which is owned 35% by the CEO and 10% by the company's vice president. The company has a market capitalization of $100 million. The two officers constitute a majority of the board. Each has a salary and benefit package worth approximately $550,000 per year. During arm's-length bargaining an acquisition of the corporation is negotiated with a third party for $160 million cash. As part of the transaction, it is agreed that the two officers will remain as officers of the company at a new higher (say doubled) salary. Assume now that a shareholder sues the directors claiming that they negligently failed to get the best available price. The directors didn't shop the Company, "locked up" the sale, and had no fiduciary out in the merger agreement. Plaintiff also (implausibly) asserts that the directors pushed this transaction rather than search for a higher alternative that might have been found in order to get the higher salaries that the acquiror proposed. Must the directors assume the burden of establishing the entire fairness of the transaction? [FN86]

> FN86. *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at \*10 (Del.Ch. June 24, 1991), *aff'd in part and rev'd in part sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del.1993). *See also Budget Rent A Car*, 1991 WL 36472, at \*4 (finding sizeable consulting agreement immaterial in light of significant stockholdings in evaluating a potential conflict of interest).

**\*1030** **\*\*11** Although the directors in this remarkably similar hypothetical had a financial interest in the merger that was not shared by the other stockholders, the Court determined that the directors' decision was entitled to the presumptions of the

859 A.2d 1012                                                                Page 15
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

business judgment rule because the alleged interest was not material. [FN87] In the context of the hypothetical, the director-stockholders' financial interests in the corporation would outweigh their financial interests in their future salaries as a matter of law. Delaware law is clear that substantial stockholdings in a company by directors create powerful incentives to get the best deal in the sale of that company. [FN88]

FN87. *Id.* at *11.

FN88. *See In re Mobile Communications Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del.Ch. Jan. 7, 1991); *Orman,* 794 A.2d at 27 n. 56; *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 356 (Del.Ch.1998), *aff'd in part, rev'd in part on other grounds sub nom. Brehm v. Eisner,* 746 A.2d 244 (Del.2000); *In re IXC Communications Inc. v. Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6-7 (Del.Ch. Oct. 27, 1999).

There can be no dispute that the director defendants in this case had substantial stockholdings in Empress. The six director defendants owned 71.82% of Empress. Together with their family members and related trusts, they owned 79.78% of Empress. The value of the Empress/Empress Financial management agreements, approximately $1 million, and the speculative potential profits of Empress Financial pale in comparison to the $230 million that McGowan claims the director defendants gave up in the Horseshoe transaction. Therefore, any such action would defy logic.

Furthermore, the record does not support McGowan's assertion that the management agreements were necessary to fund Empress Financial. The $1 million expected from the management agreements is immaterial compared to the hundreds of millions of dollars that the director defendants collectively received in the sale of Empress. [FN89] These proceeds were available to the director defendants to fund Empress Financial. Indeed, the director defendants were individuals of significant independent means based on their equity interests in Empress alone. Even drawing all reasonable inferences in his favor, McGowan has failed to present sufficient evidence to support his contention that the management agreements or any other alleged conflict gave the director defendants an incentive to close the Horseshoe transaction for less than full value. Thus, the director defendants'

decision to approve the second extension was not conflicted and they need not demonstrate the fairness of the transaction.

FN89. *See* Tr. at 30-31.

**b. Was the approval of the second extension in bad faith?**

McGowan also contends that the director defendants must demonstrate the entire fairness of the second extension because he proffered evidence of bad faith. Because good faith is presumed, McGowan bears the burden of rebutting the presumption under the business judgment rule. [FN90] McGowan must present evidence that creates "a reasonable doubt ... whether the directors honestly and in good faith believed that the action was in the best interest of the corporation." [FN91] In *1031 order to rebut the business judgment rule for purposes of Defendants' motion for summary judgment, McGowan must create a genuine issue of material fact that, if true, would demonstrate that the director defendants approved the second extension "for some purpose other than a genuine attempt to advance corporate welfare or [that] is known to constitute a violation of applicable positive law." [FN92]

FN90. *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del.1989).

FN91. *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del.Ch.2003).

FN92. *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n. 2 (Del.Ch.1996); *see also In re Walt Disney Co. Deriv. Litig.*, 825 A.2d at 289 ("Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct ... that may not have been taken honestly and in good faith to advance the best interests of the company.") In this case, the director defendants were advancing the interests of all stockholders, as well as their own, when they made their decision to grant the second extension. As in *In re IXC Communications, Inc. v. Cincinnati Bell, Inc.*, if McGowan thinks that he was so irksome to the director defendants that they would leave hundreds of millions of dollars on the table just so that they could sever their relationship with him, he needs a "serious reality check." 1999 WL 1009174, at *6-7 (Del.Ch. Oct. 27, 1999).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012,  2004 WL 2423570 (Del.Ch.))

Page 16

**\*\*12** **[5]** In this case, the action that is challenged is the decision to approve the second extension of the Horseshoe Merger Agreement. McGowan's proffered bad faith acts do not relate to the business decision to approve the second extension (even if the acts themselves might have been in bad faith). [FN93] Any inference that the alleged bad faith scheduling and misstatements to the gaming regulators were related to the business decision to approve the second extension would be unreasonable because the director defendants were all substantial equity holders of Empress who stood to gain or lose millions of dollars on the basis of that decision. Furthermore, bad faith is conduct that is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." [FN94]

> FN93. For example, McGowan alleges in his briefs that bad faith actions such as Empress's failure to turn over board minutes "demonstrate that defendants would willfully breach their duties as directors to deny McGowan that to which he is entitled [*i.e.*, the minutes] *and* that defendants fully comprehended the wrongfulness of their actions." POB at 30.

> FN94. *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780-81 & n. 5 (Del.Ch.1988).

**[6]** The director defendants proffered a number of reasons for their decision to extend the Merger Agreement. They included: the advice of Merrill Lynch; the significant regulatory delay that would result from further changes to the deal; the effect of such a delay on Horseshoe's bond indentures; potential changes in the regulatory environment or tax laws; the oversight of the regulatory authorities; capital expenditures necessary to make Empress competitive under the new regulatory environment in Illinois allowing dockside gambling; the potentially adverse effect of terminating the deal on Empress's reputation for purposes of any subsequent deal; the provision of the deal that provided Empress stockholders with dividends during the regulatory delay; the financial concessions that Empress obtained from Horseshoe; the lack of competing offers in an insular industry; and the appeal of a "bird in the hand" at what the director defendants felt was a great price. [FN95] Not surprisingly, through the skillful advocacy of his counsel, McGowan purports to rebut each of the reasons proffered by the director defendants for their decision. [FN96] **\*1032** Having considered those arguments, the Court finds them insufficient to raise a genuine issue of material fact on the issue of bad faith. The record on summary judgment shows the existence of legitimate reasons for the director defendants' decision to approve the second extension. The Court therefore concludes that the decision lies within the bounds of reasonable judgment.

> FN95. *See* DOB at 53-55 and the extensive record citations therein.

> FN96. *See* PAB at 54-57.

McGowan failed to present record evidence showing that the director defendants had disabling conflicts of interests or approved the second extension of the Merger Agreement in bad faith, even when the facts and reasonable factual inferences are viewed in the light most favorable to him. Thus, the director defendants need not prove the entire fairness of their decision to approve the second extension of the Merger Agreement.

**c. Enhanced scrutiny**
**[7]** McGowan argues that in offering to sell the casinos, the Empress board entered into a change in control transaction which triggered enhanced scrutiny under *Revlon*. The *Revlon* doctrine requires that the directors seek the maximum value reasonably obtainable for the stockholders when there is a sale of the company or a change in control transaction. [FN97] This is not an additional fiduciary duty, but rather an enhanced judicial review applied to the directors' exercise of their fiduciary duties in the context of a sale of control. [FN98]

> FN97. *See, e.g., Revlon,* 506 A.2d at 182; *Equity-Linked Investors, L.P. v. Adams,* 705 A.2d 1040, 1054-55 (Del.Ch.1997) (*Revlon* doctrine triggered when there is "no tomorrow" for stockholders).

