6

Westlaw.

Not Reported in A.2d                                                Page 1
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Peter TAFEEN, Plaintiff,
v.
HOMESTORE, INC., a Delaware corporation,
Defendant.
**No. CIVA. 023-N.**

Submitted Feb. 6, 2004.
Decided March 16, 2004.
Revised March 22, 2004.

<u>William M. Lafferty</u> and <u>Charles D. Reed</u>, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, <u>Marc A. Fenster</u>, of Russ, August & Kabat, Los Angeles, California, for Plaintiff, of counsel.

<u>William D. Johnston</u> and <u>Sara Beth A. Reyburn</u>, of Young Conaway Stargatt & Taylor, Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

<u>CHANDLER</u>, J.

*1 This is yet another case seeking advancement or indemnification of legal expenses, in this instance brought by a former officer of a Delaware company who is a defendant in multiple legal proceedings. What is unusual about this advancement case is the company's novel defense: it contends (among many other things) that the former officer is not entitled to advancement because he has offered a hollow, worthless promise to repay if he is ultimately found not to be entitled to indemnification. The defense is novel because it reminds one of a sinner who suddenly finds religion-the conversion is breathtaking. Content to adopt advancement and indemnification bylaws drafted with holes large enough to drive a truck through, [FN1] the defendant company (like so many others in this Court of late) suddenly "finds religion"-insisting on a rigorous interpretation of its loosely written bylaws. Despite the irony in this conversion, there are sufficient factual disputes surrounding the company's unclean hands defense in this case to warrant development of

a more complete record. Accordingly, this case should proceed to trial as soon as possible in order to resolve disputed facts regarding the former officer's ability to repay advanced expenses.

> FN1. I recognize the incentives that would cause directors and senior officers to favor indemnification by laws that are capacious in their scope of coverage. Care must be taken, however, that those incentives do not interfere with the obligation to ensure that advancement and indemnification bylaws are written in a manner that is fundamentally fair to the company and its stockholders.

I. INTRODUCTION

Plaintiff Peter Tafeen is a former officer of defendant Homestore, Inc. He seeks advancement of expenses in connection with various civil litigations in which he has been named as a defendant, including an ongoing investigation by the United States Securities and Exchange Commission and an ongoing investigation by the United States Department of Justice (collectively, the "Proceedings"). Tafeen relies upon <u>8 Del. C. § 145</u> [FN2] and § § 6.1 (the "Indemnification Bylaw") and 6.2 (the "Advancement Bylaw") of Homestore's bylaws. Homestore raised a number of defenses in its answer and seeks summary judgment in its favor based on the first nine of these defenses. Tafeen seeks partial summary judgment on liability. This Opinion concludes that outstanding questions of fact regarding Homestore's unclean hands defense prevent the grant of summary judgment at this time.

> FN2. Section 145(k) of the DGCL grants this Court "exclusive jurisdiction to hear and determine all actions for advancement of expenses ... brought under this section or under any bylaw." This Court is further authorized to make determinations regarding advancement in a summary fashion. *Id.*

II. FACTUAL AND PROCEDURAL
BACKGROUND
*A. Company Background and its Bylaws*

Homestore is a Delaware corporation engaged in providing online media and technology to the real estate industry. Tafeen was employed by Homestore from September 22, 1997 through November 30,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001, first as Vice President of Business Development and later as later as Executive Vice President of Business Development, Ads and Sales.

Pursuant to § 145 of the DGCL, [FN3] Homestore's bylaws, at the time that Tafeen's employment with Homestore ended, contained the following indemnification and advancement provisions:

> FN3. Section 145, like most of the DGCL an enabling law, authorizes corporations to provide indemnification for and advancement of expenses arising from certain legal proceedings. *See* 8 *Del. C.* § 145(a-b), (e).

Section 6.1: Indemnification of Officers and Directors. Each person who was or is made a party to, or is threatened to be made a party to, or is involved in any action, suit, or proceeding, whether civil, criminal, administrative or investigative (the "Proceeding"), by reason of the fact that such person ... is or was a director or officer of the Corporation ... shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law, against all expenses, liability and loss ... reasonably incurred or suffered by such person in connection therewith, provided such person acted in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or Proceeding, had no reasonable cause to believe the person's conduct was unlawful. Such indemnification shall continue as to a person who has ceased to be a director or officer....

**\*2** Section 6.2: Advance of Expenses. The Corporation shall pay all expenses (including attorneys' fees) incurred by such a director or officer in defending any such Proceeding as they are incurred in advance of its final disposition; provided, however, that if the Delaware General Corporation Law then so requires, the payment of such expenses incurred by such a director or officer in advance of the final disposition of such Proceeding shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it should be determined ultimately that such director or officer is not entitled to be indemnified under this Article VI or otherwise; and provided, further, that the Corporation shall not be required to advance any expense to a person against whom the Corporation directly brings a

claim, in a Proceeding, alleging that such person has breached such person's duty of loyalty to the Corporation, committed an act or omission not in good faith or that involves intentional misconduct or a knowing violation of law, or derived an improper personal benefit from a transaction.

*B. The Proceedings*

On December 21, 2001, Homestore announced that its audit committee was conducting an inquiry into potential improprieties in its accounting practices and financial statements. That investigation revealed that Homestore had overstated its revenues by $41.4 million for the 2000 fiscal year, [FN4] and by $119 million for the first three quarters of the 2001 fiscal year. [FN5]

> FN4. Aff. of Michael R. Douglas (Dec. 8, 2003) ("Douglas Aff."), Ex. A (presenting a Newswire report on Homestore's restatement of earnings).

> FN5. Douglas Aff. Ex. B (same).

While the audit committee was conducting its investigation, the United States Securities and Exchange Commission and the United States Department of Justice both announced that they had commenced investigations into Homestore's prior accounting practices and financial reporting. Specifically, the Department of Justice is investigating Tafeen to determine whether he engaged in any criminal conduct as an officer of Homestore. Tafeen is seeking advancement for expenses in connection with both of these investigations. He also seeks advancement for expenses in connection with 10 civil actions.

All 10 civil actions name Tafeen as defendant. Of the 10 civil actions, 6 are brought by insurers seeking rescission of director and officer liability insurance policies based on alleged misrepresentations in the applications for insurance and in warranty letters. [FN6] Of the remaining 4 civil actions, one is a class action suit alleging violations of federal securities laws; [FN7] one is a suit filed by an individual investor not in the class of persons engaged in the class action suit alleging violations of federal securities laws, intentional and negligent misrepresentation, and other state law violations; [FN8] one is a suit arising from the acquisition of another company by Homestore, in which part of the consideration given by Homestore was Homestore stock, alleging securities fraud, common law fraud,

negligent misrepresentation, breach of contract and unjust enrichment; [FN9] and one is a derivative action alleging violations of fiduciary duty as well as other California state law claims. [FN10]

> FN6. *Royal Indem. Co. v. Homestore, Inc.* (C.D. Cal. filed Nov. 15, 2002); *Clarendon Nat'l Ins. Co. v. Homestore, Inc.,* No. 02-08521 (C.D. Cal. filed Nov. 6, 2002); *Genesis Ins. Co. v. Homestore, Inc.,* No. 02-7738 ER (VBK) (C.D. Cal. filed Oct. 3, 2002); *Fed. Ins. Co. v. Homestore, Inc.,* No. 02-7304 (C.D. Cal. filed Sept. 18, 2002); *TIG Ins. Co. of Mich. v. Homestore, Inc.,* No. BC290823 (Cal.Super. Ct. filed Feb. 21, 2003); *Lubermens Mut. Cas. Co. v. Homestore, Inc.,* No. LC062502 (Cal.Super. Ct. filed Oct. 8, 2002).

> FN7. *In re Homestore.com, Inc. Sec. Litig.,* No. 01-CV-11115 MJP (C.D. Cal. filed Nov. 15, 2002).

> FN8. *Pyfrom v. Homestore.com, Inc.,* No. 03-0042-FMC (C.D. Cal. filed Sept. 11, 2003).

> FN9. *Siegel v. Homestore, Inc.,* No. 02-8275 (E.D.P.A. filed Nov. 1, 2002).

> FN10. *In re Homestore.com, Inc. Derivative Litig.,* No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002).

*C. The Parties' Actions Regarding Advancement*

**\*3** In early 2002, Tafeen requested advancement of legal fees and costs incurred in defending the then-in-progress proceedings. At that time, Homestore notified Tafeen that it would reimburse him only for expenses accrued through February 2002 related to the audit committee's investigation. Homestore proceeded to reimburse Tafeen for those limited expenses.

On April 30, 2002, Homestore sent a letter (the "April 30 Letter") to Tafeen advising him that it would advance expenses in connection with the SEC investigation and then-pending civil litigation in which Tafeen had been named as a defendant. [FN11] According to the letter, however, Homestore's advancing of the expenses was conditioned upon Tafeen's delivery of " 'an undertaking ... to repay all amounts so advanced if it should be determined that [Tafeen is] not entitled to

be indemnified under' Article VI of the Bylaws." [FN12] A form of undertaking was enclosed with the letter.

> FN11. Douglas Aff. Ex. E.

> FN12. *Id.*

At issue is whether a memorandum, dated April 30, 2002 (the "April 30 Memo"), was sent with the April 30 Letter. [FN13] The memorandum contains a bullet point list of restrictions and requirements connected with advancement. [FN14] The requirements and restrictions in the April 30 Memo include, among other things, that Tafeen must execute an undertaking pursuant to Homestore's bylaws; that Tafeen's counsel must provide Homestore with the names and rates of all attorneys and paralegals to whom advancement would be paid, and receive Homestore's consent to those individuals and their rates; that Tafeen's counsel could not undertake any major research projects without prior consent by Homestore; that Homestore would not pay in excess of $1,000 per month for online research; and that only one attorney could attend any meeting, witness interview, deposition or other proceeding unless agreed to in advance by Homestore. [FN15]

> FN13. *Compare* Pl.'s Opening Br. in Supp. of his Mot. for Summ. J. ("Pl.'s Op. Br."), at 5 n. 1 ("In that letter and an attached memorandum ...."), *with* Def.'s Combined Answering Br. and Opening Br. ("Def.'s Answering Br."), at 20 n. 7 ("The only enclosure to the April 30, 2002 letter ... was the form of undertaking offered to Tafeen.")

> FN14. Aff. of Charles D. Reed (Dec. 29, 2003) ("Reed Aff.") Ex. B.

> FN15. *Id.*

Tafeen did not tender the requested undertaking and Homestore did not advance any expenses to Tafeen. In July 2003, Tafeen's counsel again requested advancement in connection with the Proceedings (now including the Department of Justice investigation). In a July 11, 2003 letter, Tafeen's counsel wrote to Homestore's counsel demanding advancement yet again. Enclosed with this letter was a signed undertaking. [FN16]

> FN16. The undertaking stated, "I, Peter Tafeen, hereby agree to repay to Homestore any amounts advanced to me by Homestore

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

for which it should be determined ultimately that I am not entitled to be indemnified under Article VI of Homestore's Bylaws or otherwise." Douglas Aff. Ex. F.

### D. Judicial Proceedings

Having not received funds from Homestore, Tafeen filed a complaint in this Court on October 28, 2003 containing two counts: one for advancement and one for fees-on-fees. Homestore's answer, including eleven defenses, was filed on November 18, 2003. Both parties have moved for summary judgment on the issue of liability for advancement. This opinion addresses those motions.

### III. STANDARD OF REVIEW

Pursuant to Court of Chancery Rule 56, a motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." [FN17] The moving party has the burden of establishing that no genuine issue of material fact exists. [FN18] Any doubt as to the existence of such an issue will be resolved against the movant. [FN19] Importantly, at this stage in litigation, the only role for the Court is to determine whether a genuine issue of material fact exists; the Court cannot try the issue. [FN20]

> FN17. Ct. Ch. R. 56(c); *Scureman v. Judge, Del. Ch., 626 A.2d 5, 10 (1992), aff'd sub nom., Wilmington Trust Co. v. Judge, Del.Supr., 628 A.2d 85 (1993)* (mem.).

> FN18. *Nash v. Connell,* Del. Ch., 99 A.2d 242, 243 (1953).

> FN19. *Id.*

> FN20. *Banks v. Cristina Copper Mines, Inc., Del. Ch., 99 A.2d 504, 506 (1953).*

**\*4** Tafeen has moved for summary judgment as to entitlement to advancement only and Homestore's cross-motion is based on its defenses related to liability. [FN21] Since the Court does not determine Tafeen's entitlement to bring an advancement claim at this time, it does not address how expenses should be advanced.

