1

Westlaw.

Not Reported in A.2d                                                                         Page 1
Not Reported in A.2d, 1992 WL 9078 (Del.Super.)
**(Cite as: 1992 WL 9078 (Del.Super.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Thomas DESCANO and Nancy Descano
v.
Charles L. WALTERS, et al.
**Civ. A. No. 88C-NO-18.**

Submitted: Jan. 9, 1992.
Decided: Jan. 15, 1992.
Robert B. Coonin, Berkowitz, Greenstein, Schagrin
& Coonin, Wilmington.

James F. Kipp, Trzuskowski, Kipp, Kelleher &
Pearce, P.A., Wilmington.

Henry A. Heiman, Heiman, Aber & Goldlust,
Wilmington.

Mark Lynch, Dunn, Haase, Sullivan, Mallon &
Cherner, Media, Pa.

*Decision after non-jury trial January 9, 1992*

DEL PESCO, Judge.

*1 This is a case which arises as the result of the sale
of a house in Hockessin, Delaware. The
owners/defendants, Charles L. Walters and Marcia F.
Walters (now deceased) advertised the sale of their
home. The plaintiffs saw the advertisement in the
paper and entered into a contract to purchase the
house. The sales contract dated October 18, 1985,
provided that the buyer "has the privilege of having
the property examined by a reputable House
Inspector at Buyer's expense within five working
days of the date of the Agreement of Sale, in order to
determine that the electric, plumbing, and heating
systems are in good working order and that the
foundation, roof, and structure are in sound
condition." The agreement also provided that any
defects were to be repaired at the sellers expense.

The plaintiffs hired Inspector, Inc. to perform the
inspection. The President of that Pennsylvania
corporation, Jules Falcone, conducted the inspection

on October 23, 1985. He prepared a report of the
same date which states, among other things, that the
foundation is block, that the "[h]ouse is structurally
sound", that "[w]ater is being controlled, recommend
regrading to get water away from house", "[i]mprove
grades close to house & at downspouts", "[i]mprove
grades close to walls of the house", "[i]mprove
grades close to house (shrubs could be problem)".

The house was constructed in a low area which
perhaps then and apparently now is designated as
being within a flood plain. The house has a concrete
slab foundation, with a row of cinder blocks above
the perimeter of the slab except in the place where a
garage was built originally. Above the concrete
block are the wooden studs which frame the house.
The house is a bi-level. The front door enters to a
landing which has a few steps down to the lower
level or approximately ten steps up to the primary
living area.

Settlement on the property was December 4, 1985.
Plaintiffs sought repair to the retaining wall which
bordered the rear patio but the sellers denied any
defect and refused to make repairs. No other
specific repairs were demanded.

Plaintiffs noticed some water leaking into the
northwestern corner of the lower level of the house in
the spring of 1986. Thereafter they learned through
a neighbor that the original owner and builder of the
house had built it with a garage on the western side of
the house. Later, the garage door was removed, the
wall framed in, a window installed, and siding
applied to match the rest of the house thereby
rendering it impossible to know that there had once
been a garage. However, there was no concrete
block placed on top of the slab so the wooden studs
were directly on the concrete slab. PX 17 [FN1]

FN1. PX--refers to plaintiffs' trial exhibits.

Apparently at the same time as the garage
conversion, and probably because of water problems,
the original owner sprayed the bottom foot or two of
the wooden siding (described as a plywood-type)
with a styrofoam material and hauled in soil to raise
the grade around the house by a couple of feet. This
meant that the bottom of the siding on three sides of
the house was separated from the soil by only the
styrofoam material. On the fourth side, a retaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 9078 (Del.Super.)
**(Cite as: 1992 WL 9078 (Del.Super.))**

wall was constructed so that the soil was held back by the wall which surrounded a patio off the lower level of the house. This clearly improper construction technique resulted in a grade which was higher than the foundation. The inevitable occurred--all the wooden members below the grade began to rot. PX 18

**\*2** The first issue to decide relates to the statute of limitations defense asserted by all defendants.

The complaint in this case was filed on November 3, 1988. The inspection of the house occurred on October 23, 1985. The report was prepared the same day and presented to the plaintiffs. There was no other contact between Inspectors, Inc. and the plaintiffs. Defendants argue that 10 Del.C. § 8106 bars the claim, relying on *Lembert v. Gilmore, Del.Super., 312 A.2d 335 (1973)* and *Nardo v. Guido DeAnscanis & Sons, Inc., Del.Super., 254 A.2d 254 (1969).* Plaintiff argues that the defective construction of the house was inherently unknowable until problems began in spring 1986.

Since this Court decided *Lembert* and *Nardo,* the Delaware courts have steadily moved toward a less rigid application of the statute of limitations. The trend began with *Layton v. Allen, Del.Super., 246 A.2d 794 (1969),* a medical malpractice case in which a surgeon left an hemostat inside the plaintiff, who did not discover the problem until she experienced pain seven years later. In determining whether the plaintiff's case was barred by the statute of limitations, the Court held that "the rule of ignorance has no application in a case involving an inherently unknowable injury sustained by a blamelessly ignorant plaintiff as herein defined." *Id.* at 799. The Delaware Supreme Court applied the *Layton* analysis to an accountant malpractice case in *Isaacson, Stolper & Co. v. Artisan's Savings Bank, Del.Super., 330 A.2d 130 (1974)* (Accountant's malpractice in failing to get permission from the Secretary of the Treasury for change in accounting method was unknowable to plaintiff bank until bank received notice of tax deficiencies caused by the mistake). In *Pioneer Nat. Title Ins. Co. v. Child Inc., Del.Super., 401 A.2d 68 (1979),* the Supreme Court affirmed the part of *Child, Inc. v. Rodgers, Del.Super., 377 A.2d 374 (1977),* which held that the time of discovery rule should be applied in an attorney malpractice case involving a bad title search.

In 1977, Chief Justice Christie, then a Superior Court Judge, applied the time of discovery rule in a case where the plaintiffs were suing plumbers for installing an allegedly defective septic tank system. The defect was not noticeable until sewage backed up into the plaintiffs' washroom, and the defendants asserted that the case should be dismissed since the statute of limitations under 10 Del.C. § 8106 had run. The Court held: "I can find no reasonable distinction between the cases involving hidden malpractice of doctors, accountants and lawyers and the hidden errors of a plumber." *Id.* at 649. Chief Justice Christie went on to say that "the better rule and the rule to be applied here is that the cause of action did not accrue until the plaintiffs had notice that there was something wrong with the septic system or until, by the exercise of reasonable diligence and care, they could have discovered the defect." *Id.* at 649. The Superior Court has applied the time of discovery rule in several cases involving hidden construction defects since *Rudginski. See Kent County Motor Sales Co. v. O.A. Newton & Son Company,* C.A. No. 89C-SE-4, Steele, J. (Oct. 11, 1991) (Summary judgment motion denied where extent of defendant's assurances accompanying repairs and reasonableness of the plaintiff in relying on them prevented court from deciding as a matter of law whether the time of discovery rule applied); *State of Delaware v. The Regency Group, Inc.,* Del.Super., C.A. No. 87C-MY-102, Herlihy, J. (Apr. 3, 1991) ("The determination of whether the statute of limitations is tolled depends on whether the condition which is the product of the alleged negligence was inherently unknowable, and, if so, when the defendants knew or should have known of the condition." p. 8, citing *Hodges v. Smith, Del.Super., 517 A.2d 299, 301 (1986); Wilson v. Simon,* Del.Super., C.A. No. 85C-MY1, Lee, J. (Mar. 22, 1990) (Statute of limitations for inherently unknowable negligence in the design and manufacture of solvent recovery system accrued on the date when the system exploded); *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, Lee, J. (1988) (Summary judgment denied where there was a material question of fact as to when roof defect was discovered); *Pack & Process, Inc. v. Celotex Corp., Del.Super., 503 A.2d 646 (1985)* (Where roof manufacturer was contractually obligated to inspect and repair roof, statute of limitations on breach of warranty did not begin to run until manufacturer notified plaintiff of inherent defect in roof); *Consol. American Ins. Co. v. Chiriboga, Del.Super., 514 A.2d 1136 (1986)* (In suit brought by fire insurers for damage to condominium alleging negligent design and/or construction, the consideration of whether or not the condition which is the product of alleged negligence ... was inherently unknowable, and, if so, when those whose subrogated

rights plaintiffs are asserting knew or should have known of the condition is essential to the determination of whether or not suit is barred by the statute of limitations); *Burrows v. Masten Lumber and Supply Company,* Del.Super., C.A. No. 84C-MY-12, Ridgely, J. (1986) (Plaintiff's action accrued when defects were discoverable, which was when roof started to leak); *913 North Market Street Partnership, L.P. v. Melon Bank (DE),* Del.Super., C.A. No. 84C-JL-63, Bifferato, J. (July 11, 1986) (Where foundation of adjacent building trespassed under the surface of plaintiff's property, the date upon which the plaintiff learned of the encroachment is a material fact in the determination whether the statute of limitations has passed); *Harting v. Magness Construction Co.,* Del.Super., C.A. No. 84C-DE-56, Stiftel, J. (Jan. 16, 1986) (Summary judgment denied in action for breach of warranty where siding was alleged to be of inferior quality to that which was promised in contract; the record lacked sufficient evidence as to whether the different quality of siding was a hidden defect to determine whether the time of discovery rule applied).

\*3 In this instance, the first evidence the plaintiffs had of a problem with the property was the water leak in the northwest corner of the house that developed in spring 1986. It is logical that a leak would develop at that point before any other because that is the corner of the house where the garage was located and where the one row of cinder block was missing. It is also the place where the driveway had been covered by soil, NOT removed. Thus, the buried driveway obstructed the flow of water. Had plaintiffs conducted a diligent analysis of the cause of that problem at that time, they would have determined the defect in the construction. Because of the inherently unknowable construction defect, I conclude that the statute of limitations does not bar this claim.

The claim against Inspectors, Inc. and its agent and principle, Jules Falcone, is based upon negligence. The *Standards of Professional Practices for Home & Building Inspections,* a pamphlet which was given to plaintiffs at the time of the inspection, provides that the general purpose of the inspection is "to identify and disclose to the client certain conditions of the major systems as these conditions exist at the time of the inspection". The pamphlet clearly indicates that the inspection is "essentially visual; ... based on the experience and opinion of the inspector". The components of the house which are to be inspected include the foundation and structure. The pamphlet indicates that the inspector is to identify the type of

construction and the materials used. There is particular mention of the foundation walls. There is no question that the inspector misperceived the construction of the house. He apparently assumed that there was a concrete block foundation around the perimeter of the slab to the level of the grade without making any effort to look behind switch plates to confirm his assumption. In addition, he conducted a visual inspection of the outside of the house. The styrofoam material was clearly visible at the bottom of the siding at grade level. I accept the testimony of the plaintiff who says he specifically inquired about the nature of the substance and was told that it was a vapor barrier over the foundation block.

The defendant Falcone says he thought the styrofoam was concrete parging, which he defined as a cement mix like stucco used to cover the outside of block walls for waterproofing. He acknowledges that the construction of the house with the grade above the top of the foundation is improper. He testified that if he had recognized the deficiency, he would have brought it to the attention of the buyers. He also explained that he did not recognize the deficiency because it was camouflaged from him. That camouflage was due, in part, to the fact that it was stained the color of the house; not a yellow color as described by plaintiff. He denies having a conversation with the plaintiff about the styrofoam and explains that he would not have said it was a vapor barrier because he knows that would be improper construction. He admits that he never touched the "parging" to determine that it was not cement, but rather styrofoam.

