6

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
**(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)**

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County
Merle THORPE, Jr. and Foundation for Middle East
Peace, a District of Columbia
Corporation, Plaintiffs,
v.
CERBCO, INC., a Delaware Corporation, Robert W.
Erikson and George Wm.
Erikson, Defendants.
**Civ. A. No. 11713.**

Submtted: July 23, 1993.
Decided Oct. 29, 1993.

**\*\*945** Lawrence C. Ashby, Stephen E. Jenkins, and
Richard D. Heins of Ashby & Geddes, Wilmington
(Joseph M. Hassett, George H. Mernick, III, Albert
W. Turnbull, and Christopher P. Gilkerson of Hogan
& Hartson, Washington, DC, of counsel), for
plaintiffs.

Howard M. Handelman, and John H. Newcomer, Jr.,
of Bayard, Handelman & Murdoch, P.A.,
Wilmington, for Cerbco, Inc.

**\*\*946** Michael Hanrahan, and April Caso Ishak, of
Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, for defendants Robert W. Erikson and
George Wm. Erikson.

*MEMORANDUM OPINION*

ALLEN, Chancellor.

**\*1** In this derivative and individual action holders of
class A common stock of CERBCO, Inc., seek
damages form Robert and George Erikson. The
Eriksons are brothers who own the preponderant part
of CERBCO's class B common stock, which stock
holds voting control of the company. They are the
senior officers of CERBCO and are two of the four
members of CERBCO's board of directors. The suit
arises out of an alleged opportunity to sell
CERBCO's principal asset on advantageous terms.
The gist of the plaintiff's complaint is that the
Eriksons, in their role as corporate officers, failed to
try to secure this advantageous deal for the company
and all of its shareholders, but instead indicated that

they would thwart any such sale. They then
allegedly proposed as an alternative to sell their
CERBCO class B stock so that the putative buyer
could achieve an objective of controlling CERBCO's
asset. Plaintiffs claim this constituted a breach of
loyalty, more particularly an attempted usurpation of
CERBCO's corporate opportunity.

In the event, and after the filing of this lawsuit, the
proposed sale alternative was abandoned and the
buyer receded. The lawsuit, which *inter alia* sought
an injunction against the contemplated sale of the
Erikson's class B stock is, according to plaintiffs, not
made moot by the abandonment of the transaction
because CERBCO sustained damages in being
prevented from pursuing the buyers' interest in its
asset in the first instance.

Defendants' motion to dismiss the complaint for
failure to state a claim has earlier been denied.
*Thorpe v. CERBCO, Inc.,* Del.Ch., 611 A.2d 5
(1991). Substantial discovery having been completed,
defendants have now moved for summary judgment
of dismissal. They assert that the uncontested facts
show that they are guilty of no disloyalty to
CERBCO. That they were and are entitled to sell
their voting control of CERBCO at a premium and
they acted in good faith in negotiating such a
transaction. Factually they assert that the potential
buyer--Insituform of North America, Inc.--preferred
to acquire their controlling stock in CERBCO to
acquiring CERBCO's principal asset. They deny that
they forced that choice upon the buyer, which is the
plaintiff's assertion. They also deny that CERBCO
suffered any damages as a result of their activities.
**\*\*947** In these circumstances, defendants claim that
they are entitled to a dismissal of this litigation.

I start an analysis of the motion with a statement of
what appears to be undisputed facts.

I.

CERBCO, Inc. is a holding company the principal
asset of which was, at the times involved, voting
control of Insituform East, Inc. ("East"). CERBCO
also controlled two other operating subsidiaries,
neither of which generated significant profits. [FN1]
East is a sublicensee of Insituform of North America,
Inc., ("INA"), which holds the North American rights
to exploit a process used in the in-place repair of
buried sewer or water pipelines. Throughout the

Not Reported in A.2d                                                          Page 2
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)

relevant time period, East was under investigation by the S.E.C. for possible criminal insider trading and disclosure violations. [FN2]

> FN1. CERBCO's two additional operating subsidiaries at the time were Cerebronics, Inc., a defense contractor which had not generated profits for the three years preceding 1991, and which has since been terminated, and Capital Copy Products, Inc., a company which operated a copying and facsimile franchise. Capitol Copy, which had substantial interest payments on a purchase money loan, had generated insignificant net profits.

> FN2. The S.E.C. during 1989 was conducting a criminal investigation of East, and Arthur Lang, East's former President, and of other officers, for alleged disclosure of inaccurate financial statement and for insider trading. Both CERBCO and East were mindful of the threat of civil suits by shareholders subsequent to any commission action.

\*2 Both CERBCO and East have a two-tiered capital structure, with voting power concentrated in one class of stock (class B) and enhanced dividend rights in the other (class A). [FN3] CERBCO class A stock has one vote per share and also has the right to elect a minority of the board, and class B stock has ten votes per share and the right to elect a majority of the board. In 1990 defendants owned approximately 247,564 shares of CERBCO class B shares or about 78% of the outstanding class B stock, and 111,000 out of 1,457,500 class A shares. Defendants' holdings constituted 24.6% of CERBCO's \*\*948 total equity, but carried voting control of CERBCO. There are 382,100 authorized but unissued shares of CERBCO class B stock. [FN4]

> FN3. CERBCO's capital structure was created in 1982 when CERBCO's predecessor, Cerebronics, Inc., needed to raise capital via public offering, for a government contract it was fulfilling. The Eriksons at this time owned approximately 43% of Cerebronics' common stock, and a straight public offering would have had the effect of diluting their control. By offering the public the newly created class A stock, and allowing existing common stockholders to exchange their stock for the new class B stock, Cerebronics purported to reduce the

threat of a hostile takeover attempt.

> FN4. There was a discrepancy between the total number of authorized CERBCO class B stock in filings with the S.E.C., which indicated a total of 700,000 shares, and in CERBCO's 1988 certificate of incorporation, which indicated a total of 500,000 shares. This discrepancy was eliminated on September 19, 1990 when CERBCO filed with the Secretary of the State of Delaware a certificate of correction providing that there were 700,000 authorized class B shares. Plaintiffs allege that this is relevant because the higher figure would indicate that CERBCO could have issued new shares to give INA control of CERBCO if that is what INA sought.

CERBCO in turn owned approximately 30% of East's total equity, which, due to CERBCO's class B holdings, gave it voting control of East. [FN5]

> FN5. CERBCO's predecessor obtained control of East in 1985, after CERBCO lost the government contract for which it had undergone the aforementioned recapitalization in 1982. In 1986, East itself recapitalized in the same fashion as had CERBCO.

