LEXSEE 1993 DEL CH LEXIS 78

**ASH/RAMUNNO ASSOCIATES, INC., a Delaware corporation, Plaintiff, v. KENNETH L. BRANNER, JR., individually and as Mayor of Middletown, and HOWARD R. YOUNG, SR., JAMES L. REYNOLDS, THOMAS E. O'GRADY, SR., C. ALAN DOUGLAS, individually and as Members of Council of Middletown, VERINO PETTINARO and PETTINARO ENTERPRISES, INC., a Delaware corporation, ROBINO BROTHERS, INC., a Delaware corporation, REYBOLD GROUP OF COMPANIES, INC., a Delaware corporation, MOHR & DUGAN, a general partnership, NEW CASTLE COUNTY, THE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, and TOWN OF MIDDLETOWN, Defendants.**

Civil Action #12389

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1993 Del. Ch. LEXIS 78*

**April 23, 1993, Submitted
May 21, 1993, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1]

ON NEW CASTLE COUNTY'S MOTION TO DISMISS IT AS A DEFENDANT: GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action by plaintiff real estate developer to compel defendants, a town, its mayor, town council members, a county, and others, to allocate to it sufficient sewer capacity to support its construction project under a municipal contract, the county moved to dismiss all claims against it. The court considered the county's motion pursuant to Chancery Rules 10(c), 12(b)(6).

**OVERVIEW:** The real estate developer sought to compel defendants to allocate to it sufficient sewer capacity to support its planned construction of a shopping center. The developer alleged that the county breached a contract with the town to provide a certain amount of sewer capacity. The county moved to dismiss the action as against it pursuant to Chancery Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The court granted the county's motion to dismiss because as a matter of law, the county did not owe any duty, contractual or otherwise, to the developer to provide sufficient sewer capacity to support the construction of the shopping center. Under Chancery Rule 10(c), the contract between the county and the town regarding sewer capacity was a part of the pleadings. The developer referred to the contract in its complaint, but did not incorporate a copy therein. The county properly introduced the contract as part of its motion to dismiss the complaint. The court was not bound to accept the developer's characterization of the contract. The developer was not an intended third party beneficiary of the contract, and lacked standing to bring suit against the county.

**OUTCOME:** The court dismissed the action as against the county.

**CORE TERMS:** motion to dismiss, sewer, compensate, injurious, introduce, duty, owe, circumstances surrounding, third party, beneficiary, formation, promisor, Chancery Rule, injunctive relief, shopping center, legal duty, verified, allocate, build

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1] For purposes of a motion to dismiss, the Court of Chancery of Delaware, New Castle, must consider as being true the factual allegation in the complaint.

*Civil Procedure > Justiciability > Standing*
*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN2] Courts are reluctant to recognize third party standing when the third party group is large and poorly defined.

*Contracts Law > Third Parties > Beneficiaries > Types of Beneficiaries*
*Public Contracts Law > Contract Interpretation > Interpretation Generally*
[HN3] A promisor bound to a municipality by contract to do an act or render a service to some or all members of the public, is subject to no duty under the contract to compensate such members for the injurious consequences of performing or attempting to perform it, failing to do so, unless, (a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences.

*Civil Procedure > Pleading & Practice > Filing of Complaint*
*Civil Procedure > Pleading & Practice > Pleadings*
[HN4] See Chancery Rule 10(c) (Delaware).

*Civil Procedure > Pleading & Practice > Filing of Complaint*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN5] When a plaintiff fails to introduce a pertinent document as part of his pleading, the defendant may introduce the exhibit as part of his motion attacking the pleading. Because Chancery Rule 10(c) (Delaware) provides that the writing becomes part of the pleading for all purposes, the contents of any attached writing must be considered in a motion to dismiss for insufficiency. The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material.

**COUNSEL:**

L. Vincent Ramunno, Esquire, RAMUNNO & RAMUNNO, P.A., Wilmington, DE 19801-3399, Attorney for the Plaintiff.

Michael K. Tighe, Esquire, and James S. Yoder, Esquire, BERG, TIGHE & COTTRELL, P.A., Wilmington, DE 19899-0033, Attorneys for Defendants: Town of Middletown, its Mayor and Council.

Norman M. Monhait, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, DE 19899-1070, Attorney for Defendants: Robino Brothers, Inc., Verino Pettinaro and Greenlawn Associates.

Julie M. Sebring, Esquire, NEW CASTLE COUNTY DEPARTMENT OF LAW, Wilmington, DE 19801, Attorney for Defendant: New Castle County.

Keith A. Trostle, Esquire, DEPARTMENT OF JUSTICE, Wilmington, DE 19801, Attorney for Defendant: The Department of Natural Resources and Environmental Control.

Robert C. O'Hara, Esquire, and John M. Bloxom, IV, Esquire, BAYARD, HANDELMAN & MURDOCH, Wilmington, DE 19899, Attorneys for Defendants: Reybold Group of Companies, Inc. and Reybold Homes, Inc.

**JUDGES:** HARTNETT

**OPINIONBY:** HARTNETT

**OPINION:**

MEMORANDUM OPINION

HARTNETT, Vice Chancellor

Plaintiff Ash/Ramunno Associates, Inc. ("Ash/Ramunno"), a real estate developer, brought [*2] this action to compel the Town of Middletown, Delaware ("Middletown") to allocate to it sufficient sewer capacity for it to build a planned shopping center in Middletown. The complaint alleges that certain town officials conspired with other developers to allocate all potentially available sewer capacity to others. The complaint also names New Castle County ("the County") as one of the defendants. It is alleged in the complaint that the County's breach of its obligation in a contract between the County and Middletown ("the Contract") to provide Middletown with 750,000 gallons per day in sewer capacity is the cause of Ash/Ramunno's inability to obtain its desired allocation of sewer capacity.

1993 Del. Ch. LEXIS 78, *

The County has moved to dismiss all the claims against it pursuant to Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This motion must be granted because the County does not, as a matter of law, owe any duty--contractual or otherwise-- to Ash/Ramunno to provide sufficient sewer capacity for Ash/Ramunno to build its shopping center.

The County advances several reasons why the complaint should be dismissed. It first argues that because the complaint seeks [*3] preliminary injunctive relief it must be verified. See Ch. Ct. R. 3(aa) & 65(a)(1). Because the complaint was not verified, the County argues it must be dismissed.

Ash/Ramunno's application for preliminary injunctive relief already has been denied on other grounds. See *Ash/Ramunno Associates, Inc. v. Branner, 1993 Del. Ch. LEXIS 7*, Del. Ch., C.A. No. 12389-NC, Hartnett, V.C. (Jan. 11, 1993). The complaint seeks additional relief other than a preliminary injunction. Therefore, the failure to verify the complaint, while it might have provided an additional basis for denying the preliminary relief sought, clearly does not provide a basis for dismissing the complaint.

The County also argues that Ash/Ramunno cannot claim to be a third-party beneficiary under the Contract because the contract is no longer in force. Paragraph 8 of the complaint alleges that the County "has" a contract with the Middletown. [HN1] For purposes of a motion to dismiss, the Court must consider as being true the factual allegation in the complaint that the Contract is in effect. *Weinberger v. UOP, Inc., Del. Ch., 409 A.2d 1262 (1979)*. Therefore, to the extent that the current existence of the [*4] Contract is relevant to the existence of a claim, the County's motion to dismiss on that basis must be denied.

The County also argues that Ash/Ramunno is, at best, an incidental beneficiary of the Contract and that Ash/Ramunno therefore lacks standing to assert a breach of the Contract.

[HN2] Courts are reluctant to recognize third party standing when the third party group is large and poorly defined. *Browne v. Robb, Del. Supr., 583 A.2d 949, 955* (citing 4 CORBIN, Corbin on Contracts § 779G, at 53-54). The Delaware Supreme Court has held:

> [HN3] A promisor bound to . . . [a] municipality by contract to do an act or render a service to some or all members of the public, is subject to no duty under the contract to compensate such members for the injurious consequences of performing

> or attempting to perform it, failing to do so, unless, (a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, . . . .

*Pajewski v. Perry, Del. Supr., 363 A.2d 429, 431 (1976)* (quoting [*5] Restatement of the Law: Contracts § 145).

Therefore, in order for the County to owe Ash/Ramunno a legal duty, an intention to compensate Ash/Ramunno or others similarly situated must be manifest in the Contract itself.

Ash/Ramunno contends that the Contract may not be examined to determine whether such an intent exists on a motion to dismiss. It argues that on a motion to dismiss, this Court is confined to reviewing the pleadings and it argues that the Contract is not "in evidence". I assume that plaintiff means that the Contract was not incorporated in its complaint.

[HN4] Chancery Rule 10(c) provides: "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." This Court has previously held that:

> [HN5] When plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading . . . Because Rule 10(c) provides that the writing becomes part of the pleading for all purposes, the contents of any attached writing must be considered in . . . a motion to dismiss for insufficiency . . . The court is not bound to accept the pleader's allegations as to the effect [*6] of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material.

*Lewis v. Straetz, 1986 Del. Ch. LEXIS 365, *9*, Del. Ch., C.A. No. 7859-NC (Consol.), Hartnett, V.C. (Feb. 12, 1986).

Because Ash/Ramunno referred to the Contract in its complaint but failed to incorporate a copy therein, the County could (as it did) introduce the Contract as part of its motion to dismiss the complaint. This Court therefore

1993 Del. Ch. LEXIS 78, *

is not bound to blindly accept Ash/Ramunno's characterization that the Contract was intended to benefit it as a property owner. Id.; see also *Weinberger v. UOP, Inc., Del. Ch., 409 A.2d 1262 (1979)*.

There is nothing in the language of the Contract that indicates that the County intended to compensate members of the public, such as Ash/Ramunno, for any injurious consequences that might arise from any failure by the County to fully perform its contractual obligation to Middletown. Neither does Ash/Ramunno allege any specific facts related to the circumstances surrounding the formation of the Contract that would support that contention. Therefore, because the County [*7] owes no legal duty to Ash/Ramunno arising out of the Contract-- and Ash/Ramunno does not allege that the County owed it any other duty--the claims against the County must be dismissed and the County dismissed as a defendant.

IT IS SO ORDERED.

LEXSEE

**CERTAINTEED CORPORATION, a Delaware corporation, Plaintiff, v. CELOTEX CORPORATION, a Delaware corporation, and CELOTEX ASBESTOS SETTLEMENT TRUST, a Florida trust, Defendants.**

C.A. No. 471

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

2005 Del. Ch. LEXIS 11

**October 25, 2004, Submitted
January 24, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Judgment entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff buyer brought suit against defendant seller, contending that the seller was responsible, under an asset purchase agreement, for indemnifying the buyer for certain losses that the buyer incurred with respect to the assets that the buyer purchased. The seller filed a motion to dismiss the claims as time-barred.

