LEXSEE 1999 US DIST LEXIS 12447

**E.I. DUPONT DE NEMOURS & CO., Plaintiff, v. MILLENNIUM CHEMICALS, INC. and MILLENNIUM INORGANIC CHEMICALS, INC., Defendants.**

**C.A. No. 97-237-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 12447*

**August 2, 1999, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment and plaintiff's motion to dismiss denied and plaintiff's motion to strike granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant filed a motion for summary judgment and plaintiff filed a motion to dismiss, or in the alternative, to strike in whole or in part defendant's second and third counterclaims in plaintiff's patent infringement action.

**OVERVIEW:** Plaintiff filed a patent infringement action against defendants. The suit involved the use of certain pigments in the plastic film market. Defendant filed a motion for summary judgment, arguing that several terms used in the patent violated the definiteness requirement of *35 U.S.C.S. § 112* and, therefore, were invalid. On a motion for summary judgment, defendant had the burden of proving that no genuine issue of material fact existed. Because defendant failed to demonstrate the absence of genuine issues of material fact with respect to whether one skilled in the art would have understood the disputed terms, the court denied the motion for summary judgment. The court found, under the settled law in the judicial district, that defendant timely filed their counterclaims. Thus, the court denied plaintiff's motion to dismiss. As to the issue of whether *Del. Code Ann. tit. 10, § 8106* barred defendant from relying on some or all of the allegations asserted in support of its second and third counterclaims, the court granted plaintiff's motion to strike in part. The statute of limitations barred defendant's counterclaims only with respect to a 1995 incident.

**OUTCOME:** The court denied both defendant's motion for summary judgment and plaintiff's motion to dismiss. Defendant failed to demonstrate the absence of genuine material fact. Defendant filed its counterclaims in a timely manner. The court granted in part plaintiff's motion to strike. The statute of limitations only barred defendant's counterclaims with respect to a certain incident.

**CORE TERMS:** patent, counterclaim, pigment, titanium dioxide, summary judgment, statute of limitations, plastic, brochure, silane, customers, motion to dismiss, indefinite, coating, concentrate, skilled, indefiniteness, disputed, mixture, motion to dismiss, polyethylene, masterbatch, silanized, invalid, film, Lanham Act, limitations period, subject matter, manufacturer, aforementioned, polysiloxane, disadvantages

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN1] On a motion for summary judgment, the movant bears the burden of proving that no genuine issue of material fact exists.

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*
[HN2] A court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

[HN3] If a moving party fails to establish the absence of a genuine issue of fact, summary judgment must be denied even if no opposing evidentiary matter is presented.

*Patent Law > Claims & Specifications > Theory of Invention*
*Patent Law > Claims & Specifications > Definiteness > General Overview*
[HN4] A patent claim is indefinite and, therefore, invalid if the claims fail to particularly point out and distinctly claim the subject matter that the applicant regards as his invention. *35 U.S.C.S.§ 112.*

*Patent Law > Claims & Specifications > Definiteness > General Overview*
[HN5] Although compliance with *35 U.S.C.S. § 112* is a question of law, it rests on a determination of whether one skilled in the art would understand the bounds of the claim when read in light of the specification. If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more. The degree of precision necessary to satisfy § 112 depends upon the subject matter and cannot be viewed in the abstract.

*Patent Law > Claims & Specifications > Definiteness > General Overview*
[HN6] Terms that appear facially ambiguous to the lay reader may be perfectly definite to those versed in the technology at issue.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN7] On a motion for summary judgment, the nonmoving party need not present opposing evidence of definiteness where the movant fails to show the absence of genuine factual disputes.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*
[HN8] A defendant may include counterclaims in its answer to an amended complaint.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
[HN9] Because the amended pleading relates back to the date of the original pleading, the amending pleader can hardly be heard to complain that claims filed against him

are improper because they should have been asserted in response to his original pleading.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN10] When a federal statute provides no statute of limitations federal courts look to the applicable state statute of limitations for guidance.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN11] The Delaware statute of limitations provides that no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force shall be brought after the expiration of three years from the accruing of the cause of such action. *Del. Code Ann. tit. 10, § 8106.*

**COUNSEL:** For Plaintiff: Richard L. Horwitz, Esquire, Joanne Ceballos, Esquire, Potter, Anderson & Corroon LLP, Wilmington, Delaware.

For Plaintiff: John C. Vassil, Esquire, Bruce D. DeRenzi, Esquire, Of counsel, Morgan & Finnegan, L.L.P., New York, New York.

For Defendants: Jack B. Blumenfeld, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

For Defendants: David A. Kalow, Esquire, Kenneth L. Bressler, Esquire, Kalow, Springut & Bressler LLP, New York, New York.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: August 2, 1999
Wilmington, Delaware

**Robinson, District Judge**

## I. INTRODUCTION

Plaintiff E.I. DuPont De Nemours & Co. filed this patent infringement action against Millennium Chemicals, Inc. and Millennium Inorganic Chemicals, Inc. (collectively, "defendant") on May 1, 1997. Plaintiff is incorporated under the laws of Delaware and has its principal place of business in Wilmington, Delaware. (D.

[*2] I. 137, P 2) Defendant is also a Delaware corporation with its principal places of business in Iseln, New Jersey and Hunt Valley, Maryland. (D.I. 137, PP 3-4) The court has jurisdiction over this action under *28 U.S.C. § § 1331* and 1338. Venue is proper in this judicial district by virtue of *28 U.S.C. § § 1391*(c) and 1400(b).

Currently before the court is defendant's motion for summary judgment (D.I. 92) and plaintiff's motion to dismiss, or in the alternative, to strike in whole or in part defendant's second and third counterclaims (D.I. 168). In its motion, defendant argues that plaintiff's patents violate the definiteness requirement of *35 U.S.C. § 112* and therefore are invalid. For its part, plaintiff seeks dismissal of defendant's second and third counterclaims as untimely; in the alternative, plaintiff moves the court to strike all or part of defendant's counterclaims for failure to comply with the applicable statute of limitations. For the following reasons, the court shall deny both defendant's motion for summary judgment and plaintiff's motion to dismiss and grant in part plaintiff's motion to strike.

[*3] **II. BACKGROUND**

Plaintiff is the assignee of U.S. Patent Nos. *5,631,310* ("the *'310* patent") and *5,889,090* ("the *'090* patent"). n1 These patents disclose processes for manufacturing "highly loaded" silanized titanium dioxide pigments in polyethylene or other polymer concentrates. Manufacturers use titanium dioxide pigment, which is white, to color various products, including plastics (such as trash bags and diaper linings), paints, and paper. This suit involves the use of these pigments in the plastic film market. (D.I. 160, P 49) There are three steps involved in coloring plastics using titanium dioxide pigment. First, the titanium dioxide pigment is coated with silanes or other materials. Second, the coated titanium dioxide pigment is shipped to a masterbatch, or concentrate, maker who forms the masterbatch by adding plastic to the pigment. Third, the masterbatch maker sells this concentrate to a plastic manufacturer who, in turn, adds more plastic to the concentrate and extrudes the pigmented plastic into film for use in various consumer products. (D.I. 93 at 4)

n1 Initially, plaintiff alleged that defendant induced infringement of U.S. Patent No. *5,607,994* (the " *'994* patent"), a product patent disclosing a "polyethylene matrix consisting essentially of polyethylene and about 50 to about 87% by weight silanized [titanium dioxide] pigment." (D.I. 93, Ex. A, *'994* patent, col. 8, lns. 20-23) After defendant filed the instant motion for summary judgment, plaintiff filed a second amended complaint (D.I. 137), which substituted the *'090* process patent for the *'994* patent. Plaintiff appears to have abandoned suit over the *'994* patent, focussing instead on defendant's alleged inducement of infringement of the *'090* and *'310* patents. Defendant's instant motion for summary judgment addresses only the *'994* and *'310* patents. Because the *'994* patent is no longer the subject of suit, the court shall address only defendant's arguments touching on the *'310* patent.

[*4]

In the past, the use of titanium dioxide pigment in plastics had several processing disadvantages and often resulted in product quality problems. The processing disadvantages included poor dispersability of the pigment, high energy requirements for mixing the pigment, and low productivity. The pigment concentrate also occasionally produced "lacing" (holes or tears in the plastic film) and noxious gases or rendered the film resistant to printing. (D.I. 97 at 5) In response to consumer demand for less problematic pigmentation methods, both plaintiff and defendant developed "highly loaded" preparations of coated, silanized titanium dioxide pigment, which purportedly reduce the aforementioned processing and product quality disadvantages. In its second amended complaint, plaintiff alleges that defendant has induced infringement of the *'310* and *'090* patents through the manufacture, advertisement, promotion, and sale of silanized titanium dioxide pigment under the trade name "TiONA(R) RCL-188" (hereafter, "RCL-188") for use by masterbatch manufacturers in polyethylene concentrates. (D.I. 137, PP 5-8)

**III. DISCUSSION**

**A. Defendant's Motion for Summary Judgment**

Defendant [*5] argues that several terms used in the claims of the *'310* patent are ambiguous and, therefore, are invalid for indefiniteness. Defendant points to the *'310* patent's use of "coating," "mixture," and "at least one" as examples of such indefiniteness. In interrogatories, defendant asked plaintiff to clarify the meaning of each of these disputed terms, but plaintiff refused "on the ground that it is premature in seeking the contentions of [plaintiff] during the initial phase of discovery." (D.I. 93, Ex. C at 2, 4, 5) The *'310* patent employs these allegedly indefinite terms in the following manner.

**1. "Coating"**

The *'310* patent uses "coating" as a verb to describe the process of coating the pigment with "at least one organosilicon compound." (D.I. 93, Ex. B, col. 8, lns. 24-

25, 58) Defendant contends, without supporting evidence, that the ambiguity of "coating"

> lies in the fact that the chemical composition of the silane, if added to water, may change at the very least from (i) the time the ingredients are mixed to (ii) the time they attach to the pigment.

(D.I. 93 at 6) Due to this purported ambiguity, it is allegedly impossible to determine whether the *'310* patent [*6] covers the formula for silane as it is added to water or the formula for silane as (or after) it coats the titanium dioxide pigment. (D.I. 93 at 7)

### 2. "Mixture"

Claim 3 of the *'310* patent discloses a process for coating a titanium dioxide pigment with an organosilicon compound "comprising a **mixture** of . . . (a) at least one silane . . . and (b) . . . at least one polysiloxane . . . ." (D.I. 93, Ex. B, col. 8, lns. 59-60; col. 9, ln. 5) Defendant asserts that the ambiguity lies in the patent's failure to claim the proportions of silane to polysiloxane which qualify as a mixture. (D.I. 93 at 7)

### 3. "At least one"

Finally, the *'310* patent describes the pigment coating as comprising "at least one" silane or mixtures of "at least one" silane and "at least one" polysiloxane. (D.I. 93, Ex. B., col. 8, ln. 24, 60; col. 9, ln. 5) Defendant argues that this phrase is indefinite because the claims do not provide the meaning of, or the units of measurements associated with, the phrase "at least one." (D.I. 93 at 8)

[HN1] On a motion for summary judgment, the movant bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* [*7] [HN2] A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* [HN3] If a moving party fails to establish the absence of a genuine issue of fact, "'summary judgment must be denied **even if no opposing evidentiary matter is presented.**'" *Adickes v. S. H. Kress & Co., 398 U.S. 144, 160, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)* (quoting Advisory Committee Note on 1963 Amendment to Rule 56(e)).

