LEXSEE

**MADISON REALTY PARTNERS 7, LLC, a Delaware Limited Liability Company, individually and derivatively as a General Partner of ISA Partnership Liquidity Investors, MADISON AVENUE INVESTMENT PARTNERS, LLC, a Delaware Limited Liability Company, INVESTMENT SERVICES OF AMERICA, LLC, a Delaware Limited Liability Company, and THE MADISON AVENUE CAPITAL GROUP II, LLC, a Delaware Limited Liability Company, Plaintiffs, and ISA PARTNERSHIP LIQUIDITY INVESTORS, a Delaware General Partnership, Nominal Plaintiff, v. AG ISA, LLC, a Delaware Limited Liability Company, and ANGELO GORDON & CO., L.P., a Delaware Limited Partnership, Defendants.**

C.A. No. 18094

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

**2001 Del. Ch. LEXIS 37**

**January 12, 2001, Submitted**
**April 17, 2001, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1] Motion to dismiss GRANTED as to those portions of Counts I and V that allege claims by the non-signatory plaintiffs for breach of the Partnership and Umbrella Agreements; and also GRANTED as to the entirety of Counts II, III, VI and VII. Motion DENIED as to the entirety of Counts IV and VIII, and as to those portions of Counts I and V that allege claims by the signatory plaintiffs.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a general partner and two affiliates hired by the general partner to provide personnel, services, and infrastructure, sued defendants, the other general partner and its corporate parent, alleging breach of contract, breach of fiduciary duty, and tortious interference with contract. Defendants moved to dismiss for failure to state claims upon which relief could be granted.

**OVERVIEW:** Two businesses entered an agreement to purchase and manage limited partnership interests. One general partner managed the partnership, and the other provided investment capital. The managing partner hired third parties to provide personnel, services, and infrastructure. The managing partner claimed breach of the

agreement after the investment partner stopped providing funds. In support of their motion to dismiss, defendants offered a written, unsigned draft partnership agreement. The court noted the absence of an executed partnership agreement, and held that (1) in considering a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, the court was required to take the facts pled as true, and could not consider the unsigned partnership agreement because the parties disputed its validity; (2) plaintiffs could not prosecute a claim for breach of fiduciary duty that essentially restated their claim for breach of contract; (3) third parties hired by the managing partner where incidental beneficiaries of the partnership agreement, and could not sue for its breach; and (4) managing partner had stated a claim against investment partner's parent corporation for tortious interference with contract.

**OUTCOME:** The court granted defendants' motion to dismiss plaintiffs' breach of fiduciary duty claim, and also dismissed third-party service agencies the managing party had hired. However, the court denied the motion to dismiss the managing partner's claims for breach of contract, and tortious interference with a contract.

**CORE TERMS:** partnership agreement, partnership, beneficiary, affiliate, breach of contract, partner, funding, third party, non-signatory, breach of fiduciary duty, tortious interference, pled, fiduciary, cease, notice, urge, notice provision, incidental, motion to dismiss, enforceable, third-party, cognizable, breached, legally sufficient, contractual, signatory, unsigned, lawsuit, illus, aiding and abetting

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] Under Del. Ch. Ct. R. 12(b)(6), a complaint must be dismissed if the facts alleged in the complaint, when taken as true and considered in a light most favorable to the plaintiff, fail to state a cognizable legal claim that would entitle the plaintiff to the relief sought.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN2] On a motion to dismiss, documents that are incorporated by reference into the complaint will normally be considered.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN3] When evaluating a motion to dismiss, the Delaware chancery court is required to take the pled facts as true in deciding whether a legally valid claim is stated.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN4] As a general matter, only a party to a contract has enforceable rights under, and may sue for breach of, that contract. To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

*Contracts Law > Third Parties*
[HN5] Non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract.

*Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement*
[HN6] In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose.

*Contracts Law > Third Parties > Beneficiaries > Types of Beneficiaries*
[HN7] Under Delaware law, expected creditors of a partnership are incidental beneficiaries, and are not entitled to sue for breach of the partnership agreement.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
[HN8] To allow a fiduciary duty claim to coexist in parallel with a contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving contractual rights and obligations.

*Contracts Law > Breach > Causes of Action*
[HN9] If a dispute relates to obligations expressly treated by contract, it will be governed by contract principles.

*Torts > Business & Employment Torts > Interference With a Contract*
[HN10] To state a claim for tortious interference with contract, a plaintiff must plead facts that demonstrate the existence of: (1) a valid contract, (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the contract, (4) done without justification, and (5) which causes injury.

**COUNSEL:** David C. McBride, Richard H. Morse and Melanie K. Sharp, Esquires, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

James F. Burnett, Esquire of POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; and Peter N. Wang and Aimee E. Nassau, Esquires, of FRIEDMAN, WANG BLEIBERG, P.C., New York, New York; Attorneys for Defendants.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINIONBY:** JACOBS

**OPINION:**

   **MEMORANDUM OPINION**

**JACOBS, VICE CHANCELLOR**

A general partnership had two general partners, one responsible for managing the partnership, and the other for providing the capital funding. In March 2000, the funding partner refused to provide any further capital. The managing partner claimed that that refusal was wrongful, because the partnership agreement required 120 days [*2] advance notice before funding could be terminated, and no such notice had been given. The funding partner contended that no such notice was required, because the partnership agreement entitled the funding partner to cease making capital contributions without notice once its funding reached the $ 10 million level. The managing partner brought this lawsuit against the funding partner and others, asserting (inter alia) claims for breaches of contract and fiduciary duty. The funding partner and its co-defendant moved to dismiss the complaint for failure to state a claim upon which relief may be granted. This is the Opinion of the Court on that motion.

## I. BACKGROUND FACTS

This factual background is taken from the well-pled allegations of the complaint. ISA Partnership Liquidity Investors (the "Partnership") is a Delaware general partnership formed to purchase, hold, and manage limited partnership interests and similar securities ("Investment Interests"). The Partnership's two general partners entered into a partnership agreement (the "Partnership Agreement"), setting forth the rules governing the Partnership. Madison Realty Partners 7, LLC ("Madison"), is the primary plaintiff [*3] and the managing general partner responsible for managing the Partnership, including selecting Investment Interests for the Partnership. The primary defendant is AG ISA, LLC ("AGGP"), which is the other (non-managing) general partner. AGGP, which is a subsidiary of Angelo Gordon & Co., L.P. ("Angelo Gordon"), a Delaware limited liability company, n1 was also the exclusive provider of capital to the Partnership. Under the Partnership Agreement, AGGP was required to make such capital contributions as Madison requested. The Partnership Agreement provided, however, that AGGP could cease making capital contributions upon 120 days advance notice to Madison (the "120-Day notice provision").

n1 Angelo Gordon is a New York based hedge fund with approximately $ 3 billion under management.

In connection with the formation of the Partnership, Madison caused the Partnership to enter into certain agreements with two affiliates, Investment Services of America, LLC ("ISA") and The Madison Avenue Capital Group II, LLC ("MACG [*4] II"). Those affiliates are

Madison's co-plaintiffs in this lawsuit. These Agreements (the "Services Agreements") required ISA and MACG II to furnish the Partnership with personnel, services, and infrastructure that were essential both to operate, and to acquire Investment Interests for, the Partnership. As a condition of entering into the Services Agreements, ISA and MACG II required AGGP to agree to the 120-Day notice provision described above.

In September 1997, Madison Avenue Investment Partners, LLC ("MAIP"), which is a Madison affiliate, and defendant Angelo Gordon, which holds a controlling interest in AGGP, entered into an agreement (the "ISA Umbrella Agreement") in which Angelo Gordon undertook to cause AGGP to fulfill its obligations under the Partnership Agreement. n2

> n2 MAIP is a Madison affiliate. Madison, MAIP, ISA, MACG II and the Partnership are referred to collectively as the "plaintiffs." AGGP and Angelo Gordon are collectively referred to as the "defendants."

During March 2000, affiliates of [*5] the plaintiffs and the defendants met to negotiate a possible investment, unrelated to the Partnership, in a MAIP affiliate. During those negotiations, the defendants demanded that the MAIP affiliates permit them to invest on terms that were unacceptable to the MAIP affiliates, and to which the MAIP affiliates refused to accede. According to the complaint, in an effort to exert wrongful pressure on MAIP's affiliates, Angelo Gordon responded by causing AGGP to threaten that it (AGGP) would immediately cease making capital contributions to the Partnership, despite the 120-Day notice requirement. From and after that point, AGGP refused to make capital contributions to the Partnership, and Angelo Gordon failed to cause AGGP to make the required capital contributions.

Although the plaintiffs claim that the 120-Day notice provision has no exceptions, the defendants assert that the Partnership Agreement permitted them to cease providing capital funding when their total contribution reached the $ 10 million level, as occurred here. That latter contention gives rise to a threshold issue, which is addressed in Part III A, infra, of this Opinion.

## II. THE PARTIES' CONTENTIONS AND THE [*6] APPLICABLE LAW

The complaint alleges eight claims. The first four are based on AGGP's refusal to make capital contributions without first having given the 120-Day notice allegedly required by the Partnership Agreement. That conduct is claimed to have violated AGGP's contractual duties under the Partnership Agreement (Count I),

2001 Del. Ch. LEXIS 37, *

AGGP's fiduciary obligations to Madison (Count II), AGGP's fiduciary obligations to the Partnership (Count III), and AGGP's contractual duties to ISA and MACG II under the Services Agreements (Count IV).

The remaining four claims are asserted against Angelo Gordon. The plaintiffs claim that by failing to cause AGGP to fulfill its funding obligations under the Partnership Agreement, and/or by causing AGGP to cease contributing capital without giving the required 120 days notice, Angelo Gordon (1) breached the Umbrella Agreement (Count V), (2) aided and abetted AGGP's breach of fiduciary duty to Madison (Count VI) and to the Partnership (Count VII), and (3) tortiously interfered with the Services Agreements (Count VIII).

The defendants respond that none of these Counts states an actionable claim. Defendants urge that because Counts I, III, IV, V, VII and [*7] VIII are claims on behalf of the Partnership, they are expressly foreclosed by the Partnership Agreement, which prohibits either partner from commencing a lawsuit on behalf of the Partnership without the other partner's permission. For that reason, defendants urge, those Counts must be dismissed.

Alternatively, the defendants argue that Counts I and V fail to state a cognizable claim for breach of contract, because neither the Partnership Agreement nor the Umbrella Agreement confers any enforceable rights upon the plaintiffs as a group. Counts II and III are also claimed to be dismissible, because they are improper attempts to seek relief based on breach of fiduciary duty theories for conduct that is specifically addressed by the Partnership Agreement and is covered by the breach of contract claims alleged in the complaint. Under Delaware law, defendants argue, fiduciary duty claims cannot proceed where the underlying conduct is addressed by parallel breach of contract claims.

The defendants further argue that Count IV must be dismissed, because the defendants were not parties to the Services Agreements, and therefore could not have breached them. Moreover, the defendants urge, the [*8] claims against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty fail as a matter of law, because the complaint alleges no cognizable underlying claim for breach of fiduciary duty. Lastly, the defendants contend that the complaint fails to state a legally sufficient claim for tortious interference with contract.

* * *

[HN1] Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the facts alleged in the complaint, when taken as true and considered in a light most favorable to the plaintiff, fail to state a cognizable legal claim that would entitle the plaintiff to the relief sought. n3 All eight claims alleged in the complaint are evaluated in light of that procedural standard.

n3 Solomon v. Pathe Communications Corp., Del. Supr., 672 A.2d 35, 38-39 (1996).

In this Opinion, the issues are analyzed in the following order: first, the Court considers the threshold issue of whether a written draft of the Partnership Agreement submitted by the defendants can be considered [*9] on this motion. Second, the Court addresses the question of the plaintiffs' standing to bring this action. Finally, the Court considers each of the defendants' specific arguments for dismissal.

## III. ANALYSIS

### A. May the Court Consider the Partnership Agreement in Deciding This Motion?

A threshold issue that must first be decided (because it could be outcome determinative) is whether a written, unsigned draft of the Partnership Agreement, submitted by the defendants but disputed by the plaintiffs, can be considered on this Rule 12(b)(6) dismissal motion. What appears to give rise to this issue is the (apparent) fact that no fully executed original or copy of the Partnership Agreement is available.

