# **TAB 4**

LEXSEE 2005 DEL CH LEXIS 11

**CERTAINTEED CORPORATION, a Delaware corporation, Plaintiff, v. CELOTEX CORPORATION, a Delaware corporation, and CELOTEX ASBESTOS SETTLEMENT TRUST, a Florida trust, Defendants.**

C.A. No. 471

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 11*

**October 25, 2004, Submitted
January 24, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Judgment entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff buyer brought suit against defendant seller, contending that the seller was responsible, under an asset purchase agreement, for indemnifying the buyer for certain losses that the buyer incurred with respect to the assets that the buyer purchased. The seller filed a motion to dismiss the claims as time-barred.

**OVERVIEW:** The parties executed an agreement in connection with the purchase of certain assets, which provided a remedy to compensate the buyer for liabilities incurred in connection therewith. When the seller refused to compensate the buyer for losses it suffered, the buyer brought suit. In ruling on the seller's motion to dismiss, the court held: (1) that the buyer's claims for injuries due to the fact that some of the facilities' environmental conditions were not as represented should have been dismissed, as the complaint demonstrated that the buyer was on inquiry notice of the claims more than three years before filing suit; (2) that, while the buyer's claims involving allegations that the seller breached its obligation to perform certain remediation were not time-barred, laches barred the buyer from seeking specific performance because the buyer acted so slowly in bringing suit; and (3) that the buyer's claims for third-party indemnification based on liabilities incurred as a result of the seller having sold defective roofing materials were not time-barred because the claims did not accrue until the buyer

settled the product claims less than three years before suit was brought.

**OUTCOME:** The court dismissed those claims for injuries incurred for improper environmental conditions. The court concluded that most of the buyer's claims for damages for failure to perform certain environmental remediation were not time-barred, but that laches barred the buyer from seeking specific performance. The court decided that the seller's claims for liabilities incurred as a result of the seller having sold defective materials were timely.

**CORE TERMS:** indemnification, statute of limitations, closing date, specific performance, environmental, contractual, inquiry notice, remediation, tolling, time-barred, third-party, breach of contract, environmental conditions, non-compliant, warranty, non-compliance, indemnity, motion to dismiss, anniversary, accrued, seller, buyer, discovery, applicable statute, third party, common law, inherently, unknowable, accrual, testing

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Courts > Common Law*
*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
[HN1] Under Delaware law, claims for common law indemnity do not accrue until an indemnitee can be confident that any claim against him has been resolved with certainty. A cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded.

2005 Del. Ch. LEXIS 11, *

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
[HN2] Indemnification claims do not accrue until the party seeking indemnification has made payment to the injured person.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
[HN3] An indemnity claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.

*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
*Torts > Procedure > Multiple Defendants > Indemnity > Noncontractual Indemnity*
[HN4] Common law indemnity is a device by which a tortfeasor passes through his entire liability to a third party whom the tortfeasor alleges is the real party responsible for injury.

*Contracts Law > Breach > General Overview*
*Contracts Law > Defenses > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN5] *Del. Code Ann. tit. 10, § 8106* provides a three-year statute of limitations governing actions for breach of contract.

*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
[HN6] The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely.  In considering such a motion, the court applies the plaintiff-friendly principles of Del. Ch. Ct. R. 12(b)(6), namely that well-pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception. When that burden is not met, a court must dismiss the complaint if filed after expiration of the limitations period.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN7] See Del. Ch. Ct. R. 10(c).

*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN8] A party asserting that tolling applies bears the burden of pleading specific facts to demonstrate that the statute of limitations is, in fact, tolled.

*Civil Procedure > Equity > General Overview*
*Contracts Law > Remedies > Specific Performance*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN9] While statutes of limitation do not formally apply in equity, a chancery court typically applies statutes of limitation by analogy in addressing a laches argument.

*Civil Procedure > Remedies > Injunctions > Mandatory Injunctions*
*Contracts Law > Remedies > Equitable Relief > General Overview*
*Contracts Law > Remedies > Specific Performance*
[HN10] A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three years set forth in *Del. Code Ann. tit. 10, § 8106* to seek such relief. Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

*Civil Procedure > Equity > General Overview*

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN11] Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.

*Civil Procedure > Equity > General Overview*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN12] Where a statute of limitations bars a legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Contracts Law > Remedies > Specific Performance*
[HN13] A request for specific performance may be defeated by a laches defense.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Civil Procedure > Remedies > Injunctions > Mandatory Injunctions*
*Contracts Law > Remedies > Specific Performance*
[HN14] Specific performance is regarded as a serious remedy that is only available when monetary damages are inadequate. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual violation. To obtain specific performance, a plaintiff must prove the existence and terms of an enforceable contract by clear and convincing evidence. As a result, mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action. Where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable.

*Contracts Law > Breach > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN15] Certain principles of law require a court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies. First, the court must ascertain the date of accrual of the cause of action. A cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause

of action. The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach. For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN16] In determining whether a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies, a court, in addition to ascertaining the date of accrual of the cause of action, must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment, inherently unknowable injury, and equitable tolling. When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims. Assuming a tolling exception applies, the third step that is required is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of the reason for injury. Rather, it exists when the plaintiff becomes aware of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of injury.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN17] A plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury.

*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*
[HN18] A claim of fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts

or otherwise made misrepresentations intended to put the plaintiff off the trail of inquiry.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN19] While a court is obliged to make plaintiff-friendly inferences in ruling on a motion to dismiss, it is not obliged to make unreasonable inferences.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Contracts Law > Remedies > Specific Performance*
[HN20] Specific performance is an equitable remedy normally applicable only in exigent circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Multiple Defendants > Indemnity > Noncontractual Indemnity*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN21] Claims for third-party liabilities accrue in accordance with principles of common law indemnity.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Remedies > Specific Performance*
*Governments > Legislation > Statutes of Limitations > Extension & Revival*
[HN22] By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree."

*Civil Procedure > Dismissals > General Overview*
*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN23] Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of Delaware, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree. That reasoning applies with even greater force when a party seeks after long delay to recover damages because its contractual

party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute.

**COUNSEL:** Attorneys for Plaintiff: William M. Kelleher, Esquire, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, Wilmington, Delaware; Harry Weiss, Esquire, and Monique Mooney, Esquire, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, Philadelphia, Pennsylvania.

Attorneys for Celotex Corporation: Richard G. Placey, Esquire and Richard M. Donaldson, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, Wilmington, Delaware; Stephen A. Madva, Esquire, and David D. Langfitt, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, Philadelphia, Pennsylvania.

Attorneys for Celotex Asbestos Settlement Trust: R. Judson Scaggs, Jr., Esquire and Patricia R. Uhlenbrock, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Daniel J. Donnellon, Esquire, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio.

**OPINION:**

MEMORANDUM OPINION

**STRINE, Vice Chancellor**

Plaintiff CertainTeed Corporation purchased an operating business and several industrial facilities from Defendant Celotex Corporation under an asset purchase agreement. Under the asset purchase agreement, Celotex assumed the obligation [*2] to indemnify CertainTeed for certain losses CertainTeed might incur relating to the assets it was purchasing, and more generally, for losses incurred as a result of breach of the asset purchase agreement itself. After closing, CertainTeed began to experience losses of various kinds that it believed fell within Celotex's contractual duty of indemnification. After complying with the contractual notification procedure and receiving no satisfaction from Celotex, CertainTeed brought this case alleging that Celotex is responsible for these losses.

Celotex has filed a motion to dismiss CertainTeed's claims as time-barred, alleging that: 1) all of CertainTeed's claims accrued as of the August 18, 2000 closing date of the asset purchase agreement; 2) all statutes of limitation that apply (by analogy in equity under the laches doctrine) required a filing within three years of that date; 3) no basis for tolling any limitation period exists; and 4) CertainTeed filed this suit on May 28, 2004, after the applicable limitation periods had expired.

In this opinion, I cannot find as a matter of law that all of CertainTeed's claims accrued at closing and became time-barred on the third anniversary [*3] of the closing date. CertainTeed brings three general categories of claims, each of which implicates different principles of claim accrual and tolling.

The first category involves CertainTeed's claims for injuries incurred because some of the acquired facilities' environmental conditions were not as represented and warranted in the asset purchase agreement. Even indulging CertainTeed's argument that these conditions were not discoverable at the time of closing and that the applicable statutes of limitation were therefore tolled, the complaint demonstrates that CertainTeed was on inquiry notice of these claims more than three years before filing this suit. This category of claims is therefore dismissed.

The second category of claims involves allegations that Celotex breached its obligation to perform certain environmental remediation and testing work after the closing date. These claims accrued, I find, as of the date of non-compliance with the asset purchase agreement. Therefore I conclude that most of these claims are not time-barred, to the extent damages for non-compliance are sought. By contrast, however, I conclude that laches bars CertainTeed from seeking specific performance [*4] of these obligations after acting so slowly in bringing suit. A demand for specific performance is akin to a request for a mandatory injunction and it is not appropriate to measure promptness by analogy to a statute of limitations for a damages claim. CertainTeed's inexcusable torpidity in bringing suit prejudices Celotex.

The final category involves a classic claim for third-party indemnification based on liabilities that CertainTeed allegedly incurred as a result of Celotex having (as operator of the business CertainTeed bought) sold defective roofing materials. As this is a claim for third-party indemnification, it did not accrue until CertainTeed settled the product claims in July 2001. CertainTeed brought suit within three years of that date, and the claim is therefore timely.

I. Overview

CertainTeed is a manufacturer of building materials. Celotex, now bankrupt, was formerly a manufacturer of building materials, most (in)famously asbestos. Defendant Celotex Asbestos Settlement Trust (the "Trust") is the sole stockholder of Celotex, and for purposes of the asset sale at issue in this case, is Celotex's indemnitor. For brevity's sake and because the Trust has adopted Celotex's [*5] arguments in their entirety, I will not refer to the Trust in this opinion, except with regard to one unique argument that the Trust makes on its own behalf.

The facts underlying this dispute, upon which this motion shall be considered, are as set forth in CertainTeed's amended complaint (the "Complaint"). CertainTeed contracted with Celotex to purchase certain assets related to Celotex's roofing and fiberglass mat businesses, including the operating assets of those businesses, and certain facilities used for manufacturing those items. On June 29, 2000, the Asset Purchase Agreement (the "Agreement") effecting this transaction was executed. Significantly, the Agreement provided a remedy to compensate CertainTeed for environmental and other liabilities incurred in connection with the facilities. The sale closed on August 18, 2000 (the "Closing Date" or "Closing"), at which time CertainTeed took title to the four facilities now at issue (the "Facilities").

In this case, CertainTeed alleges three categories of losses for which it seeks relief from Celotex. I outline those categories briefly now.

First, in the Agreement, Celotex made numerous representations and warranties concerning [*6] environmental conditions at the Facilities, the validity of various permits required for operations at the Facilities, and compliance with applicable environmental regulations. After Closing, however, CertainTeed began to discover various environmental problems that had been warranted not to exist. CertainTeed incurred losses related to these environmental problems, and sought reimbursement for these losses and certain other liabilities in accordance with the provisions of the Agreement. Celotex refused to acknowledge its liability for the claims asserted. CertainTeed has now sued, under various theories, to recover its losses in connection with the non-compliant conditions of the Facilities. I define these claims generally as the "Facilities Claims."

Second, CertainTeed has sued Celotex because Celotex allegedly failed to complete certain environmental remediation and testing activities required by the Agreement. I define these as the "Remediation Claims."

Third and finally, CertainTeed alleges that it suffered losses because Celotex had, before Closing, sold defective roofing products. CertainTeed settled claims made by a general contractor whose clients threatened to sue over [*7] damage caused by those products. It seeks indemnification for the settlement costs from Celotex. I call this claim the "Product Claim."

Celotex has brought this motion arguing that each category of claim was brought too late and that the Complaint should be dismissed on the basis of laches.

The facts of this case are complex and numerous. In the interests of efficiency and readability, I will introduce most of the relevant facts in connection with the categories of claims I have outlined. Because all of Cer-

tainTeed's claims have their origins in the obligations undertaken and promises made by Celotex in the Agreement, it is necessary initially to discuss the relevant provisions of the Agreement and their implications for the pending motion.

