# TAB 6

LEXSEE 1998 DEL CH LEXIS 133

IN RE DEAN WITTER PARTNERSHIP LITIGATION

CONSOLIDATED CIVIL ACTION NO. 14816

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1998 Del. Ch. LEXIS 133*

**October 16, 1997, Date Submitted**
**July 17, 1998, Date Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:**

Defendants' motion to dismiss granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff class of investors filed a suit for an accounting and damages from defendant financial services company for breaches of the fiduciary duties of care, loyalty, and candor.

**OVERVIEW:** Plaintiff investors filed a suit against defendant financial services company seeking an accounting and damages for breaches of the fiduciary duties of care, loyalty, and candor. The financial services company filed a motion to dismiss the suit, arguing that the investors' claims were time-barred. The investors alleged that their claims were timely because the statute of limitations was tolled. The court held that the investors' claims were barred by operation of the applicable statute of limitations. The court determined that the investors' cause of action accrued when they invested in the allegedly fraudulent investments and that the investors failed to demonstrate that the statute of limitations was tolled. The court concluded that information available to the investors provided them with inquiry notice of any alleged misconduct by the financial services company prior to the expiration of the three-year statute of limitations.

**OUTCOME:** The court dismissed plaintiff investors' suit for an accounting and damages from defendant financial services company because the claims were time-barred for failure to file within the statutory period.

**CORE TERMS:** partnership, statute of limitations, partner, investor, annual report, inquiry notice, fraudulent concealment, unknowable, tolled, inherently, tolling, motion to dismiss, annual, limitations period, wrongful conduct, discover, managing, fiduciary, subsidiary, fiduciary duties, cause of action, self-dealing, discovery, notice, equitable tolling, real estate, net income, marketing, complain, breach of fiduciary duty

**LexisNexis(R) Headnotes**

*Civil Procedure > Equity > Maxims > Follows the Law Principle*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN1] Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2] Where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3] In evaluating a motion to dismiss, the court is required to assume the truthfulness of all well-pleaded allegations of the complaint for purposes of the motion. The court is also required to draw from the complaint all inferences or conclusions of fact that may reasonably be

drawn from the specific facts alleged therein. Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. In the end, the court may only dismiss the complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.

*Governments > Fiduciary Responsibilities*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Defenses*
[HN4] Where a plaintiff has successfully alleged a claim of fraudulent concealment the affirmative statute of limitations defense turns on a question of fact, rendering a summary disposal inappropriate. When it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate.

*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Defenses*
[HN5] Under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.

*Governments > Fiduciary Responsibilities*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
[HN6] The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN7] Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. Often, plaintiffs can establish blameless ignorance by

showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. This doctrine tolls the limitations period until a plaintiff had reason to know that a wrong has been committed.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*
[HN8] The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth. Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute of limitations. Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Good Faith & Loyalty*
*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN9] Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. Underlying this doctrine is the idea that even an attentive and diligent investor relying, in complete propriety, upon the good faith of fiduciaries may be completely ignorant of transactions that constitute self-interested acts injurious to the partnership. This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.

*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*

[HN10] As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. Significantly, if the limitations period is tolled under any of these theories, it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN11] Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN12] Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Securities Law > Investment Companies > Boards of Directors*
*Torts > Malpractice & Professional Liability > General Overview*

[HN13] Beneficiaries are entitled to trust their fiduciaries. As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. But, the trusting plaintiff still must be reasonably attentive to his interests. Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings. Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.

COUNSEL: Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr., Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Wilmington, Delaware; OF COUNSEL: Nicholas E. Chimicles, Esquire, Denise Davis Schwartzman, Esquire, Francis J. Farina, Esquire, and M. Katherine Meermans, Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Haverford, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Martin London, Esquire, Richard A. Rosen, Esquire, Robert N. Kravitz, Esquire, and Tracy Anbinder Baron, Esquire, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, Attorneys for Defendants.

JUDGES: William B. CHANDLER, Chancellor.

OPINIONBY: WILLIAM B. CHANDLER

OPINION:

MEMORANDUM OPINION

CHANDLER, Chancellor

Investors, owners of interests in numerous real estate limited partnerships, seek an accounting and damages from general partners and financial advisors for breaches of the fiduciary duties of care, loyalty and candor. Information available to the investors long before [*2] these lawsuits were instituted put the investors on notice of the wrongs about which they now complain. Therefore, all of the investors' claims are barred by operation of the applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions brought by plaintiff investors against defendants Dean Witter, Discover & Co. ("Dean Witter Discover"), Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"), Dean Witter Realty, Inc. ("Dean Witter Realty") (collectively "Dean Witter"), the managing and associate general partners of seven Dean Witter real estate limited partnerships, and Tempo-GP, Inc. ("Tempo-GP"), the general partner of Dean Witter/Coldwell Banker Tax Exempt Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund"). n1

> n1 An Order of Consolidation dated August 16, 1996, consolidated three actions filed in the Court of Chancery--*Segel v. Dean Witter, Discover & Co.,* C.A. No. 14816 (filed Feb. 6, 1996); *Schectman v. Dean Witter, Discover & Co.,* C.A. No. 14829 (filed Feb. 9, 1996); *Dosky v. Dean Witter, Discover & Co.,* C.A. No. 14838 (filed Feb. 15, 1996) and added to the consolidated action plaintiffs from two other suits, one pending in the Southern District of New York--*Grigsby v. Dean Witter Reynolds, Inc.,* S.D.N.Y., No. 96 Civ. 4064 (LAP) (originally filed Dec. 27, 1995)--and one pending in the District of Maryland-*Young v. Dean Witter, Discover & Co.,* C.A. No. H-96-1139 (D. Md.) (originally filed Feb. 6,

1996). *See* Order of Consolidation (Aug. 16, 1996) (Docket No. 9).

[*3]

Plaintiffs are customers of Dean Witter Reynolds, who between 1984 and 1989, purchased from Dean Witter Reynolds units of the following limited partnerships: Dean Witter Realty Income Partnership I, L.P. ("Income I"); Dean Witter Realty Income Partnership II, L.P. ("Income II"); Dean Witter Realty Income Partnership III, L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable"). n2 With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> n2 These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.*, all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

[*4]

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate [*5] general partners of the Proprietary Partnerships. n3 Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> n3 Managing and associate general partners will be referred to collectively as the "general partners."

Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty [*6] Income Associates IV, L.P. are the managing and associate general' partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.--the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned [*7] subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. n4

1998 Del. Ch. LEXIS 133, *

n4 In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fluid or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co., Del. Supr., 657 A.2d 254, 264 (1995).*

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present. n5 Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs [*8] as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. n6

n5 First Consolidated and Amended Class Action Complaint P 37 (Docket No. 10) [hereinafter *Complaint*]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

n6 Complaint P 3.

Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of [*9] purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. n7 Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a

relationship with the Partnerships and oversee their operation, n8 Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

n7 Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition*].

n8 Complaint P 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves [*10] at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones. n9

n9 Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996. n10 The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically [*11] addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. n11 Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

n10 Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss*].

n11 Because I have determined that defendants' claim of time-bar is dispositive, I need not

address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. n12 This is so even in equity. [HN1] Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. n13 Moreover, it is "well settled that [HN2] where the complaint itself alleges facts [*12]  that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." n14

n12 *Boeing Co. v. Shrontz, 1992 Del. Ch. LEXIS 84,* Del. Ch., C.A. No. 11273, Berger, V.C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran, Del. Ch., 313 A.2d 139 (1973)* (same).

