# TAB 9

LEXSEE

**MOORE BUSINESS FORMS, INC., a Delaware Corporation, Plaintiff, v. CORDANT HOLDINGS CORPORATION, a Delaware corporation, PETER. P. KUSEK, C. KENNETH MICHLOVITZ, KENNETH A. CASAZZA, GILBERT F. DECKER, ROBERT M. JEFFERS, and CORDANT, INC., a Maryland Corporation, Defendants.**

Civil Action No. 13911

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1995 Del. Ch. LEXIS 134

May 19, 1995, Date Submitted
November 2, 1995, Date Decided

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court November 27, 1995.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholder moved for judgment on the pleadings in its action against defendant corporation on its decision to terminate a business relationship and repurchase the shareholder's stock. The corporation moved to dismiss the action under Del. R. Civ. P. 12(b)(6).

**OVERVIEW:** A shareholder and a corporation entered into a working relationship, part of which would eventually convert preferred shares of stock into common stock. The court denied the shareholder's motion for judgment on the pleadings and granted the corporation's motion to dismiss all but one of the counts in the complaint brought by the shareholder. The rights the shareholder sought to have vindicated were contractual, not fiduciary, in nature, and its claim for breach of fiduciary duty was legally deficient. Its fiduciary claims rested on contractual considerations as well, and did not state a claim for which relief could be granted. Nothing in the purchase agreement supported a conclusion that the contracting parties intended for fair market value to mean fair value, and the shareholder's express contract claims were also legally insufficient. The shareholder's claim that the corporation breached the purchase agreement by failing to repurchase its stock within 60 days of notice of termination of the agreement stated a claim sufficient to

survive a motion to dismiss.

**OUTCOME:** The shareholder's motion for judgment on the pleadings was denied. The corporation's motion to dismiss was granted, except with respect to the shareholder's claim that its shares were not repurchased in accordance with a purchase agreement.

**CORE TERMS:** terminate, repurchase, valuation, fair market value, motion to dismiss, termination, duty, accounting firm, appraisal, fair dealing, common stock, stockholder, notice, equitable estoppel, implied covenant, contractual, disclose, breached, owed, big, survive, pleaded, business relationship, stock, misrepresented, fiduciary, promptly, voted, contractually, affirmative misrepresentation

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] For purposes of a De. R. Civ. P. 12(b)(6) motion, the well pleaded facts and reasonable inferences derived from the complaint are accepted by the Court as true. Documents incorporated by reference into the complaint may also be considered on a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses,*

*Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses,*
*Demurrers, & Objections > Motions to Dismiss*
[HN2] A Del. R. Civ. P. 12(b)(6) motion to dismiss will not be granted except where, based on the allegations of the complaint and the documents incorporated therein by reference, it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief. Reasonable inferences or conclusions of law in the complaint will be accepted if they are supported by specific allegations of fact.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Shareholder Duties & Liabilities > General Overview*
*Governments > Fiduciary Responsibilities*
[HN3] The rights of preferred stockholders are, in certain respects, both equitable and contractual. The relationship between a corporation and its preferred stockholders is primarily contractual in nature, involving rights and obligations created contractually by the certificate of designation. However, in limited circumstances fiduciary duties may be owed to preferred stockholders as well. A corporation's directors are fiduciaries for the preferred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to the corporation's other shareholders and to the corporation itself.

*Business & Corporate Law > Corporations > Shareholders > General Overview*
[HN4] Whether or not a given claim asserted by preferred stockholders is governed by contract or fiduciary principles depends on whether the dispute arises from rights and obligations created by contract or from a right or obligation that is not by virtue of a preference but is shared equally with the common. Determinations of this kind are highly fact-specific and contextual and do not easily lend themselves to a bright line rule. Disputes that relate to obligations expressly treated and rights that are created by contract will be governed by contract principles.

*Civil Procedure > Pleading & Practice > Defenses,*

*Demurrers, & Objections > Motions to Dismiss*
*Contracts Law > Breach > Causes of Action > General Overview*
[HN5] To survive a motion to dismiss, a complaint stating a claim for breach of contract must identify a contractual obligation, whether express or implied, a breach of that obligation by the defendant, and resulting damage to the plaintiff.

*Contracts Law > Breach > General Overview*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN6] To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation. The cardinal guiding principle in adjudicating a contract claim is to give effect to the intention of the contracting parties. Implied contractual obligations are terms that clearly would have been included in the contract had the parties negotiated with respect to them. Courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Contracts Law > Defenses > Equitable Estoppel > General Overview*
[HN7] To survive a Del. R. Civ. P. 12(b)(6) motion to dismiss, an equitable estoppel claim must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment. The defendants' conduct may be either an affirmative act or a failure to act when duty required. Some description of the plaintiff's state of mind is necessary to satisfy the requirement that the plaintiff's reliance be justifiable.

COUNSEL:

Richard D. Allen and Kurt M. Heyman, Esquires, of MORRIS, NICHOLS, ARSHT & TUNNEL, Wilmington, Delaware; and Stephen S. Rosenthal and Jeffery A. Tomasevich, Esquires, of MORRISON & FOERSTER, Washington, D.C.; Attorneys for Plaintiff.

Henry N. Herndon, Jr. and Joseph C. Schoell, Esquires, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware; and Joseph M. Hassett, John C. Keeney, Jr. and David G. Leitch, Esquires, of HOGAN & HARTSON L.L.P., Washington, D.C.; and Stephannie Wood, Esquire, Corporate Counsel, Cordant, Inc.; Attorneys for Defendants.

**JUDGES:** JACOBS, VICE CHANCELLOR

**OPINIONBY:** JACOBS

**OPINION:**

### MEMORANDUM OPINION

JACOBS, VICE CHANCELLOR

Pending are two motions in this action brought by a preferred stockholder against the corporate issuer, its directors, and the issuer's wholly owned subsidiary. The first motion is to dismiss this action under Rule 12(b)(6) for failure to state a claim or, alternatively, for summary judgment. The movants are the corporate defendants, Cordant Holdings Corporation ("Holdings"), and its wholly owned subsidiary, Cordant, Inc. [*2] ("Cordant"). n1 The second motion is by the plaintiff, Moore Business Forms, Inc. ("Moore"), for judgment on the pleadings. This is the Opinion of the Court on these motions.

> n1 The individual directors of Holdings -- Messrs. Peter P. Kusek, C. Kenneth Michlovitz, Kenneth A. Casazza, Gilbert F. Decker and Robert M. Jeffers -- have joined in the corporate defendants' motion, and also have moved to dismiss for lack of personal jurisdiction.

### I. THE FACTS n2

> n2 The facts are drawn from the complaint. [HN1] For purposes of a Rule 12(b)(6) motion, the well pleaded facts and reasonable inferences derived from the complaint are accepted by the Court as true. Good v. Getty Oil Co., Del. Ch., 518

A.2d 973, 975 (1986); Delaware State Troopers Lodge v. O'Rourke, Del. Ch., 403 A.2d 1109, 1110 (1979). Documents incorporated by reference into the complaint may also be considered on a motion to dismiss. Lewis v. Straetz, Del. Ch., 1986 Del. Ch. LEXIS 365, *12, CA. No. 7859, Hartnett, V.C. (Feb. 12, 1986).

[*3]

The dispute arises out of the defendants' effort to terminate a business relationship that Holdings, Cordant and Moore formed in early 1990. That relationship involved Moore's participation in the financing of an employee buy-out of Cordant by Holdings. In that transaction, Moore acquired for $ 11 million all of the outstanding shares of the Series B Noncumulative Convertible Redeemable Preferred Stock (the "Preferred Stock") of Holdings. (Complaint at PP 12-16). As part of the transaction, Cordant, Holdings and Moore entered into a business development arrangement, called the Strategic Alliance, the terms of which were embodied in a March 23, 1990 Purchase Agreement among Cordant, Holdings and Moore (the "Purchase Agreement"). (Complaint at P 14).

Moore is a manufacturer and supplier of business forms and related systems. Cordant is a provider of computer and communication systems integration services. The Strategic Alliance contemplated that Moore and Cordant would work together to identify and develop business opportunities and afford each other a first right of refusal with respect to certain client requirements. (Complaint at P 18). The Strategic Alliance would last a minimum [*4] of four and a quarter years, i.e., until June 30, 1994. (Complaint at P 19). After that, the parties would be entitled to terminate the Strategic Alliance in accordance with the terms of the Purchase Agreement. (Complaint at PP 20-21).

Under the Purchase Agreement, the Preferred Stock becomes convertible into Holdings common stock in specified circumstances. The Preferred Stock also becomes callable by Holdings at fair market value if Holdings or Cordant decide to terminate the Strategic Alliance. (Complaint at PP 16, 20). All Preferred Stock that is not either converted or repurchased by December 31, 2004 must be redeemed at par value. (Complaint at 16). As the holder of all of the outstanding Preferred

Stock, Moore was entitled to designate a director to serve on the boards of directors of both Holdings and Cordant. Moore appointed Mr. Ronald D. Rogers ("Rogers") as its representative on those boards. (Complaint at 17).

Under Section VII.F. of the Purchase Agreement, if Holdings or Cordant decide to terminate the Strategic Alliance, Holdings must repurchase all of the outstanding Preferred Stock. Holdings and Cordant are entitled to terminate the Strategic Alliance on 60 days [*5] notice to Moore. In that event, Section VII.F. requires that:

> ... promptly upon giving of such notice ... [Holdings] shall repurchase all of the [Preferred Stock] ... owned by Moore for cash at a price equal to ... the per share value set forth in a fair market value appraisal of the common stock of [Holdings], made as of the end of [Holding's] most recent fiscal quarter, by an accounting firm selected from among those firms formerly known as the big eight or their successors by a majority of the directors of [Holdings] other than directors who are executives of [Holdings] or affiliated with Moore, provided that the accounting firm selected will not be one which has audited the financial statements of either Moore or [Holdings] for the most recent three (3) years then ended, ... Moore hereby irrevocably agrres [sic] to the repurchase by [Holdings] provided for by this Section F., subject only to the conditions set forth in this Section F.

