# TAB 14

LEXSEE 1975 DEL CH LEXIS 220

**Tuckman v. Aerosonic Corporation, et al.**

**Civil Action No. 4094,**

**Court of Chancery of the State of Delaware**

*1975 Del. Ch. LEXIS 220*

**October 21, 1975.**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accounting firms filed a motion to dismiss plaintiff stockholder's action on the basis of the three year statute of limitation found in *Del. Code Ann. tit. 10, § 8106*. The stockholder had alleged that the accounting firms knew that the financial statements of the corporation contained misrepresentations and that the accounting firms participated in the conspiracy to defraud the shareholders.

**OVERVIEW:** The stockholder argued that the accounting firms should have discovered the misrepresentations in the ordinary course of an audit and were negligent in failing to disclose the misrepresentations found in the financial statements in the proxy statement. The accounting firms argued that the stockholder's complaint was filed more than three years after the challenged proxy materials. The court held that the fifth caused of action, which alleged an abuse of a fiduciary duty resulting in personal profit for the accounting firms, was not barred by the statute of limitations under the Bovay rule. The court denied the accounting firms' motion to dismiss the fiduciary duty claim and granted their motion to dismiss the negligence claim. The court concluded that § 8106 applied because the basis of the stockholder's complaint was negligence and not fraudulent concealment, which would have tolled the statute of limitations.

**OUTCOME:** The court denied the accounting firms' motion to dismiss the stockholder's cause of action of abuse of a fiduciary duty and granted the accounting firm's motion to dismiss the stockholder's cause of action under negligence.

**CORE TERMS:** statute of limitations, fraudulent concealment, fiduciary, merger, motion to dismiss, causes of action, self-dealing, three year, shareholders, oral argu-

ment, misrepresentation, derivative, artifice, conspire, bare, cause of action, conspiracy to defraud, accountant, participated, concealment, fraudulent, disclose, defraud

**LexisNexis(R) Headnotes**

*Civil Procedure > Equity > Relief*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN1] Where the statute bars the legal remedy it shall bar the equitable in analogous cases or in reference to the same subject matter and when a legal and equitable claim so far corresponds that the only difference is, that one remedy may be enforced in a court of law and the other in a court of equity. A fortiori, where a legal claim is joined in an action in equity under the principle of complete relief, the statute should be applied.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Fraud*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Causes of Action > Self-Dealing*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN2] The statute of limitations applies to derivative actions which seek recovery of damages or other essentially legal relief; however, in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profited personally from their misconduct.

*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*

[HN3] Fraudulent concealment requires something affirmative be done by a defendant, some actual artifice, which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation, which is intended to put the plaintiff off the trail of inquiry.

*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*

[HN4] Where commingling on the books is expressly alleged, this does not constitute a recitation of any specific artifice or misrepresentation by which it is claimed that defendants succeeded in concealing from plaintiffs the wrongs of which they complain. It certainly cannot support fraudulent concealment when the tort alleged is negligence.

OPINIONBY: [*1]

QUILLEN

OPINION:

Gentlemen:

This letter constitutes the Court's opinion on the motion to dismiss by Laventhol, Krekstein, Horwath & Horwath and Horwath & Horwath to dismiss the complaint against them on the basis of the three year statute of limitations. *10 Del. C., § 8106*; *Patterson v. Vincent, Del. Super., 61 A.2d 416 (1948)*. The only causes of action against the moving defendants are the fifth and sixth causes of action. The plaintiff was a stockholder of old Aerosonic Corporation (herein A. Corp.).

The case arises in the context of the purchase by Instrument Technology Corporation of the 18% interest of A. Corp. owned by the defendant Frank followed by the merger of A. Corp. and Instrument Technology Corporation. The complaint must be viewed as it is written for the present motion. It is alleged that the Laventhol firm was the Certified Public Accountant for ITC during the relevant period and that the Horwath firm was Certified Public Accountant for A. Corp. for the fiscal period ending May 31, 1969.

The Fifth Cause of Action alleges both firms "knew that the Financial Statements included in the Proxy Statement failed adequately to disclose the facts as to the matters [*2] set forth in paragraph 28 and thus ... participated in the conspiracy to defraud shareholders of A. Corp."

The Sixth Cause of Action alleges that the two firms "in the ordinary course of conducting an audit and preparing financial statements should have known of the

matters set forth in paragraph 28, and were negligent in failing to disclose such in the Financial Statements in the Proxy Statement."

The only relief sought from these defendants is money damages.

The date of the challenged proxy solicitation material is December 16, 1969. The special meeting of shareholders which approved the merger was held on January 9, 1970. The merger itself was effectuated on January 12, 1970. The complaint in this action was filed on January 15, 1973, more than three years after the merger. It thus appears that the causes of action alleged accrued not later than January 12, 1970, the date of the merger, and, if the three year statute of limitations applies, the motion to dismiss is meritorious.

There is no reason by the nature of the suit (individual, class, and derivative) that the three year statute of limitations cannot apply. *Bokat v. Getty Oil Co., Del. Supr., 262 A.2d 246 (1970)*. [*3] Moreover, it is an established rule that [HN1] where the statute bars the legal remedy it shall bar the equitable in analogous cases or in reference to the same subject matter and when a legal and equitable claim so far corresponds that the only difference is, that one remedy may be enforced in a Court of Law and the other in a Court of Equity. *Perkins v. Cartmell, 4 Harr. 270, 274* (Del. Ch., 1845). A fortiori, where a legal claim is joined in an action in equity under the principle of complete relief, the statute should be applied.

As to the Sixth Cause of Action, the allegations merely state a claim for negligence. There is no reason why the normal limitations period should not apply in a negligence case. Thus the statute of limitations is applicable unless the plaintiff can prevail under the doctrine of fraudulent concealment discussed infra.

As to the Fifth Cause of Action, the question is whether the rule in *Bovay v. H. M. Byllesby & Co., Del. Supr., 38 A.2d 808 (1944)* applies. Chancellor Duffy recently dealt with the Bovay rule in *Halpern v. Barran, Del. Ch., 313 A.2d 139, 142 (1973)*. He said:

[HN2] "The statute of limitations applies to derivative actions which seek recovery [*4] of damages or other essentially legal relief; however, in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profitted personally from their misconduct."

Chancellor Duffy did not decide whether the rule in Bovay extends beyond officers and directors to others who exercise effective control of the corporation.

Assuming the Bovay rule can be routinely extended so far as to include Certified Public Accountants, a questionable proposition, it is not alleged that the moving defendants here were fiduciaries in this case. Nor is it alleged that there was self-dealing by the moving defendants. Accordingly, reliance on the Bovay exception appears at first blush to be misplaced.

At oral argument, however, the plaintiff attempted to avoid these deficiencies by arguing that the accountants were fiduciaries or came within the Bovay exception because they conspired with fiduciaries [*Schleiff v. The Baltimore & Ohio Railroad Company, Del. Ch., 130 A.2d 321, 332 (1955)]*. The first argument fails on the pleadings, but the second has some merit. Indeed, in the Fifth [*5] Cause of Action, paragraph 38 does allege that these defendants "knew that the Financial Statements included in the Proxy Statement failed adequately to disclose the facts as to the matters set forth in paragraph 28, and thus defendants H & H, LKH & H ... participated in the conspiracy to defraud shareholders of A Corp." The language would appear fairly to fit the argument that was made in the Schleiff case, given the other allegations of the complaint. The complaint does allege an abuse of a fiduciary duty resulting in personal profit. Thus, this case is distinguishable from the conclusions reached by the Court as to General Motors in the Schleiff case. The question then becomes one of policy. Should those who conspire to defraud with self-dealing fiduciaries be bound by the same standard for statute of limitations purposes as the fiduciaries themselves? Compare *Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921)*. The answer to the question is difficult in the relative vacuum of the bare pleadings. But, if outside experts, on whom many must depend for the integrity of corporate affairs, knowingly conspire with self-dealing fiduciaries to defraud those very persons [*6] who in practicality must rely on their advice, it is difficult to see why the same trust principles of Bovay should not apply for statute of limitations purposes.