> FN98. As the Delaware Supreme Court stated in *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 43 (Del.1994):
> The consequences of a sale of control impose special obligations on the directors of a corporation. In particular, they have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders. The courts will apply enhanced scrutiny to

859 A.2d 1012                                                                                            Page 17
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

ensure that the directors have acted reasonably. The obligations of the directors and the enhanced scrutiny of the courts are well-established by the decisions of this Court. The directors' fiduciary duties in a sale of control context are those which generally attach. In short, "the directors must act in accordance with their fundamental duties of care and loyalty." *Id.,* quoting *Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1286 (Del.1989).*

**13 In this case, the stockholders were cashed out from the two most significant assets of Empress. As such, there was "no tomorrow" for them. Because the stockholders did not have an opportunity to participate in Horseshoe, the post merger entity, the Court will analyze the director defendants' decision to enter the Horseshoe transaction under enhanced scrutiny to determine whether the directors "act[ed] in accordance with their fundamental duties of care and loyalty." [FN99]

FN99. *Id.*

McGowan does not allege, however, that the Horseshoe transaction was for insufficient value when it was initially entered. In fact, any such challenge would be barred by his acquiescence since McGowan voted in favor of the initial Merger Agreement. Instead, McGowan argues that due to an increased EBITDA value prior to closing and Illinois's legalization of dockside gambling, [FN100] the financial concessions *1033 that the director defendants obtained for the second extension of the Merger Agreement (McGowan approved the first extension) were insufficient to satisfy their fiduciary duties in a change of control transaction.

> FN100. While the actual value of the Empress Joliet and Empress Hammond assets are certainly disputed facts, those disputes do not preclude summary judgment. Where there is no conflict of interest, the Court's review of such a dispute is limited by the business judgment rule or to scrutiny of whether the directors obtained a price within a range of reasonableness under *Revlon* and its progeny, *infra.*

The Court has its doubts that enhanced scrutiny is the appropriate standard of review where, as here, there is no evidence of any alternative value maximizing transaction. [FN101] Even if we indulged McGowan and reviewed the director

defendants' decision under *Revlon's* enhanced scrutiny, however, their decision was within the range of reasonableness required under Delaware law. If there is no breach of fiduciary duty when the court reviews the directors' actions with enhanced scrutiny, there obviously would be no breach of fiduciary duty under the business judgment rule.

> FN101. *Brown v. Perrette,* 1999 WL 342340, at *10 (Del.Ch. May 14, 1999) (expressing doubt that *Revlon* applies to post-bid renegotiation); *see also Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914, 915 (Del.2003) (Veasey, C.J., dissenting) (noting the difference between the board turning away a superior deal in favor of a less valuable one and committing itself to the only value maximizing transaction in a case where the majority applied the doctrine in the context of the original decision to sell the company). *Cf. QVC,* 637 A.2d at 49-50 (noting director defendants' duties in a change of control transaction is a "continuing obligation" and reasoning that board's decision to lock up the Viacom transaction was unreasonable because it foreclosed the opportunity to extract additional sums from QVC). In addition, this is a case in which no other bidders stepped forward between the time of the original Merger Agreement and the grant of the second extension, almost a year later. Kegley at 16 ("Nobody knocked on our door.").

[8] Assuming *arguendo* that *Revlon* applies to post-bid renegotiation, the Court reviews the decision to grant the second extension with "enhanced judicial scrutiny" to determine whether the board satisfied its fiduciary duties to the stockholders. As noted earlier, the *Revlon* doctrine requires that the directors seek the maximum value reasonably obtainable for the stockholders when there is a sale of the company or a change in control transaction. Where no market check has occurred, the analysis includes: (1) a judicial determination regarding the adequacy of the decision-making process employed by the directors, including the information on which the directors based their decision; and (2) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. [FN102]

> FN102. *QVC,* 637 A.2d at 45. As noted above, in view of Empress's 102(b)(7) provision, the Court will focus its analysis

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

Page 18

on whether McGowan has produced evidence from which the Court reasonably could infer a breach of the duty of loyalty or the duty of good faith.

[9][10] Under this standard of review, the directors have the burden of proving that they were adequately informed and acted reasonably. The court does not, however, ignore the complexity of the directors' task in a sale of control. The court decides whether the directors made a "reasonable decision, not a perfect decision." [FN103] Thus, the court may not substitute its business judgment for that of the directors, but must determine if the directors' decision was "on balance, within a range of reasonableness." [FN104]

      FN103. *Id.*

      FN104. *Id.*

**14 [11] In this case, the director defendants have shown that they were sufficiently informed as to the adequacy of the price in the Horseshoe transaction and detailed their efforts to obtain the best price reasonably available. The Merger Agreement was preceded by an active canvassing*1034 of the market by Empress with the help of Merrill Lynch. All the director-stockholders (including McGowan) approved the Merger Agreement.

When the regulatory approvals were not forthcoming, the director-stockholders (including McGowan) approved an extension until September 30, 1999. When Horseshoe recognized that it was unlikely to obtain the necessary regulatory approvals by the extended termination date, it requested a further extension until December 1, 1999. The Empress board initially denied that request, but later granted it after receiving significant concessions from Horseshoe, including a consulting agreement having a net present value of at least $12 million. [FN105]

      FN105. The Court notes that the directors were well aware that the regulatory approval process could be lengthy and retained the right to receive dividends from Empress until the Horseshoe transaction closed. DX 80 at § 4.06. McGowan's Complaint alleges that the director defendants were aware of the increased EBITDA numbers at the time they decided to grant the second extension. Even with the increased EBITDA, however, six of the seven director-stockholders thought that they got a good deal in the

original Merger Agreement and were willing to continue their efforts to consummate that transaction in light of the uncertainties inherent in any business decision. McEnery at 38, 82-83; Lambrecht at 50; Hammersmith at 25-28; Ferro at 328; Kegley at 14-17.

Defendants were cognizant of the changes in the regulatory environment and gaming industry and considered those changes. [FN106] The director defendants sought further advice from their investment banker, Merrill Lynch. By seeking only informal advice, they were able to avoid the fees associated with an additional fairness opinion. This was not unreasonable, especially in the context of a transaction in which a supermajority of the stockholders of a closely held corporation already had approved the merger and were the same individuals making the decision as members of the board of directors. [FN107] Although Merrill Lynch had extensive knowledge of the gaming industry, it knew of no new bidders. [FN108] Nor is there any evidence that a new bidder came forward in the 15 month period between the initial Merger Agreement and closing or when the need for a further extension became evident. "When it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed." [FN109]

      FN106. Compl. ¶ ¶ 33-42, 106; Sabo at 70; Ferro at 143-44, 153; DOB at 29-33.

      FN107. McGowan's claim that the director defendants failed to exercise their right to obtain a "free" fairness opinion is not supported by the documentary record. *See* DX 7.

      FN108. Kaplan at 12, 28; Maier at 54-56; Ferro at 312-13.

      FN109. *Barkan,* 567 A.2d at 1287; *In re Vitalink,* 1991 WL 238816, at *11 (where 45 days passed between the announcement of a tender offer and closing without any inquiry from an interested bidder, this fact was supportive of a finding that the board had adequate information to determine that a deal was the best available); *Goodwin,* 1999 WL 64265, at *22.

The failure to conduct a market check, by itself, is

859 A.2d 1012                                                                                                      Page 19
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

insufficient to state a claim for breach of fiduciary duty. [FN110] The same can be said for the failure to get a renewed fairness opinion in a nonpublic corporation in which six out of seven directors and the holders of almost 80% of the equity are already prepared to approve an extension of a transaction that had been unanimously approved previously. Under the circumstances presented here, the director defendants *1035 were not required to abandon the transaction simply because a better deal *might* have become available in the future. [FN111] The timing of a transaction is a legitimate concern of directors in approving a sale of control. [FN112] In these circumstances, the Court concludes that the director defendants' decision-making process was adequate even when the facts are considered in the light most favorable to McGowan.

> FN110. *See Wheelabrator,* 1992 WL 212595, at *9; *Goodwin,* 1999 WL 64265, at *22.

> FN111. *See In re Fort Howard Co. S'holder Litig.,* 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988).

> FN112. *See Cinerama v. Technicolor,* 1991 WL 111134, at *7 (noting the discussion of "whether a bird in hand was worth more than a fatter bird that might be in the bush.")

The record also shows that the director defendants' decision to approve the second extension of the Horseshoe Merger Agreement was within a range of reasonableness under the circumstances. The proffered good faith reasons for approving the transaction demonstrate that a better transaction (or similar profits from holding onto Empress) was not guaranteed. In the absence of a material conflict of interest, this supports a finding that the approval of the second extension was within the range of reasonableness. McGowan has failed to adduce evidence that would warrant this Court interfering with the judgment of six of the seven directors who were adequately informed and materially disinterested and held nearly 73% of the corporation's stock.