> FN21. This is consistent with Court of Chancery Rule 56: "A summary judgment, interlocutory in character, may be rendered on the issues of liability alone although there

is a genuine issue as to the amount of damages, or some other matter." Ct. Ch. R. 56(c).

### IV. DISCUSSION

Homestore's briefs raise several defenses to advancement, and its motion seeks summary judgment as to the first nine of these defenses. These defenses are considered in three categories-those involving Tafeen's conduct in the Proceedings, those involving Tafeen's conduct in seeking advancement, and those not involving Tafeen's conduct at all.

### A. Defenses Involving Tafeen's Conduct in the Proceedings

The following defenses all seek court review of Tafeen's conduct in the Proceedings-that is, they seek court analysis of Tafeen's conduct *in the underlying actions.* Delaware courts have consistently declined to undertake such an analysis and no defense proffered by Homestore moves this Court to do otherwise.

### 1. "By Reason of the Fact"

Homestore alleges that Tafeen is not entitled to advancement because he is not a party to any of the Proceedings "by reason of the fact" that he was an officer of Homestore. Tafeen suggests that this is not a requirement of Homestore's Advancement Bylaw, and that in any event, he is a party to the Proceedings by reason of the fact that he was an officer of Homestore.

Even assuming, as Homestore's brief argues, that the Advancement Bylaw only requires advancement if the person seeking advancement was made party to a proceeding "by reason of the fact" that she was a director or officer of Homestore, an allegation (such as Homestore's) that the person who is seeking advancement is a party to the underlying proceeding because of her own personal greed is not a defense to an advancement provision containing such a requirement. [FN22] To hold otherwise, as this Court has previously noted, would serve to "vitiate the protections afforded by § 145 and contractual advancement rights." [FN23] In *Perconti v. Thornton Oil Corp.,* this Court provided the test for whether one is party to a proceeding "by reason of the fact" of her corporate position. In order for one to be deemed a party to a proceeding by reason of the fact of her corporate position, there must be a "causal connection or nexus between" the underlying proceeding and the "corporate function or 'official

[corporate] capacity." ' [FN24] Motivation of the party is not a factor in this test.

> FN22. *Reddy v. Elec. Data Sys. Corp.,* Del. Ch., C.A. No. 19467, Strine, V.C., 2002 Del. Ch. LEXIS 69, at *14-*21 (June 18, 2002), *aff'd,* Del.Supr., 820 A.2d 371 (2003) (mem.); *Perconti v. Thornton Oil Corp.,* Del. Ch., C.A. No. 18630, Noble, V.C., 2002 Del. Ch. LEXIS 51, at *12-* 21 (May 3, 2002).

> FN23. *Reddy,* 2002 Del. Ch. LEXIS 69, at *16.

> FN24. *Perconti,* 2002 Del. Ch. LEXIS 51, at *13 (citations omitted).

This is entirely consistent throughout our caselaw. In *Reddy v. Electronic Data Systems Corp.,* for example, criminal proceedings were brought against a former employee of the defendant. The allegation against the former employee was that he purposely manipulated the financial records of the defendant in order to increase funds he would receive under incentive provisions in his compensation agreement. The former employee then sought advancement of his expenses in a § 145 proceeding under the company's bylaws (which covered former employees). In *Reddy,* similar to this case, the defendant argued that the former employee was not entitled to advancement because he was not a party to the underlying criminal action "by reason of the fact" that he was an "employee" of the defendant. [FN25] The defendant ground his allegation in the idea that the former employee's motivation for his actions in the underlying proceeding was personal greed. This Court rejected that argument, stating:

> FN25. In *Reddy,* the company's bylaws did not explicitly contain a "by reason of the fact" provision, but incorporated such a requirement by reference to § 145. *See* 8 Del. C. § 145(a), (b).

*5 The problem with EDS's argument is that it has no logical stopping point. It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty, and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks.... Therefore, it is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the suing parties. [FN26]

> FN26. *Reddy,* 2002 Del. Ch. LEXIS 69, at *15-*16. This is not to say that the "by reason of the fact" requirement is illusory. As the Court noted in *Weaver v. ZeniMax Media, Inc.,* Del. Ch., C.A. No. 20439, Noble, V.C., 2004 Del. Ch. LEXIS 10, at *10-*11 (Jan. 30, 2004) (quoting Cochran v. Stifel Fin. Corp., Del. Ch., C.A. No. 17350, Strine, V.C., 2000 Del. Ch. LEXIS 179, at *19-*20 (Dec. 13, 2000), *aff'd in part, rev'd in part, remanded in part,* Del. Supr ., 809 A.2d 555 (2002)), "claims brought by a corporation against an officer for excessive compensation paid or breaches of a non-competition agreement are 'quintessential examples of a dispute between an employer ... and an employee' and are not brought 'by reason of the fact' of the director's position with the corporation."

This echoes the same policy noted in *Perconti.* And it is true here as well. To entertain Homestore's argument would be to transform advancement provisions into invitations to a trial on the merits of the underlying litigation.

Here, Tafeen is a party to the Proceedings because of his alleged role in a scheme to inflate Homestore's financial results while serving as an officer of Homestore. Because all the Proceedings are connected with Tafeen's role in this scheme in his capacity as a Homestore officer, they are within the scope of coverage of the Advancement Bylaw and Homestore's motion for summary judgment as to this defense is denied as a matter of law.

### 2. *The Contract Argument*

Homestore next states that Tafeen's "underlying misconduct effectively served to fraudulently induce the corporation to enter into the officer employment relationship and, in that context, to extend contractual advancement rights to the officer employee." [FN27] Because Tafeen fraudulently induced Homestore to enter into an employment contract with him, the argument goes, the entitlements provided by the Advancement Bylaw, which are only extended to Tafeen because of his position as an executive officer, should not be provided to him.

> FN27. Reply Br. of Def. Homestore, Inc. in Supp. of its Mot. for Summ. J. ("Def.'s Reply Br."), at 14.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

While this may be a proper basis for a fraud-in-the-inducement action against Tafeen, the argument does not serve as a defense here. The Advancement Bylaw is not dependent upon Tafeen's employment contract. This action is to determine Tafeen's entitlement to advancement under Homestore's *governing* rules. Whether or not Homestore was fraudulently induced to enter into the *employment contract* with Tafeen is a peripheral issue. For the same policy reasons discussed in *Reddy*, the Court's analysis in a § 145(k) action extends only to entitlement according to advancement provisions; it does not extend to peripheral issues regarding the moving party's alleged conduct in the underlying action, even if ultimate entitlement to advanced fees may in some fashion be connected with those issues. Homestore's motion for summary judgment as to this defense is denied as a matter of law.

### 3. *The Estoppel Argument*

While still discussing Tafeen's fraudulent conduct, Homestore writes, "Tafeen thus already has profited, substantially, from his own wrongdoing. It cannot be appropriate to afford Tafeen advancement protection otherwise potentially available under Homestore's Bylaws when he never intended to act properly as a corporate officer in the first place." [FN28] This form of estoppel argument is essentially the same as Homestore's official capacity argument. Homestore simply substitutes "acted in a fraudulent manner" for "not party to the Proceeding by reason of the fact that." Both arguments are premised on the notion that Tafeen was motivated by personal greed. And, as discussed, this form of defense against advancement was considered and rejected in both *Reddy* and *Perconti*. Homestore's motion for summary judgment as to this defense is denied as a matter of law.

FN28. Def.'s Answering Br. at 21.

### 4. *Indemnification Standard and its Relation to Advancement Claims*

**\*6** Contrary to long-established Delaware law, Homestore argues that Tafeen should not receive advancement because, due to his alleged actions in the Proceedings, he ultimately will not be entitled to indemnification. "The rights to indemnification and advancement are .... correlative but nonetheless independent and discrete entitlements." [FN29] Delaware courts historically have held that a right to advancement is independent from an ultimate right to indemnification, even if repayment of advanced

expenses may ultimately turn on a right to indemnification. [FN30] This reflects the salutary purpose of section 145(e) of the DGCL-to allow corporations to pay interim costs in litigation subject to a final disposition as to whether indemnification is justified. I see no reason to, and Homestore has provided no argument why, this longstanding principle should be revisited. [FN31] Summary judgment as to this defense is denied as a matter of law.

> FN29. Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 8-2.

> FN30. *See Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818, 822 (1992) (holding an advancement right not dependent on a right to indemnity); *Bergonzi v. Rite Aid Corp.,* Del. Ch., C.A. No. 20453, Chandler, C., 2003 Del. Ch. LEXIS 117, at \*7 (Oct. 20, 2003) ("Advancement is a right that the Supreme Court has recognized as distinct from the right to indemnification."); *Lipson v. Supercuts, Inc.,* Del. Ch., C.A. No. 15074, Jacobs, V.C ., 1996 Del. Ch. LEXIS 108, at \*5 (Sept. 10, 1996) (noting that entitlement to indemnification is not relevant to an advancement action).

> FN31. Homestore attempts to distinguish cases cited by Tafeen by noting that those cases, including *Bergonzi,* 2003 Del. Ch. LEXIS 117, and *Lipson,* 1996 Del. Ch. LEXIS 108, dealt with documents explicitly stating that the person seeking advancement need not satisfy the "good faith" standard in order to make an advancement claim. Although the companies in each of these cases do not have the same bylaws, the principle behind the authorization of these bylaws-to allow corporations to pay interim costs in litigation subject to a final disposition of indemnification-is what drives the independence of the advancement and indemnification inquiries.

### B. *Defenses Involving Tafeen's Conduct in Seeking Advancement*

Although the previous defenses considered would have required an analysis of Tafeen's conduct in the *Proceedings,* the following defenses require an examination into Tafeen's conduct in *making his*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 7
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

*advancement request.* That is, the following defenses, as opposed to the earlier ones, *assume Tafeen's contractual entitlement to advancement.* They do not require the Court to look at the nature of the pleading in the Proceedings. Rather, these defenses allege that due to Tafeen's conduct in seeking funds, he should not be permitted to *claim his entitlement* in a court of equity. [FN32] Specifically, the following defenses are based on the allegation that "Tafeen purchased an expensive home in Florida, a state that has extremely protective 'homestead' provisions against creditor claims," in order to shelter assets, thus avoiding repayment should Tafeen's claims ultimately be found to be nonindemnifiable. [FN33]

> FN32. Although Homestore's defenses are couched in terms of equity, and will be addressed as such here, they may quite readily be conceptualized as contractual defenses. That is, assuming Tafeen is contractually entitled to advancement, Tafeen nonetheless breached the implied covenant of good faith and fair dealing, *see Burton v. PFPC Worldwide, Inc.,* Del. Ch., C.A. No. 20380, Chandler, C., 2003 Del. Ch. LEXIS 110, at *18-*20 (Oct. 20, 2003) (discussing this implied covenant), by engaging in a bad faith sheltering of assets.

> FN33. Tafeen has raised questions as to whether Homestore's bylaws require an undertaking to repay. *See Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co. LLC,* C.A. No. 20116, Lamb, V.C. (Mem.Op. Mar. 10, 2004) (refusing to imply an undertaking requirement in the Limited Liability Company Act, *6 Del. C. § 18-108,* or in an LLC's operating agreement). Regardless of such an undertaking requirement, both sides agree that under *§ 145(e),* there is a general obligation to repay should Tafeen's claims ultimately be found to be nonindemnifiable. *See, e.g., Reddy,* 2002 Del. Ch. LEXIS 69, at *14 ("[B]y accepting payments expressly termed an 'advancement,' Reddy necessarily acknowledges that his ultimate right to keep those payments depends on whether his underlying conduct is indemnifiable.")

### 1. Unclean Hands

Homestore argues that because Tafeen sheltered assets before seeking advancement, he has acted in bad faith. He thus, according to Homestore, comes to

this Court with unclean hands and should be prohibited from receiving advancement.

The equitable doctrine of unclean hands bars litigants who have acted inequitably from seeking what might otherwise be available relief. This Court uses the doctrine to protect the integrity of itself and those who come before it. [FN34] Homestore's unclean hands argument is unique in that it is based not in Tafeen's conduct related to the underlying claims, as previous unclean hands arguments have been based, but in his conduct in making the advancement claim itself. [FN35]

> FN34. *See generally Nakahara v. NS 1991 Am. Trust,* Del. Ch., 718 A.2d 518, 522-24 (1998) (tracing the history of the doctrine of unclean hands).