\*4 I accept the testimony of the plaintiff that the styrofoam was not stained brown until a later date when the siding was restained. I also find Mr. Falcone's testimony to be internally inconsistent when he claims to have found evidence of a water problem on the southeast and northwest corners of the lower level, both problems he attributed to grade deficiencies, but then goes on to say that he did not examine the foundation more carefully because there was nothing about the house which would have drawn him to be concerned about it. Clearly, had the most cursory examination of the styrofoam been conducted, it would have been apparent that it was placed on siding, not concrete, and questions would immediately have been raised about the quality of construction.

I find that Inspectors, Inc., and its agent Falcone, were negligent and that the negligence was a proximate cause of the loss sustained by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 9078 (Del.Super.)
**(Cite as: 1992 WL 9078 (Del.Super.))**

Page 4

plaintiffs.

The plaintiffs have also claimed misrepresentation by the sellers, Mr. and Mrs. Walters. Since Mrs. Walters has died and her estate has not been substituted, the action proceeds against Mr. Walters alone. The claim is based on the assertion that the Walters knew of prior water problems which they concealed from the plaintiffs. The evidence is that the Walters failed to disclose that there were two instances when major storms passing through the area caused the creek at the back of the property to rise and resulted in very heavy flooding of the house. However, I am satisfied that such instances where acts of God result in unusual conditions are not the type of disclosure the plaintiff's questions were seeking or the sellers had an obligation to disclose. Those flooding instances were not the cause of the loss which brings this case to court. There was no evidence of the deterioration of the structure having progressed to a point where it became apparent to a homeowner until the spring of 1986 when the water problem developed in the northwestern corner of the house. The action against Mr. Walters is dismissed.

The parties have stipulated to damages in the amount of $27,000. Judgement in that sum is entered in favor of plaintiffs against Inspectors, Inc. and Jules Falcone.

IT IS SO ORDERED.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 1993 WL 487807 (Del.Ch.)
**(Cite as: 1993 WL 487807 (Del.Ch.))**

# H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, Sussex County.
Jane C. EAST and Lawrence W. Conneen, Plaintiffs,
v.
J. Joseph TANSEY, individually, J. Joseph Tansey,
Executor of the Estate of
Barbara C. Tansey, and J. Brian Tansey, Defendants.
**Civ. A. No. 1592.**

Submitted: Aug. 17, 1993.
Decided: Oct. 22, 1993.

ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT: GRANTED.

Joseph C. Raskauskas, Bethany Beach, for plaintiffs.

David N. Rutt, Moore & Rutt, Georgetown, for
defendants.

Richard F. Stokes, and Brian D. Shirey, Tunnell and
Raysor, Georgetown, for Deborah Ann Conneen.

MEMORANDUM OPINION

HARTNETT, Vice Chancellor.

*1 Defendants moved for summary judgment.
Counts I and II of the Complaint are barred by the
lapse of time, as a matter of law. Count III must also
be dismissed because it does not state a claim upon
which relief can be granted. The motion for
summary judgment must, therefore, be granted.

### THE FACTS
### I

The essential material facts are not disputed. Doctor
Lawrence Conneen, a resident of Cumberland
County, Maine, died on February 7, 1957. He was
survived by his wife, Barbara, and three children by
his marriage to Barbara: Lawrence, age 10; Jane,
age 6; and Deborah, age 4. In his Will, Dr. Conneen left
each child $10,000. Barbara received the bequests
as parent and guardian of the minors.

On September 21, 1957, Barbara married Joseph
Tansey. The entire family moved to Maryland in
1963 when Joseph Tansey obtained employment in
Washington, D.C. In September of 1972, Joseph and
Barbara Tansey, accompanied by Deborah, moved to
Bethany Beach, Delaware, to go into the real estate
business. At this time, Lawrence and Jane, the
plaintiffs in this action, remained in Maryland.

On February 25, 1985, Barbara executed her Last
Will and Testament and a Revocable Intervivos Trust
Agreement. Joseph Tansey, her husband, was
named Executor of the Will. Joseph and J. Brian
Tansey (a son of Joseph by a prior marriage) were
named Co-Trustees of the Revocable Intervivos Trust
Agreement.

Under the Revocable Intervivos Trust Agreement,
Barbara's stock in Tansey-Warner, Inc. was to be
held by Joseph Tansey for his life and then to go to
Deborah Conneen, who is a sister of plaintiffs, but
who is not a party to this litigation. Also, under the
Trust, upon Joseph Tansey's death, Barbara's house in
Bethany Beach was to become the property of
plaintiff Jane East and Deborah Conneen, equally.
The balance of the trust property remaining was to be
divided equally among J. Brian Tansey and Elaine
Weschler (children of Joseph), Deborah Conneen and
the plaintiffs.

Under the Will, the residue of Barbara's estate
(except for personal effects) was to "pour over" into
the Revocable Intervivos Trust.

Barbara Tansey died on December 8, 1990. On
December 14, 1990, her husband Joseph Tansey was
issued Letters Testamentary by the Register of Wills
of Sussex County, Delaware. The estate was settled
on June 11, 1991. No objections to the will or the
estate administration were ever filed prior to this suit.
The only assets shown on the Final Account of the
Estate were a small checking account balance and
property jointly owned with Joseph Tansey.

### THE LAW OF SUMMARY JUDGMENT
### II

To succeed on a motion for summary judgment, a
party must demonstrate that there is no genuine issue
of relevant material fact and that it is entitled to
judgment as a matter of law. Chancery Rule 56(c).
In considering a motion for summary judgment, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 487807 (Del.Ch.)
**(Cite as: 1993 WL 487807 (Del.Ch.))**

Page 2

court must view the facts in the light most favorable to the non-moving party. *Bershad v. Curtis-Wright Corp.,* Del.Supr., 535 A.2d 840 (1987).

### COUNT ONE
### III

**\*2** In Count I of the Complaint, plaintiffs seek to impose a constructive trust upon the assets of the Estate of Barbara Tansey. (Complaint, ¶ 43). In support of this claim, plaintiffs allege that Barbara and Joseph Tansey long ago deliberately misappropriated the $10,000 bequeathed to each of them by the Will of their father, Dr. Lawrence Conneen. Defendants, in response, claim that the bequests were used to defray the costs of private schools that plaintiffs attended.

Assuming, arguendo, that a claim for a constructive trust is properly plead, the issue is whether plaintiffs' claim for a constructive trust is time-barred by either an applicable statute of limitations or the equitable doctrine of laches. It is conceded by defendants (the movants) that the limitations period could not have begun to run until the plaintiffs reached the age of majority. Plaintiff Lawrence Conneen became 18 on July 26, 1964, while plaintiff Jane East became 18 on May 9, 1968. The complaint was not filed until March 30, 1993--almost 25 years later!

Plaintiffs counter that the time period for their bringing suit did not begin until they discovered the alleged misappropriation of their bequests.

The statute of limitations applicable in an action at law is not controlling in equity; the equitable doctrine of laches is applied instead. However, "absent unusual circumstances, the analogous statute of limitations will be given great weight in deciding whether the plaintiff's claim is barred by laches." *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148, 157 (1982). As stated in *Adams,* the analogous three-year statute of limitations of 10 *Del. C.* § 8106 governs an action to impose a constructive trust. *Id.* at 158.

For the plaintiffs, therefore, to avoid having this suit dismissed as being time barred, they must show that the time limitation for the bringing of this suit was somehow tolled. They rely on the time-of-discovery rule. For the time-of-discovery rule to toll the time for bringing suit, however, plaintiffs must show: (1) that the injury was *inherently* unknowable, and, if so, (2) that suit was filed within the limitations period after plaintiffs knew or should have known of the injury. *Hodges v. Smith,* Del.Super., 517 A.2d 299,

301 (1986); *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646 (1985). Mere ignorance of a cause of action does not serve to toll the limitations. *Bradford, Inc. v. Travelers Indemnity Company,* Del.Super., 301 A.2d 519, 525 (1972).

Plaintiffs cannot satisfy the first requirement of the time-of-discovery rule because, as a matter of law, the injury alleged in the present case was not inherently unknowable. Upon reaching the age of majority, plaintiffs could have inquired at the Registrar of Probate for Cumberland County, Maine, to determine whether the probated Will of Dr. Lawrence Conneen, their father, named them as beneficiaries. Once they discovered that he had left each of them $10,000 in his will, they could have inquired about the whereabouts of the money. If a satisfactory response was not obtained, plaintiffs could have taken appropriate legal action.

**\*3** Aside from the bar by the analogous statute of limitations, the equitable doctrine of laches would also bar plaintiffs' claim. As Chief Justice Layton noted:

A Court of Equity moves upon considerations of conscience, good faith and reasonable diligence. Knowledge and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of as wrongful and bringing of suit to prevent or correct the wrong does not, in itself, determine the question of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid. Change of position on the part of those affected by non-action, and the intervention of rights are factors of supreme importance.

*Federal United Corp. v. Havender,* Del.Supr., 11 A.2d 331, 343 (1940), quoted in *Adams,* 452 A.2d at 157.

By any standard, the delay involved in the present case was unreasonable because plaintiffs waited at least twenty-four years after they became of age to bring their claim. Barbara Tansey, the mother of plaintiffs, who was legally responsible for managing the funds plaintiffs now seek, is deceased. It would be unreasonable to require Joseph Tansey to defend against claims against Barbara that, if they existed at all, arose over twenty-four years ago.

Statutes of limitation and the doctrine of laches both are designed to protect a party from being forced to defend against stale claims when evidence may no longer be available. *See Pack & Process,* 503 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 651; _Adams,_ 452 A.2d 148. This public policy would be abrogated if plaintiffs are permitted to proceed with the present action for a constructive trust against the assets of their deceased mother. Accordingly, defendants' motion for summary judgment relating to the claim for a constructive trust must be granted.

### COUNT TWO
### IV

Plaintiffs in Count Two of the complaint contend that defendants "fraudulently, maliciously, and deliberately" excluded them from knowledge as to the administration of the Estate of Barbara Tansey. (Complaint, ¶ 46). They allege that defendants lied to them about when her Will would be probated so that the statute of limitations for filing challenges to the will would bar any challenge. Plaintiffs also assert that the actual Will of Barbara Tansey was not probated, an invalid earlier will being probated in its place.

Count Two of the complaint is really a petition to review the probated will. As such, it is governed and ultimately barred by 12 _Del. C._ § 1309(a) that reads in pertinent part:

"Any person interested who shall not voluntarily appear at the time of taking the proof of a will, or be served with citation or notice as provided in § 1303 of this title, shall, at any time within 6 months after such proof or after delivery to the Register of Wills of self-proved will, have a right of review which shall on this petition be ordered by the Court of Chancery ..."

\*4 In the complaint, it is conceded by plaintiffs that although they were aware of their mother's death while she was a resident of Sussex County, Delaware, they did not appear at the time the will was proved on December 14, 1990 or file any objection to the granting of letters testamentary until March 30, 1993. They also did not file a petition with the Court of Chancery requesting notice of the proof of Barbara Tansey's Will. 12 _Del. C._ § 1303 provides:

"Proof of a will may be taken without notice to persons interested, unless such a person requests it by petition filed with the Court of Chancery. Upon receiving such petition, the Court shall, and in any case it may, appoint a time for taking the proof, and issue subpoena, requiring any person to be present at the taking of such proof. In respect to persons not within the State it may order such service or publication of notice as it deems proper."
Thus, the six-month limitation of 12 _Del. C._ § 1309(a) bars any challenge to the probated will.

In _Criscoe v. Derooy,_ Del.Ch., 384 A.2d 627, 629 (1978), this Court construed 12 _Del. C._ § 1309(a):

The statute is clear and unambiguous. It is a special statute of limitations as to wills. Any person seeking a review of an instrument proven as a will shall, within 6 months after the proof of the will, file a petition seeking the review ... The purpose for a 6-month limitation on the time to attack the validity of a will or of a provision therein is clear. It is to permit the prompt and orderly administration of estates.