In the fall of 1989, INA began preliminary research into the acquisition of one of its sublicensees. It sought through this step to advance its strategy of entering into the installation business. INA retained Drexel, Burnham, Lambert to analyze ways and means of achieving this goal. Although it was not the only possibility, INA and Drexel focused upon East. INA and Drexel were unaware of the capital structure of East or of CERBCO. Drexel's initial analysis focused on acquisition of East shares via a tender offer. Specific transactions considered included a cash tender offer for CERBCO's 1.4 million shares of East from prices ranging from $7.50 per share (representing a 30% premium over the six month average market price of publicly traded East stock), to $10 per share (representing a 74% premium). These studies contemplated $10.5 million and $14.0 million total price for control, respectively.

In January 1990, INA's chairman, James Krugman, met with the Eriksons with respect to INA's interest in acquiring East. At these meetings, INA learned of CERBCO's and East's capital structure. Krugman

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)

was surprised and embarrassed at his lack of knowledge concerning CERBCO's capital structure. The record does not foreclose the possibility that at that meeting the Eriksons in effect said that they would and could block an attempt to directly acquire control of East from CERBCO. At this meeting, the Eriksons did outline for INA a transaction by which INA could purchase the **949 Eriksons' controlling interest in CERBCO rather than purchasing CERBCO's East stock directly.

Thereafter, INA had Drexel perform comparative financial analyses of the potential transactions by which it could gain control of East. In one of these studies dated January 9, 1990, entitled "Project CERBCO," Drexel analyzed three potential transactions: (1) acquiring all of CERBCO's class A and class B stock in East for a total price of $10.5 million or $7.52 per East share; (2) acquiring 247,550 CERBCO class B shares from the Eriksons for $6.0 million or $24.24 per East controlling share; and (3) acquiring all of CERBCO's class A shares via a cash tender offer of $3.8 million and all of CERBCO's class B shares for $7.7 million in cash, for a total acquisition cost of $11.5 million. This analysis suggested that while a direct purchase of CERBCO's stock in East had higher initial up-front costs than a purchase of the Eriksons' holdings, it would be preferable, in certain respects, to a purchase of a controlling interest in CERBCO. [FN6]

> FN6. This analysis indicated that purchase of the Eriksons' controlling interest in CERBCO brought with it some risk associated with the assumption of all of CERBCO's liabilities, including a $2.8 million note. That is, a purchase of the Eriksons' stock necessarily required the purchaser, as a practical matter, to stand behind repayment of a $2.8 million CERBCO note, if CERBCO cash flows were inadequate, in order to assure that the controlling East stock owned by CERBCO would not be subject to future creditor liens.

*3 Later in January, the Eriksons proposed selling their class B shares to INA for $6.5 million. On January 10 INA's counsel drafted a letter of intent for INA to purchase these shares. [FN7] One week later, INA's board approved obtaining a $10 million line of credit that could be used for the acquisition of control of East. On January 19, 1990, Krugman represented to the Eriksons and counsel from the law firm of Rogers and Wells (counsel to CERBCO and the Eriksons) that he was not interested in any

transaction other than the one proposed.

> FN7. The plaintiffs allege that the Eriksons also suggested to Krugman on or around January 4, 1990 that after purchasing the Eriksons' controlling interest, INA could buy all remaining shares at the market price of $3 1/8 per share. Robert Erikson drafted a memo dated January 4, 1990 which noted the possibility of such a transaction, and Drexel's "Project CERBCO" study seems to analyze it. Furthermore, an internal memorandum from Rogers and Wells also analyzed the Eriksons' potential duties to the minority shareholders in the event of such a tender offer. However, Krugman of INA told the CERBCO board and testified at his deposition, that INA had no interest in such a transaction.

**950 On February 22, 1990, the Eriksons informed the CERBCO board of directors of INA's interest in acquiring control of East. The Eriksons informed the board that INA had made no bid for CERBCO's East shares, and that INA was interested only in pursuing the purchase of their controlling stock in CERBCO. Mr. Ketels of Rogers and Wells testified that he informed the Board that any sale of CERBCO's East stock would require a shareholder vote under Section 271 of the Delaware Corporate Law. [FN8]

> FN8. There is a dispute, however, as to what the Eriksons and counsel from Rogers and Wells informed the Board of Directors with respect to their position *vis a vis* the proposed transaction. George Erikson testified that he had indicated merely that he would not support a sale of CERBCO's East holdings at the same price as that offered by INA for their stock. Director Long testified that counsel from Rogers and Wells told him at this meeting that the Eriksons could block a sale of CERBCO's East stock to INA. Long also testified that he had a "definite impression" that the Eriksons would block it. Director Davies testified that based upon conversations with the Eriksons prior to the February 22 meeting he "clearly had the understanding that as stockholders the Eriksons would not vote in favor of the sale of CERBCO's INEI [East] shares." For purposes of this motion I accept the Davies and Long testimony on this point as factual.

Not Reported in A.2d                                                                 Page 4
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
**(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)**

At this meeting, the Board apparently entered into a lengthy discussion with respect to the proposed transaction, and the existence of any interests in it by CERBCO and its public shareholders. According to draft minutes of that meeting, Rogers and Wells advised the members of the Board that it was their duty as independent directors to ensure that the proposed transaction was in the interests of CERBCO's stockholders. [FN9] The current record leaves this assertion open to proof in my opinion. The Board was also advised at this meeting that as part of a proposed letter of intent that was being negotiated between the parties, INA would be given access to CERBCO's books and records for its due diligence review. The non-Erikson directors did not object to such disclosure, so long as only non-sensitive information was disclosed and the Board was allowed to review any disclosed material. According to director Long, no such sensitive information was ever disclosed, although the Eriksons did **951 disclose certain non-sensitive information to INA, prior to getting a signed confidentiality agreement. [FN10]

> FN9. The parties dispute whether directors Davies and Long were every informed as to INA's initial consideration of a direct acquisition of East. Later, on July 27, 1990, Krugman did inform the Board that INA was not interested in any deal other than the one with the Eriksons. He announced that INA had not "made, or intended to make, any proposals directly to CERBCO or INEI [East] prior to their [letter of intent] agreement with the Eriksons, nor was INA interested in doing so." Both directors had direct discussions with Mr. Krugman at an INA sublicensee convention in Hawaii shortly after a March letter of intent was signed by INA and the Eriksons.

> FN10. Mr. Long testified at his deposition that the Eriksons were "as concerned as we were, if not moreso [sic], about giving sensitive information that could hurt the company and certainly would hurt them, as much or more then [sic] it hurt the company." He also stated, "I don't know of anything we gave them that I would regard as harmful to the company or any information they could use today to our disadvantage."

At this meeting, the Eriksons also sought Board approval of their use of Rogers and Wells, as their personal counsel in their negotiations with INA. Rogers and Wells gave CERBCO its written statement that, in its opinion, there was no conflict of interest between the Eriksons and CERBCO because the proposed transaction was a private deal by the Eriksons that did not implicate CERBCO's interests. The Board then consented to the representation.