**OVERVIEW:** The parties executed an agreement in connection with the purchase of certain assets, which provided a remedy to compensate the buyer for liabilities incurred in connection therewith. When the seller refused to compensate the buyer for losses it suffered, the buyer brought suit. In ruling on the seller's motion to dismiss, the court held: (1) that the buyer's claims for injuries due to the fact that some of the facilities' environmental conditions were not as represented should have been dismissed, as the complaint demonstrated that the buyer was on inquiry notice of the claims more than three years before filing suit; (2) that, while the buyer's claims involving allegations that the seller breached its obligation to perform certain remediation were not time-barred, laches barred the buyer from seeking specific performance because the buyer acted so slowly in bringing suit; and (3) that the buyer's claims for third-party indemnification based on liabilities incurred as a result of the seller having sold defective roofing materials were not time-barred because the claims did not accrue until the buyer

settled the product claims less than three years before suit was brought.

**OUTCOME:** The court dismissed those claims for injuries incurred for improper environmental conditions. The court concluded that most of the buyer's claims for damages for failure to perform certain environmental remediation were not time-barred, but that laches barred the buyer from seeking specific performance. The court decided that the seller's claims for liabilities incurred as a result of the seller having sold defective materials were timely.

**CORE TERMS:** indemnification, statute of limitations, closing date, specific performance, environmental, contractual, inquiry notice, remediation, tolling, time-barred, third-party, breach of contract, environmental conditions, non-compliant, warranty, non-compliance, indemnity, motion to dismiss, anniversary, accrued, seller, buyer, discovery, applicable statute, third party, common law, inherently, unknowable, accrual, testing

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Multiple Defendants > Contribution & Indemnity*
[HN1] Under Delaware law, claims for common law indemnity do not accrue until an indemnitee can be confident that any claim against him has been resolved with certainty. A cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Multiple Defendants > Contribution & Indemnity*
[HN2] Indemnification claims do not accrue until the party seeking indemnification has made payment to the injured person.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Multiple Defendants > Contribution & Indemnity*
[HN3] An indemnity claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.

*Torts > Multiple Defendants > Contribution & Indemnity*
[HN4] Common law indemnity is a device by which a tortfeasor passes through his entire liability to a third party whom the tortfeasor alleges is the real party responsible for injury.

*Contracts Law > Breach > Causes of Action*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN5] Del. Code Ann. tit. 10, § 8106 provides a three-year statute of limitations governing actions for breach of contract.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
[HN6] The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely.  In considering such a motion, the court applies the plaintiff-friendly principles of Del. Ch. Ct. R. 12(b)(6), namely that well-

pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception. When that burden is not met, a court must dismiss the complaint if filed after expiration of the limitations period.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN7] See Del. Ch. Ct. R. 10(c).

*Evidence > Procedural Considerations > Burdens of Proof*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN8] A party asserting that tolling applies bears the burden of pleading specific facts to demonstrate that the statute of limitations is, in fact, tolled.

*Civil Procedure > Jurisdiction > Equity Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN9] While statutes of limitation do not formally apply in equity, a chancery court typically applies statutes of limitation by analogy in addressing a laches argument.

*Civil Procedure > Injunctions > Mandatory Injunctions*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Contracts Law > Remedies > Specific Performance*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN10] A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three years set forth in Del. Code Ann. tit. 10, § 8106 to seek such relief. Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

*Civil Procedure > Jurisdiction > Equity Jurisdiction*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

[HN11] Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.


*Civil Procedure > Jurisdiction > Equity Jurisdiction*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN12] Where a statute of limitations bars a legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.


*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Contracts Law > Remedies > Specific Performance*
[HN13] A request for specific performance may be defeated by a laches defense.


*Civil Procedure > Injunctions > Mandatory Injunctions*
*Contracts Law > Remedies > Specific Performance*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN14] Specific performance is regarded as a serious remedy that is only available when monetary damages are inadequate. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual violation. To obtain specific performance, a plaintiff must prove the existence and terms of an enforceable contract by clear and convincing evidence. As a result, mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action. Where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable.


*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
*Torts > Procedure > Statutes of Limitations*
[HN15] Certain principles of law require a court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies. First, the court must ascertain the date of accrual of the cause of action. A cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action. The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach. For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party.


*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN16] In determining whether a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies, a court, in addition to ascertaining the date of accrual of the cause of action, must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment, inherently unknowable injury, and equitable tolling. When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims. Assuming a tolling exception applies, the third step that is required is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of the reason for injury. Rather, it exists when the plaintiff becomes aware of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of injury.


*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN17] A plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury.


*Torts > Business & Employment Torts > Concealment*
[HN18] A claim of fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to put the plaintiff off the trail of inquiry.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN19] While a court is obliged to make plaintiff-friendly inferences in ruling on a motion to dismiss, it is not obliged to make unreasonable inferences.

*Contracts Law > Remedies > Specific Performance*
[HN20] Specific performance is an equitable remedy normally applicable only in exigent circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Multiple Defendants > Contribution & Indemnity*
[HN21] Claims for third-party liabilities accrue in accordance with principles of common law indemnity.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN22] By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree."

*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Formation > Formation Generally*
[HN23] Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of Delaware, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree. That reasoning applies with even greater force when a party seeks after long delay to recover damages because its contractual party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute.

COUNSEL: Attorneys for Plaintiff: William M. Kelleher, Esquire, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, Wilmington, Delaware; Harry Weiss, Esquire, and Monique Mooney, Esquire, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, Philadelphia, Pennsylvania.

Attorneys for Celotex Corporation: Richard G. Placey, Esquire and Richard M. Donaldson, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, Wilmington, Delaware; Stephen A. Madva, Esquire, and David D. Langfitt, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, Philadelphia, Pennsylvania.

Attorneys for Celotex Asbestos Settlement Trust: R. Judson Scaggs, Jr., Esquire and Patricia R. Uhlenbrock, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Daniel J. Donnellon, Esquire, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio.

OPINION:

MEMORANDUM OPINION

**STRINE, Vice Chancellor**

Plaintiff CertainTeed Corporation purchased an operating business and several industrial facilities from Defendant Celotex Corporation under an asset purchase agreement. Under the asset purchase agreement, Celotex assumed the obligation [*2] to indemnify CertainTeed for certain losses CertainTeed might incur relating to the assets it was purchasing, and more generally, for losses incurred as a result of breach of the asset purchase agreement itself. After closing, CertainTeed began to experience losses of various kinds that it believed fell within Celotex's contractual duty of indemnification. After complying with the contractual notification procedure and receiving no satisfaction from Celotex, CertainTeed brought this case alleging that Celotex is responsible for these losses.

Celotex has filed a motion to dismiss CertainTeed's claims as time-barred, alleging that: 1) all of CertainTeed's claims accrued as of the August 18, 2000 closing date of the asset purchase agreement; 2) all statutes of limitation that apply (by analogy in equity under the laches doctrine) required a filing within three years of that date; 3) no basis for tolling any limitation period exists; and 4) CertainTeed filed this suit on May 28, 2004, after the applicable limitation periods had expired.

In this opinion, I cannot find as a matter of law that all of CertainTeed's claims accrued at closing and became time-barred on the third anniversary [*3] of the closing date. CertainTeed brings three general categories of claims, each of which implicates different principles of claim accrual and tolling.

The first category involves CertainTeed's claims for injuries incurred because some of the acquired facilities' environmental conditions were not as represented and warranted in the asset purchase agreement. Even indulg-

ing CertainTeed's argument that these conditions were not discoverable at the time of closing and that the applicable statutes of limitation were therefore tolled, the complaint demonstrates that CertainTeed was on inquiry notice of these claims more than three years before filing this suit. This category of claims is therefore dismissed.

The second category of claims involves allegations that Celotex breached its obligation to perform certain environmental remediation and testing work after the closing date. These claims accrued, I find, as of the date of non-compliance with the asset purchase agreement. Therefore I conclude that most of these claims are not time-barred, to the extent damages for non-compliance are sought. By contrast, however, I conclude that laches bars CertainTeed from seeking specific performance [*4] of these obligations after acting so slowly in bringing suit. A demand for specific performance is akin to a request for a mandatory injunction and it is not appropriate to measure promptness by analogy to a statute of limitations for a damages claim. CertainTeed's inexcusable torpidity in bringing suit prejudices Celotex.

The final category involves a classic claim for third-party indemnification based on liabilities that CertainTeed allegedly incurred as a result of Celotex having (as operator of the business CertainTeed bought) sold defective roofing materials. As this is a claim for third-party indemnification, it did not accrue until CertainTeed settled the product claims in July 2001. CertainTeed brought suit within three years of that date, and the claim is therefore timely.

I. Overview

CertainTeed is a manufacturer of building materials. Celotex, now bankrupt, was formerly a manufacturer of building materials, most (in)famously asbestos. Defendant Celotex Asbestos Settlement Trust (the "Trust") is the sole stockholder of Celotex, and for purposes of the asset sale at issue in this case, is Celotex's indemnitor. For brevity's sake and because the Trust has adopted Celotex's [*5] arguments in their entirety, I will not refer to the Trust in this opinion, except with regard to one unique argument that the Trust makes on its own behalf.

The facts underlying this dispute, upon which this motion shall be considered, are as set forth in CertainTeed's amended complaint (the "Complaint"). CertainTeed contracted with Celotex to purchase certain assets related to Celotex's roofing and fiberglass mat businesses, including the operating assets of those businesses, and certain facilities used for manufacturing those items. On June 29, 2000, the Asset Purchase Agreement (the "Agreement") effecting this transaction was executed. Significantly, the Agreement provided a remedy to compensate CertainTeed for environmental and other liabilities incurred in connection with the fa-

cilities. The sale closed on August 18, 2000 (the "Closing Date" or "Closing"), at which time CertainTeed took title to the four facilities now at issue (the "Facilities").

In this case, CertainTeed alleges three categories of losses for which it seeks relief from Celotex. I outline those categories briefly now.

First, in the Agreement, Celotex made numerous representations and warranties concerning [*6] environmental conditions at the Facilities, the validity of various permits required for operations at the Facilities, and compliance with applicable environmental regulations. After Closing, however, CertainTeed began to discover various environmental problems that had been warranted not to exist. CertainTeed incurred losses related to these environmental problems, and sought reimbursement for these losses and certain other liabilities in accordance with the provisions of the Agreement. Celotex refused to acknowledge its liability for the claims asserted. CertainTeed has now sued, under various theories, to recover its losses in connection with the non-compliant conditions of the Facilities. I define these claims generally as the "Facilities Claims."

Second, CertainTeed has sued Celotex because Celotex allegedly failed to complete certain environmental remediation and testing activities required by the Agreement. I define these as the "Remediation Claims."

Third and finally, CertainTeed alleges that it suffered losses because Celotex had, before Closing, sold defective roofing products. CertainTeed settled claims made by a general contractor whose clients threatened to sue over [*7] damage caused by those products. It seeks indemnification for the settlement costs from Celotex. I call this claim the "Product Claim."