In the context of the instant motion, defendant must demonstrate that there is no genuine issue of material fact with respect to the indefiniteness of the *'310* patent claims. [HN4] A patent is indefinite and, therefore, invalid if the claims fail to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." *35 U.S.C. § 112.* [HN5] Although compliance with § 112 is a question of law, see *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1576 (Fed. Cir. 1986),* [*8] it rests on a determination of "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed. Cir. 1993).* "If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." Id. The degree of precision necessary to satisfy § 112 depends upon the subject matter and cannot be viewed in the abstract. See id.; *Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed. Cir. 1985).*

At issue, then, is whether one skilled in the art would find the *'310* patent's use of these disputed terms indefinite. Defendant, however, offers neither evidence of the requisite degree of skill in the art nor evidence of how one skilled in the art would interpret the disputed terms. Instead, defendant merely argues in rhetorical fashion that the aforementioned terms are indefinite. Defendant cannot prevail by arguing that these terms are indefinite to **any** reader of the patent; rather, defendant must demonstrate that those **skilled in the art** would find [*9] them indefinite. See *Miles Labs., 997 F.2d at 875.* [HN6] Terms that appear facially ambiguous to the lay reader may be perfectly definite to those versed in the technology at issue. See, e.g., *Andrew Corp. v. Gabriel Elecs., Inc., 847 F.2d 819, 821 (Fed. Cir. 1988)* (explaining that terms such as "closely approximate," "approach each other," and "substantially equal" are upheld by courts "when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention"); *Seattle Box Co. v. Industrial Crating & Packing, Inc., 731 F.2d 818, 826 (Fed. Cir. 1984)* (finding phrase "substantially equal to" sufficiently definite). On a motion for summary judgment, abstract and rhetorical arguments in support of indefiniteness simply do not satisfy defendant's burden of proof.

Defendant also argues that the court should infer indefiniteness from plaintiff's refusal, in its responses to defendant's interrogatories, to clarify the meaning of the disputed terms. Neither the law nor logic supports such an inferential leap. [HN7] On a motion for summary judgment, the nonmoving party need not present opposing evidence of definiteness [*10] where, as here, the movant has failed to show the absence of genuine factual disputes. See *Adickes, 398 U.S. at 160.* Because defendant has failed to demonstrate the absence of genuine

issues of material fact with respect to whether one skilled in the art would understand the disputed terms, the court shall deny defendant's motion for summary judgment.

## B. Plaintiff's Motion to Dismiss or, in the Alternative, to Strike

Plaintiff moves the court, pursuant to *Fed.R.Civ.P. 12(b)(6)*, to dismiss defendant's second and third counterclaims as untimely compulsory counterclaims filed without leave of court. In the alternative, plaintiff moves pursuant to *Fed.R.Civ.P. 12(f)* to strike defendant's second and third counterclaims as barred by the Delaware statute of limitations. (D.I. 168) Defendant asserted these counterclaims in its May 14, 1999 answer to plaintiff's second amended complaint. (D.I. 160) Defendant's second counterclaim alleges that plaintiff violated § 43(a) of the Lanham Act by making false and deceptive statements about defendant's RCL-188 product. (D.I. 160, PP 71-73) The third counterclaim asserts a state law unfair competition claim based on these same [*11] allegations. (D.I. 160, PP 74-75)

### 1. Plaintiff's Motion to Dismiss

In support of its motion, plaintiff argues that defendant's second and third counterclaims are compulsory and, therefore, should have been asserted earlier than in its answer to plaintiff's second amended complaint. Plaintiff, however, offers no compelling justification for departing from the well established rule that [HN8] a defendant may include counterclaims in its answer to an amended complaint. See *Standard Chlorine of Del., Inc. v. Sinibaldi, 1995 U.S. Dist. LEXIS 13913,* Civ. A. No. 91-188- *SLR, 1995 WL 562285,* at *2 (D. Del. Aug. 24, 1995); *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc., 50 F.R.D. 415, 419 (D. Del. 1970).* Courts in this district have reasoned that, [HN9] because the amended pleading relates back to the date of the original pleading, the amending pleader "can hardly be heard to complain that claims filed against him are improper because they should have been asserted in response to his original pleading." *Joseph Bancroft & Sons, 50 F.R.D. at 419.*

In the present case, plaintiff filed its second amended complaint on April 7, 1999. (D.I. 137) In due course, defendant [*12] then filed its answer, which included the instant counterclaims. Under the settled law of this judicial district, defendant's counterclaims were filed in a timely manner. Thus, the court shall deny plaintiff's motion to dismiss.

### 2. Plaintiff's Motion to Strike

There remains, however, the issue of whether the relevant statute of limitations bars defendant from relying on some or all of the allegations asserted in support of its second and third counterclaims. The Lanham Act provides no statute of limitations. Generally, [HN10] when a federal statute provides no statute of limitations federal courts look to the applicable state statute of limitations for guidance. See *Beauty Time, Inc. v. Vu Skin Sys., Inc., 118 F.3d 140, 143 (3d Cir. 1997).* Accordingly, the court must look to the Delaware statute of limitations for the relevant limitations period for both defendant's Lanham Act and state unfair competition counterclaims.

[HN11] The Delaware statute of limitations provides that "no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force . . . shall be brought after the expiration of 3 years from the accruing of the cause of [*13] such action. . . ." *10 Del. C. § 8106.* Because defendant's second counterclaim is "an action based on a statute" and defendant's third counterclaim is "an action to recover damages caused by an injury unaccompanied by force," Delaware's three year statute of limitations applies in the absence of an equitable exception.

Most of defendant's allegations fall within this three year period. Indeed, defendant asserts that plaintiff currently "is informing its customers and potential customers -- all of whom are either customers or potential customers of [defendant] --that the use of [defendant's] RCL-188 product will infringe [plaintiff's] patents, even though [plaintiff] knows . . . that its patents are invalid and unenforceable." (D.I. 160, P 63) Although defendant provides no specific dates for plaintiff's allegedly deceptive statements, defendant has asserted an ongoing pattern of misrepresentations and disparagement of its RCL-188 pigment by plaintiff. As such, these allegations fall within the limitations period. n2 Insofar as defendant relies on plaintiff's false statements about defendant's RCL-188 product, the statute of limitations does not bar defendant's second and [*14] third counterclaims.

> n2 Defendant need not, as plaintiff argues, specify the exact date of these alleged falsehoods.

Defendant, however, also refers to a July 1995 incident in support of its second and third counterclaims. Specifically, defendant alleges that

> in or about July 1995, [plaintiff] distributed to customers and potential customers a brochure comparing two of its titanium dioxide products to [defendant's competing product, RCL-4]. In that brochure, [plaintiff] intentionally made the false claims that its R-101 and R-104 products had significantly better vinyl tinting

strength than RCL-4 and better disper-sability than RCL-4. In fact, [plaintiff's] own internal testing documents show oth-erwise. The brochure also falsely claimed that [defendant's] RCL-4 product con-tained methyl stearate -- a compound dis-favored by customers -- when, in fact, RCL-4 contains no methyl stearate.

(D.I. 160, P 65) Because defendant filed its counter-claims in May of 1999, events relating to this 1995 [*15] brochure fall outside the three year limitations period. In the absence of some equitable exception, defendant can-not rely upon this 1995 brochure to support its second and third counterclaims.

Defendant claims that the "time of discovery rule" provides such an exception. The "time of discovery rule" tolls the statute of limitations where "an inherently un-knowable injury . . . has been suffered by one blame-lessly ignorant of the act or omission and injury com-plained of, and the harmful effect . . . develops gradually over a period of time . . . ." *Cavalier Group v. Strescon Indus., Inc., 782 F. Supp. 946, 951 (D. Del. 1992)* (inter-nal quotations and citation omitted). The statute of limi-tations period is tolled until a person of ordinary intelli-gence and prudence would have had facts sufficient to put them on notice of an injury. Id. Defendant claims in its answering brief, but not in its counterclaims, that it was "blamelessly ignorant" of plaintiff's allegedly mis-leading brochure until discovery commenced in the pre-sent litigation. (D.I. 176 at 11)

The court finds that the "time of discovery" rule is not applicable to the instant case. A misleading product brochure [*16] is not an "inherently unknowable injury," especially when the brochure in question was distributed to "potential customers" in a highly competitive market. As such, defendant's counterclaims with respect to this 1995 incident are barred by the statute of limitations. Moreover, the 1995 brochure is irrelevant and immaterial to the issues at bar because it refers to completely differ-ent products than those allegedly covered by the *'310* and *'090* patents. Accordingly, pursuant to *Fed.R.Civ.P. 12(f)*, the court shall strike P 65 from defendant's second and third counterclaims.

## IV. CONCLUSION

For the aforementioned reasons, the court shall deny defendant's motion for summary judgment and plaintiff's motion to dismiss and grant in part and deny in part plaintiff's motion to strike. An appropriate order shall issue.

LEXSEE

**THOMAS A. EAMES, ROBERTA L. EAMES, and TAMMY EAMES, on behalf of themselves and all others similarly situated, Plaintiffs, v. NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**Civil Action No. 04-1324-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2006 U.S. Dist. LEXIS 3814**

**February 2, 2006, Decided**

**PRIOR HISTORY:** Eames v. Nationwide Mut. Ins. Co., 2005 U.S. Dist. LEXIS 11240 (D. Del., Apr. 27, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff policy holders filed a class action complaint in the Delaware Superior Court seeking declaratory and other relief against defendant insurer. The holders alleged that the insurer had misrepresented the limits of liability for personal injury protection (PIP) coverage included in its automobile liability policies. The insurer removed the suit to the court and thereafter moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** The holders alleged that the insurer misled policy purchasers into believing that they were receiving maximum PIP coverage when, in fact, they received only a lesser amount of PIP coverage as required by Del. Code Ann. tit. 21, § 2118(a)(2)(a), (b). They sought declaratory relief and also asserted breach of contract, bad faith, and civil conspiracy claims, as well as claims under Del. Code Ann. tit. 6, § 2513 of the Delaware Consumer Fraud Act (DCFA). The court agreed that the holders had failed to state any legally actionable claims. It rejected the holders' assertion that the policies were ambiguous with regard to PIP coverage. Even if other documents issued by the insurer used the word "full" to describe the PIP coverage, those documents were not part of the insurance contracts, which clearly and unambiguously provided only for the statutory minimum amount of PIP coverage. Although the holders had stated a claim under the DCFA, arising out of the insurer's alleged misrepresentation, they failed to meet Fed. R. Civ. P. 9(b) heightened pleading requirements with regard to that claim. Their civil conspiracy claim also failed because no underlying wrong was specifically alleged.

**OUTCOME:** The court granted the insurer's dismissal motion. It dismissed, with prejudice, the holders' declaratory relief claim and their breach of contract and bad faith claims. The holders' DCFA and civil conspiracy claims were dismissed without prejudice, and they were granted leave to file an amended complaint reasserting those claims. The court retained jurisdiction over a motion to adopt a special discovery master's report and recommendation.

**CORE TERMS:** coverage, declarations, civil conspiracy, particularity, insured, consumer fraud, limits of liability, insurance policy, ambiguity, insurance contract, per person, unambiguously, declaratory judgment, pleading requirement, insurance coverage, breach of contract, insurance policies, proposed class, misrepresentation, concealment, omission, plead, bodily injury, enclosed, negligent misrepresentation, circumstances surrounding, granted leave to amend, retain jurisdiction, contract language, material fact

**LexisNexis(R) Headnotes**

*Insurance Law > Motor Vehicle Insurance > Compulsory Coverage*

[HN1] Delaware law requires motor vehicle owners to maintain minimum levels of insurance coverage, including coverage that provides compensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident. Del. Code Ann. tit. 21, § 2118(a)(2)(a). That type of insurance is known as personal injury protection (PIP) coverage. The minimum amount of PIP coverage an owner is required to have is $ 15,000 for any one person and $ 30,000 for all persons injured in any one accident. Del. Code Ann. tit. 21, § 2118(a)(2)(b).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] Where the plaintiffs rely on a policy to support their right to insurance coverage, a court may consider that document in connection with a Fed. R. Civ. P. 12(b)(6) motion, even though it is provided by the defendant. A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss, if the plaintiff's claims are based on the document.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN3] Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The moving party has the burden of persuasion.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules*
[HN4] Under Delaware law, the proper construction of any contract, including an insurance contract, is purely a question of law.

*Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules*
*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms*
*Insurance Law > Claims & Contracts > Policy Interpretation > Usual & Ordinary Meaning*
[HN5] Because an insurance policy is an adhesion contract, as a general rule, it is construed strongly against the insurer, and in favor of the insured. However that general rule does not apply unless there is some ambiguity in the policy language. Clear and unambiguous language in an insurance policy should be given its ordinary and usual meaning. If the language is clear and unambiguous, a Delaware court will not destroy or twist the words under the guise of construing them.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
*Contracts Law > Contract Interpretation > Parol Evidence Rule*
*Evidence > Relevance > Parol Evidence Rule*
[HN6] An ambiguity exists when the language in a contract permits two or more reasonable interpretations. The inquiry as to whether an ambiguity exists must focus on the contract. Extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN7] While the plaintiffs' factual allegations must be treated as true for purposes of a Fed. R. Civ. P. 12(b)(6) motion, their legal conclusions need not be.

*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms*
*Insurance Law > Claims & Contracts > Policy Interpretation > Parol Evidence*
[HN8] The approach, that even if documents are outside of an insurance contract, they may be considered to determine what a reasonable consumer would understand the contract to mean, is contrary to Delaware law. The Delaware Su-

preme Court has held unequivocally that extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Pleading & Practice > Motion Practice Generally*
*Civil Procedure > Summary Judgment*
[HN9] Where documents are provided by plaintiffs in their opposition to a <u>Fed. R. Civ. P. 12(b)(6)</u> motion, the fact that the defendant refers to them in a reply does not amount to presenting matters outside the pleadings, for purposes of converting the R. 12(b)(6) motion into a motion for summary judgment.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN10] See <u>Del. Code Ann. tit. 6, § 2513(a)</u> of the Delaware Consumer Fraud Act.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Governments > Legislation > Statutory Remedies & Rights*
*Insurance Law > Claims & Contracts > Unfair Business Practices*
[HN11] The Delaware Consumer Fraud Act (DCFA) provides a private cause of action for violations by an insurance company. With three exceptions, the statute must be interpreted in light of established common law definitions and concepts of fraud and deceit. Thus, as would be required for a claim of common law fraud, a plaintiff alleging a violation of the DCFA must show both a false representation, usually one of fact, made by the defendant, and damage to the plaintiff. However, the DCFA departs from the common law in the following ways: (1) a negligent misrepresentation is sufficient to violate the statute; (2) a violation of the statute is committed regardless of actual reliance by the plaintiff; and (3) the plaintiff need not show intent by the defendant to induce action or inaction by the plaintiff. Allowing a negligent misrepresentation to suffice means that the defendant need not have intended to misrepresent or to make a deceptive or untrue statement; thus, the only intent requirement of the DCFA is that in omitting or concealing a material fact, the defendant must have intended that others rely on the omission or concealment.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Governments > Legislation > Statutory Remedies & Rights*
[HN12] The Delaware Consumer Fraud Act does not require that a defendant's misrepresentations be made within a contract, so the failure of a plaintiff's breach of contract claim does not foreclose the plaintiff's fraud claim under the statute.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Governments > Legislation > Statutory Remedies & Rights*
[HN13] Delaware case law applies heightened pleading requirements to a claim under the Delaware Consumer Fraud Act.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN14] See <u>Fed. R. Civ. P. 9(b)</u>.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN15] <u>Fed. R. Civ. P. 9(b)</u> requires plaintiffs to plead with particularity the circumstances of an alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged and to safeguard the defendants against spurious charges, While allegations of date, place or time fulfill these functions, nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Torts > Multiple Defendants > Conspiracy*
[HN16] Under Delaware law, a claim for civil conspiracy requires a plaintiff to show (1) a combination of two or more persons, (2) an unlawful act done to further the conspiracy, and (3) damages. Such a claim is not an independent cause of action, and thus, a civil conspiracy claim must be predicated upon an underlying wrong.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Torts > Multiple Defendants > Conspiracy*
[HN17] The Delaware Supreme Court has applied a heightened pleading requirement in a civil conspiracy and defamation case because of the First Amendment context of that case. Where that context is lacking, reliance on that decision as authority for a particularized pleading requirement for a civil conspiracy claim is misplaced.

**COUNSEL:** [*1] John S. Spadaro, Esq., Murphy Spadaro & Landon, Wilmington, Delaware; Clayton E. Bunting, Esq., Wilson Halbrook & Bayard, Georgetown, Delaware; Counsel for Plaintiffs.

Nicholas E. Skiles, Esq., Swartz Campbell LLC, Wilmington, Delaware; Counsel for Defendant.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM OPINION

February 2, 2006
Wilmington, Delaware

**JORDAN, District Judge**

## I. INTRODUCTION

This is a proposed class action involving insurance contracts. (Docket Item ["D.I."] 1 at A6-A23; the "Complaint".) The proposed class representatives, Thomas A. Eames, Roberta L. Eames, and Tammy Eames (collectively "Plaintiffs"), allege that Nationwide Mutual Insurance Company ("Nationwide") misrepresented to class members the limits of liability for Personal Injury Protection ("PIP") coverage included in Nationwide insurance policies. (Complaint at P 9.) Invoking 28 U.S.C. § 1441, Nationwide removed the case to this court from Delaware Superior Court. (D.I. 1.) Jurisdiction is proper under 28 U.S.C. § 1332. Before me is Nationwide's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [*2] . (D.I. 3; the "Motion".) For the reasons that follow, the Motion will be granted.

## II. BACKGROUND n1

### A. *Allegations in the Complaint*

This case arises from Nationwide's underwriting of PIP insurance coverage. (Complaint at P 9.) [HN1] Delaware law requires motor vehicle owners to maintain minimum levels of insurance coverage, including coverage that provides "compensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident." 21 *Del. C.* § 2118(a)(2)(a). That type of insurance is known as PIP coverage. The minimum amount of PIP coverage an owner is required to have is "$ 15,000 for any 1 person and $ 30,000 for all persons injured in any 1 accident." *Id.* at § 2118(a)(2)(b).

n1 The following background information is based on Plaintiffs' allegations, which are assumed to be true for the purposes of this 12(b)(6) motion.

Plaintiffs allege that Nationwide "misrepresented ... the limits of liability of their PIP [*3] coverage." (Complaint at P 9.) According to Plaintiffs, Nationwide sold insurance policies "that expressly state, in policy declarations, memorandum of insurance or other policy documentation, that the purchased limits of liability for PIP coverage are 'full' limits." (*Id.*) However, Plaintiffs allege that Nationwide intends "to provide only the minimum statutory limits of $ 15,000 per person and $ 30,000 per accident." (*Id.*) Plaintiffs allege that the term "full" refers to the maximum amount of PIP coverage Nationwide offered at that time, which was $ 100,000 per person and $ 300,000 per accident. (D.I. 7 at 3-6.) Thus, according to Plaintiffs, consumers are led to believe that they have purchased coverage with those maximum limits, and so the insurance policies must be interpreted to provide for those limits. (Complaint at PP 11, 24.)

Alternatively, Plaintiffs allege that "Nationwide's practice of characterizing minimum PIP limits as 'full' limits ... leads insureds to believe that they have purchased the fullest PIP limits or PIP coverage available; the purpose being to discourage them from seeking to purchase additional (and relatively inexpensive) PIP limits." (Complaint [*4] at P 10.)

As proposed class representatives in this action, Plaintiffs allege that they were insured under Nationwide Auto Policy 52A733616 and claimed PIP benefits pursuant to that policy for injuries suffered in an automobile collision on February 7, 2003. (*Id.* at PP 3-4, 12.) According to Plaintiffs, "Nationwide has represented to one or more of [them] that the subject policy provides 'full' limits of liability for PIP coverage; and it has thereafter taken the position that such limits have been exhausted by payment of the minimum statutory amount." (*Id.* at P 13.)

B. *The Insurance Policy Document*

Plaintiffs' insurance policy (D.I. 4 at A20-A49) included the following provisions. n2

n2 [HN2] Since Plaintiffs rely on the policy to support their right to insurance coverage, the court may consider that document, even though it was provided by Nationwide. *See Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[*5]

First, the Insuring Agreement states that, "for the policyholder's payment of premiums in amounts [Nationwide] require[s] and subject to all of the terms and conditions of this policy, [Nationwide] agree[s] to provide the coverages the policyholder has selected. These selections are shown in the enclosed Declarations, which are a part of this policy contract." (*Id.* at A23.)

The Nationwide Auto Policy Declarations then includes this statement: "These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your policy provides the coverages and limits shown in the schedule of coverages." (*Id.* at A20.) The following message is found on the same page:

IMPORTANT MESSAGES:
NOTICE: THE COVERAGES YOU HAVE SELECTED, AS SHOWN IN THIS (sic) DECLARATIONS, ARE SUBJECT TO THE EXCLUSIONS, LIMITATIONS, AND CONDITIONS OF COVERAGE DETAILED IN YOUR POLICY. IN SOME CASES YOUR COVERAGE MAY BE LIMITED TO THE MINIMUM LIMITS OF COVERAGE REQUIRED BY THE DELAWARE FINANCIAL RESPONSIBILITY LAW OR THE DELAWARE MOTORISTS PROTECTION ACT. ON THE DATE THIS DECLARATIONS WAS ISSUED, THOSE LIMITS ARE:
AUTO LIABILITY: [*6] $ 15,000 PER PERSON, $ 30,000 PER OCCURRENCE FOR BODILY INJURY
$ 10,000 FOR PROPERTY DAMAGE
NO-FAULT: $ 15,000 PER PERSON, $ 30,000 PER OCCURRENE (sic) FOR BODILY INJURY
$ 10,000 FOR DAMAGE TO PROPERTY OTHER THAN A MOTOR VEHICLE

IT IS IMPORTANT THAT YOU READ YOUR POLICY CAREFULLY.

2006 U.S. Dist. LEXIS 3814, *

(*Id.*)

For "Limits of Liability associated with Personal Injury Protection and Damage to Property Other Than Motor Vehicle," the Schedule of Coverages states: "SEE POLICY." (*Id.* at A20-A21.) Under Personal Injury Protection Coverage, the policy reads: "[Nationwide] will pay benefits up to a total of $ 15,000 for bodily injury per insured in one accident, and up to $ 30,000 in total if two or more insureds are injured in one accident." (*Id.* at A35.)

For other liability limits, such as those associated with property damage or bodily injury liability coverage, the limits, e.g. $ 50,000 or $ 100,000, are listed in the Schedule of Coverages (*id.* at A20-A21), and the corresponding section of the policy reads: "[Nationwide] will pay such liability losses up to the limits stated in the Declarations" (*id.* at A30).

Finally, after stating that the policy terms will be amended [*7] to conform with conflicting statutes, the policy states: "No other changes may be made in the terms of this policy except by endorsement or policy revision." (*Id.* at A45.)

### C. *Claims for Relief*

In Count I of the Complaint, Plaintiffs seek a declaratory judgment that, according to their insurance policy contracts, class members "are entitled to the maximum PIP limits made available by Nationwide" or "to full coverage of all reasonable and necessary medical expenses incurred within the statutory (two year) period for PIP claims ... ." (Complaint at P 24.) In Count II, Plaintiffs allege that Nationwide has breached the insurance contracts by failing to provide "full" limits. (*Id.* at PP 28-29.) In Count III, Plaintiffs allege that Nationwide's breach of contract was in bad faith. (*Id.* at PP 31-34.) Finally, in Counts IV and V, Plaintiffs allege, respsectively, that Nationwide is liable for consumer fraud under 6 Del. C. § 2513 and for civil conspiracy. (*Id.* at PP 35-41.)

## III. STANDARD OF REVIEW

[HN3] Federal Rule of Civil Procedure 12(b)(6) requires a court to accept as true all material allegations [*8] of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (internal citation omitted). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* (internal citation omitted). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV. DISCUSSION

### A. *Counts I, II, and III - The Contract Claims*

Plaintiffs' declaratory judgment and breach of contract claims in Counts I-III are based on the assertions (1) that Nationwide issued one or more documents stating that limits on PIP coverage were full, (2) that such documents are part of the insurance contract, and (3) that the term "full limits" means something different than the $ 15,000/$ 30,000 limits set forth in the policy text. Thus, according to Plaintiffs, the contract is ambiguous and must be construed to provide limits greater than $ 15,000/$ [*9] 30,000. (D.I. 89 at 15, 22.) Because I conclude that, to the contrary, the insurance contract unambiguously provides for the $ 15,000/$ 30,000 limit, even assuming that Nationwide distributed documents using the word "full" to describe those limits, Counts I, II, and III must be dismissed with prejudice.