[HN2] On a motion to dismiss, documents that are incorporated by reference into the complaint will normally be considered. n4 The question is whether the alleged unsigned copy of the Partnership Agreement submitted by the defendants was "incorporated by reference." The defendants argue that it was, because the document they submitted is the only available written evidence of the Partnership Agreement. Moreover, defendants urge, it would be inequitable to allow the plaintiffs to [*10] plead the Partnership Agreement in their complaint as a basis for asserting claims against the defendants, while at the same time prohibiting the defendants from relying on the same document to challenge the legal sufficiency of those claims. The plaintiffs concede that the Partnership Agreement, as executed, is integral to their claims, but they insist that the unsigned draft submitted by the defendants does not accurately reflect the Partnership Agreement as finally executed. Because the submitted draft does not accurately memorialize the Partnership Agreement actually agreed to by Madison and AGGP, the plaintiffs argue that it cannot be deemed "incorporated by reference" into the complaint, and therefore cannot be considered on this motion to dismiss. n5

n4 In re Santa Fe Pacific Shareholder Litig., Del. Supr., 669 A.2d 59 (1995).

n5 In re Santa Fe Pacific Shareholder Litig., 669 A.2d at 69-70.

On this issue, the plaintiffs are correct. In their complaint the plaintiffs [*11] allege certain terms of the Partnership Agreement, but they also dispute the defendants' contention that the submitted draft constitutes the definitive Partnership Agreement. Whether the defendants' draft constitutes the actual, definitive Partnership Agreement presents a fact dispute that cannot be resolved without an evidentiary hearing. But, we are not yet at that stage. Because the plaintiffs claim not to be relying on the submitted draft agreement, I must assume for purposes of this motion that the plaintiffs' pled version of the Partnership Agreement is the correct one. That is because [HN3] at this procedural stage the Court is required to take the pled facts as true in deciding whether a legally valid claim is stated. n6 Accordingly, on this motion the Court will not take cognizance of the draft Partnership Agreement submitted by the defendants. n7

n6 See Solomon, Del. Supr., 672 A.2d at 38-39.

n7 I recognize the potential inequity in allowing the plaintiffs to rely on their alleged version of the Partnership Agreement to support their claim that the defendants breached the 120-day provision, while simultaneously disregarding what is claimed to be the only written evidence of other asserted terms of the contract upon which the defendants rely in challenging the sufficiency of that claim. As stated, however, the procedural rules that apply at the pleading stage dictate that result. If at a later stage the Court finds that the plaintiffs' position is not forthright and that the draft Partnership Agreement is, in fact, the definitive Partnership Agreement, the defendants have remedies, including the imposition of appropriate sanctions by this Court.

[*12]

## B. Do the Plaintiffs Have Standing To Commence This Litigation?

The defendants next argue that the plaintiffs lack standing because the Partnership Agreement prohibits one partner from bringing a lawsuit on behalf of the Partnership without the consent of all (in this case, both) partners. Because AGGP never consented to the filing of

this action, the defendants urge that Counts I, III, IV, V, VII and VIII must be dismissed. That argument, however, rests on terms that are claimed to exist in the draft Partnership Agreement which, as previously held, can not be considered in deciding this motion. Because it cannot be inferred from the complaint that the "consent-of-all-partners" provision is a term of the Partnership Agreement, the defendants' standing argument predicated on that provision must fail at this stage.

## C. Are the Non-Signatory Plaintiffs Third Party Beneficiaries of the Partnership and Umbrella Agreements?

It is undisputed that Madison, as a signatory to the Partnership Agreement, has standing to sue for a breach of that Agreement. Similarly, MAIP, as a signatory to the Umbrella Agreement, has standing to sue for a breach of the Umbrella Agreement. [*13] For that reason, Counts I and V, which allege that AGGP breached the Partnership and Umbrella Agreements, cannot be dismissed. Remaining in dispute, however, is whether the complaint alleges facts from which it can be inferred that the *non-signatory* plaintiffs have standing to enforce those agreements as intended third party beneficiaries. I conclude that it does not.

The defendants argue that the non-signatory plaintiffs are not third-party beneficiaries. Rather, because they are at most incidental beneficiaries, Counts I and V fail to state cognizable breach of contract claims by the non-signatory plaintiffs. In addition, the defendants contend that because the complaint avers that some but not all of the plaintiffs were parties to the agreements, the plaintiffs as a group are not a protected class of beneficiaries having enforceable rights under the Partnership Agreement or the Umbrella Agreement. Therefore, defendants conclude, the plaintiffs cannot claim a breach of either contract. n8

n8 The defendants claim that both contract claims must be dismissed in their entirety because in order for a claim to be adequately pled, *all* of the plaintiffs must have a right to advance the claim. The defendants cite no case law supporting this contention, and because the plaintiffs which were signatories to the relevant documents have a clear right to assert a claim against the defendants for breach thereof, the claims will not be dismissed. For that reason, the only issue that the Court need address is whether the non-signatory plaintiffs have a legally cognizable claim to occupy third-party beneficiary status.

[*14]

The plaintiffs respond that although the non-signatory plaintiffs are not direct parties to the Agreements, they nonetheless have enforceable rights as third party beneficiaries. In addition (plaintiffs urge), Madison's claim for breach of the Partnership Agreement and MAIP's claim for breach of the Umbrella Agreement are not dismissible on this ground, since Madison and MAIP are parties to those agreements.

[HN4] As a general matter, only a party to a contract has enforceable rights under, and may sue for breach of, that contract. n9 To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract. n10

n9 Insituform of N. Am., Inc. v. Chandler, Del. Ch., 534 A.2d 257, 270 (1987) (holding that [HN5] non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract).

[*15]

n10 See Guardian Constr. Co. v. Tetra Tech Richardson, Inc., Del. Supr., 583 A.2d 1378, 1386-87 (1990) (" [HN6] In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose").

In this context, Illustration 3 to Comment b to § 302 of the Restatement (Second) of Contracts is helpful in understanding the difference between an intended and an incidental beneficiary:

B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is . . . a promise that B will pay C, D and E, they are intended beneficiaries. . .; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries. n11

n11 Restatement (Second) of Contracts § 302 cmt. b, illus. 3 (1979).

[*16]

That analytical framework aids the Court's assessment of the third-party beneficiary status of the non-signatory plaintiffs under the Partnership and the Umbrella Agreements, respectively.

1. The Partnership Agreement

With respect to the contract claims based on the Partnership Agreement, I conclude that the non-signatory plaintiffs, ISA and MACG II, have not alleged facts showing that they occupied any status other than as incidental beneficiaries of that agreement. The complaint does not allege that those entities were intended third party beneficiaries, nor can that conclusion be inferred from the facts that are pled. The Partnership Agreement was entered into to create and establish the terms for governing the Partnership, which "was organized with the limited purpose to purchase . . . hold and otherwise manage and exercise all the rights of an owner of limited partnership interests and other similar equity or any debt securities . . . . n12 It may be the case that all the parties knew that the Partnership would rely on the capital calls as a source of payment of monies owed to ISA and MACG II under the Services Agreements. But, that fact, without more, does not make ISA [*17] and MACG II third party beneficiaries under the Partnership Agreement. At best, those entities were expected creditors of the Partnership, and as such, they would have no more standing to sue AGGP for breach of the Partnership Agreement than would the local utility company or the office supply store. [HN7] Under Delaware law, expected creditors of a partnership are incidental beneficiaries, and are not entitled to sue for breach of the Partnership Agreement. n13

n12 Complaint, at P2.

n13 Guardian Constr. Co., 583 A.2d at 1386-87; Restatement (Second) of Contracts § 302 cmt. b, illus. 3 (1979). The claim that MAIP is an intended beneficiary of the Partnership Agreement also fails. The complaint does not allege that MAIP was specifically intended to receive a benefit that resulted from the Partnership, nor does it identify any such benefit. For these reasons, ISA, MACG II and MAIP are not third party beneficiaries of the Partnership Agreement.

2. The Umbrella Agreement

The Umbrella Agreement [*18] presents the same issue, i.e., were Madison, ISA and MACG II intended third party beneficiaries of Angelo Gordon's promise to cause AGGP to make capital contributions to the Partnership? I find, for the reasons previously discussed, that they were not.

The parties to the Umbrella Agreement were MAIP and Angelo Gordon. That Agreement required Angelo Gordon to cause AGGP to fulfill its obligations under the Partnership Agreement, specifically, to make the required capital contributions. Madison, as the other general partner of the Partnership, would share in the proceeds of those contributions, and ISA and MACG II would receive some of those proceeds in the form of payments under the Services Agreements. Those facts, however, do not elevate Madison, ISA and MACG II to a status other than incidental beneficiary. n14 Because Madison, ISA and MACG II are not intended third party beneficiaries of the Umbrella Agreement, they have no enforceable claims for breach of that contract.

n14 See Restatement (Second) of Contracts § 302 cmt. b, illus. 3 (1979).

[*19]

**D. May the Plaintiffs Prosecute Breach of Fiduciary Duty Claims That Restate Their Claims For Breach of Contract?**

The plaintiffs next claim that AGGP's failure to make capital contributions without giving the 120-Day notice required by the Partnership Agreement was a breach of the fiduciary obligation that AGGP owed to both Madison (Count II) and to the Partnership (Count III).

The defendants contend that these breach of fiduciary duty claims amount to improper attempts to seek a recovery under alternative theories for AGGP's alleged breach of the Partnership Agreement. Those alternative theories, defendants say, cannot coexist with the breach of contract claims. The plaintiffs respond that the two sets of claims can coexist, because the fiduciary claims in Counts II and III are independent from the breach of contract claims. The issue presented is whether the breach of fiduciary duty claims asserted in Counts II and III can be maintained independently of the breach of contract claims alleged in Counts I and V. I conclude that they cannot.

In Gale v. Bershad, n15 this Court dismissed a breach of fiduciary duty claim in circumstances where the defendants' alleged wrongdoing [*20] was already addressed by a breach of contract claim. The Bershad

Court held that [HN8] "to allow a fiduciary duty claim to coexist in parallel with [a contractual] claim, would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations." n16 In this case, the contract and fiduciary claims overlap completely since they are based on the same underlying conduct. Indeed, the complaint uses identical conduct as the basis for both legal claims. n17 As this Court has held, [HN9] if the dispute "relate[s] to obligations 'expressly treated . . .' by contract [, it] will be governed by contract principles." n18 Here, the fiduciary claims relate to obligations that are expressly treated by the Partnership Agreement and are the subject of breach of contract claims in the complaint. Accordingly, the fiduciary claims alleged in Counts II and III must be dismissed. n19

n15 1998 Del. Ch. LEXIS 37, Del. Ch., C.A. No. 15714, Jacobs, V.C. (Mar. 3, 1998).

n16 Id.

n17 Compare Complaint, at P17 (The refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a violation of the Partnership Agreement) with Complaint, at P20 (the refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a breach of the fiduciary obligations owed by [AGGP] to [Madison].

[*21]

n18 Moore Bus. Forms, Inc. v. Cordant Holdings. Corp., 1995 Del. Ch. LEXIS 134, *17, Del. Ch., C.A. No. 13911, Jacobs, V.C. (Nov. 2, 1995).

n19 The plaintiffs' claim against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty must also be dismissed because there is no legally sufficient underlying claim for breach of fiduciary duty against AGGP. Moore Business Forms, Inc., at 12 (dismissing claim for aiding and abetting breach of fiduciary duty because "no cognizable breach of fiduciary duty is stated").

**E. Have the Plaintiffs Pled Adequate Claims For Tortious Interference?**

1. Count VIII

Count VIII alleges that Angelo Gordon caused AGGP to cease making capital contributions without providing the 120-day notice in order to further Angelo Gordon's own goals and objectives. That conduct, plaintiffs claim, tortiously interfered with the Services Agreements between the Partnership and ISA and MACG. The defendants argue that those allegations do not state a legally sufficient claim for tortious interference.