II. Indemnification Provision Of The Asset Purchase Agreement

Article 8 of the Agreement requires that Celotex reimburse CertainTeed for specified liabilities. Under the Agreement, Celotex retained liability for certain "Excluded Liabilities," including liabilities for certain environmental violations at the Facilities and third-party product liabilities. Celotex agreed to "indemnify" CertainTeed for: 1) losses related to breach of representations [*8] and warranties contained in the Agreement; 2) failure to perform covenants contained in the Agreement; and 3) the Excluded Liabilities.

As an initial matter, the potentially misleading use of the term "indemnification" in the Agreement requires clarification. CertainTeed has clung to this contractual term as a life raft against the sinking of its late-filed claims by contending that all of its claims must be considered as akin to common law claims for indemnification. [HN1] Under Delaware law, claims for common law indemnity do not accrue until the indemnitee can "be confident that any claim against him . . . has been resolved with certainty." n1 In other words, a cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded. n2 Because CertainTeed did not experience an ascertainable loss on any of its claims more than three years before it filed the Complaint, it alleges that all of its claims are timely. For reasons I will now explain, that argument lacks logical, legal, or equitable force.

n1 *Scharf v. Edgecomb Corporation, 864 A.2d 909, 2004 Del. LEXIS 564,    A.2d   , 2004 WL 2830885, at *8 (Del. Dec. 7, 2004).*

[*9]

n2 *See Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc., 2004 Del. Ch. LEXIS 125, 2004 WL 1949300, at *15 (Del. Ch. Aug. 27, 2004)* [HN2] ("Indemnification claims do not accrue until the party seeking indemnification has made payment to the injured person."') (citing *McDermott v. New York, 50 N.Y.2d 211, 406 N.E.2d 460, 461, 428 N.Y.S.2d 643 (N.Y. 1980));* *Chesapeake Utilities Corp. v. Chesapeake and*

*Potomac Tel. Co. of Maryland, 48 Pa. Commw. 630, 410 A.2d 101, 102 (Del. Super. Mar. 30, 1979)* [HN3] ("The [indemnity] claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.")

Article 8 of the Agreement n3 provides a contractual remedy for Losses sustained by CertainTeed, referred to as "Indemnification." n4 The term "Indemnification" is used here as a contractual term of art to describe this contractual remedy. In the context of a merger or asset acquisition, the term "indemnification" [*10] generally refers to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties. n5 "Indemnification," as used in Article 8, does not refer to the common law right known as "indemnity." n6 That is, Article 8 does not provide a general right of reimbursement for debts owed to third parties by Celotex as a secondarily-liable party. This is evidenced by language in § 8.4(c) of the Agreement that specifically distinguishes "Third Party Claims" from claims generally covered under the indemnification remedy. n7 Instead, Article 8 generally sets forth the subject matter for which CertainTeed may bring claims and procedures for bringing such claims.

n3 By its terms, the Agreement entitles its Articles, for example, "Article 8," but identifies subsections of its Articles as, for example, "Section 8.1." In keeping with this scheme, I will refer to the contractual indemnification remedy generally as "Article 8," but I will discuss specific provisions of the Agreement by reference to the corresponding section number.

[*11]

n4 Agreement at 39.
n5 *See* Lou R. Kling and Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions*, § 1.05[5], at 1-39 (2001) ("[Indemnification] provisions grant either party (particularly, the purchaser) the right to recover, postclosing, for misrepresentations and noncompliance with covenants by the other party.").
n6 *See* 42 C.J.S. *Indemnity* § 2 at 73 (1991) [HN4] ("[Common law] indemnity is a device by

which a tort-feasor passes through' his entire liability to a third party whom the tort-feasor alleges is the real party responsible for injury.").
n7 Agreement at 39 (defining Third Party Claims as "any Action against the Indemnitee by a third party which . . . if prosecuted successfully, would be a matter for which the Indemnitee is entitled to indemnification under this Agreement . . .").

Section 8.1 of the Agreement establishes the broad scope of coverage of the indemnification remedy, stating in relevant part that:

> [Celotex agrees to] indemnify, defend and hold harmless [CertainTeed] from, against [*12] and in respect of any Losses arising from or related to:
>
> (a) any breach or inaccuracy . . . in any representation or warranty of [Celotex] hereunder . . .;
>
> (b) the failure of [Celotex] to perform any covenant or agreement to be performed by it hereunder;
>
> (c) any or all of the Excluded Liabilities . . . n8

n8 Agreement at 39-40.

"Losses," as referenced in § 8.1, are defined in § 1.1 of the Agreement:

> "Loss" means any and all claims, losses, liabilities, damages, costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred or suffered by the relevant party. n9

n9 Agreement at 6.

"Excluded Liabilities," as referenced in § 8.1, are also defined in § 1.1 of the Agreement, which states in relevant part: [*13]

> "Excluded Liabilities" means all liabilities of [Celotex] other than the Assumed Liabilities, including (without limitation): (a) any other liabilities of [Celotex] . . .; (b) the Other Environmental Liabilities; (c) the Acquired Assets Environmental Liabilities; (d) the costs to complete the Remediation Projects properly . . . n10

n10 Agreement at 4-5.

Section 8.3(a) of the Agreement sets temporal limitations on indemnification claims and lawsuits brought under Article 8 as follows:

> No claims may be made or suit instituted under any provision of this Article 8 after the second (2nd) anniversary of the Closing Date, except for: (i) claims of the Buyer for Losses related to Acquired Assets Environmental Liabilities, which shall survive the execution and delivery of this Agreement and the Closing until the third (3rd) anniversary of the Closing Date; *provided however*, that it is of the essence that, after the third (3rd) anniversary of the Closing Date, the Buyer shall have [*14] no claim, including (without limitation) any claim for indemnification or contribution, against the Seller for or with respect to Acquired Assets Environmental Liabilities other than such claims which are Reserved Claims as of that date; and
>
> (ii) Reserved Claims which shall survive indefinitely (subject to any applicable statute of limitations). The term "Reserved Claims" means all claims: (1) as to which the Indemnitee has given the Indemnitor proper notice pursuant to § 8.4

below prior to the expiration of the applicable survival period; (2) based upon actual fraud or intentional misrepresentation on the part of the Indemnitor at or prior to the Closing; or (3) based upon Excluded Liabilities (other than Acquired Assets Environmental Liabilities) or Assumed Liabilities, as the case may be. n11

n11 Agreement at 41.

Section 8.4(a) requires that CertainTeed must provide Celotex with appropriate written notice in order to assert a valid claim:

A claim for indemnification hereunder . . [*15] . shall be made by [CertainTeed] by delivery of a written notice to [Celotex] requesting indemnification and specifying in reasonable detail the basis on which indemnification is sought and the amount of the Losses incurred (if known) . . . n12

n12 Agreement at 42.

The plain language of Article 8 establishes "survival periods" during which claims may be brought or reserved. CertainTeed may bring claims after the survival periods only if they are reserved in accordance with § 8.3(a)(ii). "Reserved Claims" may be brought after the third anniversary of the Closing Date, subject to the "applicable statute of limitations," which, based on the combined effect of § 10.9 of the Agreement n13 and *10 Del. C. § 8106*, is three years for contract and tort claims. n14 The cumulative effect of these provisions is that CertainTeed's Article 8 claims are valid only if:

1. the asserted liability is within the scope of Article 8;

2. an indemnifiable Loss was sustained;

3. notice of the claim [*16]   was filed within the applicable survival period;

4. the claim was converted to a Reserved Claim, permitting it to survive the third anniversary of the Closing Date; and

5. this action was filed within the "applicable statute of limitations" for each claim.

n13 Agreement at 49. Section 10.9 of the Agreement states that Delaware substantive law governs the parties' rights under the Agreement.
n14 [HN5] *10 Del. C. § 8106* provides a three-year statute of limitations governing actions for breach of contract (*see Fike v. Ruger, 754 A.2d 254, 260 (Del. Ch. 1999)*) and actions for torts (*see Becker v. Hamada, 455 A.2d 353, 356 (Del. 1982)*).

The cumulative impact of these provisions quickly dispels CertainTeed's key argument concerning claim accrual. CertainTeed advances a theory that statutes of limitation as to all of its claims begin to run only after the entirety of each claimed loss has been established, n15 citing case law supportive of the proposition [*17] that claims for indemnification accrue when an indemnifiable loss is sustained. n16 Although this general proposition is a correct statement of the law governing third-party indemnification, n17 CertainTeed's argument misconstrues the indemnification remedy provided under Article 8 of the Agreement as implicating common law theories of indemnity. At issue here is a contractual remedy, termed "Indemnification," that has no direct relation to common law indemnification. CertainTeed argues that, under its theory, indemnification claims could be brought when the first dollar of loss is sustained, but the statute of limitations would not begin to run until the last dollar of loss is sustained. n18 The Agreement clearly rejects that argument. Section 8.3(a)(ii) states that claims for indemnification survive subject to the "applicable statute of limitations," making clear that the timeliness of any claim will be measured by the statute of limitations normally applicable to such a claim. Further, the clear implication of the Agreement is that time is of the essence in submitting claims under Article 8, n19 and thus, absent claim-specific justifications for its application, this "last dollar" [*18] theory is invalid. Nevertheless, CertainTeed's theory is not wholly without merit, because the "applicable statute of limitations" for third-party claims could be subject to accrual principles of common law indemnity.

n15 Pl. Br. at 15 (citing *United States Fidelity & Guarantee Co. v. Gray's Adm'rs, 29 Del. 161, 6 Boyce 161, 97 A. 425 (Del. Super. 1916)*; *Salovaara v. SSP Advisors, L.P., 2003 Del. Ch. LEXIS 142, 2003 WL 23190391 (Del. Ch. Dec 22, 2003)*; *Shinault v. Nationwide Mut. Ins. Co., 1995 Del. Super. LEXIS 178, 1995 WL 270089 (Del. Super. Mar. 13, 1995)*; *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc., 1989 Del. Super. LEXIS 153, 1989 WL 40973 (Del. Super. Apr. 11, 1989))*.

n16 *United States Fidelity & Guarantee Co. v. Gray's Adm'rs, 29 Del. 161, 6 Boyce 161, 97 A. 425 (Del. Super. 1916)*; *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland, 401 A.2d 101 (Del. Super. 1979)*; *Seitz v. A-Del Const. Co., 1987 Del. Super. LEXIS 1279, 1987 WL 16711 (Del. Super. Aug. 13, 1987)*; *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc., 1989 Del. Super. LEXIS 153, 1989 WL 40973 (Del. Super. Apr. 11, 1989)*; *City Investing Co. Liquidating Trust v. Continental Cas. Co., 1992 Del. Ch. LEXIS 78, 1992 WL 65411 (Del. Ch. Mar. 30, 1992)*; *Getty Oil Co. v. Catalytic, Inc., 509 A.2d 1123 (Del. Super. 1986)*; *Shively v. Ken-Crest Centers for Exceptional Persons, 1998 Del. Super. LEXIS 489, 1998 WL 960719 (Del. Super. Nov. 19, 1998)*.

[*19]

n17 *See* cases cited *supra* notes 2, 15-16.

n18 Transcript at 72-73.

n19 Agreement, § 8.3(a)(i) (stating in relevant part that ". . . it is of the essence that, after the third (3rd) anniversary of the Closing Date, [CertainTeed] shall have no claim . . .").

Therefore, in the case of counts for breach of contract and misrepresentation, where claims involve direct injury to CertainTeed -- e.g., claims resting on the assertion that CertainTeed was injured because a Facility's environmental condition was not as represented in the Agreement -- timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling. Only if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) will CertainTeed's claim accrue at the time when the last dollar of loss is ascertainable. n20

n20 *See* cases cited *supra* note 2.

[*20]

It should also be noted that, at this stage, I assume that all of CertainTeed's claims complied with the first four requirements of Article 8. n21 That is, all of CertainTeed's claims: 1) are subject to indemnification under Article 8; 2) seek indemnification for Losses sustained by CertainTeed; 3) were properly submitted to Celotex within the applicable survival period; and 4) were converted to Reserved Claims. Therefore, the validity of each of CertainTeed's claims stands or falls on its compliance with the "applicable statute of limitations."

n21 There may be one exception to this general statement. The Complaint does not allege that CertainTeed's claim for losses incurred at the Russellville, Alabama Facility was submitted to Celotex in accordance with the requirements of § 8.4 of the Agreement. But Celotex does not argue this point, and I assume that such notice was given.