N13 *Kahn v. Seaboard Corp., Del. Ch., 625 A.2d 269, 271 (1993). See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc., Del. Supr., 677 A.2d 497 (1996)* ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

n14 *Seaboard, 625 A.2d at 277* (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

[HN3]

In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded *(i.e.,* nonconclusory) allegations of the complaint for purposes of the motion. n15 I am also required to draw from the complaint [*13]  all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein. n16 Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. n17 In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. n18

n15 *Loudon v. Archer-Daniels-Midland Co., Del. Supr., 700 A.2d 135, 140 (1997)* (en banc); *Grobow v. Perot, Del. Supr., 539 A.2d 180, 187 & n.6 (1988).*

n16 *Id.*

n17 *In re Santa Fe Pac. Shareholder Litig., Del. Supr., 669 A.2d 59, 65-66 (1995); Grobow, 539 A.2d at 187 & n.6.*

n18 Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp., Del. Supr., 498 A.2d 1099, 1105 (1985); Litman v. Prudential-Bache Properties, Inc., 1994 Del. Ch. LEXIS 3,* *6, Del. Ch., C.A. No. 12137, Chandler, V.C. (Jan. 14, 1994), aff'd, Del. Supr., 642 A.2d 837 (1994).*

Plaintiffs cite *Snyder v. Butcher & Co., 1992 Del. Super. LEXIS 362,* Del. Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has *"successfully pled* fraudulent concealment" *1992 Del. Super. LEXIS 362* at *10 (emphasis added). [HN4] Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz, 1992 Del. Ch. LEXIS 84* at *1 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer, Del. Supr., 456 A.2d 798, 799 (1983)* (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

[*14]

## III. ANALYSIS

### A. Statute of Limitations

It is well-settled [HN5] under Delaware law that a three-year statute of limitations applies to claims for

breach of fiduciary duty. n19 With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships. n20 Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

n19 *10 Del. C. § 8106*; *Dofflemyer v. W.F. Hall Printing Co., D. Del., 558 F. Supp. 372, 379 (1983)* (applying Delaware law).

n20 Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation PP 1, 9.

[*15]

*B. Time of Accrual*

[HN6] The general law in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. n21 Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants n22 committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

n21 *David B. Lilly Co. v. Fisher, D. Del., 18 F.3d 1112, 1117 (1994); Isaacson, Stolper & Co. v. Artisan's Sav. Bank, Del. Supr., 330 A.2d 130, 132 (1974).*

n22 Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint PP 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would [*16] never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations. n23 Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989. n24 Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992--years before plaintiffs filed their Amended Complaint.

n23 *Seidel v. Lee, D. Del., 954 F. Supp. 810, 816 (1996)* (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig., 7 F. Supp. 2d 256, 1997 U.S. Dist. LEXIS 12809,* *24-36, S.D.N.Y., No. 95 Civ. 10657 (MBM) (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

[*17]

n24 Complaint PP 9-23.

With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s. n25 Thus, as with the marketing and

sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989. n26 Plaintiffs filed their complaint on February 6, 1996, well past the expiration of the three-year limitations period. *Absent tolling,* therefore, [*18] all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> n25 *See, e.g.,* Complaint PP 91-121 (Yield Plus), PP 129-35 (Yield Plus II), PP 136-46 (Yield Plus & Yield Plus II), PP 156-79 (Growth Properties), PP 193-98 (Income I), PP 209-16 (Income II), PP 233-39 (Income II, III & IV).
> n26 *Dofflemyer, 558 F. Supp. at 379* (fiduciary duty claim accrues at time of breach).

### C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* n27 -- reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims. n28 Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: [*19] (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them. n29

> n27 This article will be referred to as the *"Wall Street Journal* article" or the "article."
> n28 Pls.' Memo. in Opposition at 9.
> n29 *See, e.g., Playtex, Inc. v. Columbia Casualty, 1993 Del. Super. LEXIS 286, *9,* Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

[HN7]

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled

while the discovery of the existence of a cause of action is a practical impossibility. n30 For the limitations period to be tolled under this doctrine, there must have been [*20] no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. n31 Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. n32 This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. n33

> n30 *Ruger v. Funk, 1996 Del. Super. LEXIS 34, *7,* Del. Super., C.A. No. 93C-04-210, Lee, J. (Jan. 22, 1996).
> n31 *Seidel,* op. at 17.
> n32 *See, e.g., Isaacson, 330 A.2d at 133-34* (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").
> n33 *Pack & Process, Inc. v. Celotex Corp., Del. Super., 503 A.2d 646, 650 (1985).*

[HN8]

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff [*21] on notice of the truth. n34 Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. n35 "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." n36 Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. n37

> n34 *Litman,* op. at 8.
> n35 *Halpern, 313 A.2d at 143.*
> n36 *Id.*
> n37 *Id.*

[HN9]

Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [*22] n38 Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [Partnership]." n39 This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. n40

> n38 *Yaw v. Talley, 1994 Del. Ch. LEXIS 35,* *17, Del. Ch., C.A. No. 12882, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).
> n39 *Seaboard, 625 A.2d at 275-76* (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).
> n40 *In re Maxxam, Inc. / Federated Dev. Shareholders Litig., Del. Ch., 659 A.2d 760, 769* (Feb. 13, 1995).

[*23] [HN10]

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. n41 Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. n42 Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e., on* inquiry notice. n43 Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not on* inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). n44

> n41 *United States Cellular, 677 A.2d at 504; Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140,* *46, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).

n42 *In re ML-Lee Acquisition Fund II, L.P. Litig., D. Del., 848 F. Supp. 527, 554 (1994)* (inherently unknowable injuries); *United States Cellular, 677 A.2d at 503* (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

[*24]

> n43 *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard, 625 A.2d at 275* (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern, 313 A.2d at 143* (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc., Del. Super., 254 A.2d 254, 256 (1969)* (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).
> n44 Where the tolling of the statute of limitations turns on controverted issues of fact, a prediscovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig., Del. Supr., 673 A.2d 159, 163 (1996)* (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig., 1995 Del. Ch. LEXIS 73,* *19-20, Del. Ch., C.A. Nos. 12111 & 12353, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least

as far back as 1990--an entirely different situation than the one presented to the *In re Maxxam* Court.

[*25]

## D. Were Plaintiffs on Inquiry Notice?

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. n45 That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply [*26] did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

> n45 *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal. Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup. Ct, Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly [*27] available Securities Exchange Commis-

sion ("SEC") filings made by the Partnerships. n46 As a matter of law, defendants assert, disclosures in any of those documents--the sole source of plaintiffs' allegations--were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

> n46 According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.
>
> The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint *Glaser v. Norris, 1992 Del. Ch. LEXIS 1,* *13 n.1, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992).

[*28]

Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied--and were entitled to rely--on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i. e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed [*29] documents," that plaintiffs were able to

reconstruct the Partnerships and actually discover defendants' wrongful conduct. n47 Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

n47 Pls.' Memo. in Opposition at 3.

[*30]

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury. n48 [HN11] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. n49 Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.*, up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? n50

n48 *In re ML-Lee Acquisition Fund II L.P. Litig., 848 F. Supp. at 554* (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

[*31]

n49 *McCoy v. Goldberg, S.D.N.Y., 748 F. Supp. 146, 158 (1990)* (statutory period does not await plaintiffs' leisurely discovery of the fill details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[HN12] once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc., E.D. Mich., 785 F. Supp. 626, 633 (1992)* (citations omitted), *aff'd*, 6th Cir., *35 F.3d 565 (1994)*.

n50 Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships [*32] sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. n51 For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." n52 In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. n53

n51 *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[] problems... The cash distribution paid during the 1990 fiscal year was . . .an annualized return of 6.25%.").

n52 Pls.' Memo. in Opposition at 51.

[*33]

n53 *Id.* at 48.

Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." n54 Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution . . . was an annualized return on investment of 7.5%" n55 But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more

1998 Del. Ch. LEXIS 133, *

than fifteen pages in length. While the distributions were maintained [*34] at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

> n54 *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.
> n55 Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "the emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." n56 Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that [HN13] beneficiaries are entitled to trust [*35] their fiduciaries. n57 As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. n58 But, the trusting plaintiff still must be *reasonably attentive* to his interests. *"Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings."* n59 Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. n60

> n56 *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140,* *47-48, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).
> n57 *See, e.g., Borden v. Sinskey, 3d Cir., 530 F.2d 478, 489, n.10 (1976)* ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

[*36]

> n58 *Seaboard, 625 A.2d at 275.*
> n59 *Seidel,* op. at 18 (emphasis added).
> n60 *Id* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, *18 Del. J. Corp. L. 1204, 1213 (1993)* ("[I]nterest holders need not delve aggressively into the internal affairs of a . . . limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs [*37] bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. n61 Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. n62 In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. n63 Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor--and should have prompted an inquiry by plaintiffs into the health of their investments. n64

> n61 Income II, 1989 Annual Report at 1, attached to affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).
> n62 For the fiscal year 1989, the Income II Partnership shows a net income figure of $ 7,043,996 and cash distributions of $ 13,768,450. *Id.* at 7.
> n63 *Id.*
> n64 *In re Prudential Sec. Inc. Ltd. Partnerships Litig., S.D.N.Y., 930 F. Supp. 68, 76 (1996)* ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to

the facts which call for investigation, knowledge of that fraud will be imputed to him.").

[*38]

The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. n65 Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. n66 Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. n67

n65 See, e.g., Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

[*39]

n66 See, e.g., Playtex, Inc. v. Columbia Casualty, 1993 Del. Super. LEXIS 286, *10, Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); Halpern, 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").
n67 See Ruger v. Funk, 1996 Del. Super. LEXIS 34 at *8 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions they were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions described in these annual reports as "annualized returns" and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. Queen Anne Pier Condominium Council v. Raley, 1988 Del. Super. LEXIS 20, *10, Del. Super., C.A. No. 85C-JA10, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery).

[*40]

IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants. n68 Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). n69 The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes more than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. n70

1998 Del. Ch. LEXIS 133, *

n68 Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig., 930 F. Supp. at 76-77;* (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales - practices or the investments - in question, nor mentioned by name

the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

[*41]

n69 *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

n70 Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris, 1992 Del. Ch. LEXIS 1,* *42, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

# **TAB 7**

LEXSEE

WILLIAM C. DEMETREE and JACK C. DEMETREE, Plaintiffs, v.
COMMONWEALTH TRUST CO., Trustee of Trust 896 U/A dated November 29,
1962, Defendant.

Civil Action No. 14354

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1996 Del. Ch. LEXIS 112

August 13, 1996, Date Submitted
August 27, 1996, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court September 20,
1996.

**DISPOSITION:**

Demetrees entitled to summary judgment as matter
of law and order granting above stated appropriate
specific performance.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sublessees and
defendant lessor cross-appealed for summary judgment in
plaintiff's action for specific performance of a contract
for the continued lease of defendant's property.

**OVERVIEW:** Plaintiff sublessees subleased property
from a third party lessee and entered into a triparty
agreement with defendant lessor and the third party under
which plaintiffs had a conditional right to enter into a
direct lease with defendant if the third party terminated
its prime lease with defendant. The third party eventually
filed for bankruptcy and terminated its renewal rights
with defendant, without informing plaintiffs. When
defendant notified plaintiffs that both the prime lease and
sublease would terminate, plaintiffs sought to renew and
filed an action seeking specific performance when
defendant refused. The court granted plaintiffs' motion
for summary judgment and denied defendant's motion.
The court held that the triparty agreement obligated
defendant to enter into a direct lease with plaintiffs, as

provided by the terms of the sublease. The interpretation
of a provision in the sublease was subjectively shared by
the parties and was well within the bounds of a
commercially reasonable agreement. Therefore, specific
performance was an appropriate remedy for enforcement.

**OUTCOME:** The court granted plaintiff sublessees'
motion for summary judgment and denied defendant
lessors' motion for summary judgment, because specific
performance was the proper remedy to enforce a term of
the parties' agreement that permitted plaintiffs to renew
their lease with defendant.

**CORE TERMS:** lease, sublease, prime, new lease,
option to renew, renewal, terminated, renew, right to
enter, terminate, specific performance, motel, year term,
renewal option, lessee, lessor, default, extrinsic evidence,
plain meaning, expiration, execute, notice, set forth,
renewed, italics, parol evidence rule, legal obligation,
unambiguous, subjective, termination date

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Interpretation > General
Overview*
[HN1] The primary goal of contract interpretation is to
satisfy the reasonable expectations of the parties at the
time they entered into the contract. This process often
requires courts to engage in an analysis of the intent or
shared understanding of the parties at that time.

*Contracts Law > Contract Interpretation > General*

Overview

*Contracts Law > Third Parties > General Overview*

[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words. Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Evidence > Documentary Evidence > Parol Evidence*

[HN3] In cases where the language of a contract is clear and unambiguous, the court may not consider parol evidence to interpret the intent of the parties. Deviation from this rule is only required where a literal reading of a contractual provision would be clearly unreasonable and yield an arbitrary result. The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*

[HN4] If there is uncertainty concerning the meaning of contractual language, the court should consider the context and circumstances in which the words were used in order to determine the intended meaning. When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*

*Contracts Law > Remedies > Specific Performance*
*Real Property Law > Landlord & Tenant > Lease Agreements > Subleases*

[HN5] Specific performance is appropriate where a clear and definite agreement can be enforced without requiring the court to supply essential additional or inconsistent contractual terms.

COUNSEL:

Richard A. Levine, Esquire, Richard H. Morse, Esquire and Janet Z. Charlton, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

Richard P. Beck, Esquire and Barbara MacDonald, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware; Attorneys for Defendant.

JUDGES: ALLEN, Chancellor

OPINIONBY: ALLEN

OPINION:

MEMORANDUM OPINION

ALLEN, Chancellor

Pending are cross-motions for summary judgment in this action for specific performance of a contract. The determination of these motions requires an interpretation of two contracts executed contemporaneously on July 22, 1966. Summary judgment has been requested on the basis of those contracts and other documents executed by and between the parties, as well as affidavits and deposition testimony.

The first contract ("Sublease"), entered into between plaintiffs, William C. Demetree and Jack C. Demetree ("Demetrees"), and Horne's Enterprises, Inc. ("Horne's"), granted the Demetrees a Sublease for a portion [*2] of a parcel of land leased by Horne's from defendant, Commonwealth Trust Co. ("Commonwealth"), in a prior contract ("Prime Lease"). The Prime Lease provided for an initial term of fifteen years and granted Horne's an option to renew for four additional successive ten year periods. As contemplated under the Prime Lease, the subsequent Sublease required the Demetrees to construct a motel on the premises and granted a conditional option

to renew the Sublease in the event that the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"), executed contemporaneously by the Demetrees, Horne's, and Commonwealth, both extended the initial termination date of the Prime Lease from 1981 to 1985, and granted the Demetrees a conditional right to enter into a direct lease with Commonwealth if the Prime Lease were terminated by Horne's "prior to the expiration of the four renewal periods" provided for in the Prime Lease. An interpretation of this right to enter into a new direct lease "on the same terms, provisions, and conditions" *as the Sublease* is the subject of this dispute.

In 1985 the original term of the Prime Lease expired and the Prime Lease was extended until [*3] 1995. In 1990 Horne's sought protection of the bankruptcy court and in that connection entered into a release with Commonwealth in which it waived its right to extend the Prime Lease. The Demetrees did not learn of this at the time; they continued to occupy the premises pursuant to their Sublease. On May 18, 1995, the Demetrees received notice that both the Prime Lease and Sublease would terminate on December 31, 1995. Commonwealth informed the Demetrees that, in its view, the Demetrees had no right to renew the Sublease or require Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific performance compelling Commonwealth to enter into a new lease term which the Demetrees contend is required by the Triparty Agreement. According to the Demetrees' interpretation of the Triparty Agreement, Commonwealth is contractually obligated to enter into a direct lease for a term ending December 31, 2005, with an option to renew for two additional ten year terms.