Purchase Agreement, Section VII.F.

If, on the other hand, Moore elects to terminate the Strategic Alliance, then Holdings loses its right to repurchase the Preferred Stock and Moore retains its Preferred Stock investment. [*6] Section IX.E. of the Purchase Agreement permits Moore to terminate the Strategic Alliance upon 60 days notice, and "upon such termination, ... [the provisions of the Purchase Agreement entitling Holdings to repurchase the Preferred Stock] shall also terminate and be of no further force or effect."

This action arises out of Holdings' election to terminate the Strategic Alliance and repurchase Moore's Preferred Stock. That dispute was triggered by the events now described.

On February 23, 1994, Holdings' board of directors met to decide upon certain stock options and bonus stock to be awarded to key employees. (Complaint at P 26). In that connection, the board considered a valuation of Holdings as at December 31, 1993 that KPMG Peat Marwick ("KPMG") had previously prepared. (Id.). KPMG had valued the Preferred Stock at between $ 4.27 million and $ 4.72 million, assuming that the Preferred Stock was not converted to Holdings common stock; and at between $ 4.36 million and $ 4.84 million, assuming that there was conversion (Complaint at P 25).

That same day, Messrs. Jeffers and Decker (two directors of Holdings who were neither executives of Cordant nor affiliated with Moore) decided [*7] to engage KPMG to conduct a fair market value appraisal of Holdings as at March 31, 1994. (Complaint P 31). The complaint alleges that Jeffers and Decker advised Kusek, in a March 8, 1994 memorandum, that they had selected KPMG "for purposes of purchasing the [Holdings] preferred and/or common stock owned by Moore." n3 (Complaint at PP 31-32). Soon thereafter, Holdings and Cordant entered into negotiations to obtain a commitment from Chase Manhattan Bank of Maryland to finance a potential repurchase of the Preferred Stock by Holdings. (Complaint at P 33).

> n3 The complaint quotes only that specific excerpt from the March 8, 1994 memorandum, thereby implying that Holdings had already formed an intention to purchase the Preferred Stock. However, the implication is misleading because the quoted excerpt is incomplete. The complete quote is that Decker and Jeffers selected KPMG "for purposes of purchasing the [Holdings] preferred and/or common stock owned by Moore ... in the event that Cordant at any time in the future terminates [the Strategic Alliance]." (March 8, 1994 Memorandum from Jeffers and Decker to Kusek, incorporated by reference in P 31 of the Complaint; emphasis added). Under Section VII.F. of the Purchase Agreement, a valuation of Holdings as of March 31, 1994 could not be used to repurchase the Preferred Stock, because (i) Holdings and Cordant may not terminate the Strategic Alliance until after

the quarter ending June 30, 1994 and (ii) the repurchase of the Preferred Stock must be at a value determined by a fair market appraisal of Holdings "made as of the end of [Holdings'] most recent fiscal quarter." Thus, the earliest possible valuation date for purposes of repurchasing the Preferred Stock was June 30, 1994.

[*8]

The defendants did not disclose these actions to Moore. (Complaint PP 31, 32, 35). Specifically, they did not reveal to Rogers (Moore's representative on the Holdings and Cordant boards) that they had engaged KPMG to value Holdings or that they had taken steps to obtain bank financing for the Preferred Stock repurchase. Nor did they furnish Rogers the March 31, 1994 valuation after it was received from KPMG. (Id.). The plaintiff alleges that in a May 9, 1994 meeting among representatives of Holdings and Moore's corporate parent, Mr. Kusek (Holdings' Board Chairman and Chief Executive Officer) remained silent about those actions, and affirmatively misrepresented that the defendants wanted to make the Strategic Alliance work and had no plans to terminate it. (Complaint at PP 36-39).

The Holdings board met on May 17, 1994. At that meeting, the directors (a) reviewed the KPMG valuation as of March 31, 1994, (b) voted to authorize Holdings' officers to terminate the Strategic Alliance after June 30, 1994, and (c) voted to obtain a valuation of Holdings as at June 30, 1994 for purposes of repurchasing the Preferred Stock in accordance with Section VII.F. of the Purchase Agreement. n4 [*9] (Complaint at P 50). The board determined that Holdings and Cordant would not disclose their intention to terminate the Strategic Alliance until after certain current contract negotiations with Moore had been completed and approval from the United States Air Force regarding a substantial contract had been obtained. (Complaint at PP 48-49).

n4 Rogers was excluded from the discussions on this subject.

After the May 17, 1994 board meeting, the defendants continued to conceal their decision and the steps they had taken to terminate the Strategic Alliance. Two months later, in a telephone conversation, Mr. Reto Braun, the President of Moore's corporate parent, and Mr. Kusek discussed the Strategic Alliance and ways to improve relations among Holdings, Cordant and Moore. (Complaint at P 51). They also exchanged letters on that subject on July 19 and August 2, 1994. (Complaint at PP 53-54). Although Mr. Kusek knew of KPMG's ongoing valuation of Holdings, he did not disclose the actions Holdings and Cordant had taken [*10] to value Holdings or to terminate the Strategic Alliance. (Complaint at PP 52, 54, 56). However, in his August 2, 1994 letter, Kusek did tell Braun of his perception of a "worsening business relationship." He also communicated his belief that Cordant and Moore "should separate that business relationship from [their] equity relationship [and that] an appropriate business relationship can be implemented without an equity relationship but an equity position by a strategic investor should only exist in support of a solid, mutually-beneficial, business relationship." (August 2, 1994, Kusek letter at 3, incorporated by reference in P 54 of the Complaint).

On August 11, 1994, KPMG submitted its valuation of Holdings as at June 30, 1994. (Complaint at P 55). KPMG had valued the Preferred Stock at $ 4.62 million assuming no conversion into Holdings common stock, and at $ 4.48 million assuming conversion. (Complaint at PP 57, 61-62). On August 30, 1994, Cordant and Holdings formally notified Moore of their decision to terminate the Strategic Alliance, and disclosed KPMG's prior retention of Holdings common stock and its $ 4.48 million valuation of the Preferred Stock as at June 30, 1994. [*11] (Complaint at P 61). Cordant and Holdings advised Moore that Holdings was prepared to repurchase the Preferred Stock for $ 4.48 million. (Id.).

One week later, on September 8, 1994, Mr. Kusek wrote a letter to Moore on Cordant stationery, enclosing a Cordant check for $ 4.48 million. (Complaint at P 68). On September 20, 1994, Moore returned the check to Mr. Kusek, taking the position that the Preferred Stock had been undervalued in a flawed process that violated the requirements of the Purchase Agreement. (Id.). Moore also contended that the manner in which Cordant had attempted to repurchase the Preferred Stock violated both the Purchase Agreement and the rights of Moore's designee to the Holdings board of directors. (Id.).

On December 5, 1994, Moore, contending that Cordant and Holdings had never validly terminated the Strategic Alliance, advised the defendants that it (Moore)

had decided to terminate the Strategic Alliance pursuant to Section IX.E of the Purchase Agreement. (Complaint at P 70). Moore takes the position that its termination of the Strategic Alliance extinguished Holdings' repurchase option and that as a consequence, Moore continues to own the Preferred Stock. [*12]

## II. CONTENTIONS OF THE PARTIES

Moore argues that the defendants (a) improperly concealed their intention to terminate the Strategic Alliance, (b) improperly selected KPMG to value the Preferred Stock, (c) unfairly excluded Moore from participating in the valuation process; and (d) as a result, improperly selected a flawed valuation methodology that grossly undervalued the Preferred Stock.

That conduct is claimed, in Count I, to constitute a breach by the individual defendants of their duties of loyalty, good faith and fair dealing owed to Moore. Moore further claims that Cordant aided and abetted the individual defendants in that breach of fiduciary duty; and alleges in Count IV that the defendants' conduct amounted to constructive fraud.

In Count II, Moore claims that Holdings' and Cordant's conduct also constituted a breach of their contract with Moore. Specifically, Moore alleges Holdings and Cordant breached the express provision of Section VII.F. of the Purchase Agreement that required a "fair market value appraisal" of Holdings to determine the Preferred Stock repurchase price. Moore also contends that the manner in which Holdings and Cordant conducted the valuation process [*13] constituted a breach of their implied covenant of good faith and fair dealing.

Finally Moore claims, in Count III, that the defendants' concealment of and affirmative misrepresentation regarding their intention to terminate the Strategic Alliance, estops them from proceeding to terminate the Strategic Alliance and repurchase the Preferred Stock.

Moore claims that as a result of the alleged wrongdoing it suffered three harms. First, Moore asserts that because it was misled into believing that Holdings and Cordant did not intend to terminate the Strategic Alliance, it (Moore) continued to treat Holdings and Cordant preferentially in business dealings. Next, Moore claims that the defendants' concealment of their plans to terminate the Strategic Alliance excluded Moore from participating in the Preferred Stock valuation process. Third, Moore contends that the defendants' conduct caused it to refrain from exercising its own termination rights, which, if done, would have extinguished Holdings' option to repurchase Moore's Preferred Stock.