Accordingly, as to the Fifth Cause of Action, I think the Bovay exception is applicable and the motion to dismiss on the bare plea of the Statute of Limitations should be denied. IT IS SO ORDERED.

The plaintiffs also argue that the statute of limitations is tolled due to the fraudulent concealment by the moving defendants of the causes of action. *Lieberman v. First National Bank, Del. Supr., 45 A. 901 (1900)*. Given the comments above, it is only necessary to consider this allegation in relation to the Sixth Cause of Action. In the Halpern case at A.2d 143 Chancellor Duffy discussed fraudulent concealment as follows:

[HN3] "Fraudulent concealment requires something affirmative be done by a defendant, some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry. *Nardo v. Guido de Ascanis & Sons, Inc., Del. Super., 254 A.2d 254 (1969).* ..."

Paragraph 29 of the complaint alleges that the moving defendants [*7] "knew or should have known, that the Proxy Statement was materially deficient, and was false and misleading in each respect set forth in paragraph 28." Emphasis added. Even considering this allegation along with the allegations in the Sixth Cause of Action, it does not seem to me that the plaintiffs can resist the instant motion on the doctrine of fraudulent concealment.

Initially, there does not appear to be any express allegation of fraudulent concealment. That would seem dispositive under the Halpern case at *331 A.2d 143-144.* Secondly, as to the negligence count, there is no allegation of fraud at all. Insofar as negligence is concerned, the Sixth Cause of Action in paragraph 40 emphasizes the "should have known" language, as indeed it must be to be consistent with the theory of the cause of action. Even considering the oral argument to the effect that the filings with the SEC and accountants' certification constitute the fraudulent concealment, such concealment cannot save a count which has simple negligence as its underlying basis.

Moreover, as the defendants note, the complaint itself specifically alleges no acts other than the preparation of allegedly false financial [*8] statements which constitutes the alleged tort itself. Under the Halpern case at *331 A.2d 143-144,* [HN4] where commingling on the books was expressly alleged, this does not appear to constitute a recitation of any specific artifice or misrepresentation by which it is claimed that defendants succeeded in concealing from plaintiffs the wrongs of which they complain. It certainly cannot support fraudulent concealment when the tort alleged is negligence.

I conclude that the statute of limitations bars the Sixth Cause of Action against the moving defendants. The motion to dismiss that cause of action is granted. IT IS SO ORDERED.

Very sincerely yours,

William T. Quillen

# TAB 15

LEXSEE

**VLIW TECHNOLOGY, LLC, a Delaware limited liability company, Plaintiff, v.
HEWLETT-PACKARD COMPANY and STMICROELECTRONICS, INC.,
Delaware corporations, Defendants.**

**C.A. No. 20069**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

**2005 Del. Ch. LEXIS 59**

**March 23, 2005, Submitted
May 4, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**PRIOR HISTORY:** VLIW Tech., L.L.C. v.
Hewlett-Packard Co., 840 A.2d 606, 2003 Del. LEXIS
615 (Del., 2003)

**DISPOSITION:** Defendants' motion for summary
judgment is granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant purchaser filed
a motion for summary judgment with regard to the cause
of action brought by plaintiff transferee, which claimed
that the purchaser violated a license agreement that was
made between the purchaser and the transferee's
predecessor, a software development company. The
transferee asserted breach of contract, misuse of trade
secrets, breach of the confidentiality provisions, and
willful misappropriation.

**OVERVIEW:** The software development company sold
a perpetual license to certain of its technology in return
for a single lump sum payment. As part of that license
agreement, the purchaser expressly agreed to maintain the
confidentiality of the company's trade secret information
for a period of five years. The company went out of
business and sold all of its assets, including its remaining
intellectual property rights, to another entity, who in turn
transferred those rights to the transferee. The transferee

asserted that the purchaser violated the license agreement
by entering into a research and development project with
another firm in 1999 that entailed disclosure of the
licensed technology. Most of the transferee's claims had
already been dismissed, and only the misappropriation
claims remained. The court held that summary judgment
in favor of the purchaser was proper because the claim
was untimely. The court found that the license agreement
contained a single five-year confidentiality agreement
that became effective on May 30, 1990. As such, the
court concluded that the confidentiality obligations under
the license agreement expired on May 30, 1995.

**OUTCOME:** The court granted the purchaser's motion
for summary judgment and dismissed the case.

**CORE TERMS:** license agreement, confidentiality,
multiflow, duty, technology, confidential information,
license, statute of limitations, perpetual, negotiation,
summary judgment, misappropriation, trade secrets,
intellectual property, confidential, licensed, chip,
disclosure, five-year, compiler, confidence, software,
email, time-barred, expired, confidentiality agreement,
breach of contract, matter of law, trade secret, discovery

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for
Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards >
Materiality*
[HN1] On a motion for summary judgment pursuant to

Del. Ch. Ct. R. 56, judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN2] The burden is on the moving party to prove an absence of a material issue of fact and the court must review all evidence in the light most favorable to the non-moving party with regard to a motion for summary judgment pursuant to Del. Ch. Ct. R. 56. If the moving party puts facts into the record which, if unrebutted, entitle it to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight; for example, the party opposing summary judgment is obliged to adduce some evidence showing the existence of a dispute of material fact.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN3] See Del. Ch. Ct. R. 56(e).

*Contracts Law > Contract Interpretation > General Overview*
[HN4] Under State of Connecticut law, when a contract is formed between two parties of relatively equal bargaining power, it must be construed to effectuate the intent of the parties. The intent of the parties is ascertained by a fair and reasonable construction of the language used in the contract, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The language of the contract must be given its ordinary meaning and usage where it can be sensibly applied to the contract's subject matter.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Contracts Law > Contract Interpretation > General*

*Overview*
[HN5] Connecticut case law does not set forth a test by which to determine whether a contract should be reviewed as a question of law rather than as a question of fact. The fact that a disputed agreement was a commercial contract between sophisticated, commercial parties with relatively equal bargaining power creates a presumption that the contract should be interpreted as a matter of law.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6] A court of equity may grant a motion to dismiss on the ground that the plaintiff's claims are barred by the applicable statute of limitations.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Misappropriation*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Civil Actions > Statutes of Limitations*
[HN7] Under State of Delaware law, the appropriate statute of limitations applied to contracts and misappropriation of trade secrets is three years. The statute of limitations for misappropriation of trade secrets in the State of Connecticut is, likewise, three years.

*Civil Procedure > Equity > Maxims > Follows the Law Principle*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN8] A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches. The statutory period may create a presumptive time period for application of laches to bar a claim. In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff will be barred from bringing suit without the necessity of the court engaging in a traditional laches analysis. Although statutes of limitation do not generally

apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.

*Antitrust & Trade Law > Trade Practices & Unfair Competition > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN9] The statute of limitations period for a claim under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g(f), is three years.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN10] An analogous statute of limitations period applicable at law is to be given great weight in determining whether a suit is to be time-barred in equity by laches and will be applied in the absence of unusual or mitigating circumstances.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN11] With respect to questions of which state's statute of limitations applies to a cause of action, a court is to apply the statute of limitations of the forum. Limitations questions are generally settled by the law of the forum.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN12] In the State of Delaware, the statute of limitations begins to run at the time of the alleged wrongful act, regardless of whether the plaintiff is aware of the injury.

*Contracts Law > Breach > Causes of Action > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN13] An action for breach of contract accrues at the time of the alleged breach of the contract.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Civil Actions > Statutes of Limitations*
*Trade Secrets Law > Misappropriation Actions > Elements > Use*
[HN14] Under the so-called discovery rule, claims for the misappropriation of trade secrets accrue at the time the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. It does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets as long as the party knew the facts which could give rise to such a claim. Therefore, the cause of action accrues when the claimant knows or should know the relevant facts.