**15 The director defendants proffered good faith reasons for their decision and a supermajority of the stockholders approved it. McGowan's argument would require the Court to accept his theory that the director defendants were willing to leave a substantial sum of money on the table in favor of a new and untested business endeavor simply to rid themselves

of McGowan. Absent a strong factual showing favoring such an inference, the Court cannot reasonably infer that directors with very substantial stock holdings would fail to seek the highest value reasonably available in the sale of a company's flagship assets. [FN113] The record, as well as the voting and ownership dynamics in Empress, sufficiently show that the director defendants satisfied their fiduciary duties when they approved the second extension of the Horseshoe Merger Agreement.

> FN113. In the past, this Court has concluded, through what it called a "natural inference," that a party with a substantial interest in a company for sale would seek a high selling price. *See Goodwin,* 1999 WL 64265, at *23. A corporation with a diverse stockholder base, rather than a director owned entity, might present a different scenario.

As in *Cinerama,* the fact that the directors sold their stock at the same price paid to McGowan "powerfully implies that the price received was fair." [FN114] This is the only reasonable inference the Court can draw from the record facts. For these reasons, the Court will grant Defendants' motion for summary judgment on McGowan's *Revlon* and breach of the duty of loyalty claims.

> FN114. *Cinerama, Inc. v. Technicolor, Inc.* 663 A.2d 1134, 1143. *See also Goodwin,* 1999 WL 64265, at *23.

### 4. McGowan's motion for summary judgment as to liability on Count I

McGowan's cross motion for summary judgment fails because of a faulty initial premise. His motion requires the Court to find first that the directors had a disabling conflict of interest due to their future participation in Empress Financial. Because the director defendants were not conflicted, but rather had a significant congruence *1036 of interests with McGowan, his argument that Defendants have the burden of proving the entire fairness of the transaction is incorrect. For that reason and the other reasons recited above for granting summary judgment to Defendants on Count I, the Court will deny McGowan's motion for summary judgment on that Count.

### B. Count III--Bad Faith

Count III alleges that at the time the director defendants approved the second extension, they did

859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))**

so in reckless or conscious disregard of the documentation and analyses showing the Empress entities were worth at least $230 million more than their value as of the date of the original Merger Agreement. Although this pleading appears to be nothing more than an attempt to circumvent Empress's 102(b)(7) provision by pleading a claim for breach of the duty of care that seeks to hold the directors personally liable for monetary damages as one for breach of the fiduciary duty of good faith, the Court will address it as pled. [FN115]

> FN115. Many of the issues raised by this claim were dealt with in the discussion of McGowan's breach of fiduciary duty claims in Count I and will not be addressed again here.

[12][13][14] The business judgment rule presumes that directors acted "in the honest belief that the action taken was in the best interests of the company." [FN116] Bad faith is "not simply bad judgment or negligence," but rather "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity ... it contemplates a state of mind affirmatively operating with furtive design or ill will." [FN117] Good faith is presumed and the party challenging director action bears the burden of rebutting that presumption. [FN118] None of the alleged bad faith acts argued in McGowan's briefing (assuming *arguendo* that the Court would permit McGowan to raise them without amending his Complaint) [FN119] relate to the director defendants' business decision to approve the second extension.

> FN116. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *In re RJR Nabisco, Inc. S'holder Litig.,* 1989 WL 7036, at * 15 (Del.Ch. Jan. 31, 1989).

> FN117. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208 n. 16 (Del.1993).

> FN118. *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del.1989).

> FN119. *See* Compl. ¶ ¶ 109-112.

**16 [15] McGowan claims that the board approval was secured without timely notice to him of the July 15, 1999 meeting, the minutes of which were later concealed from McGowan, and by an invalid written consent. [FN120] Any defect in the notice of the July

15, 1999 meeting, however, was cured at the September 2 and October 25, 1999 meetings. [FN121]

> FN120. On or about July 26, 1999, Ferro drove to the offices of the Board members and stockholders to collect signatures for a "joint consent." PX 59.

> FN121. The Court need not address Defendants' defense of acquiescence to McGowan's challenge to the approval of the second extension (DOB at 57- 59; DRB at 24) because McGowan's claim fails on other grounds.

McGowan claims that Ferro forced stockholder approval of the second extension by persistently pursuing McEnery's vote for the transaction and including him in Empress Financial. [FN122] This claim is without merit. There is no prohibition against an officer or director seeking to have a stockholder approve a transaction when there is no showing, or even allegation, *1037 of improper or unlawful tactics in that pursuit. McGowan cites no authority for his novel argument to the contrary. The Court therefore concludes that McGowan's apparent complaint about the way in which McEnery's vote in favor of the second extension was obtained fails as a matter of law, even when the record facts are viewed in the light most favorable to McGowan.

> FN122. Compl. ¶ 42.

[16] McGowan also cites as evidence of bad faith, his contention that the director defendants misled the Illinois Gaming Board regarding McGowan's opposition to the second extension (and thus the merger). Specifically, McGowan claims that Ferro's letter of October 14, 1999 to the Illinois Gaming Board, informing them that "all of the owners and directors voiced their unanimous approval for the conclusion and consummation of the sale of Empress to Horseshoe," was false and misleading. [FN123] In response, Ferro points to the undisputed fact that McGowan stated that he would not "block the sale" as supporting the statement in his letter. [FN124] The parties dispute whether Ferro's communications to the Illinois Gaming Board on this issue were misleading. Even if they were, however, the communications do not provide McGowan with a claim for damages or shift the burden of proof to the director defendants with regard to the second extension. McGowan knew about the alleged misstatements before the Gaming Board took any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

action with regard to the second extension. Nevertheless, McGowan did not communicate his objections to those statements to the Gaming Board. [FN125]

> FN123. PX 63 (letter from Ferro to Illinois Gaming Board, dated October 14, 1999).

> FN124. Ferro at 234. McGowan acknowledged saying that he wouldn't block a sale. McGowan at 62, 119.

> FN125. Tr. at 55-57.

Since six Empress directors and almost 80% of the equity favored the second extension, there is no reason to believe that the outcome of the July 15, 1999 meeting would have been different if McGowan had attended and expressed his opposition. Still, McGowan contends otherwise. He argues that his presence would have prevented the director defendants from discussing their Empress Financial plans and that he could have changed the course of the discussions of the second extension. The director defendants, however, easily could have discussed their Empress Financial plans elsewhere. McGowan's argument that he could have changed the course of the discussions, while doctrinally acceptable, ignores the fact that the individuals making the decision for the board were the same individuals that voted to approve the transaction as stockholders. Furthermore, McGowan had prior knowledge of the meeting, although not procedurally proper notice, and presented no reason why he could not have attended telephonically. [FN126] Perhaps most importantly, the Empress board ratified the decision at meetings on September 2 and October 25, 1999. The propriety of those meetings is not contested. [FN127] Thus, Defendants' *1038 motion for summary judgment on the bad faith claims challenging the second extension will be granted.

> FN126. McGowan Aff. ¶ 8. Nor is there any evidence that McGowan requested that the meeting time be changed to better suit his convenience. In that regard, the Court finds unpersuasive McGowan's reliance on an instance a year or so earlier when Ferro refused a request he made to reschedule a meeting to justify his failure even to request a rescheduling of the July 15, 1999 meeting. To the contrary, it is reasonable to infer from the evidence presented that McGowan, after speaking to McEnery on July 14, assumed that McEnery would vote against

the second extension. If that had occurred, McGowan's presence would not have been necessary to defeat the proposed extension.

> FN127. "Where board authorization of corporate action that falls within the board's *de jure* authority is defective, the defect in authority can be cured retroactively by board ratification." *Kalageorgi v. Victor Kamkin, Inc.,* 750 A.2d 531, 539 ( Del.Ch.1999).

### C. Count V--Diversion of Corporate Opportunities

**17** [17] McGowan claims that the director defendants diverted corporate opportunities of Empress. The elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation. [FN128]

> FN128. *Broz v. Cellular Info. Sys., Inc.,* 673 A.2d 148, 154-55 (Del.1996).

Although the Complaint alludes to several unspecified diversions of corporate opportunities, [FN129] it specifically alleges only two: (1) the *consideration* of the acquisition of the Flamingo Hilton, a casino in Kansas City; and (2) the funneling of "close to $1 million of Empress['s] funds to Empress Financial under the guise of 'management fees'." [FN130] Plaintiff's opening brief asserts that the director defendants also *considered* other Empress opportunities that they "desired to take for themselves." [FN131] These included consideration of the chance to invest in a Las Vegas casino, a Las Vegas gaming equipment refurbishing business and a Colorado casino. [FN132] McGowan does not allege, however, that any of those opportunities, in fact, were ever taken.