> FN35. Homestore's argument is thus distinct from the argument considered and rejected in *Reddy* 2002 Del. Ch. LEXIS 69, at *14-*21. In that case, the unclean hands argument was based on the plaintiff's actions that formed the basis of the underlying proceeding. *Id.* at *28-*29.
> Further, in a February 10, 2004 letter to the Court, counsel to Tafeen argued that an unclean hands defense, similar to the one made by Homestore, was made by the defense in *Bergonzi.* In their answer to the complaint, the defense in *Bergonzi* stated "Bergonzi's claims are barred by the doctrines of laches and unclean hands." Answer to Compl. and Countercl. at ¶ 40, *Bergonzi,* 2003 Del. Ch. LEXIS 117. Further, counsel in *Bergonzi* raised as a defense that "[t]he payment of the expenses for which Bergonzi seeks advancement in these proceedings would not comport with equity *because Bergonzi is financially unable to meet his obligation to repay any sums so advanced upon the determination that he is not entitled to indemnification." Id.* at ¶ 38 (emphasis added). These arguments were two separate defenses. It is unclear upon what basis the nonspecific unclean hands defense was made. The separate financial inability to repay defense is *not* the same as the unclean hands defense made here and, in any event, was not considered in the Court's opinion. Mere speculation as to an inability to repay is not the basis for the defense proffered by Homestore. Rather, it is the *taking of an*

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

*action* that would insulate Tafeen from an obligation to repay that forms the basis of Homestore's unclean hands defense.

Whether Tafeen did indeed intentionally engage in a sheltering of assets, which would increase the difficulty of reimbursement should his advancement claims be found nonindemnifiable, is a question of fact to be determined at trial. [FN36] What is for the Court to determine at this stage is whether, should such facts be true, those facts would be sufficient to invoke the doctrine of unclean hands. The Court concludes they would.

> FN36. Tafeen's counsel argues that Tafeen purchased his home in June 2001, almost a year before Homestore requested an undertaking. *See* Pl.'s Combined Reply Br. in Supp. of his Mot. for Partial Summ. J. and Answering Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Reply Br."), at 21. At oral argument, however, questions arose as to whether Tafeen purchased this home with the specter of the upcoming Homestore investigation in mind. Thus, there remains a question of fact as to whether this home purchase was made with sheltering of assets and protection from creditors in mind.

*7 In *Nakahara v. NS 1991 American Trust*, plaintiffs in an advancement action were entitled to advancement under the terms of a declaration of trust. [FN37] Because the plaintiffs violated a standstill agreement and an Isle of Man Court's instructions, the Court denied the plaintiff's request for advancement. [FN38] The Court stated "[a] court of equity will not use its equitable powers to condone such activity." [FN39] Similarly here, the Court will not use its equitable powers to grant advancement to Tafeen if it is shown that Tafeen did indeed engage in a sheltering of assets with the intent to increase the difficulty of a potential reimbursement.

> FN37. *Nakahara v. NS 1991 Am. Trust,* Del. Ch., 739 A.2d 770, 794 (1998).

> FN38. *Id.*

> FN39. *Id.*

The Court acknowledges the strong Delaware policy of encouraging able persons to become directors and officers that is embodied in section 145(e). [FN40] Since section 145(e) represents this strong public policy, the policy underlying the doctrine of unclean

hands must be balanced against the statute. [FN41] Where, as here, the allegations underlying the unclean hands defense involve conduct that, if true, would undermine the spirit of the statute, the balance is clearly in favor of not rewarding the alleged inequitable conduct.

> FN40. *See VonFeldt v. Stifel Fin. Corp.,* Del.Supr., 714 A.2d 79, 84 (1998) ("We have long recognized that Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits ...; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity."); *Fasciana v. Elec. Data Sys. Corp.,* Del. Ch., 829 A.2d 178, 186 (2003) ("By enacting § 145, our General Assembly helped ensure that capable persons would be willing to serve as directors, officers, employees, and agents of Delaware corporations."); *see also In re Cent. Banking Sys., Inc.,* Del. Ch., C.A. No. 12497, Jacobs, V.C., 1993 WL 183692, at *3 (May 11, 1993) ("Mandatory advances, like indemnification, serve the salutary purpose of encouraging qualified persons to become or remain as directors of Delaware corporations, by assuring them, *ex ante,* that they may resist lawsuits that they consider meritless, free of the burden of financing (at least initially) their own legal defense.")

> FN41. *Nakahara,* 718 A.2d at 523 (noting that "[t]he greatest limitation on the doctrine is the widely accepted exception that since it is ultimately based on public policy, countervailing public policy which points in the direction of reaching the case on the merits can preclude its operation," but finding that the self-help plaintiffs took prior to a judicial advancement proceeding justified the use of the unclean hands doctrine).

The Delaware Supreme Court has characterized Section 145 as follows:
The invariant policy of Delaware legislation on indemnification is to "promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they

are vindicated." Beyond that, its larger purpose is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." [FN42]

> FN42. *Stifel Fin. Corp. v. Cochran,* Del.Supr., 809 A.2d 555, 561 (2002) (quoting Rodman Ward, Jr. et al., Folk on the Delaware General Corporation Law § 145 (2001)).

Allowing an unclean hands defense based on alleged affirmative actions taken to shelter assets does not undermine this public policy. Corporate officials ought to continue to be "secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." [FN43] They are simply now on notice that they will not be permitted to use *the statute itself* after taking improper actions at the expense of the corporation's stockholders.

> FN43. *Stifel Fin. Corp,* 809 A.2d at 561.

Further, contrary to suggestions by counsel to Tafeen, the recognition of such a defense will not serve to undermine the summary nature of advancement claims. This case presents questions of fact as to whether Tafeen has acted in a way to avoid a potential obligation to repay advanced funds. This Court has the ability to expedite cases and will do so in order to balance the salutary policy underlying section 145(e) against the need to protect corporations and their stockholders from the type of conduct alleged here.

*2. Laches*

Homestore argues that because Tafeen knew he had a potential advancement claim in early 2002 and waited until October 2003 to bring suit in this Court, the doctrine of laches bars Tafeen's claim. Laches, an equitable doctrine, bars a plaintiff from delaying unreasonably in bringing a claim to the detriment of the defendant. [FN44] Although there is no bright-line rule as to what constitutes laches, there are three generally accepted elements to this equitable doctrine: (1) plaintiff's knowledge that she has a basis for legal action; (2) plaintiff's unreasonable delay in bringing a lawsuit; and (3) identifiable prejudice suffered by the defendant as a result of the plaintiff's unreasonable delay. [FN45]

> FN44. *See Porach v. City of Newark,* Del. Ch., C.A. No. 16578, Lamb, V.C., 1999 Del. Ch. LEXIS 143, at *9-*10 (June 25, 1999) (" 'Laches is an equitable principle that operates to prevent the enforcement of a claim in equity where a plaintiff has delayed unreasonably in bringing suit to the detriment of the defendant or third parties." ') (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 11-5); *Kirby v. Kirby,* Del. Ch., C.A. No. 8604, Chandler, V.C., 1989 Del. Ch. LEXIS 133, at *12 (Sept. 26, 1989) ("The doctrine of laches bars suit where the plaintiff has unreasonably delayed in bringing his cause of action, and that delay has disadvantaged the defendant to the extent that it would be inequitable to allow suit to go forward.")

> FN45. *See Porach,* 1999 Del. Ch. LEXIS 143, at *10.

**\*8** Whether or not these three elements exist is generally determined by a fact-based inquiry, and therefore summary judgment is rarely granted on a laches defense. [FN46] Where, however, there is a "clear showing of the absence of a genuine issue of material fact upon the issue of laches," summary judgment will be granted by the Court. [FN47]

> FN46. *See Clark v. Packem Assoc.,* Del. Ch., C.A. No. 1326, Chandler, V.C., 1991 Del. Ch. LEXIS 34, at *20 (Mar. 6, 1991) ("The determination of the validity of the laches defense is one of fact, and is rarely granted on summary judgment.")

> FN47. *Church of Religious Sci. v. Fox,* Del.Supr., 266 A.2d 881, 884 (1970). Other cases where summary judgment has been granted on a laches defense include *Porach,* 1999 Del. Ch. LEXIS 143, and *Weller v. Am. Tel. & Tel. Co.,* Del. Ch., 290 A.2d 842 (1972). *See also Fasciana,* 829 A.2d at 163 n. 2 (rejecting a laches defense in an advancement case at the summary judgment phase).

In this case, it is undisputed that Tafeen knew of a potential advancement claim by early 2002. [FN48] Thus the first element of the laches is satisfied. Tafeen did not file a complaint in this Court until October of 2003. The briefings have raised sufficient questions

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

as to the second element, whether this delay was unreasonable, to prevent the Court from determining whether that element of laches is satisfied. Homestore has not, however, presented any evidence as to the third element of laches: causation of prejudice.

> FN48. Compl. ¶ 14 ("In early 2002, Mr. Tafeen, through his counsel, requested advancement of his legal fees and costs and indemnification for the Proceedings from the Company....")

Here, as in the unclean hands defense, the prejudice is rooted in alleged sheltering of assets by Tafeen. Specifically, Homestore argues prejudice is caused by a potential increase in the difficulty in obtaining repayment should Tafeen's claims ultimately be found to be nonindemnifiable. [FN49] The delay in filing suit, however, is not the *cause* of this prejudice; rather the cause of the prejudice is the sheltering of assets. It is entirely conceivable that Tafeen would have submitted either an undertaking and advancement request to Homestore, or come to this Court with a complaint for advancement, and then later engaged in the alleged sheltering of assets. Because the delay in filing the complaint is not the cause of the alleged prejudice, Homestore's motion for summary judgment as to the laches defense is denied as a matter of law.

> FN49. Homestore states, "Homestore believes that, if it is required to advance Tafeen's legal fees and expenses ... and it later is determined that Tafeen was not entitled to indemnification, Homestore will have little recourse against Tafeen if he refuses to repay the advanced funds." *Id.* at 13.

*C. Defenses Not Related to Tafeen's Conduct*

1. *The Direct Claim Carve Out*

The Advancement Bylaw states that Homestore is not required to provide advancement to a person if Homestore directly brought a claim against that person alleging she breached her duty of loyalty, derived an improper benefit from a transaction, committed an act or omission not in good faith, or engaged in an act involving intentional misconduct or a knowing violation of law. Homestore suggests that the stockholder's derivative action included among the Proceedings, *In re Homestore.com, Inc. Derivative Litigation,* [FN50] should be treated as an

action brought directly by the company, and thus within the carve out provision of the advancement bylaw. [FN51]

> FN50. No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002).

> FN51. It is unclear whether Homestore is arguing that a direct action brought by it would provide a defense to all advancement claims or only those made in connection with the direct action itself. Since I do not find *In re Homestore.com, Inc. Derivative Litigation* to be a direct action within the meaning of Homestore's bylaws, I do not reach this issue, although I find it highly unlikely that the broader interpretation of § 6.2 would be the more reasonable one were I to reach it.

Homestore essentially asks this Court to apply "logic, fairness, and public policy" to rewrite its bylaw carve out to apply to any derivative action which, if brought directly by the company, would turn on the same facts that underlie the derivative case. This bylaw, however, is unambiguous and the Court will not "interpret it or search for the parties' intent behind [it]." [FN52] Unambiguous bylaws are construed as they are written, and this Court gives "language which is clear, simple, and unambiguous the force and effect required." [FN53]

> FN52. *Hibbert v. Hollywood Park, Inc.,* Del.Supr., 457 A.2d 339, 343 (1983).

> FN53. *Id.*

*\*9 Homestore's advancement carve out applies only to actions brought directly, not derivatively. *In re Homestore.com, Inc. Derivative Litigation* is a case brought derivatively. [FN54] Defendant's motion for summary judgment as to the import of the carve out language is denied as a matter of law.

> FN54. *See* First Amended Consolidated Shareholder Derivative Complaint at ¶ 1, *In re Homestore.com, Inc. Derivative Litig.,* No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002), *in* Aff. of Marc A. Fenster (Nov. 18, 2003) ("Fenster Aff."), Ex. E ("This is a shareholder's derivative action brought for the benefit of nominal defendant Homestore.com, Inc....")