In _Moore v. Graybeal,_ Del.Ch., C.A. No. 9851-NC, Allen, C. (Feb. 24, 1989), this Court was again called upon to interpret this statute. Chancellor Allen agreed with Judge Farnan (who had earlier dismissed the case in federal court) when he found that the complaint constituted an attempt to declare invalid a will already admitted to probate. In so doing, Chancellor Allen rejected the plaintiffs' alternative characterization of their complaint as a tort action for interference with an expectancy the plaintiffs retained under an earlier will. _See Moore_ at 6. The Court then dismissed the complaint, finding that the six-month limitation period of 12 _Del. C._ § 1309(a) applied to bar it. The Court found that Section 1309 operated as a statute of creation: "it is not that the remedy is barred through a limitation but that the right no longer exists by reason of the statute that creates it." _Id._ at 8, footnote 2.

Plaintiffs argue, however, that the defendants fraudulently prevented their timely discovery of the date when the Will of Barbara Tansey would be probated. This argument necessarily must fail. Fraud does not toll 12 _Del. C._ § 1309. _Criscoe v. Derooy,_ Del. Ch., 384 A.2d 627, 630 (1978). It is also uncontroverted from the briefs, supporting affidavits and depositions that plaintiffs knew that their mother had died in December of 1990 while a resident of Sussex County, Delaware, after making a will and that the will would be filed for probate in Georgetown, Delaware, most likely by David Baker, Esquire. The will was probated on December 14, 1990, 6 days after the death of Barbara Tansey, well within the 10 days required by 12 _Del. C._ § 1301. Plaintiffs could have contacted the Register of Wills for Sussex County in the six months following Barbara's death to find out if the will had been probated as is required by 12 _Del. C._ § 1301. Even if plaintiffs relied upon Joseph Tansey to tell them when the will was probated, and even if this reliance was misplaced, plaintiffs must bear the consequences of that reliance and their delay.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 487807 (Del.Ch.)
(Cite as: 1993 WL 487807 (Del.Ch.))

### V

**\*5** Plaintiffs also claim in Count Two of the complaint that the wrong will was probated. They have alleged the existence of a later will made by Barbara Tansey that allegedly provided a legacy to them. (Complaint, ¶ 50). Plaintiffs, however, have not produced this later will, although 12 *Del. C.* § 1301 requires the delivery of any will to the Register of Wills within 10 days of its discovery. Nor have they adduced any evidence as to the present whereabouts of any alleged will. Even assuming, arguendo, the existence of a later will, the time for challenging the validity of the will that was proved has long expired. Because the will was proved on December 14, 1990, and the present action was not filed until March 30, 1993, 12 *Del. C.* § 1309(a) bars any challenge to the probated will.

### COUNT THREE
### VI

In Count Three of the complaint, plaintiffs allege that the Inventory and First and Final Account filed in the Estate of Barbara Tansey on June 11, 1991, is incomplete. (Complaint, ¶ 54-62). In particular, plaintiffs allege that the assignment of two mortgages to the Revocable Intervivos Trust in October 1990 by Barbara Tansey was forged and therefore the two mortgages should have been included in the Inventory of Assets of the Estate. Defendants counter by arguing that the mortgages were validly assigned to the Co-Trustees of the Revocable Intervivos Trust by Barbara Tansey because they were signed in her name and in her presence by Joseph Tansey at her express direction while both of them were present in the offices of David Baker, Esquire.

Plaintiffs rely on the alleged forgery of the assignments as the basis for seeking a full accounting of all of the assets of the estate.

This Count must also be dismissed because plaintiffs have failed to state a claim upon which relief can be granted. Plaintiffs' claim is based solely on their allegation that the assignment of two mortgages to the Trust by Barbara Tansey was a forgery. Even if the assignment was a forgery, and void, the mortgages still would not be a part of the Estate of Barbara Tansey. This is so because the Will of Barbara Tansey devised all her residual property to the Trust. The mortgages, if they had not been assigned to the Trust by Barbara Tansey during her lifetime, would have been part of her residuary estate. There is, therefore, no basis for any claim that the mortgages should have been included in the assets of the Estate of Barbara Tansey.

### SUMMARY
### VIII

Defendants' motion for summary judgment is granted as to all three counts of the complaint. The claim for a constructive trust is barred by the three-year limitations in 10 *Del. C.* § 8106 and by the doctrine of laches. The claim alleging that an invalid will was probated is barred by the six-month limitations of 12 *Del. C.* § 1309(a). Finally, the claim alleging that the Inventory and First and Final Account filed in connection with the Estate of Barbara Tansey is incomplete is barred because the assets allegedly missing from the Inventory could not have been assets of the Estate of Barbara Tansey. This complaint is, therefore, dismissed with costs assessed against plaintiffs.

**\*6** IT IS SO ORDERED.

Not Reported in A.2d, 1993 WL 487807 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw.

Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 1991 WL 215909 (Del.Super.)
**(Cite as: 1991 WL 215909 (Del.Super.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, Kent County.
KENT COUNTY MOTOR SALES CO., a Delaware
corporation, and Whitby Family L.P.,
Plaintiff,
v.
O.A. NEWTON & SON COMPANY, Defendant.
**No. 89C-SE-4.**

Submitted: Sept. 27, 1991.
Decided: Oct. 11, 1991.

Upon Defendant's Motion for Summary Judgment.

I. Barry Guerke of Parkowski, Noble & Guerke,
Dover, for plaintiffs.

Phebe S. Young of Bayard, Handelman & Murdoch,
P.A., Wilmington, for defendant.

*ORDER*

STEELE, Judge.

*1 On this 11th day of October, after briefing and
oral argument, it appears that:

(1) Kent County Motor Sales Co. ("KCM") and
Whitby Family L.P. ("Whitby") filed suit against
O.A. Newton & Son Company ("Newton") on
September 7, 1989. At all times relevant to this
action, KCM leased from Whitby the land and
buildings it uses to operate its automobile dealership.
On August 15, 1984, KCM and Newton entered into
a contract by which Newton agreed to install and
provide KCM with a pre-engineered steel building
and accessories in exchange for KCM's total payment
of $627,102 for "material and labor". Plaintiffs seek
recovery from defendants for breach of contract,
breach of warranty and negligence. All claims
derive from alleged defects in the materials and/or
workmanship associated with the installation of the
building. KCM moved into the premises on
September 7, 1985.

(2) Newton, in its motion for summary judgment,
argues the three-year statute of limitations, 10 Del C.
§ 8106, applies to bar plaintiffs' action, filed on
September 7, 1989. This statute of limitations
applies to actions based upon contracts generally.
Both parties view the date of KCM's initial
occupancy, September 7, 1985, as the earliest date
that might have triggered any statute of limitations.
KCM claims and Newton contests the applicability of
the Uniform Commercial Code's ("U.C.C.") four-year
statute of limitations which would not bar plaintiffs'
claim. 6 Del.C. § 2-725. This statute of limitations
applies to contracts for goods.

(3) The parties do not dispute the hybrid nature of
the contract. The contract clearly provided for both
the purchase of materials and the labor to construct
the building. Defendant's contend the contract at
issue related primarily to services and therefore did
not fall within the purview of the U.C.C. which
applies only to "transactions in goods." 6 Del.C. § 2-
102. All parties agree the "predominant factor" test
properly applies to determine how to characterize
such a mixed contract.

Where a mixed contract is involved, it is necessary
that the Court review the factual circumstances
surrounding the negotiation, formation and
contemplated performance of the contract to
determine whether the contract is predominantly or
primarily a contract for the sale of goods or for
services. If the cause of action centers exclusively
on the materials portion of the contract, the
determination may rest upon that fact.

Glover Sch. & Office Equipment v. Dave Hall,
Del.Super., 372 A.2d 221, 223 (1977).

(4) Courts generally refrain from granting summary
judgment in cases concerning hybrid goods and
services contracts. DeGroft v. Lancaster Silo Co., 72
Md.App. 154, ---, 527 A.2d 1316, 1323 (1987).
Viewing the facts most favorably toward the non-
moving party, the Court finds the "goods"
characteristic most likely predominates as to the
nature of the contract. Newton clearly has not carried
its burden to persuade this Court that no genuine
factual issue remains concerning the nature of the
contract. The parties should note "[t]here is also
considerable authority for the proposition that large
items assembled from identified, pre-fabricated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 2
Not Reported in A.2d, 1991 WL 215909 (Del.Super.)
**(Cite as: 1991 WL 215909 (Del.Super.))**

component parts such as modular homes, water tanks, and bowling lanes constitute 'goods.' " *See DeGroft,* 527 A.2d at 1322, n. 2 (citing cases). Furthermore, oral argument did not help solve the issue of whether the predominant damage complained of related to defective materials (goods) which Newton supplied or to deficient services associated with the construction and installation of the building. Only a jury can properly resolve such a factual dispute. Lacking the facts necessary to conclusively determine whether the contract and damage complained of related primarily to "goods", this Court cannot possibly determine, as a matter of law, that the U.C.C. and its limitations period does not apply to the contract. *Glover Sch. & Office Equipment v. Dave Hall,* Del.Super., 372 A.2d at 223; *DeGroft,* 527 A.2d at 1322.

**\*2** (5) "Under the time of discovery rule, injuries or conditions which are inherently unknowable postpone the commencement of the statute-of-limitations period until the victim discovered or should have discovered the wrong." *Hodges v. Smith,* Del.Super., 517 A.2d 299, 300 (1986). While undisputed that, for some time, Newton made free repairs for KCM, whether and to what extent assurances accompanied these repairs remain genuine issues of material fact. The yet undetermined extent of assurances and reasonableness of KCM's reliance on them prevents this Court from deciding, as a matter of law, the "time of discovery rule" does not apply to extend the accrual date for KCM's cause of action. *Pack & Process, Inc. v. Celotex,* Del.Super., 503 A.2d 646, 651 (1985); *Rudginski v. Pullella,* Del.Super., 378 A.2d 646 (1977). Likewise, whether Newton fraudulently concealed the nature of any defects, so as to toll the running of the statute of limitations, demands further inquiry at the trial stage. *Pack & Process,* 503 A.2d at 657.

(6) Finally, whether Newton made any warranties which might affect the viability of KCM's claims also remains disputed and cannot reach resolution until trial. KCM alleges that after each repair by Newton employees, Newton would convey to KCM that the repairs presented no serious problem and that KCM's problems stemmed only from ordinary wear and tear. Those representations might amount to some form of warranty, but a jury should review this fact laden issue. *Pack & Process,* 503 A.2d at 656.

For the above reasons, the Court denies defendant's motion for summary judgment.

IT IS SO ORDERED.

Not Reported in A.2d, 1991 WL 215909 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 409015 (Del.Ch.)
**(Cite as: 1995 WL 409015 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
METRO AMBULANCE, INC., a Delaware corporation, Plaintiff,
v.
EASTERN MEDICAL BILLING, INC., a Delaware corporation, David A. Podlaseck,
Joseph A. Podlaseck and Phyllic Podlaseck, Defendants.
**Civ. A. No. 13929.**

Submitted March 28, 1995.
Decided July 5, 1995.
David Roeberg of Roeberg, Moore & Associates, P.A., Wilmington, for plaintiff.

Richard E. Berl, Jr. of Berl & Jones, P.A., Georgetown, for defendants.

*MEMORANDUM OPINION*

STEELE, Vice-Chancellor.

**\*1** Plaintiff Metro Ambulance, Inc. ("Metro") filed this action against defendant Eastern Medical Billing, Inc. ("EMB") and its principals (collectively, "Defendants") seeking an accounting of Metro's money and property in EMB's possession; the imposition of a constructive trust on the funds and the property; and a declaratory judgment and damages for breaches of contractual and fiduciary duty. Defendants have filed a motion to dismiss for lack of jurisdiction arguing Metro has an adequate remedy at law. This is the decision on the motion to dismiss.