On March 12, the Eriksons and INA signed a letter of intent for the sale of the Eriksons' controlling interest in CERBCO at $6.0 million, or $24.24 per CERBCO class B share. [FN11] The market valuation of CERBCO's class A common stock at the time was $3 1/8 per share. The letter of intent required the Eriksons to give INA access to CERBCO's books and records, subject to INA's agreement to keep the information confidential, and required INA to indemnify the Eriksons for any costs associated with a lawsuit arising from the consummation of the proposed transaction. It also restricted the Eriksons' activities with respect to other potential buyers:

> FN11. The purchase price was reduced from $6.5 million to $.60 million in exchange for INA's agreement to indemnify the Eriksons for costs arising from any challenge to the sale.

*4 The Sellers (or either of them) shall not for a period from the date hereof to the first to occur of (a) April 23, 1990, (b) the Closing or (c) the date of abandonment by INA of negotiations regarding the Stock Purchase Agreement, elicit, enter into, entertain or pursue any discussions or negotiations with any other person or entity with respect to the sale of any of the Shares or any other transaction the effect of which if completed, would frustrate the purposes of this letter.

The letter of intent required that the parties not disclose its terms unless such disclosure was required by law. The non-Erikson directors reviewed the letter at a March 1990 INA sublicensees convention in Hawaii. On May 30, 1990 the Eriksons received $75,000 from INA for extending the letter of intent through August 1, 1990.

**952 On May 11, 1990, plaintiffs lodged a demand with the CERBCO board to rescind the proposed transaction or, alternatively, to demand that the Eriksons provide an accounting for the control premium incorporated in the proposed sale of their class B stock. A special committee, comprising the two non-Erikson directors was constituted and advised by the law firm of Morgan, Lewis and

Not Reported in A.2d                                                                                                                                 Page 5
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)

Bockius, to review the demand on July 17, 1990. On July 19, the special committee withdrew its permission for Rogers and Wells to represent both the Eriksons and CERBCO, due to a possible conflict of interest with CERBCO.

On August 24, 1990, plaintiffs brought suit, seeking an injunction against the Eriksons' sale of their class B stock or imposition of a constructive trust upon any premium associated with such a sale.

During September 1990, the special committee and CERBCO continued to investigate whether any corporate opportunity existed. At a September 14, 1990 Board of Directors meeting, the directors considered the feasibility of a transaction in which CERBCO would issue to INA a sufficient number of shares of its authorized but unissued class B stock so that INA could achieve control over East and thus would pay such consideration as could be negotiated to CERBCO itself. The Eriksons objected to the corporation pursuing this possibility. It was suggested that such a transaction would imply that East could pursue a similar arrangement with INA, which, of course, would destroy the control value of CERBCO's controlling interest in East to the detriment of plaintiffs as well as all other CERBCO shareholders.

The proposed transaction between the Eriksons and INA was never consummated, and on September 18, 1990, the letter of intent between the Eriksons and INA expired. The Eriksons informed the corporation on September 19 that the letter of intent had expired without consummation of the transaction with INA, and that they had no further intention of pursuing the proposed transaction. It is claimed that INA and the Eriksons were unable to reach agreement on such issues as indemnification of liabilities that might arise out of the pending S.E.C. investigation of East, and the payment by INA of litigation costs that the Eriksons had already incurred with respect to the proposed transaction. [FN12]

> FN12. The letter agreement restricted indemnification to costs arising from *consummation* of the proposed transaction, not literally from activities preceding consummation. It was this literal interpretation of the contract which Robert Erikson apparently objected to.

**\*5 \*\*953** After the dissolution of negotiations between the Eriksons and INA, CERBCO, at an October 4, 1990 board meeting, determined that while the company was not interested in affirmatively pursuing a possible transaction with INA, it would consider any approach made by INA.

On October 29, 1990 CERBCO's special committee made a written report. Since the committee considered plaintiff's breach of fiduciary duty charges to have been mooted by the expiration of the letter agreement, it did not address that question any further. The committee did request that the Eriksons provide notice to the Board of Directors of any future negotiations concerning the sale of their control block, so as to allow the Board to consider whether the transaction implied a corporate opportunity to sell CERBCO's East holdings. The committee also noted that after its formation, it was reluctant to pursue any deal with INA due to its concern with interfering with the "no-shop" provision of the INA-Erikson letter agreement, and potentially causing the Eriksons to resign their position at CERBCO.

In November 1991, defendants sought the dismissal of the claims asserted on the ground that the complaint failed to state a claim and upon the ground that the special requirements of Rule 23.1 were neither satisfied nor excused in this instance. The motion was denied. *See Thorpe v. CERBCO, Del.Ch., 611 A.2d 5 (1991)*.

In January of this year, the defendants moved for summary judgment as to plaintiff's claim that a proxy statement relating to CERBCO's 1982 recapitalization (by which the dual class capitalization had been authorized) was incomplete and misleading. The court granted defendants' motion on the grounds that plaintiffs had no standing to litigate the claim, since they were not stockholders at the time of the proxy solicitation. *See Thorpe v. CERBCO, Del.Ch., C.A. No. 11713, Allen, C. (Jan. 26, 1993)*.

II.

Defendants are entitled to a summary judgment of dismissal only if facts not reasonably disputed in the record entitle them to such a judgment. For the reasons that follow, I cannot find that this is the case. However, I do find that the defendants will be entitled to dismissal as a matter of law, if it is determined that a sale of CERBCO's class B common stock would constitute the sale of substantially all of its assets and would therefore require for its authorization "the majority vote of the outstanding stock of the **\*\*954** corporation entitled to vote thereon ..." 8 Del.C. § 271(a) (1991). This conclusion has three premises.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
**(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)**

First, I conclude that in their capacity as stockholders of CERBCO, defendants would have had no obligation to approve a sale of all or substantially all of the Company's assets, even if a reasonable director of the Company would conclude that the proposed sale was on fair or even on advantageous terms. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840 (1987); *Tanzer v. International General Industries, Inc.,* Del.Supr., 379 A.2d 1121 (1977). Therefore, since the law confers a veto right upon the Eriksons *qua* shareholders over any transaction that constitutes a sale of substantially all of the corporation's assets, and since the law permits shareholders *qua* shareholders to act selfishly in deciding how to vote their shares, I conclude that if a sale of CERBCO's class B stock in East constituted a sale of substantially all of CERBCO's assets, then the public shareholders has no right to require them as directors to pursue a transaction over which they rightfully held a veto as shareholders.