Celotex has brought this motion arguing that each category of claim was brought too late and that the Complaint should be dismissed on the basis of laches.

The facts of this case are complex and numerous. In the interests of efficiency and readability, I will introduce most of the relevant facts in connection with the categories of claims I have outlined. Because all of CertainTeed's claims have their origins in the obligations undertaken and promises made by Celotex in the Agreement, it is necessary initially to discuss the relevant provisions of the Agreement and their implications for the pending motion.

II. Indemnification Provision Of The Asset Purchase Agreement

Article 8 of the Agreement requires that Celotex reimburse CertainTeed for specified liabilities. Under the Agreement, Celotex retained liability for certain "Excluded Liabilities," including liabilities for certain envi-

ronmental violations at the Facilities and third-party product liabilities. Celotex agreed to "indemnify" CertainTeed for: 1) losses related to breach of representations [*8] and warranties contained in the Agreement; 2) failure to perform covenants contained in the Agreement; and 3) the Excluded Liabilities.

As an initial matter, the potentially misleading use of the term "indemnification" in the Agreement requires clarification. CertainTeed has clung to this contractual term as a life raft against the sinking of its late-filed claims by contending that all of its claims must be considered as akin to common law claims for indemnification. [HN1] Under Delaware law, claims for common law indemnity do not accrue until the indemnitee can "be confident that any claim against him . . . has been resolved with certainty." n1 In other words, a cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded. n2 Because CertainTeed did not experience an ascertainable loss on any of its claims more than three years before it filed the Complaint, it alleges that all of its claims are timely. For reasons I will now explain, that argument lacks logical, legal, or equitable force.

n1  *Scharf v. Edgcomb Corporation,* 864 A.2d 909, 2004 Del. LEXIS 564, ___ A.2d ___, 2004 WL 2830885, at *8 (Del. Dec. 7, 2004).

[*9]

n2  *See Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.,* 2004 Del. Ch. LEXIS 125, 2004 WL 1949300, at *15 (Del. Ch. Aug. 27, 2004) [HN2] ("Indemnification claims do not accrue until the party seeking indemnification has made payment to the injured person.'") (citing *McDermott v. New York,* 50 N.Y.2d 211, 406 N.E.2d 460, 461, 428 N.Y.S.2d 643 (N.Y. 1980)); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland,* 48 Pa. Commw. 630, 410 A.2d 101, 102 (Del. Super. Mar. 30, 1979) [HN3] ("The [indemnity] claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.")

Article 8 of the Agreement n3 provides a contractual remedy for Losses sustained by CertainTeed, referred to

as "Indemnification." n4 The term "Indemnification" is used here as a contractual term of art to describe this contractual remedy. In the context of a merger or asset acquisition, the term "indemnification" refers [*10] generally to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties. n5 "Indemnification," as used in Article 8, does not refer to the common law right known as "indemnity." n6 That is, Article 8 does not provide a general right of reimbursement for debts owed to third parties by Celotex as a secondarily-liable party. This is evidenced by language in § 8.4(c) of the Agreement that specifically distinguishes "Third Party Claims" from claims generally covered under the indemnification remedy. n7 Instead, Article 8 generally sets forth the subject matter for which CertainTeed may bring claims and procedures for bringing such claims.

n3  By its terms, the Agreement entitles its Articles, for example, "Article 8," but identifies subsections of its Articles as, for example, "Section 8.1." In keeping with this scheme, I will refer to the contractual indemnification remedy generally as "Article 8," but I will discuss specific provisions of the Agreement by reference to the corresponding section number.

[*11]

n4  Agreement at 39.
n5  *See* Lou R. Kling and Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions,* § 1.05[5], at 1-39 (2001) ("[Indemnification] provisions grant either party (particularly, the purchaser) the right to recover, postclosing, for misrepresentations and noncompliance with covenants by the other party.").
n6  *See* 42 C.J.S. *Indemnity* § 2 at 73 (1991) [HN4] ("[Common law] indemnity is a device by which a tort-feasor passes through' his entire liability to a third party whom the tort-feasor alleges is the real party responsible for injury.").
n7  Agreement at 39 (defining Third Party Claims as "any Action against the Indemnitee by a third party which . . . if prosecuted successfully, would be a matter for which the Indemnitee is entitled to indemnification under this Agreement . . .").

Section 8.1 of the Agreement establishes the broad scope of coverage of the indemnification remedy, stating in relevant part that:

2005 Del. Ch. LEXIS 11, *

[Celotex agrees to] indemnify, defend and hold harmless [CertainTeed] from, against [*12] and in respect of any Losses arising from or related to:

(a) any breach or inaccuracy . . . in any representation or warranty of [Celotex] hereunder . . .;

(b) the failure of [Celotex] to perform any covenant or agreement to be performed by it hereunder;

(c) any or all of the Excluded Liabilities . . . n8

n8 Agreement at 39-40.

"Losses," as referenced in § 8.1, are defined in § 1.1 of the Agreement:

"Loss" means any and all claims, losses, liabilities, damages, costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred or suffered by the relevant party. n9

n9 Agreement at 6.

"Excluded Liabilities," as referenced in § 8.1, are also defined in § 1.1 of the Agreement, which states in relevant part: [*13]

"Excluded Liabilities" means all liabilities of [Celotex] other than the Assumed Liabilities, including (without limitation): (a) any other liabilities of [Celotex] . . .; (b) the Other Environmental Liabilities;

(c) the Acquired Assets Environmental Liabilities; (d) the costs to complete the Remediation Projects properly . . . n10

n10 Agreement at 4-5.

Section 8.3(a) of the Agreement sets temporal limitations on indemnification claims and lawsuits brought under Article 8 as follows:

No claims may be made or suit instituted under any provision of this Article 8 after the second (2nd) anniversary of the Closing Date, except for: (i) claims of the Buyer for Losses related to Acquired Assets Environmental Liabilities, which shall survive the execution and delivery of this Agreement and the Closing until the third (3rd) anniversary of the Closing Date; *provided however*, that it is of the essence that, after the third (3rd) anniversary of the Closing Date, the Buyer shall have [*14] no claim, including (without limitation) any claim for indemnification or contribution, against the Seller for or with respect to Acquired Assets Environmental Liabilities other than such claims which are Reserved Claims as of that date; and

(ii) Reserved Claims which shall survive indefinitely (subject to any applicable statute of limitations). The term "Reserved Claims" means all claims: (1) as to which the Indemnitee has given the Indemnitor proper notice pursuant to § 8.4 below prior to the expiration of the applicable survival period; (2) based upon actual fraud or intentional misrepresentation on the part of the Indemnitor at or prior to the Closing; or (3) based upon Excluded Liabilities (other than Acquired Assets Environmental Liabilities) or Assumed Liabilities, as the case may be. n11

n11 Agreement at 41.

2005 Del. Ch. LEXIS 11, *

Section 8.4(a) requires that CertainTeed must provide Celotex with appropriate written notice in order to assert a valid claim:

> A claim for indemnification hereunder . . [*15] . shall be made by [CertainTeed] by delivery of a written notice to [Celotex] requesting indemnification and specifying in reasonable detail the basis on which indemnification is sought and the amount of the Losses incurred (if known) . . . n12

n12 Agreement at 42.

The plain language of Article 8 establishes "survival periods" during which claims may be brought or reserved. CertainTeed may bring claims after the survival periods only if they are reserved in accordance with § 8.3(a)(ii). "Reserved Claims" may be brought after the third anniversary of the Closing Date, subject to the "applicable statute of limitations," which, based on the combined effect of § 10.9 of the Agreement n13 and 10 Del. C. § 8106, is three years for contract and tort claims. n14 The cumulative effect of these provisions is that CertainTeed's Article 8 claims are valid only if:

1. the asserted liability is within the scope of Article 8;

2. an indemnifiable Loss was sustained;

3. notice of the claim [*16] was filed within the applicable survival period;

4. the claim was converted to a Reserved Claim, permitting it to survive the third anniversary of the Closing Date; and

5. this action was filed within the "applicable statute of limitations" for each claim.

n13 Agreement at 49. Section 10.9 of the Agreement states that Delaware substantive law governs the parties' rights under the Agreement.

n14 [HN5] 10 Del. C. § 8106 provides a three-year statute of limitations governing actions for breach of contract (see Fike v. Ruger, 754 A.2d 254, 260 (Del. Ch. 1999)) and actions for torts (see Becker v. Hamada, 455 A.2d 353, 356 (Del. 1982)).

The cumulative impact of these provisions quickly dispels CertainTeed's key argument concerning claim accrual. CertainTeed advances a theory that statutes of limitation as to all of its claims begin to run only after the entirety of each claimed loss has been established, n15 citing case law supportive of the proposition [*17] that claims for indemnification accrue when an indemnifiable loss is sustained. n16 Although this general proposition is a correct statement of the law governing third-party indemnification, n17 CertainTeed's argument misconstrues the indemnification remedy provided under Article 8 of the Agreement as implicating common law theories of indemnity. At issue here is a contractual remedy, termed "Indemnification," that has no direct relation to common law indemnification. CertainTeed argues that, under its theory, indemnification claims could be brought when the first dollar of loss is sustained, but the statute of limitations would not begin to run until the last dollar of loss is sustained. n18 The Agreement clearly rejects that argument. Section 8.3(a)(ii) states that claims for indemnification survive subject to the "applicable statute of limitations," making clear that the timeliness of any claim will be measured by the statute of limitations normally applicable to such a claim. Further, the clear implication of the Agreement is that time is of the essence in submitting claims under Article 8, n19 and thus, absent claim-specific justifications for its application, this "last dollar" [*18] theory is invalid. Nevertheless, CertainTeed's theory is not wholly without merit, because the "applicable statute of limitations" for third-party claims could be subject to accrual principles of common law indemnity.

n15 Pl. Br. at 15 (citing United States Fidelity & Guarantee Co. v. Gray's Adm'rs, 29 Del. 161, 6 Boyce 161, 97 A. 425 (Del. Super. 1916); Salovaara v. SSP Advisors, L.P., 2003 Del. Ch. LEXIS 142, 2003 WL 23190391 (Del. Ch. Dec 22, 2003); Shinault v. Nationwide Mut. Ins. Co., 1995 Del. Super. LEXIS 178, 1995 WL 270089 (Del. Super. Mar. 13, 1995); Council of Unit Owners of Sea Colony, Phase III Condominium v.