[HN4] Under Delaware law, "the proper construction of any contract, including an insurance contract, is purely a question of law." *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). [HN5] "Because an insurance policy is an adhesion contract[,] ... as a general rule, ... [it] is construed strongly against the insurer, and in favor of the insured ... ." *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). However that general rule does not apply "unless there is some ambiguity in the policy language." *Id.* "Clear and unambiguous language in an insurance policy should be given its ordinary and usual meaning." *Rhone-Poulenc*, 616 A.2d at 1195. And "if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them." *Hallowell*, 443 A.2d at 926; [*10] *accord O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001). [HN6] "An ambiguity exists when the language in a contract permits two or more reasonable interpretations." *Hallowell*, 443 A.2d at 926. The inquiry as to whether an ambiguity exists must focus on the contract. "Extrinsic evidence is not to be used to interpret contract language where that language is 'plain and clear on its face.'" *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997); *accord O'Brien*, 785 A.2d at 289.

2006 U.S. Dist. LEXIS 3814, *

Starting with the language in the policy text, the liability limits for PIP coverage are stated to be "$ 15,000 for bodily injury per insured in one accident, and up to $ 30,000 in total if two or more insureds are injured in one accident." (D.I. 4 at A35.) The Nationwide Auto Policy Declarations, which by their own terms are "part of the policy," direct the reader to "SEE POLICY" to determine the liability limits for PIP coverage, which points to the $ 15,000/$ 30,000 limits set forth therein. (*Id.* at A20.) Furthermore, those Declarations warn (1) that coverage may be limited to the minimum required [*11] by law and (2) that it is important to read the policy carefully. (*Id.*) Thus, based on the policy text and accompanying Declarations, the contract unambiguously provides for liability limits of $ 15,000/$ 30,000 for PIP coverage.

Plaintiffs evidently do not dispute that those documents are unambiguous. Rather, Plaintiffs take the position that those documents do not represent the entire contract. Nationwide allegedly stated "in policy declarations, memoranda of insurance[,] or other policy documentation" that the policies provided for full limits on PIP coverage. (Complaint at P 9.) According to Plaintiffs, because policy declarations are part of the contract, so are the statements that limits are "full." (D.I. 89 at 11-12, 14-15.) The juxtaposition of those statements with the limits in the policy text is what, as Plaintiffs see it, creates an ambiguity in the contract. (*Id.* at 15.)

[HN7] While Plaintiffs' factual allegations must be treated as true, their legal conclusion that documents other than the policy text and the accompanying Declarations are part of the contract need not be. Indeed, Plaintiffs' argument that other documents containing the type of information found [*12] in the Declarations must be treated as part of the insurance contract (*id.* at 12) is inconsistent with the language in the policy text. That text states only that "the *enclosed* Declarations" are part of the policy contract. (D.I. 4 at A23 (emphasis added).) Furthermore, those Declarations state: "These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier." (*Id.* at A20.) Finally, the policy terms may not be changed "except by endorsement or policy revision." (*Id.* at A45.) Thus, only the Declarations enclosed with the policy are part of the contract, any earlier Declarations are superseded, and any later documents do not change the terms of the policy unless they fit a narrow category of revisionary documents not relevant here. Even if Plaintiffs did receive documents that used the term "full," then, those documents are not part of the contract.

Finally, Plaintiffs argue that even if those documents are outside the contract, they may be considered to determine what a reasonable consumer would understand the contract to mean. (D.I. 89 at 19-20.) *See Freeman v. Mass. Mut. Life Ins. Co.*, 27 Mich. App. 572, 183 N.W.2d 832, 834-37 (Mich. Ct. App. 1971); [*13] *Handal v. Am. Farmers Mut. Cas. Co.*, 79 Wis. 2d 67, 255 N.W.2d 903, 907 (Wis. 1977); *Westhuis v. Royal Mut. Ins. Co.*, 170 Wis. 2d 734, 492 N.W. 2d 191, 1992 WL 348297, at *2 (Wis. Ct. App. 1992). However, [HN8] that approach is contrary to Delaware law. The Delaware Supreme Court has held "unequivocally that extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face." *O'Brien*, 785 A.2d at 289 (internal quotations omitted).

Therefore, the contract at issue unambiguously provides for liability limits of $ 15,000/$ 30,000 for PIP coverage, and Plaintiffs' claim, in Count I, for a declaratory judgment that the contract provides for some other limit will be dismissed with prejudice. Also, Nationwide has not breached that contract, and Counts II and III will likewise be dismissed with prejudice. n3

n3 Plaintiffs contend that Nationwide has, in its reply brief, converted its 12(b)(6) motion into a motion for summary judgment, and that Plaintiffs should be allowed to secure evidence before the motion is decided. (D.I. 97.) According to Plaintiffs, Nationwide relied on evidence outside the pleadings by arguing that the documents presented to date that contain the term "full" all postdate the policy document. (*Id.; see* D.I. 95 at 1.) However, those [HN9] documents were provided by the Plaintiffs in their opposition to the 12(b)(6) motion (D.I. 90 at B30, B32), and referring to them in a reply does not amount to presenting matters outside the pleadings. Since the decision to dismiss Counts I-III depends only on the complaint and the policy document, which may be considered, *see supra* note 2, Nationwide's motion is properly treated as one under Rule 12(b)(6).

[*14]

### B. *Count IV - Consumer Fraud*

The dismissal of Counts I through III does not, however, end the case, because the conclusion that the insurance policy unambiguously provides for liability limits of $ 15,000/$ 30,000 does not foreclose Plaintiffs' claim for consumer fraud, as set forth in Count IV.

The Delaware Consumer Fraud Act provides that:

> [HN10] any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

*6 Del. C.* § 2513(a). [HN11] The statute provides a private cause of action for violations by an insurance company. *Mentis v. Del. Am. Life Ins. Co.,* 1999 Del. Super. LEXIS 419, No. C.A.98C-12-023, 1999 WL 744430, at *6 (Del. Super. Ct. July 28, 1999). With three exceptions, "the statute must be interpreted in light of established common law definitions and concepts of fraud and deceit." *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del. 1983). [*15] Thus, as would be required for a claim of common law fraud, a plaintiff alleging a violation of the consumer fraud statute must show both "a false representation, usually one of fact, made by the defendant" and "damage to the plaintiff." *Id.* However, the statute does depart from the common law in the following ways: (1) "a negligent misrepresentation is sufficient to violate the statute," (2) a violation of the statute "is committed regardless of actual reliance by the plaintiff," and (3) the plaintiff need not show "intent [by the defendant] to induce action or inaction by the plaintiff." *Id.* Allowing a negligent misrepresentation to suffice means that "the defendant need not have intended to misrepresent or to make a deceptive or untrue statement," and thus, "the only intent requirement of the Act is that in omitting or concealing a material fact, the defendant must have intended that others rely on the omission or concealment." *Id.*

When read in the light most favorable to Plaintiffs, the Complaint appears to allege false representations by Nationwide that were known to be false and that damaged Plaintiffs and other class members. (Complaint at PP 9-10.) According [*16] to the Complaint, Nationwide "falsely described PIP limits as 'full'," and class members were harmed either because they believed that they had purchased coverage with limits higher than $ 15,000/$ 30,000 or because they believed that those were the highest limits available to purchase. (*Id.*) [HN12] There is no requirement that such misrepresentations be made within the contract, so the failure of Plaintiffs' breach of contract claims does not foreclose their fraud claim. Thus, Nationwide has not shown, as it must under Rule 12(b)(6), that no relief could be granted for consumer fraud under any set of facts consistent with the allegations of the Complaint.

However, Nationwide does point out that the Complaint fails to plead the circumstances surrounding the alleged fraud with the necessary particularity (D.I. 3 at 16; D.I. 95 at 10), and cites [HN13] Delaware case law applying that heightened pleading requirement. *See Crowhorn v. Nationwide Mut. Ins. Co.,* 2002 Del. Super. LEXIS 178, No. Civ.A.00C-06-010, 2002 WL 1767529, at *9 (Del. Super. Ct. July 10, 2002) (applying the particularity requirement to a claim under the Consumer Fraud Act).

The Federal Rules of Civil Procedure provide that [HN14] "in all averments [*17] of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). [HN15] "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges ... ." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984). While "allegations of 'date, place or time' fulfill these functions, ... nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

Here, Nationwide argues that Plaintiffs fail to plead the circumstances surrounding a specific misrepresentation made to them (D.I. 95 at 10) and the particular harm suffered by them as a result (D.I. 3 at 16). Indeed, the Complaint does not provide any facts concerning what documents the Plaintiffs received, or when or from whom they received such documents. Thus, the Complaint fails to allege fraud with the particularity [*18] necessary to satisfy Rule 9(b). However, since the Complaint, when read in the light most favorable to Plaintiffs, does set forth a claim in skeletal form, I will dismiss Count IV without prejudice and grant Plaintiffs leave to amend as to that count.

### C. *Count V - Civil Conspiracy*

[HN16] Under Delaware law, a claim for civil conspiracy requires a plaintiff to show (1) a combination of two or more persons, (2) an unlawful act done to further the conspiracy, and (3) damages. *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del. 1987). Such a claim "is not an independent cause of action, and thus, a civil conspiracy claim must be predicated upon an underlying wrong." *Tracinda Corp. v. DaimlerChrysler AG,* 197 F. Supp. 2d 42, 74 (D. Del. 2002).

Here, Plaintiffs allege that Nationwide and its agents have "combined" to further a conspiracy to misrepresent the liability limits for PIP coverage. (Complaint at P 40.) Nationwide argues that a claim for civil conspiracy must be pleaded with particularity and that Plaintiffs have not met that requirement. (D.I. 3 at 17-18; D.I. 95 at 10 (citing *Tracinda,* 197 F. Supp. 2d at 74; *Ramunno v. Cawley,* 705 A.2d 1029, 1039 (Del. 1998).) [*19] In *Ramunno,* [HN17] the Delaware Supreme Court applied a heightened pleading requirement because of the "First Amendment context" of that defamation case. 705 A.2d at 1039. That context, of course, is lacking here. Thus, Nationwide's reliance on the *Ramunno* decision as authority for a particularized pleading requirement for the civil conspiracy claim in this case is misplaced.

Still, Count V must be dismissed because, as Nationwide correctly notes, a claim of civil conspiracy requires an underlying wrong. *Tracinda,* 197 F. Supp. 2d at 74. (D.I. 3 at 18-19; D.I. 95 at 11.) Thus, since Counts I-IV will be dismissed, Count V must be dismissed as well. Since an amended complaint sufficient to support a consumer fraud claim may provide the necessary underlying wrong, Count V, like Count IV, will be dismissed without prejudice. n4

> n4 To the extent a higher pleading standard were required for the civil conspiracy count, the particularized pleading that is being required for the underlying fraud claim should suffice. Cf. United States ex rel. Atkinson v. Pa. Shipbuilding Co., 255 F. Supp. 2d 351, 407-08 (E.D. Pa. 2002) (requiring the predicate fraud to be pleaded with particularity to support a federal conspiracy claim); *Lakonia Mgmt. Ltd. v. Meriwether,* 106 F. Supp. 2d 540, 543-44 (S.D.N.Y. 2000) (same).

[*20]

## V. CONCLUSION

For the reasons set forth herein, I will grant Nationwide's Motion to Dismiss (D.I. 3) under Fed. R. Civ. P. 12(b)(6). Counts I, II, and III will be dismissed with prejudice. Counts IV and V will be dismissed without prejudice, and Plaintiffs will be granted leave to amend, within 45 days, as to those counts. n5 An appropriate order will issue.

> n5 I currently have before me a motion (D.I. 142) to adopt the report and recommendation of a special discovery master. I will retain jurisdiction over that motion. See Cooter & Gell v. Hartmax, 496 U.S. 384, 395, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) (stating that a district court may retain jurisdiction over an award of fees and costs after dismissal and that "it is well established that a federal court may consider collateral issues after an action is no longer pending").