[HN10] To state a claim for tortious interference with contract, [*22] a plaintiff must plead facts that demonstrate the existence of: "(1) a valid contract, (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the [contract], (4) done without justification, and (5) which causes injury." n20 The defendants argue that the plaintiffs have not pled facts sufficient to demonstrate that (a) the defendants' conduct was a significant factor in causing the Partnership to breach the Services Agreements, and that (b) the defendants ceased contributing capital without justification.

n20 Boyer v. Wilmington Materials. Inc.,
1997 Del. Ch. LEXIS 97, Del. Ch., C.A. No.
12549, Allen, C. (June 27, 1997).

The plaintiffs respond that they have adequately pled each and all of the elements of tortious interference. They argue specifically that the complaint can be fairly read to show that the Partnership relied on the continued capital contributions as a source from which to pay ISA and MACG II for conducting the Partnership's day-to-day operations [*23] under the Services Agreements. Because the Partnership lost its funding without the 120-day notice, it lacked sufficient time to search for an alternate funding source. As a result, the Partnership was unable to meet its payment requirements under the Services Agreements, and ISA and MACG II lost income. Those facts, the plaintiffs urge, establish that the cessation of capital contributions was a significant factor in causing that economic loss. n21

n21 See generally, Complaint at PP6, 9, 10,
13, 14, 15.

Moreover, the plaintiffs contend that they have pled facts establishing that the defendants' actions were without justification. The plaintiffs point to paragraphs 12 and 13 of the complaint, which allege that the defendants attempted to coerce MAIP's affiliates during the negotia-

tions, and acted in retaliation for the affiliates' refusal to grant the defendants the investment terms they demanded.

I conclude that the complaint sufficiently alleges that the defendants' termination of capital contributions [*24] was a significant factor causing the Partnership to breach the Services Agreement. The complaint alleges that Angelo Gordon caused AGGP to advise Madison that it would cease making capital contributions, and that thereafter AGGP refused to make the capital contributions. The complaint further alleges that (i) AGGP was the exclusive provider of capital to the Partnership, (ii) AGGP's provision of capital and the 120-day notice provision were essential to enable the Partnership to pay for the services being rendered to it under the Services Agreements, (iii) the funding ceased, and (iv) as a result, the Partnership, ISA and MACG II lost the full benefits of the Services Agreements.

The absence of "justification" for Angelo Gordon's refusal to require AGGP to continue making the capital contributions and to respect the 120-Day notice provision, is also adequately pled. The defendants' justification argument is that once AGGP had furnished $ 10 million of capital to the Partnership, it was legally entitled to cease making contributions, irrespective of the 120-day notice provision. This argument, however, is predicated upon the unsigned draft Partnership Agreement which the Court has [*25] found cannot be considered on this motion. If at a later stage it is determined that that provision was applicable and gave the defendants that termination right, the tortious interference claim against Angelo Gordon will ultimately fail. At this stage, however, the claim must be allowed to proceed.

Because the plaintiffs have pled legally sufficient tortious interference claims, the defendants motion to dismiss those claims is denied.

2. Count IV

In Count IV, the Partnership, ISA and MACG II seek money damages for AGGP's alleged breach of the Partnership Agreement. The basis of their claim is that "the failure of [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement has caused the Partnership to be in breach of its obligation to ISA and MACG II under the Services Agreements." n22 The plaintiffs characterize this claim as one for tortious interference with contract, and argue, for the reasons previously discussed, that it should not be dismissed.

n22 Complaint, at P26.

[*26]

2001 Del. Ch. LEXIS 37, *

The defendants characterize Count IV as a claim for breach of contract, and argue that (as thus characterized) the claim must fail as a matter of law for three reasons. First, the defendants contend that the complaint does not allege that AGGP or Angelo Gordon are parties to the Services Agreements; therefore, AGGP and Angelo Gordon cannot be held liable to the Partnership, ISA or MACG II for any breach of those Agreements. Second, ISA and MACG II are not alleged to be parties to the Partnership Agreement, for which reason their claims (which in essence are claims for breach of the Partnership Agreement) must fail as a matter of law. Third, the only possible wrongdoing alleged in Count IV involves an alleged breach of the Partnership Agreement by AGGP alone, but the plaintiffs' claim on that Count is directed against all "defendants." Defendants argue that the plaintiffs cannot seek a recovery from all of the defendants where only one of them is a party to the contract allegedly breached.

I find that Count IV is fairly characterized as a claim for tortious interference with contract, essentially identical to that alleged in Count VIII. The only difference is that the Count IV claim [*27] is directed against AGGP instead of Angelo Gordon. The analysis that governs Count VIII applies equally to Count IV, for which reason the defendants' motion to dismiss Count IV will be denied.

## IV. CONCLUSION

For the reasons discussed, the defendants' motion to dismiss is GRANTED as to those portions of Counts I and V that allege claims by the non-signatory plaintiffs for breach of the Partnership and Umbrella Agreements; and is also GRANTED as to the entirety of Counts II, III, VI and VII. The motion is DENIED as to the entirety of Counts IV and VIII, and as to those portions of Counts I and V that allege claims by the signatory plaintiffs. Counsel shall submit an implementing form of order.

LEXSEE 2001 US DIST LEXIS 1741

**Polyclad Laminates, Inc., and Fry Metals, Inc., d/b/a PC Fab Division of Alpha Metals, Inc., Plaintiffs v. MacDermid, Inc., Defendant**

**Civil No. 99-162-M**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE**

*2001 DNH 27; 2001 U.S. Dist. LEXIS 1741*

**February 13, 2001, Decided**

**NOTICE:** NOT FOR PUBLICATION

**DISPOSITION:** [*1] Plaintiffs' motion for partial summary judgment (document no. 33) denied, without prejudice. Defendant's motion for summary judgment (document no. 107) denied, without prejudice, as defendant's motion to dismiss (document no. 101). Plaintiff's motion to defer responding to defendant's motion for summary judgment (document no. 111); plaintiff's motion to extend time to respond to defendant's motion for summary judgment (document no. 114); and plaintiff's motion for leave to file a surreply to defendant's motion to dismiss (document no. 116) denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs sued defendant for patent infringement. Defendant counterclaimed for declaration that patent was invalid and unenforceable due to plaintiffs' inequitable conduct and for tortious interference with business relations. Plaintiffs moved for partial summary judgment on counterclaims; defendant moved for summary judgment of non-infringement. Defendant also moved to dismiss one plaintiff as non-exclusive licensee lacking standing.

**OVERVIEW:** In its first counterclaim, defendant alleged plaintiffs, while prosecuting their European patent applications, learned that the processes taught in their patent only worked when a cationic surfactant was used. Plaintiffs were required but failed to disclose this information to the United States Patent and Trademark Office (PTO). The court was unable to conclude, as a matter of law, that plaintiffs had honored their obligations of full and candid disclosure to the PTO. Defendant's second counterclaim asserted that plaintiffs made misrepresentations to defendant's prospective and existing customers that defendant's process infringed plaintiffs' patent. De-

fendant claimed its process had no, and recommended no, surfactant and plaintiffs' process did not cover such processes. This counterclaim was inextricably intertwined with plaintiff's alleged inequitable conduct before the PTO. Since the record was not sufficiently developed to permit a conclusion about whether plaintiffs engaged in inequitable conduct, the court could not determine whether defendant stated a viable second, counter-claim. Thus, defendant was allowed to proceed on both its counterclaims.

**OUTCOME:** The court denied, without prejudice, plaintiffs' motion for partial summary judgment on defendant's counterclaims; likewise, it denied defendant's motion for summary judgment and defendant's motion to dismiss one plaintiff for lack of standing. Sufficient record evidence supported the challenged plaintiff's assertion that it had standing as an exclusive licensee.

**CORE TERMS:** patent, surfactant, licensee, summary judgment, cationic, infringement, matter of law, counterclaim, taught, co-plaintiff, inequitable conduct, invention, patentee, teaches, motion to dismiss, memorandum, customer, surface, patented, tortious interference, territory, material information, patent infringement, right to practice, record evidence, sole discretion, moving party, patentability, sublicense, practicing

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] When faced with a motion to dismiss for lack of subject matter jurisdiction, *Fed. R. Civ. P. 12(b)(1)*, the party asserting jurisdiction has the burden to establish by competent proof that jurisdiction exists. Furthermore, the court may consider pleadings, affidavits, and other evi-

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

dentiary materials without converting the motion to dismiss to a motion for summary judgment. But, the court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] When ruling upon a party's motion for summary judgment, the court must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor. Summary judgment is appropriate when the record reveals no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In this context, a fact is "material" if it potentially affects the outcome of the suit and a dispute over it is "genuine" if the parties' positions on the issue are supported by conflicting evidence.

*Governments > Legislation > Statutory Remedies & Rights*
[HN3] See *35 U.S.C.S. § 281.*

*Civil Procedure > Justiciability > Standing*
[HN4] A party suing for patent infringement must have held legal title to the patent at the time of the alleged infringement. However, a party need not hold all proprietary rights to a patent in order to have standing to sue for infringement as a co-plaintiff with the patentee.

*Civil Procedure > Justiciability > Standing*
*Patent Law > Ownership > Conveyances > Licenses*
*Copyright Law > Civil Infringement Actions > Standing > General Overview*
[HN5] Under certain circumstances, a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee. Such a licensee is usually an "exclusive licensee." In contrast, a non-exclusive licensee does not have standing to sue for infringement, even as a co-plaintiff.

*Civil Procedure > Justiciability > Standing*
*Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use*

[HN6] To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention, but also the patentee's express or implied promise that others shall be excluded from practicing the invention. It is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license. Therefore, if a party has not received a promise of exclusivity under the patent, it cannot have co-plaintiff standing in an infringement action. It is important to stress, however, that the exclusive license need not be express; it may be implied.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
*Patent Law > Infringement Actions > Defenses > Fraudulent Procurement*
[HN7] Applicants for patents and their agents are required to prosecute patent applications with candor, good faith, and honesty. Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.

*Patent Law > Infringement Actions > Defenses > Fraudulent Procurement*
[HN8] See *37 C.F.R. § 1.56.*

*Torts > Procedure > Preemption*
*Torts > Business & Employment Torts > Interference With Prospective Advantage*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Fact & Law Issues*
[HN9] Bad faith or fraudulent conduct on the part of the patent holder is a prerequisite to a state-law tortious interference claim; without it, the claim is preempted by patent law.

COUNSEL: For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: Garry R. Lane, Esq., Ransmeier & Spellman, Concord, NH.

For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: Howard J. Susser, Esq., Mintz Levin Cohn Ferris Glovsky & Popeo PC, Boston, MA.

Case 1:05-cv-00842-GMS    Document 32-4    Filed 03/03/2006    Page 13 of 33

Page 3

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

For POLYCLAD LAMINATES, INC., FRY METALS, INC., plaintiffs: John M. Delehanty, Esq., Mintz Levin Cohn Ferris Glovsky & Popeo, New York, NY.

For MACDERMID INCORPORATED, defendant: Steven M. Gordon, Esq., Shaheen & Gordon, Concord, NH.

For MACDERMID INCORPORATED, defendant: Steven M. Bauer, Esq., Testa Hurwitz & Thibeault LLP, Boston, MA.

For MACDERMID INCORPORATED, [*2] defendant:James K. Robertson, Esq., Carmody & Torrance, Waterbury, CT.

JUDGES: Steven J. McAuliffe, United States District Judge.

OPINIONBY: Steven J. McAuliffe

OPINION:

### ORDER

Polyclad Laminates, Inc. ("Polyclad") and Fry Metals, Inc., doing business as PC Fab Division of Alpha Metals, Inc. ("Alpha"), bring this patent infringement action against MacDermid, Inc. See *35 U.S.C. § 271*, et seq. Polyclad is the exclusive licensee of United States Patent No. 5,800,859 (the " '859 patent"). According to plaintiffs, Alpha is the only organization licensed by Polyclad to manufacture and sell the chemicals used in carrying out the patented processes. It also possesses the right, exercisable in its sole discretion, to sublicense third parties to practice the patented processes. See Amended complaint at para. 6.

The '859 patent teaches a process for copper coating circuit boards, the first step in creating a printed circuit board. Part of that coating process involves the use of a surface active agent, or "surfactant." A substantial dispute in this case relates to the type of surfactant actually claimed in the patent and whether, as MacDermid asserts, plaintiffs knew, [*3] but failed to disclose to the United States Patent and Trademark Office (the "PTO"): (1) that only a process utilizing cationic (i.e., negatively charged) surfactants was novel over prior art; and/or (2) that the processes taught by the '859 patent actually require a cationic surfactant in order to function as claimed.