### III. Legal Standard For A Motion to Dismiss

[HN6] The timeliness of claims may be determined on a motion to dismiss if that facts [*21] pled in the complaint, and the documents incorporated within the complaint, n22 demonstrate that the claims are untimely. n23 In considering such a motion, the court applies the plaintiff-friendly principles of Rule 12(b)(6), namely that well-pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. n24 At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception. n25 When that burden is not met, the court must dismiss the complaint if filed after expiration of the limitations period. n26

n22 CertainTeed has submitted a substantial volume of exhibits as an appendix to its Amended Complaint. Court of Chancery Rule 10(c) states

that [HN7] "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Exhibits submitted by CertainTeed are thus appropriately considered here.

n23 *See, e.g. In re Dean Witter Partnership Litigation, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*3 (Del. Ch. July 17, 1998); Kahn v. Seaboard Corp., 625 A.2d 269, 277 (Del. Ch. 1993).*

[*22]

n24 *See Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*4.*

n25 *See id. 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at \*6* [HN8] ("The party asserting that tolling applies . . . bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

n26 *See id. 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at \*4.*

[HN9] While statutes of limitation do not formally apply in equity, this court typically applies statutes of limitation by analogy in addressing a laches argument. n27 In this case, the parties have not argued for any general departure from the typical approach, and I adhere to it for the most part. Importantly, however, I note that CertainTeed seeks specific performance of certain affirmative obligations Celotex allegedly failed to perform in accordance with its duties under the Agreement. [HN10] A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. n28 Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three [*23] years set forth in *§ 8106* to seek such relief. n29 Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

n27 *See generally U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc., 677 A.2d 497, 502 (Del. 1996)* [HN11] ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."); *Kahn, 625 A.2d at 272* [HN12] ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.").

n28 *See* Donald J. Wolfe and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 12-3, 12-34 (2004).

n29 [HN13] A request for specific performance may be defeated by a laches defense. *See* Wolfe & Pittenger at § 12-3, 12-49. [HN14] Specific performance is regarded as a serious remedy, however, that is only available when monetary damages are inadequate. *See id.* at 12-35. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual violation. To obtain specific performance, a plaintiff must prove "the existence and terms of an enforceable contract by clear and convincing evidence." *Id.* As a result, it seems plain that mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. *See Carey v. Landy, 1989 Del. Ch. LEXIS 47, 1989 WL 44051, at \*3 (Del. Ch. Apr. 27, 1989)* ("Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action."); *Hollingsworth v. Szczesiak, 32 Del. Ch. 274, 84 A.2d 816, 822 (Del. Ch. 1951)* (holding that, where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable).

[*24]

IV. Statute Of Limitations Analysis

CertainTeed brings claims for various breaches of contract and for tortious misrepresentations. Celotex argues that all of these claims are time-barred. There is no dispute that the "applicable statute of limitations" for each of CertainTeed's claims is three years, however, this limitations period is subject to tolling in certain circumstances that are arguably present here. The statute of limitations analysis differs for each of the subsets of claims that CertainTeed asserts.

In addressing the timeliness of the various claims made by CertainTeed, I am required to apply settled principles of law recently reiterated by the Delaware Supreme Court in *Wal-Mart Stores Inc. v. AIG Life Ins. Co.* n30 Those [HN15] principles require the court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies.

n30 *860 A.2d 312 (Del. 2004).*

First, the court must ascertain [*25] the date of accrual of the cause of action. *Wal-Mart* holds that a cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." n31 The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach. n32 For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. n33 Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party. n34

n31 *Id.* at 319.
n32 *See Ambase Corp. v. City Investing Co., 2001 Del. Ch. LEXIS 16, 2001 WL 167698, at *14 n.4 (Del. Ch. Feb. 7, 2001).*
n33 *See Kaufman v. C.L. McCabe & Sons, 603 A.2d 831, 834 (Del. 1992).*
n34 *See* cases cited *supra* notes 2, 15-16.

[*26]

[HN16] Second, the court must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment, n35 inherently unknowable injury, n36 and equitable tolling. n37 When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims.

n35 *See Halpern v. Barran, 313 A.2d 139, 143 (Del. Ch. 1973).*
n36 *See Isaacson, Stolper & Co. v. Artisan's Savings Bank, 330 A.2d 130, 132 (Del. 1974).*
n37 *See Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *6.*

Assuming a tolling exception applies, the third step that is required under *Wal-Mart* is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of the reason [*27] for injury. n38 Rather, it exists when the plaintiff becomes aware of "facts sufficient to put a person of

ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of injury]." n39

n38 *Id. 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at *7* (emphasis omitted).
n39 *Wal-Mart, 860 A.2d at 319* (citations and emphasis omitted).

This court, and our Supreme Court, have emphasized that [HN17] a plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury. n40

n40 *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *6*; *U.S. Cellular, 677 A.2d at 504 n.7.*

With these principles in mind, I turn to addressing the categories [*28] of claims brought by CertainTeed. That task is unduly complicated by the Complaint, which unnecessarily proliferates redundant counts based on identical conduct, dividing single claims involving breaches of the Agreement into multiple counts. For the sake of analytical clarity, I have organized the claims into more readily understandable categories.

V. Application Of The Statute Of Limitations Analysis To Each Category Of Claims

A. Facilities Claims

The first category of claims is the largest in number and in economic importance, or so it appears. This category involves claims that the environmental conditions existing at four of the Facilities were inconsistent with the conditions represented and warranted in the Agreement. Although CertainTeed has pled these claims confusingly, in essence it alleges that Celotex breached representations and warranties in the Agreement -- a breach of contract claim -- and seeks contractual indemnification under the Agreement. CertainTeed has repetitively pled contractual claims based on the same noncompliance under different rubrics, including contractual indemnification, breach of contract, specific performance, and declaratory judgment. [*29] n41 Nonetheless, each is ultimately a claim for breach of contract. Under *10 Del. C. § 8106*, a three-year statute of limitations applies.

n41 Complaint, Counts I, II, V, VI, and VII.

Despite what appears to be the plain language of § 8.3(c) of the Agreement, which precludes CertainTeed from suing for fraud as to false representations and warranties, n42 CertainTeed has also pled that Celotex committed fraudulent misrepresentation by providing false representations and warranties of the conditions of the Facilities. Even assuming these claims are viable, under *10 Del. C. § 8106*, CertainTeed's misrepresentations are also subject to a three-year statute of limitations, and whether treated as breach of contract or as tort, the accrual date as to all of these claims was the date of Closing. On that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented. Because the Complaint was filed more than three years [*30] after Closing, the key question as to this category becomes whether a tolling exception applies and, if so, when CertainTeed was on inquiry notice of its claims. A category-wide discussion of these issues is useful as precedent to considering each Facility individually.

> n42 Agreement, § 8.3(c) (stating in relevant part: "*Sole Remedy*. The indemnification remedy provided in this Article 8 shall be [CertainTeed's] sole and exclusive remedy for breaches of the representations and warranties of [Celotex] . . . ").

CertainTeed explicitly argues only one tolling exception -- fraudulent concealment. But [HN18] a claim of fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to "put the plaintiff off the trail of inquiry." n43 In its Complaint, exhibits, and other pleadings, CertainTeed alleges no post-Closing acts by Celotex attempting to cover up non-compliant conditions at [*31] the Facilities. Further, after Closing, the Facilities were under CertainTeed's own dominion. And, as will be seen, CertainTeed discovered the non-compliant conditions at various of the facilities almost immediately upon assuming ownership, rendering the fraudulent concealment exception even less applicable to this case.

n43 *Halpern, 313 A.2d at 143.*

Implicitly, n44 but a bit more logically, CertainTeed argues that the non-compliant conditions at the Facilities were inherently undiscoverable and, for that reason, the statute of limitations was tolled. Frankly, that argument, at first blush, appears wholly strained. Any purchaser of industrial manufacturing facilities in our society knows of the serious risk that there will be conditions on the property, resulting from past operations, that violate relevant environmental laws and that will have to be cleaned up by the present owner. That is why purchasers of such properties procure environmental audits before buying. n45 To apply the inherently [*32] unknowable injury doctrine, which originally addressed situations where surgeons left items within the bodies of their patients, in a dissimilar circumstance so as to excuse a tardy filing by a sophisticated, multi-billion dollar corporation like CertainTeed has no apparent commercial or equitable logic. n46 Rather, one would think that the law should expect such purchasers to do appropriate due diligence before purchase.

> n44 CertainTeed did not squarely invoke the inherently unknowable injury exception in its brief, but explicitly raised it and directly relied upon it at oral argument.
> n45 By way of example, when CertainTeed sold the Los Angeles Facility to the University of Southern California less than one year after the Closing Date, USC insisted upon such environmental audits as a condition precedent to closing, and further, in connection with that sale, extracted from CertainTeed an obligation to remediate all environmental damage discovered on that property.
> n46 Admittedly, the doctrine of inherently unknowable injury has been applied in cases when a defendant's wrongdoing was unknowable because evidence of a defendant's negligence was, for example, buried underground. In *Rudginski v. Pullella (378 A.2d 646 (Del. Super. 1977))*, purchasers of a new septic system were held to have had no reason to suspect the new system they had purchased was defective until it malfunctioned. Here, however, CertainTeed was not purchasing a new underground product that it would have been entitled to assume was in proper working order. It was purchasing industrial facilities of more than modest vintage, on which it was already aware of some environmental problems and on which it should have suspected that other problems might also exist.

[*33]

There are arguably two reasons why the doctrine might credibly apply in a situation like this one. Assume the purchaser of an industrial facility extracted from the seller the pre-closing obligation to have independent environmental audits performed and to receive clean results of those audits. In such cases, the buyer could reasonably be considered to have acted diligently by, in essence, extracting from the seller the conduct of responsible due diligence that should have detected non-compliant conditions. n47 Having done so, the buyer would be entitled to assume that facilities were as contractually warranted until inquiry notice to the contrary arose. Why? Because one would assume that the non-compliant conditions, if discoverable, would have been detected by the pre-Closing audits.

n47 *See, e.g., Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 650-1 (Del. Super. 1985)* (holding that where, in accordance with a contractual relationship, a buyer relied on a seller's expertise and assurances in determining the existence and cause of damages to the subject property, and where the buyer could only discover the failure of the seller to perform in good faith and in accordance with the seller's contractual obligations through hiring an independent specialist to make the same inspections required of the seller, the buyer could be "blamelessly ignorant" for the purposes of tolling analysis).

[*34]

By contrast, CertainTeed acted here with much less diligence, extracting as to each Facility representations and warranties that environmental conditions were acceptable, and the right to receive any environmental audits that had been conducted by Celotex in the past five years. That is, CertainTeed did not act prudently in ascertaining the true conditions of the Facilities before Closing. In my view, CertainTeed's argument that procuring the representations and warranties themselves as to the compliant conditions of the Facilities was sufficient to invoke the inherently unknowable injury doctrine is a non-sequitur. It is the breach of these very representations and warranties that creates a claim; the question is whether the breach is reasonably discoverable. Otherwise, any claim for breach of a contractual representation would toll the statute of limitations on the grounds that the representation itself somehow rendered the breach of the representation undetectable. CertainTeed's own Complaint, as we shall see, refutes the notion that a party

using rational commercial practices could not have discovered the non-compliant conditions.

As a result, CertainTeed is, in my view, in a [*35] weak position to invoke the inherently unknowable injury doctrine. But a recent decision of our Supreme Court makes it arguable that CertainTeed can invoke the doctrine, even on this record and even given its lack of reasonable prudence. In *Wal-Mart*, the Supreme Court held that one of America's largest corporations, despite having a huge legal department and access to the best outside legal advice money could buy, could not be expected to discover that its utilization of a tax-avoidance strategy advocated by insurance brokers might be ruled by the Internal Revenue Service to be improper. n48 This ruling sets a low threshold for the use of the doctrine of inherently unknowable injury, but one that is hard for a trial court to ignore.

n48 *860 A.2d 312.*

Given that the conditions CertainTeed claims could not be detected were at least as hidden as the legal risk Wal-Mart supposedly could not identify, I accept solely for the sake of argument that the misrepresented environmental conditions at [*36]  the Facilities were not discoverable and that the statute of limitations was tolled with respect to the Facilities Claims until CertainTeed was on inquiry notice.