For the following reasons, I conclude that the Triparty Agreement did not create a legal obligation for Commonwealth to enter into the demanded new direct lease. The Triparty Agreement, however, [*4] obligates Commonwealth to enter into a direct lease with the Demetrees for a single seventeen year term, without an option to renew, as provided by the terms of the Sublease. n1 The Demetrees' motion for summary judgment should be granted as a matter of law pursuant to Court of Chancery Rule 56 since there is no dispute as to the material facts set forth below. *See Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Commonwealth's motion for summary judgment is denied because the Demetrees

are entitled to the above stated specific performance.

n1 Although neither of the parties argued that the contracts entitle the Demetrees to a direct lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

## I. FACTS

### 1. THE PRIME LEASE

On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along [*5] Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant. The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

### 2. THE SUBLEASE

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor lodge on the subleased premises. n2 The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease. Section 18 of the Sublease stated that:

in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option.

The Sublease [*6] specified rents payable for the initial period and four renewal periods.

> n2 Construction of the motel was to be completed within eighteen months. At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

### 3. *THE TRIPARTY AGREEMENT*

Contemporaneously, on July 22, 1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. n3 The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed. In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

> n3 Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

[*7]

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's. In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms. Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:

> execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease* except that all provisions in said sublease referring to the

construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease. (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:

> execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that [*8] all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. n4 (italics added)

> n4 According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $ 500,000 loan to the Demetrees to construct the motel on the premises. n5 In addition to the $ 500,000 loan, the Demetrees invested approximately $ 275,000 for the construction of the motel.

> n5 The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it

from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off approximately three years before the end of the initial term of the Prime Lease and Sublease.

An assignment of the sub-sublease agreement with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years and options for renewal terms expiring December 31, 1985.

[*9]

### 4. SUBSEQUENT EVENTS

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. n6 During this time period, there were other communications between the parties concerning the property. n7

n6 Commonwealth's attorney asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease.

According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) Judgment Order).

[*10]

n7 In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever having made that statement. As will become clear, however, neither this factual dispute nor the notice issue is relevant to the determination of this contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime Lease and Sublease would expire on December 31, 1995. Subsequent to receiving this notice, the Demetrees initiated this action requesting [*11] specific performance of paragraphs of the Triparty Agreement, construed by the Demetrees to provide a right to enter into a new lease directly with Commonwealth.

### II RULES OF CONTRACT CONSTRUCTION

[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. *See* CORBIN ON CONTRACTS § 1 (1960); *Bell Atlantic Meridian Systems v. Octel Communications Corp.,* 1995 Del. Ch.

LEXIS 156, C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem. Op. at 12. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time. *See* WILLISTON ON CONTRACTS § 601 (1961); RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981); *Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del. 1994); Klair v. Reese, 531 A.2d 219, 223 (Del. 1987).*

[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words. *See Myers v. Myers, 408 A.2d 279, 281 (Del. 1979).* Where parties have entered into an unambiguous integrated written contract, the contract's construction should [*12] be that which should be understood by an objective reasonable third party. *See City Investing Co. v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del. 1993); US West Inc. v. Time Warner Inc., 1996 Del. Ch. LEXIS 55, C.A. No. 14555 (Del.Ch. May 6, 1996), Mem. Op. at 21.* An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. *See Bell Atlantic,* Mem. Op. at 13, n.4.

[HN3] In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties. n8 *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).* Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly unreasonable and yield an arbitrary result." *Citadel Holding, 603 A.2d at 822.* The parol evidence rule is based on the principle that the dear meaning of the language of a written agreement most accurately reflects the understanding of the parties at [*13] the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered. *See Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch. 1984).* The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testimony concerning expectations of the parties at the time potentially less reliable. *See* 32A C.J.S., EVIDENCE § 851, p.216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

> n8  A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist. *See U.S. West* at n.10; *Bell Atlantic* at n.5; WILLISTON ON CONTRACTS § 601 (1961).

[*14]

Of course, [HN4] if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning. *Klair, 531 A.2d at 223.* n9 When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the:

> one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Holland v. National Automotive Fibres, 194 A. 123, 127 (Del. Ch. 1937).* As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared. That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

> n9  Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry

practices. In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966. Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

[*15]

## III. PLAIN MEANING ANALYSIS

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning. Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts. Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement. As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees would have a right to:

> execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, [*16] the Demetrees have a right "to execute a new lease with lessor." What are the terms of the new lease to which they are entitled? They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease." As to term, the Sublease referred to *seventeen* "remaining years" of rental

payments under the Sublease. In light of that fact and the fact that the Sublease did not contain any other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights. The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed. Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a direct lease with Commonwealth for a non-renewable seventeen year lease term. n10 If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. n11

> n10 Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason. This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

[*17]

> n11 Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might be terminated by the prime lessee. This provision recognizes that the Prime Lease had an option to renew. Paragraphs, however, does not create a right to enter into a direct lease with a right to renew. The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right. Section 18 provided that:

> in the event that Lessor fails to renew the

prime lease beyond its initial term or any renewal term . . . *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

This argument is not sound however. The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain [*18] a provision in the form of Section 18. (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable parties would spell out clearly in such an agreement if it were an intended, agreed upon term. n12 It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraphs to state that the lease would be on the same terms as the Sublease which contains no such right. Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

n12 Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the 'same terms and conditions' requires only that it be upon 'the same material terms and conditions.' 498 A.2d 151, 159 (1985). While this may be true, it does not help Demetree in this matter because the renewal option would appear to be a

highly material term in this context.

[*19]

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods. The material sections of the Sublease set out a seventeen year term lease with no option to renew. This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant. The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

## IV. CONCLUSION

The Demetrees are not entitled to their requested specific performance because there is no legal obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement. Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific [*20] performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option. [HN5] Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual terms. *MF v. F.* 172 A.2d 274, 176 (Del. Ch. 1961). Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

# TAB 8

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

JOHANNES R. KRAHMER and )
BETTY P. KRAHMER, )
 )
  Petitioners, )
 )
   v. ) C.A. No. 606-N
 )
CHRISTIE'S INCORPORATED, )
 )
  Respondent. )

## *MEMORANDUM OPINION AND ORDER*

**Submitted: March 22, 2006**
**Decided: June 2, 2006**

Victor F. Battaglia, Sr., Esquire, BIGGS AND BATTAGLIA, Wilmington, Delaware, *Attorneys for the Petitioners.*

Melanie K. Sharp, Esquire, Seth J. Reidenberg, Esquire, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Michael E. Salzman, Esquire, Russell W. Jacobs, Esquire, HUGHES HUBBARD & REED, LLP, New York, New York, *Attorneys for the Respondent.*

LAMB, Vice Chancellor.

The purchasers of a painting acquired at auction in 1986 seek to amend their petition for rescission filed against the auction house. The original petition, filed in 2004, alleges that the auction house committed fraud by intentionally concealing that the work of art was not an original. Now, after the conclusion of discovery, the petitioners wish to add claims of mutual mistake of fact, negligent misrepresentation, and/or constructive fraud. The court finds that the proposed new causes of action are barred by the applicable statute of limitations, and that the proposed amendment fails to state a claim of negligent misrepresentation as a matter of law. Therefore, the motion to amend the petition must be denied.

## I.

A.   Facts

In May 1986, defendant Christie's, Inc., a well known auction house, first offered for sale a painting by Frank Weston Benson, representing the painting's provenance as a "midwestern club."[1] Initially, no buyer was found. On December 5, 1986, at a subsequent sale, the petitioners, Johannes R. Krahmer and Betty P. Krahmer, purchased the painting for $38,500. At the time of the purchase, the Krahmers had no reason to doubt that the painting was a genuine work of art by Benson. Although Christie's had removed its representation as to the paintings

---

[1] The facts recited in this opinion are taken from the well pleaded allegations of the petition for rescission, unless otherwise noted, and are presumed to be true for the purposes of this motion.