The defendants contend that Moore has failed to state an actionable claim, because (a) the duties owed by the defendants to Moore were contractual, [*14] not fiduciary, (b) the complaint does not state an actionable breach of any duty expressed in the Purchase Agreement or arising from the implied covenant of good faith and fair dealing, (c) no equitable estoppel claim is pleaded because the complaint fails (i) to identify any duty of disclosure owed by defendants, other than the 60 day notice period required by the Purchase Agreement; and (ii) fails adequately to plead that the defendants made affirmative misrepresentations upon which Moore justifiably relied.

\* \* \*

I conclude, for the reasons next discussed, that the defendants' Rule 12(b)(6) motion to dismiss should be granted, except insofar as Count II claims that Holdings breached its contract by failing to tender payment for the Preferred Stock promptly after giving notice of the termination of the Strategic Alliance. The plaintiff's motion for judgment on the pleadings on that claim will be denied, because the defendants' averment that Holdings promptly tendered payment through its agent, Cordant, raises a litigable issue of fact.

Finally, because the plaintiff has not yet had an opportunity to conduct discovery, Chancery Rule 56(f) precludes granting the defendants' motion [*15] for summary judgment. Therefore, this Opinion addresses solely the defendants' Rule 12(b)(6) motion (including the defendants' challenges to in personam jurisdiction) and the plaintiff's motion for judgment on the pleadings.

## III. THE DEFENDANTS' MOTION TO DISMISS

[HN2] A Rule 12(b)(6) motion to dismiss will not be granted except where, based on the allegations of the complaint and the documents incorporated therein by reference, "it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief." In re Tri-Star Pictures, Inc. Litigation, Del. Supr., 634 A.2d

319, 326 (1993). Reasonable inferences or conclusions of law in the complaint will be accepted if they are supported by specific allegations of fact. Id. Each Count of the complaint is evaluated in light of this standard.

A. The Fiduciary Duty Claim

Count I claims a breach of fiduciary duties owed by a corporation's directors to a class of preferred stockholders. [HN3] The rights of preferred stockholders are, in certain respects, both equitable and contractual. The relationship between a corporation and its preferred stockholders [*16] is "primarily ... contractual in nature," involving "rights and obligations created contractually by the certificate of designation." HB Korenvaes Investments, L.P. v. Marriott Corp., Del. Ch., 1993 Del. Ch. LEXIS 90, *14, C.A. No. 12922, Allen, C. (June 9, 1993). However, in limited circumstances fiduciary duties may be owed to preferred stockholders as well. A corporation's directors "are fiduciaries for the preferred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to [the corporation's] other shareholders and to [the corporation] itself." Eisenberg v. Chicago Milwaukee Corp., Del. Ch., 537 A.2d 1051, 1062 (1987).

[HN4] Whether or not a given claim asserted by preferred stockholders is governed by contract or fiduciary principles depends on whether the dispute arises from rights and obligations created by contract or from "a right or obligation that is not by virtue of a preference but is shared equally with the common." Jedwab v. MGM Grand Hotels, Inc., Del. Ch., 509 A.2d 584, 594 (1986). Determinations of this kind are highly fact-specific and contextual and do not easily lend themselves to a "bright line" rule. [*17] See, HB Korenvaes Investments, L.P., supra, at *12. What can be said, however, is that disputes that relate to obligations "expressly treated and rights [that are] created" by contract will be governed by contract principles. Id. at *20.

Moore claims that the individual defendants' conduct constituted a breach of their fiduciary duties of loyalty, good faith and fair dealing, but Moore provides no support for that assertion. Indeed, in advancing this position, Moore attempts to downplay its status as a preferred stockholder and to portray itself as a common shareholder, by referring to itself throughout Count I as a "minority shareholder." That characterization is inaccurate. Although the Holdings Preferred Stock is

convertible into common shares in specified circumstances, nowhere is it alleged that that stock has been converted. Moore's rights flow from its status as a Preferred, not a common, stockholder.

The plaintiff's fiduciary duty argument boils down to an assertion that the claimed rights that are the subject of Count I -- specifically, Moore's right to a fair market valuation of the corporation and to a proper determination of the Preferred Stock repurchase price [*18] -- are common to all shareholders. But that is not so: the duties sought to be enforced have a clearly contractual source. This dispute among these parties relates to an event specifically anticipated and expressly provided for in their contract. The Purchase Agreement created, and Holdings issued, a class of stock having unique attributes designed to facilitate a smooth severance of Holdings' relationship with Moore if Holdings became dissatisfied with the Strategic Alliance. In that context the parties contractually created specific procedural guidelines for the valuation and repurchase of the Preferred Stock. What Moore challenges here is the manner in which those procedures were implemented.

The rights Moore seeks to have vindicated are contractual, not fiduciary, in nature. For that reason, Moore's claim for breach of fiduciary duty, as alleged, is legally deficient. Because no cognizable breach of fiduciary duty is stated, Moore's claim in Count I that Cordant aided and abetted the individual defendants' breach of fiduciary duties must be dismissed as well.

B. The Constructive Fraud Claim

Count IV is a claim for constructive fraud. At oral argument Moore's counsel [*19] conceded that that claim is essentially a breach of fiduciary duty claim in a different form, that is substantively indistinguishable from the claims alleged in Count I. (Oral Argument, TR., 5/19/95 at 101). Because Count I is dismissible, so, too, is Count IV.

C. The Contract Claims

At the heart of Moore's case are its contract claims. [HN5] To survive a motion to dismiss, a complaint stating a claim for breach of contract must identify a contractual obligation, whether express or implied, a breach of that obligation by the defendant, and resulting damage to the plaintiff. Ch. Ct. R. 12(b)(6); See, Goodrich v. E.F. Hutton Group, Inc., Del. Ch., 542 A.2d

1200, 1203-4 (1988); Wright & Miller, Federal Practice and Procedure: Civil 2d § 1235. Moore alleges, in Count II, that Holdings and Cordant breached an express provision of the Purchase Agreement as well as an implied covenant of good faith and fair dealing. Those claims are now addressed.

### 1. Express Contract Claim

Moore claims that Holdings and Cordant breached, in two distinct ways, Section VII.F. of the Purchase Agreement, which requires a "fair market value" appraisal of the Preferred Stock. First, Moore challenges [*20] the valuation process, claiming that KPMG conducted an inadequate inquiry and investigation. Second, Moore challenges the result of that process, claiming that KPMG's valuation did not yield a "fair market value" as the Purchase Agreement required. I conclude that the complaint fails to state an actionable breach of contract claim.

To ensure an adequate valuation inquiry and investigation, the process created by the Purchase Agreement relies upon the independence and professional competence of a "big eight" accounting firm. Section VII.F. requires Holdings to repurchase the Preferred Stock "at a price equal to ... the per share value set forth in a fair market value appraisal of the common stock of [Holdings]." It also requires that the appraisal be "[1] made as of the end of [Holdings'] most recent fiscal quarter, [2] by an accounting firm selected from among those firms formerly known as 'the big eight' or their successor by [3] a majority of the directors of [Holdings] other than directors who are executives of [Holdings] or affiliated with Moore. The foregoing is made subject to the proviso that "... the accounting firm selected will not be one which has audited [*21] the financial statements of either Moore or [Holdings] for the most recent three (3) years then ended ...."

Moore does not allege that Holdings or Cordant failed to comply with any of those express provisions. Nor does it cite any other provision of the Agreement that creates a contractual duty to conduct the valuation inquiry in a particular manner. For these reasons Moore's claim of inadequate inquiry and investigation is legally insufficient.

In the alternative, Moore argues that even if Holdings and Cordant fully complied with the foregoing procedural requirements, the averment that the valuation process did not yield "fair market value" suffices to state a claim for breach of the Purchase Agreement. However, Moore alleges no facts that support this claim. All the Purchase Agreement requires is that the repurchase price be equal to the "...value set forth in a fair market value appraisal ... made ... by an accounting firm selected from among those firms formerly known as 'the big eight'..." That is, the parties, mindful that the "fair market value" of a closely held company is a matter over which reasonable minds might disagree, contractually agreed that the "fair market value" [*22] repurchase price would be what the selected "big eight" accounting firm determines it to be. The complaint does not allege that the fair market valuation of Holdings was performed by someone other than a "big eight" accounting firm.

In support of its position, Moore argues that the term "fair market value" in the Purchase Agreement was intended to incorporate the "fair value" standard employed in Delaware's appraisal statute, 8 Del. C. § 262(a). According to Moore, § 262(a) requires a determination of a corporation's intrinsic or fair value as a going concern. Moore asserts that KPMG's valuation of the Preferred Stock violated Section VII.F. of the Purchase Agreement (as thus interpreted), because the valuation improperly included a discount to reflect the fact that the Preferred Stock is illiquid and does not represent a controlling interest.

The premise of that argument is wrong. Nothing in the Purchase Agreement supports a conclusion that the contracting parties intended for "fair market value" to mean "fair value" within the meaning of 8 Del. C. § 262(a). Because it rests upon an invalid premise, this claim is also legally insufficient.

### 2. Implied Contract Claim [*23]

Because Moore has failed to state a cognizable claim that Holdings or Cordant breached an express provision of the Purchase Agreement, for Count II to survive a motion to dismiss, it must allege an actionable breach of an implied contractual term. However, no such claim is alleged either.

In Count II, Moore contends that the manner in which Holdings and Cordant "initiated, controlled and directed" the valuation of the Preferred Stock constituted a breach of an implied covenant of good faith and fair dealing owed by Holdings and Cordant.