*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > Federal & State Regulation > Common Law*
*Trade Secrets Law > Federal & State Regulation > Uniform Trade Secrets Act*
[HN15] The Uniform Trade Secrets Act (UTSA), Del. Code Ann. tit. 6, §§ 2001-09, codifies the basic principles of common law trade secret protection and has been adopted by over 40 states, including the State of Delaware and the State of Connecticut. Conn. Gen. Stat. §§ 35-50 through 35-58. Due to the dearth of Delaware cases interpreting the UTSA, a Delaware court looks to other states' decisions interpreting the UTSA for guidance. Del. Code Ann. tit. 6, § 2008. The UTSA shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it. Conn. Gen. Stat. § 35-58.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Misappropriation*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Trade Secrets Law > Civil Actions > Statutes of Limitations*
[HN16] Negotiations do not toll the statute of limitations, unless the parties agree to do so. It does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets as long as the party knew the facts which could give rise to such a claim.

*Trade Secrets Law > Civil Actions > Remedies > Damages > General Overview*

*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*

[HN17] The Uniform Trade Secret Act, Del. Code Ann. tit. 6, § 2533, and Conn. Gen. Stat. § 35-52, allows an aggrieved party to not only sue for damages, but also for injunctive relief.

**COUNSEL:** Attorneys for the Plaintiff: Arthur G. Connolly, III, Esquire, CONNOLLY BOVE LODGE & HUTZ LLP, Wilmington, Delaware; Michael O. Warnecke, Esquire, Robert Unikel, Esquire, Margaret A. O'Connor, Esquire, MAYER BROWN ROWE & MAW, LLP, Chicago, Illinois; Kevin M. McGovern, Esquire, Brian T. Foley, Esquire, McGOVERN & ASSOCIATES, Greenwich, Connecticut.

Attorneys for Defendant Hewlett-Packard Company: Robert K. Payson, Esquire, Philip A. Rovner, Esquire, Brian C. Ralston, Esquire, POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware; Roger D.Taylor, Esquire, William B. Dyer III, Esquire, Douglas S. Weinstein, Esquire, FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP, Atlanta, Georgia.

Attorneys for Defendant STMicroelectronics, Inc.: Allen M. Terrell, Jr., Esquire, Jeffrey L. Moyer, Esquire, Brock E. Czeschin, Esquire, Kelly E. Farnan, Esquire, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware.

**OPINION:**

### *MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

#### I.

In 1990, a software development company sold a perpetual license to certain of its technology [*2] in return for a single lump sum payment. As part of the license agreement, the purchaser expressly agreed to maintain the confidentiality of the seller's trade secret information for a period of five years. Shortly after the sale, the software company went out of business and, as part of that process, sold all of its assets (including its remaining intellectual property rights) to another entity. A subsequent transferee of those rights now sues,

claiming that the purchaser violated the license agreement by entering into a research and development project with another firm in 1999 that entailed disclosure of the licensed technology. Although alleging multiple theories of recovery, all counts of the complaint rest on the premise that the purchaser had no right to disclose the technology in the course of the joint exploitation. This premise depends on reading the license agreement to provide that, in addition to the express five-year confidentiality agreement, there was a further, implied undertaking to maintain the confidentiality of the licensed technology in perpetuity.

After discovery, the defendants now move for summary judgment. For the following reasons, the court concludes that [*3] the license agreement is properly construed to contain a single five-year confidentiality agreement and that the claims against the transferee are untimely. Therefore, the court grants the defendants' motion for summary judgment.

#### II.

##### A. The Parties

Plaintiff VLIW Technology, LLC ("VLIW") is a Delaware limited liability company formed in November of 2000, with its principal place of business in Connecticut. VLIW is the successor-in-interest to the rights of Technology Licensing, Inc. ("TLI") and Multiflow Computer, Inc. ("Multiflow") with respect to various intellectual property originally developed by Multiflow. The intellectual property at issue relates to a compiler initially developed by Multiflow for use in a computer that utilized a special type of programming known as "very long instruction words" (the "VLIW Technology").

Defendant Hewlett-Packard Company ("H-P"), formerly a California corporation, is now a Delaware corporation with its principal place of business in Palo Alto, California. Defendant STMicroelectronics, Inc. ("STM") is a Delaware corporation with its principal place of business in Texas. STM is controlled by STMicroelectronics, N.V., a Netherlands [*4] holding company.

##### B. Background

###### 1. VLIW And The Trace Compiler

Between 1985 and 1990, Multiflow worked on developing computer hardware and software that could take advantage of the VLIW Technology. The VLIW Technology utilizes parallel processing capabilities to speed up computer operations and make them more efficient. The VLIW Technology includes the use of hardware capable of performing more than one operation at a time (i.e. in parallel) and software components capable of identifying tasks in a program that can be performed in parallel and then translating the program into a combination of parallel-processing and sequential-processing instructions, so as to enable the program to run as quickly as possible. By 1990, Multiflow had developed a computer and the associated software components that utilized the VLIW Technology. That computer was known as the Trace 200/300 series computer. The software associated with that computer included what is known as the "Trace Compiler."

A compiler is a piece of computer software typically used to translate a computer program written in a generalized, high level computer language (usually by a human being) into lower level binary [*5] code that the machine can execute. The Trace Compiler was especially innovative because it not only translated higher-level languages (such as Fortran and C), it also created an intermediate code level. At this intermediate level, optimization processes were employed to identify and maximize the number of instructions that were capable of being executed in parallel. These instructions were then translated into machine executable binary code in VLIW Technology form. In the case of the Trace Compiler, the VLIW Technology instruction word was as long as 28 instructions (1028 bytes). This permitted various operations to be performed in parallel rather than in series, to take advantage of the parallel processing capabilities of a given computer.

The Trace Compiler was especially versatile because it could be configured to work with a variety of computers and computer chips that had varying abilities to perform operations in parallel. The Trace Compiler also combined a number of different methodologies and software routines for identifying, maximizing, and reconfiguring programs to take full advantage of a given computer's or computer chip's parallel processing capabilities. The nature [*6] of many of the methodologies utilized in the Trace Compiler and the way they were combined in the Trace Compiler were not generally known in the industry and had value.

2. Multiflow's Successors

In or about June of 1991, Multiflow went out of business. At that point, Multiflow sold all of its remaining assets, including its remaining intellectual property assets, to TLI. TLI was a Connecticut corporation formed in May of 1991 to succeed to and pursue licensing of Multiflow's intellectual property rights. In November of 2000, all TLI's assets were transferred to VLIW. Pursuant to these transfers, VLIW is the successor-in-interest to Multiflow's intellectual property, including information related to the Trace Compiler.

3. The May 1990 Multiflow/H-P Agreement

In May of 1990, Multiflow and H-P entered into a license agreement (the "License Agreement"). Under the License Agreement, Multiflow perpetually licensed H-P to use certain of Multiflow's "Intellectual Property Rights," including information relating to Multiflow's Trace Compiler. In exchange for these licensing rights, H-P made a lump sum payment to Multiflow.

Section 2.1 of the License Agreement (which is governed [*7] by Connecticut law) granted H-P a "worldwide, irrevocable, perpetual, royalty-free, non-exclusive license to use and sublicense the use of" Multiflow's intellectual property (including information relating to the Trace Compiler) "for the purpose of making, using, having made, selling and otherwise disposing of" H-P products. The License Agreement does not define what an H-P product actually is.

Article 6 of the License Agreement is titled "Confidentiality Provisions" and contains the only express contractual provisions dealing with obligations of the parties to maintain information in confidence. Section 6.1 states that the parties to the license do not contemplate that any H-P confidential information would be disclosed to Multiflow. Section 6.2 designates the source code for the Trace Compiler, as well as associated materials, as "Confidential Information." Section 6.3 affirmatively obligates H-P for a period of five years to use the same level of care as it uses with its own confidential information to avoid disclosing any Confidential Information other than as authorized pursuant to the licenses granted under the License Agreement.

Article 6 also contains several exceptions designed

[*8] to allow H-P to exploit the licensed technology. Section 6.4 states that H-P shall not be liable for disclosure of any Confidential Information pursuant to a valid court order or similar compulsion. Section 6.5 provides, as follows: "Hewlett-Packard shall not be obligated to hold in confidence, and shall not be subject to the confidentiality obligations of this Article 6 with respect to any Confidential Information" in a number of situations in which the information becomes known to H-P outside the scope of the License Agreement without breach of any independent confidentiality obligation by a third party. For example, Section 6.5 applies where information was known to H-P prior to its receipt from Multiflow, or is, or becomes, public knowledge without breach of the License Agreement by H-P.