> FN129. Compl. ¶ 80.

> FN130. Compl. ¶¶ 120-123, 124; Tr. at 8-9.

> FN131. POB at 19.

> FN132. Ferro at 120-26; Ex. 2.

[18] The director defendants, on behalf of Empress,

859 A.2d 1012
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

Page 22

did consider an acquisition of the Flamingo Hilton, but decided to discontinue the efforts to acquire that property at a September 2, 1999 board meeting. [FN133] KC Entertainment LLC made a bid for the Flamingo Hilton on January 7, 2000 with funding to be provided in part by Empress Financial. [FN134] The pursuit of this opportunity was not successful. [FN135] It does not, therefore, give rise to a claim for misappropriation of corporate opportunity. [FN136]

FN133. PX 85.

FN134. PX 51.

FN135. Compl. ¶ 87. In addition, Ferro testified that any opportunity pursued by Empress Financial, which previously had been brought to Empress, would have been offered back to all Empress shareholders including McGowan. *See* Ferro at 222-23.

FN136. *Broz, 673 A.2d at 157* ("[T]he corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."). Similarly, because McGowan presented no evidence that Empress Financial ever actually invested in the Las Vegas casino, Las Vegas gaming equipment refurbishing business or Colorado casino referred to in his opening brief, none of those opportunities can support a claim for diversion by Defendants here. *See id.* Furthermore, McGowan's reply brief indicates that he is not really pursuing a direct claim of diversion of corporate opportunity as to any of these so called "gaming opportunities." Instead, McGowan argues that Defendants mere consideration of them evidences bad faith to such a degree that it warrants the equitable relief of awarding McGowan his 18.76% share of the more than $200 allegedly lost due to the approval of the second extension. *See* PAB 63 n. 45. To say this argument is farfetched is an understatement.

**\*1039** [19] Moreover, once the Empress board had rejected a corporate opportunity such as the Flamingo Hilton, its fiduciaries generally could pursue that opportunity in their own interest. [FN137] Although

McGowan argues that the board's decision to reject the Flamingo Hilton opportunity was tainted by the director defendants' future interests in Empress Financial, he does not challenge that rejection. Instead, McGowan challenges Empress Financial's indirect pursuit of this opportunity after Empress's rejection. By then, the director defendants were free to pursue the transaction in their own interests. As this Court has observed:

> FN137. *See Broz, 673 A.2d at 159* (finding that a fiduciary was "entitled to proceed in his own economic interest in the absence of any countervailing duty"); *Telxon Corp. v. Meyerson,* 802 A.2d 257, 263 (Del.2002).

[I]t is the right of the majority in a corporation to practically desert the corporate venture by selling out its assets and, thereby, in the case of a highly profitable concern, deprive their associates of the opportunity to reap gains in the future by continuing in the business, provided the terms and conditions of the sale are fair to the corporation. [FN138]

> FN138. *Allaun v. Consol. Oil Co.,* 147 A. 257, 260 (Del.Ch.1929).

McGowan received almost $80 million from the Horseshoe transaction, the same amount per share as the director defendants received. He had the ability to use that money to pursue opportunities on his own. The fact that McGowan's former business associates did not invite him to participate in their future business endeavors is of no consequence.

**\*\*18** Hence, the Court will grant Defendants' motion for summary judgment on McGowan's claim for diversion as to the gaming opportunities.

[20] The management agreements totaling close to $1 million are more problematic. In Count V of the Complaint, McGowan alleges that the director defendants diverted a corporate opportunity by "funnel[ing] close to $1 million of Empress['s] funds to Empress Financial under the guise of 'management fees.' " [FN139] More specifically, McGowan contends that Defendants used the management agreements to transfer funds from the Empress business remaining after the merger (the racetracks of Empress Mississippi and Empress Kansas and the escrow or liquidating trust) to Empress Financial. [FN140]

FN139. Compl. ¶ 124.

859 A.2d 1012                                                                    Page 23
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
(Cite as: 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.))

FN140. POB at 17.

These alleged actions of the director defendants arguably could satisfy the elements of misappropriation of corporate opportunity. Empress was a holding company for Empress Mississippi and Empress Kansas, among other businesses. Management of those companies could be said to be within Empress's line of business. The evidence is sufficient to support an inference that Empress had an interest or expectancy in that opportunity and had the financial ability to exploit it, either directly or through the liquidating trust. Lastly, McGowan has presented sufficient evidence to create a genuine issue of material fact as to the above elements, as well as whether the director defendants took the opportunity presented by the management agreements for their own, through Empress Financial, and thereby placed themselves in a position inimical to their fiduciary duties. [FN141] Thus, *1040 the Court will deny Defendants' motion for summary judgment on McGowan's claim for diversion based on the management agreements.

> FN141. McGowan did not move for summary judgment as to liability on this claim. Defendants contend that this is more properly a claim of waste. DOB at 63 n. 36. However the claim is characterized, it cannot be resolved on summary judgment on the record before the Court.

## D. Count VIII--Breach of the Stockholders' Agreement

McGowan alleges that the Stockholders Agreement and the covenant of good faith and fair dealing inherent in it obligated the director defendants to acknowledge (1) McGowan as a director for life of Empress and any successor entity, and (2) McGowan's continuing 18.76% ownership interest in Empress or any successor entity. McGowan claims that the director defendants breached the Stockholders Agreement, the covenant of good faith and fair dealing and their fiduciary duty of loyalty by depriving McGowan of his right to a continuing directorship and his 18.76% equity interest in Empress and its attendant business opportunities. Defendants argue that the Stockholders Agreement does not apply to successors of Empress, and that even if it did, Empress Financial is not a successor of Empress.

Despite McGowan's invocation of the "duty of loyalty," [FN142] Count VIII is a contract claim.

Section 3.4 of the Stockholders Agreement specifies McGowan's rights pertinent to this claim. [FN143] Section 3.4, by its terms, does not apply to successors of Empress. McGowan admits as much (PAB at 63), but argues that the covenant of good faith and fair dealing protects the "spirit" of the agreement and that this is a "rare" case in which issues of compelling fairness demand that Defendants be found liable for breaching that covenant. [FN144]

> FN142. Compl. ¶ 138.

> FN143. *Id.* Ex. H, p. 6.

> FN144. PAB at 63-64, citing *Chamison v. HealthTrust, Inc.,* 735 A.2d 912, 920-21 (Del.Ch.1999), *aff'd,* 748 A.2d 407 (Del.2000).

**19** [21] Plaintiff is grasping at straws. Even if section 3.4 did apply to successor entities, it applies only "so long as [the director] holds any shares." Upon the dissolution of Empress in December 1999, any rights that McGowan may have possessed expired. [FN145] Furthermore, it is clear from McGowan's brief that the alleged "issues of compelling fairness" underlying Count VIII stem from the sale of Empress Joliet and Empress Hammond for a supposedly inadequate price. The Court already has rejected that premise. Summary judgment therefore will be entered in favor of Defendants on Count VIII.

> FN145. In exchange for those rights, McGowan received nearly $80 million and continued equity in Empress's remaining assets through the liquidating trust.

## E. Count X--Conversion

McGowan claims that the director defendants knowingly and wrongfully converted his 18.76% equity interest in Empress and his purported right to be a director of Empress or any successor entity to their own use.

[22][23][24] Conversion is the "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." [FN146] To prove conversion of an equity interest in an entity, a claimant must show cancellation or transfer of the shares in question in a statutorily invalid acquisition. [FN147] McGowan's shares in Empress were never converted. Rather, McGowan received substantial consideration for his shares in the Horseshoe *1041 transaction and his equity interest in Empress was

cancelled as a part of its orderly dissolution through the liquidating trust. Following the Horseshoe transaction, the remaining assets of Empress were liquidated in accordance with 8 Del. C. § 275. As discussed above, McGowan had no right to a continuing directorship in Empress Financial pursuant to the Stockholders Agreement.

> FN146. _Arnold v. Soc'y for Savings Bancorp, Inc.,_ 678 A.2d 533, 536 (Del.1996) (quoting _Drug, Inc. v. Hunt,_ 168 A. 87, 93 (Del.1933)).

> FN147. _Id._ at 536.

Thus, because there was no wrongful act of dominion over McGowan's shares and the Stockholders Agreement did not give McGowan any right to an interest in Empress Financial, his conversion claim fails as a matter of law. Accordingly, the Court will grant Defendants' motion for summary judgment as to Count X.