2. *The Sarbanes-Oxley Act and its Relation to DGCL*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

Page 11

*§ 145(e)*

The Sarbanes-Oxley Act of 2002 ("Sarbox"), [FN55] Congress's response to the turn-of-the-century corporate scandals, amends the Securities and Exchange Act of 1934 (the " '34 Act") [FN56] so as to prohibit personal loans to directors or executive officers. Specifically, Sarbox states:

> FN55. Pub.L. No. 107-204, 116 Stat. 745.

> FN56. 15 U.S.C. § 78m (2004).

It shall be unlawful for any issuer ... directly or indirectly, ... to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. [FN57]

> FN57. Pub.L. No. 107-204, § 402, 116 Stat. 787 (2002) (codified at 15 U.S.C. § 78m(k)(1) (2004)).

There has been much discussion as to what effect, if any, this provision of Sarbox ("Section 402") has on advancement to *current* directors and officers under section 145(e) of the DGCL. [FN58] This issue, however, is not ripe for discussion here.

> FN58. *See, e.g.,* Sarbanes-Oxley Act Interpretive Issues under § 402- Prohibition of Insider Loans (reporting a discussion, among 25 law firms, as to whether section 402 of Sarbox prohibits advancement to directors or officers).

Section 402 applies to directors, executive officers, or equivalents thereof. Homestore contends that because Section 402 does not limit its application to *current* directors and officers, it necessarily applies to *former* directors and officers. I disagree.

First, as a matter of statutory interpretation, Section 402 is clear and unambiguous. Under the "plain meaning rule," so long as the language of a statute is clear and unambiguous, there is "no need to 'interpret' the language." [FN59] And, as the United States Supreme Court has stated, "where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." [FN60] The words of the statute, moreover, are given their common meaning. [FN61] Here, the statute clearly states "director or executive officer," *not* "current or former director or officer ." Not only is this clear and unambiguous, it leads to a perfectly logical conclusion.

> FN59. *Church of Scientology v. United States Dep't of Justice,* 612 F.2d 417, 421 (9th Cir.1979) (citing *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492 (1947), and *Caminetti v. United States,* 242 U.S. 470, 490 (1917)).

> FN60. *United States v. Mo. Pac. R.R. Co.,* 278 U.S. 269, 277 (1929), *quoted in Church of Scientology,* 612 F.2d at 421.

> FN61. *Perconti,* 2002 Del. Ch. LEXIS 51, at *13.

Second, even if one were to interpret the language of Section 402, the legislative history indicates that the purpose of Section 402 is to prohibit loans to those in control of corporate decision making. [FN62] Once a director or officer steps down from her position, becoming a former director or officer, the ability to control corporate decision making is diminished considerably. Though not completely eliminated, Congress did not see former officers and directors as sufficient threats to specifically address in Sarbox. As Congress was presumably aware, any undue influence brought by former officers or directors on those currently holding a corporation's decision-making powers can be remedied by a breach of loyalty suit brought by aggrieved stockholders.

> FN62. *See, e.g.,* Staff of Senate Governmental Affairs Comm., 107th Cong., The Role of the Board of Directors in Enron's Collapse (Comm. Print 2002) (concluding that Enron's collapse was related to, among other things, fiduciary failure of Enron's board, inappropriate conflicts of interest, and excessive compensation, and recommending in response a prohibition on company-financed loans to directors and senior officers of the company); *House Fin. Servs. Comm. Hearing on Worldcom Accounting Errors (Panel I),* 107th Cong. (2002) (statement of Jim Leach, U.S. Representative) ("[W]ith corporate governance, moral clarity requires that CEOs of public corporations not put personal interests above shareholder values. To put it plainly, it is self-dealing for a corporate head to give himself a multi

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 12
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

hundred million-dollar loan, and it is a dereliction of duty for a board to go along.")

**\*10** Further instructive is Section 402 and its interaction with the '34 Act. Although Sarbox does not define director or executive officer, the interpretive rules of the '34 Act, which Section 402 amends, do define executive officer. Rule 3b-7 of the General Rules and Regulations promulgated under the '34 Act defines executive officer, [FN63] when used with reference to a registrant (which Homestore undoubtedly is under the '34 Act), as the registrant's "president, any vice president of the registrant in charge of a principal business unit, division, or function (such as sales, administration or finance), any other officer who *performs* a policy making function or any other person who *performs* similar policy making functions for the registrant." [FN64] Given the use of the present tense in this definition of executive officer, it is apparent that the term "executive officer," as employed in Section 402, does not include former executive officers.

> FN63. Tafeen is a former executive officer; he was never a director of Homestore.

> FN64. 17 CFR 240.3b-7 (2004) (emphasis added).

Since Section 402 applies only to current directors and executive officers, and Tafeen is a *former* executive officer, Section 402 has no application here. Homestore's motion for summary judgment as to this issue is denied as a matter of law. [FN65]

> FN65. The Court does not reach the issue of Sarbox's impact on section 145 of the DGCL as it pertains to *current* officers and directors.

3. *Undue Financial Hardship*

Homestore argues that by having to advance expenses to Tafeen, it would be placed "in a position of severe financial hardship." [FN66] The Court need not reach the factual questions presented by Homestore because this argument, without more, is not a legally cognizable defense to advancement.

> FN66. Def.'s Answering Br. at 34.

Homestore argues that it did not bargain for the credit risk posed in advancement. As discussed above, this is simply false. DGCL § 145(e) allowed for Homestore to lessen its credit risk simply by drafting its bylaws differently. By drafting its bylaws as it did, Homestore opened itself up to a large credit risk.

This Court has historically given great deference to informed decisions of a board of directors. Whether ultimately proven to be a fiscally advantageous or disadvantageous decision, this Court will not interfere with informed and loyal decisions of an independent board. [FN67] The same is to be said of the drafters of a company's bylaws. Homestore's bylaws may ultimately prove to be disadvantageous; indeed here they may " 'significantly lower Homestore's chances for future operations and related recovery." ' [FN68] But there is no case precedent, nor good reason, to interfere with the decision of the bylaw drafters simply because the bylaws might cause the company financial hardship. Indeed, to allow a financial hardship exemption, without more, would be to undermine the salutary purpose of allowing advancement. Advancement would be less of an inducement to becoming a director or officer of a company if the company could simply avoid its advancement obligation when times are difficult.

> FN67. Delaware courts presume that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). Absent abuse of discretion, a board's judgment is respected by Delaware courts. *Id.*

> FN68. Douglas Aff. ¶ 18 (quoting Letter from Michael J. Eggers to Hon. Dan Weinstein 2 (July 16, 2003), *at* Douglas Aff. Ex. G).

Homestore acknowledges this, conceding that " 'financial hardship' typically has not been a defense to advancement," but argues that "this is anything *but* the 'typical case,' and this court of equity has broad latitude in granting or denying relief." [FN69] While this Court is a court of equity, and is certainly sympathetic to facts that, if true, indicate Tafeen has engaged in serious misconduct, one of the fundamental maxims of equity is that equity aids the vigilant, not those who slumber on their rights. [FN70] I do not deviate from this maxim. Homestore had the right to lessen the credit risk posed by its advancement bylaw. It did not do so. [FN71]

> FN69. Def.'s Reply Br. at 10-11.

Not Reported in A.2d                                                                                          Page 13
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

FN70. *Grand Lodge of De., I.O.O.F. v. Odd Fellows Cemetery of Milford, Inc.,* Del. Ch., C.A. No. 1461-K, Noble, V.C., 2002 Del. Ch. LEXIS 136, at *25 n. 29 (Nov. 18, 2002), *aff'd,* Del.Supr., 2003 Del. LEXIS 540 (Oct. 28, 2003) (mem.); *Fike,* 754 A.2d at 262 (quoting *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148, 157 (1982)); *Fontana v. Julian,* Del. Ch., C.A. No. 5056 (1976), Hartnett, V.C., 1980 Del. Ch. LEXIS 500, at *4 (Jan. 2, 1980).

FN71. Section 145(e) sets forth the bare minimum requirements should a corporation elect to have an advancement provision. These minimum requirements are strikingly lax. As discussed, this reflects the General Assembly's embodiment of the strong policy of encouraging able persons to serve as directors.

The General Assembly, however, left to corporations themselves to determine the *proper balance* between seeking able persons to serve as directors and officers and safeguarding the expenses advanced by the company, and thus the corporation's stockholders. At one end, companies may choose to adopt no advancement provision, thus rejecting this policy embodiment altogether. At the other end, companies may, as Homestore did here, adopt the extremely lax safeguard of requiring only an unsecured undertaking, and possibly only requiring that undertaking from current officers and directors. *See In re Cent. Banking Systems, Inc.* 1993 WL 183692, at *3 (noting that no "provision of Delaware law requires that the undertaking be secured or be accomplished by a showing of the indemnitee's financial responsibility").

There is a considerable middle ground between these two extremes. Corporations may require secured undertakings, permissive advancement, board oversight of the litigation process, etc. Homestore's April 30 Memo itself illustrates a number of restrictions corporations may put in their advancement provision. By taking advantage of this ability, issues raised in cases such as this one, *Reddy, Bergonzi,* and *In re Central Banking Systems,* would likely not be litigated, saving corporations perhaps as much money as they expend litigating advancement cases. In the absence of taking

advantage of this ability, however, this Court will not permit corporations "to do retrospectively what [they could have] precluded [themselves] from doing *ex ante.*" *Id.* at *4.

It is unfortunate when a corporation's advancement provision exposes the corporation, and ultimately the stockholders, to the form of credit risk that Homestore's does. Simply by requiring a secured undertaking, for example, Homestore could presumably, given its confidence that Tafeen's conduct in the Proceedings will ultimately render his claims nonindemnifiable, have used the secured note as collateral on a loan to the company, pending the outcome of the Proceedings. Given the high incidence of advancement proceedings, directors should be mindful of their fiduciary duties to stockholders, and the possibility of stockholder action, when reviewing and adopting advancement and indemnification bylaws. In my view, the fact that § 145 is a broad, enabling statute does not confer license to adopt loosely written bylaws that impose excessive credit risks on a company and its stockholders.

**\*11** Further, Homestore's reliance on *Dunlap v. Sunbeam Corp.* [FN72] is misplaced. While declining to state that hardship would never be a factor in determining whether advancement should be denied, the Court declined in that case to consider hardship as a factor. Similarly, this opinion does not foreclose the future possibility of financial hardship as a defense. It simply holds that the existence of financial hardship due to an extremely lax advancement bylaw, without more, is not a defense, especially when the corporation was free to adopt a more stringent bylaw.

FN72. Del. Ch., C.A. No. 17048, Chandler, C., 1999 Del. Ch. LEXIS 126 (June 23, 1999).

Homestore's motion for summary judgment as to this defense is denied as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Homestore's motion for summary judgment, with respect to all but the unclean hands defense, is denied as a matter of law. Because trial is necessary on the merits of this defense, Tafeen's motion for summary judgment is denied.

Not Reported in A.2d                                                    Page 14
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

 IT IS SO ORDERED.

 Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**7**

**Westlaw.**

2006 WL 301883

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

Only the Westlaw citation is currently available.

Court of Appeals of Arizona,
Division 1, Department B.
UNITED DAIRYMEN OF ARIZONA, an Arizona
corporation,
Plaintiff/Counterdefendant/Appellee,
v.
Michael K. SCHUGG and Debra L.B. Schugg,
husband and wife,
Defendants/Counterclaimants/Appellants.
No. 1 CA-CV 04-0611.

Feb. 9, 2006.

**Background:** Milk marketing cooperative association filed action against former members alleging breach of the marketing agreement and of covenant of good faith and fair dealing, and former members counterclaimed for breach of contract among other causes of action. The Superior Court in Maricopa County, No. CV2001-022595, Frank T. Galati, J., entered judgment for association on jury finding that members breached covenant of good faith and fair dealing and awarded liquidated damages. Former members appealed.

**Holdings:** The Court of Appeals, Winthrop, J., held that:
(1) association could not recover liquidated damages for breach of the implied covenant of good faith;
(2) association's failure to sell all of former members' milk was not breach of contract, and
(3) association not shown to have violated antitrust law.
Reversed in part, affirmed in part, and remanded.