I. BACKGROUND

Metro is a Delaware corporation with offices in Dover, Delaware. Metro transports medical patients and bills the costs of their service to patients or their health insurance carriers. EMB is a Delaware corporation with offices in Bridgeville, Delaware. EMB provides billing services for health care providers.

On October 21, 1993, Metro and EMB entered into

two contracts: a "Services Agreement" and a "Contract for Billing and Collection of Accounts." The Services Agreement authorized EMB to receive, process and forward medical claims information for billing purposes on behalf of Metro. Metro agreed to pay EMB 10% of any amount EMB collected.

The Contract for Billing and Collection of Accounts supplements the Services Agreement ("the Contract"). The Contract provides for EMB to bill for and collect Metro's accounts receivable. Section 6 of the contract sets forth EMB's compensation. Section 6 obligates Metro to pay EMB 10% of the total amount collected on each current individual account. For accounts delinquent as of October 21, 1993, Metro agreed to pay 25% of the amount EMB collected. Section 5 of the contract allows Metro, upon notice, to suspend EMB's collection efforts.

Pursuant to the Services Agreement and the Contract, Metro gave EMB all unpaid transportation services records and its source documents to EMB for its billing and collection services. EMB maintained the records of Metro's accounts receivable and processed all of Metro's invoices.

Metro failed to pay $55,000.00 in EMB commissions. EMB began to retain payments it received for Metro's accounts receivable and applied the funds to Metro's balance. Not surprisingly, on August 30, 1994, EMB suspended processing new claims.

On October 11, 1994, EMB filed suit against Metro in the Superior Court of the State of Delaware. *See Eastern Medical Billing, Inc. v. Metro Ambulance, Inc.,* Del. Super., C.A. No. 94C-10-011. Metro answered with a general denial, and included a counterclaim for compensatory and punitive damages exceeding $100,000. Metro filed this action on the same day it filed the answer in the Superior Court case.

Metro makes several allegations against EMB. Metro alleges (1) EMB, in derogation of the agreements, requested the payor make payment to EMB instead of Metro; (2) EMB failed to keep Metro's funds separate from EMB funds; (3) EMB refuses to give an accounting of funds EMB received for Metro's accounts; (4) EMB commingled Metro's account records with another entity's account records;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 1995 WL 409015 (Del.Ch.)
**(Cite as: 1995 WL 409015 (Del.Ch.))**

(5) EMB refuses to return Metro's original source documents; (6) EMB has entered information which, if processed, would result in billings, but EMB refuses to process the information; (7) EMB fraudulently coded Metro's van transportation as ambulance transportation [FN1] to increase EMB's revenue.

> FN1. Apparently, Medicare will not pay for van transportation services, but ambulance transportation costs are compensable.

## II. CONTENTIONS OF THE PARTIES

*2 Defendants contend the Court of Chancery does not have jurisdiction over this action because Metro has an "adequate remedy at law." They assert this action is based on the commercial contracts which clearly define the relationship between the parties. They argue, consequently, Metro can obtain full, fair and complete relief through money damages and a declaratory judgment in Superior Court.

Metro contends the legal remedies are "woefully inadequate and wholly incomplete, impractical and inefficient." Metro asserts the contracts created fiduciary duties between the parties, which give rise to equity jurisdiction. Metro also argues the equitable remedies it seeks -- namely, an injunction, an accounting and a constructive trust establish exclusive equitable jurisdiction.

## III. LEGAL STANDARD

The Court of Chancery does not have jurisdiction to entertain a cause of action if the plaintiff has an adequate remedy at law. *10 Del. C. § 342; Hughes Tool Co. v. Fawcett Publications, Inc., Del. Supr., 315 A.2d 577, 579 (1974).* An adequate remedy at law must afford the plaintiff "full, fair and complete relief." *Id. at 579.* The legal remedy must be as practical to the ends of justice and to prompt administration as the remedy in equity. *International Business Machines Corp. v. Comdisco, Del. Ch., 602 A.2d 74, 78 (1991); Family Court v. Department of Labor and Indus. Relations, Del. Ch., 320 A.2d 777, 780 (1974).*

Chancery jurisdiction is not conferred merely through a request for equitable relief. *McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 603 (1987); see IBM, 602 A.2d at 78.* As Chancellor Allen stated:

> Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will itself excuse the court,

upon a proper motion, from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate.

*Id.* If the legal remedy is available and fully adequate, the Court will not accept jurisdiction. *Id.*

## IV. ANALYSIS

Metro argues the contract creates a principal/agency relationship. Metro asserts this relationship imposes fiduciary duties on EMB, including, *inter alia,* a special duty to protect the interest of Metro, a duty to account for and immediately pay to Metro all Metro funds in possession of EMB and a duty of good faith, loyalty and honesty with respect to all matters within the scope of the agency and the agreement. *See* Compl. ¶ 12(a)-(f). Metro contends, therefore, that the existence of this fiduciary duty provides grounds for equitable jurisdiction.

Equity will exercise jurisdiction over a fiduciary relationship. *McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 604 (1987).* This court has already explained when a fiduciary relationship exists:

> A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another. The relationship connotes a dependence. *3 *Cheese Shop Int'l, Inc. v. Steele, Del. Ch., 303 A.2d 689, 690, rev'd on other grounds, Del. Supr., 311 A.2d 870 (1973); McMahon v. New Castle Assocs., Del. Ch., 532 A.2d 601, 604 (1987).* The traditional relationships recognized by equity as "special" are express trustees and corporate officers and directors. *Id. at 604-05.* Delaware has recognized several other relationships which also carry the "special" nature of a fiduciary relationship, including: general partners; administrators or executors; guardians; and, in special circumstances, joint venturers or principles and their agents. *Id. at 605* (citations omitted). The existence of a principal/agent relationship does not, in and of itself, give rise to a fiduciary relationship. *Maull v. Stokes, Del. Ch., 68 A.2d 200, 202 (1949).* A fiduciary relationship will arise when there is an element of confidentiality or a joint undertaking between the principal and agent. *McMahon, 532 A.2d at 605.* The hallmark of this form of special principal/agent relationship is when matters are peculiarly within the knowledge of the agent. *Maull, 68 A.2d at 202.*

The parties here bargained for and defined their relationship, including the protection of their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

particular interests, in two commercial contracts. Metro paid EMB a commission to service its accounts. In order to fulfill the terms of the contract, EMB maintained records of Metro's accounts created with information Metro gave to EMB. EMB, in turn, gave Metro all the information it had available on a periodic basis. This is a straight forward commercial transaction, with both parties fulfilling their obligations *under the contract.* No special knowledge, element of confidentiality or dependence exists which would lead me to conclude the parties had a fiduciary relationship. I will not artificially manipulate the parties' commercial relationship to create fiduciary duties where none exist. Metro can still recover under the traditional duty to deal in good faith and act honestly under the written contracts -- a duty fully recognized at common law.

The remaining issue is simple and straightforward -- does Metro have an adequate remedy at law? Metro, in its complaint, has attempted to assert two traditional equitable remedies: an accounting to determine Metro's property in possession of EMB (Count I); and a constructive trust over Metro's property (Count II). [FN2]

> FN2.   *In a separate "motion,"* Metro requests an injunction to prevent EMB from collecting Metro's receivables. This request for relief is not in the complaint. Metro filed the Notice of Motion and "Motion for Order Enjoining EMB" on the 22nd of February 1995, the same day it filed an answering brief in opposition to EMB's Motion to Dismiss and more than two months after filing its complaint in this Court. A declaratory judgment from Superior Court that EMB breached the contract will end the collection effort as it addresses the monetary claims and counterclaims of the parties. I cannot consider requests for relief that appear only as an afterthought but not in the original complaint.

As I have already stated, the parties' designed and defined their relationship in the contracts, including their rights and obligations. Metro, in reality, seeks money damages for EMB's actions which it claims constitute a breach of contract.

Metro seeks an accounting of all monies, records, documents and accounts receivable records in EMB's possession. A non-fiduciary accounting, standing alone, no longer justifies chancery jurisdiction. As Chancellor Allen describes this principle:

Historically, an accounting by a non-fiduciary has been required by a court of equity only when the accounts are so complex that the legal remedy is likely to prove inadequate. *See Pomeroy's Equity Jurisprudence* § 1421 (1941). This historical basis of equity jurisdiction reflects the fact that discovery in civil litigation was originally available in chancery but not in the law courts. *Given the development of broad and liberal discovery rules in our law courts, it now seems likely that equity shall rarely, if ever, have to be resorted to in order to determine the state of accounts in a purely commercial relationship.*

*\*4 McMahon, 532 A.2d at 605* (emphasis added). The amount of damages Metro seeks can be easily calculated from either Metro's own records or EMB documents produced in discovery. Metro has a sufficient remedy at law.

Metro also seeks a constructive trust over Metro's account receivable records and funds EMB "wrongfully converted." (Compl. at ¶ 19.) The Court will impose a constructive trust when "a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owned some duty." *Adams v. Jankouskas,* Del. Supr., 452 A.2d 148, 152 (1982). A constructive trust, not premised on an equitable right, will not succeed in conferring equity jurisdiction unless it relates to specific property or identifiable proceeds of specific property. *McMahon, 532 A.2d at 609.* Metro's claim for a constructive trust is not based on an equitable theory of beneficial entitlement. Metro desires money damages. The source documents are nothing more than a tool for calculating the damages. The documents can be "recovered" through discovery in a court of law. Furthermore, an adequate legal remedy exists for conversion in an action at law for trover. *IBM, 602 A.2d at 78.* Therefore, Metro has an adequate remedy at law.

### V. CONCLUSION

Metro's complaint solely presents an action for damages based on an arm's length commercial contractual relationship. Metro has a full, fair, complete and therefore adequate legal remedy for its claims.

The complaint is dismissed for lack of jurisdiction.

IT IS SO ORDERED.

Not Reported in A.2d, 1995 WL 409015 (Del.Ch.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 409015 (Del.Ch.)
**(Cite as: 1995 WL 409015 (Del.Ch.))**

Page 4

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Peter TAFEEN, Plaintiff,
v.
HOMESTORE, INC., a Delaware corporation,
Defendant.
**No. CIVA. 023-N.**

Submitted Feb. 6, 2004.
Decided March 16, 2004.
Revised March 22, 2004.

William M. Lafferty and Charles D. Reed, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
Marc A. Fenster, of Russ, August & Kabat, Los
Angeles, California, for Plaintiff, of counsel.

William D. Johnston and Sara Beth A. Reyburn, of
Young Conaway Stargatt & Taylor, Wilmington,
Delaware, for Defendant.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 This is yet another case seeking advancement or
indemnification of legal expenses, in this instance
brought by a former officer of a Delaware company
who is a defendant in multiple legal proceedings.
What is unusual about this advancement case is the
company's novel defense: it contends (among many
other things) that the former officer is not entitled to
advancement because he has offered a hollow,
worthless promise to repay if he is ultimately found
not to be entitled to indemnification. The defense is
novel because it reminds one of a sinner who
suddenly finds religion-the conversion is
breathtaking. Content to adopt advancement and
indemnification bylaws drafted with holes large
enough to drive a truck through, [FN1] the defendant
company (like so many others in this Court of late)
suddenly "finds religion"-insisting on a rigorous
interpretation of its loosely written bylaws. Despite
the irony in this conversion, there are sufficient
factual disputes surrounding the company's unclean
hands defense in this case to warrant development of

a more complete record. Accordingly, this case
should proceed to trial as soon as possible in order to
resolve disputed facts regarding the former officer's
ability to repay advanced expenses.