\*6 Second, I conclude (a) that the Eriksons are entitled to access to the Company's books and records for a proper corporate purpose; (b) that review of corporate books and records to enable a large shareholder to sell its stockholdings is a proper corporate purpose within the meaning of Section 220 of our corporate law, so long as steps to protect the corporate entity from substantial harm arising from such disclosure can be arranged; and (c) that therefore, despite what might be implied in my earlier expressed view in this case, contracting for review of the Company's books and records, in the circumstances alleged, does not so implicate a controlling shareholder in the exploitation of the corporation's property or processes as to provide an independent ground to impose upon that shareholder a duty of entire fairness should that shareholder elect to sell its stock. [FN13]

> FN13. This does represent a more considered view (one that takes into account shareholder statutory rights under Section 220 of our corporate code) than that stated in the opinion of November 15, 1991. *See* Part IV C, below. With respect to this I follow Justice Frankfurter's advice, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee C.I.R. v. Union Planters National Bank & Trust Co.,* 335, U.S. 595, 600 (dissenting).

Third, I conclude as a matter of fact undisputed in the record, that INA was never interested in a transaction whereby CERBCO would issue its authorized but unissued class B shares to INA in lieu of a direct purchase of East shares or of Eriksons' interest in CERBCO. There is no evidence in the record that would raise \*\*955 a fact issue on this question and, intuitively, it is extremely far-fetched that INA would freely elect that form of a transaction. Therefore, there was no corporate opportunity for the issuance of new class B stock, that the Eriksons, via their attempted sale of their own class B stock, precluded.

Each of these conclusions is explained more fully below. (*See* Part III). On the assumption that the sale of CERBCO's East stock would require a shareholder vote under Section 271 of the General Corporation Law, these conclusions require granting the motion now pending.

If on the other hand, the East stock held by CERBCO did not constitute all or substantially all of CERBCO's assets, so that the Eriksons had no privileged voting right to block any such transaction, then for the reasons described in detail below, summary judgment is not now appropriate. (*See* Part IV. below).

III.

A. *The alleged opportunity to sell CERBCO's class B stock in East to INA.*

The claim is that the Eriksons attempted to usurp a corporate opportunity by precluding a sale of CERBCO's East holdings to INA in order to pursue a sale of their own stock. If as a factual matter, sale of CERBCO's class B stock in East would constitute a sale of substantially all of CERBCO's assets under Section 271 of the Delaware General Corporation Law, then in order for one to conclude that there was an opportunity for CERBCO to sell it East stock to INA one must recognize an obligation on the part of the Eriksons, as fiduciaries, to support such a transaction *at a shareholder vote.* Delaware law, however, has never imposed such an affirmative duty upon shareholders. Under Delaware law "stockholders in Delaware corporations have a right to control and vote their shares in their own interest." *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840 (1987). [FN14] it is also true these rights are limited by any fiduciary duty the stockholder may owe the corporation. Hence, \*\*956 while in *Bershad,* the controlling shareholder could vote in favor of a freeze-out merger, it still had to satisfy the court that the transaction was entirely fair.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 7
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
**(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)**

FN14. *See also Tanzer v. International General Industries, Inc.,* Del.Supr., 379 A.2d 1121, 1123 (1977); *Ringling Bros. Barnum & Bailey Com. Shows, Inc. v. Ringling,* Del.Supr., 53 a.2d 441, 447 (1947); *Heil v. Standard Gas & Electric Co.,* 17 Del. Ch., (214) 151 A 303 (1930).

*7 The principle that a controlling shareholder may not utilize his control to deprive minority shareholders of the value of their stock is, however, far different from the proposition that a controlling stockholder *qua* stockholder has an affirmative duty to support a particular transaction, even if it is not in their interest as a shareholder to do so. Hence, in *Bershad,* the court reasoned that the parent company had no obligation to auction the subsidiary to the highest bidder even though, in comparison to a freeze-out, this would have better served the interests of minority shareholders. Controlling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them. *See Jedwab v. MGM Grand Hotels,* Del.Ch., 509 A.2d 584 (1986). For these reasons, it is my opinion that the Eriksons have a privilege as shareholders in effect conferred by Section 271 to preclude any transaction that requires shareholder approval. Surely as majority shareholders they may not use that privilege to force an unfair transaction on the corporation or its public shareholders, but here it could not be concluded that they did so. It is well established that the Eriksons have a right to sell their stock and with it control over the company. [FN15] They breached no duty to CERBCO in pursuing the sale of their stock to INA even if they did threaten to use their stockholder vote to bock a proposed deal between CERBCO and INA.

FN15. They have a duty in doing so (*e.g., Harris v. Carter,* Del. Ch., 582 A.2d 222 (1990); *Insuranceshares Corporation v. Northern Fiscal Corporation,* 35 F.Supp. 22 (E.D.Pa.1940)) but that duty does not include a sharing of the control premium. *Compare In Re Sea-Land Corporation Shareholders Litigation,* Del. Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987) *with Brown v. Halbert,* 76 Cal.Rptr. 781 (March 28, 1969).

B. *The alleged opportunity to issue authorized CERBCO class B stock to INA.*

The Eriksons had no statutory veto over the sale to INA of newly issued CERBCO class B stock, however. If it would have been advantageous to CERBCO the board had a duty to consider it. Such a transaction could be pursued without shareholder approval. But the record is clear that INA never considered purchasing such stock. This is no doubt for a fairly obvious reason. Purchasing the **957 Eriksons' holdings, would have given INA 78% of the CERBCO class B stock, control over the election of a majority of the board of directors, and voting control over the company. Purchasing all of the unissued CERBCO class B stock would provide INA with only a 46.9% voting interest while leaving the Eriksons with about 40%. Plainly this would be a very unsatisfying situation for all concerned. Purchasing all of CERBCO's remaining authorized but unissued class B stock would have required purchasing approximately 134,500 more class B shares than the Erikson transaction, while gaining a smaller voting interest.

There is nothing in the record to contradict evidence that INA had not interest in buying CERBCO's unissued class B stock. There is also evidence that CERBCO itself may not have been willing or able to pursue such a transaction. Thus even assuming the board could act to destroy a controlling shareholders control in order to benefit the corporation, [FN16] there is nothing here to suggest that the buyer would want such an unappealing deal. Finally, I note that the minutes of the September 14, 1990 board of directors meeting indicated that the members were concerned with the potential precedent such a transaction would set for East, which could also issue its own class B stock to INA, and thereby dilute CERBCO's control.