*Carl M. Freeman Associates, Inc.*, 1989 Del. Super. LEXIS 153, 1989 WL 40973 (Del. Super. Apr. 11, 1989)).

n16 *United States Fidelity & Guarantee Co. v. Gray's Adm'rs*, 29 Del. 161, 6 Boyce 161, 97 A. 425 (Del. Super. 1916); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland*, 401 A.2d 101 (Del. Super. 1979); *Seitz v. A-Del Const. Co.*, 1987 Del. Super. LEXIS 1279, 1987 WL 16711 (Del. Super. Aug. 13, 1987); *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc.*, 1989 Del. Super. LEXIS 153, 1989 WL 40973 (Del. Super. Apr. 11, 1989); *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 1992 Del. Ch. LEXIS 78, 1992 WL 65411 (Del. Ch. Mar. 30, 1992); *Getty Oil Co. v. Catalytic, Inc.*, 509 A.2d 1123 (Del. Super. 1986); *Shively v. Ken-Crest Centers for Exceptional Persons*, 1998 Del. Super. LEXIS 489, 1998 WL 960719 (Del. Super. Nov. 19, 1998).

[*19]

n17 *See* cases cited *supra* notes 2, 15-16.

n18 Transcript at 72-73.

n19 Agreement, § 8.3(a)(i) (stating in relevant part that ". . . it is of the essence that, after the third (3rd) anniversary of the Closing Date, [CertainTeed] shall have no claim . . .").

Therefore, in the case of counts for breach of contract and misrepresentation, where claims involve direct injury to CertainTeed -- e.g., claims resting on the assertion that CertainTeed was injured because a Facility's environmental condition was not as represented in the Agreement -- timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling. Only if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) will CertainTeed's claim accrue at the time when the last dollar of loss is ascertainable. n20

n20 *See* cases cited *supra* note 2.

[*20]

It should also be noted that, at this stage, I assume that all of CertainTeed's claims complied with the first four requirements of Article 8. n21 That is, all of Cer-

tainTeed's claims: 1) are subject to indemnification under Article 8; 2) seek indemnification for Losses sustained by CertainTeed; 3) were properly submitted to Celotex within the applicable survival period; and 4) were converted to Reserved Claims. Therefore, the validity of each of CertainTeed's claims stands or falls on its compliance with the "applicable statute of limitations."

n21 There may be one exception to this general statement. The Complaint does not allege that CertainTeed's claim for losses incurred at the Russellville, Alabama Facility was submitted to Celotex in accordance with the requirements of § 8.4 of the Agreement. But Celotex does not argue this point, and I assume that such notice was given.

III. Legal Standard For A Motion to Dismiss

[HN6] The timeliness of claims may be determined on a motion to dismiss if the facts [*21] pled in the complaint, and the documents incorporated within the complaint, n22 demonstrate that the claims are untimely. n23 In considering such a motion, the court applies the plaintiff-friendly principles of Rule 12(b)(6), namely that well-pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. n24 At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception. n25 When that burden is not met, the court must dismiss the complaint if filed after expiration of the limitations period. n26

n22 CertainTeed has submitted a substantial volume of exhibits as an appendix to its Amended Complaint. Court of Chancery Rule 10(c) states that [HN7] "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Exhibits submitted by CertainTeed are thus appropriately considered here.

n23 *See, e.g. In re Dean Witter Partnership Litigation*, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *3 (Del. Ch. July 17, 1998); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993).

[*22]

n24 *See Dean Witter*, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *4.

n25 *See id.* 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at *6 [HN8] ("The party asserting that tolling applies . . . bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

n26 *See id.* 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at *4.

[HN9] While statutes of limitation do not formally apply in equity, this court typically applies statutes of limitation by analogy in addressing a laches argument. n27 In this case, the parties have not argued for any general departure from the typical approach, and I adhere to it for the most part. Importantly, however, I note that CertainTeed seeks specific performance of certain affirmative obligations Celotex allegedly failed to perform in accordance with its duties under the Agreement. [HN10] A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. n28 Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three [*23] years set forth in § 8106 to seek such relief. n29 Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

n27 *See generally U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.*, 677 A.2d 497, 502 (Del. 1996) [HN11] ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."); *Kahn*, 625 A.2d at 272 [HN12] ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.").

n28 *See* Donald J. Wolfe and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 12-3, 12-34 (2004).

n29 [HN13] A request for specific performance may be defeated by a laches defense. *See* Wolfe & Pittenger at § 12-3, 12-49. [HN14] Specific performance is regarded as a serious remedy, however, that is only available when monetary damages are inadequate. *See id.* at 12-35. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual

violation. To obtain specific performance, a plaintiff must prove "the existence and terms of an enforceable contract by clear and convincing evidence." *Id.* As a result, it seems plain that mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. *See Carey v. Landy*, 1989 Del. Ch. LEXIS 47, 1989 WL 44051, at *3 (Del. Ch. Apr. 27, 1989) ("Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action."); *Hollingsworth v. Szczesiak*, 32 Del. Ch. 274, 84 A.2d 816, 822 (Del. Ch. 1951) (holding that, where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable).

[*24]

IV. Statute Of Limitations Analysis

CertainTeed brings claims for various breaches of contract and for tortious misrepresentations. Celotex argues that all of these claims are time-barred. There is no dispute that the "applicable statute of limitations" for each of CertainTeed's claims is three years, however, this limitations period is subject to tolling in certain circumstances that are arguably present here. The statute of limitations analysis differs for each of the subsets of claims that CertainTeed asserts.

In addressing the timeliness of the various claims made by CertainTeed, I am required to apply settled principles of law recently reiterated by the Delaware Supreme Court in *Wal-Mart Stores Inc. v. AIG Life Ins. Co.* n30 Those [HN15] principles require the court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies.

n30 860 A.2d 312 (Del. 2004).

First, the court must ascertain [*25] the date of accrual of the cause of action. *Wal-Mart* holds that a cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." n31 The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach. n32 For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. n33 Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues

2005 Del. Ch. LEXIS 11, *

only after the party seeking indemnification has made payment to the third party. n34

n31 *Id.* at 319.

n32 *See Ambase Corp. v. City Investing Co.,* 2001 Del. Ch. LEXIS 16, 2001 WL 167698, at *14 n.4 (Del. Ch. Feb. 7, 2001).

n33 *See Kaufman v. C.L. McCabe & Sons,* 603 A.2d 831, 834 (Del. 1992).

n34 *See* cases cited *supra* notes 2, 15-16.

[*26]

[HN16] Second, the court must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment, n35 inherently unknowable injury, n36 and equitable tolling. n37 When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims.

n35 *See Halpern v. Barran,* 313 A.2d 139, 143 (Del. 1973).

n36 *See Isaacson, Stolper & Co. v. Artisan's Savings Bank,* 330 A.2d 130, 132 (Del. 1974).

n37 *See Dean Witter,* 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *6.

Assuming a tolling exception applies, the third step that is required under *Wal-Mart* is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of the reason [*27] for injury. n38 Rather, it exists when the plaintiff becomes aware of "facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of injury]." n39

n38 *Id.* 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at *7 (emphasis omitted).

n39 *Wal-Mart,* 860 A.2d at 319 (citations and emphasis omitted).

This court, and our Supreme Court, have emphasized that [HN17] a plaintiff is expected to act with alac-

rity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury. n40

n40 *Dean Witter,* 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *6; *U.S. Cellular,* 677 A.2d at 504 n.7.

With these principles in mind, I turn to addressing the categories [*28] of claims brought by CertainTeed. That task is unduly complicated by the Complaint, which unnecessarily proliferates redundant counts based on identical conduct, dividing single claims involving breaches of the Agreement into multiple counts. For the sake of analytical clarity, I have organized the claims into more readily understandable categories.

V. Application Of The Statute Of Limitations Analysis To Each Category Of Claims

A. Facilities Claims

The first category of claims is the largest in number and in economic importance, or so it appears. This category involves claims that the environmental conditions existing at four of the Facilities were inconsistent with the conditions represented and warranted in the Agreement. Although CertainTeed has pled these claims confusingly, in essence it alleges that Celotex breached representations and warranties in the Agreement -- a breach of contract claim -- and seeks contractual indemnification under the Agreement. CertainTeed has repetitively pled contractual claims based on the same noncompliance under different rubrics, including contractual indemnification, breach of contract, specific performance, and declaratory judgment. [*29] n41 Nonetheless, each is ultimately a claim for breach of contract. Under 10 Del. C. § 8106, a three-year statute of limitations applies.

n41 Complaint, Counts I, II, V, VI, and VII.

Despite what appears to be the plain language of § 8.3(c) of the Agreement, which precludes CertainTeed from suing for fraud as to false representations and warranties, n42 CertainTeed has also pled that Celotex committed fraudulent misrepresentation by providing false representations and warranties of the conditions of the Facilities. Even assuming these claims are viable, under 10 Del. C. § 8106, CertainTeed's misrepresenta-

tions are also subject to a three-year statute of limitations, and whether treated as breach of contract or as tort, the accrual date as to all of these claims was the date of Closing. On that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented. Because the Complaint was filed more than three years [*30] after Closing, the key question as to this category becomes whether a tolling exception applies and, if so, when CertainTeed was on inquiry notice of its claims. A category-wide discussion of these issues is useful as precedent to considering each Facility individually.

n42 Agreement, § 8.3(c) (stating in relevant part: "*Sole Remedy*. The indemnification remedy provided in this Article 8 shall be [CertainTeed's] sole and exclusive remedy for breaches of the representations and warranties of [Celotex] . . . ").

CertainTeed explicitly argues only one tolling exception -- fraudulent concealment. But [HN18] a claim of fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to "put the plaintiff off the trail of inquiry." n43 In its Complaint, exhibits, and other pleadings, CertainTeed alleges no post-Closing acts by Celotex attempting to cover up non-compliant conditions at [*31] the Facilities. Further, after Closing, the Facilities were under CertainTeed's own dominion. And, as will be seen, CertainTeed discovered the non-compliant conditions at various of the facilities almost immediately upon assuming ownership, rendering the fraudulent concealment exception even less applicable to this case.

n43 *Halpern*, 313 A.2d at 143.

Implicitly, n44 but a bit more logically, CertainTeed argues that the non-compliant conditions at the Facilities were inherently undiscoverable and, for that reason, the statute of limitations was tolled. Frankly, that argument, at first blush, appears wholly strained. Any purchaser of industrial manufacturing facilities in our society knows of the serious risk that there will be conditions on the property, resulting from past operations, that violate relevant environmental laws and that will have to be cleaned up by the present owner. That is why purchasers of such properties procure environmental audits before buying. n45 To apply the inherently [*32] unknowable

injury doctrine, which originally addressed situations where surgeons left items within the bodies of their patients, in a dissimilar circumstance so as to excuse a tardy filing by a sophisticated, multi-billion dollar corporation like CertainTeed has no apparent commercial or equitable logic. n46 Rather, one would think that the law should expect such purchasers to do appropriate due diligence before purchase.

n44 CertainTeed did not squarely invoke the inherently unknowable injury exception in its brief, but explicitly raised it and directly relied upon it at oral argument.

n45 By way of example, when CertainTeed sold the Los Angeles Facility to the University of Southern California less than one year after the Closing Date, USC insisted upon such environmental audits as a condition precedent to closing, and further, in connection with that sale, extracted from CertainTeed an obligation to remediate all environmental damage discovered on that property.

n46 Admittedly, the doctrine of inherently unknowable injury has been applied in cases when a defendant's wrongdoing was unknowable because evidence of a defendant's negligence was, for example, buried underground. In *Rudginski v. Pullella* (378 A.2d 646 (Del. Super. 1977)), purchasers of a new septic system were held to have had no reason to suspect the new system they had purchased was defective until it malfunctioned. Here, however, CertainTeed was not purchasing a new underground product that it would have been entitled to assume was in proper working order. It was purchasing industrial facilities of more than modest vintage, on which it was already aware of some environmental problems and on which it should have suspected that other problems might also exist.