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion to Dismiss [*21] (D.I. 3) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs are granted leave to amend the Complaint, within 45 days, as to Counts IV and V, and that jurisdiction over Plaintiffs' Motion for Adoption and Supplementation of the Special Discovery Master's Report and Recommendation (D.I. 142) is retained.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

February 2, 2006
Wilmington, Delaware

LEXSEE

## IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION

C.A. Nos.: 01-082 GMS; 01-083 GMS, 01-084 GMS; 01-085 GMS; 01-086 GMS; 01-087 GMS, 01-088 GMS; 01-089 GMS; 01-090 GMS; 01-091 GMS; 01-092 GMS; 01-093 GMS, 01-095 GMS; 01-096 GMS, 01-097 GMS; 01-098 GMS, 01-099 GMS; 01-100 GMS, 01-101 GMS; 01-102 GMS, 01-103 GMS; 01-104 GMS

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 19552

October 15, 2002, Decided

**SUBSEQUENT HISTORY:** Motion denied by In re Elonex Phase II Power Mgmt. Litig., 2003 U.S. Dist. LEXIS 7715 (D. Del., May 6, 2003)

**PRIOR HISTORY:** In re Elonex Phase II Power Mgmt. Litig., 2002 U.S. Dist. LEXIS 18724 (D. Del., Oct. 3, 2002)

**DISPOSITION:** [*1] AOC International's motion for partial summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two companies, filed suit against defendants, certain companies that manufactured and sold computer systems or computer monitors and alleged infringement of U.S. Patent Numbers 5,389,952 ('952 patent), 5,648,799 , and 5,649,719. One of defendants moved for partial summary judgment on the issue of the companies' standing to sue for certain damages relating to the '952 patent. Several defendants joined in the motion.

**OVERVIEW:** Defendants claimed that the companies lacked standing to sue for millions of dollars in damages for infringement of the '952 patent occurring from February 14, 1995 until May 14, 1996. In making this claim, defendants argued that: (1) the companies were not themselves the owners of the patents during that time; (2) they had no direct assignments from the owners; and (3) the documents from which their rights derived failed to manifest the intention to transfer any past infringement rights. It was undisputed that the companies did not hold legal title to the '952 patent during the period in question. Rather, several other entities were the various actual owners during that time. None of the entities was a party to the present lawsuit. Defendants argued that the prior

legal owners of the '952 patent did not convey the right to sue for past infringement to the companies. However, what remained disputed and material was the intent of the parties in transferring the various patent rights. Because the parties' intentions in transferring and assigning the patent rights were clearly in dispute, granting summary judgment in favor of defendants was improper.

**OUTCOME:** Defendant's motion for partial summary judgment was denied.

**CORE TERMS:** patent, infringement, plc, license, licensee, summary judgment, transferred, patents-in-suit, non-moving, ownership, cancelled, assigned, genuine, lawsuit, monitors, replacement, terminated, novation, replaced, issues of material fact, agreement dated, reasonable jury, patent license, moving party, presently, transferring, infringing, undisputed, effective, assignee

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] The court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. In deciding the motion, the

court must construe all facts and inferences in the light most favorable to the non-moving party.

*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Remedies > Damages > Time Limitations*
*Patent Law > Infringement Actions > Infringing Acts >*
*General Overview*

[HN2] In general, only the holder of legal title to a patent at the time of the infringement may bring an action for damages resulting from that infringement. This is so because infringement harms only the owner of the patent at the time of the infringing acts. It does not affect previous owners whose interest has been terminated before the infringing acts or future owners whose interest has not yet vested. There are, however, two exceptions to this general rule. The first exception applies when the owner at the time of the infringement assigns both the patent, and the claim for past infringement, to the same person or entity. Under this exception, the right to sue for past infringement is not transferred unless the assignment agreement manifests an intent to transfer that right. The bare reference to "all right, title and interest" does not normally transfer the right to sue for past infringement. The second applicable exception is when all substantial rights under the patent at the time of the infringement have been transferred to an exclusive licensee, rendering the licensee a virtual assignee.

**COUNSEL:** For Elonex IP Holdings, Ltd, Eip Licensing BV, PLAINTIFFS: Andre G Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE USA.

For In Re: Elonex Phase II Power Management Litigation, PLAINTIFF: Donald F Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA. Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA. Andre G Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M . . Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On February 13, 2001, the plaintiffs, Elonex I.P. Holdings, Ltd. and EIP Licensing, B.V. (collectively "Elonex"), filed this action against certain companies that manufacture and sell computer systems or computer monitors. n1 The complaint alleges infringement of U.S.

Patent Numbers 5,389,952 ("the '952 patent"), 5,648,799 ("the '799 patent"), and 5,649,719 ("the '719 patent"). The lawsuit relates to technology that concerns power management in computer monitors.

> n1 In December 1998, Elonex I.P. Holdings Ltd. and Elonex plc filed a related lawsuit against another group of defendants on substantially the same grounds ("Elonex Phase I litigation").

[*2]

Presently before the court is AOC International's ("AOC") motion for partial summary judgment on the issue of Elonex's standing to sue for certain damages relating to the '952 patent. n2 For the following reasons, the court will deny this motion.

> n2 Joining in this motion are Chuntex Electronics Corporation, Ltd., Acer Communications, Daewoo Electronics Corporation, Ltd., Tatung Corporation, and ADI Corporation.

### II. STANDARD OF REVIEW

[HN1] The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania*, 139 F.3d 386, 392 (3d Cir. 1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury [*3] to find for the non-moving party. See *Boyle*, 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also  Assaf v. Fields*, 178 F.3d 170, 173-174 (3d Cir. 1999).

With these standards in mind, the court will describe the relevant facts leading to the motion presently before the court.

### III. BACKGROUND

2002 U.S. Dist. LEXIS 19552, *

The patents-in-suit are a family of related patents directed to the field of power management in computer monitors and systems. The first of the patents-in-suit, the '952 patent, was issued on February 14, 1995. The '799 patent was issued on July 15, 1997. Finally, on March 9, 1999, the '719 patent was issued.

The '952 patent's undisputed chain of ownership and assignments is as follows. On April 3, 1995, soon after the first of [*4] the patents-in-suit was issued, the first patent owner, Cordata, Inc. ("Cordata"), assigned all of its assets, including its patents, to the Oakleigh Trust. Pursuant to an agreement dated April 3, 1995, Cordata transferred "absolutely . . . together with all rights powers and benefits relating in any way thereto" the '952 patent and Cordata's other patents, patent applications, issued shares, all equipment and inventory, and "all of Cordata's cash, accounts receivables and other assets howsoever described" to the Oakleigh Trust. As a result of these transactions, no assets remained in Cordata, and it ceased operations.

On the same day, Consilium Overseas Limited ("Consilium"), in its capacity as the trustee of the Oakleigh Trust, entered into an exclusive patent license agreement that granted Elonex plc "the sole and exclusive right and license, throughout all parts of the world to the extent legally permissible, to exploit and use [the patents] in all ways whatever" and "to prosecute or settle any proceedings . . . for and on its own behalf and on its own behalf and on behalf of the Licensor." As the court held in its February 15, 2002 Memorandum and Order, this license made Elonex [*5] plc the effective assignee of the '952 patent with all substantial rights.

On February 8, 1996, Consilium retired as the trustee of the Oakleigh Trust. It was replaced by Central Independent Trustees Limited ("Central"). The Deed of Retirement and Appointment of New Trustees stated that all of the Oakleigh Trust's property would be transferred into Central's name. Consilium confirmed its transfer of legal ownership of the Oakleigh Trust's patent portfolio to Central through a May 8, 1996 Deed of Confirmatory Assignment. Citing to the Deed of Retirement and Appointment of New Trustee, the Deed of Confirmatory Assignment repeated the parties' intentions to transfer all of the Oakleigh Trust's assets out of Consilium's name and into Central's name. Specifically, the document stated that Consilium:

> assigned to and renounced in favour of the Trustee [Central] all its respective right, title and interest in and to the Patents together with all its respective rights, power and benefits relating in any way thereto to hold the same until the Trustee absolutely.

The Deed of Confirmatory Assignment also stated that the April 3, 1995 license between Consilium and Elonex plc was [*6] cancelled. It then established a new license between Central and Elonex plc "on identical terms." Thus, as of May 6, 1996, Central held legal ownership, on behalf of the Oakleigh Trust, of all rights relating to the '952 patent. Elonex plc remained the exclusive licensee with respect to all of those patent rights.

In the month before the May 8, 1996 Deed of Confirmatory Assignment, EIPH was created as a wholly-owned subsidiary of the Oakleigh Trust. Its sole purpose was to hold the trust's patent portfolio and receive patent royalties for the Trust's benefit. The Deed of Confirmatory Assignment reflects the use of such a "nominee" for holding legal title to the patents.

The '952 patent's transfer to EIPH was documented in a Declaration of Trust between Cental and EIPH, dated August 1, 1997. This Declaration specifically recounted that EIPH was created to be the legal owner of the patents for the benefit of the Trust. It also noted certain assignments that had been executed in its favor the previous year.

Clause 2 of the Declaration confirmed that the prior patent license between Central and Elonex plc was cancelled, and that a new license agreement was executed between EIPH and [*7] Elonex plc. This replacement license, with a defined commencement date of May 8, 1996, granted Elonex plc the same broad rights it had under the previous license with Central.

In 1999, Elonex plc established EIP Licensing as a wholly-owned Dutch subsidiary to carry out its patent licensing business. By a novation agreement dated October 15, 1999, EIP Licensing replaced Elonex plc as EIPH's exclusive licensee. Under the novation, the 1997 license agreement between EIPH and Elonex plc was terminated and

> as between the Licensor [EIPH] and the New Licensee [EIP Licensing], it is agreed that the Agreement shall simultaneously be effective as between the two of them, whereby each and every reference to "the Licensee" [Elonex plc] shall be read as a reference to the New Licensee [EIP Licensing].

Except for the certain "whereas" clauses and definitions reflecting the reasons for the new license, the terms of the EIPH-EIP Licensing agreement were substantially identical to the prior terminated license between EIPH and Elonex plc.

The definition of the "proceedings" that EIP Licensing could bring expressly included the then-pending Phase I infringement litigation. That [*8] litigation also included infringement allegations going back to the February 1995 issuance of the '952 patent.

## IV. DISCUSSION

AOC claims that the plaintiffs, EIPH and EIP Licensing, lack standing to sue for millions of dollars in damages for infringement of the '952 patent occurring from February 14, 1995 until May 14, 1996. In making this claim, AOC argues that: (1) the plaintiffs were not themselves the owners of the patents during that time; (2) they had no direct assignments from the owners; and (3) the documents from which their rights derive failed to manifest the intention to transfer any past infringement rights. For the following reasons, the court concludes that there remains a genuine issue of material fact which will preclude the entry of summary judgment.

[HN2] In general, only the holder of legal title to a patent at the time of the infringement may bring an action for damages resulting from that infringement. *See Crown Die & Tool Co. v. Nye Tool & Machine Works,* 261 U.S. 24, 40-41, 67 L. Ed. 516, 43 S. Ct. 254, 1923 Dec. Comm'r Pat. 651 (1923); *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed. Cir. 1991). This is so because infringement harms [*9] only the owner of the patent at the time of the infringing acts. It does not affect previous owners whose interest has been terminated before the infringing acts or future owners whose interest has not yet vested. *See Crown Die,* 261 U.S. at 41.

There are, however, two exceptions to this general rule which may be applicable to the present case. The first exception applies when the owner at the time of the infringement assigns both the patent, and the claim for past infringement, to the same person or entity. *See id.* at 43. Under this exception, the right to sue for past infringement is not transferred unless the assignment agreement manifests an intent to transfer that right. *See Minco, Inc. v. Combustion Eng'g, Inc.,* 95 F.3d 1109, 1117 (Fed. Cir. 1996); *see also Arachnid,* 939 F.2d at 1579, n.7 (noting in dicta that the transfer of this right "must be express, and cannot be inferred from an assignment of the patent itself."). The bare reference to "all right, title and interest" does not normally transfer the right to sue for past infringement. *See Minco,* 95 F.3d at 1117.