Plaintiffs say that MacDermid is infringing one or more claims of the '859 patent and is actively inducing others to infringe that patent. MacDermid denies that its conduct infringes the patent. Alternatively, it asserts that the '859 patent is invalid and unenforceable. MacDermid also raises two counterclaims. First, it seeks a judicial

declaration that the '859 patent is invalid and unenforceable due to plaintiffs' alleged "inequitable conduct" before the PTO. Next, it brings a claim for tortious interference with prospective and existing customers, based on plaintiffs' having informed MacDermid's customers of the alleged patent infringement.

Plaintiffs move for partial summary judgment with regard to MacDermid's counterclaims (as well as its third affirmative defense which, like its first counterclaim, relies upon plaintiffs' alleged inequitable conduct before the [*4] PTO). MacDermid objects and, in turn, moves for judgment of non-infringement as a matter of law. MacDermid also moves to dismiss Alpha as a party plaintiff, asserting that as a "non-exclusive licensee" of the '859 patent, Alpha lacks standing to sue for alleged infringement of that patent. See *Fed. R. Civ. P. 12(b)(1)*.

### Standard of Review

I. Motion to Dismiss.

[HN1] "When faced with a motion to dismiss for lack of subject matter jurisdiction, *Rule 12(b)(1), Fed. R. Civ. P.*, the party asserting jurisdiction has the burden to establish by competent proof that jurisdiction exists." *Stone v. Dartmouth College, 682 F. Supp. 106, 107 (D.N.H. 1988)* (citing *O'Toole v. Arlington Trust Co., 681 F.2d 94, 98 (1st Cir. 1982)*; C. Wright & A. Miller, 5 Federal Practice and Procedure § 1350, at 555 (1969 & Supp. 1987)). Furthermore, the court "may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment." *Lex Computer & Management Corp. v. Eslinger & Pelton, P.C., 676 F. Supp. 399, 402 (D.N.H. 1987)*; see also *Richmond, F & P R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)*; [*5] *Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)*. But, the court "should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Richmond, 945 F.2d at 768* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (citing *Trentacosta v. Frontier Pacific Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)*).

II. Summary Judgment.

[HN2] When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith, 904 F.2d 112, 115*

Case 1:05-cv-00842-GMS    Document 32-4    Filed 03/03/2006    Page 14 of 33

Page 4

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

*(1st Cir. 1990)*. Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is [*6] entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996)* (citations omitted).

### Discussion

I. MacDermid's Motion to Dismiss Alpha.

According to the amended complaint, Polyclad is the exclusive licensee of the '859 patent and is vested with the right to enforce that patent and sue for all past infringements. See Amended complaint, at para. 5. Alpha, in turn, is alleged to be:

> a licensee of the '859 patent from Polyclad and has the right and license in the United States of America, its territories and dependencies, to manufacture, use, import and sell materials and processes relating to the claimed subject matter of the '859 Patent and the right, at its sole discretion, to sublicense rights under the '859 Patent.

Amended complaint, at para. 6. Based upon those allegations and the record evidence, MacDermid [*7] claims that Alpha is merely a "bare licensee" of the '859 patent, without the right to sue for past infringement and, therefore, without standing to appear as a plaintiff in this litigation. See, e.g., *Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 1484 (Fed. Cir. 1998)* ("a bare licensee has no standing at all."); *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1034 (Fed. Cir. 1995)* (holding that a "bare" or nonexclusive licensee has no standing to bring or join a suit for infringement).

[HN3] The Patent Act of 1952 provides that "a patentee shall have remedy by civil action for infringement of his patent." *35 U.S.C. § 281*. Generally speaking, therefore, [HN4] a party suing for patent infringement must have held legal title to the patent at the time of the alleged infringement. See *Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1551 (Fed. Cir. 1995)*; *Ortho Pharmaceutical Corp, 52 F.3d at 1030*. As this court has observed, however, "[a] party need not . . . hold all proprietary rights to a patent in order to have standing to sue for infringement as a co-plaintiff [*8] with the patentee."

*Ricoh Co., Ltd. v. Nashua Corp., 947 F. Supp. 21, 23 (D.N.H. 1996)* (emphasis in original).

> [HN5]
> For instance, under certain circumstances, a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee. Such a licensee is usually an "exclusive licensee." In contrast, a non-exclusive licensee does not have standing to sue for infringement, even as a co-plaintiff.
> [HN6]
> To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention . . ., but also the patentee's express or implied promise that others shall be excluded from practicing the invention. It is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license. Therefore, if a party has not received a promise of exclusivity under the patent, it cannot have co-plaintiff standing in an infringement action. It is important to stress, however, that the exclusive license need not be express; it [*9] may be implied.

*Id., at 23-24* (citations and internal quotation marks omitted) (emphasis in original).

Here, plaintiffs assert that the allegations set forth in the amended complaint, taken together with the record evidence, establish that Alpha has been granted sufficient rights to the '859 patent to vest it with standing to proceed as a co-plaintiff in this litigation. The court agrees. Among other things, the amended complaint alleges that Alpha has the right, exercisable in its sole discretion, to sublicense rights under the '859 patent. Thus, Alpha plainly possesses, at a minimum, the patentee's implicit promise that others will be prevented from practicing the patented technology, absent Alpha's consent. See, e.g., *Rite-Hite, 56 F.3d at 1552* ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well."). See also *Textile Productions, 134 F.3d at 1484*.

Case 1:05-cv-00842-GMS    Document 32-4    Filed 03/03/2006    Page 15 of 33

Page 5

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

Additional support for Alpha's assertion [*10] that it has standing as an "exclusive licensee" can be found in the record, including evidence of its intimate relationship with Polyclad and Cookson Group, PLC, the parent corporation of both companies. See, e.g., Affidavit of Mark Dingley, Exhibit 3 to plaintiffs' memorandum; Affidavit of Richard Mahoney, Exhibit 4 to plaintiffs' memorandum. See generally *Ricoh, 947 F. Supp. at 24; Kalman v. Berlyn Corp., 914 F.2d 1473, 1482 (Fed. Cir. 1990)*. That evidence strongly supports plaintiffs' claim that, at a minimum, Alpha Fry, Ltd. (the assignee of the '859 patent), Polyclad (the exclusive licensee of the '859 patent), and Cookson Group, PLC (the parent corporation of all those entities) intended to vest Alpha with the right to practice the processes taught by the '859 patent and the right to preclude others from doing so (at least within the United States and its territories).

Alpha has, therefore, pled sufficient facts (and pointed to sufficient evidence in the record) to satisfy its burden under Rule 12(b)(1) and demonstrate that it has standing, as a co-plaintiff, to sue for alleged infringement of the '859 patent. Consequently, MacDermid's [*11] motion to dismiss is denied.

II. MacDermid Counterclaims.

A. First Counterclaim - Inequitable Conduct.

[HN7] Applicants for patents and their agents are required to prosecute patent applications "with candor, good faith, and honesty." *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)*. See also *37 C.F.R. § 1.56* ("Rule 56") ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins, 48 F.3d at 1178*. [HN8] Rule 56 defines "material information," subject to the disclosure requirement, as follows:

Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, [*12] and

(1) It establishes, by itself or in combination with other information, a prima

facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office; or

(ii) Asserting an argument of patentability.

*37 C.F.R. § 1.56.*

Claim 1 of the '859 patent teaches "a process for treating a metal surface to promote adhesion thereto" and specifies the use of a surfactant to form "a microroughened conversion-coated surface." Claim 8, which is dependent upon claim 1, teaches a process "according to claim 1 in which the surfactant is a cationic surfactant." Although the patent describes the use of a cationic surfactant as the "preferred embodiment" of the process described in the patent, claim 1 plainly teaches a process that utilizes surfactants that need not necessarily be cationic. That is to say, claim 1 teaches a process in which, at least theoretically, one might employ an anionic surfactant (i.e., one having a positive charge) or a nonionic surfactant (i.e., one carrying no charge).

The core of MacDermid's inequitable [*13] conduct claim is its assertion that, during the course of prosecuting their patent applications in Europe, plaintiffs (or, more accurately, their predecessors in interest) learned that: (1) use of a non-specified surfactant was taught by prior art; and, perhaps more importantly, (2) the processes taught in the '859 patent only worked when a cationic surfactant was used. In support of that argument, MacDermid points out that, in attempting to distinguish prior art, plaintiffs reported to the European Patent Office:

In accordance with the process of the present invention a metal surface is treated in order to micro-roughen it and it is submitted that is exactly the opposite of the polishing step taught in the prior art Document. The micro-roughening treatment is obtained by incorporating into the adhesion promoting compositions as an essential ingredient a cationic surfactant. . . . [A] person skilled in the art would consider that if other surfactants were substi-

Case 1:05-cv-00842-GMS    Document 32-4    Filed 03/03/2006    Page 16 of 33

Page 6

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

tuted for the surfactants taught in Document D1 a brilliant chemically polished surface would be obtained. Accordingly, it is submitted that Document D1 teaches exactly the opposite of the result required to [*14] be obtained by the process invention.

Letter to EPO dated November 27, 1996, Exhibit C to defendant's memorandum (emphasis supplied). And, in an effort to distinguish other prior art before the EPO, plaintiffs reported:

> Although the solutions of document D2 contain a corrosion inhibitor they do not contain a cationic surfactant and in the absence of a cationic surfactant/corrosion inhibitor combination the copper surface is not coated.

Letter to EPO dated May 15, 1998, Exhibit F to defendant's memorandum (emphasis supplied).

Ultimately, says MacDermid, plaintiffs were forced to limit the European patent's claims to cover only a coating process that employed a cationic surfactant. And, although MacDermid seems to acknowledge that plaintiffs brought all relevant prior art to the attention of the United States Patent Office, it says plaintiffs were required (but failed) to disclose the results of testing that revealed that the process taught in claim 1 of the '859 patent would not work in the absence of a cationic surfactant.

At this stage of the litigation, (which, parenthetically, is prior to a Markman hearing and any determination of the scope [*15] of the '859 patent), the court is unable to definitively conclude, as a matter of law, that plaintiffs honored their obligations of full and candid disclosure to the PTO. If, as MacDermid asserts, plaintiffs knew that the process taught in the '859 patent could not be accomplished unless a cationic surfactant was used, and if plaintiffs failed to disclose to the PTO the results of their own testing revealing that fact, plaintiffs might well have violated their obligation of good faith and candor. Consequently, plaintiffs' motion for judgment as a matter of law as to MacDermid's first counterclaim (and its third affirmative defense) is necessarily denied, without prejudice.

B. Second Counterclaim - Tortious Interference.

MacDermid says that it "developed and owns a chemical composition particularly useful in the produc-

tion of multilayer printed circuits, covered by U.S. Patent No. 5,869,130 and marketed under the tradename MultiBond." MacDermid's Answer and Counterclaim (document no. 29), at 7. According to MacDermid, "MultiBond has no surfactant. Nor is a surfactant recommended. MacDermid is not aware of any customer using a surfactant in its MultiBond product." MacDermid's memorandum [*16] at 5.

MacDermid also asserts that plaintiffs "misrepresented to prospective and existing MultiBond customers that MacDermid's marketing of MultiBond was a violation of the Plaintiffs' patent applications and the '859 patent." Id. Additionally, it claims that plaintiffs knew that the '859 patent was necessarily "limited to an adhesion promotion process incorporating a cationic surfactant and did not cover processes utilizing other types of surfactants or no surfactant at all." Id. Thus, says MacDermid, plaintiffs tortiously interfered with their business relationships with customers and that unlawful conduct is intimately intertwined with plaintiffs' inequitable conduct before the PTO (i.e., conduct that resulted in its allegedly wrongful receipt of an overly broad patent).