At the same time, however, the commercial context does, to my mind, matter. CertainTeed premises its claims on one Asset Purchase Agreement. Once it had reason to suspect, despite the pre-Closing representations and historical environmental audits to be provided to it by Celotex, that some of the Facilities did not comply with their warranted condition, CertainTeed was not entitled to lean back in the recliner and not investigate whether, as to other of the Facilities, similar breaches also existed. Rather, knowing that it could not rely on Celotex's pre-Closing representations and audits, CertainTeed was duty-bound to investigate and to try to discover all of its claims against Celotex. n49 With this in mind, I next turn to determining when CertainTeed was on inquiry notice, which must be analyzed on a facility-by-facility basis.

n49 *See U.S. Cellular, 677 A.2d at 504, n.7* ("Whatever is notice calling for inquiry is notice of everything to which such inquiry might have led.").

[*37]

### 1. The Birmingham Facility

The Complaint alleges that the Birmingham, Alabama Facility was non-compliant because soil and groundwater were contaminated with naphthalene, coal tar, and other hazardous substances. But the Complaint also admits that the non-compliance was suspected before Closing n50 and confirmed in October 2000. n51 Thus, at the very latest, inquiry notice triggered the running of the statute of limitations in October 2000, but CertainTeed waited more than three years after that date to file suit. Even after receiving formal notice of a permit violation, CertainTeed took almost two more years to sue. The existence of coal tar waste in the soil was ascertained at the Birmingham Facility soon after Closing. Naphthalene contamination was found in groundwater between August and October 2000, n52 and in the soil in February 2001. n53 On July 30, 2002, CertainTeed received notification that the Birmingham Facility was not in compliance with its National Pollution Discharge Elimination System Permit. n54 Making all inferences in favor of CertainTeed, the statute of limitations was tolled until October 2000 at the latest, when groundwater contamination was first ascertained. [*38] Although other injuries were discovered after October 2000, the initial discovery constituted "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of other contamination and noncompliance with permit requirements. n55 Thus, the applicable statute of limitations began to run soon after the Closing Date and expired soon after the third anniversary of the Closing Date, in October 2003. As to the Birmingham Facility, the Facilities Claims filed May 28, 2004 are therefore time-barred.

n50 Complaint P 78.
n51 Complaint Ex. K at 4 (noting that Water Quality Data recorded between August and October 2000 "demonstrated naphthalene concentrations far in excess of targeted federal and state water quality criteria").
n52 *Id.*
n53 *Id.*
n54 Complaint Ex. L at 5.
n55 *Wal-Mart, 860 A.2d at 319.*

### 2. The Cincinnati Facility

At the Cincinnati, Ohio Facility, shortly [*39] after Closing, CertainTeed discovered liquid hydrocarbons floating on groundwater. n56 On an unspecified date thereafter, CertainTeed also discovered petroleum and tar contamination in the soil. n57 Here again, discovery of groundwater contamination constituted inquiry notice for other environmental liabilities. The statute of limitations was tolled only until "shortly after the Closing Date." n58 The Facilities claims relating to the Cincinnati Facility were not filed within the limitations period that began to run shortly after Closing, and are thus time-barred.

n56 Complaint P 101.
n57 Complaint P 103.
n58 Discovery of contamination at the Cincinnati facility is characterized as having occurred "shortly after closing," and the actual date is not specified. In order for this action filed May 28, 2004 to have been timely, however, discovery would have to have been sometime after May 28, 2001, more than nine months after the Closing Date. [HN19] While I am obliged to make plaintiff-friendly inferences, I am not obliged to make unreasonable inferences.

[*40]

### 3. The Los Angeles Facility

Based on conditions that had already been discovered at the Birmingham and Cincinnati Facilities, by October 2000, CertainTeed should have suspected that environmental conditions at the other acquired Facilities were also potentially non-compliant and begun to undertake diligent discovery efforts. Having been given reason to suspect two very serious breaches, CertainTeed could not fail to act with diligence as to other possible instances of non-compliance by taking prudent steps to ascertain the environmental condition of each Facility.

In this regard, the plain averments of the Complaint implicitly but unmistakably concede that CertainTeed was on inquiry notice as to possible non-compliance at the Los Angeles Facility more than three years before it filed its May 28, 2004 Complaint. In the Complaint, CertainTeed alleges that non-compliance at Los Angeles was first confirmed on May 31, 2001 in an Environmental Site Assessment report disclosing the existence of contamination. n59 But, the Assessment obviously does not reflect results discovered the very day that the report was completed or the date when results were first delivered to CertainTeed. [*41] Rather, it manifests the results of CertainTeed's actions in response to earlier inquiry notice. As of May 31, 2001, CertainTeed indisputably should have been on actual notice of the non-compliance, but the statute of limitations had already begun running

no later than the time when CertainTeed first initiated the Assessment, which was obviously many months before then.

n59 Complaint Ex. G at 1-2. CertainTeed alleges that it did not actually receive the Environmental Site Assessment dated May 31, 2001 until mid-July 2001. CertainTeed evidently failed to inquire as to the results of an environmental assessment in progress that indisputably would have constituted inquiry notice as early as May 31. Instead, CertainTeed passively waited to be informed of contamination more than one month after it was discovered. CertainTeed's failure to monitor results of an environmental assessment as they became available supports a general conclusion that its failure to discover injuries at the Los Angeles Facility was due more to a lack of diligence than to inherent undiscoverability.

[*42]

After receiving actual notice in mid-July of injuries that could have been ascertained on May 31, 2001, CertainTeed also learned of the existence of underground storage tanks that had leaked other contaminants. Instead of acting promptly in the face of this information, CertainTeed waited until May 28, 2004 to sue on its Facilities Claims. This was clearly more than three years after inquiry notice existed. For this reason, the Los Angeles Facilities Claims are untimely and shall be dismissed.

The Los Angeles Facilities Claims are also untimely for a related, although not identical reason. As noted earlier, CertainTeed's notice of non-compliant conditions at Birmingham and Cincinnati shortly after Closing triggered a more general duty of inquiry on CertainTeed's part. CertainTeed should have suspected non-compliance might exist at the Los Angeles Facility after deficient conditions were discovered at Birmingham and Cincinnati. n60 Notably, the Birmingham and Cincinnati Facilities, like the Los Angeles Facility, were used for the manufacture of roofing materials. All three of these Facilities used asphalt in their manufacturing processes and maintained asphalt storage tanks on the [*43] premises. n61 All three of these facilities maintained storage tanks for diesel fuel, waste oil, or other petroleum products on the premises. n62 Contamination ultimately discovered at all three of these Facilities involved hydrocarbons and tar. Given the similarities between the Facilities and the environmental conditions allegedly concealed at each of them, a person of ordinary intelligence and prudence would have been on inquiry notice of the injurious conditions at the Los Angeles Facility shortly after the Closing

Date, when injurious conditions were discovered at the Birmingham and Cincinnati Facilities. On these facts, the statute of limitations for bringing claims related to the Los Angeles Facility began to run, at the latest, from the earlier of the date when groundwater contamination was discovered at the Birmingham facility in October 2000 or the date when CertainTeed commissioned the Assessment, a date clearly earlier than May 31, 2001, when results of Phase I of that assessment were reported. Under either date, the Los Angeles Claims were filed too late, and this action, filed May 28, 2004, is time-barred.

n60 *See* Complaint Ex. P at 2. The similarity of the injuries at the Facilities was not lost on CertainTeed. In a letter to Celotex disclosing conditions at the Cincinnati facility, CertainTeed noted that "material discovered at the Cincinnati Facility is similar to the material discovered at the Birmingham Facility, which we have discovered is coal tar, a hazardous substance."

[*44]

n61 Agreement, Schedule 4.18.
n62 *Id.*

4. The Russellville Facility

CertainTeed brings claims for losses at the Russellville Alabama Facility related to the condition of a regenerative thermal oxidizer ("RTO") used at that Facility to reduce air emissions to a level in compliance with air pollution standards. In accordance with the Agreement, Celotex conducted tests to assure that the RTO achieved required levels of emissions abatement before Closing. n63 After the Closing Date, CertainTeed questioned the validity of testing conducted by Celotex, n64 but waited until November 2003, several years later, to conduct its own testing of the RTO. It was only then that CertainTeed supposedly discovered that the RTO did not achieve the necessary level of emissions abatement, in violation of the facility's Air Pollution Control Permit. n65

n63 Complaint P 109.
n64 Complaint P 120.
n65 Complaint PP 111-126.

[*45]

The Russellville Claims are time-barred because CertainTeed was on inquiry notice more than three years before it filed this lawsuit. Given CertainTeed's own admission that it immediately suspected the reliability of the pre-Closing test results, and its own immediate discovery of non-compliant conditions at other facilities, CertainTeed should have tested the performance of the RTO itself soon after Closing. By waiting until more than three years elapsed after Closing to test for itself, CertainTeed unreasonably delayed and let the statute of limitations lapse. n66

n66 Celotex has advanced the theory that CertainTeed lacks standing to sue because title to the Russellville facility was transferred at Closing to Vetrotex, a subsidiary of CertainTeed. Because CertainTeed's claims with respect to the Russellville facility can be dismissed on other grounds, the question of standing need not be addressed here.

B. Remediation Claims

CertainTeed's Remediation Claims comprise the second category of claims against [*46] Celotex. In the Agreement, Celotex covenanted to perform, after Closing, certain environmental remediation, monitoring, and testing obligations related to known or suspected environmental conditions at the Cincinnati n67 and Birmingham n68 Facilities. Celotex's obligations are set out in § 6.13 and Disclosure Schedule 6.13 of the Agreement.

n67 Complaint PP 145, 147, 166, and 217(a).
n68 Complaint PP 141, 165 and 217(a).

CertainTeed alleges that Celotex failed to perform these post-Closing remediation obligations at the Cincinnati and Birmingham Facilities, and requests an order for specific performance here, or alternatively, damages. CertainTeed's claims for failure of Celotex to meet its remediation obligations are breach of contract claims that accrued on the date of the breach. Section 6.13(a) of the Agreement requires that Celotex complete all remediation projects no later than one year from the Closing Date, on August 18, 2001, and CertainTeed argues that any cause of action for breach of [*47] Celotex's failure to meet its remediation obligations accrued at the time performance was due on that date. Celotex argues that breach occurred much earlier, alleging that CertainTeed either refused performance or Celotex notified Cer-

tainTeed that it would not comply with its obligations at each of these Facilities shortly after Closing.

Celotex suggests that frustration of performance by CertainTeed or its own anticipatory repudiation of its performance obligations set the three-year statute of limitations running soon after the Closing Date, and that CertainTeed's claims as to both Facilities are now time-barred. Those arguments rely on facts outside the Complaint, and cannot serve as a basis for granting a motion to dismiss here. If the facts are reasonably construed in favor of CertainTeed, the statute of limitations for its Remediation Claims would have expired on August 18, 2004, three years after Celotex's performance of its obligations was due, and this action for breach of contract was timely filed on May 28, 2004. Accordingly, CertainTeed's claim for damages as a result of the failure of Celotex to perform its remediation obligations cannot be dismissed.

The remediation [*48] claims, however, raise distinct considerations in an important respect. Although Celotex's remediation claims may have accrued on August 18, 2001, the doctrine of laches does not permit CertainTeed to obtain an order of specific performance at this late stage. As discussed earlier, a request for specific performance is a specialized demand for a mandatory injunction. As a result, it is not the case that the statute of limitations applies by analogy. Rather, a party seeking specific performance must act with alacrity or lose its rights. n69 Here, CertainTeed's tardiness was unreasonable, and is unfairly prejudicial. Celotex covenanted under the Agreement to address environmental conditions at the Facilities that existed at Closing. Implicit in this covenant is that Celotex was required to rectify problems that it created. With the passage of time, Celotex's responsibility for current environmental conditions at those Facilities grows more and more tenuous, and requiring performance by Celotex four years after it relinquished control over the Facilities would be unreasonable and prejudicial to Celotex. Further, [HN20] specific performance is an equitable remedy normally applicable only in exigent [*49] circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice. n70 Here, there are no exigencies suggestive of a need for specific performance. A monetary assessment covering the cost of remediation services is an adequate remedy here.

n69 See supra notes 28-9 and accompanying text.
n70 E.g., Equitable Trust Co. v. Gallagher, 34 Del. Ch. 249, 102 A.2d 538, 546 (Del. 1954).