1

provenance from the catalogue, after the Krahmers purchased the painting,

Christie's gave them a nameplate which stated that the painting belonged to the

Detroit Club of Michigan. Moreover, Christie's told the Krahmers that the Detroit

Club purchased the painting directly from the artist. Four years later, in 1990,

Christie's provided the Krahmers with an updated appraisal of the painting,

confirming its authenticity and raising the value of the painting to $85,000.

In the 1990s, the Krahmers began researching the painting, and, in the fall of

1999, they wrote to the Catalogue Raisonné Committee for Benson's paintings to

have the painting listed as authentic.[2] The Krahmers learned that another Benson

painting of the same subject was in the collection of the New Britain (Connecticut)

Art Museum. When the Krahmers brought this to the attention of the Catalogue

Raisonné Committee, they were advised that there might be two finished works by

Benson. "The Committee did not suggest that the painting might not be genuine,

nor did the Krahmers contemplate that possibility."[3]

In the spring of 2002, the Krahmers attempted to sell the painting at

Sotheby's auction house. Sotheby's sent the painting to a restorer to assess its

condition. The restorer issued an analysis on September 26, 2002, expressing

---

[2] The Catalogue Raisonné Committee for Benson's paintings is headquartered at Vose Galleries in Boston, Massachusetts.
[3] Pet. for Rescission ¶ 10.

2

concern that the painting was not authentic.[4]  Allegedly, for the first time, the

Krahmers suspected that the painting might not be a genuine work by Benson.[5]

The Krahmers informed Christie's of this newfound suspicion, and the parties

agreed to have the Benson Catalogue Raisonné Committee determine the

painting's authenticity.

The Committee issued a report on October 20, 2003, opining that the

painting was a fake.  Specifically, the Committee reported that after comparing the

Krahmers' painting to the similar painting at the New Britain Museum, it

determined that the painting at the New Britain Museum was more consistent with

Benson's style.  According to the Committee, the Krahmers' painting did not bear

the hallmarks of Benson's work.[6]

Furthermore, the Committee found that in 1913 Benson exhibited the

painting at the 19th Annual Exhibition of Paintings at Poland Springs, Maine.  In

the exhibition catalogue, upon close examination, there was a pearl necklace

around the neck of the model.  That necklace was missing in the Krahmers'

painting and appeared in the New Britain Museum painting.  Benson also

---

[4] *Id.* at ¶ 12. Sotheby's declined to accept the painting for sale.
[5] *Id.*
[6] Pet. for Rescission Ex. G. The committee found that the light on the curtain at left was hard, the color unnaturally bright, the depiction of the sculpture on the table was awkward and its modeling very primitive, the right hand of the figure was very poorly modeled, the features of the woman's face were messy and ill defined, and the handling of the reflection in the mirror was wooden and unnatural.  In addition, the committee found that the signature was stiff and unlike any other signatures by Benson.

3

purportedly exhibited the painting at the First Annual Art Exhibition of the Detroit

Club in 1914. The Committee believed that the Detroit Club purchased the

painting at that exhibition. These determinations were confirmed by the Benson

Archives at the Peabody Essex Museum in Salem, Massachusetts, which had a

photograph of the painting with the words "Detroit Club" purportedly written by

Benson on it. In this photograph, the model in the painting had a pearl necklace

around her neck.

The Committee opined that the painting was sold to the Detroit Club and

then came into the hands of Donald Purdy by 1973, whereupon it was purchased

from Purdy for the New Britain Museum. Essentially, the Committee believed that

at some point during this time period, the painting was removed from its frame at

the Detroit Club, swapped with a forgery, and eventually the original was sold to

the New Britain Museum. Therefore, while the Krahmers' painting was a forgery,

it was possible that it was placed in the frame of the authentic painting.

After learning that their painting may not be a genuine work of art by

Benson, the Krahmers asked Christie's to rescind the December 1986 sale.

Christie's refused, reasoning that its six-year warranty of authenticity on the

painting had long ago expired and that no other basis for rescission existed.[7] On

July 29, 2004, the Krahmers filed this petition for rescission.

---

[7] The Krahmers were given a catalogue of the paintings for sale prior to the auction. The
catalogue conspicuously informed the Krahmers that there was a six-year warranty of
authenticity for the painting.

B.     The Krahmers' Allegation Of Fraud

The Krahmers allege in their original complaint that Christie's fraudulently misled them to believe that the painting they purchased was a true Benson. Specifically, they allege that, after the painting did not sell in the May 1986 auction, Christie's reviewed its file and confirmed that the painting had not been consigned to it for sale by the Detroit Club, but rather by Purdy or someone in privity with him.[8] Therefore, they claim, Christie's became concerned that the painting it had for sale was not an authentic Benson, but rather a fake painting in the original frame. Allegedly, to conceal the true nature of the painting, Christie's removed from its catalogue the representation that it was the property of a mid-western club and detached the nameplate identifying the painting as belonging to the Detroit Club. After the Krahmers purchased the painting, however, Christie's gave the Krahmers the nameplate and represented that the painting was a Benson purchased directly from the artist by the Detroit Club.[9] According to the Krahmers, Christie's "intentional misrepresentation of the authenticity of the

---

[8] The Krahmers allege that "there can be no doubt that respondent knew that the Detroit Club was not the consignor of the painting." Pet. for Rescission ¶ 18.

[9] Allegedly, Christie's concocted a story that the nameplate had been removed from the frame during the viewing period because the chief shareholder of Sotheby's was a member of the Detroit Club and would be embarrassed if it was known that he was auctioning one of its paintings at Christie's. Pet. for Rescission ¶ 6.

painting, and its subsequent appraisal of the painting at more than twice the amount

of petitioner's purchase price, constituted fraud."[10]

C.    Motion to Amend

After the parties exchanged written discovery, including interrogatories,

requests for admissions and documents, and took several depositions, the

Krahmers moved to amend their complaint to include allegations of mutual

mistake of fact, negligent misrepresentation, and constructive fraud.[11] These

proposed amendments contain no new factual allegations, but merely claim relief

on the basis of misrepresentation without the scienter required in a fraud claim.

The parties submitted briefs on this motion to amend, and argument was held on

March 22, 2006.

**II.**

Delaware Court of Chancery Rule 15(a) permits amendment of a petition

after an answer has been filed "only by leave of court or by written consent of the

adverse party." Leave to amend should be liberally and "freely given when justice

---

[10] Pet. for Rescission ¶ 20.
[11] The Krahmers added two counts to the proposed amended petition. In the first count, the Krahmers reallege and incorporate by reference their previous allegations, but add elements of equitable fraud by alleging that "Christie's's representations as to the authenticity of the painting were made for the purpose of inducing the Krahmers to purchase the painting," and the "Krahmers justifiably relied on Christie's's misrepresentations as to the authenticity of the painting when making their purchase of the painting." The second count states that "Christie's's representations as to the authenticity of the painting constitute actual and/or constructive fraud and/or negligent misrepresentation."

6

so requires."[12] This decision, however, is a matter for the discretion of the trial

judge.[13] In exercising this discretion, "the motion to amend must be denied if, after

assuming the truth of [the] plaintiff's allegations, [the] plaintiff has failed to state a

claim upon which relief may be granted."[14] In effect, the standard to be applied is

essentially that which would apply on a motion to dismiss under Court of Chancery

Rule 12(b)(6). Therefore, leave to amend should not be granted "where it appears

with a reasonable certainty that the plaintiff would not be entitled to the relief

sought under any reasonable set of facts properly supported by the complaint,

because such amendments would be futile."[15]

Christie's asserts that leave to amend should be denied for two reasons.

First, Christie's argues that the newly added claims of mutual mistake of fact,

negligent misrepresentation, and equitable fraud are barred by the three-year

statute of limitations pursuant to 10 *Del. C.* § 8106. Second, Christie's argues that

the Krahmers' amendments fail to state a cognizable claim for negligent

misrepresentation under New York law.