[HN6] To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation. Goodrich, 542 A.2d at 1204. The cardinal guiding principle in adjudicating a contract claim is to give effect to the intention of the contracting parties. E.I. du Pont de Nemours v. Shell Oil Co., Del. Supr., 498 A.2d 1108, 1113 (1985). Thus, implied contractual obligations are terms that "clearly would have been included [in the contract] had the parties negotiated with respect to them." Price Organization, Inc. v. Universal Computer Consulting Inc., Del. Ch., 1993 Del. Ch. LEXIS 216, *16, C.A. No. 12505, Allen, [*24] C., (Oct. 1, 1993) (citing Katz v. Oak Industries, Del. Ch., 508 A.2d 873, 880 (1986)). By parity of reasoning, "courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong," yet does not provide for the obligation that is claimed to arise by implication. Abex, Inc. v. Koll Real Estate Group, Inc., Del. Ch., 1994 Del. Ch. LEXIS 213, *35, C.A. No. 13462, Jacobs, V.C. (Dec. 22, 1994).

Moore complains that Holdings and Cordant acted in bad faith by hiring KPMG to value the Preferred Stock, because KPMG had previously valued Holdings in connection with stock option and bonus plans. Moore also claims that it should have been given notice when the defendants decided to conduct a valuation of the Preferred Stock and/or when their boards of directors decided to terminate the Strategic Alliance. Finally, Moore claims that the defendants were obligated to afford Moore the opportunity to provide KPMG with information that Moore considered pertinent to the valuation of Holdings.

The problem with these claims is that the obligations that Moore urges the Court to recognize (by implication) flow from matters expressly addressed [*25] by the Purchase Agreement. The conditions to which the Preferred Stock repurchase is made subject are limited to those expressly set forth in Section VII.F. That Section (i) imposes criteria to governing the selection of an accounting firm to conduct the valuation of the Preferred Stock; (ii) establishes a 60 day notice period for the orderly termination of the Strategic Alliance, and (iii) rather than include Moore in the valuation process, specifically permits Holdings to repurchase the Preferred Stock without any notice to or involvement of Moore. n5

n5 The 60 day notice period required

by Section VII.F. applies only to the termination of the Strategic Alliance. In contrast, Section VII.F. requires that Holdings repurchase the Preferred Stock "promptly upon giving of such notice ...." (emphasis added)

Contrary to the duties Moore claims it is owed by virtue of the Purchase Agreement, Section VII.F. does not require that Holdings and Cordant give notice of their intention to terminate the Strategic Alliance [*26] within a period of time after that intention is formed. It merely imposes a 60 day period between the date that Holdings and Cordant announce their decision to terminate the Strategic Alliance, and the date upon which the termination of that Alliance becomes effective. Nor does Section VII.F. require notice to Moore before Holdings may exercise its right to repurchase the Preferred Stock after giving notice of the termination of the Strategic Alliance. All that Section requires is that Holdings repurchase the Preferred Stock, promptly upon giving of such notice. . . ." (emphasis added). Thus, the "implied" duties Moore seeks to enforce are inconsistent with the scheme of express duties created by Section VII.F. Moore cannot, therefore, validly claim that the conduct complained of violated an implied covenant of good faith and fair dealing owed by Holdings and Cordant.

For these reasons, Count II must fail as a matter of law.

D. The Equitable Estoppel Claim

Count III alleges equitable estoppel. [HN7] To survive a Rule 12(b)(6) motion to dismiss, an equitable estoppel claim must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable [*27] reliance on that conduct, to its detriment. Wilson v. American Ins. Co., Del. Supr., 58 Del. 394, 209 A.2d 902, 903-4 (1965). The defendants' conduct may be either an affirmative act or a failure to act when duty required. Welshire, Inc. v. Harbison, Del. Ch., 32 Del. Ch. 362, 88 A.2d 121, 125 (1952), aff'd, Del. Supr., 33 Del. Ch. 199, 91 A.2d 404 (1952). Some description of the plaintiff's state of mind is necessary to satisfy the requirement that the plaintiff's reliance be justifiable. Burge v. Fidelity Bond and Mortg. Co., Del. Supr., 648 A.2d 414, 420 (1994).

Here, Moore alleges that it relied to its detriment

upon the defendants' omissions to disclose facts and affirmative misrepresentations concerning the status of the Strategic Alliance. With respect to the alleged omissions, the plaintiff claims that the defendants had a duty, arising from their contractual and fiduciary relationships with Moore, to disclose their intention to terminate the Strategic Alliance. I conclude, for the reasons previously stated in my discussion of Counts I and II, that the defendants owed no disclosure duty beyond the 60 day notice requirement prescribed by the Purchase Agreement. Thus, insofar [*28] as the claim for equitable estoppel rests upon a disclosure omission, it must fail.

Moore's "affirmative misrepresentation" estoppel claim rests solely upon the allegation that on May 9, 1994, Mr. Kusek "... affirmatively misrepresented Defendants' position by stating that they had no plans to terminate [the Strategic Alliance] ..." (Complaint, P 39). However, nowhere does Moore specifically allege that the defendants had decided to terminate the Strategic Alliance before Kusek made that statement. Moore asks the Court to infer that intent from its use of the word "misrepresented" in Paragraph 39 of the complaint. n6

> n6 Moore alleges that "when asked by Braun at this [May 9] meeting whether, in light of the difficulties the companies were having, Holdings and Cordant wanted to terminate the Strategic Alliance, Defendant Kusek affirmatively misrepresented Defendants' position by stating that they had no plans to terminate it, but rather that Holdings and Cordant wanted to make the Strategic Alliance work." (Complaint, P 39) (emphasis added).

[*29]

Given the alleged sequence of events leading to the termination of the Strategic Alliance, in my view no reasonable inference can be drawn that Holdings had decided to terminate the Strategic Alliance by May 9, 1994. Nowhere does the complaint straightforwardly allege that Holdings had already formed an intention to terminate the Strategic Alliance by that date. All the complaint specifically avers is that on May 17, 1994, the Holdings board met and voted to terminate the Strategic Alliance, and to authorize its officers to obtain a

valuation of Holdings as at June 30, 1994 and effect the termination of the Strategic Alliance (Complaint, Section F). For the Court to infer that Holdings had decided to terminate the Strategic Alliance by May 9, 1994, it must have a pleaded basis also to infer that (a) a majority of the individual members of Holdings' board had formed the intention to terminate the Strategic Alliance before they met and voted at the May 17, 1994 board meeting, and (b) despite having formed that intention, those directors refrained from recording their decision or authorizing Holdings' officers to act on that decision until the May 17, 1994 meeting. That is too much [*30] water for a single word ("misrepresented") to carry uphill.

To support the conclusory allegation that Kusek's May 9, 1994 statement was a misrepresentation, some minimal factual averments are needed. Here, the only reasonable inference that can be drawn from the complaint is that the Holdings board was actively exploring the possibility of terminating the Strategic Alliance, but did not decide to do that until its members collectively voted at the May 17, 1994 meeting. In short, Moore's allegation of an affirmative misrepresentation is not well pleaded. I therefore need not consider whether Moore has successfully pleaded the other elements essential to a claim of equitable estoppel. Because Count III fails to allege an actionable omission or affirmative misrepresentation by the defendants, it does not state an a valid claim for equitable estoppel.

As analyzed thus far, Counts I through IV state no actionable claim. However, Moore has stated a cognizable contract claim that is the subject of its motion for judgment on the pleadings. Moore alleges that Holdings breached the Purchase Agreement by failing to "repurchase Moore's stock ... within sixty days of Holdings' and Cordant's notice [*31] to Moore" of the termination of the Strategic Alliance. (Complaint P 69). That allegation states a claim sufficient to survive a motion to dismiss. However, it cannot be the basis for judgment on the pleadings, because, as set forth in Part IV below, the pleadings disclose a litigable dispute.

IV.    THE    PLAINTIFF'S    MOTION    FOR JUDGMENT ON THE PLEADINGS

Moore's final claim is that even if Holdings and Cordant did legally terminate the Strategic Alliance, Holdings did not validly repurchase the Preferred Stock in accordance with the Purchase Agreement, because payment for the stock was tendered in the form of a

Cordant check accompanied by a letter on Cordant stationery, rather than by a check of Holdings, which was the only party contractually entitled to purchase the Preferred Stock. Therefore, Moore argues, Holdings did not validly repurchase the Preferred Stock and as a consequence, Moore continues to own the Preferred Stock as a matter of law.

The pleadings are not sufficient to warrant judgment in Moore's favor, because the defendants have alleged in their Answer that "Holdings handles its financial and other transactions through Cordant." (Answer P 68). That allegation raises [*32] the possibility that Cordant was acting as Holdings' agent. Because the pleadings allege a factual scenario inconsistent with Moore's version of the facts, that precludes judgment on the pleadings in Moore's favor. Ch. Ct. R. 12(c); Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., Del. Supr., 624 A.2d 1199, 1205 (1993). As previously noted, however, this claim is sufficient to survive the defendants' motion to dismiss.

V. CONCLUSION

For the foregoing reasons, (a) the defendants' motion for summary judgment and the plaintiff's motion for judgment on the pleadings are denied; (b) the defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted, except with respect to Moore's claim (against Holdings) that Holdings did not repurchase the Preferred Stock in accordance with Section VII.F. of the Purchase Agreement. As to that claim, the motion is denied. n7 IT IS SO ORDERED.

n7 These rulings render moot the individual defendants' motion to dismiss on jurisdictional grounds, for which reason, those grounds are not addressed.

[*33]

# **TAB 10**

LEXSEE

**ROBERT W. PALESE, Plaintiff, v. DELAWARE STATE LOTTERY OFFICE, its employees, agents and/or servants, WAYNE LEMONS, Director, Defendants.**

**C.A. No. 1546-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**2006 Del. Ch. LEXIS 126**

**March 16, 2006, Submitted**
**June 29, 2006, Decided**
**June 29, 2006, Filed**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff lottery ticket buyer filed an action against defendants, the Director of the Delaware State Lottery Office and the Delaware State Lottery Office, for unjust enrichment and breach of the implied duty of good faith and fair dealing after they denied the buyer's claim to a prize in the Delaware State Lottery. The Director and the Lottery Office filed a motion to dismiss the buyer's complaint.