### 4. H-P's Development Of The H-P LX Compiler And The H-P LX Architecture

After obtaining the License to the Trace Compiler, H-P invested a great deal of money and manpower developing a new compiler based on the Trace Compiler, which it calls the LX Compiler. The LX Compiler is a result of changes (H-P argues fundamental improvements) made to the Trace Compiler between 1990 and 2002 by a team [*9] of H-P scientists. n1 According to an expert that compared the LX Compiler and the Trace Compiler, the LX Compiler is almost 50% larger than the original Trace Compiler and it contains at least 120,000 lines of additional source code. n2 These additions allowed the LX Compiler to compile code for microprocessors (i.e. chips), while the Trace Compiler could only run on room-sized Trace computers. n3 H-P also developed an "architecture," i.e. the model for processor programming, using the LX Compiler, which it calls the LX Architecture.

n1 Faraboschi Dep. at 20, 69.
n2 Expert Report of Dr. John R. Levine P 56-57.
n3 Id. P 58.

### 5. STM's Status

Throughout the 1990s, various companies manufactured the integrated circuits or computer chips that form the heart of any computer. STM is one such computer chip manufacturer. These computer chip designers explored possibilities of utilizing the VLIW Technology in future generations of computer chips to speed up the performance of various tasks [*10] (such as video processing) by those chips. Some of those manufacturers executed license agreements with Multiflow and its successors, others (including STM) did not.

H-P and STM formed a research and development partnership sometime in late 1999 to work on the design and development of computer chips and other computer products. In the course of the joint R&D work, H-P shared the LX Compiler and the LX Architecture with STM. STM then used the LX Compiler and the LX Architecture in designing chips. Pursuant to this business arrangement, H-P and STM entered into a Technology License Development Agreement (the "H-P/STM Agreement"). In sharing the LX Compiler and the LX Architecture with STM, H-P required that STM keep this technology confidential. The H-P/STM Agreement contained extensive restrictions on the use and transfer of confidential information (basically the LX Compiler and the LX Architecture), which H-P has consistently enforced.

### 6. Procedural History

On December 9, 2002, VLIW filed its complaint in this action against H-P and STM. In general, the six-count complaint alleges breach of contract and misuse of trade secrets by H-P. Count 1 alleges a breach of the confidentiality [*11] provisions of the License Agreement by H-P. Count 2 alleges a violation of the Connecticut Trade Secrets Act n4 by H-P and STM. Count 3 alleges that H-P and STM willfully misappropriated VLIW's intellectual property. Count 4 alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA") n5 by H-P and STM by breaching the License Agreement. Count 5 alleges a violation of Delaware's Uniform Trade Secrets Act n6 by H-P and STM. Finally, Count 6 alleges a violation of Delaware's Deceptive Trade Practices Act ("DTPA") n7 by H-P and STM by breaching the License Agreement. n8

n4 CON. GEN. STAT. §§ 35-50 through 35-58.
n5 CON. GEN. STAT. §§ 42-110a through 42-110q.

n6 *6 Del. C. §§ 2001-2009.*
n7 *6 Del. C. §§ 2531-2536.*
n8 VLIW has agreed to a voluntary dismissal with prejudice with respect to Count 6 of its complaint. *See* Pl. Ans. Br. at 3 n.3.

On June 16, 2003, the court dismissed the complaint [*12] pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. n9 In ruling on the defendants' motion to dismiss, this court held that VLIW's complaint did not state a claim for breach of contract because the confidentiality provisions found in Section 6.3 of the contract had expired, and dismissed the trade secret and unfair practice claims on the basis that those claims were premised on, and dependent upon, the breach of contract claim. n10 Based on a plain reading of Section 6.3 as creating a single, five-year duty of confidentiality, and the fact that the effective date of the License Agreement was May 30, 1990, the court concluded that H-P's confidentiality obligations under the License Agreement expired on May 30, 1995. Therefore, the allegation of the complaint that H-P shared confidential information regarding the Trace Compiler with STM in 1999 did not state a claim for breach of the License Agreement.

n9 *VLIW Tech. LLC v. Hewlett-Packard Co., 2003 Del. Ch. LEXIS 65, at *2 (Del. Ch. June 16, 2003).*
n10 2003 Del. Ch. LEXIS 65 at *20.

[*13]

VLIW argued on appeal (as it had argued in opposition to the motion to dismiss) that there is another reasonable reading of the scope of the confidentiality provisions in the License Agreement: i.e. that Section 6.3 imposes a heightened level of confidentiality on the part of H-P for a period of five years, following which H-P has a lessened duty of confidentiality in perpetuity. This reading of the License Agreement is premised on the argument that an additional, lower level, but perpetual, confidentiality obligation can be inferred from the language of Sections 2.1 and 6.5 of the License Agreement.

Section 2.1 of the License Agreement grants H-P a

perpetual license to use (and to sublicense the use of) the licensed technology in H-P products. VLIW argues that this perpetual license is meaningless if the License Agreement requires H-P to keep information regarding the licensed technology confidential for only five years. VLIW also argues that Section 6.5 of the License Agreement distinguishes between H-P's general obligation to keep the licensed technology confidential and its enhanced duties under Section 6.3 to use the same level of care it employs to protect its own trade secrets. [*14]

Section 6.5 begins, "HEWLETT PACKARD shall not be obligated to hold in confidence, and shall not be subject to the confidentiality obligations of this Article 6 [Confidentiality Provisions] with respect to any Confidential Information . . . ." Despite the fact that both clauses are expressed in the negative, VLIW argues that the placement of a comma before the conjunction "and" implies the existence of two distinct confidentiality obligations. The first is an otherwise unexpressed obligation that H-P "hold in confidence" the Confidential Information, while the second is the heightened duty of confidentiality expressly found in Section 6.3.

The Delaware Supreme Court concluded that this reading was reasonable and that the License Agreement was ambiguous. Therefore, that court held that dismissal on the pleadings was not appropriate because "the Court of Chancery's analysis did not resolve in favor of the plaintiff all reasonable inferences from the facts alleged in the complaint and its attachments." n11

n11 *VLIW, 840 A.2d at 613.*

[*15]

On remand, the parties engaged in discovery, including discovery related to the proper construction of the confidentiality terms of the License Agreement. In that regard, in particular, they deposed the surviving witnesses who have some knowledge of the 1990 negotiations. They also discovered into the practices of the parties and the terms of other more or less contemporaneous Multiflow license agreements.

Following discovery, H-P and STM moved for summary judgment on three separate grounds. First, H-P and STM argue that the confidentiality obligation

contained in the License Agreement expired before H-P shared any confidential information with STM. Specifically, they argue that the License Agreement must be construed to limit H-P's confidentiality obligation to the five-year term expressly contained in Section 6.3. Because that five-year period expired years before H-P disclosed any information to STM, they argue that H-P was within its rights when it shared the LX Compiler and the LX Architecture with STM, notwithstanding that such disclosure necessarily included the disclosure of derivatives of the Trace Compiler. Since all counts of the complaint rest on the claim that H-P wrongfully [*16] disclosed confidential trade secrets to STM, H-P and STM contend that they are entitled to judgment on all claims asserted by VLIW.

Second, H-P and STM argue that the LX Compiler and the LX Architecture are H-P "products," as that term is used in the License Agreement, such that even if H-P was bound by a confidentiality agreement, H-P did not violate it by sharing the LX Compiler and the LX Architecture with STM. n12

> n12 After reviewing the evidence in the record, the court finds that there are disputed issues of fact as to the proper interpretation of H-P "product," as that phrase is used in the License Agreement. Therefore, granting summary judgment on these grounds would be inappropriate. Because the court disposes of the case on other grounds, it is unnecessary to address these arguments more fully.

Third, STM argues that the claims against it were brought more than three years after the factual basis of VLIW's claims occurred, i.e. more than three years after H-P shared the LX Compiler and the LX Architecture [*17] with STM. STM also argues that VLIW was on inquiry notice that this occurred. Therefore, it argues, all claims against STM are time-barred. This is the court's disposition of the summary judgment motion.