### F. Aiding and Abetting Claims Against Canfora—Counts II, IV, VI, IX and XI

McGowan claims that Canfora knowingly participated in the director defendants' alleged breaches and other misconduct. Specifically, McGowan claims that Canfora knowingly participated in the director defendants' breach of their fiduciary duty of loyalty by approving the second extension (Count II), [FN148] bad faith and intentional misconduct in connection with the approval of the second extension (Count IV), diversion of corporate opportunities of Empress (Count VI), breach of the Stockholders Agreement and covenant of good faith and fair dealing and the fiduciary duty of loyalty in connection with the formation of Empress Financial (Count IX), and conversion of McGowan's equity interest in Empress and his right to be a director of Empress or any successor entity (Count XI).

> FN148. In Count VII, McGowan alleges that Horseshoe also aided and abetted the director defendants' breach of fiduciary duty. Former Vice Chancellor Jacobs dismissed this claim on January 11, 2002. _McGowan v. Ferro,_ 2002 WL 77712 (Del.Ch. Jan.11, 2002). Since McGowan reasserts the claim "for the sole purpose of preserving Count VII for appeal" (Com pl. ¶ ¶ 130-36 & n. 9), there is no need to address it further.

[25] To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead four elements: (i) the existence of a fiduciary relationship; (ii) a breach of that relationship; (iii) knowing participation in the breach by a defendant who is not a fiduciary; and (iv) damages proximately caused by the breach. [FN149] Because the underlying claims challenging the second extension and Empress Financial fail as a matter of law for the reasons stated above, the aiding and abetting claims likewise fail. Therefore, Counts II, IV, and IX will be dismissed.

> FN149. _Malpiede v. Townson,_ 780 A.2d 1075, 1097 (Del.2001); _Crescent/Mach I Partners, L.P. v. Turner,_ 846 A.2d 963, 989 (Del.Ch. 2000); _In re Lukens Inc. S'holders Litig.,_ 757 A.2d 720, 734 (Del.Ch.1999) (citing _Gilbert v. El Paso Co.,_ 490 A.2d 1050, 1057 (Del.Ch.1984), _aff'd,_ 575 A.2d 1131 (Del.1990)).

**20 In Count VI, McGowan claims that Canfora knowingly participated in the director defendants' diversion of corporate opportunities of Empress for the benefit of Empress Financial. Because the underlying corporate opportunity claim as to the Flamingo Hilton is deficient as a matter of law, the aiding and abetting claim is likewise deficient and will be dismissed. The claim for aiding and abetting the diversion of the management agreements survives Defendants' motion for summary judgment for the same reasons as the underlying claims against the director defendants.

As discussed above, the Court has concluded that McGowan has failed to make out a claim for breach of contract or the covenant of good faith and fair dealing or for conversion. Consequently, the Court *1042 also will grant summary judgment for Defendants on the related claims against Canfora for aiding and abetting (Counts IX and XI).

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART as follows. The Court will GRANT summary judgment in favor of Defendants on Counts I, II, III, IV, VII, VIII, IX, X, and XI of McGowan's Complaint. Defendants' motion for summary judgment is GRANTED as to Counts V and VI with respect to the gaming opportunities, but DENIED with respect to the management agreements.

859 A.2d 1012                                                                                              Page 25
859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)
**(Cite as: 859 A.2d 1012,  2004 WL 2423570 (Del.Ch.))**

 IT IS SO ORDERED.

 859 A.2d 1012, 2004 WL 2423570 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

291 B.R. 592                                                                                                    Page 1
291 B.R. 592, 2003 WL 1053531 (D.Del.)
**(Cite as: 291 B.R. 592, 2003 WL 1053531 (D.Del.))**

▷

**Motions, Pleadings and Filings**


United States District Court,
D. Delaware.
PHP LIQUIDATING, LLC, Plaintiff,
v.
Charles H. ROBBINS, et al., Defendants.
**No. CIV.A.01-236-JJF.**

March 7, 2003.

Liquidator of Chapter 11 debtor's assets, as assignee of debtor-in-possession's and unsecured creditors' claims, brought action against former shareholders whose stock had been redeemed by debtor. On former shareholders' motion to dismiss, the District Court, Farnan, J., held that: (1) debtor-in-possession could not avoid redemptions completed through stockbroker; (2) creditors could not recover from shareholders, absent evidence redemptions were obtained in bad faith; (3) alleged violation of redemption statute was general claim, assertable only by trustee or debtor-in-possession; and (4) redemption was not avoidable as fraudulent transfer.

Motions granted.

West Headnotes

**[1] Bankruptcy** ⟜2701
51k2701 Most Cited Cases
Chapter 11 trustee or debtor-in-possession may not avoid debtor's prepetition redemption of securities, even if redemption violated state law prohibiting corporation from purchasing its own shares when its capital is impaired, if transaction was completed through stockbroker. Bankr.Code, 11 U.S.C.A. § § 544(b), 546(e); 8 Del.C. § 160(a).

**[2] Corporations** ⟜547(4)
101k547(4) Most Cited Cases
Under Delaware law, unsecured creditors of corporation had no right to recover corporate funds paid to shareholders whose shares had been redeemed in violation of statute prohibiting corporation from purchasing its own shares when its capital was impaired, absent evidence that shareholders had redeemed stock in bad faith. 8 Del.C. § § 124,

160(a), 174(a).

**[3] Bankruptcy** ⟜2154.1
51k2154.1 Most Cited Cases
Only trustee or debtor-in-possession has standing to pursue general claims held by debtor's creditors. Bankr.Code, 11 U.S.C.A. § 544(b).

**[4] Bankruptcy** ⟜2154.1
51k2154.1 Most Cited Cases
Claim for violation of Delaware statute prohibiting corporation from purchasing its own shares when its capital is impaired was general claim which only trustee or debtor-in-possession had standing to bring. Bankr.Code, 11 U.S.C.A. § 544(b); 8 Del.C. § 160(a).

**[5] Bankruptcy** ⟜2650(2)
51k2650(2) Most Cited Cases

**[5] Corporations** ⟜545(1)
101k545(1) Most Cited Cases
Chapter 11 debtor's prepetition redemption of shareholder's stock was not avoidable as fraudulent transfer, under either federal or Delaware law, absent showing that corporation received less than reasonably equivalent value for redeemed stock; redemption price was less than share price at close of trading on day of redemption. Bankr.Code, 11 U.S.C.A. § 548; 6 Del.C. § 1301 et seq.

**[6] Bankruptcy** ⟜2724
51k2724 Most Cited Cases
Chapter 11 debtor's prepetition redemption of shareholder's stock was not avoidable as fraudulent transfer, under either federal or Delaware law, even if corporation was insolvent at time of redemption, absent allegation that debtor redeemed shares with actual intent to defraud its creditors, or that debtor did not receive reasonably equivalent value in transaction. Bankr.Code, 11 U.S.C.A. § 548; 6 Del.C. § 1301 et seq.

*593 Neal J. Levitsky, Agostini, Levitsky, Isaacs & Kulesza, Wilmington, Delaware. Of Counsel: Gerald H. Gline and Warren A. Usatine, Cole, Schotz, Meisel, Forman & Leonard, P.A., Hackensack, New Jersey, for PHP Liquidating, LLC.

William P. Bowden, Gregory A. Taylor, Ashby & Geddes, Wilmington, Delaware. Of Counsel: William M. Goldman and Elizabeth Storch, Sidley,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 B.R. 592                                                                                      Page 2
291 B.R. 592, 2003 WL 1053531 (D.Del.)
**(Cite as: 291 B.R. 592, 2003 WL 1053531 (D.Del.))**

Austin, Brown & Wood, LLP, New York City,
Merrill Lynch, Pierce, Fenner & Smith Incorporated.

David S. Eagle, Klehr, Harrison, Harvey, Branzburg
& Ellers, LLP, Wilmington, Delaware. Of Counsel:
Raniero D'Aversa, Jr., Claudius O. Sokenu, Mayer,
Brown, Rowe & Maw, New York City, for
Defendants Q Funding, L.P. and R 2 Investments,
LDC.

Jeffrey C. Wisler, Karen C. Bifferato, Connolly,
Bove, Lodge & Hutz, LLP, Wilmington, Delaware,
for Michael B. Sirkin, Janice Phoenix, Edward F.
McGehrin, Frances R. McGehrin, and The McGehrin
Family Trust.

John G. Harris, Reed Smith, LLP, Wilmington,
Delaware, for Elara Ltd.

William A. Hazeltine, Potter, Anderson & Corroon,
LLP, Wilmington, Delaware. Of Counsel: Ronald L.
Cohen, Mark D. Kotwick, Seward & Kissel, LLP,
New York City, for Lakeshore International Ltd.