**[1] Trial** ⚖0

388k0 k.
Defendant's who filed a motion for judgment as a

matter of law (JMOL) to prevent the court from submitting plaintiffs' claim for breach of the implied covenant of good faith and fair dealing to the jury thereby properly preserved their right on appeal to challenge the trial court's ruling as it related to the submission of this claim to the jury.

**[2] Contracts** ⚖0

95k0 k.
All contracts as a matter of law include the implied duties of good faith and fair dealing, and contract damages are available for their breach.

**[3] Contracts** ⚖0

95k0 k.
A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract.

**[4] Contracts** ⚖0

95k0 k.
Express contract provisions governing remedies or damages are generally binding on the parties.

**[5] Contracts** ⚖0

95k0 k.
The right to recover liquidated damages is limited by the express terms of the parties' agreement.

**[6] Appeal and Error** ⚖0

30k0 k.
A reviewing court must search for a reasonable way to read jury verdicts as expressing a coherent view of the case, and it must exhaust this effort before it disregards the jury's verdicts.

**[7] Contracts** ⚖0

95k0 k.
A party can breach the implied covenant of good faith and fair dealing by acting in ways not expressly included in the contract but which nonetheless bear adversely on the other party's reasonably expected benefits of the bargain.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

**[8] Appeal and Error** ☜0
30k0 k.
When a party has chosen not to present evidence that could support the proper recovery for its claim, remand on that claim is not justified.

**[9] Contracts** ☜0
95k0 k.
Where milk marketing association's right to liquidated damages against former members depended upon their breach of certain provision of marketing agreement, and because association did not prove any contract damages, association had no right to recover liquidated damages for breach of the implied covenant of good faith and fair dealing.

**[10] Judgment** ☜0
228k0 k.
Summary judgment is proper if the evidence presented by the party opposing the motion has so little probative value, given the required burden of proof, that reasonable people could not agree with that party's conclusions.

**[11] Judgment** ☜0
228k0 k.
In reviewing a grant of summary judgment, Court of Appeals determines de novo whether any genuine issues of material fact exist and whether the trial court erred in applying the law; it considers the record in the light most favorable to the party against whom summary judgment has been entered.

**[12] Agriculture** ☜0
23k0 k.
Milk marketing association's failure to sell all of former members' milk to its customers, did not breach marketing agreement requiring association to "use its best efforts to market the Member's milk in such manner as the Association shall deem to be to the best advantage of the Member and all other Members of the Association"; "market" is not equated with "sell," and holding some milk off the market to maintain better prices was a manner of marketing the milk.

**[13] Contracts** ☜0
95k0 k.

Court of Appeal would construe the meaning of "market" in the context of its use in a milk marketing association's agreement with members, viewing the agreement in its entirety, considering the purposes of the agreement, and giving effect to every part.

**[14] Corporations** ☜0
101k0 k.
The business judgment rule presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company; absent an abuse of discretion, business judgments will be respected by the courts.

**[15] Monopolies** ☜0
265k0 k.
Agricultural cooperatives are exempt from antitrust laws when they engage in collective discussions and make agreements with other agricultural cooperatives to carry out the cooperative's purpose, but exemption does not protect agreements among parties other than agricultural cooperatives. Cooperative Marketing Associations Act, § 291-92; 7 U.S.C.A. § 291; 15 U.S.C.A. § 17.

**[16] Monopolies** ☜0
265k0 k.
Certain testimony by a co-owner of a milk broker who was also an officer of a milk marketing association, concerning milk sales by broker, who was not exempt from antitrust laws, to another milk marketing association that was exempt, was not sufficient evidence of an illegal anti-competitive marketing between broker and second association to support summary judgment against second association. Cooperative Marketing Associations Act, § 291-92; 7 U.S.C.A. § 291; 15 U.S.C.A. § 17.

**[17] Judgment** ☜0
228k0 k.
Genuine issue of material fact existed as to whether milk marketing association breached agreement with member by not approving its application to sell its milk production quota to another member, which precluded summary judgment for association on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 301883

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

member's claim for breach of the implied covenant of good faith and fair dealing, and interference with contract.

Appeal from the Superior Court in Maricopa County; Cause No. CV2001-022595; The Honorable Frank T. Galati, Judge. AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Squire Sanders & Dempsey LLP by George I. Brandon, Cynthia A. Ricketts, Brian M. McQuaid, Mitchell W. Fleischmann, Phoenix, Attorneys for Plaintiff/Counterdefendant/Appellee.

Robbins & Green PA by Brian Imbornoni, Phoenix, Attorneys for Defendants/Counterclaimants/Appellants.

OPINION

WINTHROP, Judge.

*1 ¶ 1 Michael K. Schugg and Debra L. Schugg ("the Schuggs") appeal from a judgment for liquidated damages in favor of the United Dairymen of Arizona ("UDA"). They also appeal from summary judgment on various counterclaims. For the reasons that follow, we find that the trial court improperly authorized an award of liquidated damages for breach of the implied covenant of good faith and fair dealing and reverse the judgment. We also find that genuine issues of material fact precluded summary judgment on two of the Schuggs' counterclaims and we remand for further proceedings.

### I. FACTS AND PROCEDURAL BACKGROUND

¶ 2 This case involves a dispute between UDA, an agricultural milk marketing cooperative association and its former members, the Schuggs. The Schuggs operated a dairy known as Schuburg Holsteins. On October 27, 1988, the Schuggs signed a UDA Membership Agreement ("the Agreement") giving UDA the exclusive right to market their milk. [FN1] The Agreement provides for termination 1) when either party gives written notice of an intent to cancel not more than 90 or less than 60 days prior to the anniversary of the Agreement's effective date,

or 2) upon the occurrence of other events listed in the bylaws, such as a Member's resignation, or the dissolution, merger, or consolidation of a Member's business. Pursuant to UDA's bylaws, the Agreement requires members to deliver to UDA all milk produced by cows that a member owns, possesses or controls, and also sets liquidated damages [FN2] in the event of a member's breach:

2. During the term of this Agreement, *the Member agrees to deliver all Grade A milk produced by dairy cows that he owns, possesses or controls,* except milk used for home consumption, to such persons and at such place or places and in such manner as the Association may designate.... (Emphasis added.)

\* \* \* \*

10. The Member hereby agrees that if at any time *while this Agreement is in force and effect, he neglects or refuses to deliver all milk produced by him ... as may be designated from time to time by the Association, then, in that event, the Member will pay to the Association a sum of money equal to forty percent of the gross sale price of such milk as the Member may deliver to any person or persons or at any place or in any manner not designated by the Association or otherwise in violation of the agreement.* This payment is not and shall not be construed as a penalty or forfeiture, but is agreed upon as liquidated damages, since it is agreed by the Member and the Association that the damages which the Association will suffer by reason of such neglect or refusal is difficult of specific ascertainment.... (Emphasis added.)

¶ 3 On September 28, 2001, the Schuggs informed UDA that they were no longer in business, and that UDA should stop picking up their milk. The Schuggs claimed that they sold their milk-producing cows and leased their dairy facility to S & T Dairy, L.L.C. ("S & T"), a company formed by their adult children. [FN3] S & T marketed its milk through a rival milk cooperative, Maverick Milk Producers Association ("Maverick").

*2 ¶ 4 On December 31, 2001, UDA filed a complaint against the Schuggs alleging breach of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 301883                                                          Page 4

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

the Agreement. UDA later amended its complaint to add claims for breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, negligent misrepresentation, and claims against the Schugg children. UDA contended that the creation of S & T was a sham transaction to enable the Schuggs to market their milk through Maverick and avoid waiting until the next anniversary date to terminate their UDA membership. UDA alleged that the Schuggs remained in possession and control of the dairy and requested an award of liquidated damages pursuant to Paragraph 10 of the Agreement based on the amount of milk S & T sold from October 1, 2001 through October 27, 2002. UDA also requested liquidated damages for breach of the implied covenant of good faith and fair dealing.

¶ 5 The Schuggs denied liability, and asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, intentional interference with contract, and unjust enrichment. As more fully discussed below, these claims arose out of UDA's requirement that members "dump" their milk production for several months, and UDA's decision to table the Schuggs' Applications for Base Transfer in 2001.

¶ 6 Prior to trial, the court entered summary judgments dismissing UDA's claims for fraudulent and negligent misrepresentation, and each of the Schuggs' counterclaims. The parties stipulated to dismiss the claims against the Schugg children. UDA's remaining claims for breach of contract and breach of the implied covenant of good faith and fair dealing were tried to a jury.

¶ 7 At the close of UDA's evidence, the Schuggs moved for judgment as a matter of law ("JMOL") on UDA's claim for breach of the implied covenant of good faith and fair dealing because UDA had not presented any evidence of actual damages. The Schuggs argued that a jury could find a breach of the implied covenant without finding a violation of Paragraphs 2 and 10 of the Agreement. Thus, absent such violation, the jury could not award liquidated damages. The Schuggs contended that because

UDA failed to present evidence of ordinary contract damages, it failed to present a *prima facie* case for such a claim.

¶ 8 The trial court denied the Schuggs' motion, concluding that liquidated damages were available for a breach of the implied covenant of good faith and fair dealing, and both claims were submitted to the jury. The court instructed the jury that in order to succeed on its breach of contract claim, UDA had to prove that the Schuggs materially breached the Agreement. It instructed the jury to award liquidated damages calculated pursuant to the Agreement if they found breach of the Agreement.

¶ 9 The court further instructed the jury that to succeed on the breach of the implied covenant of good faith and fair dealing claim, UDA had to prove that the Schuggs intentionally impaired the benefits that should have flowed to UDA under the agreement, and that they committed this breach when they started shipping their milk to Maverick. The court also instructed the jury that if they found a breach of the implied covenant, they must award liquidated damages as set forth in the Agreement.

*3 ¶ 10 The jury returned two verdict forms: one finding that the Schuggs did not breach the Agreement, the other finding that the Schuggs breached the implied covenant of good faith and fair dealing. As directed by the court's instructions, the jury awarded liquidated damages to UDA on this claim in the amount of $1,034,350.18.

¶ 11 The Schuggs renewed their motion for judgment as a matter of law, and alternatively, requested a new trial. The trial court denied these motions and ultimately awarded $938,453.61 as costs and attorneys' fees to UDA. The Schuggs timely appealed. [FN4] We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-2101(B) (2003) and - 2102(F)(1) (2003).

## II. UDA'S CONTRACT CLAIMS

[1] ¶ 12 On appeal, the Schuggs argue that the trial court erred in authorizing an award of liquidated damages for the breach of the implied

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

covenant of good faith and fair dealing claim. UDA initially contends that the Schuggs did not object to the jury instructions and thus have waived their right to challenge the submission of those instructions on appeal. We disagree. The Schuggs are not appealing the form of jury instructions. They filed a motion for JMOL to prevent the court from submitting UDA's claim for breach of the implied covenant of good faith and fair dealing to the jury. Accordingly, the Schuggs properly preserved their right on appeal to challenge the trial court's ruling as it relates to the submission of this claim to the jury.

### A. UDA's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

¶ 13 We review de novo the trial court's denial of a motion for JMOL. Monaco v. HealthPartners of S. Ariz., 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App.1999). UDA contends that the trial court properly denied the Schuggs' motion because liquidated damages are recoverable for breach of the implied covenant of good faith and fair dealing. UDA asserts that liquidated damages were recoverable not only under Paragraph 10 of the Agreement, but also under the liquidated damages provision of UDA's bylaws. [FN5]

¶ 14 Although UDA's First Amended Complaint contains a claim for violation of the bylaws, UDA did not present this issue to the jury, nor did it request an instruction on this claim. Accordingly, the jury could not have awarded liquidated damages pursuant to UDA's bylaws. We therefore need consider only whether liquidated damages are recoverable under our common law for breach of the implied covenant of good faith and fair dealing.

[2][3] ¶ 15 All contracts as a matter of law include the implied duties of good faith and fair dealing, and contract damages are available for their breach. E.g., Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 490-91, ¶¶ 59-60, 38 P.3d 12, 28-29 (2002); Rawlings v. Apodaca, 151 Ariz. 149, 153-54, 726 P.2d 565, 569- 70 (1986); Enyart v. Transamerica Ins. Co.,

195 Ariz. 71, 76, 985 P.2d 556, 561 (App.1998). A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract. See Beaudry v. Ins. Co. of the West, 203 Ariz. 86, 91, ¶ 18, 50 P.3d 836, 841 (App.2002) (quoting Wells Fargo Bank, 201 Ariz. at 491, ¶ 64, 38 P.3d at 29).