> FN1. I recognize the incentives that would
> cause directors and senior officers to favor
> indemnification by laws that are capacious
> in their scope of coverage. Care must be
> taken, however, that those incentives do not
> interfere with the obligation to ensure that
> advancement and indemnification bylaws
> are written in a manner that is fundamentally
> fair to the company and its stockholders.

**I. INTRODUCTION**

Plaintiff Peter Tafeen is a former officer of
defendant Homestore, Inc. He seeks advancement of
expenses in connection with various civil litigations
in which he has been named as a defendant, including
an ongoing investigation by the United States
Securities and Exchange Commission and an ongoing
investigation by the United States Department of
Justice (collectively, the "Proceedings"). Tafeen
relies upon 8 Del. C. § 145 [FN2] and § § 6.1 (the
"Indemnification   Bylaw")   and   6.2   (the
"Advancement Bylaw") of Homestore's bylaws.
Homestore raised a number of defenses in its answer
and seeks summary judgment in its favor based on
the first nine of these defenses. Tafeen seeks partial
summary judgment on liability. This Opinion
concludes that outstanding questions of fact
regarding Homestore's unclean hands defense prevent
the grant of summary judgment at this time.

> FN2. Section 145(k) of the DGCL grants
> this Court "exclusive jurisdiction to hear and
> determine all actions for advancement of
> expenses ... brought under this section or
> under any bylaw." This Court is further
> authorized to make determinations regarding
> advancement in a summary fashion. *Id.*

**II. FACTUAL AND PROCEDURAL**
**BACKGROUND**
*A. Company Background and its Bylaws*

Homestore is a Delaware corporation engaged in
providing online media and technology to the real
estate industry. Tafeen was employed by Homestore
from September 22, 1997 through November 30,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001, first as Vice President of Business Development and later as later as Executive Vice President of Business Development, Ads and Sales.

Pursuant to § 145 of the DGCL, [FN3] Homestore's bylaws, at the time that Tafeen's employment with Homestore ended, contained the following indemnification and advancement provisions:

> FN3. Section 145, like most of the DGCL an enabling law, authorizes corporations to provide indemnification for and advancement of expenses arising from certain legal proceedings. *See* 8 *Del. C.* § 145(a-b), (e).

Section 6.1: Indemnification of Officers and Directors. Each person who was or is made a party to, or is threatened to be made a party to, or is involved in any action, suit, or proceeding, whether civil, criminal, administrative or investigative (the "Proceeding"), by reason of the fact that such person ... is or was a director or officer of the Corporation ... shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law, against all expenses, liability and loss ... reasonably incurred or suffered by such person in connection therewith, provided such person acted in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or Proceeding, had no reasonable cause to believe the person's conduct was unlawful. Such indemnification shall continue as to a person who has ceased to be a director or officer....

*2 Section 6.2: Advance of Expenses. The Corporation shall pay all expenses (including attorneys' fees) incurred by such a director or officer in defending any such Proceeding as they are incurred in advance of its final disposition; provided, however, that if the Delaware General Corporation Law then so requires, the payment of such expenses incurred by such a director or officer in advance of the final disposition of such Proceeding shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it should be determined ultimately that such director or officer is not entitled to be indemnified under this Article VI or otherwise; and provided, further, that the Corporation shall not be required to advance any expense to a person against whom the Corporation directly brings a

claim, in a Proceeding, alleging that such person has breached such person's duty of loyalty to the Corporation, committed an act or omission not in good faith or that involves intentional misconduct or a knowing violation of law, or derived an improper personal benefit from a transaction.

*B. The Proceedings*

On December 21, 2001, Homestore announced that its audit committee was conducting an inquiry into potential improprieties in its accounting practices and financial statements. That investigation revealed that Homestore had overstated its revenues by $41.4 million for the 2000 fiscal year, [FN4] and by $119 million for the first three quarters of the 2001 fiscal year. [FN5]

> FN4. Aff. of Michael R. Douglas (Dec. 8, 2003) ("Douglas Aff."), Ex. A (presenting a Newswire report on Homestore's restatement of earnings).

> FN5. Douglas Aff. Ex. B (same).

While the audit committee was conducting its investigation, the United States Securities and Exchange Commission and the United States Department of Justice both announced that they had commenced investigations into Homestore's prior accounting practices and financial reporting. Specifically, the Department of Justice is investigating Tafeen to determine whether he engaged in any criminal conduct as an officer of Homestore. Tafeen is seeking advancement for expenses in connection with both of these investigations. He also seeks advancement for expenses in connection with 10 civil actions.

All 10 civil actions name Tafeen as defendant. Of the 10 civil actions, 6 are brought by insurers seeking rescission of director and officer liability insurance policies based on alleged misrepresentations in the applications for insurance and in warranty letters. [FN6] Of the remaining 4 civil actions, one is a class action suit alleging violations of federal securities laws; [FN7] one is a suit filed by an individual investor not in the class of persons engaged in the class action suit alleging violations of federal securities laws, intentional and negligent misrepresentation, and other state law violations; [FN8] one is a suit arising from the acquisition of another company by Homestore, in which part of the consideration given by Homestore was Homestore stock, alleging securities fraud, common law fraud,

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

Page 3

negligent misrepresentation, breach of contract and unjust enrichment; [FN9] and one is a derivative action alleging violations of fiduciary duty as well as other California state law claims. [FN10]

> FN6. *Royal Indem. Co. v. Homestore, Inc.* (C.D. Cal. filed Nov. 15, 2002); *Clarendon Nat'l Ins. Co. v. Homestore, Inc.*, No. 02-08521 (C.D. Cal. filed Nov. 6, 2002); *Genesis Ins. Co. v. Homestore, Inc.*, No. 02-7738 ER (VBK) (C.D. Cal. filed Oct. 3, 2002); *Fed. Ins. Co. v. Homestore, Inc.*, No. 02-7304 (C.D. Cal. filed Sept. 18, 2002); *TIG Ins. Co. of Mich. v. Homestore, Inc.*, No. BC290823 (Cal.Super. Ct. filed Feb. 21, 2003); *Lubermens Mut. Cas. Co. v. Homestore, Inc.*, No. LC062502 (Cal.Super. Ct. filed Oct. 8, 2002).

> FN7. *In re Homestore.com, Inc. Sec. Litig.*, No. 01-CV-11115 MJP (C.D. Cal. filed Nov. 15, 2002).

> FN8. *Pyfrom v. Homestore.com, Inc.*, No. 03-0042-FMC (C.D. Cal. filed Sept. 11, 2003).

> FN9. *Siegel v. Homestore, Inc.*, No. 02-8275 (E.D.P.A. filed Nov. 1, 2002).

> FN10. *In re Homestore.com, Inc. Derivative Litig.*, No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002).

*C. The Parties' Actions Regarding Advancement*

**\*3** In early 2002, Tafeen requested advancement of legal fees and costs incurred in defending the then-in-progress proceedings. At that time, Homestore notified Tafeen that it would reimburse him only for expenses accrued through February 2002 related to the audit committee's investigation. Homestore proceeded to reimburse Tafeen for those limited expenses.

On April 30, 2002, Homestore sent a letter (the "April 30 Letter") to Tafeen advising him that it would advance expenses in connection with the SEC investigation and then-pending civil litigation in which Tafeen had been named as a defendant. [FN11] According to the letter, however, Homestore's advancing of the expenses was conditioned upon Tafeen's delivery of " 'an undertaking ... to repay all amounts so advanced if it should be determined that [Tafeen is] not entitled to

be indemnified under' Article VI of the Bylaws." [FN12] A form of undertaking was enclosed with the letter.

> FN11. Douglas Aff. Ex. E.

> FN12. *Id.*

At issue is whether a memorandum, dated April 30, 2002 (the "April 30 Memo"), was sent with the April 30 Letter. [FN13] The memorandum contains a bullet point list of restrictions and requirements connected with advancement. [FN14] The requirements and restrictions in the April 30 Memo include, among other things, that Tafeen must execute an undertaking pursuant to Homestore's bylaws; that Tafeen's counsel must provide Homestore with the names and rates of all attorneys and paralegals to whom advancement would be paid, and receive Homestore's consent to those individuals and their rates; that Tafeen's counsel could not undertake any major research projects without prior consent by Homestore; that Homestore would not pay in excess of $1,000 per month for online research; and that only one attorney could attend any meeting, witness interview, deposition or other proceeding unless agreed to in advance by Homestore. [FN15]

> FN13. *Compare* Pl.'s Opening Br. in Supp. of his Mot. for Summ. J. ("Pl.'s Op. Br."), at 5 n. 1 ("In that letter and an attached memorandum ...."), *with* Def.'s Combined Answering Br. and Opening Br. ("Def.'s Answering Br."), at 20 n. 7 ("The only enclosure to the April 30, 2002 letter ... was the form of undertaking offered to Tafeen.")

> FN14. Aff. of Charles D. Reed (Dec. 29, 2003) ("Reed Aff.") Ex. B.

> FN15. *Id.*

Tafeen did not tender the requested undertaking and Homestore did not advance any expenses to Tafeen. In July 2003, Tafeen's counsel again requested advancement in connection with the Proceedings (now including the Department of Justice investigation). In a July 11, 2003 letter, Tafeen's counsel wrote to Homestore's counsel demanding advancement yet again. Enclosed with this letter was a signed undertaking. [FN16]

> FN16. The undertaking stated, "I, Peter Tafeen, hereby agree to repay to Homestore any amounts advanced to me by Homestore

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for which it should be determined ultimately that I am not entitled to be indemnified under Article VI of Homestore's Bylaws or otherwise." Douglas Aff. Ex. F.

*D. Judicial Proceedings*

Having not received funds from Homestore, Tafeen filed a complaint in this Court on October 28, 2003 containing two counts: one for advancement and one for fees-on-fees. Homestore's answer, including eleven defenses, was filed on November 18, 2003. Both parties have moved for summary judgment on the issue of liability for advancement. This opinion addresses those motions.

### III. STANDARD OF REVIEW

Pursuant to Court of Chancery Rule 56, a motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." [FN17] The moving party has the burden of establishing that no genuine issue of material fact exists. [FN18] Any doubt as to the existence of such an issue will be resolved against the movant. [FN19] Importantly, at this stage in litigation, the only role for the Court is to determine whether a genuine issue of material fact exists; the Court cannot try the issue. [FN20]

> FN17. Ct. Ch. R. 56(c); *Scureman v. Judge,* Del. Ch., 626 A.2d 5, 10 (1992), *aff'd sub nom., Wilmington Trust Co. v. Judge,* Del.Supr., 628 A.2d 85 (1993) (mem.).

> FN18. *Nash v. Connell,* Del. Ch., 99 A.2d 242, 243 (1953).

> FN19. *Id.*

> FN20. *Banks v. Cristina Copper Mines, Inc.,* Del. Ch., 99 A.2d 504, 506 (1953).

*4 Tafeen has moved for summary judgment as to entitlement to advancement only and Homestore's cross-motion is based on its defenses related to liability. [FN21] Since the Court does not determine Tafeen's entitlement to bring an advancement claim at this time, it does not address how expenses should be advanced.

> FN21. This is consistent with Court of Chancery Rule 56: "A summary judgment, interlocutory in character, may be rendered on the issues of liability alone although there

is a genuine issue as to the amount of damages, or some other matter." Ct. Ch. R. 56(c).

### IV. DISCUSSION

Homestore's briefs raise several defenses to advancement, and its motion seeks summary judgment as to the first nine of these defenses. These defenses are considered in three categories-those involving Tafeen's conduct in the Proceedings, those involving Tafeen's conduct in seeking advancement, and those not involving Tafeen's conduct at all.