FN16. *See Condec v. Lukenheimer,* Del. Ch., 230 A.2d 769 (1967) (issuance of stock for primary purchase of diluting control of majority shareholder and entrenching existing board of directors is improper); *see also Phillips v. Insituform of North America, Inc.,* Del. Ch., C.A. No. 9173, Allen, C. (Aug. 27, 1987) (issuance of stock for primary reasons of diluting the voting power of an existing voting block may be justified if the issuance is to further a compelling corporate purpose); *Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.,* Del. Ch., 96 A.2d 810 (1953); *Freedman v. Restaurant Assoc.,* Del. Ch., C.A. No. 9212, Allen, C. (Oct. 16, 1987).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)

C. *The disclosure of CERBCO's books and records to INA.*

*8 The allegation is that the Eriksons breached a duty to CERBCO by disclosing to INA information from CERBCO's books and records, thereby utilizing their control over the corporate machinery to benefit themselves at the minority's expense. It is not claimed that CERBCO has been competitively injured in any respect. The point sought to be made, rather is that any use of corporate property or processes must be undertaken in the good faith pursuit of corporate advantage or advantages of all shareholders. As noted above, I find this generalization powerful, but consideration of stockholder's inspection rights lead me to conclude that with respect to right **958 to inspect corporate books and records, that it is overly-broad. That statute (Section 220 of DGCL) creates rights and duties that need to be taken into account. Namely, it creates a right in every shareholder to inspect the company's books and records "for a proper purpose."

Under the definition of a proper purpose of Section 220, the Eriksons could, as shareholders, inspect the corporation's books and records in order to facilitate a sale of their stock. *See CM & M Group, Inc. v. Carroll,* Del.Supr., 453 A.2d 788 (1982). Moreover, shareholders have also been allowed to disclose information in the corporation's books and records to bona-fide prospective purchasers, so long as these parties sign a confidentiality agreement. *See id.* at 794. In *Blommer Chocolate Company v. Robert Blommer, Suzann Blommer Love, John Love and Cargill, Inc.,* Del. Ch., C.A. No. 12693, Allen, C. (Sept. 28, 1992) I assumed, for purposes of the motion there under consideration, that disclosure of corporate information to assist a director in a sale of stock constituted a wrong. That case is distinguishable from this case (1) by the fact that the information disclosed was competitively significant and thus it was arguably beyond a Section 220 right and (2) by the fact that the disclosing party used stealth and deception to disclose corporate information. Even so no injunction was entered in *Blommer.*

Since the Eriksons had the right under Section 220 to force CERBCO to afford them reasonable access to the corporation books and records for a proper purpose and since facilitating a sale of their control stock is a proper purpose, one cannot correctly conclude, as I earlier was inclined to do, that providing access to INA (where there was no competitive injury that could be reasonably expected)

imposed a duty upon them with respect to the sale they sought to facilitate.

IV.

I turn now to the arguments which, as I interpret the, are dependant upon a finding that the sale of CERBCO's class B stock to INA did not require a shareholder vote. If this were the case, then the Eriksons did not have the capacity, as shareholders, to preclude a transaction with INA. Hence, as officers and directors the defendants had the power, in that capacity alone, to negotiate and vote for a sale by CERBCO of its East stock. In this capacity, if the Eriksons intentionally blocked such a sale in which INA was interested in order to divert a corporate transaction to their personal benefit, they may be held to have breached their duty of loyalty. I turn briefly to a description to the applicable legal standard, and **959 will then discuss defendants' specific assertions as to why, as a matter of law, no such breach occurred.

*9 Plaintiffs allege a breach of the duty of loyalty under the rubric of the usurpation of a corporate opportunity. While courts have considered a number of criteria in evaluating whether a director has usurped a corporate opportunity, the essence of this doctrine is "that a director may not appropriate something for himself that in all fairness should belong to his corporation." *Equity Corp. v. Milton,* 43 Del. Ch., 160, 221, 221, A.2d 494 (1966). Whether an opportunity belongs to a corporation is to be determined by the particular circumstances of the case *Johnston v. Greene,* Del Supr., 35 Del. Ch., 479 121 a.2d 919 (1956).

Delaware courts have developed particularized rules to guide this determination. *See Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 511 (1939); *Equity Corp. v. Milton,* 43 Del. Ch., 160, 221, 221 A.2d 494 (1966). In order to recover for the corporation, plaintiff must show:

(1) that the transaction falls within the corporation's business and would be of practical advantage to it;
(2) that the transaction presents an opportunity in which the corporation has an interest or legitimate expectancy; and
(3) that the corporation would be able and willing to undertake the transaction.

I turn to defendants' arguments as to why no corporate opportunity existed here.

A. *Defendants' assertion that INA made no formal*

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)

Page 9

*offer for CERBCO's East stock, and that therefore, no opportunity existed for CERBCO to sell its East holdings.*

While it is undisputed that INA made no offer to CERBCO, the conclusion movants draw from this misconstrues the legal requirements for a corporate opportunity.   This gist of the claim is that INA presented an opportunity that could have been developed and seized by CERBCO but that CERBCO was wrongfully precluded from that chance to its damage.  If defendants had not privilege to preclude CERBCO from selling its East stock, and if defendants' actions did divert a transaction with INA from CERBCO to themselves, then it is no answer that they did so before discussions could proceed to the stage of a formal offer.

A requirement that a formal offer be made for a finding that a corporate opportunity existed would allow controlling shareholders to use their influence to deter such offers.  Indeed, this is precisely **960 what plaintiffs allege the Eriksons did in this case. There is no good reason for imposing such a requirement when the existence of a potential corporate transaction can be proved through other means, such as internal studies by the acquirer and its retained investment bank, the substance of meetings between the parties, etc.

B.  *Defendants' contention that once INA was informed of CERBCO's capital structure, it had no desire to, nor was it financially able to purchase control of East directly.*

If such a contention were true, then the claim that the Eriksons had taken for themselves an opportunity which belonged to the corporation would not be viable, since there was no transaction available to the corporation.   However, there is a fact issue as to whether that in fact was INA's position, even though Krugman's testimony is consistent with this view.

*10 First, as to whether INA could afford to purchase control of East directly, there is a fact issue as to what the cost of such a purchase would have been.   Drexel's "Project CERBCO" analysis of a direct purchase of CERBCO's East holdings suggests that the transaction would have cost $10.5 million, $500,000 over the $10 million dollar line of credit which INA had established in anticipation of the transaction.  Plaintiffs argue that utilizing the same premium allegedly incorporated in INA's $6.0 million offer for the Eriksons' stock, and factoring in the additional price per share of CERBCO's East stock,

yields an acquisition price of well under $10 million. Furthermore, since no formal negotiations with CERBCO with respect to its East stock ever occurred, it is impossible to know what price the stock would have commanded.   It is, however, safe to say that the price of a direct purchase of CERBCO's East holdings is uncertain, and INA's incapacity to pursue such a transaction is not established beyond dispute.

As to which transaction was less costly, Drexel's "Project CERBCO" analysis did suggest that purchasing the Eriksons' stock had the lowest up-front financial cost.  However, Drexel's analysis also suggested that a purchase of the Eriksons' holdings might bring with it the additional risk, in effect, of assuming all of CERBCO's liabilities.  Therefore, it is to clear beyond dispute that the Eriksons' proposal was the least costly, considering all the relevant factors.