[*33]

There are arguably two reasons why the doctrine might credibly apply in a situation like this one. Assume the purchaser of an industrial facility extracted from the seller the pre-closing obligation to have independent environmental audits performed and to receive clean results of those audits. In such cases, the buyer could reasonably be considered to have acted diligently by, in essence, extracting from the seller the conduct of responsible due diligence that should have detected non-compliant conditions. n47 Having done so, the buyer would be entitled to assume that facilities were as con-

tractually warranted until inquiry notice to the contrary arose. Why? Because one would assume that the non-compliant conditions, if discoverable, would have been detected by the pre-Closing audits.

n47 See, e.g., Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 650-1 (Del. Super. 1985) (holding that where, in accordance with a contractual relationship, a buyer relied on a seller's expertise and assurances in determining the existence and cause of damages to the subject property, and where the buyer could only discover the failure of the seller to perform in good faith and in accordance with the seller's contractual obligations through hiring an independent specialist to make the same inspections required of the seller, the buyer could be "blamelessly ignorant" for the purposes of tolling analysis).

[*34]

By contrast, CertainTeed acted here with much less diligence, extracting as to each Facility representations and warranties that environmental conditions were acceptable, and the right to receive any environmental audits that had been conducted by Celotex in the past five years. That is, CertainTeed did not act prudently in ascertaining the true conditions of the Facilities before Closing. In my view, CertainTeed's argument that procuring the representations and warranties themselves as to the compliant conditions of the Facilities was sufficient to invoke the inherently unknowable injury doctrine is a non-sequitur. It is the breach of these very representations and warranties that creates a claim; the question is whether the breach is reasonably discoverable. Otherwise, any claim for breach of a contractual representation would toll the statute of limitations on the grounds that the representation itself somehow rendered the breach of the representation undetectable. CertainTeed's own Complaint, as we shall see, refutes the notion that a party using rational commercial practices could not have discovered the non-compliant conditions.

As a result, CertainTeed is, in my view, in a [*35] weak position to invoke the inherently unknowable injury doctrine. But a recent decision of our Supreme Court makes it arguable that CertainTeed can invoke the doctrine, even on this record and even given its lack of reasonable prudence. In Wal-Mart, the Supreme Court held that one of America's largest corporations, despite having a huge legal department and access to the best outside legal advice money could buy, could not be expected to discover that its utilization of a tax-avoidance strategy advocated by insurance brokers might be ruled

by the Internal Revenue Service to be improper. n48 This ruling sets a low threshold for the use of the doctrine of inherently unknowable injury, but one that is hard for a trial court to ignore.

n48 860 A.2d 312.

Given that the conditions CertainTeed claims could not be detected were at least as hidden as the legal risk Wal-Mart supposedly could not identify, I accept solely for the sake of argument that the misrepresented environmental conditions at [*36] the Facilities were not discoverable and that the statute of limitations was tolled with respect to the Facilities Claims until CertainTeed was on inquiry notice.

At the same time, however, the commercial context does, to my mind, matter. CertainTeed premises its claims on one Asset Purchase Agreement. Once it had reason to suspect, despite the pre-Closing representations and historical environmental audits to be provided to it by Celotex, that some of the Facilities did not comply with their warranted condition, CertainTeed was not entitled to lean back in the recliner and not investigate whether, as to other of the Facilities, similar breaches also existed. Rather, knowing that it could not rely on Celotex's pre-Closing representations and audits, CertainTeed was duty-bound to investigate and to try to discover all of its claims against Celotex. n49 With this in mind, I next turn to determining when CertainTeed was on inquiry notice, which must be analyzed on a facility-by-facility basis.

n49 See U.S. Cellular, 677 A.2d at 504, n.7 ("Whatever is notice calling for inquiry is notice of everything to which such inquiry might have led.").

[*37]

1. The Birmingham Facility

The Complaint alleges that the Birmingham, Alabama Facility was non-compliant because soil and groundwater were contaminated with naphthalene, coal tar, and other hazardous substances. But the Complaint also admits that the non-compliance was suspected before Closing n50 and confirmed in October 2000. n51 Thus, at the very latest, inquiry notice triggered the running of the statute of limitations in October 2000, but CertainTeed waited more than three years after that date

to file suit. Even after receiving formal notice of a permit violation, CertainTeed took almost two more years to sue. The existence of coal tar waste in the soil was ascertained at the Birmingham Facility soon after Closing. Naphthalene contamination was found in groundwater between August and October 2000, n52 and in the soil in February 2001. n53 On July 30, 2002, CertainTeed received notification that the Birmingham Facility was not in compliance with its National Pollution Discharge Elimination System Permit. n54 Making all inferences in favor of CertainTeed, the statute of limitations was tolled until October 2000 at the latest, when groundwater contamination was first ascertained. [*38] Although other injuries were discovered after October 2000, the initial discovery constituted "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of other contamination and noncompliance with permit requirements. n55 Thus, the applicable statute of limitations began to run soon after the Closing Date and expired soon after the third anniversary of the Closing Date, in October 2003. As to the Birmingham Facility, the Facilities Claims filed May 28, 2004 are therefore time-barred.

n50 Complaint P 78.
n51 Complaint Ex. K at 4 (noting that Water Quality Data recorded between August and October 2000 "demonstrated naphthalene concentrations far in excess of targeted federal and state water quality criteria").
n52 *Id.*
n53 *Id.*
n54 Complaint Ex. L at 5.
n55 *Wal-Mart*, 860 A.2d at 319.

2. The Cincinnati Facility

At the Cincinnati, Ohio Facility, shortly [*39] after Closing, CertainTeed discovered liquid hydrocarbons floating on groundwater. n56 On an unspecified date thereafter, CertainTeed also discovered petroleum and tar contamination in the soil. n57 Here again, discovery of groundwater contamination constituted inquiry notice for other environmental liabilities. The statute of limitations was tolled only until "shortly after the Closing Date." n58 The Facilities claims relating to the Cincinnati Facility were not filed within the limitations period that began to run shortly after Closing, and are thus time-barred.

n56 Complaint P 101.
n57 Complaint P 103.
n58 Discovery of contamination at the Cincinnati facility is characterized as having occurred "shortly after closing," and the actual date is not specified. In order for this action filed May 28, 2004 to have been timely, however, discovery would have to have been sometime after May 28, 2001, more than nine months after the Closing Date. [HN19] While I am obliged to make plaintiff-friendly inferences, I am not obliged to make unreasonable inferences.

[*40]

3. The Los Angeles Facility

Based on conditions that had already been discovered at the Birmingham and Cincinnati Facilities, by October 2000, CertainTeed should have suspected that environmental conditions at the other acquired Facilities were also potentially non-compliant and begun to undertake diligent discovery efforts. Having been given reason to suspect two very serious breaches, CertainTeed could not fail to act with diligence as to other possible instances of non-compliance by taking prudent steps to ascertain the environmental condition of each Facility.

In this regard, the plain averments of the Complaint implicitly but unmistakably concede that CertainTeed was on inquiry notice as to possible non-compliance at the Los Angeles Facility more than three years before it filed its May 28, 2004 Complaint. In the Complaint, CertainTeed alleges that non-compliance at Los Angeles was first confirmed on May 31, 2001 in an Environmental Site Assessment report disclosing the existence of contamination. n59 But, the Assessment obviously does not reflect results discovered the very day that the report was completed or the date when results were first delivered to CertainTeed. [*41] Rather, it manifests the results of CertainTeed's actions in response to earlier inquiry notice. As of May 31, 2001, CertainTeed indisputably should have been on actual notice of the non-compliance, but the statute of limitations had already begun running no later than the time when CertainTeed first initiated the Assessment, which was obviously many months before then.

n59 Complaint Ex. G at 1-2. CertainTeed alleges that it did not actually receive the Environmental Site Assessment dated May 31, 2001 until mid-July 2001. CertainTeed evidently failed to inquire as to the results of an environmental assessment in progress that indisputably would have consti-

tuted inquiry notice as early as May 31. Instead, CertainTeed passively waited to be informed of contamination more than one month after it was discovered. CertainTeed's failure to monitor results of an environmental assessment as they became available supports a general conclusion that its failure to discover injuries at the Los Angeles Facility was due more to a lack of diligence than to inherent undiscoverability.

[*42]

After receiving actual notice in mid-July of injuries that could have been ascertained on May 31, 2001, CertainTeed also learned of the existence of underground storage tanks that had leaked other contaminants. Instead of acting promptly in the face of this information, CertainTeed waited until May 28, 2004 to sue on its Facilities Claims. This was clearly more than three years after inquiry notice existed. For this reason, the Los Angeles Facilities Claims are untimely and shall be dismissed.

The Los Angeles Facilities Claims are also untimely for a related, although not identical reason. As noted earlier, CertainTeed's notice of non-compliant conditions at Birmingham and Cincinnati shortly after Closing triggered a more general duty of inquiry on CertainTeed's part. CertainTeed should have suspected non-compliance might exist at the Los Angeles Facility after deficient conditions were discovered at Birmingham and Cincinnati. n60 Notably, the Birmingham and Cincinnati Facilities, like the Los Angeles Facility, were used for the manufacture of roofing materials. All three of these Facilities used asphalt in their manufacturing processes and maintained asphalt storage tanks on the [*43] premises. n61 All three of these facilities maintained storage tanks for diesel fuel, waste oil, or other petroleum products on the premises. n62 Contamination ultimately discovered at all three of these Facilities involved hydrocarbons and tar. Given the similarities between the Facilities and the environmental conditions allegedly concealed at each of them, a person of ordinary intelligence and prudence would have been on inquiry notice of the injurious conditions at the Los Angeles Facility shortly after the Closing Date, when injurious conditions were discovered at the Birmingham and Cincinnati Facilities. On these facts, the statute of limitations for bringing claims related to the Los Angeles Facility began to run, at the latest, from the earlier of the date when groundwater contamination was discovered at the Birmingham facility in October 2000 or the date when CertainTeed commissioned the Assessment, a date clearly earlier than May 31, 2001, when results of Phase I of that assessment were reported. Under either date, the Los Angeles Claims were filed too late, and this action, filed May 28, 2004, is time-barred.

n60 *See* Complaint Ex. P at 2. The similarity of the injuries at the Facilities was not lost on CertainTeed. In a letter to Celotex disclosing conditions at the Cincinnati facility, CertainTeed noted that "material discovered at the Cincinnati Facility is similar to the material discovered at the Birmingham Facility, which we have discovered is coal tar, a hazardous substance."