The second applicable exception [*10] is when all substantial rights under the patent at the time of the infringement have been transferred to an exclusive licensee, rendering the licensee a virtual assignee. *See e.g., Vaupel Textilmaschinen v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed. Cir. 1991) (conferring standing to sue on an exclusive licensee without joining the patent owner).

In the present case, it is undisputed that EIPH and EIP Licensing did not hold legal title to the '952 patent during the period in question. Rather, Cordata, Consilium, and Cental were the various actual owners during that time. None of these entities is a party to the present lawsuit. Thus, for EIPH and EIP Licensing to recover damages for infringement which occurred during that period, one of the above-mentioned exceptions must apply. Because the court finds that it must deny the motion for summary judgment based on the existence of genuine issues of material fact with regard to the first exception, it will not address the second exception.

With regard to the first exception, AOC argues that the prior legal owners of the '952 patent did not convey the right to sue for past infringement to EIPH or EIP Licensing. However, [*11] what remains disputed, and material to the present case, is the intent of the parties in transferring the various patent rights. As stated above, the undisputed facts indicate a complicated series of transfers and assignments of the '952 patent. For instance, by Declaration of Trust dated August 1, 1997, Central assigned its patent rights to EIPH. The Declaration of Trust also cancelled the prior exclusive license agreement between Central and Elonex plc. In that agreement's place, it attached a replacement exclusive patent license as between the replacement owner representative EIPH and Elonex plc. Elonex argues that these actions are of great importance because, as the court recognized in its February 15, 2002 Memorandum and Order, Elonex plc had the right to sue for past infringement as the exclusive licensee with all substantial rights. AOC disputes that, by these actions and documents, among others, the parties intended to convey the right to sue for past infringement as well. Because the parties' intentions in transferring and assigning the patent rights are clearly in dispute, the court concludes that granting summary judgment in favor of AOC would be improper. *See American Bank Note Holographics, Inc. v. Upper Deck Co.,* 1997 U.S. Dist. LEXIS 657, 1997 WL 30877, at *2 (S.D.N.Y. Jan. 27, 1997) [*12] (stating that a disputed issue of fact as to the intent to assign the right to sue for prior infringement would be reserved for trial.).

In addition to the above dispute, the court is also unable to determine EIP Licensing's status for an additional, independent reason. Specifically, by a novation dated October 15, 1999, EIP Licensing replaced Elonex plc as EIPH's exclusive licensee. However, the record evidence does not unequivocally support, as AOC argues, a determination that EIP Licensing did not also inherit Elonex plc's right to sue for past infringement. Accordingly, because the intent of the parties is in dis-

2002 U.S. Dist. LEXIS 19552, *

pute here as well, the court will decline to enter summary judgment in favor of AOC.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. AOC's Motion for Partial Summary Judgment (D.I. 727) is DENIED.

Dated: October 15, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 1999 US DIST LEXIS 11262

**LEARNING CURVE TOYS, L.P., Plaintiff, v. PLAYWOOD TOYS, INC., Defendant.**

No. 94 C 6884

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 11262*

**July 19, 1999, Decided
July 20, 1999, Docketed**

**DISPOSITION:** [*1] Counterdefendants motion for summary judgment granted in part and denied in part. Summary judgment granted in favor of Learning Curve on certain claims as well.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff toy manufacturer sought a declaratory judgment that its activities did not violate any rights of defendant, a toy designer. Defendant filed a counterclaim naming plaintiff as well as three individual employees of plaintiff (the counterdefendants), and the three individual counterdefendants moved for summary judgment.

**OVERVIEW:** Defendant toy designer created a toy train track at the request of plaintiff toy manufacturer, but the parties never closed a deal, and plaintiff later began producing a similar track. Plaintiff sought a declaratory judgment that its activities did not violate any rights of defendant; defendant filed a counterclaim, alleging common law unjust enrichment and idea misappropriation, as well as violations of state and federal unfair trade practices and trade secrets acts, and naming three individual employees of plaintiff in addition to plaintiff (the counterdefendants); and the individual counterdefendants moved for summary judgment. The court granted summary judgment to all counterdefendants, including plaintiff, on the unjust enrichment and idea misappropriation claims, holding that such common law claims were preempted by the Illinois Trade Secrets Act; on the claims brought under the state consumer fraud act, because no harm to consumers had been shown; and on all the federal claims, because the federal statutes required a showing that the allegedly illegal acts were likely to cause confusion among consumers; but denied summary judgment on the state trade secrets act claims.

**OUTCOME:** The court granted summary judgment to all counterdefendants, including plaintiff, on unjust enrichment and idea misappropriation claims, because common law claims were preempted by state statute; on state consumer fraud act claims, because no harm to consumers had been shown; and on all federal claims, because federal statutes required proof of likelihood of confusion among consumers; but denied summary judgment on state trade secrets act claims.

**CORE TERMS:** misappropriation, track, summary judgment, trade secret, consumer, common law, Lanham Act, toy, counterclaim, clickity-clack, designation, train, unjust enrichment, unfair competition, commerce, deception, confused, trade secrets, confidentiality agreement, consumer protection, causes of action, misrepresentation, competitor, implicate, preempted, wooden, secret, Consumer Fraud Act, preemption provision, civil remedies

**LexisNexis(R) Headnotes**

*Trade Secrets Law > Federal & State Regulation > Uniform Trade Secrets Act*
*Trade Secrets Law > Civil Actions > Remedies > General Overview*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN1] By its terms, the Illinois Trade Secrets Act displaces other causes of action that provide civil remedies for misappropriation of a trade secret. *765 Ill. Comp. Stat. 1065/8.*

*Trade Secrets Law > Federal & State Regulation > General Overview*

Case 1:05-cv-00842-GMS    Document 32-3    Filed 03/03/2006    Page 25 of 32

Page 2
1999 U.S. Dist. LEXIS 11262, *

*Torts > Business & Employment Torts > Unfair Business Practices*
*Trade Secrets Law > Civil Actions > Remedies > Damages > Unjust Enrichment*
[HN2] A plaintiff may not resort to common law causes of action as well as the Illinois Trade Secrets Act, *765 Ill. Comp. Stat. 1065/8*, to obtain relief for the same alleged wrongdoing.

*Trade Secrets Law > Federal & State Regulation > Uniform Trade Secrets Act*
*Trade Secrets Law > Federal & State Regulation > Common Law*
*Trade Secrets Law > Civil Actions > Remedies > General Overview*
[HN3] The purpose of the Illinois Trade Secrets Act (ITSA) was to codify all the various common law remedies for theft of ideas. The ITSA did not establish a parallel statutory regime to complement the common law; rather, it abolished common law theories of misuse of such secret information. Unless defendants misappropriate a statutory trade secret, they do no legal wrong. Thus, plaintiffs who believe their ideas were pilfered may resort only to the ITSA; the alleged theft of ideas cannot support multiple claims under different theories of recovery.

*Trade Secrets Law > Federal & State Regulation > Uniform Trade Secrets Act*
*Trade Secrets Law > Federal & State Regulation > Common Law*
*Copyright Law > Subject Matter > Ideas > Misappropriation*
[HN4] The Illinois Trade Secrets Act (ITSA) does not simply preempt common law claims for which misappropriation of a trade secret is an element. Rather, the provision eliminates common law claims based on conduct that might support an ITSA action. In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN5] The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact in the conduct of any trade or commerce. *815 Ill. Comp. Stat. 505/2*.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN6] A plaintiff who is not a consumer of the defendant's goods or services may sue under the Illinois Consumer Fraud and Deceptive Business Practices Act if the alleged wrongful conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN7] Trade practices directed at "the market generally" must still cause harm to consumers to be cognizable under the Illinois Consumer Fraud and Deceptive Business Practices Act.

*Torts > Business & Employment Torts > Unfair Business Practices*
*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > Misappropriation Actions > Elements > General Overview*
[HN8] . The elements of an Illinois Trade Secrets Act misappropriation claim are simply that the plaintiff had a trade secret, and the defendant misappropriated it for business purposes. Plaintiff is not required to show that a defendant personally benefitted or profited from misappropriation of trade secrets.

*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN9] Under § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125* (a)(1), a plaintiff making a claim of false designation of origin must show that the mark is entitled to protection as a trademark, and that the false designation of origin creates a likelihood of confusion.

*Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview*
[HN10] The Lanham Act provides a cause of action for a plaintiff with a "reasonable interest" in the form of some sort of "mark."

*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > Appearance*

**Trademark Law > Likelihood of Confusion > Intent > General Overview**

**Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview**

[HN11] Under § 43(a) of the Lanham Act, the test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a substantial number of consumers. This inquiry is a function of seven factors, including: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm-off his product as that of another.

**Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion**

**Trademark Law > Likelihood of Confusion > General Overview**

[HN12] A claim for unfair competition under § 44(b) of the Lanham Act requires that plaintiff prove a likelihood of confusion among consumers.

**Trademark Law > Foreign & International Protections > International Treaties**

**Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion**

[HN13] A claim for unfair competition under the Illinois Deceptive Trade Practices Act requires that plaintiff prove a likelihood of confusion among consumers.

**COUNSEL:** For LEARNING CURVE TOYS L.P., plaintiff: Dean A. Dickie, Roger L. Price, Michael John Lyle, Vanessa L. Vargas, D'Ancona & Pflaum, Chicago, IL.

For PLAYWOOD TOYS INC., defendant: John Sheldon Letchinger, Ian James McPheron, Wildman, Harrold, Allen & Dixon, Thomas John Verticchio, Patzik, Frank & Samotny, Ltd., Chicago, IL.

For PLAYWOOD TOYS INC., counter-claimant: John Sheldon Letchinger, Ian James McPheron, Wildman, Harrold, Allen & Dixon, Thomas John Verticchio, Patzik, Frank & Samotny, Ltd., Chicago, IL.

For LEARNING CURVE TOYS L.P., counter-defendant: Roger L. Price, Vanessa L. Vargas, D'Ancona & Pflaum, Chicago, IL.

For ROY WILSON, HARRY ABRAHAM, JOHN LEE, counter-defendants: Dean A. Dickie, Roger L. Price, Michael John Lyle, D'Ancona & Pflaum, Chicago, IL.

**JUDGES:** REBECCA R. PALLMEYER, United States District Judge.

**OPINIONBY:** REBECCA R. PALLMEYER

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Learning Curve Toys L.P., a toy manufacturer, sought a declaratory judgment that its activities do not violate any rights [*2] of Play Wood Toys, Inc., a toy designer. PlayWood filed an eight-count counterclaim, naming Learning Curve as well as three individuals, Roy Wilson, Harry Abraham and John Lee (collectively, "Counterdefendants"), all currently or formerly employed by Learning Curve. The individual Counterdefendants now move for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part. Because many of the arguments made by the individual Counterdefendants are equally applicable to Learning Curve L.P., the court grants summary judgment in favor of Learning Curve on certain claims as well.

### BACKGROUND

Judge Grady, who was assigned this case originally, outlined the nature of the dispute in his earlier ruling on Learning Curve's own motion for summary judgment, *Learning Curve Toys, L.L.C. v. PlayWood Toys, Inc., 1998 U.S. Dist. LEXIS 1048,* No. 94 C 6884, *1998 WL 46894* (N.D. Ill. Jan. 30, 1998), so the court will set forth only a brief summary here. The court views disputed facts in the light most favorable to PlayWood. In February 1993, Wilson and Abraham visited PlayWood's offices to discuss a joint business venture in manufacturing toys, particularly toy trains. [*3] (12N Response P 24.) n1 An express confidentiality agreement governed the exchange of ideas at this meeting. (12N Add'l Facts P 1.) PlayWood proposed production ideas for cutting grooves in the wooden train tracks, to make them look more realistic, and to generate a "clickity-clack" sound. (*Id.* P 3.) Learning Curve was receptive to this idea, and PlayWood created a prototype and delivered it to Learning Curve. (*Id.* P 4.) PlayWood proposed calling the product "Clickity-Clack Track." (Clausi Dep., at 141-42.) PlayWood had no patent or trademark on its idea, nor any registered rights in the name "Clickity-Clack Track." (12N Response PP 43, 44, 46.) PlayWood itself was not at that time a manufacturer or distributor of toys (the court has no information that this status has changed),

but had produced some prototypes of the track. (*Id.* PP 23-26.)

n1 Rather than submit another 12M statement, Counterdefendants have chosen to rely on facts as presented in PlayWood's 12N statement filed in July 1997 in opposition to Learning Curve's motion for summary judgment. The court has considered this document, as well as the exhibits both sides have attached to their briefs.