In response, plaintiffs rely on their denial of inequitable conduct before the PTO and, therefore, assert that MacDermid has failed to support an essential element of its tortious interference claim: that the patent holder was guilty of bad faith or fraudulent conduct before the PTO. See generally *Zenith Electronics Corp. v. Exzec, Inc., 182 F.3d 1340, 1355 (Fed. Cir. 1999)* [HN9] ("bad [*17] faith is a prerequisite to [plaintiff's] state-law tortious interference claim; without it, the claim is preempted by patent law."). See also *Polyclad Laminates, Inc. v. MacDermid, 1999 U.S. Dist. LEXIS 22563,* No 99-162-M, slip op. at 1 (D.N.H. July 22, 1999). As noted above, however, the record is not sufficiently developed at this point to permit any conclusion, as a matter of law, as to whether plaintiffs did or did not engage in inequitable conduct before the PTO. Consequently, the court cannot conclude that MacDermid's second counterclaim fails to state a viable claim. That is to say, the record evidence does not establish that, as a matter of law, MacDermid's second counterclaim is preempted by federal law.

III. MacDermid's Motion for Summary Judgment.

Finally, MacDermid moves the court to hold that, as a matter of law, it does not infringe the '859 patent "because its accused product, MultiBond, does not contain the 'surfactant' element required by all the claims of the '859 patent." MacDermid's motion for summary judgment (document no. 107) at 1. In response, plaintiffs point out that, in order to resolve MacDermid's motion, the court must first determine: (1) precisely what is meant by [*18] the term "surfactant," as used in the '859

2001 DNH 27; 2001 U.S. Dist. LEXIS 1741, *

patent; and, then, (2) whether MacDermid's allegedly infringing product actually employs a surfactant.

As noted above, the scope of the '859 patent has yet to be determined (the parties having only recently requested a Markman hearing). Because MacDermid's motion for summary judgment is essentially one for claim construction, it must necessarily be denied, without prejudice, pending the Markman hearing and the court's legal construction of the scope of the '859 patent, and the meaning of the term "surfactant," as used in that patent.

### Conclusion

For the foregoing reasons, plaintiffs' motion for partial summary judgment (document no. 33) is denied, without prejudice. Defendant's motion for summary judgment (document no. 107) is likewise denied, without

prejudice, as is defendant's motion to dismiss (document no. 101).

Finally, the following motions are denied as moot: plaintiff's motion to defer responding to defendant's motion for summary judgment (document no. 111); plaintiff's motion to extend time to respond to defendant's motion for summary judgment (document no. 114); and plaintiff's motion for leave to file a surreply [*19] to defendant's motion to dismiss (document no. 116).

**SO ORDERED.**

Steven J. McAuliffe

United States District Judge

February 13, 2001

LEXSEE 2004 US DIST LEXIS 19966

**SICOM SYSTEMS LTD., Plaintiff, v. AGILENT TECHNOLOGIES, INC., TEKTRONIX, INC., and LECROY CORPORATION, Defendant.**

Civil Action No. 03-1171-JJF

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE.**

*2004 U.S. Dist. LEXIS 19966*

October 5, 2004, Decided

**SUBSEQUENT HISTORY:** Subsequent appeal at, Judgment entered by *Sicom Sys. v. Agilent Techs., Inc., 2005 U.S. App. LEXIS 22371 (Fed. Cir., Oct. 18, 2005)*

**PRIOR HISTORY:** *Sicom Sys. v. Agilent Techs., Inc., 2003 U.S. Dist. LEXIS 21339 (D. Del., Nov. 20, 2003)*

**DISPOSITION:** [*1] Defendants' Motion To Dismiss was granted and action was dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporations filed a motion to dismiss plaintiff licensee's action for alleged patent infringement.

**OVERVIEW:** After the licensee's first infringement action was dismissed for lack of standing, the licensee and the patentee amended an agreement to grant the licensee the exclusive right to initiate commercial infringement actions. The court concluded that the licensee did not possess the substantial rights necessary to be an effective patentee for purposes of granting it standing to sue for infringement. The patentee retained the right to sue for any infringement, which was not commercial. The amendment did not expressly grant the licensee the right to sue for past infringement, and the amendment was only effective as of the date it was signed. The licensee's right to sue was limited in that it had to notify the patentee before bringing suit, it had to consult with the patentee to jointly determine the steps to be taken in the event of litigation, and it could not make any admission of liability, nor offer or conclude settlement without the prior written consent of the patentee. Because the licensee's ability to assign the patent was restricted, the licensee's interest in the patent was limited to that of a licensee, and therefore, it did not have standing to bring an infringement lawsuit.

**OUTCOME:** The court granted the corporations' motion to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Standing*
*Constitutional Law > The Judiciary > Case or Controversy > Standing*
[HN1] Standing to sue is a threshold requirement in every federal action.

*Civil Procedure > Justiciability > Standing*
*Constitutional Law > The Judiciary > Case or Controversy > Standing*
[HN2] Standing must be present at the time the suit is brought.

*Civil Procedure > Justiciability > Standing*
[HN3] The party bringing the action bears the burden of establishing that it has standing.

*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Ownership > Conveyances > Licenses*
*Civil Procedure > Justiciability > Standing*
[HN4] Under *35 U.S.C.S. § 100,* the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot.

*Patent Law > Ownership > Conveyances > Assignments*
*Civil Procedure > Justiciability > Standing*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
[HN5] A licensee does not have standing to sue without the joinder of the patentee, unless the patentee makes an

assignment of all substantial rights under the patent such that the assignee may be deemed the effective patentee under *35 U.S.C.S. § 281*, and thus may have standing to maintain an infringement suit in its own name.

*Civil Procedure > Justiciability > Standing*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > General Overview*
[HN6] An exclusive license may be treated like an assignment for purposes of creating standing, if it conveys to the licensee all substantial rights.

*Civil Procedure > Justiciability > Standing*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > General Overview*
[HN7] To determine if an exclusive license is sufficient to grant standing to the licensee, the court must ascertain the intention of the parties and examine the substance of what the licensing agreement granted.

*Civil Procedure > Justiciability > Standing*
*Patent Law > Ownership > Conveyances > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
[HN8] A "right to sue" provision within a license cannot, of its own force, confer standing on a bare licensee.

*Patent Law > Ownership > Conveyances > Licenses*
*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Ownership > Patents as Property*
[HN9] Just as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment. Limits on the right to assignment weigh against a finding that the licensor transferred to the licensee all substantial rights in the patent.

**COUNSEL:** Steven T. Margolin, Esquire and Tiffany Geyer Lydon, Esquire of ASHBY & GEDDES, Wilmington, Delaware.

Of Counsel: Edward W. Goldstein, Esquire and Corby R. Vowell, Esquire of GOLDSTEIN & FAUCETT, L.L.P., Houston, Texas. Attorneys for Plaintiff Sicom Systems Ltd.

Josy W. Ingersoll, Esquire, and Adam W. Poff, Esquire of YOUNG, CONAWAY, STARGATT, & TAYLOR, LLP, Wilmington Delaware.

Of Counsel: James Galbraith, Esquire, Thomas F. Meagher, Esquire, and John C. Vetter, Esquire of KENYON & KENYON, New York, New York.

Philip J. McCabe, Esquire, and Susan A. Smith, Esquire of KENYON & KENYON, San Jose, California. Attorneys for Defendant Agilent Technologies, Inc.

N. Richard Powers, Esquire of CONNOLLY, BOVE, LODGE & HUTZ LLP, Wilmington, Delaware.

Of Counsel: John M. Romary, Esquire, and Michael R. Kelly, Esquire of FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, District of Columbia. Attorneys for Defendant Tektronix, Inc.

John T. Meli, Jr., Esquire, and Kevin M. Baird, Esquire of FISH & RICHARDSON, P.C., Wilmington, Delaware. Attorneys for Defendant LeCroy [*2] Corporation.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** Farnan

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge**

Presently before the Court is a Motion To Dismiss (D.I. 15) filed by Defendants Agilent Technologies, Inc., Tektronix, Inc., and LeCroy Corporation (collectively, "Defendants") requesting the Court to dismiss with prejudice the Complaint filed by Sicom Systems Ltd. ("Sicom"). For the reasons discussed, the Court has granted Defendants' Motion and dismissed this action with prejudice.

#### BACKGROUND

This action is Sicom's second attempt to sue Defendants for alleged infringement of *U.S. Patent No. 5,333,147* ("'147 patent"). The Court dismissed Sicom's first action on the grounds that Sicom lacked standing to sue for infringement as a licensee of the Canadian government ("Canada"). In reaching this decision, the Court concluded that, as a result of the 1998 License Agreement (the "Agreement") between Sicom and Canada, Canada retained substantial rights to the patent to a de-

gree sufficient to preclude Sicom from bringing an infringement action. *Sicom Sys. Ltd. v. Agilent Techs., Inc., 2003 U.S. Dist. LEXIS 21339 (D. Del. 2003).* [*3]

Since the Court's decision, Sicom and Canada amended the Agreement (the "Amendment") to (1) grant Sicom the exclusive right to initiate commercial infringement actions related to the *'147 patent*, and (2) extend the term of the Agreement to coincide with the term of the *'147 patent.* Sicom filed this action shortly after the Amendment was executed.

## DISCUSSION

By their Motion, Defendants contend that the Amendment is insufficient to provide Sicom with the standing necessary to bring an infringement action. Defendants contend that Canada retains legal title to the *'147 patent* and continues to hold important rights with regard to sub-licensing and infringement lawsuits. Because Sicom's rights with respect to the *'147 patent* are limited, Defendants contend that Sicom lacks standing to sue despite the Amendment.

In response, Sicom contends that the Amendment demonstrates that Sicom has been granted all substantial rights in the *'147 patent*, with Canada retaining only legal title and other insignificant rights which do not affect Sicom's exclusive right to sue. Sicom contends that under the Amendment, its right to sue is exclusive and covers actions for past, present and future infringement. [*4] Sicom also contends that Canada is not a necessary party to the litigation, and therefore, Canada need not be joined in this lawsuit to permit Sicom to proceed.

[HN1] Standing to sue is a threshold requirement in every federal action. *Pfizer Inc. v. Elan Pharms. Research Corp., 812 F. Supp. 1352, 1356 (D. Del. 1993).* [HN2] Standing must be present at the time the suit is brought. See *Procter & Gamble Co. v. Paragon Trade Brands, Inc. 917 F. Supp. 305, 309-10 (D. Del. 1995).* [HN3] The party bringing the action bears the burden of establishing that it has standing. *Pfizer, 812 F. Supp. at 1356.*

[HN4] Under *35 U.S.C. § 100*, "the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot." *Calgon Corp. v. Nalco Chemical Co. 726 F. Supp. 983, 985 (D. Del. 1989).* Thus, [HN5] a licensee does not have standing to sue without the joinder of the patentee, unless the patentee makes an assignment of all substantial rights under the patent such that "the assignee may be deemed the effective patentee under *35 U.S.C. § 281*, and thus may have standing to [*5] maintain an infringement suit in its own name." *Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000).* [HN6] An exclusive license may be treated like an assignment for purposes of

creating standing, if it conveys to the licensee all substantial rights. See *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 875 (Fed. Cir. 1991).* [HN7] To determine if an exclusive license is sufficient to grant standing to the licensee, the court "must ascertain the intention of the parties and examine the substance of what [the licensing agreement] granted." *Prima Tek II, L.L.C., 222 F.3d at 1378.*

After reviewing the Amendment in light of the applicable legal principles, the Court concludes that Sicom does not possess the substantial rights necessary to be an "effective patentee" for purposes of granting Sicom standing to sue for infringement of the *'147 patent.* Under the terms of the Agreement, both Canada and Sicom "shall be at liberty to defend or take any proceedings at its own expense and shall be entitled to retain anything flowing from the proceedings." (Art. 11, Cl. 2). Although the Amendment expands Sicom's right [*6] to sue by granting it "the exclusive right to sue for commercial infringement" of the *'147 patent* in the United States, the Court concludes that this expansion of rights does not grant Sicom the exclusive rights necessary to transform its license into an assignment. See *Textile Prods v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir. 1998)* [HN8] ("A 'right to sue' provision within a license cannot, of its own force, confer standing on a bare licensee."); *Calgon, 726 F. Supp. at 986.* The qualifier of "non-commercial infringement" contained in the Amendment coupled with the provisions of Article 11, cl. 2 of the Agreement, still give Canada the right to sue for any alleged infringement which is not commercial. Thus, Canada may still be able to pursue non-commercial customers of Defendants like governmental entities, the military and universities, thereby creating multiple risk of litigation over the same patent, a result which is inconsistent with a genuine exclusive right to sue. Further, the Amendment does not expressly grant Sicom the right to sue for past infringement, and the Amendment is only effective as of the date it was signed. *Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574 n.9 (Fed. Cir. 1991).* [*7] In addition, Sicom's right to sue is still limited despite the Amendment, in that Sicom (1) must notify Canada before bringing suit, (2) must consult with Canada for the purpose of jointly determining the steps to be taken in the event of actual or threatened litigation, and (3) may not "make any admission of liability, nor offer or conclude settlement" without the prior written consent of Canada. n1 (Art. 11, cl. 1).

n1 Sicom urges the Court to consider the letter of Erick K. Fresque on behalf of Canada for purposes of interpreting the Amendment. The Court is not persuaded that this letter is relevant to the rights of Sicom and Canada under the

Agreement and the Amendment. The letter is not signed by both parties, and thus, cannot be considered to amend the Agreement. (Art. 17). As such, Canada is not bound by this letter and can repudiate it at any time. Further, the Court finds the import of the Amendment to be clear, and therefore, the Court concludes that extrinsic evidence is not needed to illuminate its terms.