Although I will not deny CertainTeed the chance to recover the reasonable costs of performing, on its own, the remediation activities specifically identified in the Agreement, the intervening period of time must equitably be taken into consideration in that calculus as well. That will require CertainTeed to demonstrate not only what it spent to perform the remediation activities, but also to prove that no intervening events occurred since CertainTeed assumed ownership of the Facilities that made the work more expensive to complete.

CertainTeed also [*50] claims that Celotex failed to perform certain testing obligations at the Russellville Facility in an acceptable manner. n71 Section 6.13(b) of the Agreement requires that air emission "stack testing" be performed at the Russellville Facility by an independent third-party contractor in accordance with requirements set forth in Schedule 6.13(a) of the Agreement. n72 Notably, § 6.13(b) requires that this testing be performed no later than July 14, 2000. n73 Any claim for breach of contract accrued, at the latest, at the time performance was due, which was July 14, 2000. The three-year statute of limitations for bringing a claim for that breach thus expired on July 14, 2003, and this action, filed May 28, 2004, is time-barred as to the Russellville Remediation Claims.

n71 Complaint PP 167-168.
n72 Agreement at 34.
n73 *Id.*

C. Product Liability Claims

CertainTeed's claims for product liability comprise the third category of claims considered here. Celotex, in the Agreement, retained [*51] liability for claims related to products sold before the Closing Date. n74 Celotex manufactured and sold a line of algae-resistant shingles, the granular coating of which, in conjunction with certain unfavorable environmental conditions, is alleged to have caused the corrosion of gutters and other aluminum fixtures on the houses of certain consumers in two California neighborhoods who had purchased and installed the shingles on their roofs. n75 CertainTeed received complaints from consumers whose homes had been damaged by the shingles, demanding the replacement of corroded aluminum fixtures, primarily gutters, with copper fixtures. n76 When this occurred, CertainTeed promptly notified Celotex. Celotex acknowledged that the product claims were Excluded Liabilities under Section 2.2 of the Agreement and stated that it would exercise its right to provide a defense against the third-party claims. n77 On July 18, 2000, a homeowners' association in one of the

neighborhoods stated its intent to sue the builder who built their homes for damages related to the algae-resistant shingles. The builder, in turn, communicated to CertainTeed that, due to the unacceptable delay in resolving the claims [*52] of the affected consumers, he was not inclined to use CertainTeed products in the future. n78 On July 19, 2001, CertainTeed, evidently pressured to resolve these claims quickly, n79 indicated that if Celotex did not act, CertainTeed would undertake the replacement of the corroded aluminum gutters on July 25, 2001. n80

n74 The assumption of product liabilities by Celotex is somewhat circuitous. Section 8.1 of the Agreement defines the scope of the Indemnification clause under which Celotex is bound to compensate CertainTeed for losses. Indemnifiable losses include, under § 8.1(c), Excluded Liabilities. Section 2.2 defines Excluded Liabilities as including "all liabilities of the Seller, other than the Assumed Liabilities." Section 2.2 defines Assumed Liabilities as including "all Assumed Product Claims." Section 2.2 further defines Assumed Product Claims as including "all liabilities related to the resolution of product claims," but excluding "product claims to the extent arising from or related to damage to property, bodily injury, or death." Thus, under § 8.1, Celotex retains liability for product claims related to damage to property, such as those at issue here.

[*53]

n75 Complaint PP 174-178 and Ex. R.
n76 Complaint PP 175-178 and Ex. R at 2. The chemical reaction that damaged the aluminum gutters was specific to aluminum metal, and did not corrode copper. Replacement of aluminum gutters with copper gutters was supposedly the most practical means of solving the problem.
n77 Complaint, P 180 and Ex. S.
n78 Complaint Ex. S at 2.
n79 Complaint Ex. T at 2. CertainTeed alleges that, although Celotex stated its intent to assume a defense of the third-party claims, it failed to do so in a timely manner. Presumably, this failure of Celotex to consider the matter quickly prompted the builder to issue an ultimatum that required immediate action by CertainTeed.
n80 Complaint Ex. S.

2005 Del. Ch. LEXIS 11, *

The principles of accrual and tolling applicable to CertainTeed's Product Liability Claims differ from those applicable to its Facilities Claims. These Product Liability Claims are not direct claims against Celotex, but claims for damages paid to third parties. [HN21] Claims for third-party liabilities accrue in accordance with principles of common [*54] law indemnity. Under this standard, CertainTeed's Product Liability Claims accrued, and the statute of limitations began to run, when the indemnifiable losses to the third parties were incurred and the dispute with them concluded, n81 which was when CertainTeed settled its third-party claims.

n81 See cases cited *supra* notes 2, 15-16.

Making inferences favorable to CertainTeed, its Product Liability Claims accrued when the consumer claims were settled, sometime after July 25, 2001. The statute of limitations began to run when the claims were settled and expired on the third anniversary of that date in 2004. This action, filed May 28, 2004, is therefore timely as to CertainTeed's Product Liability Claims. n82

n82 Celotex argues that CertainTeed failed to comply with other requirements of the Agreement in asserting its Product Liability Claims. That may well be the case. There is language in the Agreement permitting Celotex to provide a defense against third-party claims, and Celotex alleges that, although it had indicated to CertainTeed that it wished to provide a defense for claims related to the algae-resistant shingles, CertainTeed nevertheless settled the claims unilaterally, in contravention of the terms of the Agreement. This is an argument on the merits, however, that depends on facts and documents outside the Complaint, and is not appropriately resolved on this motion to dismiss.

[*55]

VI. Remaining Issues

The timeliness of the Facilities, Remediation, and Product Liability Claims is the central issue on this motion. In their sprawling papers, the parties also tangled over a few other issues, which I next address.

A. The Viability Of CertainTeed's Claims That Celotex Breached Its Contractual Obligation To Mediate

CertainTeed has pled, as supposedly independent claims, counts alleging that Celotex breached the Agreement by refusing to participate in the mediation process contemplated by § 8.4 of the Agreement in order to resolve the various Article 8 claims the timeliness of which this opinion has just addressed. CertainTeed seeks specific performance or, in the alternative, damages for these supposed breaches. As with the other claims for specific performance, I conclude that CertainTeed's torpor renders it guilty of laches and bars its request for an order of specific performance. If CertainTeed wished to compel mediation -- a process that by its nature has no guaranteed outcome -- it should have filed suit much earlier.

As important, I conclude that the only possible relief CertainTeed could receive for any failure of Celotex to mediate is an order [*56] of specific performance. [HN22] By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree." Under the Agreement as written, the pendency of mediation did not excuse the party seeking relief from making a timely filing in order to satisfy the statute of limitations. n83 CertainTeed cannot revive its time-barred substantive claims through the guise of arguing that Celotex's failure to mediate them somehow tolled the statute of limitations as to those claims.

n83 Agreement at 42. Section 8.4(b) states that "Celotex may file an Action during the Negotiation Period or the Mediation Period if the indemnification would otherwise be subject to dismissal for a failure to file within applicable statutes of limitation."

Nor is there any basis for this court to render a damages award based on its approximation of the level at which the parties might have hypothetically settled after mediation. [*57] [HN23] Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree. n84 That reasoning applies with even greater force when, as here, a party seeks after long delay to recover damages because its contractual party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute. Therefore, these counts of the Complaint are dismissed.

n84 *See, e.g., International Equity Capital Growth Fund, L.P. v. Clegg, 1997 Del. Ch. LEXIS 59, 1997 WL 208955, at \*9 n.3 (Del. Ch. Apr. 22, 1997)* ("Delaware law . . . require[s] the parties to have reached agreement on all material terms before an agreement to agree' will be enforced.").

B. Celotex's Motion To Dismiss Aspects Of CertainTeed's Request For Damages

Celotex has argued that the ad damnum clause [\*58] of the Complaint contains requests for damages that are excluded under the Agreement. Section 8.3(b)(iii) of the Agreement states that the "Buyer may not assert a claim for indemnification for Losses for . . . special or consequential damages except to the extent such damages are part of a Loss arising from a Third Party Claim." Celotex claims that this exclusion bars CertainTeed's requests for awards of lost profits, attorney's and consultant's fees, and costs to bring this suit. CertainTeed retorts citing the general definition of "Loss" in § 1.1 of the Agreement, which includes "any and all . . . costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred . . . by the relevant party." n85 Further, CertainTeed looks to § 3 of the Trust Indemnification Agreement, under which the Trust assumed liability as a third party indemnitor for claims asserted by CertainTeed against Celotex, stating that "The Trust hereby agrees to pay any and all expenses (including attorneys' fees and expenses) reasonably incurred by [CertainTeed] in enforcing any rights under this Indemnification Agreement." n86

n85 Agreement at 6.

[\*59]

n86 Trust Indemnification Agreement at 4.

Frankly, the parties' briefing on this issue is inadequate to reach any definitive resolution on this difference of opinion. It appears certain that CertainTeed cannot receive an award of lost profits for its surviving Remediation Claims, and its claim for that category of damages is therefore dismissed. It is not apparent, however, that the other recompense it seeks falls outside the contractual definition of Loss and within the category of

consequential damages, particularly given the specific language of § 1.1 of the Agreement and the lack of sufficient briefing on this question. Therefore, I will not preclude CertainTeed from pressing forward with its claims for the other relief it has requested. If it becomes necessary later in the case, when the question of damages is before the court in a more concrete context, Celotex can again present the argument that certain remaining categories of relief sought constitute excludable consequential damages.

C. The Trust's Motion To Dismiss On The Ground That The Claims Against It Are Not Ripe

The [\*60] Trust has moved to dismiss all of CertainTeed's claims on ripeness grounds, arguing that, consistent with accrual principles of common law indemnity, n87 as Celotex's indemnitor, its third-party liability to CertainTeed accrues only after a judgment has been rendered against Celotex. Thus, the Trust contends, it is not a proper defendant in the present action.

n87 *See* cases cited *supra* notes 2, 15-16.

The Trust's obligations to indemnify CertainTeed are limited, and contingent upon a judgment against Celotex. As to the claims pled in the Complaint, CertainTeed has no right to assert claims for losses against the Trust until Celotex's assets, under a specific letter of credit, are exhausted. n88 That has not occurred yet. Give that reality, and given that the Trust conceded that it will be bound by and have no right to relitigate any judgment against Celotex, n89 CertainTeed has sued the Trust prematurely and the claims against the Trust are dismissed without prejudice. When CertainTeed's contractual [\*61] right to seek indemnity against the Trust ripens, it will be free to reassert these claims, which will depend for their force on CertainTeed's ability to obtain a judgment against Celotex.

n88 Trust Indemnification Agreement at 3. Section 2(c) states that "CertainTeed will not be entitled to assert claims for Losses directly against the Trust until the Letter of Credit is exhausted . . . ."

n89 Transcript at 128-9.

VII. Conclusion

For all the foregoing reasons, Celotex's motion to dismiss the Facilities Claims is GRANTED; its motion to

2005 Del. Ch. LEXIS 11, *

dismiss the Remediation Claims is GRANTED as to CertainTeed's demand for specific performance and is otherwise DENIED; its motion to dismiss the Product Liability Claims is DENIED; its motion to dismiss CertainTeed's claim that Celotex failed to mediate in accordance with the Agreement is GRANTED; and its motion to dismiss CertainTeed's request for lost profits as to the Facilities Claims (which are barred on other grounds) and Remediation Claims is GRANTED. The [*62] Trusts's motion for dismissal on ripeness and contractual grounds is GRANTED.