---

[12] Ct. Ch. R. 15(a).
[13] *FS Parallel Fund L.P. v. Ergen*, 2004 Del. Ch. LEXIS 160 at *6 (Del. Ch. Nov. 3, 2004).
[14] *Id.*, quoting *Smith v. Smitty McGee's, Inc.*, 1998 Del. Ch. LEXIS 87, *8 (Del. Ch. May 8, 1998).
[15] *Id.* at *7; *see also Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985).

A.    Statute Of Limitations

The parties do not dispute that the applicable statute of limitations is 10

*Del. C.* § 8106, which imposes a three-year period for claims of negligent

misrepresentation and equitable fraud.  A cause of action accrues under this section

at the time of the wrongful act, "even if the plaintiff is ignorant of the cause of

action."[16]  For tort claims, a cause of action accrues at the time of the injury.[17]

Here, the Krahmers' cause of action accrued in December of 1986 when they

purchased the painting from Christie's.  This is so because on that date Christie's

allegedly injured the Krahmers by misrepresenting the authenticity of the painting.

Therefore, unless the Krahmers can demonstrate that the statute of limitations

period should be tolled, the Krahmers' claims, which were filed almost 18 years

later, are time-barred.[18]

The Delaware courts have narrowly carved out limited circumstances in

which the running of the limitations period can be tolled.[19]  Such tolling exceptions

include the doctrines of (1) fraudulent concealment, (2) inherent unknowable

---

[16] *SmithKline Beecham Pharms. v. Merck & Co.*, 766 A.2d 442, 450 (Del. 2000); *Wal-Mart Stores v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).
[17] *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992) ("A cause of action in tort accrues at the time of injury.")
[18] *In re Dean Witter P'ship Litig.*, 1998 Del. Ch. LEXIS 133 at *23 (Del. Ch. July 17, 1998) ("As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.")
[19] *Wal-Mart Stores*, 860 A.2d at 319 (holding that, under Delaware law, "even after a cause of action accrues, the 'running' of the limitations period can be 'tolled' in certain limited circumstances.").

8

injury, and (3) equitable tolling.[20] "Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[21] If one of these tolling exceptions apply, "the statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of the injury]."[22]

In the present motion, the Krahmers argue that the inherently unknowable injury doctrine applies to toll the statute of limitations for their added claims of negligent misrepresentation and actual/constructive fraud.[23] Specifically, the Krahmers contend that the time of discovery rule tolls the statute of limitations for these claims until at least 2002 when they were first told by Sotheby's that the painting may not be authentic.

In *Layton v. Allen*, the Delaware Supreme Court established the inherently unknowable injury exception to the statute of limitations.[24] In *Layton*, a doctor

---

[20] *Certainteed Corp. v. Celotex Corp.*, 2005 Del. Ch. LEXIS 11, *26 (Del. Ch. Jan. 24, 2005).
[21] *In re Dean Witter*, 1998 Del. Ch. LEXIS 133 at *19.
[22] *Wal-Mart Stores*, 860 A.2d at 319.
[23] The Krahmers alleged in their initial complaint that Christie's fraudulently concealed the authenticity of the painting. This opinion does not address whether the Krahmers' allegations in their initial complaint are sufficient to toll the statute of limitations under the fraudulent concealment doctrine. The court only determines whether the newly added claims of negligent misrepresentation and actual/constructive fraud are timely under the inherent unknowable injury exception.
[24] 246 A.2d 794 (Del. 1968).

9

negligently left a surgical instrument in a patient's body. Seven years later, after

the instrument was discovered during emergency surgery, the patient brought an

action for medical malpractice against the surgeon and the hospital.[25] The

defendants argued that the patient's claims were barred by the statute of

limitations, which provided for a two-year limitation period accruing at the date of

the surgery.

The court in *Layton* held that, under the particular circumstances, the statute

of limitations was tolled until the patient discovered the injury. It found that

"when an inherently unknowable injury . . . has been suffered by one blamelessly

ignorant of the act or omission and injury complained of, and the harmful effect

thereof develops gradually over a period of time," the injury is tolled until the

harmful effects become physically ascertainable.[26] The court found that it would

be unreasonable to bar the remedy before the wrong was physically ascertainable

by due diligence.[27] According to the court, "the rule of ignorance has no

application in a case involving an inherently unknowable injury sustained by a

blamelessly ignorant plaintiff."[28]

---

[25] *Id.* at 796.
[26] *Id.* at 798.
[27] *Id.* at 797.
[28] *Id.* at 799. The court explained that this was not a case where the plaintiff slept on her rights before she knew, or by reasonable diligence could know, that she had such rights.

10

In addition, *Layton* rejected the lower court's conclusion that the statute was tolled upon an analogy to the doctrine of fraudulent concealment.[29] It determined that the doctrine of fraudulent concealment did not apply to a situation where there were no allegations of actual knowledge or affirmative concealment of the wrong committed. The court explained that it would not equate negligent concealment with fraudulent concealment.[30] Instead, it created a separate exclusion that was to apply only in the narrow circumstances which involve an inherently unknowable injury sustained by a blamelessly ignorant plaintiff.[31]

After the *Layton* decision was rendered, the Delaware General Assembly enacted 18 *Del. C.* § 6856, which restricted the court's holding in medical malpractice cases.[32] However, *Layton* remained good law as applied in other contexts. Its rationale has been applied to cases involving accounting malpractice where the taxpayer did not know he suffered an injury until the Internal Revenue Service asserted a claim,[33] and alleged negligence of a plumber where the

---

[29] *Id.* at 798.

[30] *Id.*

[31] *Id.* The court stated that "we expressly limit this holding to such case; we do not intend any broad relation of the rule of ignorance."

[32] *Morton v. Sky Nails*, 884 A.2d 480, 482 (Del. 2005).

[33] *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 131 (Del. 1974); *see also Began v. Dixon*, 547 A.2d 620 (Del. Super. 1988) (legal malpractice action where statute of limitations began to run when the client consulted with independent counsel).

11

purchasers of a new septic system had no reason to suspect that the underground

system was defective until it malfunctioned.[34]

Perhaps the broadest application of this so called "time of discovery rule"

can be found in *Pack & Process, Inc. v. Celotex Corp.*, where a property owner

sued in connection with the installation of a defective roof manufactured by the

defendant and installed ten years before the defect was discovered.[35] The court,

applying the *Layton* rationale, tolled the applicable three-year statute of limitations

until the date of the discovery of the defect,[36] holding that, while the injury to the

plaintiff was not inherently unknowable, "the nature of the contractual relationship

between the parties was such that the existence of roof defects and the cause of the

leaks was the responsibility of the defendant, and, as such not a condition about

which plaintiff should have been knowledgeable."[37]

The issue before the court in this case, however, is one of first impression in

Delaware—whether the inherently unknowable injury rule applies where an auction

house sells an allegedly fake work of art to one who has no specific reason to

question its authenticity until long after the three-year statute of limitations has

---

[34] *Rudginski v. Pullella*, 378 A.2d 646, 649 (Del. Super. 1977) (The court explained that there was "no reasonable distinction between the cases involving the hidden malpractice of doctors, accountants, and lawyers and the hidden errors of a plumber.").
[35] 503 A.2d 646 (Del. 1985).
[36] *Id.* at 650.
[37] *Id.*

12

expired.[38] On the one hand, the Krahmers claim to be amateur art collectors who

have reasonably relied on the representations of a reputable auction house that held

itself out as an expert in American art.[39] In addition, it can be argued that questions

as to the authenticity of artwork normally do not arise until some future date,

perhaps beyond the statute of limitations when the owner decides to put the

artwork up for sale.[40]

On the other hand, "an auction house acts as an agent on behalf of its

consignors."[41] As an agent, its interests are aligned with the consigners and not the

purchasers.[42] Here, Christie's is a mere intermediary between the seller who

consigns the artwork and the buyer who purchases it at the auction. In effect,

Christie's is considered a fiduciary to the consigner and owes a duty only to him.[43]

---

[38] The court notes that the case law in the area of purchasing inauthentic art work at major auction houses is few and far between.