**OVERVIEW:** When the buyer purchased lottery tickets, he placed them in his pants and forgot about them. After the winning lottery numbers were announced, he was unable to find his tickets. He concluded that they were destroyed when he washed his pants. However, he found the play slip that he used to request the numbers on the lottery tickets. The play slip contained the winning numbers for one of the tickets. Therefore, he believed that the play slip permitted him to claim the lottery prize. However, the Director and the Lottery Office contended that the winning lottery ticket had to be produced to claim the prize. The court found that (1) pursuant to the Delaware State Lottery Regulations promulgated under Del. Code Ann. tit. 29, § 4805(a), the winning ticket had to be presented to claim the prize; (2) the buyer's claim for unjust enrichment had to be dismissed because an enforceable contract existed between the parties which

required presentment of the ticket; and (3) the implied duty of good faith and fair dealing was not breached because the Director's and the Lottery Office's actions conformed to the express terms of the contract, as well as the applicable statutes and regulations.

**OUTCOME:** The court dismissed the buyer's complaint.

**CORE TERMS:** ticket, lottery, regulation, prize, winning ticket, winning, holder, prize money, lottery ticket, Lottery Act, unjust enrichment, fair dealing, game, duty, motion to dismiss, Lottery Rules, legal authority, express terms, purchaser, constructive trust, investigate, destroyed, deference, fraudulent, drawing, unfair, contractual relationship, accompanying text, implied covenant, set forth

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Judicial Notice > General Overview*
[HN1] Generally, on a motion to dismiss, a court may only consider facts alleged in the complaint. However, in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint. The trial court may also take judicial notice of matters that are not subject to reasonable dispute.

*Governments > State & Territorial Governments > Finance*

*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN2] By Del. Code Ann. tit. 29, § 4812, unclaimed prizes revert to the Delaware State Lottery Fund after one year. Surplus funds in the State Lottery Fund are remitted to the Delaware General Fund in accordance with Del. Code Ann. tit. 29, § 4815(a).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

[HN3] In deciding a motion to dismiss, a court must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor. If the court determines with reasonable certainty that there is no set of facts which would entitle the plaintiff to relief, the motion to dismiss will be granted.

*Administrative Law > Agency Rulemaking > State Proceedings*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN4] The Delaware State Lottery Act, Del. Code Ann. tit. 29, ch. 48, delegates to the Director of the Delaware State Lottery Office the authority to promulgate rules and regulations governing the establishment and operation of the Delaware State Lottery. Del. Code Ann. tit. 29, § 4805.

*Administrative Law > Agency Rulemaking > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN5] The Delaware Lottery Rules and Regulations may be found at 31-300-001 Del. Code Regs. (2006).

*Constitutional Law > State Constitutional Operation*
*Governments > State & Territorial Governments > Finance*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN6] The Lottery Exception contained in Del. Const. art. II, § 17 prohibits all forms of gambling, with limited exceptions. One of those exceptions encompasses lotteries under the State of Delaware's control for the purpose of raising funds.

*Administrative Law > Agency Rulemaking > Rule*

*Application & Interpretation > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN7] The Delaware Lottery Act, Del. Code Ann. tit. 29, ch. 48, and the Delaware Lottery Rules and Regulations, 31-300-001 Del. Code Regs. (2006), both require production of the winning ticket before prize money may be paid.

*Administrative Law > Agency Rulemaking > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN8] The Delaware Lottery Act, Del. Code Ann. tit. 29, ch. 48, charges the Director of the Delaware State Lottery Office to prescribe rules and regulations designed to provide for all matters necessary or desirable for the efficient and economical operation and administration of the system and for the convenience of the purchasers of lottery tickets and the holders of winning tickets, including, but not limited to, the following: (1) manner of payment of prizes to the holders of winning tickets; (2) apportionment of the total revenues accruing from the sale of tickets among payment of prizes to the holders of winning tickets; and (3) such other matters necessary or desirable for the efficient and economical operation and administration of the game and for the convenience of the purchasers of tickets and the holders of winning tickets. Del. Code Ann. tit. 29, § 4805.

*Governments > Legislation > Interpretation*

[HN9] The doctrine of expressio unius est exclusio alterius is that the expression of one thing is the exclusion of an other.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN10] Pursuant to its mandate under the Delaware Lottery Act, Del. Code Ann. tit. 29, ch. 48, the Delaware State Lottery Office has promulgated rules and regulations that set forth the procedures for claiming prizes. These rules advance the Lottery Act's directive that payment of prizes be made to holders of winning tickets. As stated in Del. Lottery Reg. 18, all winning tickets will be validated. A winning ticket must not be counterfeit in whole or in part and must be presented by a

person authorized to play the Delaware State Lottery. Furthermore, Del. Lottery Reg. 11.3 provides that the Lottery shall not be responsible for lost, stolen, or mutilated tickets after sale of same to the public. Finally, under Del. Lottery Reg. 19, a lottery ticket which has been sold shall be owned by the physical possessor of said ticket.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN11] Del. Lottery Reg. 18 authorizes the Director of the Delaware State Lottery Office to establish and modify procedures by which prizes may be claimed and paid.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
[HN12] A court is not at liberty to stretch the meaning of rules beyond the plain language used, no matter how compelling the circumstances.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
*Governments > Legislation > Interpretation*
[HN13] Where the language of a statute or, a regulation is plain, and conveys a clear and definite meaning, construction is forbidden, even though other meanings could be found. In such case a court will accept the language as it finds it. It will not exercise its imagination in an effort to discover some obscure, uncertain, or merely possible meaning, but will give the language the meaning clearly demanded by it.

*Contracts Law > Formation > Acceptance > Methods of Acceptance > Overt Acts*
*Contracts Law > Formation > Offers > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN14] The relationship between a lottery ticket holder and a state lottery agency is primarily contractual in nature, and the purchase of a ticket in the proper manner constitutes acceptance of an offer, forming a binding contract.

*Contracts Law > Contract Interpretation > General*

*Overview*
[HN15] It is the duty of a court to construe agreements as they are made by the parties and to give to language that is clear, simple, and unambiguous the force and effect which the language clearly demands. A court may not, in the guise of interpreting a contract, make for the parties a better agreement than they themselves have been satisfied to make by affording to a party a measure of protection which the contract does not cover.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN16] Existing and applicable laws implicitly form a part of every contract.

*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN17] Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. Courts have developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract. A party cannot seek recovery under an unjust enrichment theory if a contract is the measure of a plaintiff's right.

*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN18] An unjust enrichment analysis is predicated upon a valid and enforceable contract, one not, for example, procured by fraud or other overreaching or improper conduct.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
[HN19] Courts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint there exists an express contract that controls.

*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN20] To recover for unjust enrichment, a plaintiff must demonstrate: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.

*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN21] Under governing Delaware law, only persons with a winning lottery ticket are eligible to receive prize money.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN22] The Delaware lottery laws and regulations require presentation of the winning lottery ticket.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
[HN23] As a general matter, courts will grant some deference to an agency's interpretation of its rules and regulations.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*
*Administrative Law > Judicial Review > Standards of Review > Clearly Erroneous Review*
[HN24] Although the interpretation of a regulation is ultimately a question of law for a court to decide, substantial weight and deference is accorded to the construction of a regulation enacted by an agency which is also charged with its enforcement. This deference is reflected in the standard of judicial review that an administrative agency's interpretation of its rules and regulations will not be reversed unless clearly erroneous.

*Estate, Gift & Trust Law > Trusts > Constructive Trusts*
*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Remedies*

*Torts > Business Torts > Fraud & Misrepresentation > Constructive Fraud > Remedies*
[HN25] As a general matter, a constructive trust may be awarded where one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty. Some fraudulent or unfair and unconscionable conduct is essential.

*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN26] Under governing Delaware law, prize money may only be awarded to winning ticket holders.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN27] Under Delaware law, every contract includes an implied covenant of good faith and fair dealing -- a promise of faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.

*Governments > State & Territorial Governments > Gaming & Lotteries*
[HN28] The purchase of a lottery ticket creates a contractual relationship between the purchaser and the Delaware State Lottery Office. The ticket unequivocally establishes that the right to payment is controlled by applicable laws and regulations.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN29] To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation. The cardinal guiding principle in adjudicating a contract claim is to give effect to the intention of the contracting parties. Implied contractual obligations are terms that clearly would have been included in the contract had the parties negotiated with respect to them. Courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview*

*Governments > State & Territorial Governments > Gaming & Lotteries*

[HN30] The Delaware State Lottery Regulations set forth the procedures for collecting prize money and require presentation of the winning ticket.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Contracts Law > Defenses > Equitable Estoppel > Elements*

[HN31] To survive a Del. R. Civ. P. 12(b)(6) motion to dismiss, an equitable estoppel claim must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment. The defendants' conduct may be either an affirmative act or a failure to act when duty required.

**COUNSEL:** Attorneys for Plaintiff: Antonia S. Bevis, Esquire and Patrick Collins, Esquire of Ferrara Haley & Bevis, Wilmington, Delaware.

Attorneys for Defendants: Michael F. McTaggart, Esquire and Phillip Bangle, Esquire of the Department of Justice, Wilmington, Delaware.