### 7. Testimonial And Documentary Evidence

The evidence relating to the proper construction of the License Agreement now before the court on the motion for summary judgment focuses on three areas.

First is the deposition testimony of Alan Donahue, one of the principals of TLI and formerly Multiflow's CFO, who was questioned about the negotiation of the License Agreement. Donahue testified that he "did not take direct part in the negotiation," but, instead, "was background in support of Don [Eckdahl]." n13 According to Donahue, Eckdahl, a former officer of Multiflow (now deceased), negotiated the License Agreement with Richard Lampman, a H-P executive. n14

> n13 Donahue Dep. of 01/11/2005 at 106.
> n14 Donahue Dep. of 12/07/2004 at 75-77.

Donahue testified as follows about the structure of H-P's [*18] confidentiality obligations: "As I understand the intent, the five-year period [in Section 6.3] is to be a higher duty to keep the technology secret or confidential to raise the standard to that of their own intellectual property." n15 He further testified to his understanding that "following the five-year confidentiality provision there is still some confidentiality requirement, but at a lower level." n16 Donahue's testimony does not, however, connect his "understanding" to any of the language found in the License Agreement. For example, when asked to describe the standard of care for the second, lower and supposedly perpetual duty of confidentiality, Donahue could do so only metaphorically:

> I'm not sure what the standard is. As I have had it described to me, it was the reference of your children versus my children. The higher standard is you taking care of my children as if they were yours and the next level you're taking care of them as they're mine. n17

> n15 *Id.* at 82.
> n16 *Id.* at 88.
> n17 *Id.*

[*19]

Second, the summary judgment record includes a license agreement between Intel Corp. and Multiflow

dated December 18, 1989 (the "1989 Intel Contract") and a second license agreement between Intel and Multiflow (the "1990 Intel Contract"). The 1989 Intel Contract contains an express confidentiality clause, with a bifurcated duty of confidentiality, although different from that which VLIW argues is contained in the License Agreement at issue here. Section 6.3 of the 1989 Intel Contract states:

> For a period of five (5) years from the date of disclosure under this Agreement for all Confidential Information, the receiving Party agrees to use the same care and discretion to prevent disclosure, publication, or dissemination outside of itself or its subsidiaries, of received "Intel Confidential Information" or "Multiflow Confidential Information", as the case may be, as the receiving Party employs with similar information of its own which it seeks to maintain and protect as confidential. . . . Notwithstanding any provision of this Agreement or the Escrow Agreement set forth as Annex "C" hereto, Intel's obligations of confidentiality (as set forth in this Section 6.0) with respect [*20] to the Escrowed Material (as defined in the Escrow Agreement) shall extend for a period of fifteen (15) years from the Effective Date.

The 1990 Intel Contract, by contrast, contains a confidentiality agreement essentially the same as that in Article 6.3 of the License Agreement. Section 5.3 of the 1990 Intel Contract states:

> For a period of five years from the Effective Date, Intel shall use the same level of care Intel employs with its own confidential information of like importance in avoiding any unauthorized disclosure or use of confidential Licensed Technology.

Third, the record contains the deposition testimony of Richard Lampman, a H-P executive, who negotiated and drafted the License Agreement on behalf of H-P. Lampman is the only deponent to participate directly in the negotiation of the License Agreement. He did not recall many of the details of the 1990 negotiation of the License Agreement. But he did testify that it was H-P's common practice, when it licensed technology, to negotiate time limits on the confidentiality requirements in those license agreements. As Lampman explained, this is because H-P typically made substantial changes to the technology it [*21] acquired and, therefore, had an interest in both using the technology it was able to develop under the license and in protecting the confidentiality of its own technology. Lampman testified:

> There were also restrictions or time caps, as we call them, about disclosure of information and that -- that element's quite critical because in any case when intellectual property is coming in from a company, typically there are restrictions about the use of it, but as we make investments in that technology, as things are obsoleted or updated, the normal issue is, at some point, it becomes very difficult to figure out how much intellectual property actually is from the original stream and how much is new investment. And, certainly, given the scale of investment we were making in this, that was, in fact, an issue. *So, I believe in the contract, as every contract I've ever signed for technology acquisition, there's time restrictions about what happens at some point in terms of the original terms and conditions.* n18

> n18 Lampman Dep. at 35 (emphasis added).

[*22]

## III.

[HN1] On a motion for summary judgment pursuant to Court of Chancery Rule 56, judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. n19 [HN2] The burden is on the moving party to prove an absence of a material issue of fact and the court must review all evidence in the light most favorable to the non-moving party. n20 However, if the moving party puts

facts into the record which, if unrebutted, entitle it to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight; n21 i.e. the party opposing summary judgment is obliged to adduce some evidence showing the existence of a dispute of material fact. n22 Rule 56(e) states in relevant part:

> [HN3] When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary [*23] judgment, if appropriate, shall be entered against him.

n19 *Scureman v. Judge*, 626 A.2d 5, 10 (Del. Ch. 1992).
n20 *Id.* at 10-11.
n21 *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979).
n22 *Id.*

## IV.

A.    Standard  Of  Contract  Interpretation  Under Connecticut Law

[HN4] Under Connecticut law, when a contract is formed between two parties of relatively equal bargaining power, it must be construed to effectuate the intent of the parties. n23 The intent of the parties is ascertained by a "fair and reasonable" construction of the language used in the contract, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. n24 The language of the contract must be given its ordinary meaning and usage where it can be sensibly applied to the contract's subject matter. n25

n23 *Poole v. City of Waterbury*, 266 Conn. 68, 831 A.2d 211, 224 (Conn. 2003); *Tallmadge Bros. v. Iroquois Gas Transmission Sys. L.P.*, 252 Conn. 479, 746 A.2d 1277, 1287 (Conn. 2000).

[*24]

n24 *Poole*, 831 A.2d at 224.
n25 *Id.*

[HN5] Connecticut case law does not set forth a test by which to determine whether a contract should be reviewed as a question of law rather than as a question of fact. n26 However, in *Tallmadge Brothers*, the Connecticut Supreme Court held that the fact that a disputed agreement was a commercial contract between sophisticated, commercial parties with relatively equal bargaining power created a presumption that the contract should be interpreted as a matter of law. n27

n26 *Tallmadge Bros.*, 746 A.2d at 1287.
n27 *Id.*

In this case, just as in *Tallmadge Brothers*, "the contracts at issue are commercial in nature and were made by sophisticated commercial parties with the advice of counsel during an extensive drafting process." n28 Furthermore, as discussed more fully *infra*, the summary judgment record demonstrates that [*25] there is no actual dispute about a material issue of fact. Therefore, this case is properly resolved on summary judgment.

n28 *Id.*

With this standard in mind, viewed in light of the undisputed record, the court will now undertake to construe the confidentiality provisions of the License Agreement on this summary judgment motion.

B. The Additional Evidence

1. Donahue's Deposition Testimony

While for the purposes of this motion the court accepts everything that Donahue said as true, his testimony is of little probative value. As stated, *supra*, contract interpretation under Connecticut law looks to the reasonable expectations of the parties to the contract. n29 While Donahue stated that he had a "review role" in the negotiation with H-P, he was not active in drafting or negotiating the License Agreement and "did not take direct part in the negotiation." n30

[*26]

n29 *See Poole,* 831 A.2d at 224.

n30 Donahue Dep. of 01/11/2005 at 106.

Apart from Donahue's lack of first-hand knowledge about the negotiation, there is the additional problem that VLIW makes no effort to tie Donahue's testimony about Multiflow's supposed intent to the language employed by the parties to express their agreement. Under Connecticut law, a "fair and reasonable" construction of the contract begins with the language of the document, n31 and not with the party's testimony of intent that is unrelated to the actual language used by the parties to express their agreement. In this case, the contract contains *no language* (not a single word or phrase) that VLIW can point to that expressly creates a perpetual confidentiality obligation. Instead, the only language in the contract affirmatively describing any confidentiality duty is found in Section 6.3 and is expressly limited to five years.

n31 *See Poole,* 831 A.2d at 224.