N. Jane Dubovy, Law Offices of N. Jane Dubovy,
Pacific Palisades, California, for Harry Mehterian,
Jolana Mehterian, and The Mehterian Family Living
Trust.

Dawn E. Mulholland, pro se of Executive Nurse
Home Care, Inc., Port Washington, New York,
Representing Defendant Executive Nurses Home
Care, Inc.

Thomas J. Allingham, II, Anthony W. Clark, Darryl
A. Parson, Skadden, Arps, Slate, Meagher & Flom,
LLP, Wilmington, Delaware., for Charles H.
Robbins.

Stuart M. Brown, Buchanan Ingersoll, PC,
Wilmington, Delaware. Of Counsel: *594 James T.
Markus, Donald J. Quigley, Block Markus Williams,
LLC, Denver, Colorado, for ProFutures Special
Equities Fund, L.P. and ProFutures Fund
Management, Inc.

### *MEMORANDUM OPINION*

FARNAN, District Judge.

**\*\*1** Currently before the Court are the Motion of
Charles H. Robbins to Dismiss the Amended
Complaint (D.I.43) and the Motion by Defendants
ProFutures Special Equities Fund, L.P. and the Motion by Defendants
ProFutures Fund Management, Inc. ("ProFutures")

[FN1] to Dismiss the Amended Complaint (D.I.38).
For the reasons discussed below, the Court will grant
both motions.

> FN1.    Although    ProFutures    Fund
> Management, Inc. did not redeem PHP
> Corporation stock, it is allegedly liable to
> PHP LLC because it is the general partner of
> ProFutures Special Equities Fund, L.P.

### FACTS

In November 1998, PHP Healthcare Corporation
("PHP Corporation") filed a voluntary petition for
relief under Chapter 11 of the Bankruptcy Code in
the United States Bankruptcy Court for the District of
Delaware.    Subsequently, PHP Liquidating LLC
("PHP LLC") was created pursuant to the Second
Amended Joint Plan of Liquidation for PHP
Corporation ("the Plan"), which was confirmed by
the Bankruptcy Court in October 1999.    PHP LLC
was established to liquidate assets of PHP
Corporation in furtherance of the Plan and for the
sole benefit of PHP LLC's members, who were the
creditors of PHP Corporation.    PHP LLC is not the
same entity as PHP Corporation but, with exceptions
not relevant here, is the assignee of all rights, titles,
and interests in and to all causes of action of PHP
Corporation.    Additionally, PHP LLC possesses the
express power to investigate, institute, compromise,
dismiss, or pursue in litigation any and all such
claims of PHP Corporation.    Pursuant to the Plan,
creditors were also given the option to assign and
transfer to PHP LLC their claims and causes of
action.    One hundred nineteen creditors assigned their
claims against Defendants to PHP LLC.

Defendant Charles H. Robbins ("Robbins") was the
founder and a director of PHP Corporation from 1976
until January 31, 1997.    On April 30, 1998, Robbins;
his wife, Ellen E. Robbins;    and his children,
Caroline H. Robbins and Lee S. Robbins
(collectively, the "Robbins Family"), entered into a
Stock Repurchase Agreement with PHP Corporation,
pursuant to which PHP Corporation repurchased 1
million shares of PHP common stock for $16.75 per
share.    On April 30, 1998, the price per share of PHP
Common Stock closed at $17.56 on the New York
Stock Exchange ("NYSE").

ProFutures is an investment fund that purchased
1,000 shares of PHP Corporation's preferred stock on
December 19, 1997.    PHP Corporation redeemed the
preferred stock owned by Profutures on June 4, 1998,
by way of a wire transfer to a bank account
maintained by Dain Raucher, Inc., a stockbroker.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In Count One of its Amended Complaint, PHP LLC contends that PHP Corporation redeemed stock owned by Robbins and ProFutures (collectively, "Defendants") when PHP Corporation had no surplus capital, in violation of Section 160(a)(1) of the Delaware General Corporation Law ("DGCL"), and thus, PHP LLC seeks to recover the proceeds of these allegedly illegal stock redemption transactions.

*595 In Count Two of its Amended Complaint, PHP LLC contends that the redemption transactions between PHP Corporation and Defendants were fraudulent transfers of property under federal and state law and thus are recoverable by PHP LLC.

### LEGAL STANDARD

**2 The instant motions to dismiss are brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which is made applicable here by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm*, 835 F.2d at 1011; *see also Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Jordan*, 20 F.3d at 1261.

### DISCUSSION
### I. Count One: Violation of Section 160 of the DGCL

As to Count One of the Amended Complaint, Defendants present three arguments in support of dismissal: (1) PHP LLC's claim is barred by Section 546(e) of Title 11 of the United States Code (the "Bankruptcy Code"); (2) PHP LLC's Amended Complaint does not identify any Delaware statute [FN2] or controlling precedent creating a state avoidance action that allows creditors to avoid the stock repurchase and force the disgorgement of settlement payments that were paid to shareholders, who, in good faith, engaged in a securities transaction

through a stockbroker; and (3) assuming that such an avoidance action existed, PHP LLC does not have standing in its capacity as an assignee of creditors to assert any such claim because the creditors did not have standing to commence avoidance actions.

> FN2. Robbins contends that a choice of law clause in the Stock Repurchase Agreement dictates that it is governed by the laws of Virginia, and thus, as to Robbins, all of PHP LLC's claims based on Delaware law must fail. However, the Court assumes, without deciding, that Delaware law applies. The end result of either analysis is the same-- dismissal.

In response, PHP LLC contends that Delaware law allows creditors to recover the purchase price from former stockholders where the purchase violated Section 160 of the DGCL. Additionally, PHP LLC contends that because it asserts its Section 160 claims as the direct assignee of unsecured creditors, and not as a trustee or successor to a debtor-in-possession, PHP LLC's claims are not barred by Section 546(e) of the Bankruptcy Code.

Section 160 of the DGCL, which prohibits a corporation from purchasing its own shares when its capital is impaired, provides:
    Every corporation may purchase, redeem, receive, take or otherwise acquire ... its own shares; provided, however, that no corporation shall ... [p]urchase or redeem its own shares of capital stock for cash or other property when the *596 capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation....
8 *Del. C.* § 160(a)(2002). Based on the facts presented in PHP LLC's Amended Complaint, which the Court accepts as true, PHP Corporation violated Section 160 when it purchased Defendants' shares while its capital was impaired. The issue presented is whether PHP LLC has a cause of action against Defendants for PHP Corporation's violation of Section 160.

### A. Does Section 546(e) of the Bankruptcy Code Bar PHP LLC's Cause of Action?

**3 [1] Section 544(b) of the Bankruptcy Code, which addresses a trustee's or a debtor-in-possession's avoidance powers, provides:
    [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law

by a creditor holding an unsecured claim....

11 U.S.C. § 544(b)(2002). Under Section 544(b), a trustee or debtor-in-possession is empowered to bring an avoidance action for a debtor's violation of Section 160 of the DGCL.

However, Section 546(e) of the Bankruptcy Code, which bars certain avoidance actions, provides: "the trustee may not avoid a transfer that is a ... settlement payment ... made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case...." 11 U.S.C. § 546(e)(2002). The Bankruptcy Code defines a settlement payment as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade...." 11 U.S.C. § 741(8)(2002). Additionally, the Court of Appeals for the Third Circuit has stated that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *In re Resorts Intern., Inc.,* 181 F.3d 505, 515 (3d Cir.1999). In sum, even where the debtor redeemed securities in violation of Section 160 of the DGCL, a trustee or debtor-in-possession may not use its Section 544(b) avoidance powers if the transaction was completed through a stockbroker.

In the instant case, the Court concludes, based on the broad definition set forth in *Resorts Intern,* that the stock redemptions at issue were settlement payments, and PHP LLC concedes that Defendants' sales of PHP Corporation stock were cleared through stockbrokers. (D.I. 44 at 7). Thus, the Court concludes that if the avoidance action were brought by a trustee or a debtor-in-possession (or the successor to a debtor-in-possession), the avoidance action would be barred by Section 546(e) of the Bankruptcy Code. However, in this case, PHP LLC has not asserted its claims against Movants in the capacity of a trustee or as a successor-in-interest to a trustee or debtor-in-possession. Rather, PHP LLC is bringing the instant claims as a direct assignee of the unsecured creditors. As such, Section 546(e) is not a bar to PHP LLC's claims. However, that is not the end of the inquiry. The Court must examine whether these creditors have a remedy under Delaware law such that their rights to bring an action can be assigned to PHP LLC.