*4 [4][5] ¶ 16 Express contract provisions governing remedies or damages are generally binding on the parties. Dixon v. City of Phoenix, 173 Ariz. 612, 618, 845 P.2d 1107, 1113 (App.1992). The right to recover liquidated damages is limited by the express terms of the parties' agreement. See Deuel v. McCollum, 1 Ariz.App. 188, 191, 400 P.2d 859, 862 (App.1965) (reversing an award of liquidated damages because the plaintiff failed to prove a violation of the specific condition necessary to recover liquidated damages); Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney, 190 Ariz. 213, 217, 946 P.2d 464, 468 (App.1997) (finding that liquidated damages were not available because no breach of the contract provision gave rise to such damages).

¶ 17 Liquidated damages provisions in a cooperative marketing agreement have likewise been limited to the express terms of that agreement. See Staple Cotton Coop. Ass'n v. Pickett, 326 So.2d 337, 339 (La.1976) (finding that a liquidated damages provision "has no application" absent evidence that defendant "marketed or otherwise disposed of" his crop in violation of express terms of stipulated damages clause); Olson v. Biola Co-op. Raisin Growers Ass'n, 33 Cal.2d 664, 204 P.2d 10, 17 (Cal.1949) (reversing an award of liquidated damages where plaintiff cooperative proved that a product was of poor quality, but did not prove that the member failed to deliver the product as required by the express terms of stipulated damages clause). In light of these principles, the trial court should have granted the Schuggs' motion for JMOL on UDA's claim for breach of the implied covenant of good faith and fair dealing.

¶ 18 In opposing the Schuggs' motion for JMOL, UDA contended that because the jury instructions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 301883

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))

Page 6

on breach of the implied covenant related that breach to "when *they* started shipping *their* Grade A milk to Maverick ..." (emphasis added), the jury implicitly found that the Schuggs refused to deliver milk over which they had possession or control, as set forth in Paragraphs 2 and 10 of the Agreement. Initially, we note that this contention references a jury instruction, fashioned by the court and counsel, and not a form of verdict, or special interrogatory adopted by the jury. More importantly, we cannot presume that the jury reached that conclusion in light of its unambiguous verdict finding no breach of the Agreement.

[6] ¶ 19 A reviewing court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and it must exhaust this effort before it disregards the jury's verdicts. *See Standard Chartered PLC,* 190 Ariz. at 39, 945 P.2d at 350 (*as corrected on denial of reconsideration* ) (quoting *Toner v. Lederle Lab.,* 828 F.2d 510, 512 (9th Cir.1987), *cert. denied,* 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988)). We find that the jury's verdicts were not inconsistent. *See Walter v. Simmons,* 169 Ariz. 229, 234, 818 P.2d 214, 219 (App.1991) (finding that jury verdicts that find a breach of the implied covenant of good faith and fair dealing, but no breach of contract are not necessarily inconsistent).

*5 [7] ¶ 20 A party can breach the implied covenant of good faith and fair dealing by acting in ways not expressly included in the contract but which nonetheless bear adversely on the other party's reasonably expected benefits of the bargain. *Bike Fashion Corp. v. Kramer,* 202 Ariz. 420, 424, ¶ 14, 46 P.3d 431, 435 (App.2002). *Accord Wells Fargo Bank,* 201 Ariz. at 491-92, ¶¶ 65-66, 38 P.3d at 29-30; *Southwest Sav. & Loan Ass'n v. SunAmp Sys., Inc.,* 172 Ariz. 553, 558-59, 838 P.2d 1314, 1319-20 (App.1992). Here, the jury could have found that although the Schuggs did not own, possess, or control dairy cows, and thus did not violate the terms of Paragraph 10, they intentionally transferred possession and control of the cows to S & T to deprive UDA of the benefits it would otherwise have under the Agreement.

[8][9] ¶ 21 Because the right to liquidated damages depended upon a breach of Paragraph 2 of the Agreement, UDA had no right to recover liquidated damages for breach of the implied covenant of good faith and fair dealing. Ordinary contract damages were the proper measure of damages for this breach. *Enyart,* 195 Ariz. at 76, 985 P.2d at 561 (stating that, ordinarily, a party claiming breach of an implied covenant of good faith and fair dealing is limited to contract damages). However, UDA presented no evidence to support an award of contract damages. Moreover, because UDA did not prove any contract damages, we are constrained from remanding for a new trial on this claim. When a party has chosen not to present evidence that could support the proper recovery for its claim, remand on that claim is not justified. *See Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale,* 187 Ariz. 479, 484-85, 930 P.2d 993, 998-99 (1997) (finding that remand was unwarranted where plaintiff challenged a municipal development fee only on the basis that it failed to confer a benefit as required by statute, but raised no issue as to the reasonableness of that fee). *See also Crouch v. Truman,* 84 Ariz. 360, 362, 328 P.2d 614, 615 (1958) (finding that a party who had a full and complete opportunity to develop its case, but did not do so, was not entitled to a new trial to permit it to do what it should have done earlier); *Shetter v. Rochelle,* 2 Ariz.App. 607, 609, 411 P.2d 45, 47 (App.1966) (finding that reversal with judgment for the opposing party was proper when a party presented no evidence relating to an essential element of the claim and there was no interference by the trial court to prevent the party from developing the case). Thus, UDA failed to present a *prima facie* claim for breach of the implied covenant of good faith and fair dealing, and we reverse and vacate the jury's award. [FN6]

## III. THE SCHUGGS' COUNTERCLAIMS
### A. The Schuggs' Counterclaims Regarding UDA's Obligation to Market Milk

¶ 22 In its Membership Agreement, UDA agreed to market "all Grade A milk" produced by its members, and to use its "best efforts" to market the milk in a manner it deemed to be to the best advantage of its members, including the Schuggs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

For many years, UDA's principal customers (or "handlers" in the industry jargon) for milk bottled and sold in fluid form were Shamrock Farms, Kroger Company and Safeway, Inc. In an effort to enhance revenue, UDA joined with other milk-marketing cooperatives in other states (such as the Western Milk Marketing Agency, or "WMMA") in agreements not to sell milk to these customers until they agreed to pay a substantial premium above the federally regulated prices.

*6 ¶ 23 UDA's two largest customers, Kroger and Shamrock, refused to pay the requested premiums and, as a result, UDA was unable to market millions of pounds of Grade A milk produced by its members, including the Schuggs. As a further result of UDA's strategy, the Schuggs were forced to dump hundreds of thousands of pounds of their Grade A milk. UDA apparently treated the milk dumped by its members as if it had been sold when computing its pay prices to its members. To make these payments, UDA incurred substantial debt, which in turn led UDA to impose an assessment on its members' milk production. The amount assessed against the Schuggs' milk production was in excess of $232,000. Additionally, the Schuggs claim that UDA "wrote off" almost $34,000 in equity credits that the Schuggs earned, which UDA had retained in a revolving fund for the fiscal year ending September 30, 2000.

¶ 24 In their counterclaims, the Schuggs alleged that UDA not only committed antitrust violations, but also breached its contractual obligation to market its members' Grade A milk when it effectively forced members to dump their milk, rather than deliver it to UDA's primary milk customers. These alleged wrongful acts were also the basis for the Schuggs' claims that UDA acted in bad faith and breached its fiduciary duties.

¶ 25 Prior to trial, UDA moved for summary judgment on these counterclaims. The trial court granted summary judgment, finding that UDA's marketing decisions were not actionable, and/or that the evidence presented by the Schuggs on these claims was not strong enough to survive the *Orme School* standard.

[10][11] ¶ 26 Summary judgment is proper if the evidence presented by the party opposing the motion contains so little probative value, given the required burden of proof, that reasonable people could not agree with that party's conclusions. *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In reviewing a grant of summary judgment, we determine *de novo* whether any genuine issues of material fact exist and whether the trial court erred in applying the law. *Bothell v. Two Point Acres, Inc.,* 192 Ariz. 313, 316, 965 P.2d 47, 50 (App.1998). We consider the record in the light most favorable to the party against whom summary judgment has been entered. *Great Am. Mortgage, Inc. v. Statewide Ins. Co.,* 189 Ariz. 123, 124, 938 P.2d 1124, 1125 (App.1997).

¶ 27 In their motion for summary judgment, the Schuggs argued that by paying out monies that had not been received from customers, UDA was incurring substantial indebtedness to its primary lender. They asserted that this harmed members because UDA later required them to compensate for that indebtedness by paying assessments. The Schuggs also claimed other financial losses resulting from UDA's "dumping policy."

[12] ¶ 28 We first consider whether any evidence supported the Schuggs' claim that UDA did not "market" the members' milk. The Schuggs equate "market" with "sell" and argue that by failing to sell the milk to its customers, UDA breached the Agreement. We find no authority supporting this limited construction of what it means to "market" a product.

*7 [13] ¶ 29 Instead, we construe the meaning of "market" in the context of its use in the Agreement. Viewing the Agreement in its entirety, we consider the purposes of the Agreement, and give effect to every part. *See State ex rel. Goddard v. R.J. Reynolds Tobacco Co.,* 206 Ariz. 117, 120, ¶ 12, 75 P.3d 1075, 1078 (App.2003).

¶ 30 Paragraph 3 of the Agreement requires UDA to "use its best efforts to market the Member's milk *in such manner* as the Association shall deem to be to the best advantage of the Member and all other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

Members of the Association...." (Emphasis added.) UDA's contractual duty to "market" milk reasonably includes taking actions to protect its long-term ability to sell at prices beneficial to its members. UDA attempted to obtain long-term contracts and premiums from its primary customers by limiting the supply of milk from its members and from members of other cooperatives. In doing so, it was exercising its authority to "market" in a manner it deemed to be to the best advantage of its members.

[14] ¶ 31 Even assuming UDA's strategy was questionable, [FN7] the "business judgment" rule precludes the Schuggs from claiming that UDA violated its promise to "market" the milk. The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Blumenthal v. Teets,* 155 Ariz. 123, 128, 745 P.2d 181, 186 (App.1987).

¶ 32 This rule applies equally to cooperatives. *See, e.g., Ripplemeyer v. Nat'l Grape Coop. Ass'n,* 807 F.Supp. 1439, 1447 (W.D.Ark.1992); *Santo Tomas Produce Ass'n v. Smith,* 68 N.M. 436, 362 P.2d 977, 979 (N.M.1961); *Sanchez v. Grain Growers Assoc. of Cal.,* 126 Cal.App.3d 665, 675, 179 Cal.Rptr. 459, 469 (Cal.Ct.App.1981). Absent an abuse of discretion, business judgments will be respected by the courts. *See Blumenthal,* 155 Ariz. at 128, 745 P.2d at 186.

¶ 33 The Schuggs contend that even were the business judgment rule applicable, it does not shield UDA because its "dumping" policy involved illegal conduct. *See, e.g., Schoen v. Schoen,* 167 Ariz. 58, 65, 804 P.2d 787, 794 (App.1990) (finding that judicial inquiry is precluded where a decision is made in good faith and in the exercise of honest judgment, in the *legitimate and lawful* furtherance of the corporate purpose) (emphasis added); *see generally* 3A Fletcher Cyc. Corp. § 1040 (Perm. Ed.1986) (discussing the rule's inapplicability when directors act illegally or in bad faith). The Schuggs argue that UDA's "dumping" policy was part of an illegal anti-competitive scheme to limit milk supply in violation of federal and state antitrust laws. We

disagree.

[15] ¶ 34 We first note that agricultural cooperatives are exempt from antitrust laws when they engage in collective discussions and make agreements with other agricultural cooperatives to carry out the cooperative's purpose. *See* Capper-Volstead Act of 1922, 7 U .S.C. §§ 291-92; Clayton Act, 15 U.S.C. § 17. The Capper-Volstead Act's purpose is to allow "farmer-producers to organize together, set association policy, [and] fix prices at which their cooperative will sell their produce ... without thereby violating the antitrust laws...." *Maryland & Virginia Milk Producers Ass'n v. United States,* 362 U.S. 458, 466, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). This exemption, however, does not protect agreements among parties other than agricultural cooperatives. *Case-Swayne Co. v. Sunkist Growers, Inc.,* 389 U.S. 384, 395- 96, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) (holding that an agricultural organization was not a qualified cooperative under the Act when the organization included non-producer fruit processors).