*A. Defenses Involving Tafeen's Conduct in the Proceedings*

The following defenses all seek court review of Tafeen's conduct in the Proceedings-that is, they seek court analysis of Tafeen's conduct *in the underlying actions.* Delaware courts have consistently declined to undertake such an analysis and no argument proffered by Homestore moves this Court to do otherwise.

1. *"By Reason of the Fact"*

Homestore alleges that Tafeen is not entitled to advancement because he is not a party to any of the Proceedings "by reason of the fact" that he was an officer of Homestore. Tafeen suggests that this is not a requirement of Homestore's Advancement Bylaw, and that in any event, he is a party to the Proceedings by reason of the fact that he was an officer of Homestore.

Even assuming, as Homestore's brief argues, that the Advancement Bylaw only requires advancement if the person seeking advancement was made party to a proceeding "by reason of the fact" that she was a director or officer of Homestore, an allegation (such as Homestore's) that the person who is seeking advancement is a party to the underlying proceeding because of her own personal greed is not a defense to an advancement provision containing such a requirement. [FN22] To hold otherwise, as this Court has previously noted, would serve to "vitiate the protections afforded by § 145 and contractual advancement rights." [FN23] In *Perconti v. Thornton Oil Corp.,* this Court provided the test for whether one is party to a proceeding "by reason of the fact" of her corporate position. In order for one to be deemed a party to a proceeding by reason of the fact of her corporate position, there must be a "causal connection or nexus between" the underlying proceeding and the "corporate function or 'official

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

[corporate] capacity." ' [FN24] Motivation of the party is not a factor in this test.

> FN22. *Reddy v. Elec. Data Sys. Corp.,* Del. Ch., C.A. No. 19467, Strine, V.C., 2002 Del. Ch. LEXIS 69, at \*14-\*21 (June 18, 2002), *aff'd,* Del.Supr., 820 A.2d 371 (2003) (mem.); *Perconti v. Thornton Oil Corp.,* Del. Ch., C.A. No. 18630, Noble, V.C., 2002 Del. Ch. LEXIS 51, at \*12-\* 21 (May 3, 2002).

> FN23. *Reddy,* 2002 Del. Ch. LEXIS 69, at \*16.

> FN24. *Perconti,* 2002 Del. Ch. LEXIS 51, at \*13 (citations omitted).

This is entirely consistent throughout our caselaw. In *Reddy v. Electronic Data Systems Corp.,* for example, criminal proceedings were brought against a former employee of the defendant. The allegation against the former employee was that he purposely manipulated the financial records of the defendant in order to increase funds he would receive under incentive provisions in his compensation agreement. The former employee then sought advancement of his expenses in a § 145 proceeding under the company's bylaws (which covered former employees). In *Reddy,* similar to this case, the defendant argued that the former employee was not entitled to advancement because he was not a party to the underlying criminal action "by reason of the fact" that he was an "employee" of the defendant. [FN25] The defendant ground his allegation in the idea that the former employee's motivation for his actions in the underlying proceeding was personal greed. This Court rejected that argument, stating:

> FN25. In *Reddy,* the company's bylaws did not explicitly contain a "by reason of the fact" provision, but incorporated such a requirement by reference to § 145. *See* § *Del. C.* § 145(a), (b).

\*5 The problem with EDS's argument is that it has no logical stopping point. It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty, and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks.... Therefore, it is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the

suing parties. [FN26]

> FN26. *Reddy,* 2002 Del. Ch. LEXIS 69, at \*15-\*16. This is not to say that the "by reason of the fact" requirement is illusory. As the Court noted in *Weaver v. ZeniMax Media, Inc.,* Del. Ch., C.A. No. 20439, Noble, V.C., 2004 Del. Ch. LEXIS 10, at \*10-\*11 (Jan. 30, 2004) (quoting Cochran v. Stifel Fin. Corp., Del. Ch., C.A. No. 17350, Strine, V.C., 2000 Del. Ch. LEXIS 179, at \*19-\*20 (Dec. 13, 2000), *aff'd in part, rev'd in part, remanded in part,* Del. Supr ., 809 A.2d 555 (2002)), "claims brought by a corporation against an officer for excessive compensation paid or breaches of a non-competition agreement are 'quintessential examples of a dispute between an employer ... and an employee' and are not brought 'by reason of the fact' of the director's position with the corporation."

This echoes the same policy noted in *Perconti.* And it is true here as well. To entertain Homestore's argument would be to transform advancement provisions into invitations to a trial on the merits of the underlying litigation.

Here, Tafeen is a party to the Proceedings because of his alleged role in a scheme to inflate Homestore's financial results while serving as an officer of Homestore. Because all the Proceedings are connected with Tafeen's role in this scheme in his capacity as a Homestore officer, they are within the scope of coverage of the Advancement Bylaw and Homestore's motion for summary judgment as to this defense is denied as a matter of law.

### 2. *The Contract Argument*

Homestore next states that Tafeen's "underlying misconduct effectively served to fraudulently induce the corporation to enter into the officer employment relationship and, in that context, to extend contractual advancement rights to the officer employee." [FN27] Because Tafeen fraudulently induced Homestore to enter into an employment contract with him, the argument goes, the entitlements provided by the Advancement Bylaw, which are only extended to Tafeen because of his position as an executive officer, should not be provided to him.

> FN27. Reply Br. of Def. Homestore, Inc. in Supp. of its Mot. for Summ. J. ("Def.'s Reply Br."), at 14.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

While this may be a proper basis for a fraud-in-the-inducement action against Tafeen, the argument does not serve as a defense here. The Advancement Bylaw is not dependent upon Tafeen's employment contract. This action is to determine Tafeen's entitlement to advancement under Homestore's *governing* rules. Whether or not Homestore was fraudulently induced to enter into the *employment contract* with Tafeen is a peripheral issue. For the same policy reasons discussed in *Reddy*, the Court's analysis in a *§ 145(k)* action extends only to entitlement according to advancement provisions; it does not extend to peripheral issues regarding the moving party's alleged conduct in the underlying action, even if ultimate entitlement to advanced fees may in some fashion be connected with those issues. Homestore's motion for summary judgment as to this defense is denied as a matter of law.

### 3. *The Estoppel Argument*

While still discussing Tafeen's fraudulent conduct, Homestore writes, "Tafeen thus already has profited, substantially, from his own wrongdoing. It cannot be appropriate to afford Tafeen advancement protection otherwise potentially available under Homestore's Bylaws when he never intended to act properly as a corporate officer in the first place." [FN28] This form of estoppel argument is essentially the same as Homestore's official capacity argument. Homestore simply substitutes "acted in a fraudulent manner" for "not party to the Proceeding by reason of the fact that." Both arguments are premised on the notion that Tafeen was motivated by personal greed. And, as discussed, this form of defense against advancement was considered and rejected in both *Reddy* and *Perconti*. Homestore's motion for summary judgment as to this defense is denied as a matter of law.

FN28. Def.'s Answering Br. at 21.

### 4. *Indemnification Standard and its Relation to Advancement Claims*

*\*6* Contrary to long-established Delaware law, Homestore argues that Tafeen should not receive advancement because, due to his alleged actions in the Proceedings, he ultimately will not be entitled to indemnification. "The rights to indemnification and advancement are .... correlative but nonetheless independent and discrete entitlements." [FN29] Delaware courts historically have held that a right to advancement is independent from an ultimate right to indemnification, even if repayment of advanced

expenses may ultimately turn on a right to indemnification. [FN30] This reflects the salutary purpose of section 145(e) of the DGCL-to allow corporations to pay interim costs in litigation subject to a final disposition as to whether indemnification is justified. I see no reason to, and Homestore has provided no argument why, this longstanding principle should be revisited. [FN31] Summary judgment as to this defense is denied as a matter of law.

> FN29. Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 8-2.

> FN30. *See Citadel Holding Corp. v. Roven, Del.Supr., 603 A.2d 818, 822 (1992)* (holding an advancement right not dependent on a right to indemnity); *Bergonzi v. Rite Aid Corp.,* Del. Ch., C.A. No. 20453, Chandler, C., 2003 Del. Ch. LEXIS 117, at *7 (Oct. 20, 2003) ("Advancement is a right that the Supreme Court has recognized as distinct from the right to indemnification."); *Lipson v. Supercuts, Inc.,* Del. Ch., C.A. No. 15074, Jacobs, V.C ., 1996 Del. Ch. LEXIS 108, at *5 (Sept. 10, 1996) (noting that entitlement to indemnification is not relevant to an advancement action).

> FN31. Homestore attempts to distinguish cases cited by Tafeen by noting that those cases, including *Bergonzi,* 2003 Del. Ch. LEXIS 117, and *Lipson,* 1996 Del. Ch. LEXIS 108, dealt with documents explicitly stating that the person seeking advancement need not satisfy the "good faith" standard in order to make an advancement claim. Although the companies in each of these cases do not have the same bylaws, the principle behind the authorization of these bylaws-to allow corporations to pay interim costs in litigation subject to a final disposition of indemnification-is what drives the independence of the advancement and indemnification inquiries.

### B. *Defenses Involving Tafeen's Conduct in Seeking Advancement*

Although the previous defenses considered would have required an analysis of Tafeen's conduct in the *Proceedings,* the following defenses require an examination into Tafeen's conduct in *making his*

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

advancement request. That is, the following defenses, as opposed to the earlier ones, *assume Tafeen's contractual entitlement to advancement.* They do not require the Court to look at the nature of the pleading in the Proceedings. Rather, these defenses allege that due to Tafeen's conduct in seeking funds, he should not be permitted to *claim his entitlement* in a court of equity. [FN32] Specifically, the following defenses are based on the allegation that "Tafeen purchased an expensive home in Florida, a state that has extremely protective 'homestead' provisions against creditor claims," in order to shelter assets, thus avoiding repayment should Tafeen's claims ultimately be found to be nonindemnifiable. [FN33]

> FN32. Although Homestore's defenses are couched in terms of equity, and will be addressed as such here, they may quite readily be conceptualized as contractual defenses. That is, assuming Tafeen is contractually entitled to advancement, Tafeen nonetheless breached the implied covenant of good faith and fair dealing, *see Burton v. PFPC Worldwide, Inc.,* Del. Ch., C.A. No. 20380, Chandler, C., 2003 Del. Ch. LEXIS 110, at *18-*20 (Oct. 20, 2003) (discussing this implied covenant), by engaging in a bad faith sheltering of assets.

> FN33. Tafeen has raised questions as to whether Homestore's bylaws require an undertaking to repay. *See Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co. LLC,* C.A. No. 20116, Lamb, V.C. (Mem.Op. Mar. 10, 2004) (refusing to imply an undertaking requirement in the Limited Liability Company Act, 6 Del. C. § 18-108, or in an LLC's operating agreement). Regardless of such an undertaking requirement, both sides agree that under § 145(e), there is a general obligation to repay should Tafeen's claims ultimately be found to be nonindemnifiable. *See, e.g., Reddy,* 2002 Del. Ch. LEXIS 69, at *14 ("[B]y accepting payments expressly termed an 'advancement,' Reddy necessarily acknowledges that his ultimate right to keep those payments depends on whether his underlying conduct is indemnifiable.")

1. *Unclean Hands*

Homestore argues that because Tafeen sheltered assets before seeking advancement, he has acted in bad faith. He thus, according to Homestore, comes to

this Court with unclean hands and should be prohibited from receiving advancement.

The equitable doctrine of unclean hands bars litigants who have acted inequitably from seeking what might otherwise be available relief. This Court uses the doctrine to protect the integrity of itself and those who come before it. [FN34] Homestore's unclean hands argument is unique in that it is based not in Tafeen's conduct related to the underlying claims, as previous unclean hands arguments have been based, but in his conduct in making the advancement claim itself. [FN35]

> FN34. *See generally Nakahara v. NS 1991 Am. Trust,* Del. Ch., 718 A.2d 518, 522-24 (1998) (tracing the history of the doctrine of unclean hands).