Importantly, there is evidence that a transaction between INA and CERBCO may not have gone forward, not due to cost considerations, but because the Eriksons let it be know that they would **961 preclude any such transaction.   While the Eriksons deny that they indicated that they would preclude any offer for CERBCO's East stock, the two non-Erikson directors' recollections directly contradict this. Directors Davies and Long both testified that they had the impression that the Eriksons would not vote for this transaction.

C. *Defendants' contention that CERBCO's selling its East shares did not further any corporate policy, nor was it of practical advantage to CERBCO.*

Defendants assert that the depressed price of East stock at the time of the negotiations with INA made it a poor time to sell.   However, the fact that the defendants thought it was worthwhile to sell their own controlling interest in CERBCO, whose principal asset was its East stock, makes this contention subject to legitimate dispute and thus not a summary judgment point.

As to the existence of a corporate policy that precluded a sale of its East stock, the Eriksons themselves in a February 22, 1990 board meeting noted that the 1994 termination of East's exclusive rights to the Insituform process made combination with INA an effective alliance in an increasingly competitive market.  This recognition of the threat of increased competition demonstrates an awareness on the part of the members of the corporate board of

Not Reported in A.2d                                                                    Page 10
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
**(Cite as: 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942)**

threats to East's profitability, and the advantages of a sale to INA.

*11 While defendants cite to the CERBCO Board of Directors' October 4, 1990 conclusion not to pursue a sale of CERBCO's East stock to INA as evidence of the lack of any policy to sell East, the Board also stated at this same meeting that it would consider any approach made by INA with respect to such an acquisition. Furthermore, as the special committee noted in its report, prior to the Eriksons informing them on September 19th as to the expiration of the letter of intent, the CERBCO directors felt constrained from negotiating with INA due to concerns of interfering with the rights set forth in the "no-shop" provision of the letter agreement, and due to fears of causing the Eriksons to resign. Plaintiffs have also alleged that the minutes of the September 14, 1990 Board meeting (in which the directors discussed the idea of CERBCO's issuing its own B stock to INA) indicate that CERBCO was interested in gaining the value of the control premium for itself. There are, therefore, fact issues as to CERBCO's posture with respect to a sale of East during the relevant period.

**962 D. *Defendants' assertion that the S.E.C. investigation would have precluded CERBCO from selling East to INA and that therefore CERBCO was unable to undertake the opportunity.*

This contention rests upon assertions of fact concerning the existence and importance of the S.E.C. investigations that are not settled by the record. There is some evidence consistent with the view that the S.E.C. investigation was not so very vital.

For example, Robert Erikson, shortly after the failure to extend the letter of intent, attributed the breakdown specifically to INA's refusal to advance the Eriksons the costs in the instant litigation. Furthermore, from INA's perspective, the critical issue, at least as of August 1990, seems to have been its concerns that the CERBCO and East class B stock might not, in fact, be able to elect a majority of the respective boards of directors. At an August 23, 1990 meeting, the INA board granted its approval of the transaction with the Eriksons, subject *solely* to the issuance of an opinion letter from counsel to the effect that the class B shares did have the power to elect a majority of the board. Therefore, it is not at all established beyond dispute in this record that INA would not have been able to conclude negotiations with CERBCO because of the on-going S.E.C. investigation.

In addition to alleging that no opportunity for a sale of CERBCO's East holdings to INA existed, defendants also claim, in effect that even if INA was interested in a deal with CERBCO, the Eriksons in no way interfered with such a transaction. However, there plainly are fact issues relating to the Eriksons' good faith with respect to CERBCO in their negotiations with INA. The record offers some support of the view that INA, even after it was aware of CERBCO and East's capital structures, still saw advantages to a direct purchase of East, as revealed in Drexel's "Project CERBCO" analysis. The facts are not unambiguous as to whether INA merely decided that a deal with the Eriksons used their authority as persons in charge of the day-to-day communication of the Company and as controlling persons to in effect tell INA that their sale was the only possibility. Because this is the case, defendants' motion for summary judgment on the grounds that there was no opportunity to arrange a sale of CERBCO's East stock to INA, or, alternatively, that the Eriksons acted in good faith with respect to a potential corporate transaction, must be denied.

**963 V.
*12 I turn finally to movants' second principal ground for requesting summary judgment, their claim that neither CERBCO nor its class A shareholders have suffered actionable damages. This is so, defendants say because plaintiffs have submitted no credible evidence that a hypothetical deal with INA would have offered them consideration in excess of the value of CERBCO's East holdings. [FN17] Therefore, defendants assert that there is no basis for plaintiff's claims that the Eriksons' activities caused CERBCO to lose a potentially profitable transaction, even if they did exert their power to preclude CERBCO from negotiating with INA. [FN18]

> FN17. Specifically, defendants contend that the price obtainable in such a deal is pure speculation, and that the $6 million INA was willing to pay is significantly less than the value of CERBCO's stock in East.

> FN18. Defendants also, dispute plaintiff's claims that the Eriksons must disgorge a payment they received from INA for extending the letter of intent, and that CERBCO should be compensated for the costs of the special committee, salary payments to the Eriksons during the period of their alleged breach of duty, and alleged payments to Rogers and Wells for their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 443406 (Del.Ch.), 19 Del. J. Corp. L. 942
(Cite as: 1993 WL 443406 (Del.Ch.),  19 Del. J. Corp. L. 942)

> services to the Eriksons.   Concluding as I
> do on the main claim, I need not address
> these points.

It is, of course, fundamental that a fiduciary who
breaches his duty is liable for any loss suffered by the
beneficiary of his trust.   Moreover, given the nature
of the right, it is also well established that any profit
made through the breach of trust may be disgorged
through the device of constructive trust. *See Guth v.
Loft,* Del.Supr., 5 A.2d at 510.

While courts will not award damages which require
speculation as to the value of unknown future
transactions, so long as the court has a basis for a
responsible estimate of damages, and plaintiff has
suffered some harm, mathematical certainty is not
required.   *Red Sail Eastern Ltd. Partners, L.P. v.
Radio City Music Hall Productions, Inc.,* Del. Ch.,
C.A. No. 12036 at 14, Allen, C. (Sept. 29, 1992).
Furthermore, once a breach of duty is established,
uncertainties in awarding damages are generally
resolved against the wrongdoer.     *Donovan v.
Bierwirth,* 754 F.2d 1049, 1056 (3d Cir.1985).

The difficulty of calculating damages is ordinarily
no ground for summary judgment.   The complete
impossibility as a matter of principle would provide a
ground to avoid a trial, but that will be a rare case.
Here we must await evidence before one can reach a
judgment as to whether there are grounds in the
record for fixing damages to CERBCO proximately
flowing from the proof of the **964 alleged
diversion of a corporate opportunity.    Surely one
cannot say that this record precludes any responsible
estimate of damages being set forth at trial.
Therefore this ground for a summary judgment of
dismissal is denied.