[*44]

n61 Agreement, Schedule 4.18.
n62 *Id.*

4. The Russellville Facility

CertainTeed brings claims for losses at the Russellville Alabama Facility related to the condition of a regenerative thermal oxidizer ("RTO") used at that Facility to reduce air emissions to a level in compliance with air pollution standards. In accordance with the Agreement, Celotex conducted tests to assure that the RTO achieved required levels of emissions abatement before Closing. n63 After the Closing Date, CertainTeed questioned the validity of testing conducted by Celotex, n64 but waited until November 2003, several years later, to conduct its own testing of the RTO. It was only then that CertainTeed supposedly discovered that the RTO did not achieve the necessary level of emissions abatement, in violation of the facility's Air Pollution Control Permit. n65

n63 Complaint P 109.
n64 Complaint P 120.
n65 Complaint PP 111-126.

[*45]

The Russellville Claims are time-barred because CertainTeed was on inquiry notice more than three years before it filed this lawsuit. Given CertainTeed's own admission that it immediately suspected the reliability of the pre-Closing test results, and its own immediate discovery of non-compliant conditions at other facilities, CertainTeed should have tested the performance of the RTO itself soon after Closing. By waiting until more than three years elapsed after Closing to test for itself, CertainTeed unreasonably delayed and let the statute of limitations lapse. n66

n66 Celotex has advanced the theory that CertainTeed lacks standing to sue because title to the Russellville facility was transferred at Closing to Vetrotex, a subsidiary of CertainTeed. Because CertainTeed's claims with respect to the Russellville facility can be dismissed on other grounds, the question of standing need not be addressed here.

## B. Remediation Claims

CertainTeed's Remediation Claims comprise the second category of claims against [*46] Celotex. In the Agreement, Celotex covenanted to perform, after Closing, certain environmental remediation, monitoring, and testing obligations related to known or suspected environmental conditions at the Cincinnati n67 and Birmingham n68 Facilities. Celotex's obligations are set out in § 6.13 and Disclosure Schedule 6.13 of the Agreement.

n67 Complaint PP 145, 147, 166, and 217(a).
n68 Complaint PP 141, 165 and 217(a).

CertainTeed alleges that Celotex failed to perform these post-Closing remediation obligations at the Cincinnati and Birmingham Facilities, and requests an order for specific performance here, or alternatively, damages. CertainTeed's claims for failure of Celotex to meet its remediation obligations are breach of contract claims that accrued on the date of the breach. Section 6.13(a) of the Agreement requires that Celotex complete all remediation projects no later than one year from the Closing Date, on August 18, 2001, and CertainTeed argues that any cause of action for breach of [*47] Celotex's failure to meet its remediation obligations accrued at the time performance was due on that date. Celotex argues that breach occurred much earlier, alleging that CertainTeed either refused performance or Celotex notified CertainTeed that it would not comply with its obligations at each of these Facilities shortly after Closing.

Celotex suggests that frustration of performance by CertainTeed or its own anticipatory repudiation of its performance obligations set the three-year statute of limitations running soon after the Closing Date, and that CertainTeed's claims as to both Facilities are now time-barred. Those arguments rely on facts outside the Complaint, and cannot serve as a basis for granting a motion to dismiss here. If the facts are reasonably construed in favor of CertainTeed, the statute of limitations for its Remediation Claims would have expired on August 18, 2004, three years after Celotex's performance of its obli-

gations was due, and this action for breach of contract was timely filed on May 28, 2004. Accordingly, CertainTeed's claim for damages as a result of the failure of Celotex to perform its remediation obligations cannot be dismissed.

The remediation [*48] claims, however, raise distinct considerations in an important respect. Although Celotex's remediation claims may have accrued on August 18, 2001, the doctrine of laches does not permit CertainTeed to obtain an order of specific performance at this late stage. As discussed earlier, a request for specific performance is a specialized demand for a mandatory injunction. As a result, it is not the case that the statute of limitations applies by analogy. Rather, a party seeking specific performance must act with alacrity or lose its rights. n69 Here, CertainTeed's tardiness was unreasonable, and is unfairly prejudicial. Celotex covenanted under the Agreement to address environmental conditions at the Facilities that existed at Closing. Implicit in this covenant is that Celotex was required to rectify problems that it created. With the passage of time, Celotex's responsibility for current environmental conditions at those Facilities grows more and more tenuous, and requiring performance by Celotex four years after it relinquished control over the Facilities would be unreasonable and prejudicial to Celotex. Further, [HN20] specific performance is an equitable remedy normally applicable only in exigent [*49] circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice. n70 Here, there are no exigencies suggestive of a need for specific performance. A monetary assessment covering the cost of remediation services is an adequate remedy here.

n69 See supra notes 28-9 and accompanying text.
n70 E.g., Equitable Trust Co. v. Gallagher, 34 Del. Ch. 249, 102 A.2d 538, 546 (Del. 1954).

Although I will not deny CertainTeed the chance to recover the reasonable costs of performing, on its own, the remediation activities specifically identified in the Agreement, the intervening period of time must equitably be taken into consideration in that calculus as well. That will require CertainTeed to demonstrate not only what it spent to perform the remediation activities, but also to prove that no intervening events occurred since CertainTeed assumed ownership of the Facilities that made the work more expensive to complete.

CertainTeed also [*50] claims that Celotex failed to perform certain testing obligations at the Russellville

2005 Del. Ch. LEXIS 11, *

Facility in an acceptable manner. n71 Section 6.13(b) of the Agreement requires that air emission "stack testing" be performed at the Russellville Facility by an independent third-party contractor in accordance with requirements set forth in Schedule 6.13(a) of the Agreement. n72 Notably, § 6.13(b) requires that this testing be performed no later than July 14, 2000. n73 Any claim for breach of contract accrued, at the latest, at the time performance was due, which was July 14, 2000. The three-year statute of limitations for bringing a claim for that breach thus expired on July 14, 2003, and this action, filed May 28, 2004, is time-barred as to the Russellville Remediation Claims.

n71 Complaint PP 167-168.
n72 Agreement at 34.
n73 Id.

C. Product Liability Claims

CertainTeed's claims for product liability comprise the third category of claims considered here. Celotex, in the Agreement, retained [*51] liability for claims related to products sold before the Closing Date. n74 Celotex manufactured and sold a line of algae-resistant shingles, the granular coating of which, in conjunction with certain unfavorable environmental conditions, is alleged to have caused the corrosion of gutters and other aluminum fixtures on the houses of certain consumers in two California neighborhoods who had purchased and installed the shingles on their roofs. n75 CertainTeed received complaints from consumers whose homes had been damaged by the shingles, demanding the replacement of corroded aluminum fixtures, primarily gutters, with copper fixtures. n76 When this occurred, CertainTeed promptly notified Celotex. Celotex acknowledged that the product claims were Excluded Liabilities under Section 2.2 of the Agreement and stated that it would exercise its right to provide a defense against the third-party claims. n77 On July 18, 2000, a homeowners' association in one of the neighborhoods stated its intent to sue the builder who built their homes for damages related to the algae-resistant shingles. The builder, in turn, communicated to CertainTeed that, due to the unacceptable delay in resolving the claims [*52] of the affected consumers, he was not inclined to use CertainTeed products in the future. n78 On July 19, 2001, CertainTeed, evidently pressured to resolve these claims quickly, n79 indicated that if Celotex did not act, CertainTeed would undertake the replacement of the corroded aluminum gutters on July 25, 2001. n80

n74 The assumption of product liabilities by Celotex is somewhat circuitous. Section 8.1 of the Agreement defines the scope of the Indemnification clause under which Celotex is bound to compensate CertainTeed for losses. Indemnifiable losses include, under § 8.1(c), Excluded Liabilities. Section 2.2 defines Excluded Liabilities as including "all liabilities of the Seller, other than the Assumed Liabilities." Section 2.2 defines Assumed Liabilities as including "all Assumed Product Claims." Section 2.2 further defines Assumed Product Claims as including "all liabilities related to the resolution of product claims," but excluding "product claims to the extent arising from or related to damage to property, bodily injury, or death." Thus, under § 8.1, Celotex retains liability for product claims related to damage to property, such as those at issue here.

[*53]

n75 Complaint PP 174-178 and Ex. R.
n76 Complaint PP 175-178 and Ex. R at 2. The chemical reaction that damaged the aluminum gutters was specific to aluminum metal, and did not corrode copper. Replacement of aluminum gutters with copper gutters was supposedly the most practical means of solving the problem.
n77 Complaint, P 180 and Ex. S.
n78 Complaint Ex. S at 2.
n79 Complaint Ex. T at 2. CertainTeed alleges that, although Celotex stated its intent to assume a defense of the third-party claims, it failed to do so in a timely manner. Presumably, this failure of Celotex to consider the matter quickly prompted the builder to issue an ultimatum that required immediate action by CertainTeed.
n80 Complaint Ex. S.

The principles of accrual and tolling applicable to CertainTeed's Product Liability Claims differ from those applicable to its Facilities Claims. These Product Liability Claims are not direct claims against Celotex, but claims for damages paid to third parties. [HN21] Claims for third-party liabilities accrue in accordance with principles of common [*54] law indemnity. Under this standard, CertainTeed's Product Liability Claims accrued, and the statute of limitations began to run, when the indemnifiable losses to the third parties were incurred and the dispute with them concluded, n81 which was when CertainTeed settled its third-party claims.

n81 *See* cases cited *supra* notes 2, 15-16.

Making inferences favorable to CertainTeed, its Product Liability Claims accrued when the consumer claims were settled, sometime after July 25, 2001. The statute of limitations began to run when the claims were settled and expired on the third anniversary of that date in 2004. This action, filed May 28, 2004, is therefore timely as to CertainTeed's Product Liability Claims. n82

n82 Celotex argues that CertainTeed failed to comply with other requirements of the Agreement in asserting its Product Liability Claims. That may well be the case. There is language in the Agreement permitting Celotex to provide a defense against third-party claims, and Celotex alleges that, although it had indicated to CertainTeed that it wished to provide a defense for claims related to the algae-resistant shingles, CertainTeed nevertheless settled the claims unilaterally, in contravention of the terms of the Agreement. This is an argument on the merits, however, that depends on facts and documents outside the Complaint, and is not appropriately resolved on this motion to dismiss.

[*55]

VI. Remaining Issues

The timeliness of the Facilities, Remediation, and Product Liability Claims is the central issue on this motion. In their sprawling papers, the parties also tangled over a few other issues, which I next address.