[*4]

Learning Curve backed off, and the parties never closed a formal deal. "In 1994, Learning Curve patented and began to manufacture a toy train track called Clickety-Clack Track(R) which made a 'clickety clack' noise when traversed by a toy train." *Learning Curve Toys, 1998 WL 46894,* at *1. At the heart of this dispute is the question of which company originated the idea for the more realistic-looking, clickity clack sound-producing wooden toy railroad track. Learning Curve was the first to enlist the assistance of the courts in resolving this dispute, filing this suit for a declaratory judgment in December 1994.

PlayWood counterclaimed, alleging that Learning Curve is liable for breach of implied-in-fact contract (Count I), unjust enrichment (Count II), "idea misappropriation" (Count III), and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV), Illinois Trade Secrets Act (Count V), Sections 44(b) and 43(a) of the Lanham Act (Counts VI and VII), and the Uniform Deceptive Trade Practices Act (Count VIII). Learning Curve moved for summary judgment on all eight counterclaims in 1997. Judge Grady granted the motion with respect to [*5] Count I, but denied summary judgment on the remaining claims. After analyzing the implied contract issues in Counts I and II, Judge Grady stated with regard to the other counts:

There are disputed issues of material fact on the remaining counterclaims. For example, it is disputed whether PlayWood designed the toy track, whether PlayWood and Learning Curve had a confidentiality agreement, whether PlayWood otherwise attempted to keep the train track design secret, and the extent of damages sustained by PlayWood. As trial is necessary on these issues, [the court] will, in the interest of judicial economy, deny summary judgment on the remaining counterclaims.

*Learning Curve Toys, 1998 WL 46894,* at *5.

The individual Counterdefendants now move for summary judgment a second time. n2 PlayWood has moved to strike portions of Counterdefendants' reply brief, on the grounds that they contain arguments not raised in the opening brief. The court has taken this motion into account as it considers the summary judgment issues.

n2 All Counterdefendants were party to the first motion for summary judgment.

[*6]

## Counts II & III - Unjust Enrichment n3 and Idea Misappropriation

n3 The court uses the terms "unjust enrichment," "quasi-contract" and "implied-in-law contract" interchangeably.

Counterdefendants maintain that these counterclaims must be dismissed altogether, because they are preempted by [HN1] the Illinois Trade Secrets Act (ITSA). n4 By its terms, the ITSA displaces other causes of action that provide civil remedies for misappropriation of a trade secret. *765 ILCS 1065/8.* n5 Counterdefendants argue that PlayWood is using theories of unjust enrichment and misappropriation to attempt to obtain redress for the same conduct that PlayWood identifies as violative of the ITSA, and therefore these counterclaims fall within the scope of the ITSA preemption provision and must be dismissed. Counterdefendants cite three cases-- *Nilssen v. Motorola, Inc., 963 F. Supp. 664, 683-84 (N.D. Ill. 1997), Web Communications Group, Inc. v. Gateway 2000, Inc., 889 F. Supp. 316, 321 (N.D. Ill. 1995),* [*7] and *Pope v. Alberto-Culver Co., 296 Ill. App. 3d 512,    , 694 N.E.2d 615, 619, 230 Ill. Dec. 646 (1st Dist. 1998)*--in support of their argument.

n4 Although PlayWood did not respond to this argument in its latest briefs, the court has referred to PlayWood's briefs from the first summary judgment.

n5 *765 ILCS 1065/8* states:

(a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitu-

tionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

(b) This Act does not affect:

(1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty;

(2) other civil remedies that are not based upon misappropriation of a trade secret;

(3) criminal remedies, whether or not based upon misappropriation of a trade secret; or

(4) the definition of a trade secret contained in any other Act of this State.

[*8]

These cases cited by Counterdefendants plainly establish that [HN2] a plaintiff may not resort to common law causes of action as well as the ITSA to obtain relief for the same alleged wrongdoing. *See Web, 889 F. Supp. at 321* (finding unjust enrichment claim preempted "to the extent [it was] directed at trade secret misappropriation"). PlayWood contends, however, that the ITSA only preempts claims that require misappropriation of a trade secret as an element. PlayWood insists that "trade secret misappropriation [under the ITSA] and idea misappropriation are distinct causes of action that seek to protect different types of intellectual property." (PlayWood March 9, 1999 Response, at 11). PlayWood does not fully explain its reasoning, but the court interprets it to be essentially a pleading-in-the-alternative approach: PlayWood believes its ideas are protectible as trade secrets under the ITSA; however, if the ideas do not meet the requirements of trade secrets, PlayWood believes it is still entitled to pursue common law causes of action for Counterdefendants' alleged theft of ideas.

The caselaw from the Seventh Circuit, and in this district, belies PlayWood's argument. [*9] *See* Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising to the Level of Trade Secrets, 29 LOY. U. CHI. L.J. 841, 886 n.176 (1998)* (collecting cases). [HN3] The purpose of the ITSA was to codify all the various common law reme-

dies for theft of ideas. *See Pepsico, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995).* The ITSA did not establish a parallel statutory regime to complement the common law; rather, it "abolished common law theories of misuse of such [secret] information. . . . Unless defendants misappropriate[] a statutory trade secret, they do no legal wrong." *Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992).* Thus, plaintiffs who believe their ideas were pilfered may resort only to the ITSA; the alleged theft of ideas cannot support multiple claims under different theories of recovery. *See Powell Prods., Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996)* (dicta) (preemption appropriate under the Uniform Trade Secrets Act where "'other claims are no more than a restatement of the same operative facts which would plainly [*10] and exclusively spell out only trade secret misappropriation'") (quoting ROGER M. MILGRIM, *MILGRIM ON TRADE SECRETS, § 1.01*[4], at 1-68.14 (1996)).

*C&F Packing Co. v. IBP, Inc., 1994 U.S. Dist. LEXIS 973,* No. 93 C 1601, *1994 WL 30540* (N.D. Ill. Feb. 1, 1994) illustrates this rule. There, the plaintiff, a meat products business, negotiated a deal whereby Pizza Hut was to use the plaintiff's sausage in its restaurants. The plaintiff disclosed to Pizza Hut, under a confidentiality agreement, information regarding a secret process for making sausage. The deal went sour, and the plaintiff brought suit for misappropriation of trade secrets as well as several common law actions, including unjust enrichment and unfair competition. The court held that the common law claims were preempted, n6 since they were based on the same course of events—specifically, Pizza Hut allegedly using the plaintiff's ideas without permission—as the statutory claim. *1994 WL 30540,* at *7 (noting that the "common law claims cannot be meaningfully distinguished from plaintiff's statutory misappropriation claim"). Numerous other cases have similarly interpreted the ITSA preemption provision. *See, e.g.. Precision* [*11] *Screen Machs., Inc. v. Elexon, Inc., 1996 U.S. Dist. LEXIS 12487,* No. 95 C 1730, *1996 WL 495564,* at *4 (N.D. Ill. Aug. 28, 1996) (tortious breach of a confidential relationship claim preempted); *cf. Thermodyne Food Svc. Prods., Inc. v. McDonald's Corp., 940 F. Supp. 1300, 1309 (N.D. Ill. 1996)* ("To the extent that the breach of fiduciary duty claim is premised on conduct other than the misappropriation of Thermodyne technology, the claim survives.").

n6 *C&F Packing Co.* considered the preemption provision of the Kansas Uniform Trade Secrets Act. However, the Kansas and Illinois statutes were both derived from the Uniform Trade Secrets Act, and their preemption provisions are practically identical. The Kansas statute states:

"this act displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret." *K.S.A. 60-3326(a).*

In [HN4] sum, the ITSA does not, as PlayWood contends, simply preempt common law claims for which misappropriation of [*12] a trade secret is an element. Rather, the provision eliminated common law claims based on conduct which might support an ITSA action. In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois. This strict interpretation is fatal to PlayWood's idea misappropriation and unjust enrichment counterclaims, and Counterdefendants' motion for summary judgment is granted on those two counterclaims.

## Count IV - Consumer Fraud and Deceptive Business Practices Act

Counterdefendants contend that PlayWood's Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) claim must be dismissed because it does not implicate "consumer protection concerns," and therefore PlayWood does not have standing to sue under the statute. Both parties addressed this issue as part of Learning Curve's earlier motion for summary judgment. PlayWood protests that the court should disregard Counterdefendants' re-submission of this argument because this time around they did not raise it until their reply brief, and because Judge Grady already rejected it. From this court's [*13] reading of the earlier decision, however, it does not appear that Judge Grady reached the issue. Rather, he denied summary judgment "in the interest of judicial economy" because trial was necessary to decide several factual issues, and because the court could consider a motion for judgment as a matter of law at a later time. *Learning Curve, 1998 WL 46894,* at *5. Since it is potentially dispositive of the claim, the court will re-examine Counterdefendants' argument, and refer to the briefing from the first summary judgment motion for PlayWood's response.

[HN5] The Consumer Fraud Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact . . . in the conduct of any trade or commerce." *815 ILCS § 505/2.* The law was designed "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices." *Id.* § 505/1 (historical notes).

Although PlayWood is not a consumer of Learning Curve toys, [HN6] a plaintiff who is not a consumer [*14] of the defendant's goods or services may sue under the Consumer Fraud Act if the alleged wrongful conduct "involves trade practices directed to the market generally or otherwise implicates consumer protection concerns." *Athey Prods. Corp. v. Harris Bank Roselle, 89 F.3d 430, 437 (7th Cir. 1996).* Counterdefendants maintain that PlayWood cannot show that "any Illinois consumer was ever confused over the source of Learning Curve's Clickity-Clack Track product . . . or that any Illinois consumer was directly injured from Learning Curve's conduct." (Learning Curve Reply, at 9-10.) PlayWood concedes that it has identified no individual consumer who has been confused about the origin of Clickity-Clack Track. (PlayWood 12N Response P 62.) But PlayWood argues that there is a genuine dispute over who invented the product, and that Learning Curve improperly markets itself as the originator of the product in its promotional materials. PlayWood's position is that by holding itself out as the creator Clickity-Clack Track, Learning Curve engages in deliberate "deception on the market" which harms PlayWood as well as consumers. (PlayWood July 8, 1997 Response, at 14-15.)

PlayWood's [*15] claim falls short. [HN7] Trade practices directed to "the market generally" must still cause harm to consumers to be cognizable, *Amon v. Harrison, 1994 U.S. Dist. LEXIS 13918,* No. 91 C 980, *1994 WL 532025,* at *3 (N.D. Ill. Sept. 29, 1994) (statute does not "authorize a suit by a non-consumer where there is no injury to consumers"), and PlayWood does not meet this requirement. PlayWood cannot substitute conclusory allegations of "fraud on the market" for its obligation to show injury to consumers. *See American Broadcast Co. v. Maljack Prods., Inc., 34 F. Supp. 2d 665, 680-81 (N.D. Ill. 1998); Amon, 1994 WL 532025,* at *3. Even if consumers are deceived about the origins of Clickity-Clack Track--a contention which PlayWood supports with inference, rather than direct evidence--the court cannot perceive how these consumers are harmed by such a deception.