[*8]

In addition to the limitations on Sicom's purported exclusive right to sue, the Court also finds the restriction on Sicom's right to assign to be a fatal reservation of rights by Canada for purposes of attempting to grant Sicom standing to sue. [HN9] "Just as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment." *Calgon, 726 F. Supp. at 988.* Limits on the right to assignment weigh against a finding that the licensor transferred to the licensee all substantial rights in the patent. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc. 248 F.3d 1333 at 1345.* In this case, the Amendment does not alter the Agreement's provision that Sicom cannot assign the *'147 patent* without the written consent of Canada. (Art. 2, cl. 9). Because Sicom's ability to assign the patent is restricted, Sicom's interest in the patent is limited to that of a licensee, and

therefore, Sicom does not have standing to bring an infringement lawsuit. See *Calgon, 726 F. Supp. at 988*; *Pfizer, Inc. v. Elan Pharmaceutical Research Corp., 812 F. Supp. 1352, 1373.*

In sum, the Court concludes that the Amendment is not sufficient to grant Sicom the [*9] substantial rights necessary to transform Sicom from a bare licensee to an assignee with the requisite standing to bring this action. Legal title to the patent rests with Canada and Sicom has not been granted the exclusive right to sue or the unrestricted right to assign the *'147 patent*. Because Sicom is no more than a licensee under the Agreement and Amendment, it lacks standing to bring this action. Further, Sicom has not contested Defendants' assertion that any dismissal by the Court of this action should be with prejudice, because Sicom has twice attempted and twice failed to establish standing. Accordingly, for these reasons, the Court has granted Defendants' Motion To Dismiss and dismissed this action with prejudice.

## CONCLUSION

For the reasons discussed, the Court has granted Defendants' Motion To Dismiss and dismissed this action with prejudice.

An appropriate Order has been entered.

LEXSEE 1975 DEL CH LEXIS 220

**Tuckman v. Aerosonic Corporation, et al.**

**Civil Action No. 4094.**

**Court of Chancery of the State of Delaware**

*1975 Del. Ch. LEXIS 220*

**October 21, 1975.**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accounting firms filed a motion to dismiss plaintiff stockholder's action on the basis of the three year statute of limitation found in *Del. Code Ann. tit. 10, § 8106.* The stockholder had alleged that the accounting firms knew that the financial statements of the corporation contained misrepresentations and that the accounting firms participated in the conspiracy to defraud the shareholders.

**OVERVIEW:** The stockholder argued that the accounting firms should have discovered the misrepresentations in the ordinary course of an audit and were negligent in failing to disclose the misrepresentations found in the financial statements in the proxy statement. The accounting firms argued that the stockholder's complaint was filed more than three years after the challenged proxy materials. The court held that the fifth cause of action, which alleged an abuse of a fiduciary duty resulting in personal profit for the accounting firms, was not barred by the statute of limitations under the Bovay rule. The court denied the accounting firms' motion to dismiss the fiduciary duty claim and granted their motion to dismiss the negligence claim. The court concluded that § 8106 applied because the basis of the stockholder's complaint was negligence and not fraudulent concealment, which would have tolled the statute of limitations.

**OUTCOME:** The court denied the accounting firms' motion to dismiss the stockholder's cause of action of abuse of a fiduciary duty and granted the accounting firm's motion to dismiss the stockholder's cause of action under negligence.

**CORE TERMS:** statute of limitations, fraudulent concealment, fiduciary, merger, motion to dismiss, causes of action, self-dealing, three year, shareholders, oral argu-

ment, misrepresentation, derivative, artifice, conspire, bare, cause of action, conspiracy to defraud, accountant, participated, concealment, fraudulent, disclose, defraud

**LexisNexis(R) Headnotes**

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN1] Where the statute bars the legal remedy it shall bar the equitable in analogous cases or in reference to the same subject matter and when a legal and equitable claim so far corresponds that the only difference is, that one remedy may be enforced in a court of law and the other in a court of equity. A fortiori, where a legal claim is joined in an action in equity under the principle of complete relief, the statute should be applied.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN2] The statute of limitations applies to derivative actions which seek recovery of damages or other essentially legal relief; however, in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profited personally from their misconduct.

*Torts > Business & Employment Torts > Concealment*
[HN3] Fraudulent concealment requires something affirmative be done by a defendant, some actual artifice, which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation, which is intended to put the plaintiff off the trail of inquiry.

*Torts > Business & Employment Torts > Concealment*
[HN4] Where commingling on the books is expressly alleged, this does not constitute a recitation of any specific artifice or misrepresentation by which it is claimed that defendants succeeded in concealing from plaintiffs the wrongs of which they complain. It certainly cannot support fraudulent concealment when the tort alleged is negligence.

**OPINIONBY:** [*1]

QUILLEN

**OPINION:**

Gentlemen:

This letter constitutes the Court's opinion on the motion to dismiss by Laventhol, Krekstein, Horwath & Horwath and Horwath & Horwath to dismiss the complaint against them on the basis of the three year statute of limitations. *10 Del. C., § 8106*; *Patterson v. Vincent, Del. Super., 61 A.2d 416 (1948)*. The only causes of action against the moving defendants are the fifth and sixth causes of action. The plaintiff was a stockholder of old Aerosonic Corporation (herein A. Corp.).

The case arises in the context of the purchase by Instrument Technology Corporation of the 18% interest of A. Corp. owned by the defendant Frank followed by the merger of A. Corp. and Instrument Technology Corporation. The complaint must be viewed as it is written for the present motion. It is alleged that the Laventhol firm was the Certified Public Accountant for ITC during the relevant period and that the Horwath firm was Certified Public Accountant for A. Corp. for the fiscal period ending May 31, 1969.

The Fifth Cause of Action alleges both firms "knew that the Financial Statements included in the Proxy Statement failed adequately to disclose the facts as to the matters [*2] set forth in paragraph 28 and thus ... participated in the conspiracy to defraud shareholders of A. Corp."

The Sixth Cause of Action alleges that the two firms "in the ordinary course of conducting an audit and preparing financial statements should have known of the matters set forth in paragraph 28, and were negligent in failing to disclose such in the Financial Statements in the Proxy Statement."

The only relief sought from these defendants is money damages.

The date of the challenged proxy solicitation material is December 16, 1969. The special meeting of shareholders which approved the merger was held on January 9, 1970. The merger itself was effectuated on January 12, 1970. The complaint in this action was filed on January 15, 1973, more than three years after the merger. It thus appears that the causes of action alleged accrued not later than January 12, 1970, the date of the merger, and, if the three year statute of limitations applies, the motion to dismiss is meritorious.

There is no reason by the nature of the suit (individual, class, and derivative) that the three year statute of limitations cannot apply. *Bokat v. Getty Oil Co., Del. Supr., 262 A.2d 246 (1970)*. [*3] Moreover, it is an established rule that [HN1] where the statute bars the legal remedy it shall bar the equitable in analogous cases or in reference to the same subject matter and when a legal and equitable claim so far corresponds that the only difference is, that one remedy may be enforced in a Court of Law and the other in a Court of Equity. *Perkins v. Cartmell, 4 Harr. 270, 274* (Del. Ch., 1845). A fortiori, where a legal claim is joined in an action in equity under the principle of complete relief, the statute should be applied.

As to the Sixth Cause of Action, the allegations merely state a claim for negligence. There is no reason why the normal limitations period should not apply in a negligence case. Thus the statute of limitations is applicable unless the plaintiff can prevail under the doctrine of fraudulent concealment discussed infra.

As to the Fifth Cause of Action, the question is whether the rule in *Bovay v. H. M. Byllesby & Co., Del. Supr., 38 A.2d 808 (1944)* applies. Chancellor Duffy recently dealt with the Bovay rule in *Halpern v. Barran, Del. Ch., 313 A.2d 139, 142 (1973)*. He said:

[HN2] "The statute of limitations applies to derivative actions which seek recovery [*4] of damages or other essentially legal relief; however, in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profitted personally from their misconduct."

Chancellor Duffy did not decide whether the rule in Bovay extends beyond officers and directors to others who exercise effective control of the corporation.

Assuming the Bovay rule can be routinely extended so far as to include Certified Public Accountants, a questionable proposition, it is not alleged that the moving defendants here were fiduciaries in this case. Nor is it alleged that there was self-dealing by the moving defendants. Accordingly, reliance on the Bovay exception appears at first blush to be misplaced.

At oral argument, however, the plaintiff attempted to avoid these deficiencies by arguing that the accountants

were fiduciaries or came within the Bovay exception because they conspired with fiduciaries *[Schleiff v. The Baltimore & Ohio Railroad Company, Del. Ch., 130 A.2d 321, 332 (1955)]*. The first argument fails on the pleadings, but the second has some merit. Indeed, in the Fifth [*5] Cause of Action, paragraph 38 does allege that these defendants "knew that the Financial Statements included in the Proxy Statement failed adequately to disclose the facts as to the matters set forth in paragraph 28, and thus defendants H & H, LKH & H ... participated in the conspiracy to defraud shareholders of A Corp." The language would appear fairly to fit the argument that was made in the Schleiff case, given the other allegations of the complaint. The complaint does allege an abuse of a fiduciary duty resulting in personal profit. Thus, this case is distinguishable from the conclusions reached by the Court as to General Motors in the Schleiff case. The question then becomes one of policy. Should those who conspire to defraud with self-dealing fiduciaries be bound by the same standard for statute of limitations purposes as the fiduciaries themselves? Compare *Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921)*. The answer to the question is difficult in the relative vacuum of the bare pleadings. But, if outside experts, on whom many must depend for the integrity of corporate affairs, knowingly conspire with self-dealing fiduciaries to defraud those very persons [*6] who in practicality must rely on their advice, it is difficult to see why the same trust principles of Bovay should not apply for statute of limitations purposes.

Accordingly, as to the Fifth Cause of Action, I think the Bovay exception is applicable and the motion to dismiss on the bare plea of the Statute of Limitations should be denied. IT IS SO ORDERED.

The plaintiffs also argue that the statute of limitations is tolled due to the fraudulent concealment by the moving defendants of the causes of action. *Lieberman v. First National Bank, Del. Supr., 45 A. 901 (1900)*. Given the comments above, it is only necessary to consider this allegation in relation to the Sixth Cause of Action. In the Halpern case at A.2d 143 Chancellor Duffy discussed fraudulent concealment as follows:

[HN3] "Fraudulent concealment requires something affirmative be done by a defendant, some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry. *Nardo v. Guido de Ascanis & Sons, Inc., Del. Super., 254 A.2d 254 (1969).* ..."

Paragraph 29 of the complaint alleges that the moving defendants [*7] "knew or should have known, that the Proxy Statement was materially deficient, and was false and misleading in each respect set forth in paragraph 28." Emphasis added. Even considering this allegation along with the allegations in the Sixth Cause of Action, it does not seem to me that the plaintiffs can resist the instant motion on the doctrine of fraudulent concealment.