Within ten days, Celotex and the Trust shall, upon notice as to form by CertainTeed, submit an implementing order dismissing the relevant counts of the Complaint addressed by this opinion. CertainTeed has pled counts for declaratory judgment that track the Facilities and Remediation Claims categories. The parties shall also include in the implementing order language that dismisses those counts to the extent that the related counts for damages have not survived and permitting those counts to remain to the extent that the related counts for damages have weathered this motion.

# **TAB 5**

LEXSEE

**CYPRESS ASSOCIATES, LLC, Plaintiff, v. SUNNYSIDE COGENERATION.
ASSOCIATES PROJECT, SUNNYSIDE HOLDINGS I, INC., and SUNNYSIDE II,
L.P., Defendants.**

C.A. No. 1607-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

2006 Del. Ch. LEXIS 61

January 11, 2006, Submitted
March 8, 2006, Decided
March 8, 2006, Filed

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**CORE TERMS:** borrower, bondholder, loan agreement,
indenture, unanimous, motion to dismiss, implied
covenant, fair dealing, beneficiary, issuer, amend, duty,
outstanding, written approval, prior written consent,
sophisticated, no-action, ceiling, validly, futile, energy,
contracting parties, de facto amendment, principal
amount, third-party, issuance, license, upside, reward,
rate of interest

**COUNSEL:** Attorneys for Plaintiff: William M.
Lafferty, Esquire, Samuel T. Hirzel, Esquire, Lisa K.
Whitaker, Esquire, MORRIS, NICHOLS, ARSHT &
TUNNELL, Wilmington, Delaware.

Attorneys for Defendants: Donald J. Wolfe, Jr., Esquire,
Michael A. Pittenger, Esquire, Melony R. Anderson,
Esquire, POTTER ANDERSON & CORROON LLP,
Wilmington, Delaware; David Clarke, Jr., Esquire, James
D. Mathias, Esquire, DLA PIPER RUDNICK GRAY
CARY US LLP, Baltimore, Maryland.

**JUDGES:** STRINE, Vice Chancellor.

**OPINIONBY:** STRINE

**OPINION:**

OPINION

This is a dispute between a bondholder and the
borrower that succeeded to most of the issuer's duties and
rights. The parties are dueling over the extent to which
the borrower may amend certain contracts without
approval from the bondholders. The plaintiff bondholder
has refused to provide its assent to an amendment the
borrower desires because it believes that the amendment
would lower the value of its bonds. The other
bondholders support the amendment.

In this opinion, I address the borrower's motion to
dismiss. Because it would be futile for the plaintiff
bondholder [*2] to seek to have the bond trustee sue on
its behalf in a situation when the trustee has given
approval to the contested amendment and where all the
other bondholders support the amendment, I reject the
borrower's contention that the plaintiff bondholder lacks
standing to sue.

On the merits, I deny the borrower's motion to
dismiss the bondholder's contention that the trust
indenture required the borrower to obtain approval of
80% of the outstanding bonds as a requirement for
effecting the amendment. The bondholder -- who owns
enough bonds to thwart 80% approval unilaterally -- has
convincingly demonstrated why the relevant instruments
support its contention that approval at that super-majority
level is required. Because the bondholder has not
cross-moved for judgment on the pleadings, however, I
do not enter judgment for the bondholder now but simply
find that its reading of the relevant instruments is a
reasonable one and that the motion to dismiss therefore
must be denied.

By contrast, I grant the borrower's motion to dismiss the bondholder's contention that the amendment in question must receive unanimous bondholder approval for adoption. As to that contention, the carefully negotiated [*3] provisions of the instruments governing the requirements for the approval of particular amendments rule out a finding that the amendment in question -- which does not literally fall within the class of amendments for which unanimous approval is required -- cannot be approved without unanimous consent because of the implied covenant of good faith and fair dealing. The relevant instruments carefully delineate those amendments that can be approved by the borrower and trustee acting alone, those that can be approved by the borrower and the trustee with the support of an 80% vote of the bondholders, and those that can only be approved by the borrower and the trustee with the unanimous approval of the bondholders. To sustain the bondholder's unanimous vote claim would involve an exercise in after-the-fact judicial contracting, whereby a judge broadens the class of amendments subject to unanimous approval in a context where sophisticated parties chose not to take that course when they actually made their bargain. The implied covenant of good faith and fair dealing provides no license for judicial action of that kind.

I.

As required, the facts are drawn from the complaint and the documents [*4] it incorporates.

On December 1, 1987, Carbon County, Utah issued $ 80 million in bonds (the "1987 Bonds"). The 1987 Bonds were issued to finance the construction of a solid waste disposal facility (the "Waste Facility") in Carbon County.

Carbon County itself, however, did not intend to build or operate the Waste Facility. Rather, by the issuance of the tax-exempt 1987 Bonds, Carbon County was seeking to obtain favorable financing terms that would enable it to further its public purposes (the building of the Waste Facility to abate pollution) by loaning the Bond proceeds to the for-profit entity, Sunnyside Power Corporation ("SPC") that would build the Facility. The loan was accomplished through a loan agreement also dated December 1, 1987 (the "Loan Agreement").

Although Carbon County remained the Issuer, it had very limited rights and obligations regarding the 1987

Bonds. SPC took on most of the responsibilities and had most of the rights traditionally associated with an issuer. SPC had a duty to repay the Bondholders in accordance with the Loan Agreement and if SPC defaulted, there was no recourse against Carbon County. Eventually, SPC's obligations were assumed by defendant Sunnyside [*5] Cogeneration Associates Project ("SCA"). For the sake of clarity, I will primarily refer to SCA and its successors (as described below) as the "Borrower."

The Borrower refinanced the 1987 Bonds several times between 1987 and 1999. The last refinancing resulted in the issuance of the currently outstanding bonds (the "Bonds"). These included $ 59 million in Series A Bonds and $ 18 million in Series B Bonds. According to the complaint, $ 48.7 million of the Series A Bonds remain outstanding and all of the $ 18 million in Series B Bonds are still outstanding.

The Bonds were issued through an "Exchange Offer" consummated in accordance with an "Exchange Agreement," and an amended and restated trust "Indenture," both dated August 1, 1999. Simultaneous with the Exchange Offer's completion, defendants Sunnyside Holdings I, Inc. and Sunnyside II, L.P. and their affiliates acquired SCA's interests and obligations regarding the Waste Facility and the Bonds. The defendants thus became the Borrower. As with the original issuance, after the Exchange Offer, the Borrower, rather than Carbon County, the Issuer, held the most important rights and responsibilities relating to the Bonds. To illustrate [*6] that point, the Bondholders must look to the Borrower for repayment of principal and interest, without recourse to Carbon County as Issuer.

The Series A and Series B Bonds do not have identical rights. The Series A Bonds are entitled to fixed payments of principal and interest that accrue semiannually. By contrast, the Series B Bonds are not guaranteed any interest as a percentage of the $ 18 million in Series B Bonds outstanding. Instead, the Series B Bondholders are entitled to annual payments equal to the funds generated by the Borrower's operations after the payment of operating expenses, debt service on the Series A Bonds, capital expenditures, and certain other fees. In other words, the Series B Bonds derive much of their value from their right to share in the upside profits of the Borrower. To the extent that the Borrower is profitable, the Series B Bondholders share in those gains. But to the extent that the Borrower simply covers costs (some of

which includes payments to the Borrower for its management services), the Series B Bondholders do not receive any annual payment. Principal on the Series B Bonds is payable in a single lump on maturity, which does not occur until August 15, 2024. [*7]

This disparity between the interests of the Series A and Series B Bondholders is what in large measure inspires this suit. In November 2004, the Borrower and the Utah Power & Light Company agreed in principle to an "Amendment" to the Power Purchase Agreement or "PPA." The PPA regulates the prices for energy delivered by the Waste Facility to Utah Power & Light.

On December 15, 2004, the Borrow sent the Series A and B Bondholders a letter seeking their approval of the Amendment to the PPA. The letter references § 9.4 of the Loan Agreement, subtitled "Amendments, Changes, and Modifications," which states in pertinent part that:

> Subsequent to the initial issuance and delivery of the Refunding Bonds and prior to their payment in full (or provision for payment thereof having been made in accordance with the provisions of Article IX of the indenture), this Loan Agreement may not be amended, changed, modified or altered except as provided in Section 10.07 of the Indenture or by an instrument in writing signed by the Issuer and the Borrower and consented to by the Trustee and the Required Percentage of Bondholders. *In addition, except as otherwise permitted or provided by the* [*8] *Deed of Trust or the Security Agreement, the Borrower agrees that it will not terminate or amend in any material respect or permit any termination or material amendment of any of the Facility Documents without the prior written consent of the Trustee and the Required Percentage of Bondholders, which consent shall not be unreasonably withheld or delayed.* n1

n1 Loan Agreement § 9.4 (emphasis added).

Under the Loan Agreement, the PPA is indisputably a "Facility Document" for purposes of the Loan Agreement. Moreover, the term "Required Percentage of Bondholders" is defined in § 1.2 of the Loan Agreement as "Bondholders of eighty percent (80%) or more in aggregate principal amount of the Outstanding Bonds," consistent with the definition in the Indenture. n2

n2 Indenture § 1.01 ("Definitions").

The letter sent by the [*9] Borrower regarding the proposed Amendment to the PPA stated explicitly:

> We are requesting your expedited review and approval of these documents as required by Section 9.4 of the Loan Agreement between Carbon County, Utah [the Issuer] and Sunnyside Cogeneration Associates [the Borrower]. n3

n3 Compl., Ex. H.

The Amendment purports to resolve a dispute between the Borrower and Utah Power & Light regarding the price for energy. The Amendment includes floor and ceiling prices capping the downside and upside price at which the Borrower sells energy. According to the complaint, the Amendment would work a major change in the Borrower's potential profits, as the ceiling in the Amendment allegedly would reduce the recently paid prices for energy by the Utah Power to the Borrower by more than 50%.

Cypress -- which holds approximately 74.4% of the Series B Bonds -- viewed the Amendment as injurious to the value of the Series B Bonds. Because the ceiling capped the upside potential of the Borrower, [*10] Cypress believed that the Amendment would diminish or even eliminate the annual payments to the Series B Bondholders. For that reason, Cypress refused to give its

assent to the Amendment.

As a result of Cypress's refusal, the Amendment did not receive the Required Percentage of Bondholders under § 9.4 of the Loan Agreement. In the face of Cypress's dissent, however, the Borrower decided that it did not need the Required Percentage of Bondholders to adopt the Amendment, but instead advanced the position that under § 7(h) of the Security Agreement the Trustee could effect the Amendment after it was proposed by the Borrower. After securing letters of support from a majority, but not 80%, of the Bondholders and promising to indemnify the Trustee, the Borrower received written approval from the Trustee. The Borrower then submitted the Amendment to the Utah Public Service Commission for approval.

This lawsuit then ensued. In its complaint, Cypress has made two distinct contentions regarding the Amendment.

First, Cypress argues that § 9.4 of the Loan Agreement requires that the Amendment be approved not only by the Trustee but also by the Required Percentage of the Bondholders. Because [*11] that has not occurred, Cypress contends that the Amendment has not been properly adopted.

Alternatively, Cypress contends that the Amendment's likely effect on the profits of the Borrower and therefore the payments to the Series B Bondholders is so substantial as to amount to a de facto amendment to the Indenture and Loan Documents. The Indenture and Loan Documents require unanimous consent of the Bondholders whenever: (i) the stated maturity, redemption rights, or any installment of interest on the Bonds as set forth in the Indenture are changed; n4 (ii) the principal amount, redemption premium, or the rate of interest on the Bonds as set forth in the Indenture are reduced; n5 or (iii) the Loan Documents are amended or modified in a manner that changes the amount or the time when Loan Payments are required to be made. n6 Cypress claims that the Amendment contested in this case has a substantive effect very similar to those amendments that must be approved unanimously. Therefore, Cypress claims that the Amendment also must receive unanimous approval before adoption. Because Cypress has not consented, it contends that the Amendment has not been validly adopted.

[*12]

n4 Indenture § 10.02.

n5 *Id.*
n6 *Id.* at § 10.08. Included in the Loan Documents are the Loan Agreement, Notes, Deed of Trust, and Security Agreement.