[39] See Balog v. Center Art Gallery-Hawaii, Inc., 745 F. Supp. 1556, 1565-66, 1573 (D. Haw. 1990) (tolling the statute of limitations until the buyers discovered that the painting was not genuine and holding that the amateur buyers were reasonable in relying on the art dealer's representations as the basis for information regarding the authenticity of the art works); see also Kai B. Singer, Sotheby's Sold Me a Fake! Holding Auction Houses Accountable for Authenticating and Attributing Works of Fine Arts, 23 COLUM.-VLA J.L. & ARTS 439, 440 (2000) ("Where the playing field is uniquely tilted in favor of established merchants of fine art, particularly the major auction houses, the rights of the amateur collections should not be overlooked.").

[40] Id. at 1571.

[41] Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc., 117 A.D.2d 284, 292 (N.Y. App. Div. 1986); see also Singer at 441.

[42] Id. at 292 (holding that an auction house has a fiduciary duty to act in the utmost good faith and in the interest of the consigner, its principal, throughout their relationship).

[43] Therefore, unlike in Pack & Process, Inc. where there was a special contractual relationship between the defendant who certified that the bond would cover all of the damages to the roof and the plaintiff who relied on the installer's assurances, in this circumstance there was no such relationship of trust. 503 A.2d at 850.

13

Furthermore, a prudent buyer of artwork, as in other commercial

transactions of similar value, can safeguard his or her investment by verifying its

authenticity with an independent third party appraisal.[44]  Particularly, a buyer at

auction assumes a greater risk as to the authenticity of the work than a buyer who

purchases directly from the artist–a risk that is taken into account in the bid price.[45]

As explained in *Weisz v. Parke-Bernet Galleries, Inc.*, absent fraud on the part of

the auction house, "the purchasers assumed the risk that in judging the paintings as

readily-identifiable works of the named artist, and scaling their bids accordingly,

they may be mistaken."[46]  For this reason, the Krahmers cannot reasonably be

found to be "blamelessly ignorant" of the authenticity of their painting in the same

way that a patient is blamelessly ignorant of an instrument that is left in his body, a

purchaser of an underground septic tank is blamelessly ignorant of its defects, or a

building owner is blamelessly ignorant that his roofer installed a faulty roof.[47]

---

[44] *See* Ralph Lerner & Judith Bresler, *Art Law: The Guide for Collections, Investors, Dealers and Artists* 49 (1989) ("Defects abound in artwork as frequently as in other property. Accordingly, the art buyer should observe the same precautions ordinarily used by the prudent buyer in other commercial transactions of like value."); *Firestone & Parson, Inc. v. Union League of Phila.*, 672 F. Supp. 819, 822 (E.D. Pa. 1987) (refusing to apply the discovery rule because the plaintiffs could have learned of the alleged error in attribution prior to the expiration of the limitations period).

[45] *Weisz v. Parke-Bernet Galleries, Inc.*, 77 Misc. 2d 80 (N.Y. Misc. 1974) ("One of the factors necessarily entering into the competition among bidders at the public auction was the variable value of the paintings depending upon the degree of certainty with which they could be authenticated and established as the works of the ascribed artist."); Singer at 452 (explaining that purchasers are likely to pay less for a painting at an auction than if they buy it from an art dealer because they assume a greater risk of the authenticity of the work).

[46] 77 Misc. 2d at 80-81.

[47] *Id.* (stating that "they will not now be heard to complain that, in failing to act with caution of one in circumstances abounding with signals of *caveat emptor*, they made a bad bargain").

14

Moreover, this is not a circumstance where the discovery of the existence of a cause of action is a "practical impossibility."[48] The Krahmers have not alleged that information on the painting's authenticity was uniquely in the hands of Christie's. Nor have the Krahmers alleged that they were unable to obtain an appraisal from another art expert. Indeed, the Krahmers could have consulted with an additional source to independently authenticate their painting at any time after the purchase. Through the exercise of reasonable due diligence, the Krahmers could have discovered that the painting might not be a genuine work by Benson well within the limitations period. They failed to do so and now ask Christie's to produce evidence and refresh its memory as to the sale of the painting that took place over 18 years ago.[49]

A leading Second Circuit case under New York law on art, inauthenticity, and the statute of limitations, *Rosen v. Spanierman,* is instructive.[50] In that case,

---

[48] The Krahmers do not assert that they were unable to discover the defect prior to the time they tried to sell the painting at Sotheby's. *See In re Dean Witter,* 1998 Del. Ch. LEXIS at *19-20 ("For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.").

[49] The court notes that the individual at the Detroit Club who handled the sale of the painting and had important information relevant to the authenticity and consignment of the painting is deceased. Therefore, the court would have to rely on other witness' memories of the sale that took place almost 20 years ago. *See Rudginski,* 378 A.2d at 649 (explaining that the purpose of the underlying statute of limitations is one of fairness to the defendant in that the defendant should not be expected to be called upon to defend against stale claims).

[50] 894 F.2d 28 (2d Cir. 1990); *see also Foxley v. Sotheby's Inc.,* 893 F. Supp. 1224, 1232 n.8 (S.D.N.Y. 1995) (holding that the statute of limitations barred a negligent misrepresentation claim brought against Sotheby's by a purchaser of a fake painting).

15

the plaintiffs purchased a painting that the gallery expressly warranted as an original work by John Singer Sargent.[51] Just like in this case, the gallery provided subsequent appraisals of the painting at the plaintiffs' request.[52] When the plaintiffs attempted to sell the painting at a Christie's auction 19 years later, the auction house determined that the painting was not a genuine Sargent. Subsequently, the plaintiffs brought suit against the gallery for common law fraud, negligent misrepresentation, professional negligence, and breach of warranty of authenticity. The gallery argued that the plaintiffs' breach of warranty claims were untimely and sought dismissal of the action under the four-year limitations period pursuant to section 2-725 of New York's Uniform Commercial Code.[53]

The Second Circuit held that the plaintiffs' breach of warranty claims accrued when they purchased the painting and not when they discovered it was inauthentic because the painting's lack of authenticity was immediately discoverable through the trained eye of an art expert.[54] The court determined that it was not unreasonable to expect a purchaser of valuable art to obtain a second opinion on the painting's authenticity. It reasoned that "requiring a purchaser to

---

[51] *Id.* at 30.

[52] *Id.* The gallery provided five subsequent appraisals over the years.

[53] *Id.* at 30-31.

[54] *Id.* at 32, 36 n.2 (holding that the defect was discoverable immediately after the good was purchased); *see also Firestone & Parson,* 672 F. Supp. at 822 (holding that in the absence of fraudulent concealment by the defendant, the statute of limitations began to run when the buyer purchased the inauthentic painting).

16

obtain that appraisal from an expert other than the seller is not an onerous burden."[55]

As a result, the Second Circuit held that the discovery exception to the statute of limitations contained in section 2-725(2) was not applicable, and that the plaintiffs' breach of warranty claims were untimely.[56] This holding in *Rosen*, although decided in the context of a breach of warranty claim under the UCC's statute of limitations, supports the determination that the authenticity of a painting is readily discoverable and not an "inherently unknowable injury" for purposes of the discovery rule.[57]

In the instant case, Christie's warranted the authenticity of the work for six years.[58] The warranty by its express terms created a reasonable inference that Christie's put the Krahmers on inquiry notice that claims involving the authenticity

---

[55] *Id.*

[56] *Id.* at 33.

[57] *Id.* at 33. The court also found that the gallery's subsequent appraisals did not extend the plaintiffs' warranty to future performance. The court reasoned that the appraisals themselves contained no warranties and were completely separate transactions from the sale of the painting. *See also Wilson*, 850 F.2d at 7 (barring a claim under the statute of limitations where the plaintiff art buyer discovered the painting was a fake 26 years after the purchase and finding that the plaintiff easily could have discovered the problem from the outset by obtaining a second expert option); *but see Balog*, 745 F. Supp. at 1571 (holding that when purchasing a painting from an art dealer, "to force buyers to secure an additional warranty of future performance after an expert had certified a piece as genuine would be not only redundant, but ridiculous.").