**JUDGES:** NOBLE, Vice Chancellor.

**OPINIONBY:** NOBLE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

NOBLE, Vice Chancellor

### I. FACTUAL BACKGROUND

On March 21, 2003, Robert W. Palese ("Palese") bought five Delaware State Lottery tickets from a liquor store in Newark, Delaware. n1 To select his numbers for the games, Palese used a "play slip" that contained five game panels. n2 Each panel had a selection grid with numbers one through thirty-eight, and Palese chose six numbers from each of these grids by manually filling in the grids. n3 After purchasing the tickets, Palese placed them in his pants pocket and returned home. n4

n1 Compl. P 9.
n2 Compl. P 9.
n3 Compl. P 13.

n4 Pl.'s Ans. Br. at Ex. F (Letter from Palese to Lottery Office, Mar. 31, 2004). [HN1] Generally, on a motion to dismiss, the Court may only consider facts alleged in the complaint. *In re GM (Hughes) S'holder Litig.*, 897 A.2d 162, 2006 WL 722198, at *3 (Del. 2006). However, "in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint. The trial court may also take judicial notice of matters that are not subject to reasonable dispute." *Id.* Thus, the Court may consider Palese's letter, because, although he submitted it with his Answering Brief, the document was referenced in detail in the Complaint. Compl. P 19.

[*2]

Several days later, Palese learned that someone had won the March 21, 2003 lottery, but that the winner had not yet come forward. n5 He searched for his ticket to see if he had selected the winning numbers, but was unable to find it. n6 Eventually, he remembered that he had done laundry the evening he purchased the ticket; thus he concluded that the ticket -- which had been left in his pants pocket -- had probably been destroyed in the wash. n7

n5 Pl.'s Ans. Br. at Ex. F.
n6 *Id.*
n7 *Id.*

Although the lottery ticket was gone, Palese still possessed the play slip he used when he purchased the ticket. n8 He checked the numbers on the play slip and discovered that the numbers he selected on the play slip's fifth game panel -- 9, 13, 19, 24, 27, and 35 -- were the winning numbers for the March 21, 2003 lottery. n9

n8 *Id.*
n9 *Id.*

[*3]

Palese, although lacking the winning lottery ticket, did not lose hope. He posited that the play slip would be sufficient to claim the prize. n10 After all, the play slip contained five game panels, each with a different six-number combination selected. n11 He figured that the Lottery Office had the technology to verify his purchase with the store's records, which would reflect that the winning ticket had been purchased simultaneously with four additional tickets. n12 The numbers on Palese's play slip would match the numbers selected for not only the winning game, but also the four other games played along with it. n13 He believed that the statistical significance of picking not only the winning six-number combination on the play slip, but also the six-number combinations for the four additional tickets, would satisfy the Lottery Office that he had selected the winning numbers, and he would be awarded the prize money.

n10 Compl. P 13.
n11 Compl. P 13.
n12 Compl. P 13.
n13 Compl. P 13.

[*4]

Palese described his predicament in a letter to the Lottery Office. n14 He was advised that he would need to wait one year "before the Lottery can even review your claim. If no other claims are made to this winning prize by March 21, 2004, the Lottery will then determine whether it has the legal authority under the Lottery laws and regulations to consider your letter claiming the winning prize." n15

n14 Compl. P 11.
n15 Pl.'s Ans. Br. at Ex. C (Letter from Lottery Office to Palese (undated)). The substance of this letter was fully developed in the Complaint, Compl. P 14, and thus may be considered by the Court in its analysis. *See supra* note 4.

About eleven months later, Palese read in the newspaper that the unclaimed lottery jackpot had been transferred to the State's General Fund. n16 Palese immediately contacted the Lottery Office. n17 He was asked to provide further information about the ticket he purchased and how it had been destroyed. n18 Palese complied and again explained that, although [*5] the ticket itself had been inadvertently destroyed in the laundry, he still had the play slip. n19

n16 Compl. P 16. [HN2] By 29 *Del.C.* § 4812, unclaimed prizes revert to the State Lottery Fund after one year. Surplus funds in the State Lottery Fund are remitted to the State's General Fund in accordance with 29 *Del.C.* § 4815(a).
n17 Compl. P 17.
n18 Compl. P 18.
n19 Pl.'s Ans. Br. at Ex. F.

According to the Lottery Office, however, Palese needed to produce the actual winning ticket. n20 Wayne Lemons ("Lemons"), Director of the Delaware State Lottery Office, denied Palese's claim on April 13, 2004:

Under Delaware Lottery Laws and Regulations, the claimant of a Lottery prize is required to produce the actual winning ticket. 29 *Del.C.* § 4805(a)(5); Lottery Regulation 11 -- Lottery Tickets; Lottery Regulation 18 -- Procedure for Claiming Prizes; Lottery Regulation 19 -- Ownership of Lottery [*6] Tickets. Since you are unable to produce the ticket from the Lottery drawing in question, your claim is denied. n21

n20 Compl. P 21.
n21 Pl.'s Ans. Br. at Ex. G (Letter from Lottery Office to Palese, Apr. 13, 2004). The principal contents of this letter were set forth in the Complaint, Compl. P 21, and thus may be considered by the Court

in its analysis. *See supra* note 4.

Palese requested a hearing pursuant to the Lottery Rules. n22 The hearing was held on July 27, 2004, but the Lottery Office terminated the hearing because Palese had no new evidence to present. n23 Following the hearing, Lemons affirmed the decision to deny Palese's claim. n24 Implicit in his decision was the Lottery Office's view that a person seeking to collect the prize must hold the winning ticket.

n22 Compl. P 22.

n23 Compl. P 22. Palese has informed the Court that he was not permitted to question Lemons during the administrative hearing, but he has not alleged any violation of his procedural due process rights; because Palese has not formally raised such claims in this action, the suggested inadequacy of the administrative hearing is not considered by the Court. Moreover, Palese has not predicted any outcome or benefit that would have resulted from such questioning.

[*7]

n24 Compl. P 23.

On February 14, 2005, Palese sought relief in the Superior Court. He voluntarily dismissed that action without seeking to transfer to this Court and, on August 5, 2005, filed this action against the Defendants, Lemons and the Delaware State Lottery Office.

## II. CONTENTIONS

In his Complaint, Palese alleges that the actions of the Defendants resulted in unjust enrichment to the State when the lottery prize accrued to the State's General Fund. n25 Additionally, he charges Defendants with breach of the implied duty of good faith and fair dealing. n26 Finally, he invokes the correspondence from the Lottery Office as an independent source of relief.

n25 Compl. P 25.
n26 Compl. P 28.

The Defendants have moved to dismiss this action under Court of Chancery Rule 12(b)(1), contending that this Court lacks subject matter jurisdiction, and under Court of Chancery Rule 12(b)(6), asserting that [*8] Palese has failed to state a claim for which relief can be granted. n27

n27 Defs.' Mtn. to Dismiss at 1. Because Palese seeks equitable relief in the form of imposition of a constructive trust and disgorgement of an unjustly retained benefit (among other remedies), the Court is satisfied that subject matter jurisdiction exists. Accordingly, the remainder of this memorandum opinion addresses the Defendants' motion to dismiss under Rule 12(b)(6).

## III. ANALYSIS

### A. *The Applicable Standard*

[HN3] In deciding a motion to dismiss, the Court "must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor." n28 If the Court determines with reasonable certainty that there is no set of facts which would entitle the plaintiff to relief, the motion to dismiss will be granted. n29

n28 *Hughes, 897 A.2d 162, 2006 WL 722198, at *3.*
n29 *Id.* For purposes of this motion to dismiss, the Court accepts that Palese purchased the winning lottery ticket and that the ticket was inadvertently destroyed in the wash.

[*9]

### B. *The Governing Law*

## 1. The Lottery Exception

The Delaware Constitution of 1897 contained a general prohibition against gambling. n30 In 1973, Article II was amended to permit, among other exceptions, a state-operated Lottery ("the Lottery Exception"). n31 Within a few months, enabling legislation (the "Lottery Act") n32 was passed which created the State Lottery Office and the position of Director of the State Lottery Office. n33 [HN4] The Lottery Act delegated to the Director the authority "to promulgate such rules and regulations governing the establishment and operation of the lottery." n34 Accordingly, the "Lottery Rules and Regulations" were promulgated. n35 The Court is guided by these three sources, the Lottery Exception to Article II, the Lottery Act, and the Lottery Rules and Regulations, in its consideration of Defendants' Motion to Dismiss.

> n30 See *Opinion of the Justices*, 385 A.2d 695, 700 (Del. 1978) ("The original 1897 version of Art. II, § 17 provided: 'Lotteries, the sale of lottery tickets, pool selling and all other forms of gambling are prohibited in this State. The General Assembly shall enforce this section by appropriate legislation.'").

[*10]

> n31 59 Del. Laws Ch. 143. *See generally Opinion of the Justices*, 385 A.2d at 706.
> n32 29 *Del.C.* Ch. 48.
> n33 *Opinion of the Justices*, 385 A.2d at 706.
> n34 29 *Del.C.* § 4805.
> n35 [HN5] The Lottery Rules and Regulations (the "Lottery Regulations") may be found at 31-300-001 DEL. CODE REGS. (Weil 2006).

[HN6] The Lottery Exception contained in Art. II, § 17 prohibits all forms of gambling, with limited exceptions. One of those exceptions encompasses "[l]otteries under State control for the purpose of raising funds." n36 The Article does not address the requirement of possessing the actual ticket or discuss any other prize redemption procedures, but it provides a foundation for the Court's consideration of the enabling legislation that followed the ratification of the Lottery Exception.

> n36 Del. Const. Art. II, § 17.