[*27]

Similarly, the court notes that Donahue was unable to articulate a sensible standard of care that would differentiate the claimed perpetual duty of confidentiality from the duty expressly found in Section 6.3. This is a crucial point because, if there were a second, implied confidentiality obligation, it would necessarily need to be governed by a different standard than that expressly contained in Section 6.3. Otherwise, the second, implied obligation would be nothing more than a continuation of the first, in obvious contradiction to the express five-year

term of Section 6.3. In his disposition, Donahue testified:

> I'm not sure what the standard is. As I have had it described to me, it was the reference of your children versus my children. The higher standard is you taking care of my children as if they were yours and the next level you're taking care of them as they're mine.

This "standard" is no standard at all and is entirely divorced from the actual language found in the License Agreement. The court is at a loss for how it would interpret or enforce such a standard. While for purposes of this motion the court accepts that Donahue testified truthfully and candidly, [*28] the court cannot read the License Agreement as containing such a vague, amorphous standard. n32 For these reasons, Donahue's testimony as to the meaning of the contract does not give rise to a disputed issue of material fact.

> n32 At oral arguments, counsel for VLIW argued that the court should apply a "reasonableness" standard to the second, lower confidentiality requirement. While this standard has the benefit of being intelligible, it is likewise utterly unsupported by any contractual provision in the License Agreement, and there is no other evidence, testimonial or otherwise, showing that the parties ever contemplated such a standard.

2. Multiflow's Other Contracts

The 1989 Intel Contract and the 1990 Intel Contract bolster H-P's argument that the License Agreement does not contain a second, implied confidentiality duty.

First, neither of these contracts creates *any* implied confidentiality duty. Section 6.3 of the 1989 Intel Contract created a *mutual* duty of confidentiality for the first [*29] five years, i.e. Intel was required to maintain as confidential information it received from Multiflow, as well as vice versa. This same section of the 1989 Intel Contract additionally provides that Intel keep confidential the information in Annex "C" (essentially, the Compiler technology) for fifteen years. Thus, the two express

confidentiality duties are applied to different sets of information. In contrast, the alleged implied confidentiality obligations in the License Agreement are claimed to apply to the same set of information, just for different periods of time.

Second, even in the 1989 Intel Contract, Intel's second express confidentiality duty is not perpetual, but is limited to fifteen years. Thus, there is nothing in that contract that implies the existence of a perpetual confidentiality duty in the License Agreement.

Third, when one compares the confidentiality provisions of the two Intel contracts it is strikingly obvious that Intel's confidentiality obligations under the 1990 Contract are narrower than those under the 1989 Contract, and are limited to five years. n33 The fifteen-year period of confidentiality with respect to Annex "C" information is gone and is replaced [*30] with nothing.

> n33 For an example of express contractual language that would create a bifurcated duty of confidentiality, see *BIEC Int'l, Inc. v. Global Steel Serv., Ltd.*, 791 F. Supp. 489, 544 (E.D. Pa. 1992) (holding that the language "Furthermore, Licensee shall not, except as provided under this Agreement, disclose such information to a third party or use such information for Licensee's own benefit except for the production of Licensed Products or research work related thereto[]" created a perpetual duty of confidentiality).

VLIW argues that the changes in the confidentiality provision from one Intel contract to the next should be interpreted to be the result of Multiflow's having bargained to extend the express second-tier, fifteen-year obligation to an implied one of infinite duration. The court cannot accept this argument. By 1990, Multiflow was experiencing great financial difficulties and was out of business shortly thereafter. n34 This tenuous financial condition surely reduced [*31] Multiflow's bargaining position. The only reasonable inference is that the change from one contact to the next is the result of Intel having bargained to limit its duty of confidentiality to five years.

> n34 Donahue Dep. of 12/07/2004 at 63-64.

### 3. Lampman's Deposition Testimony

H-P introduced the deposition testimony of Lampman, who negotiated and drafted the License Agreement on its behalf. Although he did not have a clear recollection of the particular negotiation with Multiflow, he did recollect that it was H-P's practice to limit the duration of all confidentiality undertakings. Unlike Donahue's testimony that is unrelated to the actual language of the contract, Lampman's testimony is consistent with the language employed by the parties to express their understanding in the License Agreement. In that agreement, there is only one express confidentiality duty, found in Section 6.3, and this duty is limited to five years.

### C. The Court's Contract Interpretation

Having considered the language [*32] of the License Agreement and the evidence relating to its formation, the court concludes, as a matter of law, that the only reasonable reading of the License Agreement is that a single duty of confidentiality was created, and that duty expired after five years.

The court begins its analysis with the plain language of the contract. The sole provision affirmatively imposing a duty of confidentiality on H-P is found in Section 6.3 and is clearly and unambiguously limited to five years. There is no other language that expressly imposes any additional duty of confidentiality on H-P.

VLIW argues that Section 2.1 of the License Agreement would be meaningless if the License Agreement only requires H-P to keep information regarding the licensed technology confidential for five years. Section 2.1, in pertinent part, states:

> MULTIFLOW grants HEWLETT PACKARD a worldwide, irrevocable, perpetual, royalty-free, non-exclusive license under MULTIFLOW's Intellectual Property Rights to use and sublicense the use of License Technology for the purpose of making, using, having made, selling and otherwise disposing of HEWLETT

PACKARD products.

VLIW argues that the confidentiality requirement [*33] is of infinite duration because the license is "perpetual." This provision makes no mention, however, of any confidentiality duty. Even if H-P undertook no duty of confidentiality, this section of the agreement would still have meaning because it would describe the duration of H-P's license. Therefore, VLIW's argument that a restrictive reading of H-P's duty of confidentiality renders this section of the agreement meaningless is simply wrong.

VLIW also argues that Section 6.5 of the License Agreement distinguishes between H-P's general obligation to keep the licensed technology confidential and its enhanced duties under Section 6.3 to use the same level of care it employs to protect its own trade secrets. The first alleged obligation is that H-P "hold in confidence" the Confidential Information, while the second is the heightened duty of confidentiality under Section 6.3. VLIW apparently argues that, coupled with the fact that the license is perpetual, the (albeit negative) language of Section 6.5 supports an inference that the parties agreed to a concomitant obligation on the part of H-P to hold the trade secrets in confidence in perpetuity. The reasoning seems to be that a perpetual [*34] confidentiality obligation protects VLIW's interests in the perpetual license.

While the Supreme Court regarded this as a possible interpretation of the contract in the context of a motion to dismiss, on the record now before this court, that interpretation is not the most "fair and reasonable" construction "interpreted in the light of the situation of the parties and the circumstances connected with the transaction" required by Connecticut law. n35 First, this argument rests on a false premise. VLIW had no "perpetual" rights under the License Agreement, since H-P's royalty obligation was structured as a single, up-front payment. Once paid, VLIW had no interest in ensuring that H-P exploited the technology and received no money from H-P's efforts, no matter how successful H-P might be. Thus, while VLIW had a generalized interest in preventing future disclosure of its technology, that interest was unrelated to the duration of H-P's license. The "perpetual" term benefitted only H-P, and corresponded with the single payment royalty term.

n35 *Poole, 831 A.2d at 224.*

[*35]

Second, VLIW's reading of the License Agreement is not the most fair and reasonable because both clauses in Section 6.5 that VLIW argues imply confidentiality duties-begin with the word "not." Section 6.5 states, "HEWLETT PACKARD shall *not* be obligated to hold in confidence, and shall *not* be subject to the confidentiality obligations of this Article 6 with respect to any Confidential Information . . . ." (Emphasis added). The use of the negative in both clauses is simply inconsistent with VLIW's suggestion that this language implies the existence of an affirmative duty nowhere else expressed in the License Agreement. No one intending to express an affirmative contract duty would use the phrases "shall *not* be obligated" or "shall *not* be subject to" to do so.

Third, this reading of the License Agreement is not the most fair and reasonable because, as discussed *supra*, there is no intelligible standard by which to judge the supposed second, lower standard of confidentiality. Neither suggestion put forward by VLIW-Donahue's unintelligible "your children versus my children" standard nor VLIW's counsel's "reasonableness" standard-finds any support in the actual language [*36] of the License Agreement.