**B. Do Creditors Have a Remedy Under Delaware Law for Violations of Section 160 of the DGCL?**

[2] Defendants contend that no statutory authority exists under Delaware law *597 for a creditor, or the assignee of a creditor, to recover from a shareholder for a violation of Section 160 and that no controlling case law recognizes a creditor's right to recover from a shareholder for a violation of Section 160. PHP LLC contends that because a stock purchase which violates Section 160 is void, the Court should imply a remedy against former stockholders for the purchase price.

**4 Section 160 prohibits a Delaware corporation from purchasing its own stock when its capital is impaired but is silent as to a remedy for such a violation. Three other code sections of the DGCL provide possible remedies for violations of Section 160, but the Court concludes that none of the three are applicable here.

*1. Section 124 of the DGCL*

Section 124 of the DGCL limits the application of the *ultra vires* doctrine in Delaware and provides:

> *No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer,* but such lack of capacity or power may be asserted:
> (1) In a proceeding by a stockholder against the corporation ....;
> (2) In a proceeding by the corporation, whether acting directly or through a receiver, trustee or other legal representative, or through stockholders in a representative suit, against an incumbent or former officer or director of the corporation, for loss or damage due to such incumbent or former officer's or director's unauthorized act;
> (3) In a proceeding by the Attorney General....

8 *Del. C.* § 124 (2002) (emphasis added). Section 124 specifically states that a corporation's lack of capacity or power to engage in a transaction shall not invalidate the transaction unless one of the three delineated exceptions applies. In the instant case, PHP Corporation redeemed stock when, pursuant to Section 160, it lacked the authority to do so. However, Section 124 explicitly disallows PHP LLC from using PHP Corporation's violation of Section 160 to invalidate the redemption transactions. Thus, PHP LLC cannot obtain relief from Defendants based on PHP Corporations violation of Section 160. Moreover, the exceptions set forth in Section 124 are inapplicable to the case at bar by their plain language.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This is not a proceeding brought by a stockholder against the corporation as allowed by Section 124(1). Additionally, this is not a proceeding against an incumbent or former officer or director of the corporation as allowed by Section 124(2). Finally, this is not a proceeding by the Attorney General as allowed by Section 124(3). Thus, the Court concludes that Section 124 of the DGCL does not provide PHP LLC with a remedy for violations of Section 160.

### 2. Section 174 of the DGCL

Section 174(a), the second code section that addresses violations of Section 160, provides:

In case of any wilful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after ... such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, ... to the full amount unlawfully paid for the purchase or redemption of the corporation's stock....

**\*5** 8 Del. C. § 174(a)(2002). This statute provides a remedy against directors, not stockholders, for violations of Section 160.

**\*598** In *The Delaware Law of Corporations and Business Organizations,* [FN3] the authors state that "[t]here is no statute imposing liability on stockholders who receive unlawful dividends." Similarly, there is also no statute imposing liability on stockholders who receive payments for unlawful stock redemptions. Nonetheless, Section 174(c) of the DGCL grants directors found liable for unlawful stock redemptions the right "to be subrogated to the rights of the corporation against stockholders who received ... assets for the sale or redemption of their stock with knowledge of facts indicating that such ... redemption was unlawful ...." 8 Del. C. § 174(c)(2002). "This suggests that the shareholder will be liable for any amount received by him but only if he had notice that the dividend was unlawful." *The Delaware Law of Corporations and Business Organizations, supra,* § 5.32. Stated another way, shareholder liability requires bad faith. Thus, stockholders who redeem their stock in good faith are not liable to the corporation.

> FN3. 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.32 (3d Ed.2002)

In the instant case, Defendants sold their stock through stockbrokers and there are no allegations that Defendants were aware that PHP Corporation's capital was impaired. Thus, the Court concludes that Defendants redeemed their stock in good faith. Accordingly, the Court concludes that Section 174 of the DGCL does not provide PHP LLC with a cause of action against Defendants. [FN4]

> FN4. The Delaware Fraudulent Transfer Act ("DFTA"), 6 Del. C. § 1301 et seq. (2002), also provides a remedy for violations of Section 160; however, PHP LLC concedes that the DFTA is inapplicable to Count One of the Amended Complaint. *See* D.I. 44 at 2.

### 3. Implied Remedy for Section 160 Violations

PHP LLC cites *In re Kettle Fried Chicken of America, Inc.,* 513 F.2d 807, 812-13 (6th Cir.1975) in support of its argument that the Court should imply a remedy against former stockholders for PHP Corporation's violation of Section 160. In *Kettle Fried Chicken,* the court implied a cause of action against former stockholders under Section 160 of the DGCL. In the instant case, the Court concludes that the reasoning of *Kettle Fried Chicken,* which is not binding on this Court, is unpersuasive and is contrary to Delaware's statutory scheme. As discussed above, Delaware's statutory scheme specifically lists the circumstances in which a Section 160 cause of action can be asserted and to imply an additional cause of action in these circumstances would undermine the established statutory scheme. Moreover, the Court finds that the circumstances of the instant case are distinguishable from those in *Kettle Fried Chicken.* In *Kettle Fried Chicken,* the bankruptcy trustee brought the action. In the instant case, PHP LLC, standing in the shoes of PHP Corporation's third-party creditors, is the party seeking disgorgement of funds received by former shareholders. Thus, the Court concludes that Delaware law does not give individual creditors an implied remedy against shareholders for a corporation's violation of Section 160.

### C. Does PHP LLC Have Standing?

**\*\*6** In the alternative, even if Delaware law provided a remedy for Section 160 violations in these circumstances, Defendants contend that PHP LLC does not have standing to assert any such claim in its capacity as assignee of individual creditors **\*599** because the individual creditors did not have

standing that they could assign to PHP LLC. Defendants present two arguments in support of their contention that the individual creditors and PHP LLC, as the creditors' assignee, do not have standing to assert this action.

First, Defendants contend that the Bankruptcy Code and supporting case law make it clear that only trustees and debtors-in-possession have standing to bring a general claim such as the violation of Section 160 at issue here. In response, PHP LLC, relying on *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), contends that creditors do have standing to maintain an action for a violation of Section 160.

[3] Section 544(b) of the Bankruptcy Code grants only trustees or debtors-in-possession standing to pursue general claims held by the debtor's creditors. *See* 11 U.S.C. § 544(b)(2002); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir.1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action...."); *In re Sunshine Precious Metals, Inc.*, 157 B.R. 159, 163 (Bankr.D.Idaho 1993) ("A creditor of a debtor does not have standing to assert an action against a third party if the creditor has only suffered a general injury...."). Whether an action accrues to a creditor individually, such that a creditor has standing, or generally, such that a trustee has standing, requires the court to look "to the injury for which relief is sought and consider whether it is peculiar and personal to the [creditor] or general and common to the ... creditors." *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). "A cause of action is 'personal' if the claimant [or creditor] himself is harmed and no other claimant or creditor has an interest in the cause." *Id.* at 1348. A cause of action is general if the injury is common to all creditors. *Id.* at 1349.

[4] In the case of claims brought under Section 160, the Court finds the purpose of the statute to be instructive in determining whether Section 160 claims are general or personal. The purpose of Section 160 is to protect a corporation's creditors. *Askanase v. Fatjo*, 130 F.3d 657, 675 (5th Cir.1997) ("The purpose of the [Section 160 of the DGCL] is to protect creditors."); *In re Reliable Mfg. Corp.*, 703 F.2d 996, 1001 (7th Cir.1983) ("The

prohibition against a corporation's acquiring its own stock when to do so would impair its capital is intended to protect creditors.") (citing *Propp v. Sadacca*, 175 A.2d 33, 38 (Del.Ch.1961), *aff'd in part and rev'd in part*, 187 A.2d 405 (Del.1962)). Because Section 160 protects all creditors rather than just one individual creditor, the Court concludes that violations of Section 160 are general claims that accrue to all creditors, and therefore, PHP LLC, as an assignee of individual creditors, lacks standing under Section 544(b) of the Bankruptcy Code to bring the instant action.

**7 The Court also concludes that PHP LLC's reliance on *Caplin* is misplaced. *Caplin* 's facts are inapposite to those at issue here because *Caplin* involved personal claims rather than general claims. Further, the issue in *Caplin* focused on whether the trustee could bring such claims. That inquiry is not the issue in this case, as the trustee is not the party bringing the claims.