*8 ¶ 35 The Schuggs argue that certain deposition testimony elicited before trial was evidence of an illegal agreement between UDA and Advance Milk Commodities ("AMC"), a milk broker that was not an agricultural cooperative organization, to limit milk supply. However, we agree with the trial court that this evidence does not demonstrate an illegal agreement.

¶ 36 At relevant times, the testifying witness, Ms. Karen Brooks, was a co-owner of AMC, and also served as General Manager of Security Milk Producers Association ("Security"), a California dairy cooperative. As a representative of Security, she was also a board member of WMMA. Ms. Brooks testified about discussions at a 1999 WMMA board meeting during which UDA had applied to join the agency. At the meeting, UDA expressed concerns about WMMA's ability to control milk coming into the Arizona market from AMC's independent producers. Ms. Brooks testified as follows:

   Q. So you were addressing UDA's concern that the handlers might obtain alternative sources of

2006 WL 301883

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

milk if UDA requested a premium?

A. Yes.

Q. And did that discussion include a discussion of the milk being marketed by AMC for the Arizona independent producers?

A. AMC was not--AMC was selling that milk to Security because the agency had requested it. But they wanted to make sure that we had a handle on that milk and that it wouldn't move.

Q. Am I correct to understand that UDA was requesting your assurance that the milk being marketed by AMC from the Arizona independent producers would not be sold to the Arizona handlers?

A. December 1st, yeah. That we had control on it, yes.

Q. As of December 1st. Did you provide assurances that the milk being marketed by AMC for the independent producers wouldn't go to the Arizona handlers?

A. December 1st, yes, it would not.

[16] ¶ 37 The Schuggs contend that a trier of fact could infer from this evidence that UDA improperly entered into an agreement with AMC. We disagree. Any such inference would require a strained view of Ms. Brooks' statements. AMC was not a member of WMMA. Security, an agricultural cooperative, was a member, and Ms. Brooks served as Security's representative on the WMMA board. She made these statements during a board meeting regarding WMMA's ability to control milk supplies. The testimony indicates that AMC sold to Security, a cooperative, which in turn could legally be a party to anti-competitive marketing agreements. We agree with the trial court that under the *Orme School* standard, this is insufficient evidence from which a reasonable person could find that UDA violated antitrust laws. [FN8] Thus, the trial court properly granted UDA's motion for summary judgment on this counterclaim.

### B. The Schuggs' Counterclaims for their Applications for Base Transfer

¶ 38 The Schuggs' other counterclaims for breach of the implied covenant of good faith and fair dealing, interference with contract, and unjust enrichment relate to UDA's failure to approve their application for "base transfer." The disposition of this issue requires an understanding of how UDA's base plan operates.

*9 ¶ 39 UDA members hold or may purchase an amount of "base" [FN9] which is measured in hundreds of pounds. UDA's plan generally assures a member that he will be paid a "quota price" for an amount of milk equal to the amount of base that he holds. [FN10] For any amount of milk produced in excess of the base, UDA pays a lower price.

¶ 40 UDA members may acquire base by purchasing it from other members or through UDA's base earning programs for new and existing producers. UDA approval is required before one member may obtain additional base by transfer from another member. At the time of these events, the Schuggs had acquired 65,685 pounds of base, some of which they purchased at prices ranging from $15 to $27 per pound.

¶ 41 In September and October 2001, the Schuggs completed three agreements to transfer (sell) their base to third parties and submitted base transfer applications to UDA. UDA tabled the Schuggs' applications indefinitely and did not approve them. Consequently, the Schuggs filed counterclaims against UDA. They contended that UDA's decision to table their applications violated the implied covenant of good faith and fair dealing, interfered with the contracts they executed to sell their base, and unjustly enriched UDA because it retained the unclaimed premium payments that this base would have generated. In response, UDA contended, in part, that in light of the Schuggs' breach of the Membership Agreement, they had no legal basis to expect that UDA would process the base transfer applications.

¶ 42 In granting UDA's motion for summary judgment on these claims, the trial court found that evidence of the Schuggs' expectations regarding their base transfer applications was "so weak as to be nearly non-existent." It also found that whether the Schuggs were in breach of the Agreement was at least "debatable;" accordingly, the Schuggs could not reasonably have expected a pro forma approval

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 301883                                                                    Page 10

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

of their base transfer applications.

[17] ¶ 43 On this record, we find a genuine question of material fact on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing, and interference with contract. The Schuggs presented adequate evidence of their reasonable expectation that their base had an economic value for which they could be compensated. The Schuggs had executed contracts with several individuals to purchase their base. They also listed their base as an asset on financial statements and used it as collateral for bank loans. The fact that UDA had a standard application form to transfer the base indicates that the base had a recognized economic value and that UDA members could reasonably expect to obtain something in return for the transfer. The Schuggs also presented evidence that, prior to the effective denial of their applications, no other members had been denied the right to transfer their base.

¶ 44 UDA argues that the Schuggs failed to meet the non-compete conditions in the application to transfer their base. These conditions required that the Schuggs not sell to certain Arizona milk customers or lease to a dairy that was doing so for three years. Under these circumstances, UDA argues, it was unreasonable for the Schuggs to expect UDA to approve their applications. UDA also contends that it had no duty to honor the Schuggs' applications because the Schuggs were in breach of their contractual obligations to UDA and were guilty of fraud. Further, UDA argues that the Schuggs had no justifiable expectation that UDA would consider and grant their applications in light of a letter Mr. Schugg allegedly wrote to Maverick. [FN11]

*10 ¶ 45 While these assertions are relevant to whether the Schuggs can prevail on their claims, they reflect factual disputes, not a lack of evidence sufficient to create a genuine issue for the jury. Whether the Schuggs could comply with the non-compete provisions of the application and whether they had acted fraudulently so as to excuse performance by UDA [FN12] should have been submitted to the jury. The admissibility and the

interpretation of the letter from Mr. Schugg to Maverick was also in dispute. Thus, we find that sufficient evidence was presented to preclude summary judgment on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing, and for interference with contract.

¶ 46 The trial court also granted summary judgment in favor of UDA on the Schuggs' unjust enrichment claim. UDA argued that the rights of the parties were governed by the contract. The Schuggs claimed that it was proper to plead unjust enrichment in the alternative to their breach of contract claim.

¶ 47 In *Trustmark Ins. Co. v. Bank One, Arizona, NA,* this court held that the trial court properly granted a JMOL for the defendant when the plaintiff was pursuing an unjust enrichment claim, not in the alternative to its original claim, but rather, to avoid contractual limitations on its claim. 202 Ariz. 535, 542-43, ¶ 32, 48 P.3d 485, 492-93 (App.2002). Here, the Schuggs based their claim for unjust enrichment on the value of the amount of unclaimed base retained by UDA rather than the amount that the Schuggs could have obtained by selling it in 2001. Depending on the quota price for base in the interim, this value is potentially greater than the amount the Schuggs could have recovered if UDA had granted their applications in 2001. The parties' rights are subject to the terms of the Agreement and we find that the doctrine of unjust enrichment has no applicability in this instance. *See Brooks v. Valley Nat'l Bank,* 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976) (stating that the existence of a contract specifically governing rights and obligations of each party precludes recovery for unjust enrichment). Therefore, we find that the trial court properly granted summary judgment on the unjust enrichment claim.

**IV. CONCLUSION**

¶ 48 We reverse the judgment in favor of UDA on its claim for breach of the implied covenant of good faith and fair dealing and direct entry of judgment for the Schuggs. We affirm summary judgment in favor of UDA on the Schuggs' claims for bad faith breach and breach of fiduciary duty regarding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

UDA's obligations to market their milk. We also affirm summary judgment in favor of UDA on the counterclaim for unjust enrichment. We reverse summary judgment on the Schuggs' claims for breach of the implied covenant of good faith and fair dealing and interference with contract regarding UDA's failure to approve their applications to transfer their base, and we remand for further proceedings on those claims.

**\*11 ¶ 49** Based on the foregoing, we also reverse the trial court's award of attorneys' fees. On remand, the trial court is authorized to consider the parties' respective applications for attorneys' fees in light of the reversal of the judgment for UDA and the ultimate disposition of the remaining counterclaims.

**¶ 50** We grant the Schuggs' request for reasonable attorneys' fees on appeal pursuant to A.R.S. § 12-341.01 in an amount to be determined following submission of a statement of costs in accordance with Arizona Rule of Civil Appellate Procedure 21(c).

CONCURRING: JEFFERSON L. LANKFORD and JON W. THOMPSON, Judges.

> FN1. The Arizona Cooperative Marketing Act, Arizona Revised Statutes ("A.R.S.") sections 10-2001 to -2025 (2004) allows agricultural producers to form cooperative associations and enter into exclusive marketing contracts with their members. A.R.S. § 10-2016(A).

> FN2. The Arizona Cooperative Marketing Act allows the exclusive marketing contracts to provide for liquidated damages, when authorized in the association's bylaws. A.R.S. § 10-2016(D).

> FN3. As of September 2001, the Schuggs' children were 21 and 19 years of age, and were enrolled in out-of-state colleges.

> FN4. UDA has not cross-appealed from the jury verdict finding that the Schuggs did not breach paragraph 2 of the

Agreement.

> FN5. The bylaws provide in part:
> Article X, Section 2. Enforcement of agreement. The Association may, in the event of a breach of the marketing agreement executed by its Members, whether provided in the marketing agreement or not, exercise any or all of the following remedies in law or equity.
> (a) Liquidated Damages. Recover as liquidated damages specific sums from Members breaching any provisions of the marketing agreement regarding the sale, delivery or withholding of products called for in the agreement....

> FN6. Because we reverse on the basis that UDA failed to establish a *prima facie* case for breach of the implied covenant of good faith and fair dealing, we do not address whether A.R.S. § 10-2016 abrogates common-law principles barring enforcement of liquidated damages provisions as penalties when the fixed amount is not a reasonable prediction of just compensation for the harm. *See, e.g .,* *Larson-Hegstrom & Assoc. v. Jeffries,* 145 Ariz. 329, 333, 701 P.2d 587, 591 (App.1985). For the same reason, we also do not consider claims that the trial court erred in ruling on the admission of evidence relating to such contract claims.

> FN7. We note that, eventually, all of UDA's customers entered long-term milk supply agreements with UDA that included premiums or "service charges" in excess of the federally-set minimum class prices.

> FN8. Having found that the evidence was insufficient to raise a factual issue concerning whether UDA violated antitrust laws, we do not address UDA's contention that the Schuggs lack standing to assert this claim.

> FN9. "Base" is a term applied to a UDA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

**(Cite as: 2006 WL 301883 (Ariz.App. Div. 1))**

member's daily pounds of milk production for which he is paid by UDA. "Base" is also the mechanism UDA utilizes to value each producer's share of UDA's total allocation for the sale of its members' milk. The more "base" a member owns, the more of that member's milk receives a higher price from UDA's proceeds of its sale of milk.

FN10. This court's decision in *Lueck v. United Dairymen of Ariz.,* 162 Ariz. 232, 782 P.2d 708 (App.1989) more fully describes the background and operation of the plan.

FN11. Mr. Schugg wrote a letter "to whom it may concern" stating that he would no longer be shipping any milk under his milk base, and that if he were unable to transfer base he would be "walking [away] from it." UDA argued that Mr. Schugg wrote this letter to demonstrate his commitment to Maverick.

FN12. The jury verdict that the Schuggs did not breach the Agreement is *res judicata* between these parties, and therefore breach of the Agreement cannot be utilized by UDA as an affirmative defense to these counterclaims.

--- P.3d ----, 2006 WL 301883 (Ariz.App. Div. 1)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Robert O. WRIGHT t/a House of Wright Mortuary,
Plaintiff,
v.
Joseph K. DUMIZO and Samjos Service Corp.,
Defendants.
**No. 01C-08-292-JRJ.**

Submitted July 30, 2002.
Decided Oct. 17, 2002.

Upon Defendant's Motion for Summary Judgment--
Granted in Part and Denied in Part.

Daryl K. Fountain, Law Office of Daryl K. Fountain,
Wilmington, Delaware, for the plaintiff.

Clark C. Kingery, Clark C. Kingery Attorney at
Law, Wilmington, Delaware, for the defendants.

MEMORANDUM OPINION

JURDEN, J.

*1 Before the Court is the defendants' Motion
Summary Judgment on Plaintiff's Breach of Contract
and Deceptive Trade Practices Act claims. For the
reasons stated below, the defendants Motion for
Summary Judgment is GRANTED IN PART,
DENIED IN PART.