> FN35. Homestore's argument is thus distinct from the argument considered and rejected in *Reddy* 2002 Del. Ch. LEXIS 69, at *14-*21. In that case, the unclean hands argument was based on the plaintiff's actions that formed the basis of the underlying proceeding. *Id.* at *28-*29.
> Further, in a February 10, 2004 letter to the Court, counsel to Tafeen argued that an unclean hands defense, similar to the one made by Homestore, was made by the defense in *Bergonzi.* In their answer to the complaint, the defense in *Bergonzi* stated "Bergonzi's claims are barred by the doctrines of laches and unclean hands." Answer to Compl. and Countercl. at ¶ 40, *Bergonzi,* 2003 Del. Ch. LEXIS 117. Further, counsel in *Bergonzi* raised as a defense that "[t]he payment of the expenses for which Bergonzi seeks advancement in these proceedings would not comport with equity *because Bergonzi is financially unable to meet his obligation to repay any sums so advanced upon the determination that he is not entitled to indemnification." Id.* at ¶ 38 (emphasis added). These arguments were two separate defenses. It is unclear upon what basis the nonspecific unclean hands defense was made. The separate financial inability to repay defense is *not* the same as the unclean hands defense made here and, in any event, was not considered in the Court's opinion. Mere speculation as to an inability to repay is not the basis for the defense proffered by Homestore. Rather, it is the *taking of an*

*action* that would insulate Tafeen from an obligation to repay that forms the basis of Homestore's unclean hands defense.

Whether Tafeen did indeed intentionally engage in a sheltering of assets, which would increase the difficulty of reimbursement should his advancement claims be found nonindemnifiable, is a question of fact to be determined at trial. [FN36] What is for the Court to determine at this stage is whether, should such facts be true, those facts would be sufficient to invoke the doctrine of unclean hands. The Court concludes they would.

> FN36. Tafeen's counsel argues that Tafeen purchased his home in June 2001, almost a year before Homestore requested an undertaking. *See* Pl.'s Combined Reply Br. in Supp. of his Mot. for Partial Summ. J. and Answering Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Reply Br."), at 21. At oral argument, however, questions arose as to whether Tafeen purchased this home with the specter of the upcoming Homestore investigation in mind. Thus, there remains a question of fact as to whether this home purchase was made with sheltering of assets and protection from creditors in mind.

*7 In *Nakahara v. NS 1991 American Trust,* plaintiffs in an advancement action were entitled to advancement under the terms of a declaration of trust. [FN37] Because the plaintiffs violated a standstill agreement and an Isle of Man Court's instructions, the Court denied the plaintiff's request for advancement. [FN38] The Court stated "[a] court of equity will not use its equitable powers to condone such activity." [FN39] Similarly here, the Court will not use its equitable powers to grant advancement to Tafeen if it is shown that Tafeen did indeed engage in a sheltering of assets with the intent to increase the difficulty of a potential reimbursement.

> FN37. *Nakahara v. NS 1991 Am. Trust,* Del. Ch., 739 A.2d 770, 794 (1998).

> FN38. *Id.*

> FN39. *Id.*

The Court acknowledges the strong Delaware policy of encouraging able persons to become directors and officers that is embodied in section 145(e). [FN40] Since section 145(e) represents this strong public policy, the policy underlying the doctrine of unclean

hands must be balanced against the statute. [FN41] Where, as here, the allegations underlying the unclean hands defense involve conduct that, if true, would undermine the spirit of the statute, the balance is clearly in favor of not rewarding the alleged inequitable conduct.

> FN40. *See VonFeldt v. Stifel Fin. Corp.,* Del.Supr., 714 A.2d 79, 84 (1998) ("We have long recognized that Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits ...; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity."); *Fasciana v. Elec. Data Sys. Corp.,* Del. Ch., 829 A.2d 178, 186 (2003) ("By enacting § 145, our General Assembly helped ensure that capable persons would be willing to serve as directors, officers, employees, and agents of Delaware corporations."); *see also In re Cent. Banking Sys., Inc.,* Del. Ch., C.A. No. 12497, Jacobs, V.C., 1993 WL 183692, at *3 (May 11, 1993) ("Mandatory advances, like indemnification, serve the salutary purpose of encouraging qualified persons to become or remain as directors of Delaware corporations, by assuring them, *ex ante,* that they may resist lawsuits that they consider meritless, free of the burden of financing (at least initially) their own legal defense.")

> FN41. *Nakahara,* 718 A.2d at 523 (noting that "[t]he greatest limitation on the doctrine is the widely accepted exception that since it is ultimately based on public policy, countervailing public policy which points in the direction of reaching the case on the merits can preclude its operation," but finding that the self-help plaintiffs took prior to a judicial advancement proceeding justified the use of the unclean hands doctrine).

The Delaware Supreme Court has characterized Section 145 as follows:
The invariant policy of Delaware legislation on indemnification is to "promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

are vindicated." Beyond that, its larger purpose is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." [FN42]

> FN42. *Stifel Fin. Corp. v. Cochran,* Del.Supr., 809 A.2d 555, 561 (2002) (quoting Rodman Ward, Jr. et al., Folk on the Delaware General Corporation Law § 145 (2001)).

Allowing an unclean hands defense based on alleged affirmative actions taken to shelter assets does not undermine this public policy. Corporate officials ought to continue to be "secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." [FN43] They are simply now on notice that they will not be permitted to use *the statute itself* after taking improper actions at the expense of the corporation's stockholders.

> FN43. *Stifel Fin. Corp,* 809 A.2d at 561.

Further, contrary to suggestions by counsel to Tafeen, the recognition of such a defense will not serve to undermine the summary nature of advancement claims. This case presents questions of fact as to whether Tafeen has acted in a way to avoid a potential obligation to repay advanced funds. This Court has the ability to expedite cases and will do so in order to balance the salutary policy underlying section 145(e) against the need to protect corporations and their stockholders from the type of conduct alleged here.

## 2. *Laches*

Homestore argues that because Tafeen knew he had a potential advancement claim in early 2002 and waited until October 2003 to bring suit in this Court, the doctrine of laches bars Tafeen's claim. Laches, an equitable doctrine, bars a plaintiff from delaying unreasonably in bringing a claim to the detriment of the defendant. [FN44] Although there is no bright-line rule as to what constitutes laches, there are three generally accepted elements to this equitable defense: (1) plaintiff's knowledge that she has a basis for legal action; (2) plaintiff's unreasonable delay in bringing a lawsuit; and (3) identifiable prejudice suffered by the defendant as a result of the plaintiff's unreasonable delay. [FN45]

> FN44. *See Porach v. City of Newark,* Del. Ch., C.A. No. 16578, Lamb, V.C., 1999 Del. Ch. LEXIS 143, at *9-*10 (June 25, 1999) (" 'Laches is an equitable principle that operates to prevent the enforcement of a claim in equity where a plaintiff has delayed unreasonably in bringing suit to the detriment of the defendant or third parties." ') (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 11-5); *Kirby v. Kirby,* Del. Ch., C.A. No. 8604, Chandler, V.C., 1989 Del. Ch. LEXIS 133, at *12 (Sept. 26, 1989) ("The doctrine of laches bars suit where the plaintiff has unreasonably delayed in bringing his cause of action, and that delay has disadvantaged the defendant to the extent that it would be inequitable to allow suit to go forward.")

> FN45. *See Porach,* 1999 Del Ch. LEXIS 143, at *10.

*8 Whether or not these three elements exist is generally determined by a fact-based inquiry, and therefore summary judgment is rarely granted on a laches defense. [FN46] Where, however, there is a "clear showing of the absence of a genuine issue of material fact upon the issue of laches," summary judgment will be granted by the Court. [FN47]

> FN46. *See Clark v. Packem Assoc.,* Del. Ch., C.A. No. 1326, Chandler, V.C., 1991 Del. Ch. LEXIS 34, at *20 (Mar. 6, 1991) ("The determination of the validity of the laches defense is one of fact, and is rarely granted on summary judgment.")

> FN47. *Church of Religious Sci. v. Fox,* Del.Supr., 266 A.2d 881, 884 (1970). Other cases where summary judgment has been granted on a laches defense include *Porach,* 1999 Del. Ch. LEXIS 143, and *Weller v. Am. Tel. & Tel. Co.,* Del. Ch., 290 A.2d 842 (1972). *See also Fasciana,* 829 A.2d at 163 n. 2 (rejecting a laches defense in an advancement case at the summary judgment phase).

In this case, it is undisputed that Tafeen knew of a potential advancement claim by early 2002. [FN48] Thus the first element of laches is satisfied. Tafeen did not file a complaint in this Court until October of 2003. The briefings have raised sufficient questions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

as to the second element, whether this delay was unreasonable, to prevent the Court from determining whether that element of laches is satisfied. Homestore has not, however, presented any evidence as to the third element of laches: causation of prejudice.

> FN48. Compl. ¶ 14 ("In early 2002, Mr. Tafeen, through his counsel, requested advancement of his legal fees and costs and indemnification for the Proceedings from the Company....")

Here, as in the unclean hands defense, the prejudice is rooted in alleged sheltering of assets by Tafeen. Specifically, Homestore argues prejudice is caused by a potential increase in the difficulty in obtaining repayment should Tafeen's claims ultimately be found to be nonindemnifiable. [FN49] The delay in filing suit, however, is not the *cause* of this prejudice; rather the cause of the prejudice is the sheltering of assets. It is entirely conceivable that Tafeen would have submitted either an undertaking and advancement request to Homestore, or come to this Court with a complaint for advancement, and then later engaged in the alleged sheltering of assets. Because the delay in filing the complaint is not the cause of the alleged prejudice, Homestore's motion for summary judgment as to the laches defense is denied as a matter of law.

> FN49. Homestore states, "Homestore believes that, if it is required to advance Tafeen's legal fees and expenses ... and it later is determined that Tafeen was not entitled to indemnification, Homestore will have little recourse against Tafeen if he refuses to repay the advanced funds." *Id.* at 13.

### C. Defenses Not Related to Tafeen's Conduct

#### 1. The Direct Claim Carve Out

The Advancement Bylaw states that Homestore is not required to provide advancement to a person if Homestore directly brought a claim against that person alleging she breached her duty of loyalty, derived an improper benefit from a transaction, committed an act or omission not in good faith, or engaged in an act involving intentional misconduct or a knowing violation of law. Homestore suggests that the stockholder's derivative action included among the Proceedings, *In re Homestore.com, Inc. Derivative Litigation,* [FN50] should be treated as an action brought directly by the company, and thus within the carve out provision of the advancement bylaw. [FN51]

> FN50. No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002).

> FN51. It is unclear whether Homestore is arguing that a direct action brought by it would provide a defense to all advancement claims or only those made in connection with the direct action itself. Since I do not find *In re Homestore.com, Inc. Derivative Litigation* to be a direct action within the meaning of Homestore's bylaws, I do not reach this issue, although I find it highly unlikely that the broader interpretation of § 6.2 would be the more reasonable one were I to reach it.

Homestore essentially asks this Court to apply "logic, fairness, and public policy" to rewrite its bylaw carve out to apply to any derivative action which, if brought directly by the company, would turn on the same facts that underlie the derivative case. This bylaw, however, is unambiguous and the Court will not "interpret it or search for the parties' intent behind [it]." [FN52] Unambiguous bylaws are construed as they are written, and this Court gives "language which is clear, simple, and unambiguous the force and effect required." [FN53]

> FN52. *Hibbert v. Hollywood Park, Inc.,* Del.Supr., 457 A.2d 339, 343 (1983).