Not Reported in A.2d, 1993 WL 443406 (Del.Ch.),
19 Del. J. Corp. L. 942

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

Westlaw.

Not Reported in A.2d                                                                                        Page 1
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Robert O. WRIGHT t/a House of Wright Mortuary,
Plaintiff,
v.
Joseph K. DUMIZO and Samjos Service Corp.,
Defendants.
**No. 01C-08-292-JRJ.**

Submitted July 30, 2002.
Decided Oct. 17, 2002.

Upon Defendant's Motion for Summary Judgment--
Granted in Part and Denied in Part.

Daryl K. Fountain, Law Office of Daryl K. Fountain,
Wilmington, Delaware, for the plaintiff.

Clark C. Kingery, Clark C. Kingery Attorney at
Law, Wilmington, Delaware, for the defendants.

MEMORANDUM OPINION

JURDEN, J.

*1 Before the Court is the defendants' Motion
Summary Judgment on Plaintiff's Breach of Contract
and Deceptive Trade Practices Act claims. For the
reasons stated below, the defendants Motion for
Summary Judgment is GRANTED IN PART,
DENIED IN PART.

*Background*
This action stems from accounting services provided
to the plaintiff, Robert O. Wright ("Wright"), t/a
House of Wright Mortuary, by defendants, Joseph K.
Dumizo ("Dumizo") and Samjos Serv. Corp.
("Samjos"), from 1994 to 1997. In his Complaint
filed on August 31, 2001, the plaintiff alleges that the
defendants are liable based on five theories:
fraudulent misrepresentation (Count I), negligent
misrepresentation (Count II), negligence (Count III),
breach of contract (Count IV), and deceptive trade
practices (Count V).

On January 2, 2002, the defendant filed a Motion for

Summary Judgment alleging that all causes of action
are barred by the three-year statute of limitations set
forth in title 10, section 8106 of the Delaware Code.
On February 14, 2002, the plaintiff filed his
Opposition to the defendants' Motion for Summary
Judgment. The Court heard oral argument on May
21, 2002. By Order dated May 21, 2002, the Court
granted the defendants' Motion for Summary
Judgment on Counts I, II and III. With respect to the
two surviving counts, breach of contract and
deceptive trade practices, the Court requested
"verified evidence demonstrating the nature and
extent of the 'irregularities' with [plaintiff's] business
and personal tax returns, ... a documented time line
showing how and when he became aware of such
irregularities, and legal authority relating to the
tolling of the statute of limitations...." [FN1]

> FN1. *Wright v. Dumizo*, Del.Super., C.A.
> No. 01C-08-292-JRJ (May 21, 2002) (Order
> granting summary judgment as to fraudulent
> misrepresentation (Count I), negligent
> misrepresentation (Count II) and negligence
> (Count III)).

On July 18, 2002, the plaintiff filed his Supplemental
Opposition to Defendant's Motion for Summary
Judgment. The plaintiff contends that the statute of
limitations on the breach of contract and deceptive
trade practices claims was tolled by the defendants'
fraudulent concealment of the fact that Dumizo was
not a licensed or qualified accountant during the
relevant period. The plaintiff claims that because of
this fraudulent concealment, the plaintiff could not
discover that defendant's conduct rose to the level of
a cause of action until the State of Delaware Division
of Revenue ("Division of Revenue") notified the
plaintiff, on January 1, 2000, of errors in the
calculation of the plaintiff's corporate income tax
returns. The defendant argues that there is substantial
evidence in the record to demonstrate that the
plaintiff had notice of the defendants' alleged
malfeasance in the preparation and analysis of the
plaintiff's taxes. The defendants assert that the
plaintiff was aware of a cause of action for breach of
contract as early as May 1997 or, at the latest, August
19, 1998.

*Facts*
For the time period 1994 through 1998, defendants,
Dumizo and Samjos, were retained to prepare

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
(Cite as: 2002 WL 31357891 (Del.Super.))

Page 2

personal and business tax returns for the plaintiff, Wright. During this time, Dumizo represented to plaintiff that he was fully capable and qualified to perform such work. On or about May 1997, the plaintiff contacted Dumizo regarding certain penalties and interest incurred as a result of the plaintiff's failure to file a return and failure to calculate certain taxes correctly. On May 9, 1997, Dumizo responded in writing to the plaintiff clarifying that plaintiff was liable for the tax, but Dumizo was liable for the penalties and interest incurred. During this same time period, plaintiff discovered that Dumizo was not a Certified Public Accountant (CPA) and that Dumizo was not licensed to prepare tax returns.

*2 On March 18, 1998, plaintiff and the Division of Revenue executed a consent agreement concerning State of Delaware tax due. The consent agreement stated, "[t]hat the amount(s) of any State tax due under any return(s) made by or on behalf of the above-named taxpayer(s) for the tax year(s) ended December 31, 1994 under existing or prior revenue acts, may be assessed at any time on or before March 31, 1999." [FN2]

> FN2. Def's Supplemental Submission to Mot. for Summ. J. Ex. B (July 30, 2002).

On or about June 17, 1998, the plaintiff retained criminal and tax attorneys to assist in the correction of incorrectly calculated or filed returns and to exculpate the plaintiff of any wrongdoing. On or about August 19, 1998, the plaintiff terminated relations with Dumizo and Samjos. [FN3] During this time, the State ultimately concluded that the plaintiff had violated several tax laws, including the under reporting of income and falsifying tax documents. On September 20, 2001, defendant, Samjos, filed a certificate of dissolution.

> FN3. Def's Mot. Summ. J.App. (Jan. 3, 2002) (Delaware Superior Court Civil Rule 36(a), (b) provides, "[e]ach matter of which an admission is requested ... is admitted unless, within 30 days after service of the request ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection.... Any matter admitted under this Rule is conclusively established....").

*Standard of Review*
Superior Court Rule 56(c) provides that judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN4] The burden is on the moving party to show, with reasonable certainty, that no genuine issue of material fact exists and judgment as a matter of law is permitted. [FN5] When considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party. [FN6] Further, if the record indicates that a material fact is disputed, or if further inquiry into the facts is necessary, summary judgment is not appropriate.

> FN4. Del.Super. Ct. Civ. R. 56.

> FN5. See *Celotex Corp. v. Cattret*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Martin v. Nealis Motors, Inc.*, 247 A.2d 831 (Del.1968).

> FN6. *McCall v. Villa Pizza, Inc.*, 636 A.2d 912 (Del.1994).

*Discussion*
I. Deceptive Trade Practices
Plaintiff's fifth cause of action alleges deceptive trade practices. Plaintiff does not have standing to bring a claim of deceptive trade practices under title 6, section 2531 et. seq. of the Delaware Code. "Deceptive trade practices arise only from those unfair trade practices that interfere with the business of another, so only competing businesses have standing to raise the claim." [FN7] In this case, because Wright is a consumer, and not a competing business, Wright lacks standing to raise this issue under § 2531 et. seq.. Consequently, the defendants' motion for summary judgment on this claim is GRANTED.