A. The Viability Of CertainTeed's Claims That Celotex Breached Its Contractual Obligation To Mediate

CertainTeed has pled, as supposedly independent claims, counts alleging that Celotex breached the Agreement by refusing to participate in the mediation process contemplated by § 8.4 of the Agreement in order to resolve the various Article 8 claims the timeliness of which this opinion has just addressed. CertainTeed seeks specific performance or, in the alternative, damages for these supposed breaches. As with the other claims for specific performance, I conclude that CertainTeed's torpor renders it guilty of laches and bars its request for an order of specific performance. If CertainTeed wished to compel mediation -- a process that by its nature has no guaranteed outcome -- it should have filed suit much earlier.

As important, I conclude that the only possible relief CertainTeed could receive for any failure of Celotex to mediate is an order [*56] of specific performance. [HN22] By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree." Under the Agreement as written, the pendency of mediation did not excuse the party seeking relief from making a timely filing in order to satisfy the statute of limitations. n83 CertainTeed cannot revive its time-barred substantive claims through the guise of arguing that Celotex's failure to mediate them somehow tolled the statute of limitations as to those claims.

n83 Agreement at 42. Section 8.4(b) states that "Celotex may file an Action during the Negotiation Period or the Mediation Period if the indemnification would otherwise be subject to dismissal for a failure to file within applicable statutes of limitation."

Nor is there any basis for this court to render a damages award based on its approximation of the level at which the parties might have hypothetically settled after mediation. [*57] [HN23] Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree. n84 That reasoning applies with even greater force when, as here, a party seeks after long delay to recover damages because its contractual party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute. Therefore, these counts of the Complaint are dismissed.

n84 *See, e.g., International Equity Capital Growth Fund. L.P. v. Clegg*, 1997 Del. Ch. LEXIS 59, 1997 WL 208955, at *9 n.3 (Del. Ch. Apr. 22, 1997) ("Delaware law . . . require[s] the parties to have reached agreement on all material terms before an agreement to agree' will be enforced.").

B. Celotex's Motion To Dismiss Aspects Of CertainTeed's Request For Damages

Celotex has argued that the ad damnum clause [*58] of the Complaint contains requests for damages that are excluded under the Agreement. Section 8.3(b)(iii) of the Agreement states that the "Buyer may not assert a claim for indemnification for Losses for . . . special or consequential damages except to the extent such damages are part of a Loss arising from a Third Party Claim." Celotex claims that this exclusion bars CertainTeed's requests for awards of lost profits, attorney's and consultant's fees, and costs to bring this suit. CertainTeed retorts citing the general definition of "Loss" in § 1.1 of the Agreement, which includes "any and all . . . costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred . . . by the relevant party." n85 Further, CertainTeed looks to § 3 of the Trust Indemnification Agreement, under which the Trust assumed liability as a third party indemnitor for claims asserted by CertainTeed against Celotex, stating that "The Trust hereby agrees to pay any and all expenses (including attorneys' fees and expenses) reasonably incurred by [CertainTeed] in enforcing any rights under this Indemnification Agreement." n86

n85 Agreement at 6.
[*59]

n86 Trust Indemnification Agreement at 4.

Frankly, the parties' briefing on this issue is inadequate to reach any definitive resolution on this difference of opinion. It appears certain that CertainTeed cannot receive an award of lost profits for its surviving Remediation Claims, and its claim for that category of damages is therefore dismissed. It is not apparent, however, that the other recompense it seeks falls outside the contractual definition of Loss and within the category of consequential damages, particularly given the specific language of § 1.1 of the Agreement and the lack of sufficient briefing on this question. Therefore, I will not preclude CertainTeed from pressing forward with its claims for the other relief it has requested. If it becomes necessary later in the case, when the question of damages is before the court in a more concrete context, Celotex can again present the argument that certain remaining categories of relief sought constitute excludable consequential damages.

C. The Trust's Motion To Dismiss On The Ground That The Claims Against It Are Not Ripe

The [*60] Trust has moved to dismiss all of CertainTeed's claims on ripeness grounds, arguing that, consistent with accrual principles of common law indemnity, n87 as Celotex's indemnitor, its third-party liability to CertainTeed accrues only after a judgment has been rendered against Celotex. Thus, the Trust contends, it is not a proper defendant in the present action.

n87 *See* cases cited *supra* notes 2, 15-16.

The Trust's obligations to indemnify CertainTeed are limited, and contingent upon a judgment against Celotex. As to the claims pled in the Complaint, CertainTeed has no right to assert claims for losses against the Trust until Celotex's assets, under a specific letter of credit, are exhausted. n88 That has not occurred yet. Give that reality, and given that the Trust conceded that it will be bound by and have no right to relitigate any judgment against Celotex, n89 CertainTeed has sued the Trust prematurely and the claims against the Trust are dismissed without prejudice. When CertainTeed's contractual [*61] right to seek indemnity against the Trust ripens, it will be free to reassert these claims, which will depend for their force on CertainTeed's ability to obtain a judgment against Celotex.

n88 Trust Indemnification Agreement at 3. Section 2(c) states that "CertainTeed will not be entitled to assert claims for Losses directly against the Trust until the Letter of Credit is exhausted . . . "

n89 Transcript at 128-9.

VII. Conclusion

For all the foregoing reasons, Celotex's motion to dismiss the Facilities Claims is GRANTED; its motion to dismiss the Remediation Claims is GRANTED as to CertainTeed's demand for specific performance and is otherwise DENIED; its motion to dismiss the Product Liability Claims is DENIED; its motion to dismiss CertainTeed's claim that Celotex failed to mediate in accordance with the Agreement is GRANTED; and its motion to dismiss CertainTeed's request for lost profits as to the Facilities Claims (which are barred on other grounds) and Remediation Claims is GRANTED. The [*62] Trusts's motion for dismissal on ripeness and contractual grounds is GRANTED.

Within ten days, Celotex and the Trust shall, upon notice as to form by CertainTeed, submit an implementing order dismissing the relevant counts of the Complaint addressed by this opinion. CertainTeed has pled counts for declaratory judgment that track the Facilities and Remediation Claims categories. The parties shall also include in the implementing order language that dismisses those counts to the extent that the related counts for damages have not survived and permitting those counts to remain to the extent that the related counts for damages have weathered this motion.

LEXSEE

IN RE DEAN WITTER PARTNERSHIP LITIGATION

CONSOLIDATED CIVIL ACTION NO. 14816

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1998 Del. Ch. LEXIS 133

October 16, 1997, Date Submitted
July 17, 1998, Date Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:**

Defendants' motion to dismiss granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff class of investors filed a suit for an accounting and damages from defendant financial services company for breaches of the fiduciary duties of care, loyalty, and candor.

**OVERVIEW:** Plaintiff investors filed a suit against defendant financial services company seeking an accounting and damages for breaches of the fiduciary duties of care, loyalty, and candor. The financial services company filed a motion to dismiss the suit, arguing that the investors' claims were time-barred. The investors alleged that their claims were timely because the statute of limitations was tolled. The court held that the investors' claims were barred by operation of the applicable statute of limitations. The court determined that the investors' cause of action accrued when they invested in the allegedly fraudulent investments and that the investors failed to demonstrate that the statute of limitations was tolled. The court concluded that information available to the investors provided them with inquiry notice of any alleged misconduct by the financial services company prior to the expiration of the three-year statute of limitations.

**OUTCOME:** The court dismissed plaintiff investors' suit for an accounting and damages from defendant financial services company because the claims were time-barred for failure to file within the statutory period.

**CORE TERMS:** partnership, statute of limitations, partner, investor, annual report, inquiry notice, fraudulent concealment, unknowable, tolled, inherently, tolling, motion to dismiss, annual, limitations period, wrongful conduct, discover, managing, fiduciary, subsidiary, fiduciary duties, cause of action, self-dealing, discovery, notice, equitable tolling, real estate, net income, marketing, complain, breach of fiduciary duty

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Equity Jurisdiction*
*Governments > Legislation > Statutes of Limitations >*
*Statutes of Limitations Generally*
[HN1] Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN2] Where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] In evaluating a motion to dismiss, the court is required to assume the truthfulness of all well-pleaded allegations of the complaint for purposes of the motion. The court is also required to draw from the complaint all inferences or conclusions of fact that may reasonably be

drawn from the specific facts alleged therein. Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. In the end, the court may only dismiss the complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Torts > Business & Employment Torts > Concealment*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] Where a plaintiff has successfully alleged a claim of fraudulent concealment the affirmative statute of limitations defense turns on a question of fact, rendering a summary disposal inappropriate. When it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Torts > Malpractice Liability > Misconduct Generally*
[HN5] Under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6] The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN7] Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. Often, plaintiffs can establish blameless ignorance by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. This doctrine tolls the limitations period until a plaintiff had reason to know that a wrong has been committed.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Torts > Business & Employment Torts > Concealment*
[HN8] The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth. Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute of limitations. Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
[HN9] Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. Underlying this doctrine is the idea that even an attentive and diligent investor relying, in complete propriety, upon the good faith of fiduciaries may be completely ignorant of transactions that constitute self-interested acts injurious to the partnership. This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN10] As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. Significantly, if the limitations period is tolled under any of these theories, it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN11] Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN12] Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Torts > Malpractice Liability > Misconduct Generally*
*Securities Law > Investment Companies > Board of Directors*
[HN13] Beneficiaries are entitled to trust their fiduciaries. As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. But, the trusting plaintiff still must be reasonably attentive to his interests. Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings. Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.

COUNSEL: Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr., Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Wilmington, Delaware; OF COUNSEL: Nicholas E. Chimicles, Esquire, Denise Davis Schwartzman, Esquire, Francis J. Farina, Esquire, and M. Katherine Meermans, Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Haverford, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Martin London, Esquire, Richard A. Rosen, Esquire, Robert N. Kravitz, Esquire, and Tracy Anbinder Baron, Esquire, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, Attorneys for Defendants.

JUDGES: William B. CHANDLER, Chancellor.

OPINIONBY: WILLIAM B. CHANDLER

OPINION:

MEMORANDUM OPINION

CHANDLER, Chancellor

Investors, owners of interests in numerous real estate limited partnerships, seek an accounting and damages from general partners and financial advisors for breaches of the fiduciary duties of care, loyalty and candor. Information available to the investors long before [*2] these lawsuits were instituted put the investors on notice of the wrongs about which they now complain. Therefore, all of the investors' claims are barred by operation of the applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions brought by plaintiff investors against defendants Dean Witter, Discover & Co. ("Dean Witter Discover"), Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"), Dean Witter Realty, Inc. ("Dean Witter Realty") (collectively "Dean Witter"), the managing and associate general partners of seven Dean Witter real estate limited partnerships, and Tempo-GP, Inc. ("Tempo-GP"), the general partner of Dean Witter/Coldwell Banker Tax Exempt Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund"). n1

n1 An Order of Consolidation dated August 16, 1996, consolidated three actions filed in the Court of Chancery--*Segel v. Dean Witter, Discover & Co.,* C.A. No. 14816 (filed Feb. 6, 1996); *Schectman v. Dean Witter, Discover & Co.,* C.A. No. 14829 (filed Feb. 9, 1996); *Dosky v. Dean Witter, Discover & Co.,* C.A. No. 14838 (filed Feb. 15, 1996) and added to the consolidated action plaintiffs from two other suits, one pending in the Southern District of New York--*Grigsby v. Dean Witter Reynolds, Inc.,* S.D.N.Y., No. 96 Civ. 4064 (LAP) (originally filed Dec. 27, 1995)--and one pending in the District of Maryland-*Young v. Dean Witter, Discover & Co.,* C.A. No. H-96-1139 (D. Md.) (originally filed Feb. 6, 1996). *See* Order of Consolidation (Aug. 16, 1996) (Docket No. 9).