Nor does Learning Curve's alleged deception implicate "consumer protection concerns." Although courts have struggled to define the scope of this term, *see Brody v. Finch Univ. of Health Sciences, 298 Ill. App. 3d 146, 159, 698 N.E.2d 257, 269, 232 Ill. Dec. 419 (2d Dist. 1998),* it generally involves sharp [*16] practices designed to mislead consumers about a competitor company, *see Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc., 190 Ill. App. 3d 524, 533, 546 N.E.2d 33, 39, 137 Ill. Dec. 409 (2d Dist. 1989)* (finding standing for plaintiff whose competitor distributed 15,000 disparaging brochures to consumers), or public health, safety or welfare issues, *see Stickle Enters., Ltd.*

v. CPC Int'l, Inc., 1997 U.S. Dist. LEXIS 19538, No. 96 C 3123, 1997 WL 767301, at *4 (N.D. Ill. Dec. 3, 1997) (allowing plaintiff to challenge competitor's deceptive actions to promote sale of contaminated animal feed). By these standards, Learning Curve's alleged misrepresentation does not implicate consumer protection concerns. Consequently Counterdefendants' motion for summary judgment on Count IV is granted. As the problems identified by the individual Counterdefendants have equal force for Learning Curve L.P., Count IV is dismissed in its entirety.

### Count V - Illinois Trade Secrets Act

Counterdefendants submit that PlayWood cannot go forward with this claim because the law requires a showing that the individual defendants personally benefitted or profited from Learning Curve's misappropriation [*17] of trade secrets, and PlayWood cannot make this showing. Counterdefendants cite three cases in support of the proposition that proving that "the defendant profited" is an element of a claim under the ITSA: Syntex Ophthalmics, Inc. v. Novicky, 745 F.2d 1423 (Fed. Cir. 1984), vacated on other grounds, 470 U.S. 1047 (1985); Glenayre Electronics, Ltd. v. Sandahl, 830 F. Supp. 1149 (C.D. Ill. 1993); and Etri, Inc. v. Nippon Miniature Bearing Corp., 1989 U.S. Dist. LEXIS 10129, No. 85 C 615, 1989 WL 99575 (N.D. Ill. Aug. 18, 1989). These cases, however, cite the standard for a claim of common law trade secret misappropriation, not a cause of action under the ITSA. Syntex (Syntex is the seminal case, since Etri cites Syntex and Glenayre cites Etri) outlined the elements of a misappropriation claim at common law, which included a "profit" requirement, based on the decision of Schulenburg v. Signatrol, Inc., 50 Ill. App. 2d 402, 200 N.E.2d 615 (4th Dist. 1964), aff'd in part and rev'd in part, 33 Ill. 2d 379, 212 N.E.2d 865 (1968), a common law misappropriation case decided more than twenty years before [*18] the 1988 effective date of the ITSA. 745 F.2d at 1434. Etri also involved a common law claim filed before the ITSA became effective. n7 1989 WL 99575, at *6.

n7 Glenayre did not involve a common law claim, but seems inadvertently to have invoked the old standard. The profit element was not at issue in Glenayre.

In short, Counterdefendants' authority is inapposite, since it pertains to a different cause of action than the one PlayWood advances in its ITSA [HN8] counterclaim. The elements of an ITSA misappropriation claim are simply that the plaintiff had a trade secret, and the defendant misappropriated it for business purposes. See

Composite Marine, 962 F.2d at 1265-66 (citing 765 ILCS 1065/2(d), American Antenna Corp. v. Amperex Electronic Corp., 190 Ill. App. 3d 535, 538, 546 N.E.2d 41, 44, 137 Ill. Dec. 417 (2d Dist. 1989), and Service Ctrs. of Chicago, Inc. v. Minogue, 180 Ill. App. 3d 447, 453, 535 N.E.2d 1132, 1136, 129 Ill. Dec. 367 (1st Dist. 1989)). [*19] PlayWood is not required to show that the individual defendants personally benefitted or profited from Learning Curve's misappropriation of trade secrets.

Counterdefendants also contend that PlayWood cannot make out the elements of an ITSA claim because PlayWood cannot show the product plans allegedly stolen by Learning Curve satisfy the definition of "trade secret" under the caselaw. Again, PlayWood objects that Counterdefendants waited to present this argument in their reply brief. The parties debated this issue also in the first motion for summary judgment, and Judge Grady apparently did not find Learning Curve's position persuasive. See Learning Curve, 1998 WL 46894, at *5 (finding "whether PlayWood and Learning Curve had a confidentiality agreement, [and] whether PlayWood otherwise attempted to keep the train track design secret" to be disputed issues of material fact). Therefore, the court will not revisit this argument.

### Counts VI, VII, VIII - Lanham Act Section 43(a), Lanham Act Section 44(b), Uniform Deceptive Trade Practices Act

PlayWood claims Counterdefendants [HN9] violated Section 43(a) of the Lanham Act, specifically 15 U.S.C. § 1125 [*20] (a)(1), n8 by falsely designating the origin of Clickity-Clack Track. [A] plaintiff making a claim of false designation of origin must show that . . . [the] mark is entitled to protection as a trademark, and that the false designation of origin creates a likelihood of confusion." Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1214 (7th Cir. 1997) (cite omitted). Counterdefendants dispute whether PlayWood has protectible interests under the Lanham Act, and whether PlayWood can demonstrate likelihood of confusion; PlayWood protests that these arguments were not presented in a timely fashion. These questions arose in the first summary judgment motion, and Judge Grady basically reserved ruling on them. The court now reaches these issues, and will consider each party's arguments from its earlier briefs.

n8 This portion of the statute states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[*21]

PlayWood's main difficulty is that the interests for which it seeks protection are not protected by [HN10] the Lanham Act. The Act provides a cause of action for a plaintiff with a "reasonable interest," in the form of some sort of "mark." *Dovenmuehle v. Gilldorn Mtge. Midwest Corp., 871 F.2d 697, 700 (7th Cir. 1989)* (quotes omitted); *see also Advanced Resources Int'l, Inc. v. Tri-Star Petroleum Co., 4 F.3d 327, 334 (4th Cir. 1993).* Typically, a mark is "a brand name, a word, 'a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand'--so similar to that of the plaintiff's that the public may be confused as to the source of the good or service." *Advanced Resources, 4 F.3d at 334* (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986)).* Other courts have taken a broader view of a mark, to encompass "voices, uniforms, likenesses, published words, or names . . . used in such a way as to deceive the public into believing that [the plaintiff] endorsed, sponsored, or approved of the defendant's [*22] product." *Id.* (collecting cases). Even under the broadest conception of what constitutes a protected interest, however, something about it is at least arguably identifiable as connected to the party alleging false designation of origin. n9 PlayWood does not argue that anything about Learning Curve's marketing of Clickity-Clack Track improperly co-opts a mark that customers associate with PlayWood. Absent such circumstances, PlayWood's false designation of origin claim is not sustainable under Section 43(a) of the Lanham Act. *Cf. Blau Plumbing, 781 F.2d at 609* (remarking on the purpose of Section 43(a)); *McMahon v. City of Chicago, 1999 U.S. Dist. LEXIS 7964,* No. 98 C 8026, *1999 WL 342712,* at *3 (N.D. Ill. May 17, 1999)

(declining to broaden the scope of Section 43 of the Lanham Act).

n9 Regarding legislative purpose, the Lanham Act states:

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

*15 U.S.C. § 1127.*

[*23]

This point informs the likelihood of confusion inquiry. Counterdefendants note that PlayWood concedes that it has not "identified a single person who has ever been confused about the source or origin of Learning Curve's Clickity-Clack Track." (12N Response P 62.) Counterdefendants further maintain that no confusion is likely to result because PlayWood does not itself manufacture toy wooden trains and track. PlayWood counters that Learning Curve "falsely market[s] the wooden toy track to the public by misrepresenting Learning Curve as its originator" and thereby creates a likelihood of confusion. (PlayWood July 7, 1997 Response, at 8.) As evidence of this false marketing, PlayWood points to language from Learning Curve catalogs and other promotional materials which states that Learning Curve "created" its toy railway system, and calls Clickity-Clack track its "most exciting innovation." (12N Add'l Facts PP 8, 10.)

"[HN11] The test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a substantial number of

consumers." *Rust Env't, 131 F.3d at 1216.* This inquiry is a function of seven factors, including: "(1) [*24] similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm-off his product as that of another." *Id.* (quotes omitted). By PlayWood's own admission there is no evidence to support a finding of actual confusion (sometimes considered one of the most important factors, *see Ziebart Int'l v. After Market Assoc., Inc., 802 F.2d 220, 226 (7th Cir. 1986)).*

Moreover, both the general statement of the test as well as several of the enumerated factors seem wholly inapplicable here, as they contemplate one firm's improperly capitalizing on the mark of another. In any event, PlayWood has adduced scant evidence on this issue. Even if Learning Curve's promotional materials are fallacious, and it is reasonable to infer that the public would be misled about the exact origins of the product, this is not the sort of misconception that the Lanham Act prohibits, as the language of the seven-part test indicates. PlayWood makes no claim to have manufactured toys, beyond [*25] some prototypes. Therefore, PlayWood cannot demonstrate how the public would be confused as between Learning Curve and PlayWood products, or how Learning Curve's alleged misrepresentations are allowing it to take advantage somehow of PlayWoods' recognizable mark. Without some showing of this sort, there is not sufficient likelihood of confusion to maintain a false designation of origin claim under Section 43(a). *See Libman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1361 (7th Cir. 1995).*

PlayWood's attempt to produce authority to the contrary is unavailing. PlayWood cites *Keller Med. Specialties Prods. v. Armstrong Med. Indus., Inc., 842 F. Supp. 1086 (N.D. Ill. 1994)* and *Legat Architects, P.C. v. United States Development Corp., 625 F. Supp. 293 (N.D. Ill. 1985).* In *Keller,* the defendant stated in its catalog that it was the sole distributor of certain medical products, a claim the plaintiff disputed, and used as a basis to sue under the Lanham Act. The case is factually distinguishable because the parties in the case were business competitors, with one allegedly attempting to gain a competitive advantage over the other by its [*26] misrepresentations. Additionally, the court did not reach the likelihood of confusion issue because of inadequate discovery. *842 F. Supp. at 1092-93. Legat* is distinguishable on its facts as well. There, the defendant corporation commissioned building plans from the plaintiff, an archi-

tect. After receiving the plans, an architect on the defendant's staff allegedly signed his name to the plans and submitted them to various government agencies to obtain the necessary permits and approvals. The court held that these actions could create a likelihood of confusion. *625 F. Supp. at 299-300.* However, the plaintiff architect in *Legat* had rights under a form agreement to preclude a successor from using the plans prepared by plaintiff. Further, the holding of *Legat* is something of an outlier; the court has found no other case to follow it. Finally, both cases carry less weight than the other authority cited by the court, much of which is binding. Therefore, the court declines to follow either *Keller* or *Legat.*

PlayWood has no mark, and cannot demonstrate a likelihood of confusion. PlayWood cannot proceed-- against the individual Counterdefendants [*27] or Learning Curve L.P.--with its counterclaim for unfair competition in the form of false designation of origin.

[HN12] The remaining counterclaims-for unfair competition under Section 44(b) of the Lanham Act, and under the [HN13] Illinois Deceptive Trade Practices Act--also share the requirement that PlayWood prove a likelihood of confusion among consumers. *See McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1167, 1174 (7th Cir. 1986); Scotch Whisky Assoc. v. Majestic Distilling Co., Inc., 958 F.2d 594, 597 (4th Cir. 1992)* (determining that Section 44(b) of the Lanham Act, read in conjunction with the Paris Union Convention, provides the same protections as Section 43(a)). Therefore, summary judgment is appropriate on these counts as well.

## CONCLUSION

Summary judgment is granted in favor of all Counterdefendants on Counts II, III, IV, VI, VII and VIII. Although Counterdefendant Learning Curve L.P. was not a party to the instant motion for summary judgment, the court grants summary judgment as to Learning Curve L.P. on Counts II, III, IV, VI, VII and VIII on its own motion. If there are in fact arguments that mandate differentiating between the [*28] Counterdefendants' on these counts, PlayWood may make such arguments in a motion for reconsideration.

ENTER:

Dated: July 19, 1999

REBECCA R. PALLMEYER

United States District Judge