Initially, there does not appear to be any express allegation of fraudulent concealment. That would seem dispositive under the Halpern case at *331 A.2d 143-144*. Secondly, as to the negligence count, there is no allegation of fraud at all. Insofar as negligence is concerned, the Sixth Cause of Action in paragraph 40 emphasizes the "should have known" language, as indeed it must be to be consistent with the theory of the cause of action. Even considering the oral argument to the effect that the filings with the SEC and accountants' certification constitute the fraudulent concealment, such concealment cannot save a count which has simple negligence as its underlying basis.

Moreover, as the defendants note, the complaint itself specifically alleges no acts other than the preparation of allegedly false financial [*8] statements which constitutes the alleged tort itself. Under the Halpern case at *331 A.2d 143-144,* [HN4] where commingling on the books was expressly alleged, this does not appear to constitute a recitation of any specific artifice or misrepresentation by which it is claimed that defendants succeeded in concealing from plaintiffs the wrongs of which they complain. It certainly cannot support fraudulent concealment when the tort alleged is negligence.

I conclude that the statute of limitations bars the Sixth Cause of Action against the moving defendants. The motion to dismiss that cause of action is granted. IT IS SO ORDERED.

Very sincerely yours,

William T. Quillen

LEXSEE

**Weiss v. Rockwell International Corporation et al.**

**Civil Action No. 8811**

**Court of Chancery of Delaware, New Castle**

**1989 Del. Ch. LEXIS 94**

**Date Submitted: March 14, 1989**
**July 19, 1989**

**DISPOSITION:** [*1]

For the reasons discussed, the defendants motion to dismiss the complaint for failure to state a claim is granted. IT IS SO ORDERED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation sought dismissal for failure to state a claim upon which relief could be granted of plaintiff shareholder's derivative action to invalidate and rescind a stock certificate amendment approved by the majority of stockholders.

**OVERVIEW:** Plaintiff stockholder brought a derivative stockholder's action against defendant corporation to invalidate and rescind a stock certificate amendment approved by the majority of stockholders. Defendant sought dismissal of the suit for failure to state a claim upon which relief could be granted. The court granted dismissal, holding that plaintiff asserted no claim that the certificate amendment constituted a gift or waste, a fraud, or ultra vires, and thus, the affirmation of the amendment by a majority of the stockholders cured any defect in the transaction. The court held that allegedly deficient proxy disclosures were in fact adequate because they unmistakably disclosed the critical features, purposes and likely effects of the certificate amendment. The court held that none of the omitted information would have been viewed by a reasonable shareholder as significantly altering the total mix of information made available to shareholders. Thus, the court held that plaintiff's disclosure claims were insufficient as a matter of law.

**OUTCOME:** The court granted defendant corporation's motion to dismiss for failure to state a claim upon which relief could be granted plaintiff stockholder's derivative

action to invalidate and rescind a stock certificate amendment approved by the majority of stockholders. The affirmation of the amendment by a majority of stockholders cured any defect in the absence of an allegation that the amendment constituted a gift, waste, fraud, or was ultra vires.

**CORE TERMS:** stockholder, stock, disclosure, proxy statement, shareholder, voting power, common stock, certificate, holder, voting, proxy, per share, convert, ratification, waste, gift, motion to dismiss, disclose, scenario, shares of common stock, fiduciary duty, beneficial, ultra vires, matter of law, one vote, presently, transferability, automatically, outstanding, incumbent

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] On a motion to dismiss for failure to state a claim, it must appear with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN2] Where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transactions normally must fail. That is because the effect of a valid shareholder ratification is to cure any defect in the ratified transaction, except where the transaction is claimed to involve a gift or waste of assets,

fraud, or ultra vires. In such cases only unanimous share-
holder ratification is a complete defense.

*Civil Procedure > Pleading & Practice > Defenses, Ob-
jections & Demurrers > Failure to State a Cause of
Action*
[HN3] For a contention to rise to the status of a claim
that will be considered on a motion to dismiss, it must be
alleged in the complaint.

**COUNSEL:**

Norman M. Monhait, Esquire, Morris, Rosenthal,
Monhait & Gross, P. A., Wilmington, Delaware.

Allen M. Terrell, Jr., Esquire, C. Stephen Bigler,
Esquire, Richards, Layton & Finger, Wilmington, Dela-
ware.

**JUDGES:**

Before JACK S. JACOBS, VICE-CHANCELLOR

**OPINIONBY:**

JACOBS

**OPINION:**

JACK B. JACOBS, VICE-CHANCELLOR

Presently pending are: (a) the plaintiff's motion for
class certification, (b) the plaintiff's motion to compel
discovery, and (c) the defendants' motion to dismiss the
second amended complaint under Chancery Court Rules
12(b)(6) and 23.1. Because the Court finds, pursuant to
Rule 12(b)(6), that the second amended complaint fails
to state a claim upon which relief can be granted, it be-
comes unnecessary to address the remaining two mo-
tions.

I.

A.

The procedural history of the case, and the facts re-
lating to the Rule 12(b)(6) motion, are relatively straight-
forward. This action was brought on January 15, 1987,
on behalf of a purported class of shareholders of Rock-
well International Corporation ("Rockwell") n1 to enjoin
the implementation of a proposed amendment to Rock-
well's certificate [*2] of incorporation. That amendment
would authorize a new class of common stock ("Class A"
stock) having ten votes per share and limited transfer-
ability rights that would discourage or make more diffi-
cult an unfriendly takeover of Rockwell. The sole basis
of the original complaint was that the individual defen-
dants (i.e., Rockwell's directors) had breached substan-

tive fiduciary duties under Delaware law by submitting
the proposed amendment to a vote of shareholders.

n1 Rockwell is a Delaware corporation and
one of the nation's leading aerospace manufactur-
ers. As of December 15, 1986, Rockwell had
147,395,734 outstanding shares of common stock
that were traded on the New York Stock Ex-
change.

Concurrently with the filing of the complaint, the
plaintiff moved for a preliminary injunction to prohibit
the proposed certificate amendment from being submit-
ted for shareholder approval at the forthcoming annual
stockholders meeting. During the briefing on that mo-
tion, the plaintiff amended the complaint on February 1,
1987, to add (inter alia) a claim that certain disclosures in
the proxy statement issued in connection with that meet-
ing (the "proxy statement") were false and misleading.
[*3] Following a hearing on February 6, 1987, this
Court denied the plaintiff's motion for preliminary in-
junctive relief.

At the February 11, 1987 annual meeting, Rock-
well's shareholders approved the certificate amendment.
Thereafter, on April 13, 1987, the plaintiff filed a second
amended and supplemental complaint which reflected
the certificate amendment's adoption. The second
amended complaint, which is the pleading presently un-
der attack, seeks an order invalidating and rescinding the
certificate amendment.

Between February and August, 1987, the plaintiff
took discovery on the merits. During that period disputes
arose over class certification and discovery, which led
ultimately to the presentation of the pending motions that
were argued on March 14, 1989. This is the decision of
the Court on those motions.

B.

The purpose, the essential features, and the effect of
the Class A common stock authorized by the amendment
are disclosed in the proxy statement that forms the basis
for plaintiff's disclosure claims and that is incorporated
into the second amended complaint by reference. Lewis
v. Straetz, Del. Ch., C. A. No. 7859, Hartnett, V.C. (Feb-
ruary 12, 1986).

The purpose of the amendment [*4] was to serve
the long term interests of Rockwell and its stockholders,
and to afford Rockwell's Board of Directors and stock-
holders time in which to evaluate and properly consider
any offers affecting the ownership and control of the
corporation. That purpose was to be accomplished by
issuing to Rockwell's stockholders a security (namely,
the Class A stock) having disproportionately high voting

—

power. The combined effect of that stock's peculiar conversion and transferability attributes would, over time, cause disproportionate voting power to become concentrated significantly in the hands of Rockwell's long term stockholders. Included within that category were Rockwell's employees' Savings Plan which owned approximately 30% of Rockwell's outstanding common stock.

The attributes of the Class A common stock that would yield that result are as follows: (1) the Class A common stock entitles the holder to ten votes per share, (2) the Class A - stock is freely convertible into regular common stock having one vote per share, (3) the Class A stock is nontransferable except in a narrowly defined class of circumstances, and (4) upon any nonauthorized transfer of Class A stock, the Class A stock [*5] automatically converts to regular common stock having one vote per share.

Because the Class A stock would be issued to Rockwell's stockholders as a pro rata dividend, it would not initially affect the relative voting power of Rockwell's stockholders. However, logic indicates, and the proxy statement discloses, that over time the distribution of the voting power among Rockwell's shareholders would shift disproportionately in favor of those shareholders who did not sell or otherwise make "unauthorized" transfers of their Class A shares. n2 That is because all such transfers of the ten-vote-per-share Class A stock would automatically cause that stock to be converted into common stock having only one vote per share. As a result, all stockholders who continued to retain their Class A stock would have ten times the voting power (on a per share basis) of those shareholders who did not. n3

n2 Authorized transfers of the Class A stock include transfers to the stockholders' own family members, or to certain trusts and other entities specified in the charter amendment.

n3 The Class A shares have other features designed to temper the effect of this shift of voting power. Thus, all of the Class A shares will automatically convert into common stock after ten years, unless extended by the Board for up to one additional five year period. Moreover, the Board is empowered to convert the Class A stock to common stock if it determines that there has been a material adverse change in the stock's liquidity, marketability, or market value, under certain defined circumstances which include a merger, consolidation, liquidation, or a sale of all or substantially all of the corporation's assets. Thus, the amendment does not preclude offers affecting ownership or control of the company that the Board determines are in the company's and its

stockholders' best interests. Finally, an affirmative vote of the holders of a majority of the shares of both the Class A stock and the common stock, each voting separately as a class, is required to alter any of the rights or restrictions of either class of stock.

[*6]

As previously noted, Rockwell's shareholders approved the Certificate amendment authorizing the Class A stock at the February, 1987 annual meeting. It appears from the record (and plaintiff does not dispute) that that approval was overwhelming, 95,080,020 votes being cast in favor, 21,172,359 votes cast against, and 1,141,295 votes abstaining.

II.

[HN1] On a motion to dismiss for failure to state a claim, it must appear with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action. Rabkin v. Philip A. Hunt Chemical Corp., Del. Supr., 498 A.2d 1099, 1104 (1985); Harman v. Masoneilan Int'l. Inc., Del. Supr. 442 A.2d 487, 502 (1982).

The claims alleged in the second amended complaint fall into two distinct categories: (i) proxy disclosure violation claims and (ii) claims alleging fiduciary duty violations unrelated to disclosure. Although the precise nature of the second category (i.e., the fiduciary claims) is not clearly defined in the complaint, its best expression is found in Paragraph 29, which pertinently alleges:

By virtue of their recommendation [*7] of the Proposal and their submission of such plan to the stockholders at the February stockholders' meeting, defendants, knowingly and in willful violation of the fiduciary obligations owed to plaintiff and the other members of the class, have and will have acted in their own interests and contrary to the best interests of plaintiff and the other members of the Class in that, inter alia, they have and will have engaged in acts of self-dealing by recommending a plan detrimental to the best interests of the minority stockholders and designed for the sole or primary purpose of entrenching themselves, deterring hostile takeover bids which could maximize stockholder value and diluting the voting power of the public stockholders of Rockwell and their ability to have defendants account to them for their actions as directors. . . .

The defendants contend that none of these fiduciary duty claims is legally cognizable in the face of stockholder approval of the certificate amendment, and that the only claims which are cognizable are those alleging improper proxy disclosures. And these, the defendants argue, are deficient as a matter of law. Not surprisingly, the plaintiff disputes that position, [*8] arguing that (i)

his fiduciary claims are viable notwithstanding the shareholders' approval of the amendment, and that (ii) in any event, his proxy disclosure claims are legally sufficient. To these contentions I now turn.

III.

Concerning ratification, the Delaware Supreme Court has stated in Smith v. Van Gorkom, Del. Supr., 488 A.2d 858, 890 (1985) that:

The settled rule in Delaware is that [HN2] where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transactions normally must fail. (citation omitted).