Cypress and the Borrower have stipulated to a stay of the proceedings for approval of the Amendment before the Utah Public Service Commission pending the resolution of the Borrower's motion to dismiss the complaint for failure to state a claim.

II.

The Borrower seeks dismissal on the grounds that the plain terms of the Loan Agreement and the myriad contracts related to it (the "Relevant Instruments" n7) make clear that the Borrower has the authority to effect the Amendment solely with consent from the Trustee and that no Bondholder approval is required. In order for the Borrower to succeed, it therefore must demonstrate that the Relevant Instruments may only be reasonably read in the manner advanced by the Borrower. In the event that the Relevant Instruments may be reasonably read in another manner, the motion to dismiss must be denied. n8

n7 The Relevant Instruments are the Facility Documents (which include the PPA), the Loan Documents, and the Indenture. The dispute centers on how amendments to the Relevant Instruments proposed by the Borrower (or by the Borrower in conjunction with the Issuer), in this case the Amendment to the PPA, are to be effected.

[*13]

n8 *E.g., VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 614-15 (Del. 2003)* ("In deciding a motion to dismiss, the trial court cannot choose

between two differing reasonable interpretations of ambiguous provisions. Dismissal, pursuant to *Rule 12(b)(6)*, is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."); *Vanderbilt Income and Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (same).

The Relevant Instruments are all, per their own terms, governed by the law of Utah. As is the case in Delaware, in Utah contracts are to be interpreted as written and parol evidence is inadmissible as an interpretive aid when the contractual language is unambiguous in the sense that it is susceptible to only one reasonable reading. n9 Moreover, as this is a motion to dismiss, the only relevant facts are those set forth in the complaint itself. In this context, the most critical facts of record are the plain terms of the Relevant Instruments, which are incorporated by reference in the complaint.

> n9 *See Central Florida Inv., Inc. v. Parkwest Assoc.*, 2002 UT 3, 40 P.3d 599, 605 (Ut. 2002); *Ward v. Intermountain Farmers Assoc.*, 907 P.2d 264, 268 (Ut. 1995); *Gillmor v. Macey*, 121 P.3d 57, 65 n.8 (Ut.App. 2005).

[*14]

### III.

The Borrower's first two arguments are related, and I address them together. For starters, the Borrower alleges that Cypress cannot maintain this action because the Loan Agreement that contains, in § 9.4, the 80% vote provision addressing certain amendments to the Facility Documents was executed between the Issuer and the Borrower, and the Bondholders are not third-party beneficiaries of that Agreement. Relatedly, the Borrower argues that provisions of the Indenture addressing when Bondholders can assert claims for remedy under the Indenture apply here, that Cypress has not complied with those provisions, and that Cypress therefore has no standing to bring this action. I find neither of these arguments meritorious, for reasons I now explain.

As to the first argument, it is clear from the text of § 9.4 of the Loan Agreement that Bondholders are not simply incidental beneficiaries of that section, but intended beneficiaries. To the extent that § 9.4 prohibits the Borrower from amending the Facility Documents, including the PPA, without the Required Percentage of Bondholders, it specifically gives the Bondholders the contractual right to inhibit amendments that do not achieve [*15] the Required Percentage support. Furthermore, § 9.4 also imposes the contractual duty on Bondholders not to unreasonably withhold their consent to a proposed amendment.

Under the law of Utah, § 302 of the Restatement of Contracts has been looked to for guidance as to when a contract confers third-party beneficiary status. n10 Under § 302, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance." n11 Those conditions are satisfied here, as § 9.4 was obviously intended to provide the Bondholders with enforceable rights of self-protection. n12 Moreover, no provision of the Loan Agreement is inconsistent with the proposition that the Bondholders were intended beneficiaries of § 9.4, certainly not the provision cited by the Borrower, § 9.7, which merely states that the Loan Agreement "shall inure to the benefit of and shall be binding upon the Issuer, the Borrower and their respective successors and assigns. . . ." n13 Nothing in that section [*16] or in any other portion of the Loan Agreement clearly precludes third-party beneficiary status for Bondholders, and to read such an implied exclusion into § 9.7 would gut the clear import of § 9.4's terms, which plainly invest the Bondholders with rights and corresponding responsibilities.

> n10 *E.g., Continental Ill. Nat'l Bank v. Allen*, 811 P.2d 168, 172 (Ut. 1991); *Ron Case Roofing & Asphalt Paving v. Blomquist*, 773 P.2d 1382, 1386 (Ut. 1989); *Clark v. American Standard, Inc.*, 583 P.2d 618, 620 (Ut. 1978).
>
> n11 Restatement (Second) of Contracts § 302 (2005).

n12 *See Wasatch Bank of Pleasant Grove v. Surety Ins. Co. of Cal., 703 P.2d 298, 300 (Ut. 1985)* ("Whether a third party is a beneficiary of a contract is determined by the intent of the parties to the contract."); *Tracy Collins Bank & Trust v. Dickamore, 652 P.2d 1314, 1315 (Ut. 1982)* ("Generally, the rights of a third-party beneficiary are determined by the intentions of the parties to the subject contract."); *Richards Irrigation Co. v. Karren, 880 P.2d 6, 10 (Ut. App. 1994)* (noting Utah courts look to intent of parties to determine third party beneficiary status).

[*17]

n13 Loan Agreement § 9.7.

Likewise, the Borrower's argument that Cypress may not proceed with this action because it has failed to comply with the no-action provision in the Indenture is without merit. That provision states:

**Section 7.10 Limitations on Rights of Bondholders.**

(a) No Bondholder shall have any right to pursue any other remedy under this Indenture unless: (1) an Event of Default shall have occurred and is continuing; (2) the holders of at least fifty-one percent (51%) of the principal amount of the Outstanding Bonds have requested the Trustee, in writing, to exercise the powers hereinabove granted or to pursue such remedy in its or their name or names; (3) the Trustee has been offered indemnity satisfactory to it against reasonable costs, expenses and liabilities reasonably anticipated to be incurred; (4) the Trustee has declined to comply with such request, or has failed to do so, within sixty (60) days after its receipt of such written request and offer of indemnity; and (5) no direction inconsistent with such request has been given to the Trustee during such [*18] 60-day period by the holders of at least fifty-one percent (51%) of the principal amount of the Outstanding Bonds.

(b) The provisions of subsection (a) of this Section are conditions precedent to the exercise by any Bondholder of any remedy hereunder. The exercise of such rights is further subject to the provisions of Sections 7.09, 7.11 and 7.14 hereof. No one or more Bondholders shall have any right in any manner whatever to enforce any right under this Indenture, except in the manner herein provided. All proceedings at law or in equity with respect to an Event of Default shall be instituted and maintained in the manner herein provided for the equal and ratable benefit of the Bondholders of all Bonds Outstanding. n14

n14 Indenture § 7.10.

By its admission, Cypress did not attempt to follow the steps outlined in § 7.10 of the Indenture for pursuing a remedy under the Indenture. It contends that it was not required to do so for two reasons: 1) Cypress is attempting to enforce its rights [*19] under the Loan Agreement and not the Indenture; and 2) in any event, recourse to the procedures in § 7.10 would be futile. I need not reach the first argument, which has color, because the second argument is obviously meritorious.

As the undisputed facts show, all of the other Bondholders gave their assent to the Amendment. Cypress, which holds enough Bonds of its own to block the attainment of an 80% vote, is the reason the Amendment did not pass in the first place. In these circumstances, it would be futile to expect that Cypress would attain the support of a majority of the Bondholders -- who supported the Amendment -- to press a claim that the Amendment was not validly adopted. Likewise, the Trustee would be forced to place itself at odds with a majority of the Bondholders by pressing such a claim. Indeed, in this respect, the obvious lack of fit between the

provisions of § 7.10 helps explain Cypress's argument as to why the provisions of § 7.10 of the Indenture do not pertain to a claim under § 9.4 of the Loan Agreement. By its plain terms, § 9.4 -- when it applies -- invests a minority of 20% or greater with the power to block an amendment favored by a majority of the Bondholders. [*20] A provision like § 7.10 that is designed to limit suits on behalf of all holders unless a majority supports the suit arguably does not speak at all to claims under provisions like § 9.4 which are brought only for the benefit of the dissenting minority.

Regardless of whether that is so, the law is clear that no-action clauses such as § 7.10 do not present an insuperable barrier to all suits not brought in strict conformity with their terms. Rather, the law has read no-action clauses as an important, but surmountable, barrier to suits. They may be overcome when it is plain that procession 12 under the suit would be futile, a line of reasoning that draws on the law of derivative suits. As Chancellor Allen stated in *Feldbaum v. McCrory Corp.*:

> I do not mean to imply that courts will apply no-action clauses to bar claims where misconduct by the trustee is alleged. For the same reason that equity has long recognized that, in some circumstances, corporate shareholders will be excused from making a demand to sue upon corporate directors, but will be permitted to sue in the corporation's name themselves, bondholders will be excused from compliance with a no-action provision where [*21] they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty. n15

*Feldbaum* remains good law and has been embraced on several occasions by this court since. n16 *Feldbaum's* sound approach, which has been embraced by courts in other jurisdictions, n17 would likely be adopted by the courts of Utah and be used by them to permit suit by Cypress. Cypress does not seek to bring a claim that will inure to all Bondholders pro rata to their ownership, it seeks to vindicate its minority rights. It would be a futile exercise for Cypress to ask the majority of the Bondholders who disagree with it to join with it in a suit to declare an Amendment they support invalid. Thus, § 7.10 does not bar this suit.

n15 *Feldbaum v. McCrory Corp., et al.,* 1992 Del. Ch. LEXIS 113, 1992 WL 119095, at *7 (Del. Ch. June 2, 1992).

n16 *E.g., U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls,* 864 A.2d 930, 940-42 (Del. Ch. 2004); *U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls,* 2004 Del. Ch. LEXIS 106, 2004 WL 1699057, at *5 (Del. Ch. July 29, 2004); *Lange v. Citibank, N.A.,* 2002 Del. Ch. LEXIS 101, 2002 WL 2005728, at *1, *6-*7 (Del. Ch. Aug. 13, 2002).

[*22]

n17 *E.g., Metropolitan West Asset Mgmt. v. Magnus Funding,* 2004 U.S. Dist. LEXIS 11761, 2004 WL 1444868, at *5 (S.D.N.Y. Jun. 25, 2004); *In re Oakwood Homes Corp.,* 2004 Bankr. LEXIS 1385, 2004 WL 2126514, at *3 (Bankr.D.Del. Sept. 22, 2004); *In re Envirodyne Indus.,* 174 B.R. 986, 993 (Bankr.N.D.Ill. Dec. 1, 1994).

I therefore turn to the merits of the interpretive dispute at the heart of this motion to dismiss.

IV.

The Borrower finds itself in a rather odd position. After all, it sent the Bondholders a letter seeking their approval for the Amendment on the basis that such approval was "required" by § 9.4 of the Loan Agreement. Then, when that approval was not received, the Borrower searched through the Relevant Instruments and concluded that the Trustee had the unilateral authority to adopt the Amendment. In order to get the Trustee to act, the Borrower provided to it written statements of support for the Amendment from the Bondholders other than Cypress and a promise to indemnify the Trustee for approving the Amendment.

The supposed authority of the Trustee to adopt the

Amendment proposed by the Borrower is said to emanate [*23] from § 7(h) of the Security Agreement and not from the Loan Agreement itself. Section 7(h) states:

> Except as otherwise permitted under the Loan Agreement, the Grantor shall not without the prior written consent of the Trustee, (i) modify, amend, terminate, waive, or supplement any provision of any Facility Document, (ii) fail to exercise promptly and diligently each and every material right which it may have under each Facility Document (other than any right of termination), or (iii) fail to deliver to the Trustee a copy of each material demand, notice, or document received or given by it relating in any way to any of the Facility Documents. n18

According to the Borrower, § 7(h) permits the Grantor (now, the Borrower for these purposes) to amend any Facility Document -- including the PPA -- so long as the Trustee provides prior written consent. Because the Trustee has provided such consent to the Amendment, the Borrower says it is validly approved. Essentially, the Borrower 18 Security Agreement § 7(h). 14 reads § 7(h) as authorization for it to amend, with the Trustee's prior written consent, any provision of the Facility Documents.