[58] The Krahmers do not allege that they were unaware of the warranty when they purchased the painting or that they lacked the sophistication or understanding of the general rules governing the auction. The six-year warranty provided protection to the Krahmers beyond the applicable three-year Delaware statute of limitations and the four-year UCC statute of limitations. U.C.C. § 2-725(1) (1999).

17

of the painting could only be brought within six years from the date of purchase.

Accordingly, the court cannot reasonably allow the Krahmers to bring a claim for

rescission based on a theory of negligence years after the expiration of both the

applicable statute of limitations and the Christie's express warranty.[59]

    For the foregoing reasons, the court concludes that the Krahmers do not

satisfy the discovery rule to toll the time for bringing these amended claims. As a

result, since their amended causes of action for negligent misrepresentation and

actual/constructive fraud expired in 1989, three years after they purchased the

painting, granting leave to amend the petition filed in 2004, would be futile.

B.    Negligent Misrepresentation

    Christie's argues that there is no cognizable claim of negligent

misrepresentation under New York law for a commercial relationship of this type.[60]

---

[59] In *Wilson v. Hammer Holdings*, 850 F.2d 3, 8-9 (1st Cir. 1988), the court did not reach the issue of whether the plaintiff's negligent misrepresentation action should be tolled under the discovery rule because it would not characterize a claim of this type as a cause of action based in tort. Instead, the court found that the claim fell squarely within the laws of contract and was therefore barred by the statute of limitations of the U.C.C.

[60] The parties agree that, although Delaware law applies with respect to the statute of limitations, New York substantive law applies to the Krahmers' claims. The Krahmers consented to the application of New York law by purchasing the painting under the terms of the auction catalogue, which provided that the law of New York, the site of the auction, governed. In addition, Christie's made the claims regarding the authenticity of the painting in New York where the painting was purchased. Therefore, under Delaware's "most significant relationship test," as set forth in the Restatement (Second) of Conflicts, New York law governs the Krahmers' claims. *See Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.*, 832 A.2d 116, 124 (Del. Ch. 2003).

18

Under New York law, to state a claim for negligent misrepresentation, the plaintiff

must allege that:

> (1) the defendant had a duty, as a result of a special relationship, to
> give correct information; (2) the defendant made a false representation
> that he or she should have known was incorrect; (3) the information
> supplied in the representation was known by the defendant to be
> desired by the plaintiff for a serious purpose; (4) the plaintiff intended
> to rely and act upon it; and (5) the plaintiff reasonably relied on it to
> his or her detriment.[61]

"Generally there is no liability for words negligently spoken but . . . there is an

exception when the parties' relationship suggests a closer degree of trust and

reliance than that of the ordinary buyer and seller."[62]  A plaintiff may only recover

for negligent misrepresentation where there is a fiduciary or special relationship

between the parties.[63]

---

[61] *Hydro Investors v. Trafalgar Power*, 227 F.3d 8, 20-21 (2d Cir. 2000); *Fresh Direct v. Blue Martini Software*, 7 A.D.3d 487, 489 (N.Y. App. Div. 2004).

[62] *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988) (*citing Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 488 (1st Dept. 1976).

[63] *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (holding that liability for negligent misrepresentation is imposed on those who are in a special position of confidence and trust with the injured party than that of an ordinary buyer and seller); *Fresh Direct*, 7 A.D.3d at 489 (holding that in the commercial context, liability for negligent misrepresentation has been imposed only on those persons who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified); *Hudson River Club v. Consol. Edison Co.*, 275 A.D.2d 218, 220 (N.Y. App. Div. 2000) ("A claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given."); *Stewart v. Jackson & Nash*, 976 F.2d 90 (2d Cir. 1992) ("a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty").

19

Here, Christie's contends that there was no such fiduciary or special relationship between the Krahmers and Christie's. The Krahmers argue to the contrary that the court could find that they had a special relationship with Christie's due to their long history of dealings with the auction house. Specifically, the Krahmers highlight the following elements of that relationship: (1) the parties were in privity of contract for the purchase of the painting; (2) Christie's provided the name plate and an appraisal at the time of the sale allegedly authenticating the work; (3) an agent on behalf of Christie's traveled to the Krahmers' home in 1990 to reassess and appraise the painting; and (4) Christie's directed the Krahmers to the Catalogue Raisonné Committee in 2002 and arranged the transport of the painting to the Committee. The court concludes that these rather sparse alleged contacts with Christie's, mostly dealing with the transaction at issue, cannot reasonably lead to the finding that the parties had a special relationship.

New York cases have held that the purchase of a painting and subsequent appraisals from an auction house do not create the special relationship necessary to maintain a negligent misrepresentation claim.[64] In *Rosen v. Spanierman*, the lower

---

[64] *Foxley*, 893 F. Supp. at 1232 (dismissing a claim of negligent misrepresentation for failing to allege a special relationship between the purchaser of a painting and the auction house); *Rosen*, 711 F. Supp. 758 (holding that the mere purchase of a painting from defendant and subsequent appraisals do not create the special relationship necessary to maintain a negligence claim); *see also Ravenna v. Christie's, Inc.*, 734 N.Y.S.2d 21, 22 (N.Y. App. Div. 2001) (holding that no special relationship existed between the auction house and the party seeking an appraisal of a painting).

court held that the relationship between a buyer and seller of a painting is merely contractual in nature and is insufficient to sustain a cause of action for negligent misrepresentation.[65] In addition, the court concluded that the subsequent appraisals given by the seller to the buyer did not form a special relationship necessary to maintain a negligent misrepresentation claim. The court determined that these appraisals were completely separate transactions between the parties "which had no bearing on the relationship between the parties at the relevant time, that is, when the alleged negligent misrepresentations were made."[66] Therefore, it granted the defendant's motion for summary judgment on the plaintiff's negligent misrepresentation claim.

Also, the court in *Foxley v. Sotheby's Inc.* dismissed a negligent misrepresentation claim by a buyer against an auction house because there was no special or fiduciary relationship between the parties.[67] The action was dismissed in *Foxley* even though the plaintiff "meticulously laid out an array of allegations establishing a significant association" between himself and the auction house throughout two decades.[68] These interactions between the parties included personal visits, viewings of the plaintiff's personal collection, introductions to

---

[65] *Rosen*, 711 F. Supp. at 758-59.
[66] *Id.* at 759.
[67] 893 F. Supp. at 1232.
[68] *Id.*

21

Sotheby's key personnel, and private luncheons. Nevertheless, the court concluded that the plaintiff failed to allege a fiduciary relationship between the parties sufficient to satisfy a claim for negligent misrepresentation.[69]

Based on this unequivocal precedent, the court cannot possibly infer from the Krahmers' allegations that a special relationship existed between the Krahmers and Christie's.[70] Therefore, the court concludes that the Krahmers' proposed amendments fail to state a claim for negligent misrepresentation.

## III.

For these reasons, the motion for leave to amend the petition is DENIED. IT IS SO ORDERED.

---

[69] *Id.*

[70] The court is not convinced by the Krahmers' argument that *Parrot v. Coopers*, 95 N.Y.2d 479 (N.Y. 2000), a case dealing with a negligent misrepresentation claim against a professional accounting firm over a valuation of stock, is controlling in this situation. In *Parrot*, the court held that there must be a showing of at least privity between the parties before a plaintiff may recover in tort for pecuniary loss sustained as a result of an accountant's negligent misrepresentation. It explained that "such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." The court was merely reiterating a general long-standing rule applied in accounting and other professional malpractice suits, and did not intend, as the Krahmers' contend, to eliminate or call into question the requirement that a special relationship of trust and confidence is needed to maintain a negligent misrepresentation claim in other contexts.