With [*11] this background, the Court turns its analysis to the laws and regulations spawned by the Lottery Exception: the Lottery Act and the Lottery Rules and Regulations. As explained below, [HN7] both of these sources require production of the winning ticket before the prize money may be paid. n37

> n37 This case does not, of course, involve a dispute among several purchasers of a ticket that is presented for payment.

## 2. The Lottery Act

[HN8] The Lottery Act charges the Director to prescribe rules and regulations designed to:

> [P]rovide for all matters necessary or desirable for the efficient and economical operation and administration of the system and for the convenience of the purchasers of lottery tickets and the *holders* of winning tickets, . . . including, but not limited to, the following:
>
> (5) Manner of payment of prizes to the *holders* of winning tickets.
>
> (11) Apportionment of the total revenues accruing from the sale of tickets among:
>
> > a. Payment of prizes to the *holders* of winning [*12] tickets;
>
> (12) Such other matters necessary or desirable for the efficient and economical operation and administration of the game and for the convenience of the purchasers of tickets and the *holders* of winning

tickets. n38

n38 29 Del.C. § 4805 (emphasis added).

These provisions evince the Legislature's intention for the payment of prize money to be conditioned upon presentation of the winning ticket. In all instances where the payment of prizes is discussed, the text explicitly refers to "holders of winning tickets." More importantly, it does so exclusively -- payment to non-ticket holders is not contemplated by the statute. Under [HN9] the doctrine of *expressio unius est exclusio alterius* -- the expression of one thing is the exclusion of the other -- the Court presumes that the General Assembly intended to limit payment of prize money to winning ticket holders. n39

n39 *See, e.g., Priest v. State*, 879 A.2d 575, 584 (Del. 2005).

[*13]

3. The Lottery Regulations

[HN10] Pursuant to its mandate under the Lottery Act, the Lottery Office has promulgated rules and regulations that set forth the procedures for claiming prizes. These rules advance the Lottery Act's directive that payment of prizes be made to holders of winning tickets. As stated in Lottery Regulation 18, "[a]ll winning tickets will be validated. A winning ticket must not be counterfeit in whole or in part and *must be presented* by a person authorized to play the Lottery." Furthermore, Lottery Regulation 11.3 provides that the Lottery "shall not be responsible for lost, stolen, or mutilated tickets after sale of same to the public." Finally, under Lottery Regulation 19, "a lottery ticket which has been sold shall be owned by *the physical possessor* of said ticket." n40

n40 Emphasis added.

[HN11] Lottery Regulation 18 authorizes the Director to "establish and

modify procedures by which prizes may be claimed and paid." Because the enabling statute instructs the Director to determine the "manner of payment to the *holders* of winning tickets," 29 Del.C. § 4805 (emphasis added), it may be beyond the Director's authority -- and belie legislative intent-to adopt procedures that would allow the award of prize money without presentment of the ticket. Whether the Director could adopt such rules, of course, is not before the Court. What is important for present purposes is that he has not.

[*14]

[HN12] The Court is not at liberty to stretch the meaning of the rules beyond the plain -- language used, no matter how compelling the circumstances.

[HN13] Where the language of a statute [or, as in this instance, a regulation] is plain, and conveys a clear and definite meaning, construction is forbidden, even though other meanings could be found. In such case the court will accept the language as it finds it. It will not exercise its imagination in an effort to discover some obscure, uncertain or merely possible meaning, but will give the language the meaning clearly demanded by it. n41

n41 *Hartford Accident & Indem. Co. v. W.S. Dickey Clay Mfg. Co.*, 26 Del. Ch. 411, 24 A.2d 315, 320 (Del. 1942).

Thus, in accordance with the Lottery Regulations, the winning ticket must be presented in order to claim the prize.

C. *The Relationship between Palese and the Lottery Office*

By purchasing a lottery ticket, Palese entered into a contractual relationship with the Lottery Office, one evidenced, in the [*15] first instance, by the lottery ticket. The majority rule in American jurisprudence is that [HN14] "[t]he relationship between a lottery ticket holder and the state lottery agency is primarily contractual in nature, and the . . . purchase of a ticket in the proper manner constitutes acceptance of an offer, forming a binding contract." n42 The text on the back of the lottery ticket placed Palese on notice that his rights as player of the lottery would be subject to the following terms:

> This ticket is a bearer instrument, therefore you should sign your ticket for safety. Valid only for date(s) shown. *Determination of winners and transactions are subject to Delaware State Lottery laws, rules, regulations and directives.* Void if mutilated, altered illegible or incomplete. Not responsible for torn or stolen tickets. n43

> n42 1 ARTHUR L. CORBIN, ET AL., CORBIN ON CONTRACTS § 3.10 (Joseph M. Perillo, ed., rev. ed. 1993 & Supp. 2004) (quoting *Brown v. Wisconsin,* 602 N.W. 2d 79 (Wis. 1999)).
>
> n43 Defs.' Opening Br. at 10 (emphasis added). Although the words on the back of the ticket were not recited in the Complaint, the ticket was otherwise referenced in the Complaint and the words are not subject to reasonable dispute. *See supra* note 4.

[*16]

The ticket unequivocally stated that the right to payment is controlled by applicable laws and regulations (which, as discussed above, restrict payment of prizes to holders of winning tickets). Furthermore, the purchaser is advised to sign the back of the ticket because it is a "bearer instrument," meaning it is "payable to the person who holds it rather than to the order of a specific person." n44 Just as the Court is bound to honor the plain language of the Lottery Act, it also must honor the express terms of the parties' agreement.

> n44 BLACK'S LAW DICTIONARY 1142 (8th ed. 2004).

[HN15] It is the duty of the court to construe agreements as they are made by the parties and to give to language that is clear, simple and unambiguous the force and effect which the language clearly demands. The court may not, in the guise of interpreting the contract, make for the parties a better agreement than they themselves have been satisfied to make by affording to a party a measure of protection which the contract does [*17] not cover. n45

Under the plain language of the parties' agreement, which Palese consented to when he purchased the ticket, payment of prize money is restricted to winning ticket holders. n46

> n45 *Van Brunt v. Peninsula United Methodist Homes, Inc.,* 1987 Del. Ch. LEXIS 396, 1987 WL 7953, at *4 (Del. Ch. Mar. 16, 1987) (internal quotations omitted).
>
> n46 Furthermore, even if the ticket did not expressly state that the Lottery Act and the Lottery Regulations applied, or if it did so insufficiently, the laws and regulations would nonetheless be given their full effect, because [HN16] existing and applicable laws implicitly form a part of every contract. *See Koval v. Peoples,* 431 A.2d 1284, 1285 (Del. Super. 1981). *See also Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n,* 499 U.S. 117, 130, 111 S. Ct. 1156, 113 L. Ed. 2d 95 (1991).

Accordingly, under the applicable laws and

regulations and the express terms governing participation in the lottery, prizes may not be paid in the absence of the winning ticket. [*18]

D. *Analysis of Palese's Claims*

1. Unjust Enrichment

In Count I of the Complaint, Palese alleges that the State has been unjustly enriched by retaining a benefit to his detriment. He asks the Court to impose a quasi-contractual duty upon the Defendants to pay the, allegedly, unjustly retained prize to him. The appropriate remedy, according to Palese, is the imposition of a constructive trust.

> [HN17] Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract. A party cannot seek recovery under an unjust enrichment theory if a contract is the measure of the plaintiff's right. n47

>> n47 *ID Biomedical Corp.. v. Tm Techs.. Inc.. 1995 Del. Ch. LEXIS 34, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)* (internal citations omitted). [HN18] This analysis is predicated upon a valid and enforceable contract, one not, for example, procured by fraud or other overreaching or improper conduct. *Compare Breakaway Solutions. Inc. v. Morgan Stanley & Co.. 2004 Del. Ch. LEXIS 125, 2004 WL 1949300, at *15 (Del. Ch. Aug. 27 2004)* ("While the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter, there are situations where alternative pleading is allowed under both theories. This is generally so, however,

only when there is doubt as to the enforceability or meaning of the terms of the contract in question.") (internal quotations omitted) (applying New York law).

[*19]

Palese is precluded from prevailing on his claim for unjust enrichment because a binding contract exists between the parties that addresses the particular subject matter -- the procedure for claiming the prize money. Because an enforceable contract exists between the parties and that contract requires presentment of the ticket, Palese's claim for unjust enrichment must be dismissed. n48

>> n48 *See, e.g., Albert v. Alex. Brown Mgmt. Servs.. 2005 Del. Ch. LEXIS 133, 2005 WL 2130607. at *8* ( [HN19] "Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint there exists an express contract that controls."). For a helpful discussion of this issue, see RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (TENTATIVE DRAFT NO. 3) INTRODUCTORY NOTE, Ch. 4, Reporter's Note (2004). Furthermore, there is nothing oppressive about a requirement-one that is known or should be known -- that, to win a lottery, one must hold the winning ticket.

Even if the express terms established [*20] under the contractual relationship between Palese and the Lottery Office were not dispositive, Palese would nonetheless be denied the equitable relief he seeks under the doctrine of unjust enrichment. [HN20] To recover for unjust enrichment, a plaintiff must demonstrate: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." n49 The facts, as alleged by Palese, could support no such finding here. As explained, *supra*, [HN21] under governing Delaware law, only

persons with a winning ticket are eligible to receive the prize money. The Defendants denied Palese's claim based on their interpretation -- which the Court accepts -- that [HN22] the Delaware lottery laws and regulations require presentation of the winning ticket. n50 As a consequence, not only is his claim defeated by a controlling contract term, it also is deficient because the Defendants' conduct was not "absent of justification"; on the contrary, the Defendants acted within the bounds of their prescribed legal authority and in conformity with the governing statute and regulations. n51 Thus, Palese's claim under [*21] the doctrine of unjust enrichment must be dismissed. n52

n49 *Oliver v. Boston Univ.*, 2000 Del. Ch. LEXIS 104, 2000 WL 1091480, at *9 (Del. Ch. July 18, 2000) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).

n50 This dispute also involves an agency's interpretation of its rules and regulations. [HN23] As a general matter, courts will grant some deference to an agency's interpretation of its rules and regulations.