In light of the record now before the court and the clear language of the document, the "fair and reasonable" interpretation of the License Agreement is that the only duty of confidentiality is found in Section 6.3 and expired in 1995. Section 6.5 is simply an exception to Section 6.3, and, as such, has no relevance to the treatment of confidential information after the five-year period found in Section 6.3 has lapsed.

In sum, after extensive and time-consuming discovery, the record on this motion for summary judgment fully and unequivocally supports the conclusion that the only confidentiality obligation in the License Agreement expired four years before H-P disclosed any of Multiflow's confidential information to STM. Therefore, the court holds that H-P did not violate any confidentiality agreement by sharing the LX Compiler and the LX Architecture with STM. Because this claim of breach of a nondisclosure obligation underlies all of the claims of the complaint, judgment must be entered in favor of the defendants.

## V.

### A. Statute Of Limitations

STM also argues that all claims against it are time-barred. [HN6] A court of equity may grant a motion [*37] to dismiss on the ground that the plaintiff's claims are barred by the applicable statute of limitations. n36 [HN7] Under Delaware law, the appropriate statute of limitations applied to contracts and misappropriation of trade secrets is three years. n37 The statute of limitations for misappropriation of trade secrets in Connecticut is, likewise, three years. n38 [HN8] A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches. However, the statutory period may create a presumptive time period for application of laches to bar a claim. n39 In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff will be barred from bringing suit without the necessity of the court engaging in a traditional laches analysis. n40

n36 *See In re Dean Witter Partnership Litig.*, 1998 Del. Ch. LEXIS 133, at *11 (Del. Ch. July 17, 1998) ("Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.").

[*38]

n37 *See* 10 Del. C. § 8106 (contract); 6 Del. C. § 2006 (misappropriation of trade secrets). In accordance with 10 Del. C. § 8121, the court does not consider whether some other state's law would provide for a longer limitations period.

n38 CONN. GEN. STAT. §§ 35-56. [HN9] The statute of limitations period for CUTPA is, likewise, three years. *See* CONN. GEN. STAT. 42-110g(f).

n39 *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys.*, 677 A.2d 497, 502 (Del. 1996); *see also Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch.

1989) [HN10] ("An analogous statute of limitations period applicable at law, however, is to be given great weight in determining whether a suit is to be time-barred in equity by laches and will be applied in the absence of unusual or mitigating circumstances.").

n40 *See United States Cellular*, 677 A.2d at 502; *Atlantis Plastics*, 558 A.2d at 1064.

[*39]

Where the law of two different states may apply to an action, Delaware courts apply the Restatement (Second) Conflict of Law to determine which state law applies. n41 [HN11] With respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum. n42 Thus, in this case, the court looks to the statute of limitations laws of Delaware.

n41 *Juran v. Bron*, 2000 Del. Ch. LEXIS 143, at *33 (Del. Ch. Oct. 6, 2000); *Asten, Inc. v. Wangner Systems Corp.*, 1999 Del. Ch. LEXIS 195, at *5 (Del. Ch. Sept. 23, 1999).

n42 RESTATEMENT (SECOND) CONFLICT OF LAWS § 142 (1971); *see also Lumb v. Cooper*, 266 A.2d 196, 198 (Del. 1970) ("Limitations questions are generally settled by the law of the forum.").

### 1. Savings Statute

On July 26, 2002, VLIW brought an action against H-P on substantially the same claims as those in this case [*40] in United States District Court for the District of Connecticut (the "Connecticut Action"). On December 12, 2002, VLIW voluntarily dismissed the Connecticut Action. n43 VLIW argues that the so-called Delaware "Savings Statute" n44 allows it to bring this claim within one year of the original Connecticut Action. n45 However, the Connecticut Action did not name STM as a defendant. n46 The Savings Statute cannot be used to lengthen the statute of limitations against a defendant not named in original suit. n47 Therefore, the proper date for

applying the statute of limitations is December 9, 2002, the date that this action was brought against STM.

n43 *See* docket sheet for *VLIW Technology, LLC v. Hewlett-Packard, Inc.*, 3:02-CV-01292 WWE, filed in United States District Court, District of Connecticut, dated July 26, 2002.
n44 10 Del. C. § 8118
n45 H-P did not argue either in its briefs or at oral argument that the Savings Statute is inapplicable to the claims against it. Therefore the court does not address this issue.
n46 *See* complaint filed in United States District Court, District of Connecticut, *VLIW Technology, LLC v. Hewlett-Packard, Inc.*, 3:02-CV-01292, dated July 26, 2002.

[*41]

n47 *See Vari v. Food Fair Stores, New Castle, Inc., 58 Del. 145, 205 A.2d 529, 8 Storey 145 (1964)* (applying the Savings Statute and holding that a plaintiff cannot substitute a second corporate defendant on the theory that second corporation is the same defendant due to common registered agent and some common officers.).

2. Contractual Claims n48

n48 The analysis under CUPTA is the same.

It is well-established law [HN12] in Delaware that the statute of limitations begins to run at the time of the alleged wrongful act, regardless of whether the plaintiff is aware of the injury. n49 [HN13] An action for breach of contract accrues at the time of the alleged breach of the contract. n50 VLIW first brought suit against STM on December 9, 2002. Thus, in order for its contract claim to be timely, the alleged breach must have occurred no earlier than December 9, 1999.

n49 *Wal-Mart Stores v. AIG Life Ins. Co., 860 A.2d 312, 319 (Del. 2004)* (per curiam); *Dean Witter, 1998 Del. Ch. LEXIS 133, at *15.*

[*42]

n50 *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc., 677 A.2d 497, 503 (Del. 1996).*

The factual basis of VLIW's contractual claims is that H-P shared the LX Compiler and the LX Architecture with STM and that STM used these to design microchips. n51 It is undisputed that H-P shared the LX Compiler and the LX Architecture with STM in June of 1998. n52 Therefore, any claims based on this alleged contractual breach are presumptively time-barred.

n51 Compl. P 28.
n52 *See* Memo. of Understanding between H-P and STM, dated June 1, 1998.

VLIW argued in its brief that the statute of limitations should not apply to it because it was engaged in negotiations to license the VLIW Technology to STM. This argument is untenable. The fact that the parties were engaged in negotiations to avoid the suit is not a proper ground for tolling the statute of limitations. n53 Nor should it be, as [*43] such a doctrine would obviously undermine the public policy behind the statute of limitations. n54

n53 For a discussion of several tolling doctrines, see *Dean Witter, 1998 Del. Ch. LEXIS 133, at *18 *25* (discussing the doctrines of inherently unknowable injuries, fraudulent concealment, and equitable tolling).
n54 In almost all disputes that end up in court, the parties attempt some sort of negotiation to avoid litigation. Tolling the statute of limitations during such

negotiations, without agreement of the parties, would encourage potential plaintiffs to engage in bad faith negotiations to lengthen the time they would have to bring a suit. It would also discourage potential defendants from engaging in negotiations to avoid giving plaintiffs more time to bring their suits. This is to be avoided.

For the above reasons, VLIW's contract claims are time-barred.

2. Misappropriation Of Trade Secrets

[HN14] Under the so-called "discovery rule," claims for the misappropriation of trade secrets [*44] accrue at the time the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered. n55 "The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." n56 It does not matter if an aggrieved party does not realize that the use "legally constituted a misappropriation of trade secrets . . . as long as [the party] knew *the facts* which could give rise to such a claim." n57 Therefore, "the cause of action accrues when the claimant knows or should know the relevant *facts*[.]" n58 The factual basis of VLIW's misappropriation claim is the same as for its contractual claim: H-P shared the LX Compiler and the LX Architecture with STM in June of 1998, and STM used them to design microchips. n59 Thus, the court must determine whether there are sufficient undisputed facts in the record to compel the conclusion that VLIW knew (or should have known) these facts, on or before December 9, 1999.

n55 *See 6 Del. C. § 2006*; *SmithKline Beecham Pharms. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000)*; CONN. GEN. STAT. § 35-56.