Defendants' second argument that the individual creditors and PHP LLC, as the *600 creditors' assignee, do not have standing to assert the instant action is based on the language of the Plan. Under the terms of the Plan, Defendants contend that creditors have no standing to assign Section 160 claims because such claims were transferred as a matter of law from PHP Corporation as debtor-in-possession to its successor, PHP LLC. In response, PHP LLC contends that the creditors assigned their claims to PHP LLC under an express provision of the Plan.

As discussed above, claims for violations of Section 160 are general claims that are held, in bankruptcy, by a trustee or a debtor-in-possession. Exhibit 1.1.24 of the Plan provides that among that which is "assigned to the Liquidating LLC by operation of the Plan" are

> *any claims,* causes of action, demands or obligations arising or existing in favor of the Debtor, Debtor in Possession, or its bankruptcy estate under sections 544, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code, and any similar statutes under applicable nonbankruptcy law, *including, without limitation, claims under Section 160 of the Delaware General Corporate Law....*

(D.I.44, Ex. A) (emphasis added). Based on the above language, the Court concludes that the Section 160 claims, which were claims held by PHP Corporation as a debtor-in-possession during its Chapter 11 proceedings, were transferred from PHP Corporation as debtor-in-possession to PHP LLC and therefore could not be assigned by individual

creditors because the individual creditors never possessed the claims.

PHP LLC contends that the creditors assigned their claims to PHP LLC pursuant to Section 3.2.4.6 of the Plan, which, in relevant part, provides:

*Optional Assignment of Claims:* Each holder of an Allowed Unsecured Claim shall have the option of assigning and transferring to the Liquidating LLC any and all claims for money due or owing to such holder from, any and all causes of action of whatever kind or nature that such holder has or may have against ... any former or current preferred or common shareholders of the Debtor ... for any loss, injury or damages sustained by such holder, whether arising under applicable bankruptcy or non-bankruptcy law....

(D.I. 44, Ex. A at 16). Section 3.2.4.6 allows creditors to assign claims to PHP LLC; however, the creditor must first have a claim to assign. As discussed above, the individual creditors did not possess claims for violations of Section 160, because the claim are general claims which could only be brought by PHP Corporation as debtor-in-possession. Therefore, because the creditors did not have standing to bring claims under Section 160, the creditors could not assign them pursuant to Section 3.2.4.6. Accordingly, the Court concludes that PHP LLC, in its capacity as assignee of individual creditors, does not have standing to assert claims for violations of Section 160 of the DGCL.

## II. Count Two: Fraudulent Transfer of Property

### A. Defendant Robbins

**\*\*8 [5]** Robbins contends that Count Two of PHP LLC's Amended Complaint is facially deficient in that it does not allege sufficient facts to state a fraudulent transfer claim. Robbins contends that to properly allege a claim for fraudulent transfer under federal and state law, PHP LLC must allege that PHP Corporation received less than reasonably equivalent value for the challenged transfer *and* that PHP Corporation was insolvent on the date such obligation was incurred or rendered **\*601** insolvent by the transfer. [FN5] Robbins contends that PHP LLC's Amended Complaint does not allege that PHP Corporation received less than reasonably equivalent value for the challenged transfer. Robbins further contends that PHP Corporation received more than equivalent value for the transfer because, on the day of the stock redemption transaction, PHP Corporation's NYSE price was higher than the price PHP Corporation paid Robbins for his shares.

FN5. Robbins presents SEC filings of PHP Corporation to demonstrate that PHP Corporation was solvent at the time the Stock Repurchase Agreement was executed; however, for purposes of this Motion, the Court will assume that the allegation that PHP Corporation was insolvent at the relevant time is true.

In response, PHP LLC contends that it has stated a valid fraudulent transfer claim. PHP LLC also contends that Robbins' arguments go to the merits of the fraudulent transfer claim and thus are inappropriate at this stage of the proceedings.

In relevant part, the fraudulent transfer provisions of the Bankruptcy Code provide:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... if the debtor voluntarily or involuntarily--

(A) made such transfer ... with actual intent to hinder, delay, or defraud ...; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

11 U.S.C. § 548 (2002). [FN6] The provisions of the Delaware Fraudulent Transfer Act ("DFTA"), 6 Del. C. § 1301 et seq. (2002), are substantially the same as those in the Bankruptcy Code. *Compare* 11 U.S.C. § 548 (2002) *with* 6 Del. C. § § 1302-1306 (2002).

FN6. Robbins' Opening Brief (D.I. 43 at 16) does not discuss the actual fraud prong of the fraudulent transfer statute. In fact, in footnote twelve, Robbins quotes 11 U.S.C. § 548 with subsection (a)(1)(A), pertaining to fraud, deleted and does not indicate the omission by using the generally accepted convention of inserting an ellipsis. PHP LLC's Response Brief (D.I.56) also does not discuss the actual fraud prong of the fraudulent transfer statute. Moreover, PHP LLC's Amended Complaint does not allege that PHP Corporation redeemed Robbins' stock with the actual intent to defraud. For these reasons, and because Federal Rule of Civil Procedure 9(b) requires averments of fraud to be plead with particularity, the Court will not further address 11 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

548(a)(1)(A).

In the instant case, to properly plead a fraudulent transfer claim, PHP LLC would have had to allege that when PHP Corporation redeemed Robbins' stock, PHP Corporation received less than a reasonably equivalent value for the stock and that PHP Corporation was insolvent or was made insolvent by the redemption transaction. In Count Two of the Amended Complaint, PHP LLC does not allege that PHP Corporation received less than a reasonably equivalent value for the redeemed stock. (D.I. 29 at 7-8). Thus, the Court concludes that Count Two of PHP LLC's Amended Complaint is facially deficient. Additionally, the Court finds that PHP Corporation received reasonably equivalent value for the transfer because, on the day of the stock redemption transaction, PHP Corporation's NYSE price was higher than the price PHP Corporation paid for Robbins' shares. On April 30, 1998, PHP Corporation repurchased 1 million shares of PHP common stock for **602 $16.75 per share from Robbins. (D.I.43, Ex. A). Pursuant to Federal Rule of Evidence 201, [FN7] the Court takes judicial notice that, on April 30, 1998, the price per share of PHP Common Stock closed at $17.56 on the NYSE. (D.I.43, Ex. C). Based on the above, the Court concludes that PHP LLC cannot prove any set of facts showing that PHP Corporation did not receive reasonably equivalent value in the stock redemption transaction. Accordingly, the Court concludes PHP LLC has not stated a claim for which relief can be granted in Count Two of the Amended Compliant.

> FN7. Pursuant to Federal Rule of Evidence 201, a "[c]ourt is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered." *In re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1299 (D.Del.1992). Specifically, published stock prices fall within the category of information that can be judicially noticed. *Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594, 598 (3d Cir.2000).

**B. Defendant ProFutures**

**9 [6] ProFutures contends that Count Two of PHP LLC's Amended Complaint is facially deficient because it does not allege sufficient facts to state a fraudulent transfer claim. Specifically, ProFutures contends that PHP LLC's Amended Complaint does not allege that PHP Corporation redeemed the shares owned by ProFutures with the actual intent to defraud

PHP Corporation's creditors and does not allege that PHP Corporation did not receive reasonably equivalent value from ProFutures in the redemption transaction. ProFutures also contends that it meets the good faith exception to the fraudulent transfer statutes. *See* 11 U.S.C. § 548 (2002); 6 Del. C. § 1308 (2002).

In response, PHP LLC contends it has stated a valid fraudulent transfer claim in its Amended Complaint. PHP LLC also contends that ProFutures' attempt to raise the affirmative defense of good faith is inappropriate at this stage of the proceeding.

In Count Two of its Amended Complaint, PHP LLC alleges that PHP Corporation's redemption of ProFutures' stock was a fraudulent transfer of property because PHP Corporation was insolvent at the time or made insolvent by the transaction. (D.I. 29 at 7). However, it takes more than allegations of insolvency to properly plead a cause of action under the relevant fraudulent transfer statutes.

After reviewing Count Two of PHP LLC's Amended Complaint, the Court concludes that PHP LLC has not alleged that PHP Corporation redeemed the shares owned by ProFutures with the actual intent to defraud PHP Corporation's creditors. In addition, PHP LLC has not alleged that PHP Corporation did not receive reasonably equivalent value from ProFutures in the redemption transaction. Because of these omissions, and because Federal Rule of Civil Procedure 9(b) requires averments of fraud to be plead with particularity, the Court concludes that Count Two of PHP LLC's Amended Complaint fails to state a claim upon which relief can be granted.

### CONCLUSION
For the reasons discussed, Defendants' Motions to Dismiss will be granted.

291 B.R. 592, 2003 WL 1053531 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00236 (Docket) (Apr. 02, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.