*Background*
This action stems from accounting services provided
to the plaintiff, Robert O. Wright ("Wright"), t/a
House of Wright Mortuary, by defendants, Joseph K.
Dumizo ("Dumizo") and Samjos Serv. Corp.
("Samjos"), from 1994 to 1997. In his Complaint
filed on August 31, 2001, the plaintiff alleges that the
defendants are liable based on five theories:
fraudulent misrepresentation (Count I), negligent
misrepresentation (Count II), negligence (Count III),
breach of contract (Count IV), and deceptive trade
practices (Count V).

On January 2, 2002, the defendant filed a Motion for

Summary Judgment alleging that all causes of action
are barred by the three-year statute of limitations set
forth in title 10, section 8106 of the Delaware Code.
On February 14, 2002, the plaintiff filed his
Opposition to the defendants' Motion for Summary
Judgment. The Court heard oral argument on May
21, 2002. By Order dated May 21, 2002, the Court
granted the defendants' Motion for Summary
Judgment on Counts I, II and III. With respect to the
two surviving counts, breach of contract and
deceptive trade practices, the Court requested
"verified evidence demonstrating the nature and
extent of the 'irregularities' with [plaintiff's] business
and personal tax returns, ... a documented time line
showing how and when he became aware of such
irregularities, and legal authority relating to the
tolling of the statute of limitations...." [FN1]

> FN1. *Wright v. Dumizo,* Del.Super., C.A.
> No. 01C-08-292-JRJ (May 21, 2002) (Order
> granting summary judgment as to fraudulent
> misrepresentation (Count I), negligent
> misrepresentation (Count II) and negligence
> (Count III)).

On July 18, 2002, the plaintiff filed his Supplemental
Opposition to Defendant's Motion for Summary
Judgment. The plaintiff contends that the statute of
limitations on the breach of contract and deceptive
trade practices claims was tolled by the defendants'
fraudulent concealment of the fact that Dumizo was
not a licensed or qualified accountant during the
relevant period. The plaintiff claims that because of
this fraudulent concealment, the plaintiff could not
discover that defendant's conduct rose to the level of
a cause of action until the State of Delaware Division
of Revenue ("Division of Revenue") notified the
plaintiff, on January 1, 2000, of errors in the
calculation of the plaintiff's corporate income tax
returns. The defendant argues that there is substantial
evidence in the record to demonstrate that the
plaintiff had notice of the defendants' alleged
malfeasance in the preparation and analysis of the
plaintiff's taxes. The defendants assert that the
plaintiff was aware of a cause of action for breach of
contract as early as May 1997 or, at the latest, August
19, 1998.

*Facts*
For the time period 1994 through 1998, defendants,
Dumizo and Samjos, were retained to prepare

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

personal and business tax returns for the plaintiff, Wright. During this time, Dumizo represented to plaintiff that he was fully capable and qualified to perform such work. On or about May 1997, the plaintiff contacted Dumizo regarding certain penalties and interest incurred as a result of the plaintiff's failure to file a return and failure to calculate certain taxes correctly. On May 9, 1997, Dumizo responded in writing to the plaintiff clarifying that plaintiff was liable for the tax, but Dumizo was liable for the penalties and interest incurred. During this same time period, plaintiff discovered that Dumizo was not a Certified Public Accountant (CPA) and that Dumizo was not licensed to prepare tax returns.

   *2 On March 18, 1998, plaintiff and the Division of Revenue executed a consent agreement concerning State of Delaware tax due. The consent agreement stated, "[t]hat the amount(s) of any State tax due under any return(s) made by or on behalf of the above-named taxpayer(s) for the tax year(s) ended December 31, 1994 under existing or prior revenue acts, may be assessed at any time on or before March 31, 1999." [FN2]

> FN2. Def's Supplemental Submission to Mot. for Summ. J. Ex. B (July 30, 2002).

On or about June 17, 1998, the plaintiff retained criminal and tax attorneys to assist in the correction of incorrectly calculated or filed returns and to exculpate the plaintiff of any wrongdoing. On or about August 19, 1998, the plaintiff terminated relations with Dumizo and Samjos. [FN3] During this time, the State ultimately concluded that the plaintiff had violated several tax laws, including the under reporting of income and falsifying tax documents. On September 20, 2001, defendant, Samjos, filed a certificate of dissolution.

> FN3. Def's Mot. Summ. J.App. (Jan. 3, 2002) (Delaware Superior Court Civil Rule 36(a), (b) provides, "[e]ach matter of which an admission is requested ... is admitted unless, within 30 days after service of the request ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection.... Any matter admitted under this Rule is conclusively established....").

*Standard of Review*
Superior Court Rule 56(c) provides that judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN4] The burden is on the moving party to show, with reasonable certainty, that no genuine issue of material fact exists and judgment as a matter of law is permitted. [FN5] When considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party. [FN6] Further, if the record indicates that a material fact is disputed, or if further inquiry into the facts is necessary, summary judgment is not appropriate.

> FN4. Del.Super. Ct. Civ. R. 56.

> FN5. *See Celotex Corp. v. Cattret,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Martin v. Nealis Motors, Inc.,* 247 A.2d 831 (Del.1968).

> FN6. *McCall v. Villa Pizza, Inc.,* 636 A.2d 912 (Del.1994).

*Discussion*
I. Deceptive Trade Practices
 Plaintiff's fifth cause of action alleges deceptive trade practices. Plaintiff does not have standing to bring a claim of deceptive trade practices under title 6, section 2531 *et. seq.* of the Delaware Code. "Deceptive trade practices arise only from those unfair trade practices that interfere with the business of another, so only competing businesses have standing to raise the claim." [FN7] In this case, because Wright is a consumer, and not a competing business, Wright lacks standing to raise this issue under § 2531 *et. seq..* Consequently, the defendants' motion for summary judgment on this claim is GRANTED.

> FN7. *S & R Associates, L.P. v. Shell Oil Co.,* 725 A.2d 431 (Del.Super.Ct.1998) (citing *Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 70 (Del.1993)).

   II. Breach of Contract/ Statute of Limitations
 Plaintiff's fourth cause of action alleges breach of contract. The issue to be decided is whether the cause of action based on breach of contract was brought too late, and is therefore time barred by the statute of limitations. The parties disagree on when the cause of action began to accrue and, thus, when the three-year statute began to run.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 3
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

Under Delaware law, the applicable statute of limitations for a breach of contract is three years. [FN8] Typically, the cause of action in a contract dispute is said to accrue at the time of breach . [FN9] Thus, a service contract is breached when the service is due. [FN10] However, two exceptions exist to toll the statute of limitations. The Court will examine each in turn.

FN8. Del.Code Ann. tit. 10, § 8106 (2002).

FN9. *Snyder v. Baltimore Trust Co.,* 532 A.2d 624, 627 (Del.Super.Ct.1986) (citing *Nardo v. Guido DeAscanis & Sons, Inc.,* 254 A.2d 254, 255-56 (Del.Super.Ct.1969)).

FN10. *Shively v. Ken-Crest Centers for Exceptional Persons v. State,* 1998 WL 960719 (Del.Super.).

A. Fraudulent Concealment of Breach
*3 First, Delaware law recognizes that fraudulent concealment of a cause of action may toll the statute of limitations. [FN11] Fraudulent concealment requires a showing of (1) the defendant's knowledge of the alleged wrong, and (2) an affirmative act of concealment by the defendant thereby preventing the nonbreaching party from discovering and pursuing a cause of action. [FN12] "[W]hile the Statute of Limitations may not apply when the acts complained of are fraudulently concealed from the plaintiff, such application is suspended only until his rights are discovered by the exercise of reasonable diligence." [FN13] That is not to say that the plaintiff must have a defendant's verification that a cause of action exists. [FN14]

FN11. *Lecates v. Hertrich Pontiac Buick, Co.,* 515 A.2d 163, 176 (Del.Super.Ct.1986).

FN12. *Id.*

FN13. *Giordano v. Czerwinski,* 216 A.2d 874, 876 (Del.1966).

FN14. *Began,* 547 A.2d 620, 623 (Del.Super.Ct.1988) ("If all parties were allowed to toll the statute until they learned of the legal theory of a proposed action or so pursued an action, there would be no purpose to the statute of limitations.").

Plaintiff argues that "the defendant fraudulently concealed the fact that he was not licensed nor

qualified to prepare tax returns and that [defendant] had been incorrectly preparing [plaintiff's] tax returns." [FN15] The Court agrees that one who purports to provide accounting services knowing he is unauthorized to do so intends, by the very act of posing as a licensed accountant, to conceal the fact that he is not authorized to provide valid accounting services; however, the inquiry does not end here. Rather, the Court must further determine at what point plaintiff discovered or should have discovered by the exercise of due diligence the fraudulently concealed facts.

FN15. Pl. Supplemental Opp'n to Def's Mot. for Summ. J. ¶ 4 (July 18, 2002).

The defendants assert that since the plaintiff, as early as May 1997, confronted Dumizo regarding the payment of "[p]enalties and interest for failure to file a return" and "[p]enalties and interest for failure to calculate tax correctly resulting in [an] understatement of tax liability," the plaintiff was on notice of the defendants' alleged malfeasance. [FN16] Furthermore, the defendants argue that the plaintiff was on notice in March 1998, when the plaintiff entered into a consent agreement with the Division of Revenue concerning an audit of Delaware State tax due for the tax year ended December 31, 1994 [FN17] and in June 1998, when the plaintiff retained a new accountant, Charles Seitz, CPA [FN18] to review his tax filings. However, the plaintiff contends that it was not until January 14, 1999, when the plaintiff began receiving notices from the Division of Revenue that he became aware that a cause of action existed, and thus the statute of limitations was tolled until that time.

FN16. Def's Supplemental Submission to Mot. for Summ. J. Ex. A (July 30, 2002); *Id.* ¶ 7.

FN17. *Id.* Ex. B.

FN18. *Id.* Ex. C.

It may be that the plaintiff should have recognized that defendants' failure to calculate the plaintiff's 1994 State of Delaware tax correctly, the audit by the Division of Revenue and the need for plaintiff to hire a new account indicated malfeasance on the part of the defendant, however, these questions must be resolved by the trier of fact. The Court finds that evidence exists sufficient to raise an issue of fact as to when the plaintiff, through the exercise of due diligence, should have discovered that the alleged

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

accounting errors in the taxes prepared by the                END OF DOCUMENT
defendants constituted a cause of action.

### B. Time of Discovery

*4 "Generally, ignorance of the facts constituting a
cause of action does not act as an obstacle to the
operation of the statute [of limitations], except in the
case of infancy, incapacity, and certain types of
fraud. An exception occurs when there are no
observable or objective factors which put laymen on
notice of a problem." [FN19] Thus, "no cause of
action accrues if the breach is inherently unknowable
and the plaintiff was blamelessly ignorant that the
cause of action existed." [FN20]

> FN19. *Began v. Dixon,* 547 A.2d at 623
> (legal malpractice action).

> FN20. *Henlopen Station Condominium
> Council of Unit Owners v. Henlopen
> Junction Condominium Council of Unit
> Owners & Piraeus Realty, Corp.,* 2000 WL
> 303635, at *3 (Del.Super.).

While the plaintiff began questioning whether the
plaintiff or defendants would be responsible for the
penalties and interest due on the plaintiff's taxes, the
record is unclear as to why the plaintiff made the
May 1997 inquiry. Furthermore, the plaintiff's
accountant, Charles F. Seitz, states that, "it is my
professional opinion that a layman would not have
the knowledge to have discovered these flaws and
inaccuracies, and in any event, most of these matters
were not discoverable until the tax authorities
inquired in 1999." [FN21] A factual question
therefore also exists as to when the plaintiff was no
longer "blamelessly ignorant" of the fact that the tax
problems were a result of the defendants' alleged
malfeasance. Because the Court finds genuine issues
of material fact with respect to when the plaintiff's
breach of contract action accrued the Court denies
summary judgment on the breach of contract claim.

> FN21. Charles F. Seitz Aff. ¶ 47.

### Conclusion

For the foregoing reasons, Defendants' Motion for
Summary Judgment on the Deceptive Trace practices
claim is GRANTED and the Defendants' Motion for
Summary Judgment on the breach of contract claim
is DENIED.

Not Reported in A.2d, 2002 WL 31357891
(Del.Super.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.