> FN53. *Id.*

**\*9** Homestore's advancement carve out applies only to actions brought directly, not derivatively. *In re Homestore.com, Inc. Derivative Litigation* is a case brought derivatively. [FN54] Defendant's motion for summary judgment as to the import of the carve out language is denied as a matter of law.

> FN54. *See* First Amended Consolidated Shareholder Derivative Complaint at ¶ 1, *In re Homestore.com, Inc. Derivative Litig.,* No. BC265709 (Cal.Super. Ct. filed Nov. 15, 2002), *in* Aff. of Marc A. Fenster (Nov. 18, 2003) ("Fenster Aff."), Ex. E ("This is a shareholder's derivative action brought for the benefit of nominal defendant Homestore.com, Inc....")

#### 2. The Sarbanes-Oxley Act and its Relation to DGCL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

*§ 145(e)*

The Sarbanes-Oxley Act of 2002 ("Sarbox"), [FN55] Congress's response to the turn-of-the-century corporate scandals, amends the Securities and Exchange Act of 1934 (the " '34 Act") [FN56] so as to prohibit personal loans to directors or executive officers. Specifically, Sarbox states:

FN55. Pub.L. No. 107-204, 116 Stat. 745.

FN56. 15 U.S.C. § 78m (2004).

It shall be unlawful for any issuer ... directly or indirectly, ... to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer. [FN57]

FN57. Pub.L. No. 107-204, § 402, 116 Stat. 787 (2002) (codified at 15 U.S.C. § 78m(k)(1) (2004)).

There has been much discussion as to what effect, if any, this provision of Sarbox ("Section 402") has on advancement to *current* directors and officers under section 145(e) of the DGCL. [FN58] This issue, however, is not ripe for discussion here.

FN58. *See, e.g.,* Sarbanes-Oxley Act Interpretive Issues under § 402- Prohibition of Insider Loans (reporting a discussion, among 25 law firms, as to whether section 402 of Sarbox prohibits advancement to directors or officers).

Section 402 applies to directors, executive officers, or equivalents thereof. Homestore contends that because Section 402 does not limit its application to *current* directors and officers, it necessarily applies to *former* directors and officers. I disagree.

First, as a matter of statutory interpretation, Section 402 is clear and unambiguous. Under the "plain meaning rule," so long as the language of a statute is clear and unambiguous, there is "no need to 'interpret' the language." [FN59] And, as the United States Supreme Court has stated, "where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." [FN60] The words of the statute, moreover, are given their common meaning. [FN61] Here, the statute

clearly states "director or executive officer," *not* "current or former director or officer ." Not only is this clear and unambiguous, it leads to a perfectly logical conclusion.

FN59. *Church of Scientology v. United States Dep't of Justice,* 612 F.2d 417, 421 (9th Cir.1979) (citing *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492 (1947), and *Caminetti v. United States,* 242 U.S. 470, 490 (1917)).

FN60. *United States v. Mo. Pac. R.R. Co.,* 278 U.S. 269, 277 (1929), *quoted in Church of Scientology,* 612 F.2d at 421.

FN61. *Perconti,* 2002 Del. Ch. LEXIS 51, at *13.

Second, even if one were to interpret the language of Section 402, the legislative history indicates that the purpose of Section 402 is to prohibit loans to those in control of corporate decision making. [FN62] Once a director or officer steps down from her position, becoming a former director or officer, the ability to control corporate decision making is diminished considerably. Though not completely eliminated, Congress did not see former officers and directors as sufficient threats to specifically address in Sarbox. As Congress was presumably aware, any undue influence brought by former officers or directors on those currently holding a corporation's decision-making powers can be remedied by a breach of loyalty suit brought by aggrieved stockholders.

FN62. *See, e.g.,* Staff of Senate Governmental Affairs Comm., 107th Cong., The Role of the Board of Directors in Enron's Collapse (Comm. Print 2002) (concluding that Enron's collapse was related to, among other things, fiduciary failure of Enron's board, inappropriate conflicts of interest, and excessive compensation, and recommending in response a prohibition on company-financed loans to directors and senior officers of the company); *House Fin. Servs. Comm. Hearing on Worldcom Accounting Errors (Panel I),* 107th Cong. (2002) (statement of Jim Leach, U.S. Representative) ("[W]ith corporate governance, moral clarity requires that CEOs of public corporations not put personal interests above shareholder values. To put it plainly, it is self-dealing for a corporate head to give himself a multi

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hundred million-dollar loan, and it is a dereliction of duty for a board to go along.")

**\*10** Further instructive is Section 402 and its interaction with the '34 Act. Although Sarbox does not define director or executive officer, the interpretive rules of the '34 Act, which Section 402 amends, do define executive officer. Rule 3b-7 of the General Rules and Regulations promulgated under the '34 Act defines executive officer, [FN63] when used with reference to a registrant (which Homestore undoubtedly is under the '34 Act), as the registrant's "president, any vice president of the registrant in charge of a principal business unit, division, or function (such as sales, administration or finance), any other officer who *performs* a policy making function or any other person who *performs* similar policy making functions for the registrant." [FN64] Given the use of the present tense in this definition of executive officer, it is apparent that the term "executive officer," as employed in Section 402, does not include former executive officers.

> FN63. Tafeen is a former executive officer; he was never a director of Homestore.

> FN64. 17 CFR 240.3b-7 (2004) (emphasis added).

Since Section 402 applies only to current directors and executive officers, and Tafeen is a *former* executive officer, Section 402 has no application here. Homestore's motion for summary judgment as to this issue is denied as a matter of law. [FN65]

> FN65. The Court does not reach the issue of Sarbox's impact on section 145 of the DGCL as it pertains to *current* officers and directors.

### 3. *Undue Financial Hardship*

Homestore argues that by having to advance expenses to Tafeen, it would be placed "in a position of severe financial hardship." [FN66] The Court need not reach the factual questions presented by Homestore because this argument, without more, is not a legally cognizable defense to advancement.

> FN66. Def.'s Answering Br. at 34.

Homestore argues that it did not bargain for the credit risk posed in advancement. As discussed above, this is simply false. DGCL § 145(e) allowed for Homestore to lessen its credit risk simply by

drafting its bylaws differently. By drafting its bylaws as it did, Homestore opened itself up to a large credit risk.

This Court has historically given great deference to informed decisions of a board of directors. Whether ultimately proven to be a fiscally advantageous or disadvantageous decision, this Court will not interfere with informed and loyal decisions of an independent board. [FN67] The same is to be said of the drafters of a company's bylaws. Homestore's bylaws may ultimately prove to be disadvantageous; indeed here they may " 'significantly lower Homestore's chances for future operations and related recovery." ' [FN68] But there is no case precedent, nor good reason, to interfere with the decision of the bylaw drafters simply because the bylaws might cause the company financial hardship. Indeed, to allow a financial hardship exemption, without more, would be to undermine the salutary purpose of allowing advancement. Advancement would be less of an inducement to becoming a director or officer of a company if the company could simply avoid its advancement obligation when times are difficult.

> FN67. Delaware courts presume that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). Absent abuse of discretion, a board's judgment is respected by Delaware courts. *Id.*

> FN68. Douglas Aff. ¶ 18 (quoting Letter from Michael J. Eggers to Hon. Dan Weinstein 2 (July 16, 2003), *at* Douglas Aff. Ex. G).

Homestore acknowledges this, conceding that " 'financial hardship' typically has not been a defense to advancement," but argues that "this is anything *but* the 'typical case,' and this court of equity has broad latitude in granting or denying relief." [FN69] While this Court is a court of equity, and is certainly sympathetic to facts that, if true, indicate Tafeen has engaged in serious misconduct, one of the fundamental maxims of equity is that equity aids the vigilant, not those who slumber on their rights. [FN70] I do not deviate from this maxim. Homestore had the right to lessen the credit risk posed by its advancement bylaw. It did not do so. [FN71]

> FN69. Def.'s Reply Br. at 10-11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
(Cite as: 2004 WL 556733 (Del.Ch.))

FN70. *Grand Lodge of De., I.O.O.F. v. Odd Fellows Cemetery of Milford, Inc.,* Del. Ch., C.A. No. 1461-K, Noble, V.C., 2002 Del. Ch. LEXIS 136, at *25 n. 29 (Nov. 18, 2002), *aff'd,* Del.Supr., 2003 Del. LEXIS 540 (Oct. 28, 2003) (mem.); *Fike,* 754 A.2d at 262 (quoting *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148, 157 (1982)); *Fontana v. Julian,* Del. Ch., C.A. No. 5056 (1976), Hartnett, V.C., 1980 Del. Ch. LEXIS 500, at *4 (Jan. 2, 1980).

FN71. Section 145(e) sets forth the bare minimum requirements should a corporation elect to have an advancement provision. These minimum requirements are strikingly lax. As discussed, this reflects the General Assembly's embodiment of the strong policy of encouraging able persons to serve as directors.

The General Assembly, however, left to corporations themselves to determine the *proper balance* between seeking able persons to serve as directors and officers and safeguarding the expenses advanced by the company, and thus the corporation's stockholders. At one end, companies may choose to adopt no advancement provision, thus rejecting this policy embodiment altogether. At the other end, companies may, as Homestore did here, adopt the extremely lax safeguard of requiring only an unsecured undertaking, and possibly only requiring that undertaking from current officers and directors. *See In re Cent. Banking Systems, Inc.* 1993 WL 183692, at *3 (noting that no "provision of Delaware law requires that the undertaking be secured or be accomplished by a showing of the indemnitee's financial responsibility").

There is a considerable middle ground between these two extremes. Corporations may require secured undertakings, permissive advancement, board oversight of the litigation process, etc. Homestore's April 30 Memo itself illustrates a number of restrictions corporations may put in their advancement provision. By taking advantage of this ability, issues raised in cases such as this one, *Reddy, Bergonzi,* and *In re Central Banking Systems,* would likely not be litigated, saving corporations perhaps as much money as they expend litigating advancement cases. In the absence of taking advantage of this ability, however, this Court will not permit corporations "to do retrospectively what [they could have] precluded [themselves] from doing *ex ante." Id.* at *4.

It is unfortunate when a corporation's advancement provision exposes the corporation, and ultimately the stockholders, to the form of credit risk that Homestore's does. Simply by requiring a secured undertaking, for example, Homestore could presumably, given its confidence that Tafeen's conduct in the Proceedings will ultimately render his claims nonindemnifiable, have used the secured note as collateral on a loan to the company, pending the outcome of the Proceedings. Given the high incidence of advancement proceedings, directors should be mindful of their fiduciary duties to stockholders, and the possibility of stockholder action, when reviewing and adopting advancement and indemnification bylaws. In my view, the fact that § 145 is a broad, enabling statute does not confer license to adopt loosely written bylaws that impose excessive credit risks on a company and its stockholders.

**\*11** Further, Homestore's reliance on *Dunlap v. Sunbeam Corp.* [FN72] is misplaced. While declining to state that hardship would never be a factor in determining whether advancement should be denied, the Court declined in that case to consider hardship as a factor. Similarly, this opinion does not foreclose the future possibility of financial hardship as a defense. It simply holds that the existence of financial hardship due to an extremely lax advancement bylaw, without more, is not a defense, especially when the corporation was free to adopt a more stringent bylaw.

FN72. Del. Ch., C.A. No. 17048, Chandler, C., 1999 Del. Ch. LEXIS 126 (June 23, 1999).

Homestore's motion for summary judgment as to this defense is denied as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Homestore's motion for summary judgment, with respect to all but the unclean hands defense, is denied as a matter of law. Because trial is necessary on the merits of this defense, Tafeen's motion for summary judgment is denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)
**(Cite as: 2004 WL 556733 (Del.Ch.))**

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 556733 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.