> FN7. *S & R Associates, L.P. v. Shell Oil Co.*, 725 A.2d 431 (Del.Super.Ct.1998) (citing *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del.1993)).

II. Breach of Contract/ Statute of Limitations
Plaintiff's fourth cause of action alleges breach of contract. The issue to be decided is whether the cause of action based on breach of contract was brought too late, and is therefore time barred by the statute of limitations. The parties disagree on when the cause of action began to accrue and, thus, when the three-year statute began to run.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
(Cite as: 2002 WL 31357891 (Del.Super.))

Page 3

Under Delaware law, the applicable statute of limitations for a breach of contract is three years. [FN8] Typically, the cause of action in a contract dispute is said to accrue at the time of breach . [FN9] Thus, a service contract is breached when the service is due. [FN10] However, two exceptions exist to toll the statute of limitations. The Court will examine each in turn.

> FN8. Del.Code Ann. tit. 10, § 8106 (2002).

> FN9. *Snyder v. Baltimore Trust Co.,* 532 A.2d 624, 627 (Del.Super.Ct.1986) (citing *Nardo v. Guido DeAscanis & Sons, Inc.,* 254 A.2d 254, 255-56 (Del.Super.Ct.1969)).

> FN10. *Shively v. Ken-Crest Centers for Exceptional Persons v. State,* 1998 WL 960719 (Del.Super.).

### A. Fraudulent Concealment of Breach

*3 First, Delaware law recognizes that fraudulent concealment of a cause of action may toll the statute of limitations. [FN11] Fraudulent concealment requires a showing of (1) the defendant's knowledge of the alleged wrong, and (2) an affirmative act of concealment by the defendant thereby preventing the nonbreaching party from discovering and pursuing a cause of action. [FN12] "[W]hile the Statute of Limitations may not apply when the acts complained of are fraudulently concealed from the plaintiff, such application is suspended only until his rights are discovered by the exercise of reasonable diligence." [FN13] That is not to say that the plaintiff must have a defendant's verification that a cause of action exists. [FN14]

> FN11. *Lecates v. Hertrich Pontiac Buick, Co.,* 515 A.2d 163, 176 (Del.Super.Ct.1986).

> FN12. *Id.*

> FN13. *Giordano v. Czerwinski,* 216 A.2d 874, 876 (Del.1966).

> FN14. *Began,* 547 A.2d 620, 623 (Del.Super.Ct.1988) ("If all parties were allowed to toll the statute until they learned of the legal theory of a proposed action or so pursued an action, there would be no purpose to the statute of limitations.").

Plaintiff argues that "the defendant fraudulently concealed the fact that he was not licensed nor qualified to prepare tax returns and that [defendant] had been incorrectly preparing [plaintiff's] tax returns." [FN15] The Court agrees that one who purports to provide accounting services knowing he is unauthorized to do so intends, by the very act of posing as a licensed accountant, to conceal the fact that he is not authorized to provide valid accounting services; however, the inquiry does not end here. Rather, the Court must further determine at what point plaintiff discovered or should have discovered by the exercise of due diligence the fraudulently concealed facts.

> FN15. Pl. Supplemental Opp'n to Def's Mot. for Summ. J. ¶ 4 (July 18, 2002).

The defendants assert that since the plaintiff, as early as May 1997, confronted Dumizo regarding the payment of "[p]enalties and interest for failure to file a return" and "[p]enalties and interest for failure to calculate tax correctly resulting in [an] understatement of tax liability," the plaintiff was on notice of the defendants' alleged malfeasance. [FN16] Furthermore, the defendants argue that the plaintiff was on notice in March 1998, when the plaintiff entered into a consent agreement with the Division of Revenue concerning an audit of Delaware State tax due for the tax year ended December 31, 1994 [FN17] and in June 1998, when the plaintiff retained a new accountant, Charles Seitz, CPA [FN18] to review his tax filings. However, the plaintiff contends that it was not until January 14, 1999, when the plaintiff began receiving notices from the Division of Revenue that he became aware that a cause of action existed, and thus the statute of limitations was tolled until that time.

> FN16. Def's Supplemental Submission to Mot. for Summ. J. Ex. A (July 30, 2002); *Id.* ¶ 7.

> FN17. *Id.* Ex. B.

> FN18. *Id.* Ex. C.

It may be that the plaintiff should have recognized that defendants' failure to calculate the plaintiff's 1994 State of Delaware tax correctly, the audit by the Division of Revenue and the need for plaintiff to hire a new account indicated malfeasance on the part of the defendant, however, these questions must be resolved by the trier of fact. The Court finds that evidence exists sufficient to raise an issue of fact as to when the plaintiff, through the exercise of due diligence, should have discovered that the alleged

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)
**(Cite as: 2002 WL 31357891 (Del.Super.))**

accounting errors in the taxes prepared by the defendants constituted a cause of action.

### B. Time of Discovery

*4 "Generally, ignorance of the facts constituting a cause of action does not act as an obstacle to the operation of the statute [of limitations], except in the case of infancy, incapacity, and certain types of fraud. An exception occurs when there are no observable or objective factors which put laymen on notice of a problem." [FN19] Thus, "no cause of action accrues if the breach is inherently unknowable and the plaintiff was blamelessly ignorant that the cause of action existed." [FN20]

> FN19. *Began v. Dixon,* 547 A.2d at 623 (legal malpractice action).

> FN20. *Henlopen Station Condominium Council of Unit Owners v. Henlopen Junction Condominium Council of Unit Owners & Piraeus Realty, Corp.,* 2000 WL 303635, at *3 (Del.Super.).

While the plaintiff began questioning whether the plaintiff or defendants would be responsible for the penalties and interest due on the plaintiff's taxes, the record is unclear as to why the plaintiff made the May 1997 inquiry. Furthermore, the plaintiff's accountant, Charles F. Seitz, states that, "it is my professional opinion that a layman would not have the knowledge to have discovered these flaws and inaccuracies, and in any event, most of these matters were not discoverable until the tax authorities inquired in 1999." [FN21] A factual question therefore also exists as to when the plaintiff was no longer "blamelessly ignorant" of the fact that the tax problems were a result of the defendants' alleged malfeasance. Because the Court finds genuine issues of material fact with respect to when the plaintiff's breach of contract action accrued the Court denies summary judgment on the breach of contract claim.

> FN21. Charles F. Seitz Aff. ¶ 47.

### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment on the Deceptive Trace practices claim is GRANTED and the Defendants' Motion for Summary Judgment on the breach of contract claim is DENIED.

Not Reported in A.2d, 2002 WL 31357891 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.