[*3]

Plaintiffs are customers of Dean Witter Reynolds, who between 1984 and 1989, purchased from Dean Witter Reynolds units of the following limited partnerships: Dean Witter Realty Income Partnership I, L.P. ("Income I"); Dean Witter Realty Income Partnership II, L.P. ("Income II"); Dean Witter Realty Yield Income Partnership III, L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty

Growth Properties, L.P. ("Growth Properties"); and Fal-con Classic Cable Income Properties, L.P. ("Falcon Classic Cable"). n2 With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> n2 These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, i.e., all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

[*4]

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate [*5] general partners of the Proprietary Partnerships. n3 Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> n3 Managing and associate general partners will be referred to collectively as the "general partners."

Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty [*6] Income Associates IV, L.P. are the managing and associate general' partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.--the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned [*7] subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. n4

> n4 In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fluid or its general partner, Tempo-GP. See Alabama By-Products Corp. v. Cede & Co., Del. Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984

through the present. n5 Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs [*8] as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. n6

n5 First Consolidated and Amended Class Action Complaint P 37 (Docket No. 10) [hereinafter *Complaint*]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

n6 Complaint P 3.

Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of [*9] purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. n7 Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, n8 Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

n7 Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition*].

n8 Complaint P 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves [*10] at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones. n9

n9 Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996. n10 The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically [*11] addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. n11 Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

n10 Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss*].

n11 Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. n12 This is so even in equity. [HN1] Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. n13 Moreover, it is "well settled that [HN2] where the complaint itself alleges facts [*12] that show that the com-

plaint is filed too late, the matter may be raised by [a] motion to dismiss." n14

n12 *Boeing Co. v. Shrontz,* 1992 Del. Ch. LEXIS 84, Del. Ch., C.A. No. 11273, Berger, V.C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

N13 *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del. Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

n14 *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

[HN3]

In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded *(i.e., nonconclusory)* allegations of the complaint for purposes of the motion. n15 I am also required to draw from the complaint [*13] all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein. n16 Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. n17 In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. n18

n15 *Loudon v. Archer-Daniels-Midland Co.,* Del. Supr., 700 A.2d 135, 140 (1997) (en banc); *Grobow v. Perot,* Del. Supr., 539 A.2d 180, 187 & n.6 (1988).

n16 *Id.*

n17 *In re Santa Fe Pac. Shareholder Litig.,* Del. Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n.6.

n18 Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del. Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* 1994 Del. Ch. LEXIS 3, *6, Del. Ch., C.A. No. 12137, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del. Supr., 642 A.2d 837 (1994).

Plaintiffs cite *Snyder v. Butcher & Co.,* 1992 Del. Super. LEXIS 362, Del. Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has *"successfully pled"* fraudulent concealment" 1992 Del. Super. LEXIS 362 at *10 (emphasis added). [HN4] Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* 1992 Del. Ch. LEXIS 84 at *1 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del. Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

[*14]

III. ANALYSIS

*A. Statute of Limitations*

It is well-settled [HN5] under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty. n19 With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships. n20 Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

n19 10 Del. C. § 8106; Dofflemyer v. W.F. Hall Printing Co., D. Del., 558 F. Supp. 372, 379 (1983) (applying Delaware law).

n20 Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-Segel-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. See Order of Consolidation PP 1, 9.

[*15]

B. Time of Accrual

[HN6] The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. n21 Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants n22 committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

n21 David B. Lilly Co. v. Fisher, D. Del., 18 F.3d 1112, 1117 (1994); Isaacson, Stolper & Co. v. Artisan's Sav. Bank, Del. Supr., 330 A.2d 130, 132 (1974).

n22 Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint PP 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would [*16] never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred when they purchased their Partnership interests as a result of defendants' alleged misrepresentations. n23 Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989. n24 Thus, with respect to the marketing and

sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1 992--years before plaintiffs filed their Amended Complaint.

n23 Seidel v. Lee, D. Del., 954 F. Supp. 810, 816 (1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). See also In re Merrill Lynch Ltd. Partnerships Litig., 7 F. Supp. 2d 256, 1997 U.S. Dist. LEXIS 12809, *24-36, S.D.N.Y., No. 95 Civ. 10657 (MBM) (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

[*17]

n24 Complaint PP 9-23.

With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s. n25 Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989. n26 Plaintiffs filed their complaint on February 6, 1996, well past the expiration of the three-year limitations period. Absent tolling, therefore, [*18] all of plaintiffs' claims fall outside the statutory period and would be time-barred.

n25 See, e.g., Complaint PP 91-121 (Yield Plus), PP 129-35 (Yield Plus II), PP 136-46 (Yield Plus & Yield Plus II), PP 156-79 (Growth Properties), PP 193-98 (Income I), PP 209-16 (Income II), PP 233-39 (Income II, III & IV).

n26 *Dofflemyer,* 558 F. Supp. at 379 (fiduciary duty claim accrues at time of breach).

## C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* n27 -- reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims. n28 Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: [*19] (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them. n29

n27 This article will be referred to as the *"Wall Street Journal* article" or the "article."

n28 Pls.' Memo. in Opposition at 9.

n29 *See, e.g., Playtex, Inc. v. Columbia Casualty,* 1993 Del. Super. LEXIS 286, *9, Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

### [HN7]

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. n30 For the limitations period to be tolled under this doctrine, there must have been [*20] no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. n31 Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. n32 This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. n33

n30 *Ruger v. Funk,* 1996 Del. Super. LEXIS 34, *7, Del. Super., C.A. No. 93C-04-210, Lee, J. (Jan. 22, 1996).

n31 *Seidel,* op. at 17.

n32 *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

n33 *Pack & Process, Inc. v. Celotex Corp.,* Del. Super., 503 A.2d 646, 650 (1985).

### [HN8]

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff [*21] on notice of the truth. n34 Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. n35 "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." n36 Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. n37

n34 *Litman,* op. at 8.

n35 *Halpern,* 313 A.2d at 143.

n36 *Id.*

n37 *Id.*

### [HN9]

Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [*22] n38 Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [Partnership]." n39 This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. n40

n38 *Yaw v. Talley,* 1994 Del. Ch. LEXIS 35, *17, Del. Ch., C.A. No. 12882, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

n39 *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

n40 *In re Maxxam, Inc. / Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

[*23]  [HN10]

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. n41 Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. n42 Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e., on* inquiry notice. n43 Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not on* inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). n44

n41 *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 Del. Ch. LEXIS 140, *46, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).

n42 *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F. Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

[*24]

n43 *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong);

*Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del. Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

n44 Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del. Supr., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* 1995 Del. Ch. LEXIS 73, *19-20, Del. Ch., C.A. Nos. 12111 & 12353, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990--an entirely different situation than the one presented to the *In re Maxxam* Court.

[*25]

*D. Were Plaintiffs on Inquiry Notice?*

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or

October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. n45 That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply [*26] did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

> n45 *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal. Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup. Ct, Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly [*27] available Securities Exchange Commission ("SEC") filings made by the Partnerships. n46 As a matter of law, defendants assert, disclosures in any of those documents--the sole source of plaintiffs' allegations--were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

> n46 According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and

reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint *Glaser v. Norris,* 1992 Del. Ch. LEXIS 1, *13 n.1, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992).

[*28]

Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied--and were entitled to rely--on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i. e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed [*29] documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. n47 Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

> n47 Pls.' Memo. in Opposition at 3.

[*30]

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the

injury. n48 [HN11] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. n49 Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.*, up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? n50

n48 *In re ML-Lee Acquisition Fund II L.P. Litig.*, 848 F. Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

[*31]

n49 *McCoy v. Goldberg*, S.D.N.Y., 748 F. Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, " [HN12] once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.*, E.D. Mich., 785 F. Supp. 626, 633 (1992) (citations omitted), *aff'd*, 6th Cir., 35 F.3d 565 (1994). n50 Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships [*32] sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. n51 For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." n52 In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason

to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. n53

n51 *See, e.g.*, Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[] problems... The cash distribution paid during the 1990 fiscal year was . . .an annualized return of 6.25%.").
n52 Pls.' Memo. in Opposition at 51.

[*33]

n53 *Id.* at 48.

Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." n54 Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution . . . was an annualized return on investment of 7.5%" n55 But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained [*34] at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

n54 *See, e.g.*, Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.
n55 Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "the emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." n56 Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that [HN13] beneficiaries are entitled to trust [*35] their fiduciaries. n57 As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. n58 But, the trusting plaintiff still must be *reasonably attentive* to his interests. *"Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings."* n59 Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. n60

give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs [*37] bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. n61 Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. n62 In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. n63 Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor-- and should have prompted an inquiry by plaintiffs into the health of their investments. n64

n56 *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 Del. Ch. LEXIS 140, *47-48, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).

n57 *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n.10 (1976) ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

[*36]

n58 *Seaboard,* 625 A.2d at 275.

n59 *Seidel,* op. at 18 (emphasis added).

n60 *Id* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a . . . limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that

n61 Income II, 1989 Annual Report at 1, attached to affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

n62 For the fiscal year 1989, the Income II Partnership shows a net income figure of $ 7,043,996 and cash distributions of $ 13,768,450. *Id.* at 7.

n63 *Id.*

n64 *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* S.D.N.Y., 930 F. Supp. 68, 76 (1996) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

[*38]

The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. n65 Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. n66 Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships.

Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. n67

n65 See, e.g., Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

[*39]

n66 See, e.g., Playtex, Inc. v. Columbia Casualty, 1993 Del. Super. LEXIS 286, *10, Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); Halpern, 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

n67 See Ruger v. Funk, 1996 Del. Super. LEXIS 34 at *8 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions they were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not

the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions described in these annual reports as "annualized returns" and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. Queen Anne Pier Condominium Council v. Raley, 1988 Del. Super. LEXIS 20, *10, Del. Super., C.A. No. 85C-JA10, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery).

[*40]

IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants. n68 Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). n69 The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes more than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. n70

n68 Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. See In re Prudential Sec. Inc. L.P. Litig., 930 F. Supp. at 76-77; (2) that some investors in the Partnerships

did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales - practices or the investments - in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

[*41]

n69 *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 Del. Ch. LEXIS 140, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995)

(motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

n70 Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris,* 1992 Del. Ch. LEXIS 1, *42, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.