That is because the effect of a valid shareholder ratification is to cure any defect in the ratified transaction, except where the transaction is claimed to involve a gift or waste of assets, fraud, or ultra vires. In such cases only unanimous shareholder ratification is a complete defense. Michaelson v. Duncan, Del. Supr., 407 A.2d 211, 219 (1979). ("It is only where a claim of gift or waste of assets, fraud or ultra vires is asserted that a less than unanimous shareholder ratification is not a full defense.")

In this case the plaintiff asserts no claim that the certificate [*9] amendment constituted a gift or waste, a fraud, or ultra vires. Under our corporate statute, separate classes of stock having differing voting rights are clearly permissible (See 8 Del. C. § 151(a), and Lacos Land Co. v. Arden Group, Inc., Del. Ch., 517 A.2d 271, 275 (1986)), and the plaintiff does not contend otherwise. And while the plaintiff sharply criticizes Rockwell's two-class voting structure, he offers no reasoned argument and cites no authority to show why the amendment is not a valid corporate act. n4 Rather, the thrust of his argument is that the certificate amendment should be treated as being akin to a gift or waste of assets, because it shifted voting control from the public shareholders to the Savings Plan which, plaintiff contends, the defendant directors control.

n4 Plaintiff emphasizes that SEC Rule 19 C-4, adopted last year, proscribes the listing of securities that would entail such a dual class voting structure. However, that Rule expressly "grandfathers" two-tier voting stock plans such as Rockwell's, that were in existence at the time of its adoption. See Exchange Act Release No. 25891 53 Fed. Reg. 26376, 26386 (July 12, 1988).

[*10]

Again plaintiff offers neither authority nor reasoned analysis to support that ipse dixit assertion. Plaintiff's fiduciary duty claim, however it might be viewed cannot fairly be characterized as involving a gift or waste of corporate assets. Because the fiduciary duty claim does not fall within any recognized exception to the defense of shareholder ratification, the only claim that may properly be considered on this motion concerns the validity of the ratification itself, i.e., the alleged proxy disclosure violations. Smith v. Van Gorkom, 488 A.2d at 890. The question therefore becomes whether the proxy disclosure claims are sufficient to withstand a motion to dismiss. That issue is next addressed.

IV.

In his complaint plaintiff alleges that the proxy statement was materially false and misleading in seven distinct respects. However, plaintiff relies upon only two of those disclosure claims in his brief, the other five having subsequently been abandoned. The balance of plaintiff's disclosure contentions consist of newly-minted arguments that were raised for the first time in plaintiff's answering brief.

The two disclosure claims alleged in the complaint [*11] are that (a) the proxy statement fails to disclose that the sole purpose of the certificate amendment was to shift voting control of Rockwell into the hands of the participants in the employee Savings Plan, and that (b) the proxy statement omits to disclose that Rockwell's financial advisor, Morgan Stanley, would receive a $ 500,000 fee if the certificate amendment was approved, but would otherwise be paid on a time and efforts basis. The other disclosure violation contentions (i.e., those not alleged in the complaint) are that the proxy statement omits to disclose that (c) the defendants expected that the Savings Plan Participants would vote in favor of any management proposal Presented to stockholders; (d) the defendants exercise de facto control over the Savings Plan; and that (e) the defendants expected that the Savings Plan participants would retain all their Class A stock, while the public stockholders would transfer all their Class A stock. (Plaintiff's Answering Br., at 40-41).

None of these claimed disclosure violations is actionable as a matter of law. Given the extensive proxy statement disclosure of the critical features, purposes and likely effects of the certificate [*12] amendment, none of the omitted information would have been viewed by a reasonable shareholder as significantly altering the total mix of information made available to shareholders. Rosenblatt v. Getty Oil, Co., Del. Supr., 493 A.2d 929, 944 (1985); Williams v. Geier, Del. Ch., C. A. No. 8456, Berger V.C. (May 20, 1987) at 12. In addition, the last three claimed disclosure violations (i.e., claims (c), (d), and (e)) are legally insufficient because they do not form a subject of any allegation in the now-twice-amended complaint. [HN3] For a contention to rise to the status of a claim that will be considered on a motion to dismiss, it

must be alleged in the complaint. See Zirn v. VLI Corporation, Del. Ch., C. A. No. 9488, Hartnett, V.C. (July 17, 1989); Haber v. Bell, Del. Ch., 465 A.2d 353 (1983); 5 Wright & Miller, Federal Practice and Procedure, Civil § 1356 (1969). The plaintiff, having not seen fit to embody his contentions in his complaint, cannot now be heard to interpose those contentions, in the form of arguments advanced in his brief, as a basis to defeat a Rule 12(b)(6) motion to dismiss.

The disclosures relating to the proposed [*13] certificate amendment are detailed and extensive. They occupy twelve printed, double columned pages in the proxy statement. In addition to describing the Class A stock's voting and limited transferability features, the proxy statement made detailed disclosures concerning the purpose and effect of the issuance of that stock.

As for the purpose of the amendment, the proxy statement disclosed that the Board had determined that the best interest of the corporation and its stockholders was "to preserve the environment in which management and employees continue to have a balanced focus on long range and short range objectives" by affording the Board "time to evaluate and consider properly any offers affecting the ownership and control of the Corporation." (Proxy St., p.19) Also disclosed is that the Board had considered a variety of defensive steps, including "poison pill" warrants, voting limitations on the holders of large blocks of stock, and issuing to management stock with "supervoting" rights. However, the Board had determined to propose the Class A stock certificate provision, which

would result in the long-term investors in the Corporation having more significant voice in its [*14] direction than short-term holders. In this connection, the Board of Directors has taken into account the fact that the Trustee under the Corporation's Savings Plan . . . holds for participating employees of the Corporation approximately 30% of the Corporation's total outstanding voting securities and for many years has been the largest stockholder of the Corporation. Id. n5

n5 The proxy statement elsewhere discloses that such long term holders include the directors, officers, and beneficial owners of shares held by the Savings Plan Trustee. Id. at 27.

As for the amendment's intended effect, the proxy statement disclosed that it "may well have the intended effect of making more difficult or discouraging any unfriendly efforts to acquire the Corporation." Id. The proxy statement repeatedly points out that because of their transfer restrictions, the Class A shares, which carry ten votes per share, will over time be converted into

shares of common stock having one vote per share. Accordingly, "all holders of Class A Common Stock who continue to hold their stock . . . will realize over time an increase in their relative voting power in the Corporation." (Proxy St., p.21). And [*15] that, the proxy statement specifically notes,

could result in some disadvantages to stockholders. For example, the ability of stockholders to remove incumbent directors or management would be reduced, even if such actions were favored by a majority of the holders of the Common Stock, as would the ability to benefit from other transactions that are opposed by the holders of Class A Common Stock. . . . . Id.

Finally, in even more pointed disclosures, the proxy statement made it Unmistakably clear that control of Rockwell could or would shift to the directors, officers, and employees who are participants in the Savings Plan and other plans:

The Corporation cannot predict to what extent stockholders will elect to convert their Class A Common Stock. Depending on the extent to which other holders of Class A Common Stock elect to convert their Class A Common Stock, the relative aggregate voting power of directors, officers and employees who on or after the Distribution are or become beneficial owners of shares held by the [Savings Plan] Trustee and other benefit and stock ownership plans may increase substantially over time. This becomes even more likely, if as Presently [*16] contemplated, additional shares of Class A Common Stock are issued in respect of employee stock option benefit and stock ownership plans.

Proxy St., p.26.

* * *

For example, if following the Distribution, all stockholders other than directors and officers of the Corporation and the Trustee were to sell their Class A Common Stock or otherwise convert their Class A Common Stock into Common Stock (other than to Permitted Transferees) the aggregate voting power of all of the Corporation's stockholders held by the directors, officers and the Trustee, who own approximately 31% of the outstanding shares of common stock would be approximately 71% and the aggregate voting power of all other stockholders of the Corporation, who own approximately 69% of the outstanding shares of common stock would be approximately 29% . . . .

The foregoing example is illustrative only. The actual effect on the relative voting power of the directors and officers and on the beneficial owners of shares held by

the Trustee will depend on the extent to which stock-holders sell their Class A Common Stock or convert their Class A Common Stock into Common Stock, the extent to which directors and officers and the [*17] Trustee retain their Class A Common Stock, and the extent to which additional equity securities are issued in the future. Id. at 27.

Lastly, the proxy statement disclosed that the amendment would

render more difficult or discourage the assumption of control of the Corporation by a holder of a large block of the Corporation's voting securities, a merger proposal, a tender offer, a proxy contest or the removal of incumbent directors or management, even if such action were favored by holders of a majority of the Common Stock, other than the holders of Class A Common Stock, and may prove beneficial to management in a hostile take-over attempt.

Proxy St., p.28.

Given these Painstaking and entirely candid disclosures, it is apparent to this Court that the disclosure of the additional "facts" that plaintiff contends were wrongfully omitted, would not have significantly altered the total mix of information made available to Rockwell's stockholders. To any reasonable stockholder reading the proxy statement it would have been clear that if the certificate amendment were approved, voting control could or would likely shift from the public shareholders to long term stockholders, specifically [*18] to the officers, directors, and employee participants in the Savings Plan. The result would be to entrench incumbent management and the Board. To argue, as plaintiff does, that the proxy statement should have embellished these disclosures by adding to them a confession of corporate wrongdoing in the form of a statement that the defendants' primary purpose was entrenchment, is simply not required. Williams v. Geier, supra at 12, Weingarden & Stark v. Meenan Oil Co., Del. Ch., C. A. Nos. 7291 & 7310, Berger, V.C. (January 2, 1985) at 7; Fisher v. United Technologies Corp., Del. Ch., C. A. No. 5847, Hartnett, V.C. (May 12, 1981) at 8.

Similarly immaterial are the "effect" disclosures that plaintiff contends should have been included. First, plaintiff argues that the defendants should have disclosed their expectation that the Savings Plan employee participants would vote in favor of management's position on any issue submitted to shareholders. That argument fails, because it rests upon a legally unsupported premise that directors are required to disclose which stockholders they "expect" will support (and, presumably, those which are expected to oppose) future management-sponsored [*19] proposals.

Second, plaintiff contends that the directors were obliged to disclose that they had "de facto" control over the Savings Plan. Such an argument, might, in these circumstances, have merit if the directors had de @e control, but here it is undisputed that they did not. n6 That being the case, it is unclear precisely what factual information plaintiff claims should have been communicated to the shareholders. The Court is not required to speculate as to what the plaintiff may have in mind by his use of a latinate term (de facto control), the meaning of which is (at least in this context), obscure.

n6 The Savings Plan contains a "pass through" provision which permits each employee participant to direct the Trustee how to vote the employees shares.

Third, nothing material would have been added by a disclosure that the defendants expected that the Savings Plan participants would retain their Class A shares and that the public shareholders would sell theirs. That is because that Possible scenario and its likely effect were in fact disclosed. n7 To that information the defendants were not required to add their subjective opinion as to whether that Particular scenario [*20] (over which they had no control) would or would not occur. The proxy statement fairly indicated that scenario as one of many Possible vote-shifting outcomes, and that the degree of the shift would depend upon many variables that could not be Predicted. The scenario in which management, the Board and the Savings Plan would wind up with over 70% of the voting power was at one extreme of that spectrum. Those disclosures, in the circumstances, were sufficient.

n7 On pages 26-27, the Proxy statement disclosed a scenario whereby if management and the Savings Plan retained all their Class A stock and the public stockholders sold their Class A stock, the relative voting power of Rockwell stockholders would shift from a 69%-31% split in favor of the public stockholders to a 71%-29% split in favor of management and the Savings Plan.

Finally, plaintiff cites no authority, or makes any reasoned argument, why the nature of the fee paid to Morgan Stanley should be deemed material. Plaintiff argues that what is material is not the amount of the fee, but rather its contingent nature, which establishes that Morgan Stanley had a conflict that tainted its advice to the Board. However, the complaint [*21] contains no allegation that challenges the substance of that advice, and the plaintiff offers no other rationale explaining why that fee arrangement would have been material to a rea-

1989 Del. Ch. LEXIS 94, *

sonable stockholder considering whether or not to vote in favor of the certificate amendment. No persuasive showing has been made as to how that information, in that particular context, would have been material.

Accordingly, the plaintiff's disclosure claims are insufficient as a matter of law.