As Cypress points out, that [*24] reading of the Relevant Instruments is arguably not even colorable, and certainly not the only reasonable reading of the Instruments. To start with, § 7(h) is not by its own terms an affirmative empowerment of the Borrower to amend the Facility Documents so long as it has prior written approval of the Trustee. Rather, § 7(h) is a check on the Borrower's power that functions to prohibit the Borrower from making such an amendment -- unless otherwise permitted by the Loan Agreement -- without the prior written approval of the Trustee. To the extent that other provisions of the Relevant Instruments require Bondholder support for an amendment, § 7(h) of the Security Agreement does not conflict with these additional conditions of approval.

Here, as Cypress points out, there is a plain provision of the Loan Agreement, § 9.4, that seems clearly to condition approval of a "material amendment" of the PPA on the "prior written consent of the Trustee and the Required Percentage of the Bondholders. . . ." In other words, § 9.4 of the Loan Agreement deals with a narrower set of amendments than § 7(h) of the Security Agreement -- those amendments to Facility Documents that are material in [*25] nature. Section 7(h) of the Security Agreement is broader and requires (except when the Loan Agreement otherwise permits) the Issuer to receive the prior written approval of the Trustee for all amendments to the Facility Documents, even if immaterial. By this method, § 7(h) of the Security Agreement permits the Borrower to make ministerial or linguistic changes to the Facility Documents more 15 flexibly, while still giving Bondholders the comfort of prior written approval by the Trustee.

Under the Borrower's recent reading, § 9.4 is simply an illusory protection that runs not to the Bondholders but to the Borrower itself and the Trustee. According to the Borrower, it can employ § 9.4 when it desires the added moral or liability-limiting assurance of Bondholder approval but need not seek such assurance if it chooses simply to adopt an amendment with prior written approval of the Trustee only. This is an odd argument that finds little resonance in the text of the Relevant Instruments or in commercial logic. Certainly it is insufficient to justify dismissal.

Although there are other reasons why the Borrower's reading is obviously not the only reasonable reading of the Relevant Instruments, [*26] I need not burden the reader with them now, as Cypress has not cross-moved for judgment on this issue. For now it suffices to say that Cypress's contention that the Amendment was a material one that, per § 9.4 of the Loan Agreement, could only be adopted by the Required Percentage of Bondholders rests on a reasonable reading of the Relevant Instruments. Therefore, the Borrower's motion to dismiss Count I of the Complaint, which seeks a declaration that the Amendment has not been validly adopted, is denied insofar as that Count alleges that the Amendment must be passed with the support of the Required Percentage of Bondholders, i.e., to obtain the consent of 80% or more of the outstanding Bonds. Likewise, the Borrower's motion to dismiss Count II, which seeks an order requiring the Borrower to submit the Amendment to a vote of the Bondholders as a condition of any subsequent attempt at approval, is denied.

V.

I come to the final issue on this motion. As noted, Cypress claims that the Amendment, which directly

modifies one of the Facility Documents, constitutes a de facto amendment to the Loan Documents and Indenture, and therefore that unanimous consent of the Bondholders is required. [*27] Cypress premises that argument on §§ 10.02 and 10.08 of the Indenture, which prohibit the Borrower from modifying the Indenture or Loan Documents (including the Loan and Security Agreements) in a manner that changes the amount or timing of principal and interest payments to Bondholders without the express consent of all affected Bondholders. Specifically, Cypress claims that the floor and ceiling on energy prices contained in the Amendment caps the upside potential to the Series B Bondholders in a manner that "does such violence" n19 to the bargained for risk/return structure that it must be considered a de facto amendment to the interest rate of the Series B Bonds.

n19 Cypress Br. at 17.

Frankly, Cypress's briefs on this issue read more like a college economics primer than a legal brief. Cypress cited no Utah or other case law supporting its "de facto is de jure" argument. Therefore, at oral argument, I inquired of Cypress whether its de facto amendment argument was essentially a claim based on breach of [*28] the implied covenant of good faith and fair dealing. Counsel for Cypress agreed with that assessment.

That is, Cypress agrees that its argument asserts that the implied covenant of good faith and fair dealing in the Indenture and Loan Agreement precludes the Amendment because the Amendment does de facto what it could not do de jure absent unanimous approval. Cypress supports this argument with the economic rationale that the Series B Bondholders are in reality equity participants who share in the profits via cash-flow sharing and that therefore the Amendment alters the payment structure or the risk/reward structure fundamentally such that the benefits of the contract fashioned with the Borrower no longer exist.

As the Borrower points out, the Amendment does not literally change the rate of interest of the Series B Bondholders as the language in the Indenture and Loan Documents that governs the entitlement of the payments of interest remains the same and the impact of the Amendment remains entirely hypothetical. As a result, the Borrower correctly points out that the Indenture does not literally require that the Amendment be approved by unanimous consent of the Bondholders. Recognizing [*29] this reality, Cypress necessarily fell back on the argument that the Amendment constitutes a de facto change to the Indenture. Because the Series B Bondholders only receive annual payments once a number of other costs (like interest payments to the Series A, the Waste Facility's costs of operations, etc.) are covered and profits are generated, Cypress contends that the ceiling in the Amendment fundamentally alters the risk/reward calculus for the Series B Bonds and should be read as a change to the interest rate paid to the Bondholders.

But this contention does not state a cognizable contract claim. By any measure, the Relevant Instruments reflect the detailed consideration of sophisticated parties of multiple factors bearing on the interests of the Issuer, the Borrower, and the Bondholders. As just discussed, the Loan Agreement can be reasonably read to require 80% or more of the Bondholders to approve the Amendment.

What is not reasonable is to conclude that the parties intended for the judiciary to analyze amendments that do not implicate the plain terms of the Relevant Instruments to determine whether they have the same de facto effect as an amendment for which unanimous consent [*30] was required and to rewrite the Instruments to impose a unanimous consent requirement upon such amendments. The implied covenant of good faith and fair dealing does not exist as a license for the judiciary to rewrite contracts, which is what the Borrower essentially seeks here without reference to Utah case law to support its position.

The Delaware Supreme Court has recognized that implying contract terms is an "occasional necessity" n20 to ensure that parties' reasonable expectations are fulfilled, but that this "quasi-reformation . . . should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness" n21 and that "only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter' may a party invoke the covenant's protections." n22 Thus, a claim for breach of an implied covenant generally cannot be based on conduct authorized by the terms of the agreement. n23 Likewise, under Utah law, an implied covenant of good faith and fair dealing cannot be read to establish new independent rights or duties to which the parties did not [*31] agree, n24 and cannot

create rights and duties inconsistent with the express contractual terms. n25

n20 *See Dunlap v. State Farm Fire & Casualty Co.*, 878 A.2d 434, 442 (Del. 2005); *Chrin v. Ibrix Inc.*, 2005 Del. Ch. LEXIS 161, 2005 WL 2810599, at *7 (Del. Ch. Oct. 19, 2005) ("The implied covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.").

n21 *Dunlap*, 878 A.2d at 442 *quoting Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992-93 (Del. 1998).

n22 *Dunlap*, 878 A.2d at 442 *quoting Katz v. Oak Industries, Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).

n23 *Dunlap*, 878 A.2d at 441-42 ("Existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal documents."); *Bonham v. HBW Holdings, Inc.*, 2005 Del. Ch. LEXIS 210, 2005 WL 3589419, at *11 (Del. Ch. Dec. 23, 2005) (same).

[*32]

n24 *See Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, 104 P.3d 1226, 1240 (Ut. 2004) (explaining an implied covenant of good faith and fair dealing cannot be construed to establish new independent rights or duties not agreed to by the parties ex ante); *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Ut. 1991) (same).

n25 *See Oakwood Village LLC*, 104 P.3d at 1240; *Brehany*, 812 P.2d at 55 (noting that an implied covenant of good faith and fair dealing cannot be used to nullify a

right granted by a contract to one of the parties or to require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest); *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 505 (Ut. 1980) (stating an express agreement or covenant relating to a specific contract right excludes the possibility of an implied covenant of a different or contradictory nature).

Those principles refute the proposition that the Borrower breached an implied covenant of good faith and fair dealing in this case. The sophisticated parties to the Relevant Instruments [*33] carefully delineated several categories of amendments. Each category required the Borrower (acting alone or in some cases with the Issuer) to obtain different approvals as a prior condition of effecting amendments it desired. Three of these categories established in the Relevant Instruments are the most pertinent. They are: (1) immaterial amendments to the Facility Documents that require the Trustee's approval; n26 (2) material amendments to the Facility Documents that require the Trustee's approval and the approval of 80% of the outstanding Bondholders; n27 and (3) actual changes to the redemption provisions, payment structure, and terms of the Bonds made in the Indenture or the Loan Documents that require the Trustee's approval and unanimous Bondholder approval. n28

n26 Security Agreement § 7(h).
n27 Loan Agreement § 9.4.
n28 Indenture §§ 10.02, 10.08(a).

There is no unfairness to be rectified simply because the Borrower seeks to use its bargained-for flexibility to amend the PPA, assuming [*34] that the Borrower complies with the approval requirements in the Loan Agreement, which do not require unanimous approval. Had the contracting parties wanted any bondholder to have a veto right over any amendments to the PPA or other Facility Documents that might affect the Bondholders' returns, they could have provided for unanimous approval for any amendment that "*might* have the effect of changing the rate of interest or influencing the payments received by the Series B Bondholders." No

such promise was extracted by the Bondholders. And Cypress may not now broaden the class of amendments that require unanimous approval by claiming that the implied covenant of good faith and fair dealing was breached by the Borrower. n29 By doing so, Cypress asks the court to widen the class of amendment subject to unanimous approval despite the failure of sophisticated parties to choose this course for themselves. This is essentially asking the court to write a new contract.

> n29 See *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, 94 P.3d 193, 198 (Ut. 2004) ("The degree to which a party to a contract may invoke the protections of [an implied] covenant [of good faith and fair dealing] turns on the extent to which the contracting parties have defined their expectations and imposed limitations on contract terms.").

[*35]

But the implied covenant of good faith and fair dealing does not grant a judicial license for the court to write a new contract. n30 To do so would be inequitable. Cypress has no bargained-for expectancy of unanimous approval that would be taken away by the Borrower's proposed conduct. Rather, to rewrite the contract would defeat the Borrower's expectancy that it could amend the PPA without unanimous approval unless an amendment fell within the express contractual language defining when unanimous approval was required. n31

> n30 See *Rio Algom Corp.*, 618 P.2d at 505 ("A court will not, however, make a better contract for the parties than they have made for themselves.").
> n31 Of course, as noted, the Borrower may well be required to obtain approval of 80% of the Bondholders. That is, the

literal terms of the relevant instruments already likely provide strong protection to Cypress.

Doubtless the Borrower makes decisions every day that affect the risk/reward calculus of the Bondholders. For example, [*36] to the extent that the Borrower hazards risk in order to increase its level of profitability, it arguably places at risk the Series A Bondholders, who are essentially interested in assuring that the Borrower remains solvent and able to repay principal and interest. In this regard, it is important to note that the Series A Bondholders might tend to suspect the Borrower of having a risk tolerance more in line with that of the Series B, as the Borrower shares in the profits with the Series B Bondholders. Given the daily instances of such tradeoffs of risk and reward in the operation of a Waste Facility, it is implausible to believe that an interstitial voting protection of the kind Cypress advocates was intended by the contracting parties, as it would give wide license to the Series A and Series B Bondholders to use their conflicting economic incentives to demand unanimous consent to any number of measures, when the plain terms of the Relevant Instruments do not require such consent.

Put simply, had the sophisticated scriveners of the Relevant Instruments wished to require unanimous consent of any amendment to a Facility Document that had the potential for influencing the extent or [*37] probability of payments to the Bondholders, they could have done so. They did not. Thus, the Borrower's motion to dismiss Count I of the Complaint is granted to the extent to which that Count seeks a declaration that unanimous approval of the Amendment is required in order for the Amendment to be validly adopted.

VI.

For the foregoing reasons, the Borrower's motion to dismiss Count I is DENIED IN PART and GRANTED IN PART as articulated in this opinion. The Borrower's motion to dismiss Count II of the Complaint is DENIED. IT IS SO ORDERED.