> [HN24] Although the interpretation of a regulation is ultimately a question of law for a court to decide, substantial weight and deference is accorded to the construction of a regulation enacted by an agency which is also charged with its enforcement. This deference is reflected in the standard of judicial review that an administrative agency's interpretation of its rules and regulations will not be reversed unless clearly erroneous.

*State Farm Mut. Auto. Ins. Co. v. Mundorf*, 659 A.2d 215, 220 (Del. 1995).

[*22]

The Court's interpretation of the Lottery Regulations, however, is not dependent upon any deference accorded to Lottery Office's views. *See supra* note 41 and accompanying text.

n51 In other jurisdictions, similar actions against state lotteries have been unsuccessful because the controlling legislation restricted payment to holders of winning tickets. *See, e.g., Karafa v. New Jersey State Lottery Comm'n*, 129 N.J. Super. 499, 324 A.2d 97 (N.J. Super. 1974).

n52 Palese also seeks the remedy of imposition of a constructive trust. To the extent that an equitable trust may be available in the absence of unjust enrichment, it should be noted that, [HN25] as a general matter, a constructive trust may be awarded where "one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty. . . . Some fraudulent or unfair and unconscionable conduct is essential." *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993). *See also* DONALD J. WOLFE, jr. & MICHAEL A. PITTENGER, CORPORATE & COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12-7[b] (2006). The facts, as alleged, would not support any inference that such conduct occurred here. As explained, *supra*, [HN26] under governing Delaware law, prize money may only be awarded to winning ticket holders. Thus, the Defendants' conduct was not "fraudulent, unfair, or unconscionable."

The Lottery Office did nothing to defeat any right or, indeed, any expectation of Palese because, until the lottery ticket was presented, Palese could not have satisfied the condition imposed

upon a participant in the lottery of presenting the winning ticket. Palese's effort to fit his allegations within the unjust enrichment doctrine, admittedly a doctrine of substantial flexibility, is awkward because the problem is of his own making and the Lottery Office not only did nothing wrong, it also did nothing for which it could be fairly criticized.

[*23]

2. Breach of the Covenant of Good Faith and Fair Dealing

Count II of the Complaint alleges that the Defendants breached the duty of good faith and fair dealing owed to Palese. [HN27] Under Delaware law, every contract includes an implied covenant of good faith and fair dealing -- a promise of "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." n53

n53 *Corp. Prop. Assocs. 6 v. Hallwood Group, Inc., 792 A.2d 993 (Del. Ch. 2002)*.

As noted, [HN28] the purchase of a lottery ticket creates a contractual relationship between the purchaser and the Lottery Office. n54 The ticket unequivocally establishes that the right to payment is controlled by applicable laws and regulations (which, as discussed above, restrict payments of prizes to holders of winning tickets).

n54 *See supra* note 42 and accompanying text.

[*24]

Palese insists that had the Lottery further investigated his purchase, the records from the store where he purchased the ticket would have proven that he indeed selected the winning numbers and, at one time, held the winning ticket. However, the Court cannot impose upon the Defendants this additional duty, because

the contract, as well as statutory law, decidedly occupies the field.

[HN29] To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation. The cardinal guiding principle in adjudicating a contract claim is to give effect to the intention of the contracting parties. Implied contractual obligations are terms that clearly would have been included in the contract had the parties negotiated with respect to them. Courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication. n55

n55 *Moore Bus. Forms v. Cordant Holdings Corp., 1995 Del. Ch. LEXIS 134, 1995 WL 662685, at *8 (Del. Ch. Nov. 2, 1995)*. See *Dunlap v. State Farm Fire and Cas. Co., 878 A.2d 434, 440-45 (Del. 2005)*; *Frontier Oil Corp. v. Holly Corp., 2005 Del. Ch. LEXIS 57, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005)* ("The Court, of course, may not substitute its notions of fairness [through invoking the covenant of good faith and fair dealing] for the terms of [the parties' agreement].").

[*25]

Here, the subject of the alleged wrong (i.e., procedures for claiming prize money) was expressly addressed in the parties' agreement. Furthermore, [HN30] the Lottery Regulations (which are explicitly part of the parties' agreement) set forth the procedures for collecting prize money and require presentation of the winning ticket. The implied duty of good faith and fair dealing was not breached because the Defendants' actions conformed to the express terms of the contract, as well as the applicable statutes and regulations. n56

n56 The Court could not find that the terms needed to rescue Palese would have been included if they had been "negotiated" because the opposite (i.e., the winning ticket is necessary) of those favorable terms was, in fact, specified. Thus, Palese attempts to use the covenant of good faith and fair dealing for a purpose it cannot accomplish: to contradict the agreement's express terms.

### 3. The Lottery Office's Commitment to Investigate

The Defendants' conduct in response to Palese's claim [*26] does not entitle Palese to receive the proceeds. After Palese initially contacted the Lottery Office, he was advised that the Lottery Office would not be able to review his claim until one year after the drawing. n57 According to Palese, that changed everything, because it was an affirmative promise that the Lottery Office would investigate Palese's claim.

n57 *See supra* note 15 and accompanying text.

Assuming that the letter set forth an enforceable promise under which the Lottery Office pledged to review Palese's claim, the alleged facts do not support an inference that the Lottery Office broke its promise, or that Palese suffered any consequences because of the Defendants' commitment. n58 The letter stated that "[i]f no other claims are made [within one year], the Lottery will then determine whether it has the legal authority under the Lottery laws and regulations to consider your letter claiming the winning prize." n59 The Lottery then followed -- up on its promise to review the claim, concluding [*27] that "[u]nder Delaware Lottery Laws and Regulations, the claimant of a Lottery prize is required to produce the actual winning ticket." n60 That communication reflected its determination of whether it could pay the prize to him. It also satisfied the commitment that it had made to him. n61

n58 Palese relies on the fact that the prize

money reverted to the General Fund before the year had expired to support his claim that the Defendants did not investigate his claim in good faith. However, there is no allegation that Palese's claim was harmed by the transfer of the funds to the General Fund. There is no reason to infer that the Lottery Office could not have arranged for payment of the prize from the General Fund, had it found in Palese's favor.

n59 Pls. Ans. Br. at Ex. C.

n60 Pls. Ans. Br. at Ex. G. Thus, the Lottery Office honored its commitment to determine whether it had the "legal authority" to pay the prize under those circumstances.

n61 Palese may have expected that the Lottery Office would conduct a thorough investigation of the factual basis for his claim. Of course, the Lottery Office only promised to "determine whether it has the legal authority" to pay the prize without a ticket. Once the Lottery Office concluded, as a matter of law, that delivery of the winning ticket was necessary, the question of whether Palese, in fact, had held, and then lost, the winning ticket descended into the realm of the immaterial.

[*28]

Furthermore, the allegations do not demonstrate that the Lottery Office acted in bad faith. n62 The Lottery Office considered Palese's claim and ultimately determined that it could not lawfully award the prize money to a non-ticket holder. This was, of course, an unfortunate outcome for Palese, but the Defendants' actions were consistent with the laws of this State.

n62 It is not clear what rights Palese is claiming under the implied covenant of good faith and fair dealing that may have attached to the Lottery Office's letter. It is a sufficient answer that there is no basis for implying any additional terms for any purpose underlying the covenant of good faith doctrine. The Lottery Office fairly

assessed the claim. No gaps need filling; no unanticipated developments occurred; no "overarching" purposes have been frustrated. *See, e.g., Dunlap, 878 A.2d at 441-42.*

Moreover, the alleged facts do not support Palese's assertion that he detrimentally relied on the Defendants' conduct. This claim, [*29] which may be characterized as in the nature of equitable estoppel, is premised on Palese's contention that, because of the Defendants' statements, he was foreclosed from pursuing alternative methods of claiming the prize money. Specifically, Palese suggested that he might have sought the assistance from the Legislature, but for his reliance on the Lottery Office's commitment.

> [HN31] To survive a Del. R. Civ. P. 12(b)(6) motion to dismiss, an equitable estoppel claim must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment. The defendants' conduct may be either an affirmative act or a failure to act when duty required. n63

n63 *Moore Bus. Forms, 1995 Del. Ch. LEXIS 134, 1995 WL 662685, at *9.*

Palese's argument fails because nothing done by, said by, or omitted by the Lottery Office precluded Palese from seeking help from the General Assembly (or from taking any other action that might have achieved his goal n64)

[*30] while he waited to hear from the Lottery Office, and, perhaps more importantly, Palese is not foreclosed from petitioning the General Assembly now. n65

n64 Palese has not been able to identify any other pathway that he would have followed in the absence of the Lottery Office's commitment.

n65 Lemons' commitment may have induced Palese to wait until the expiration of the year following the lottery drawing. If the Lottery Office, for example, had argued that Palese's claim was time-barred, equity might not have countenanced such an effort. The Court views Palese's claim as timely brought. He has suffered no prejudice as the result of the Lottery's representations. A promise to investigate -- which is all the Lottery did -- cannot be warped into some sort of obligation to pay.

## IV. CONCLUSION

For the forgoing reasons, Palese's Complaint is dismissed for failure to state a claim for which relief can be granted. n66

n66 The Court need not, and does not, address other arguments advanced by the Defendants.

[*31]

IT IS SO ORDERED.