[*45]

n56 *McLeod v. Northwest Alloys, Inc., 90 Wn. App. 30, 969 P.2d 1066, 1069 (Wash. Ct. App. 1998)* (quoting *Allen v. State, 118 Wn.2d 753, 826 P.2d 200 (Wash. 1992)* and applying the Uniform Trade Secrets

Act ("UTSA")). The UTSA, which [HN15] codifies the basic principles of common law trade secret protection, has been adopted by over 40 states, including Delaware (*6 Del. C. §§ 2001-09*) and Connecticut (CONN. GEN. STAT. §§ 35-50 through 35-58). Due to the dearth of Delaware cases interpreting the UTSA, the court looks to other states' decisions interpreting the UTSA for guidance. *See 6 Del. C. § 2008* ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); CONN. GEN. STAT. § 35-58 (same).

n57 *Chasteen v. UNISIA JECS Corp., 216 F.3d 1212, 1218 (10th Cir. 2000)* (applying the UTSA) (emphasis added).

n58 *McLeod, 969 P.2d at 1069-70* (emphasis added).

n59 *See, supra,* notes 51 & 52.

[*46]

The record is replete with evidence that Donahue, John Kikoski, and John O'Donnell n60 knew these two facts before December 9, 1999. It is undisputed that principals at VLIW were aware that H-P shared the LX Compiler and the LX Architecture with *someone* before this date, and that no later than August 2, 1999, VLIW knew that "someone" was STM.

. On June 28, 1999, Richard Lethin sent a letter to Donahue, telling him that "Hewlett Packard is working with a technology partner doing research on embedded architectures using the Multiflow compiler" and that the partner was in need of a Trace Compiler License. n61

. On June 30, 1999, Donahue and Lethin exchanged a series of emails in which Lethin stated that he had spoken with Joseph (Josh) Fisher, n62 that "the exploratory research with the partner had come to the point where that partner would like to develop product, but that they now have some concerns about their

ability to do so without a [Trace Compiler] license." n63

. On July 28, 1999, Donahue forwarded to Kikoski an email with the subject line: "did HP really have the right to pass the multiflow compiler through to ST without any other HP products?" n64 The [*47] email attached to this message replies to an original message written by O'Donnell which states, in pertinent part:

Josh [Fisher] is interested in getting licensing for ST because he passed the compiler through to them, claiming he had the right to sublicense. . . . *The entire ST organization is dirty with the technology and it's critical for their next mainstream processor/product.* n65

. On August 3, 1999, Donahue sent an email to O'Donnell indicating he had spoken to a lawyer and believed there was a "breach of contract issue." n66 Donahue indicated that they should decide what they want "before contacting H-P directly" and, in addition, should be sure to "know as much as possible about what *ST* and H-P are doing." n67

. On August 20, 1999, Donahue sent an email to O'Donnell outlining a strategy to address H-P's breach of the H-P/Multiflow license agreement. Specifically, Donahue proposed that "one strategy to get something started is for me to write the lawyer a letter . . . [which] could be in terms of We believe the following is true' . . . if true, then H-P is breach [sic] of contract'" n68

. On September 14, 1999, consistent with the strategy [*48] outlined above, Donahue sent an email to Kikoski and O'Donnell attaching a draft letter to H-P's counsel for the purpose of "opening the HP breach issue." n69 In the letter, Donahue informs H-P that TLI has learned that "a European company may have received the compiler from HP." n70 The letter further states that TLI believes that "HP and the European company have entered into some form of joint development agreement" and that "HP has delivered the compiler to the partner." n71 Donahue argues that, if true, these actions could constitute a breach of the H-P/Multiflow license. n72

. On September 15, 1999, Donahue followed up his email with a fax to O'Donnell which conceded that Donahue knew that ST was involved: In discussing the draft HP letter I sent to you by e-mail with John Kikoski, he made the point that we should have notes of your conversations *with ST*, specifically identify the names of people present, titles or description of their roles, dates of meetings or phone calls in order to be prepared for a response by HP asking us to be more specific as to what company, and how do we know. n73

n60 O'Donnell was one of the co-founders of Multiflow and was co-founder, president, and chief technology officer of Equator Technologies (O'Donnell Dep. at 8-10) whose business was to provide consulting and technical support to licensees of the Trace Compiler (Donahue Dep. of 12/07/2004 at 102-06). In or around June of 1991, Kikoski entered into a finder's fee relationship with TLI and subsequently became a TLI stockholder (*id.* at 130-31).

[*49]

n61 Letter from Lethin to Donahue of 06/29/1999 at 1.

n62 Fisher was one of the co-founders of Multiflow and was later an employee of H-P.

n63 Emails between Lethin and Donahue of 06/20/1999 at 1-2.

n64 Email from Donahue to Kikoski of

2005 Del. Ch. LEXIS 59, *49

07/28/1999 at 1.
n65 Email from Donahue to O'Donnell of 07/28/1999 at 1 (emphasis added).
n66 Email from Donahue to O'Donnell of 08/03/1999 at 1.
n67 *Id.* (emphasis added).
n68 Email from Donahue to O'Donnell of 08/20/1999 at 1.
n69 Email from Donahue to O'Donnell, Kikoski of 09/14/1999 at 1.
n70 Letter from Donahue to Lampman of 09/14/1999 at 1.
n71 *Id.*
n72 *Id.*
n73 Faxed letter from Donahue to O'Donnell of 09/15/1999 at 1.

Instead of arguing that it did not know these facts, VLIW argues that they were not (and should not have been) aware of the alleged misappropriation until December 20, 1999 -- the date that Donahue received the first H-P/STM press release announcing their partnership. VLIW argues that this is so because Fischer, on behalf [*50] of H-P, was negotiating with TLI (the then-owner of the intellectual property) to procure a license for STM. VLIW also argues that the claim could not have accrued, because it could not have brought the claim until it was sure that H-P would not (from VLIW's viewpoint) comply with its obligations under the License Agreement. In essence, VLIW argues that it could not have brought suit until it knew it had suffered harm, and that it did not know this until Donahue received the H-P/STM press release.

As already discussed, however, [HN16] negotiations do not toll the statute of limitations, unless the parties agree to do so. Moreover, it does not matter if an aggrieved party does not realize that the use "legally constituted a misappropriation of trade secrets . . . *as long as [the party] knew the facts* which could give rise to such a claim." n74 Courts have consistently rejected the notion that the "statute of limitations only begins running when a plaintiff can unassailably establish a legal claim for trade secret misappropriation, [as that] would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers smoking gun' evidence of misappropriation. [*51] " n75 For instance, in *Intermedics*, the District Court for the Northern District of California held that the "language of the UTSA makes no reference to an appreciable harm' requirement" and that mere use "gives rise to access to judicial relief." n76 The District Court further stated that "there is, as a matter of law, sufficient harm or threat of harm in disclosure [or use] of a real trade secret to a competitor for a cause of action to accrue." n77

n74 *Chasteen*, 216 F.3d at 1218.

n75 *Id.; see also Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 641-42 (N.D. Cal., 1993) (rejecting the argument that a cause of action cannot accrue for statute of limitation purposes until the plaintiff has a winning claim as fundamentally wrong as a matter of law for it would prohibit defendants from using the statute for protection); *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427 (7th Cir. 1994) (holding that misappropriation of trade secrets occurred not when the defendant sold a product that it developed using plaintiff's confidential information but when it used that information in developing the product).

[*52]

n76 *Intermedics*, 822 F. Supp. at 642.
n77 *Id.*

In addition, based on the facts known to VLIW, it did not have to wait until the H-P/STM press release to seek judicial relief. The UTSA [HN17] allows an aggrieved party to not only sue for damages, but also for injunctive relief. n78 Therefore, VLIW need not have waited to bring suit until it suffered pecuniary harm (if this ever occurred).

n78 *See 6 Del. C. § 2533*; CONN. GEN. STAT. § 35-52.

As the plaintiff was aware of the alleged misappropriation of confidential information by September 15, 1999, at the latest, the three-year statute of

limitation had run by the time VLIW filed its complaint. VLIW's claims under the UTSA for misappropriation of trade secrets against STM are thus untimely, and STM's motion for summary judgment must be granted as to these claims.

## VI.

For the above [*53] reasons, the court GRANTS the defendants' motion for summary judgment and this case is DISMISSED. IT IS SO ORDERED.