# EXHIBIT A

ASNAG257        RCT Project No. 243-1611, Wirth - RCT to Institution

<u>Agreement to Assign</u>

The PARTIES and other fully-capitalized terms are defined in SECTION 3.

Effective____ July 24, 2001 _____, RCT and INSTITUTION agree as follows:

SECTION 1. <u>Recitals</u>.

    1.1.    The INVENTORS made the INVENTION described in the PATENT RIGHTS. The INSTITUTION submitted the INVENTION to RCT for evaluation and commercialization under the DECA.

    1.2.    In accordance with the DECA, INSTITUTION has caused the assignment to RCT of the INSTITUTION's and the INVENTORS' entire right, title and interest in the INVENTION and PATENT RIGHTS in the DEED OF ASSIGNMENT.

    1.3.    The INSTITUTION now desires that the INVENTION and PATENT RIGHTS be assigned to INSTITUTION or INSTITUTION's designee. RCT is willing to make such assignment under the following terms and conditions.

SECTION 2. <u>Agreements</u>.

    2.1.    RCT agrees to assign the INVENTION and PATENT RIGHTS to the INSTITUTION or INSTITUTION's designee by executing and delivering to INSTITUTION a certain deed of assignment from RCT in the form of Exhibit A, attached to this Agreement, promptly upon full execution of this Agreement.

    2.2.    INSTITUTION agrees to accept the aforesaid assignment of the INVENTION and PATENT RIGHTS with the understanding that:

        (a)    RCT shall have no further obligation with respect to the patenting of the INVENTION, including the filing, prosecution and maintenance of the PATENT RIGHTS or any other patent applications or patents covering the INVENTION; and

        (b)    RCT shall have no further obligation with respect to the marketing or licensing of the INVENTION or PATENT RIGHTS, either under the DECA or otherwise; provided however that, this Agreement shall not release RCT from its obligation to pay INSTITUTION amounts payable to INSTITUTION out of moneys received or to be received by RCT and which is distributable to INSTITUTION under the DECA as a consequence of RCT's ownership or licensing of the INVENTION or PATENT RIGHTS.

SECTION 3. <u>Definitions</u>.

    3.1.    "DEED OF ASSIGNMENT" means that deed of assignment recorded in the U.S. Patent and Trademark Office on July 15, 1993 at Reel: 6938; Frames: 007, 008, 009 and 010.

    3.2.    "DECA" means that Disclosure, Evaluation and Commercialization of Inventions Agreement between RCT and the INSTITUTION dated April 1, 1990.

    3.3.    "INVENTION" means Products Having Multiple-Substituted Polysiloxane Monolayer.

    3.4.    "INVENTORS" mean Mary J. Wirth and Hafeez O. Fatunmbi.

1

ASNAG257        RCT Project No. 243-1611, Wirth - RCT to Institution

3.5.   "PARTIES" mean RCT and INSTITUTION, where:

"RCT" means Research Corporation Technologies, Inc., 101 North Wilmot Road, Suite 600, Tucson, Arizona, 85711-3335.

"INSTITUTION" means the University of Delaware, Newark Delaware, 19716-1551.

3.6.   "PATENT RIGHTS" mean:
        U.S. Patent No. 5,599,625 issued February 4, 1997 and
        U.S. Patent No. 5,716,705 issued February 10, 1998.

SECTION 4.        Government Rights.  This Agreement and any assignment hereto are subject to the rights of the United States Government, if any, as set forth in Exhibit A hereof.


RCT ·
Research Corporation Technologies, Inc.

By _____
     Gary M. Munsinger
     President

INSTITUTION
University of Delaware

By: _____

Title _Associate Provost for Research_

2

# EXHIBIT B

## ASSIGNMENT

This Assignment is effective this twenty seventh day of May, 2004 by and between the University of Delaware (University), a non-profit corporation of the State of Delaware and UD Technology Corporation (Corporation), a non-profit corporation of the State of Delaware.

### WITNESSETH

WHEREAS, the University of Delaware is the owner of US Patent No. 5,599,625 (UD92-04) titled, "Products Having Multiple-Substituted Polysiloxane Monolayer" (Patent);

WHEREAS, Corporation is desirous of securing all rights, titles and privileges granted under the Patent Application;

NOW, THEREFORE, the parties agree as follows:

1. University hereby assigns, transfers, and conveys all of its right, title and interest in and to the Patent.

2. Corporation hereby undertakes, assumes and agrees to perform, pay or discharge all obligations of University accruing from and after the date hereof in respect of the Patent referenced in paragraph 1 above.

3. This agreement shall inure to the benefit of and be binding upon Corporation and its respective successors and assigns.
4. University retains a royalty free, nonexclusive license to practice the Patent for educational and research purposes.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date indicated below.

University of Delaware

By: _____
Richard D. Holsten

Title: Associate Provost for Research

Date: _5/27/04_

UD Technology Corporation

By: _____
T W Fraser Russell

Title: President _____

Date: _5/28/04_

# EXHIBIT C

## ASSIGNMENT OF RIGHTS AGREEMENT

THIS ASSIGNMENT OF RIGHTS AGREEMENT ("Assignment of Rights"), is executed as of the 30TH day of November, 2005 by and between The University of Delaware, a non-profit corporation of the State of Delaware (the "University") and UD Technology Corporation, a non-profit corporation of the State of Delaware (the "Corporation").

## W I T N E S S E T H:

WHEREAS, the University entered into an agreement dated April 1, 1990 with Research Corporation Technologies, Inc. ("RCT") regarding the disclosure, evaluation and commercialization of certain inventions (the "DECA"), pursuant to which certain technology and inventions were disclosed to RCT for evaluation to determine the potential for commercialization; and

WHEREAS, following RCT's evaluation of certain technology disclosed by or through the University pursuant to the DECA relating to chromatographic separations technologies (the "Technology"), the University, together with the inventors of the Technology, caused the Technology to be assigned to RCT pursuant to a Deed of Assignment recorded in the U.S. Patent and Trademark Office on July 15, 1993 at Reel: 6938; Frames: 007, 008, 009, and 010 (the "RCT Assignment"); and

WHEREAS, pursuant to the terms of the DECA, RCT took certain steps to commercialize the Technology, including without limitation, the filing of US Patent Application Serial Number 07/900,215 which eventually issued as US Patent Number 5,599,625 entitled, "Products Having Mulitple-Substituted Polysiloxane Monolayer" (the "Patent"); and

WHEREAS, pursuant to the terms of the DECA, and in light of the RCT Assignment, RCT undertook certain obligations to the University with regard to the Patent, including, among other things, the obligation to pay the University a percentage of any income earned by RCT in connection with commercialization of the Technology, including without limitation the licensing of the Patent (the "Royalty Obligation"); and

WHEREAS, on July 24, 2001, RCT transferred and assigned all right, title and interest in and to the Patent to the University pursuant to a Deed of Assignment recorded in the U.S. Patent and Trademark Office on September 4, 2001 at Reel: 012124; Frame: 0469 (the "UD Assignment"); and

WHEREAS, on May 27, 2004, the University transferred and assigned all right, title and interest in and to the Patent to the Corporation (the "Corporation Assignment"); and

WHEREAS, the University and the Corporation each desire that the Corporation shall possess, without limitation, the exclusive right to any and all benefits accruing to the University pursuant to the DECA including but not limited to any and all rights, past, present or future, arising from or relating to the Patent, the Technology and the Royalty Obligation.

Error! Unknown document property name.

NOW, THEREFORE, in consideration of the foregoing and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the University and the Corporation hereby agree as follows:

1. **Assignment of University's Rights and Obligations under the DECA**.

    **1.1**    The University hereby assigns to the Corporation any and all of its rights arising under the DECA, including without limitation the rights to receive any and all past, present and/or future payments from RCT including, but not limited to the Royalty Obligations, as well as any and all past, present and/or future claims, demands, causes of action, of every name and nature, known or unknown, in law and in equity, arising out of, which may have existed, and/or which could have been asserted or in any way connected with the commercialization of the Technology by RCT under the DECA, including without limitation any and all past, present and/or future third party beneficiary rights held by the University.

    **1.2**    The Corporation hereby undertakes, assumes and agrees to perform, pay or discharge all obligations of the University arising from or related to the DECA.

2. **Assignment of University's Rights to the Technology**.

    **2.1**    The University hereby assigns, transfers, and conveys to the Corporation all of the University's past, present and future right, title and interest in and to the Technology not otherwise assigned and conveyed to the corporation pursuant to the Corporation Assignment.

    **2.2**    The Corporation hereby undertakes, assumes and agrees to perform, pay or discharge all obligations of the University arising from the Technology.

3. **No Amendment to Corporation Assignment**. Except as specifically set forth herein, nothing in this Assignment of Rights shall change any of the terms of the Corporation Assignment, and to this end, the University shall retain a royalty free, nonexclusive license to practice the Patent for educational and research purposes as set forth in the Corporation Assignment.

4. **Miscellaneous**.

    **4.1**    **Entire Agreement**. This Assignment of Rights, together with the Corporation Assignment, represents the entire agreement between the Corporation and the University with respect to the subject matter hereof and supercedes all other agreements or discussions between the parties whether in writing or oral, including any warranties, express or implied provided by the parties. No amendment or modification shall have any effect unless reduced to writing and signed by all parties thereto.

    **4.2**    **Governing Law**. This Agreement shall be governed by, and interpreted, construed and enforced in accordance with, the laws of the State of Delaware without reference to its principles regarding the conflict of laws.

Error! Unknown document property name.

4.3     **Binding Upon Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of successors and assigns of the parties hereto.

       **IN WITNESS WHEREOF**, the authorized representatives of the parties have executed this Assignment as of the date first set forth above.

**THE UNIVERSITY OF DELAWARE**      **UD TECHNOLOGY CORPORATION**

By: _Phil Wilkes_              By: _Carolyn Thoroughgood_

Name/Title: _RICHARD D. HOLSTEN_    Name/Title: _Carolyn Thoroughgood, President_
          _ASSOCIATE PROVOST FOR RESEARCH_

3

Error! Unknown document property name.

# EXHIBIT D

LEXSEE 2002 U.S. DIST. LEXIS 6464

ASSOCIATED/ACC INTERNATIONAL, LTD., Plaintiff/Counterclaim Defendant,
v. DUPONT FLOORING SYSTEMS FRANCHISE CO., INC., et al., Defen-
dant/Counterclaim Plaintiff.

Civil Action No. 99-803-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 6464

March 28, 2002, Decided

**SUBSEQUENT HISTORY:** Judgment entered by,
Costs and fees proceeding at, Motion granted by, in part
Associated/ACC Int'l, Ltd. v. DuPont Flooring Sys.
Franchise Co., 2003 U.S. Dist. LEXIS 1334 (D. Del.,
Jan. 28, 2003)
Affirmed by Associated/ACC Int'l, Ltd. v. DuPont Floor-
ing Sys. Franchise Co., 2004 U.S. App. LEXIS 413 (3d
Cir. Del., Jan. 12, 2004)

**DISPOSITION:** [*1] Defendants' motion for summary
judgment was granted.

**COUNSEL:** Edmond D. Johnson, Esquire, and Ashley
B. Stitzer, Esquire of THE BAYARD FIRM, Wilming-
ton, Delaware. Of Counsel: John T. Morin, Esquire of
WORMSER, KIELY, GALEF & JACOBS LLP, New
York, New York. Attorneys for Plaintiff.

Richard L. Horwitz, Esquire, Kevin R. Shannon, Esquire,
and James M. Kron, Esquire of POTTER ANDERSON
& CORROON, LLP, Wilmington, Delaware. Attorneys
for Defendants.

**JUDGES:** FARNAN, District Judge.

**OPINION BY:** FARNAN

**OPINION:**

### MEMORANDUM OPINION

March 28, 2002
Wilmington, Delaware

**FARNAN, District Judge.**

Presently before the Court is Defendants' Motion for
Summary Judgment (D.I. 89). For the reasons stated be-
low, the Court will grant the motion.

### BACKGROUND

Plaintiff Associated/ACC International, Ltd. ("Plain-
tiff"), is a New York Corporation with its principal place
of business located in New York City. Plaintiff is primar-
ily involved in selling commercial flooring products to
national chains of specialty retail stores ("the National
Retail Market"). The three Defendants, DuPont Flooring
Systems Franchise Company, Inc. ("DFSFC"), DuPont
Commercial Flooring Systems, Inc. ("DCFS"), and Du-
Pont [*2] Flooring Systems, Inc. ("DFS") (collectively
"Defendants"), are corporations involved in the commer-
cial flooring business with their principal places of busi-
ness in Kennesaw, Georgia. n1 DFSFC and DCFS are
operating subsidiaries of DFS, which is a holding com-
pany. DFSFC's business primarily involves granting DFS
franchises to independent companies ("Franchisees") in
the commercial flooring industry. DCFS directly owns
numerous companies involved in the commercial floor-
ing industry ("Owned Operations") (Franchisees and
Owned Operations are collectively referred to as "the
DuPont Network"). All three Defendants are affiliates of
E.I. DuPont de Nemours & Co. ("DuPont").

> n1 DFSFC and DFS are Delaware corpora-
> tions, while DCFS is a California corporation.
> (D.I. 12 at 12).

After months of negotiations, Plaintiff and DFSFC
entered into a contract in September of 1998 ("the Con-
tract"). The Contract consisted of two sections: the Fran-
chise Agreement, which is the standard agreement of-
fered by DFSFC to potential Franchisees, [*3] and the
Special Stipulations, which are negotiated modifications
to the Franchise Agreement. The Special Stipulations
provide that Plaintiff would be designated as DFS's "Na-
tional Retail Store Account specialist." (D.I. 92 at A-
222).

In the months following the September 1998 agreement, the relationship between Plaintiff and Defendants deteriorated, and on November 23, 1999, Plaintiff filed the instant lawsuit against Defendants. In its Amended Complaint, Plaintiff alleges that (1) Defendants made fraudulent and/or negligent misrepresentations during and prior to the Contract negotiations, (2) DFSFC breached the Contract, (3) DFS and DCFS tortiously interfered with the Contract, and (4) DFS defamed Plaintiff by making certain statements to Perstorp AB ("Perstorp"), a Swedish manufacturer of floor coverings. n2 (D.I. 8). In their Answer, Defendants deny Plaintiff's allegations, assert counterclaims against Plaintiff for defamation and breach of contract, and seek to have the Contract terminated. n3 (D.I. 12).

> n2 By way of a distribution agreement with Perstorp, the DuPont Network had the exclusive right to sell commercial flooring products manufactured by Perstorp ("Pergo Products").

[*4]

> n3 The parties executed a Termination Agreement in January 2000, terminating the Contract effective as of December 31, 1999. (D.I. 92 at A-326 to A-330).

Defendants filed the instant motion for summary judgment on February 1, 2001. Briefing was completed on February 27, 2001. Below is the Court's decision on Defendants' motion.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh [*5] the evidence. n4 Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). However, to defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Thus, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

> n4 To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the [non-movant] as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).

[*6]

## DISCUSSION

### I. Plaintiff's Breach of Contract Claim

Defendants contend that they are entitled to summary judgment on Plaintiff's breach of contract claim. (D.I. 90 at 14). Plaintiff's Amended Complaint alleges that DFSFC breached paragraph 4(a) of the Special Stipulations by failing to provide certain business "leads" to Plaintiff. The relevant portion of the Special Stipulations reads:

> 4. HANDLING OF BUSINESS LEADS - Recognizing that special skills are needed to adequately service certain segments of the commercial flooring market, in particular the retail store and the corporate end-use segments, [Plaintiff] and [DFSFC] shall, as set forth below, share leads that they uncover to business in these market segments. It is not intended or expected that [Plaintiff] or Owned Operation shall forgo or refrain from bidding

on any business they feel competent to handle; rather, the purpose of this exchange of leads is to insure that each client receives the best possible service from [DFS] and its franchise members.

> (a) All Owned Operations locations will be informed of [Plaintiff's] status as a National Retail Store Specialist and will be encouraged [*7] to inform [Plaintiff] of leads that they uncover involving business in this segment, with the exception of business involving relationships strategic to its business. These leads will be in the form of headquarters locations and/or key personnel involved in the decision making process, along with any other information they might have that could assist [Plaintiff] in the development of prospective business.

(D.I. 92 at A-223 - A-224) (emphasis added). Defendants contend that Plaintiff's breach of contract claim is premised on the theory that the word "encouraged," as used above, "required" or "directed" the Owned Operations to inform Plaintiff of leads relating to the National Retail Market. (D.I. 90 at 14). Defendants argue that Plaintiff's interpretation of "encouraged" contradicts its plain meaning, and thus, should not be adopted by the Court. (D.I. 90 at 14-15). Plaintiff responds that, in the context of the Special Stipulations, the word "encouraged" is ambiguous and the Court can consider Plaintiff's extrinsic evidence that suggests the parties intended "encouraged" to mean "very close to the same as 'directing' Owned Operations to provide leads." (D.I. 96 at 8-9, 16). [*8] Accordingly, the Court must first determine whether the word "encouraged" is ambiguous.

Under Delaware law, n5 the interpretation of contract language is a question of law. O'Brien v. Progressive N. Ins. Co., 2000 Del. Super. LEXIS 443, 2000 WL 33113833, at *4 (Del. Super. Ct. Dec. 18, 2000) (citing Rhone-Polenc Basis Chems. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)). The use of extrinsic evidence to interpret "clear and unambiguous language" in a contract is not permitted. E.I. du Pont de

Nemours & Co. v. Admiral Ins. Co., 711 A.2d 45, 56 (Del. Super. Ct. 1995), modified on other grounds, 1996 Del. Super. LEXIS 571, 1996 WL 769627 (Del. Super. Ct. Dec. 24, 1996). The parties' intent is dispositive when a court construes a contract; however, when the language is unambiguous and has "an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." Id. (citing Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985)). See also Fox v. Rodel, Inc., 1999 U.S. Dist. LEXIS 15502, 1999 WL 803885, at *8 n.14 (D. Del. Sept. 13, 1999). [*9] Unambiguous contract language must be construed in accordance with how it would be understood by "an objective reasonable third party." Sanders v. Wang, 1999 Del. Super. LEXIS 203, 1999 WL 1044880, at *6 (Del. Ch. Nov. 8, 1999). Contract language is not unambiguous, however, if the language is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc, 616 A.2d at 1196.

> n5 The Franchise Agreement specifically provides that all disputes regarding the Contract are to be governed by Delaware law. (D.I. 92 at A-212).

The Court concludes that the word "encouraged" is unambiguous. In the Court's view, "encouraged" does not create an obligation on Defendants to "direct" or "require" Owned Operations to provide business leads, nor does it create a contractual guarantee that leads would be provided to Plaintiff. The Court agrees with Defendants that "encouraged" means "to spur on" or "to stimulate" someone to do something. [*10] (D.I. 90 at 15 (citing MERIAM WEBSTER'S COLLEGIATE DICTIONARY, at 381 (10th ed.)); D.I. 92 at A-173). As used in the Special Stipulations, "encouraged" describes DFSFC's conduct towards Owned Operations. Accordingly, the Court concludes that Plaintiff's proffered interpretation, which focuses on Owned Operations' conduct towards Plaintiff, should be considered. As a result, all of Plaintiff's proffered extrinsic evidence supporting its interpretation of "encouraged" will be disregarded by the Court.

Plaintiff nonetheless contends that there are different degrees of encouragement that DFSFC could have provided to Owned Operations, and this fact should be sufficient to defeat Defendants' motion for summary judgment. (D.I. 96 at 10-14). The Court agrees that encouragement may be provided in varying degrees, however, this does not change the focus of the Court's inquiry, which is whether or not DFSFC "encouraged" Owned Operations to provide leads to Plaintiff. n6

n6 Plaintiff advances a number of additional contentions in support of its interpretation of "encouraged," and its "result driven" focus, all of which the Court concludes are irrelevant to the issue of whether Defendants encouraged Owned Operation to provide leads to Plaintiff. First, Plaintiff contends that the "strategic" leads exception in Paragraph 4(a) is unnecessary if "encouraged" does not mean "required," and that therefore, the Court should adopt Plaintiff's interpretation. (D.I. 96 at 12). However, the Court fails to see Plaintiff's logic. What the exception states is that DFSFC need not "encourage" Owned Operations to provide strategic leads to Plaintiff, while DFSFC was obligated to "encourage" Owned Operations to provide non-strategic leads to Plaintiff.

Plaintiff also contends that the sentence in Paragraph 4(a) immediately following the disputed language supports its interpretation of "encouraged" because it describes in detail the form of these leads. Plaintiff contends that such a detailed description would not be included if these leads were not "required" to be provided to Plaintiff. (D.I. 96 at 13-14). Again, Plaintiff's contention does not make sense. The mere fact that Paragraph 4(a) describes the form of these leads in detail does not support the inference that these leads were required to be provided; rather, the description is included in the event that Owned Operations agree to provide leads after DFSFC encouraged them to do so. Any other interpretation would contradict the plain meaning of the word "encouraged."

[*11]

In order to avoid summary judgment, Plaintiff must come forward with sufficient evidence that Defendants did not "encourage" Owned Operations to provide leads as required by Paragraph 4(a) of the Special Stipulations. On the record before it, the Court concludes that Plaintiff has failed to do so.

Plaintiff's first contention in support of its position that DFSFC failed to sufficiently "encourage" Owned Operations is that any encouragement provided by DFSFC to Owned Operations would not result in Plaintiff actually receiving any leads because the assignment of leads was determined by the Pergo database logic. (D.I. 96 at 25) (citing D.I. 92 at A-71 to A-73). This contention focuses on the lack of leads actually received by Plaintiff, not the encouragement provided by DFSFC. Thus, the Court finds this contention to be irrelevant.

Plaintiff's second contention is that there is no evidence that DFSFC ever encouraged Owned Operations to provide leads, and further, that there is hardly any evidence that DFSFC even informed Owned Operations of Plaintiff's status as National Retail Store Account specialist. (D.I. 96 at 25). The Court concludes that this contention is not supported by the [*12] evidence.

Plaintiff argues that: (1) DFSFC never explained to the Owned Operations, in writing, what benefits they would receive if they were to provide leads to Plaintiff, (D.I. 96 at 26), and (2) Plaintiff was not identified in the operations manual that was given to Owned Operations and Franchisees, even though said manual contained a section on national accounts that identified Defendants' other "national account specialists," and instructed Owned Operations how to develop their own national retail store business without involving Plaintiff. (D.I. 96 at 26).

The Court concludes that Plaintiff's contentions are insufficient to meet its burden of proof. First, in its brief, Plaintiff fails to cite evidence of record supporting the above contentions. (D.I. 96 at 26). Second, nowhere in its brief does Plaintiff cite evidence which suggests that Defendants were required to present in writing the potential benefits for Owned Operations if it provided leads to Plaintiff. Third, Plaintiff has not produced any evidence that the above-mentioned operations manual was required to identify Plaintiff as its National Retail Store Account specialist. Fourth, Defendants have produced evidence [*13] that they did encourage Owned Operations to provide leads to Plaintiff in various ways, including but not limited to: (1) issuing press releases and announcements to Franchisees and Owned Operations and sending letters to "aligned suppliers," that announced Plaintiff as Defendants' National Retail Store Account Specialist, (2) having the President of DFSFC, Ron Rose, give interviews in which he discussed the expected benefits to both parties as a result of the Contract, (3) publishing information concerning Plaintiff in the DFS Newsletter, (4) offering Plaintiff an opportunity to speak at various meetings, some of which were attended by Defendants' "entire network," in order for Plaintiff to communicate the financial benefits to Owned Operations if they informed Plaintiff of leads and if they included Plaintiff in business dealings involving accounts in the National Retail Market. (D.I. 99 at 7) (citing D.I. 92 at A-84 to A-86).

Based on this record, the Court concludes that Plaintiff has failed to produce sufficient evidence in support of its contention that Defendants failed to adequately "encourage" Owned Operations to provide leads to Plaintiff. Accordingly, Defendants' motion [*14] for summary judgment on Plaintiff's breach of contract claim will be granted. n7

2002 U.S. Dist. LEXIS 6464, *

n7 Defendants also contend that they are entitled to summary judgment on Plaintiff's breach of contract claim because: (1) only DFSFC was a party to the Franchise Agreement, (2) Plaintiff waived the right to bring its breach of contract claim, and (3) Plaintiff has failed to produce any evidence that it suffered damages as a result of the alleged breach. (D.I. 90 at 19-21). Because of the decision reached, the Court will not address the additional contention offered by Defendants.

## II. Plaintiff's Fraud Claim

Defendants contend that they are entitled to summary judgment on Plaintiff's claim of fraudulent inducement and/or fraudulent misrepresentation. (D.I. 90 at 21). Under Delaware law, the elements of fraud are:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) [*15] an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction [was] taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

Lord v. Souder, 748 A.2d 393, 402 (Del. 2000).

Defendants contend that Plaintiff has failed to produce sufficient evidence to support its fraud claim. Plaintiff relies on four alleged statements and/or omissions in opposition to Defendants' motion. First, Mr. Rose made certain statements during negotiations regarding the meaning of the word "encouraged." (D.I. 96 at 35). Second, Mr. Rose stated during negotiations that he did not want all of the words in the Contract to have "legal significance in the sense of contractually binding language." (D.I. 96 at 35-36). Third, Defendants failed to inform Plaintiff that under Defendants' contract with Perstorp, all members of the DuPont Network were obligated to sell only Pergo products in Pergo's market system. (D.I. 96 at 36). Fourth, Defendants fraudulently claimed that, "if it were successful in meeting its goals for the [DuPont] Network it was establishing, no carpet contractors

outside [*16] the [DuPont Network] would have access to carpet made from Antron fiber. (D.I. 96 at 36). The Court will address each alleged instance of fraud in turn.

1. Meaning of the Word "Encouraged"

The Court concludes that no reasonable jury could conclude that Plaintiff justifiably relied on Mr. Rose's alleged statements regarding his interpretation of the word encouraged. If Mr. Rose intended for Paragraph 4(a) to mean "very close to the same as 'directing'" Owned Operations to provide leads to Plaintiff, and if this interpretation was acceptable to Plaintiff, specific language should have been included providing as such. Negotiations over the Franchise Agreement and Special Stipulations lasted for many months, and the Special Stipulations were of critical importance to Plaintiff due to its opinion that executing the standard Franchise Agreement by itself was not a viable option. It was unreasonable for Plaintiff to have simply accepted Mr. Rose's alleged representations as to the meaning of "encouraged," when such interpretation contradicts the meaning that an ordinary person would ascribe to it. The unreasonableness of this reliance is underscored when considering that the Franchise [*17] Agreement contains a comprehensive integration clause. n8 As a result, the Court concludes that any reliance by Plaintiff on these representations was not justifiable, and that, therefore, these representations cannot sustain Plaintiff's fraud claim.

n8 The Integration Clause reads in relevant part:

(a) [The Contract] undertakes all the terms and conditions of [the parties' agreement]. This [Contract] contains all oral and written agreements, representations and arrangements between the parties hereto . . .

(b) [Plaintiff] has no knowledge of any representations by [Defendants] about the business contemplated by this [Contract] that are contrary to the terms of this agreement or the documents incorporated herein. . . . (j) [Plaintiff] acknowledges that this [Contract] constitutes the entire agreement of the parties . . . and supersedes any prior agreement between the parties concerning the same subject matter.

(D.I. 92 at A-213 to A-215).

2. Avoiding Legally Significant Contract [*18] Language

The Court concludes that any reliance by Plaintiff on Mr. Rose's alleged statement that he did not want Plaintiff to worry about inclusion of the word "encouraged" because he did not intend "to make every word . . . legally significant and create clear contractually binding language," was unjustifiable. (D.I. 96 at 37) (citing D.I. 92 at A-173). As noted above, the Contract was extensively negotiated for many months by sophisticated businesses that had retained legal counsel, n9 and it is unlikely that the parties did not intend for "encouraged" to have a binding effect in a "strict legal way." (D.I. 96 at 37). The Court therefore concludes that it was not justifiable for Plaintiff to rely on Mr. Rose's statement that he did not intend "encouraged" to have any "legal significance."

n9 Plaintiff contends that Mr. Rose lied when he stated that Defendants' lawyers did not suggest using the word "encouraged." (D.I. 96 at 37-38). However, this fact is irrelevant to the issue of whether Plaintiff's reliance on this statement was justifiable. At the time, Plaintiff believed that Mr. Rose had not gotten this idea from Defendants' lawyers, and the Court has already concluded that reliance under those conditions was unreasonable.

[*19]

3. Omissions Regarding the Perstorp Agreement

Plaintiff contends that under Defendants' contract with Perstorp ("the Perstorp Agreement"), the entire Du-Pont Network was required to sell only Pergo products in the Pergo market system. (D.I. 96 at 38-39) (citing D.I. 97 at B-172). The Special Stipulations, however, do not limit Plaintiff in such a manner. (D.I. 96 at 38) (citing D.I. 92 at A-223 to A-227). By failing to disclose this exclusivity provision regarding Pergo products, Plaintiff contends that Defendants misled Plaintiff regarding Defendants' authority to enter into the Special Stipulations. (D.I. 96 at 38).

A defendant commits fraud if he "fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading. Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983). See also Snyder v. Butcher & Co., 1992 Del. Super. LEXIS 362, 1992 WL 240344, at *3 (Del. Super. Ct. Sept. 15, 1992). The Court concludes, however, that

Plaintiff has failed to offer sufficient evidence that the Perstorp Agreement's exclusivity provision applies to Plaintiff.

The Perstorp Agreement specifically prohibits DFSFC, DFS, and DCFS [*20] from "directly or indirectly" selling non-Pergo products. (D.I. 97 at B-170 to B-172). The Perstorp Agreement separately defines franchises of DFSFC, such as Plaintiff, as "Franchisees." (D.I. 97 at B-172). Since Franchisees are not specifically precluded from selling non-Pergo products, the Court concludes that, absent any evidence to the contrary, the Perstorp Agreement's exclusivity provision did not extend to Plaintiff. n10

n10 It is conceivable that DFSFC or DFS would "indirectly" be selling non-Pergo products if one of its Franchisees sold non-Pergo products. However, Plaintiff has failed to adduce any evidence supporting this position, and the Court finds that such an interpretation is unlikely to represent the contracting parties' intent when considering that Franchisees are separately defined and distinguished from DFSFC and DFS. Thus, the Court concludes that Plaintiff has failed to meet its burden to show that the Perstorp Agreement's exclusivity provision applied to Franchisees.

Thus, Plaintiff's [*21] only viable contention of fraud is that Defendants were required to inform Plaintiff that, if Defendants fulfilled the terms of the Special Stipulations, this would necessarily place Defendants in breach of the Perstorp Agreement. However, Plaintiff fails to cite authority that requires such a disclosure. In fact, even if DFSFC knew when it entered into the Special Stipulations that the terms would put it in breach of the Perstorp Agreement and that, therefore, it knew that it would not fulfill its obligations under the Special Stipulations, this still would not amount to fraud. See Diamond Elec. Inc. v. Delaware Solid Waste Auth., 1999 Del. Super. LEXIS 45, 1999 WL 160161, at *7 (Del. Ch. March 15, 1999) ("a breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform"); IOTEX Communications, Inc. v. DeFries, 1998 Del. Ch. LEXIS 236, 1998 WL 914265, at *5-6 (Del. Ch. Dec. 21, 1998) (same). Therefore, the Court concludes that Defendants' alleged omission regarding the Perstorp Agreement does not amount to fraud.

4. Statements Regarding Future Goals for the Du-Pont Network

Lastly, Plaintiff offers evidence that Defendants made statements [*22] at a 1996 meeting in Scottsdale, Arizona. These statements expressed Defendants' intent

to develop a network of Owned Operations and Franchisees that would dominate the commercial market for carpets made of synthetic fibers, and that all carpet contractors that refused to join the DuPont Network would not have access to a DuPont fiber, Antron, that was used in "the vast majority of the carpet sold by Plaintiff." (D.I. 96 at 40) (citing D.I. 97 at B-3 to B-5). These statements led Plaintiff to believe that if it did not join the DuPont Network, it would eventually be forced out of business. (D.I. 97 at B-4 - B-5). In reliance on these statements, Plaintiff contends that it incurred various expenses in order to prepare for its becoming a Franchisee. n11 (D.I. 96 at 40-41).

> n11 Plaintiff seeks to recover damages for numerous expenses it incurred prior to entering into the Contract, including: (1) an upgrade of its computer system and software, (2) leasing of a larger office space, (3) the hiring of a new chief financial officer, (4) an increase in marketing and advertising expenditures, and (5) the hiring of more employees. (D.I. 8 at P41; D.I. 92 at A-106 to A-107).

[*23]

Defendants admit that they failed to develop the DuPont Network and failed to achieve the market domination to the extent predicted. (D.I. 99 at 18). However, the Court concludes that this failure to reach expectations is insufficient to support Plaintiff's fraud claim.

First, there is no evidence suggesting that Defendants made these statements with the intent to induce Plaintiff into incurring these expenses. The Court finds that, because Defendants never requested Plaintiff to incur these expenses, and because the statements were made in the Spring of 1996, (D.I. 97 at B-4), which was more than two years before the parties entered into the Contract, no reasonable jury could conclude that Defendants intended to induce Plaintiff to incur these expenses. (D.I. 90 at 24-25).

Plaintiff's own contentions support this conclusion. Plaintiff admits that it found Defendants' standard Franchise Agreement objectionable. As a result, Plaintiff sought to enhance its attractiveness to Defendants and to increase its bargaining position in order to better negotiate modifications to the Franchise Agreement. (D.I. 96 at 40). Plaintiff contends that incurring these expenses in advance was necessary [*24] to achieve these goals and to show its good faith to Defendants. (D.I. 96 at 40) (D.I. 93 at A-440 to A-441). The Court concludes that it is unreasonable to suggest that Defendants intended to induce Plaintiff to incur expenses that put Plaintiff in an

enhanced bargaining position to the detriment of Defendants.

Plaintiff further contends that even if it had not incurred these expenses in advance, it would have incurred them subsequent to its entering into the Contract. (D.I. 96 at 40-41). This contention, however, is irrelevant. It was Plaintiff who sought to become Defendants' National Retail Store Account specialist rather than a normal Franchisee. Without these advance expenditures, it is unlikely that Plaintiff would have entered into the DuPont Network due to Plaintiff's objections to the standard Franchise Agreement. Thus, absent any evidence contemporaneous to the 1996 Scottsdale, Arizona meeting that Defendants intended to induce Plaintiff to become their National Retail Store Account specialist or to incur all of the above expenses, the Court concludes that Defendants' motion for summary judgment should be granted on this issue.

Even if the Court were to conclude that Defendants [*25] intended to induce Plaintiff to incur all of these expenses, the Court nonetheless concludes that Plaintiff did not justifiable rely on the Scottsdale, Arizona representations in incurring these expenses. Plaintiff concedes that the statements were declarations of what Defendants "hoped" to achieve, and that Defendants' predicted market domination would only come to fruition if Defendants "were successful in [its] goal" of developing the DuPont Network to the extent desired. (D.I. 96 at 39-40) (citing D.I. 97 at B-3 & B-49 to B-53). As a result, the Court concludes that it was not justifiable for Plaintiff to incur these expenses in reliance on statements of future predictions, when Defendants in no way guaranteed that these plans would come to fruition.

In addition, it was unreasonable for Plaintiff to incur these expenses over two years before it ever agreed to enter into the DuPont Network. (D.I. 97 at B-4; D.I. 92 at A-181). Plaintiff admits that it did not intend to become a regular Franchisee of DFSFC unless it was able to negotiate modifications to the standard Franchise Agreement. (D.I. 93 at A-426). Thus, Plaintiff incurred all of these expenses in advance, based on representations [*26] about what the DuPont Network might become, and based on the possibility that Plaintiff might eventually become a Franchisee. Considering the speculative nature of these alleged inducements and considering how far in advance these expenses were made, the Court concludes that Plaintiff's reliance on these inducements was not justifiable. Thus, the Court concludes that the 1996 Scottsdale, Arizona statements are insufficient to sustain Plaintiff's fraud claim.

In sum, none of the alleged statements or omissions relied upon by Plaintiff in support of its fraud claim satisfy the elements of a fraud claim. Therefore, the Court

concludes that Defendants' motion for summary judg-
ment on Plaintiff's fraud claim must be granted. n12

> n12 Defendants also contend that Plaintiff's
> fraud claim must be dismissed: (1) pursuant to
> the collateral promise rule, (2) because it is
> barred by the Franchise Agreement's integration
> clause, and (3) because Plaintiff has produced no
> evidence that it suffered any damages as a result
> of the alleged fraud. (D.I. 90 at 26-31). Due to
> the conclusion above, these contentions are moot.

[*27]

### III. Plaintiff's Negligent Misrepresentation Claim

Defendants also contend that they are entitled to
summary judgment on Plaintiff's negligent misrepresen-
tation claim. (D.I. 90 at 32). The elements of a negligent
misrepresentation claim are essentially the same as for a
fraudulent misrepresentation claim, except that there is
no state of mind requirement; rather, the defendant
merely must have made the representation without exer-
cising reasonable care to determine its accuracy. Darnell
v. Myers, 1998 WL 294012, at *5 (Del. Ch. May 27,
1998). Since the Court dismissed Plaintiff's fraud claim
in its entirety, and because this dismissal was not de-
pendent on Defendants' intent, the reasons for dismissing
Plaintiff's fraud claim are equally applicable here. Thus,
the Court concludes that Defendants' motion for sum-
mary judgment as to Plaintiff's negligent misrepresenta-
tion claim must also be granted.

### IV. Plaintiff's Tortious Interference Claim

Defendants also contend that they are entitled to
summary judgment on Plaintiff's tortious interference
claim, which asserts that DCFS and DFS tortiously inter-
fered with the Contract. (D.I. 8 at P90-98). To [*28]
state a claim for tortious interference, a plaintiff must
prove that: (1) a valid contract existed, (2) the defendants
knew of the contract, (3) the defendants undertook an
intentional act that was a significant factor in causing a
breach of the contract, (4) a lack of justification for the
defendant's action, and (5) injury as a result of the inten-
tional act. Cantor Fitzgerald, L.P. v. Cantor, 2000 Del.
Ch. LEXIS 43, 2000 WL 307370, at *24 (Del. Ch.
March 13, 2000).

The Court concluded above that Defendants did not
breach the Contract. Therefore, Plaintiff has failed to
satisfy the third element of tortious interference. As a
result, the Court will grant Defendants' motion for sum-
mary judgment as to Plaintiff's tortious interference
claim.

### V. Plaintiff's Defamation Claim

Defendants also contend that they are entitled to
summary judgment on Plaintiff's defamation claim as-
serted against DFS. (D.I. 90 at 33). Under Delaware law,
a plaintiff asserting a claim of defamation must establish:
(1) a defamatory communication about the plaintiff, (2)
publication, (3) a third party's understanding of the de-
famatory character of the communication, and (4) injury.
Bloss v. Kershner, 2000 WL 303342, at *6 (Del. Super.
Ct. March 9, 2000). [*29]

Plaintiff's defamation claim is based on an alleged
statement made to Perstorp by J.C. Brunache, DFS's
vice-president of the national accounts marketing team,
that: "[Plaintiff] did not have enough salespeople on
staff, and did not have the resources or expertise to 'exe-
cute' transactions and to follow projects through to com-
pletion." (D.I. 8 at P50). Defendants contend that Plain-
tiff has failed to offer any admissible evidence that the
alleged defamatory statement was ever made. (D.I. 90 at
35).

The only evidence that this statement was made is
Plaintiff's response to Defendants' interrogatory; how-
ever, this response is vague and provides little informa-
tion in addition to that already contained in Plaintiff's
Amended Complaint. (D.I. 92 at A-28 to A-29). Plaintiff
fails to cite any evidence adduced from either the speaker
or persons who heard the alleged statement attesting that
the statement was actually made. (D.I. 96 at 44-45). Fur-
thermore, Plaintiff admitted in its interrogatory response
that it did not know "when or where" the statement was
made. (D.I. 92 at A-29). Based on this record, the Court
concludes that Plaintiff has not adduced [*30] sufficient
evidence for a reasonable jury to render a verdict in favor
of Plaintiff on its defamation claim, and that Defendants'
motion for summary judgment must be granted as to this
claim. n13

> n13 Because of the above conclusion, the
> Court need not address Defendants' other conten-
> tions in support of their motion regarding Plain-
> tiff's defamation claim.

### VI. Defendants' Defamation Counterclaim

Defendants contend that they are entitled to sum-
mary judgment on their defamation counterclaim. (D.I.
90 at 35). In their counterclaim, Defendants allege that
Plaintiff committed defamation by widely disseminating
a press release accusing Defendants of fraud. (D.I. 12 at
P14).

Plaintiff responds by first claiming that Defendant did defraud Plaintiff, and thus, Defendants' defamation counterclaim necessarily fails. (D.I. 96 at 45). However, the Court's conclusion above that Defendants are entitled to summary judgment on Plaintiff's fraud claim renders this contention moot.

Plaintiff also contends that the press [*31] release is privileged. (D.I. 96 at 46). Specifically, Plaintiff contends that the press release explains that Plaintiff had filed a lawsuit against Defendants and describes the particular allegations in the lawsuit. (D.I. 96 at 35). The press release is careful to preface the allegations with statements such as: "according to the suit," "[the] lawsuit claims that," or "the lawsuit says." (D.I. 92 at A-321 to A-323). As a result, Plaintiff contends that it cannot be liable for disseminating the press release. (D.I. 96 at 35). In the alternative, Plaintiff contends that it is entitled to "a limited privilege for fair reports on public actions such as judicial proceedings." (D.I. 96 at 46) (citing Read v. News Journal Co., 474 A.2d 119, 120 (Del. 1984).

Under Delaware law, Plaintiff cannot be held liable for defamation for the allegations contained in its Amended Complaint due to Delaware's absolute privilege for statements made in the course of judicial proceedings. Barker v. Huang, 610 A.2d 1341, 1345 (Del. 1992); Read v. Carpenter, 1995 Del. Super. LEXIS 251, 1995 WL 945544, at *3 (Del. Super. Ct. June 8, 1995). However, statements made by a litigant, outside [*32] the course of judicial proceedings, about the pending judicial proceeding are not afforded the protection of the absolute privilege. Barker, 610 A.2d at 1345. Accordingly, Plaintiff's statements are not entitled to an absolute privilege. Further, the Court is not persuaded that the limited privilege to publish fair and accurate reports of judicial proceedings, referred to as the "fair report privilege," is applicable. Read v. News-Journal Co., 474 A.2d 119, 120 (Del. 1984). In Read, the Supreme Court of Delaware held that a newspaper was privileged in printing a story that fairly and accurately summarized a court decision. The fair report privilege has been exclusively extended to the media, not a litigant acting as its own media. Therefore the Court believes that the Delaware Supreme Court would not extend the limited privilege in Read to include a litigant's statements, prepared for media publication, regarding a judicial proceeding in which it is involved.

Because Plaintiff's press release is not privileged, the Court must examine the elements of a defamation claim. As discussed previously, under Delaware law, a plaintiff asserting a claim [*33] of defamation must establish: (1) a defamatory communication about the plaintiff, (2) publication, (3) a third party's understanding of the defamatory character of the communication, and (4) injury. Bloss v. Kershner, 2000 WL 303342, at *6 (Del. Super.

Ct. March 9, 2000). First, the press release is a defamatory communication about Defendants that would tend to harm the reputation of Defendants or would discourage third parties from associating with Defendants. Stevens v. Independent Newspapers Inc., 1988 Del. Super. LEXIS 89, 1988 WL 25377, at *2 (Del. Super. Ct. March 10, 1988). n14 Second, it is not disputed that the press release was published to several newspapers and business associates of Defendants. (D.I. 93 at A-511 to A-517). As for the third element, after reviewing the record, the Court concludes that Defendant has not adduced evidence, establishing that the third parties who received the press release understood the defamatory character of the communication. Further, the Court cannot conclude as a matter of law that a third party would understand the defamatory nature of the press release. In fact, a third party might simply understand the press release to be a [*34] discussion of a recently filed civil action. Therefore, because Defendant fails to establish all the elements of defamation, the motion for summary judgment will be denied.

> n14 Statements of opinion, as opposed to statements of fact, generally are not defamatory unless the opinion implies the existence of undisclosed facts that are ultimately determined to be untrue. Kanaga v. Gannett Co., Inc., 687 A.2d 173, 174 (Del. 1996). The press release makes some statements of fact and also makes some conclusory allegations of fraud without stating the underlying facts. To the extent that the press release can be construed as an expression of Plaintiff's opinion, it clearly implies the existence of undisclosed facts that the Court concluded are untrue. Accordingly, the press release is a defamatory statement.

## VII. Defendants' Breach of Contract Counterclaim

Defendants contend that they are entitled to summary judgment on their breach of contract counterclaim in which they seek $ 19,654.94 for [*35] Pergo products that DFS supplied to Plaintiff. (D.I. 90 at 36-37; D.I. 12 at P24-28). Plaintiff admits that it owes DFS this money, but states that "it is holding this [money] as a set-off against what is owed by [Defendants] for [their] breach of contract." (D.I. 96 at 46). Since there is no dispute that Plaintiff owes this money, the Court will grant Defendants' motion as to the breach of contract counterclaim.

## VIII. Defendants' Counterclaim for Franchise Fees

Defendants contend that they are entitled to summary judgment on their counterclaim for $ 7,500 in franchise fees owed by Plaintiff pursuant to paragraph # 5 of the Franchise Agreement - $ 2,500 a month for October, November, and December of 1999. (D.I. 90 at 37-38). Plaintiff contends that DFSFC breached the Contract in August 1999, and that this breach relieved Plaintiff of its obligation to pay franchise fees. Since the Court concluded above that Defendants did not breach the Contract, Defendants are entitled to summary judgment on this counterclaim.

## CONCLUSION

For the reasons discussed, the Court will grant Defendants' motion for summary judgment, in all respects, except as it pertains to Defendants' [*36] defamation counterclaim.

An appropriate Order will be entered.

## ORDER

At Wilmington this 28th day of March 2002, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D.I. 89) is **GRANTED** in all respects, except as it pertains to Defendants' defamation counterclaim.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORNING INCORPORATED, et al.,   :
                                 :
          Plaintiffs,            :
                                 :
     v.                          :      Civil Action No. 03-633-JJF
                                 :
SRU BIOSYSTEMS, et al.,          :
                                 :
          Defendants.            :

---

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of
POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.
Of Counsel: Larry L. Shatzer, Esquire, Andrew E. Rawlins,
Esquire, Kenneth E. Krosin, Esquire, and George C. Best, Esquire,
of FOLEY & LARDNER, Washington, D.C.
Attorneys for Plaintiffs.

Steven J. Balick, Esquire, and John G. Day, Esquire, of ASHBY &
GEDDES, Wilmington, Delaware.
Of Counsel: John J. McDonnell, Esquire, Daniel A. Boehnen,
Esquire, Matthew J. Sampson, Esquire, Richard A. Machonkin,
Esquire, Patrick G. Gattari, Esquire, of McDONNELL BOEHNEN
HULBERT & BERGHOFF LLP, Chicago, Illinois.
Attorneys for Defendants.

---

MEMORANDUM OPINION

January 30, 2006
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Request For Reconsideration Of November 15, 2005 Memorandum Opinion And Order (D.I. 299) filed by Defendants, SRU Biosystems, LLC, SRU Biosystems, Inc. and SRU Biosystems Holdings, LLC (collectively, "SRU"). Corning Incorporated and Artificial Sensing Instruments ASI AG (collectively, "Corning") have filed an Opposition to SRU's request. For the reasons discussed, the Court will deny SRU's Request For Reconsideration.

## I. THE PARTIES' CONTENTIONS

By its Motion, SRU requests the Court to reconsider its November 15, 2005 decision on three grounds. Specifically, SRU contends that (1) the Court overlooked testimony of Corning's own witness in concluding that the '843 patent was not invalid for lack of written description; (2) the Court erroneously excluded the '248 patent which SRU maintains is relevant to this action; and (3) the Court should consider whether the '843 patent is invalid as indefinite as a result of an intervening development in the law, i.e. the Federal Circuit's recent decision in IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377 (Fed. Cir. 2005).

In response, Corning contends that the Court should deny reargument, because SRU restates arguments that have already been made by SRU in its prior submissions and rejected by the Court.

1

Corning also contends SRU's request to reconsider the Court's exclusion of the '248 patent is untimely. As for the Federal Circuit's recent decision in IPXL, Corning contends that SRU waived any argument related to indefiniteness by failing to raise an indefinite argument at any point prior to the instant Request For Reconsideration.

II.   STANDARD OF REVIEW

A motion for reconsideration under Delaware Local Rule 7.1.5 which is timely filed and challenges the correctness of a previously entered ordered is considered the "functional equivalent" of a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e).[1]  In re DaimlerChrysler AG Securities Litigation, 200 F. Supp. 2d 439, 441 (D. Del. 2002) (citations omitted).  The purpose of a motion for reconsideration filed pursuant to Rule 59(e) is "to correct manifest errors of

---

[1]     Because SRU's motion is made under Del. L.R. 7.1.5, Corning couches its discussion of the standard of review solely in terms of that which is required for reargument.  Reargument, like reconsideration, is granted sparingly, but the grounds justifying reargument differ slightly from that which is required for reconsideration.  Specifically, reargument is only appropriate where: (1) the court has patently misunderstood a party, (2) the court has made an error not of reasoning, but of apprehension, and (3) the court has made a decision outside the scope of the issues presented to the court by the parties.
        Though brought under Del. L.R. 7.1.5, the Court believes SRU is seeking reconsideration as evidenced both by the relief it requests and its use of the term "reconsideration" throughout its briefing.  However, under either the standard for reargument or the standard for reconsideration, the Court concludes that SRU is not entitled to relief.

law or fact or to present newly discovered evidence." Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Motions for reargument or reconsideration should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court. Karr v. Castle, 768 F. Supp. 1087, 1090 (D. Del. 1991); Brambles USA, Inc. v. Blocker, 735 F. Supp. 1239, 1240 (D. Del. 1990). Thus, a court may only grant reconsideration if there is: (1) a change in the controlling law; (2) newly available evidence; or (3) the need to correct a clear error of law or fact to prevent manifest injustice. Max's Seafood, 176 F.3d at 677. With this standard in mind, the Court will address SRU's Request For Reconsideration.

III. DISCUSSION

    A.   Whether SRU Is Entitled To Reconsideration Of The
           Court's Decision To Exclude The '248 Patent

SRU requests the Court to reconsider its decision excluding from evidence the '248 patent. SRU contends that the '248 patent is a continuation of the '843 patent, and thus, relevant to demonstrate that the '843 patent fails to satisfy the written description requirement.

SRU raised these arguments previously, and they have already been considered by the Court. In addition, the Court's decision excluding the '248 patent from evidence was issued on September 27, 2005, with a Memorandum Opinion explaining the Court's

3

decision on October 5, 2005.  Thus, SRU was required to raise any motion to reconsider or reargue that decision by October 20, 2005, at the latest.  Accordingly, the Court declines to grant reconsideration of its decision to exclude the '248 patent.

B.    Whether SRU Is Entitled To Reconsideration Of The Court's Decision That SRU Failed To Establish Invalidity Of The '843 Patent Based On Lack Of Written Description

SRU also requests reconsideration of the Court's decision regarding the invalidity of the '843 patent based on the lack of written description.  SRU contends that one of ordinary skill in the art would know that the evanescent field can actually extend into the sample more than one wavelength.  SRU contends that the testimony of Corning's Dr. Pollock supports its position, and therefore, the Court erred in concluding that the specification teaches that the evanescent wave penetrates less than one wavelength into the sample and that the chemoresponsive layer within the evanescent field must therefore be less than one wavelength thick.

SRU's arguments concerning the written description requirement have already been raised in its previous briefing and considered by the Court.  SRU has not demonstrated that reconsideration of these arguments is warranted.

In a letter requesting oral argument on its request for reconsideration, SRU contends that Corning has changed its position regarding what the '843 patent discloses.  Specifically,

4

SRU contends that Corning has "now admitted that the '843 patent discloses that 'the thickness of the chemo-responsive layer can be more than the evanescent filed.'" (D.I. 312) (citing D.I. 306 at 9). However, it appears to the Court that Corning has always recognized that the '843 patent describes other sensors, such as sensors that work on absorption principles, and that in those types of sensors the thickness of the chemo-responsive layer can be more than the thickness of the evanescent field. D.I. 279 at 25-26; D.I. 275 at PFF 436. However, Corning has also argued that in sensors using adsorption principles, the chemo-responsive layer must be less than the evanescent field, and the Court's discussion of this issue is in the context of an adsorption layer. As such, the Court is not persuaded that it overlooked SRU's arguments or the testimony of Dr. Pollock as it pertains to this issue, and therefore, the Court is not persuaded that reconsideration of the Court's written description decision is warranted.

C.   Whether SRU Is Entitled To Reconsideration In Light Of The Federal Circuit's Decision In IPXL Holdings, L.L.C. Relating To Indefiniteness

SRU also contends that reconsideration is appropriate so that the Court can consider whether the '843 patent is invalid for indefiniteness in light of the Federal Circuit's recent decision in IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377 (Fed. Cir. 2005). In IPXL, the Federal Circuit concluded

5

that an invention is invalid for indefiniteness if it is a
combination of two statutory classes of the invention.  However,
SRU did not raise an indefiniteness defense in response to
Corning's Interrogatories requesting SRU's defenses, in the Joint
Proposed Pretrial Order, at trial or in any of its original post-
trial submissions.  Although SRU contends that the IPXL decision
was reached by the Federal Circuit as a matter of first
impression, the Court notes that this type of indefiniteness
argument was available to SRU well before the trial in this case,
despite the lack of available Federal Circuit precedent on point.
Specifically, the  U.S. Patent & Trademark Office concluded in a
published decision fifteen years ago that a patent claim is
invalid if it is a combination of two statutory classes of
invention.  See Ex parte Lyell, 17 U.S.P.Q.2d 1548, 1552 (Bd.
Pat. App. & Inter. 1990).  Further, the United States District
Court for the Eastern District of Virginia reached the same
conclusion in the IPXL case more than a year ago and before the
trial in this case.  In addition, SRU has not offered any reasons
for its failure to pursue this argument earlier.  Accordingly,
the Court concludes that SRU's argument related to indefiniteness
has been waived, and therefore, it is not the proper subject of a
motion for reargument.  See e.g., Davis v. Mountaire Farms. Inc.,
2005 WL 180054, *1 (D. Del. Jul. 29, 2005) (declining to address
newly raised argument and recognizing that such an argument is

6

"not properly the subject of a motion for reargument").

## CONCLUSION

For the reasons discussed, the Court will deny SRU's Request For Reconsideration Of November 15, 2005 Memorandum Opinion And Order.

An appropriate Order will be entered.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORNING INCORPORATED, et al., :
                              :
        Plaintiffs,           :
                              :
  v.                          :    Civil Action No. 03-633 JJF
                              :
SRU BIOSYSTEMS, et al.,       :
                              :
        Defendants.           :

## O R D E R

At Wilmington, this $\overset{\cup}{2\cup}$ day of January 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that SRU's Request For Reconsideration Of November 15, 2005 Memorandum Opinion And Order (D.I. 299) is DENIED.

_____
UNITED STATES DISTRICT JUDGE

LEXSEE 1993 US APP LEXIS 10321

**CARRIE DOUGLAS and KERRY L. WILLIAMS, Plaintiffs/Appellants, v. RICHARD CLARK, Superintendent, CHARLES ADKINS, Assistant Superintendent, HERBERT NEWKIRK, Assistant Superintendent, et al., Defendants/Appellants.**

No. 92-1533

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1993 U.S. App. LEXIS 10321*

**April 14, 1993, Submitted ***

* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed. R. App. P. 34(a); Cir. R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and the record.

**April 30, 1993, Decided**

**NOTICE:** [*1]   UNPUBLISHED ORDER NOT TO BE CITED PER SEVENTH CIRCUIT RULE 53.

**SUBSEQUENT HISTORY:** *Reported as Table Case at 993 F.2d 1549, 1993 U.S. App. LEXIS 19541.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Indiana, South Bend Div. No. 91 C 579. Allen Sharp, Chief Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant inmates challenged a decision of the United States District Court for the Northern District of Indiana, which dismissed the inmates' *42 U.S.C.S. § 1983* action against defendants, prison superintendent, assistant superintendents, and Commissioner of the Indiana Department of Corrections, for failure to state a claim under Fed. R. Civ. P. 12(b)(6), denied their motion for leave to amend, and denied their motion for class certification.

**OVERVIEW:** The inmates claimed that numerous policies and practices of the prison in which they were incarcerated violated the constitutional rights of the 1,600 prisoners residing therein. The trial court denied the in-

mates' motion to certify the prisoners as a class and dismissed both the original complaint and the amended complaint under Fed. R. Civ. P. 12(b)(6). On appeal, the court affirmed. The court held that the trial court did not abuse its discretion in denying class certification because the inmates lacked the competence to represent the interests of their fellow prisoners. The court held that the inmates lacked standing to file the original complaint because they failed to allege that they suffered any direct, personal injury from defendants' alleged unconstitutional practices. The court held that the amended complaint was properly dismissed for failure to state a § 1983 claim because the inmates did not allege that the additional named defendants personally engaged in any wrongful conduct. The court also held that the inmates' due process claim failed because they did not allege that they suffered the "distinct and palpable injury" required by U.S. Const. art. III, § 2.

**OUTCOME:** The court affirmed the trial court's orders refusing to certify case as a class action and dismissing both the original complaint and the amended complaint for failure to state a claim upon which relief could have been granted.

**CORE TERMS:** prison, inmates, proffered, correctly, certify, law library, stamps, failed to state, superinten-

1993 U.S. App. LEXIS 10321, *

dent, deprived, motion to dismiss, destroyed, survive, appropriately, personally, prisoners', outcount, constitutional right, medical treatment, class action, pro se, participated, sixty-four, competence, purported, grievances, informing, religion, supervisor, notified

## LexisNexis(R) Headnotes

Civil Procedure > Class Actions > Certification
Civil Procedure > Class Actions > Prerequisites > Adequacy of Representation
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
[HN1] The appellate court will not reverse a district court's refusal to certify a class unless the district court abused its discretion. Pursuant to Fed. R. Civ. P. 23(a)(4), the district court may certify a class only if it first determines that the representative parties will fairly and adequately protect the interests of the class. The ability to protect the interests of a class depends in part on the quality of counsel.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Parties > Self-Representation > Pleading Standards
Civil Procedure > Appeals > Standards of Review > De Novo Review
[HN2] An appellate court must consider whether the complaint's well-pleaded allegations, together with all reasonable inferences that may be drawn from those allegations, state a claim against any of the defendants. If it appears beyond doubt that the plaintiffs can prove any set of facts consistent with the allegations in the complaint that would entitle them to relief, the court will find that dismissal was inappropriate. Review of this question is de novo.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss
Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court
[HN3] A district court may deny leave to amend if the proposed amendment fails to cure the deficiencies in the original pleading or could not survive a motion to dismiss.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies
Torts > Negligence > Causation > General Overview
[HN4] A defendant can be held liable under 42 U.S.C.S. § 1983 only if he personally caused or participated in the constitutional deprivation; a "causal connection, or affirmative link" between the conduct and the defendant must exist.

Civil Rights Law > Prisoner Rights > Access to Courts
Constitutional Law > Substantive Due Process > Scope of Protection
Criminal Law & Procedure > Postconviction Proceedings > Imprisonment
[HN5] Inmates have a fundamental constitutional right of access to the courts that requires prison authorities to assist inmates in the preparation and filing of legal papers by providing them with adequate law libraries or adequate assistance of persons trained in the law. The constitutionally relevant benchmark is meaningful, not total or unlimited, access to the courts. Prison officials can satisfy the Constitution by providing law libraries or other forms of legal assistance. Lack of direct access to the law library for a limited period of time does not render a prison's legal-access program per se unconstitutional; rather, a prison may limit inmates' access to the main law library for security reasons as long as a system is in place by which inmates can obtain relevant materials.

Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview
[HN6] A "distinct and palpable injury" is a predicate requirement of U.S. Const. art. III, § 2.

JUDGES: Before Hon. Walter J. Cummings, Circuit Judge, Hon. Richard D. Cudady, Circuit Judge, Hon. Daniel A. Manion, Circuit Judge

OPINION:

    ORDER

    Carrie Douglas and Kerry L. Williams, two inmates at the Indiana State Prison in Michigan City, Indiana, appeal the district court's dismissal of their § 1983 suit for failing to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), and denial of their motion for leave to amend the complaint. We affirm.

    The original complaint in this case consisted of a laundry list of sixty-four complaints about the conditions at, and the administration of, the Indiana State Prison and purported to allege violations of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Con-

stitution. The complaint named as plaintiff the "Lifers United for Penal Progress," a prisoners' club of which Williams was president and Douglas was vice-president, and named as defendants the superintendent of the prison, two assistant superintendents of the [*2] prison, and the commissioner of the Indiana Department of Corrections. Williams and Douglas subsequently moved for certification of a class consisting of the 1600 inmates at the prison. Fed. R. Civ. P. 23. In a single order the court denied the motion to certify the class and dismissed the complaint without prejudice, for failure to state a claim upon which relief could be granted. Nevertheless, the court granted the plaintiffs additional time in which to file an amended complaint. Fed. R. Civ. P. 15(a).

Williams and Douglas contend that the district court erred in refusing to certify the class. We disagree. [HN1] We will not reverse a district court's refusal to certify a class unless the court abused its discretion. Marcial v. Coronet Ins. Co., 880 F.2d 954, 957 (7th Cir. 1989); First Interstate Bank, N.A. v. Chapman & Cutler, 837 F.2d 775, 781 (7th Cir. 1988). Pursuant to Federal Rule of Civil Procedure 23(a)(4), the district court may certify a class only if it first determines that "the representative parties will fairly and adequately protect the interests of the class." The court determined that because Williams and Douglas [*3] were laymen who were proceeding pro se, they lacked the competence to represent the interests of their fellow inmates. See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975). We agree with this assessment. Clearly the ability to protect the interests of a class depends in part on the quality of counsel. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed, 113 S. Ct. 1070 (1993); Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986) (en banc); Gonzales v. Cassidy, 474 F.2d 67, 72 (5th Cir. 1973). Williams and Douglas were not qualified either to pursue the claims on behalf of the class or to protect the interests of the class. The complaint alleges that numerous policies and practices of the prison violate the constitutional rights of 1600 inmates. Only experienced counsel with significant resources could provide the level of competence necessary to prosecute such a massive suit. We therefore conclude that the district court did not abuse its discretion in refusing [*4] to certify that this case could proceed as a class action.

Williams and Douglas maintain that the district court erred in dismissing the original complaint for failing to state a claim upon which relief could be granted. Because the plaintiffs proceeded pro se, we construe their complaint liberally. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). [HN2] We must consider whether the complaint's well-pleaded allegations, together with all reasonable inferences that may be drawn from those

allegations, state a claim against any of the defendants. Johnson v. Martin, 943 F.2d 15, 16 (7th Cir. 1991); Pearson v. Gatto, 933 F.2d 521, 527 (7th Cir. 1991). If it appears beyond doubt that the plaintiffs can prove any set of facts consistent with the allegations in the complaint that would entitle them to relief, we will find that dismissal was inappropriate. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). Our review of this question is de novo. Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir. 1990).

We have little difficulty in [*5] concluding that the district court appropriately dismissed the original complaint. The complaint consists of general grievances about the conditions and policies of the prison. Each of the sixty-four separate allegations states that the defendants are engaging in purportedly unconstitutional practices against the general prison population. Williams and Douglas allege, for example, that prisoners are denied medical treatment; and that Muslim prisoners are denied the ability to practice their religion. Nevertheless, Williams and Douglas do not state that they themselves have been denied medical treatment or that they themselves are Muslims who have been prevented from practicing their religion. Indeed, nowhere in the complaint is an allegation that either plaintiff suffered any direct, personal injury, which is a prerequisite to invoking the power of the federal courts. See Allen v. Wright, 468 U.S. 737, 751 (1984). The generalized grievances raised in their complaint, even if true, are insufficient to provide Williams and Douglas with the necessary standing to bring this suit in federal court. Id. at 754-55. Therefore, the [*6] district court appropriately dismissed the complaint.

As noted above, the district court dismissed the original complaint without prejudice and allowed Williams and Douglas time to file an amended complaint. They subsequently filed a motion to amend their complaint together with a proffered amended complaint. The district court denied leave to amend, concluding that the proffered amended complaint could not survive a second motion to dismiss.

[HN3] A district court may deny leave to amend if the proposed amendment fails to cure the deficiencies in the original pleading or could not survive a motion to dismiss. Perkins v. Silverstein, 939 F.2d 463, 472 (7th Cir. 1991). The district court in this case correctly concluded that the proffered amended complaint, like the original complaint, failed to state a claim upon which relief could be granted. The amended complaint names as defendants, in addition to others, James Aikens, the commissioner for the Indiana Department of Corrections; Charles Adkins, the superintendent of the Indiana State Prison; Herbert Newkirk, an assistant superintendent of the prison; and "R. Keith," a "policy maker" at the

1993 U.S. App. LEXIS 10321, *

prison. The amended [*7] complaint does not allege that any of these defendants personally engaged in any wrongful conduct. [HN4] A defendant can be held liable under § 1983 only if he personally caused or participated in the constitutional deprivation; a "causal connection, or affirmative link" between the conduct and the defendant must exist. *Rizzo v. Goode, 423 U.S. 362, 371 (1976)*. The amended complaint fails to allege that any of the above-named defendants personally caused or participated in the purported constitutional violations. Thus the district court correctly concluded that the complaint failed to state a claim against these defendants and appropriately denied leave to amend.

The claims against the three remaining defendants fare no better. The proffered amended complaint alleges that Barry Northine, an administrative assistant at the prison, and "D. Monroe," the supervisor of the prison's law library, canceled Williams' and Douglas' "outcount" time (permission to be out of their cells at "count" time so that they could do legal work in the writ room) on October 16, 1991; and that "W. Hartley," a supervisor of the classification department at the prison, notified Williams [*8] that on October 2, 1991, his postage stamps would be destroyed in sixty days and notified Douglas on September 23, 1991, that his stamps would be destroyed on October 2, 1991. The district court correctly concluded that the proffered amended complaint would not survive a motion to dismiss as to these claims.

Williams and Douglas allege that Monroe and Northine deprived them of their constitutional right of access to the courts by canceling their "outcount" time. [HN5] Inmates have a fundamental constitutional right of access to the courts that requires prison authorities to assist inmates in the preparation and filing of legal papers by providing them with adequate law libraries or adequate assistance of persons trained in the law. *Bounds v. Smith, 430 U.S. 817 (1977)*. Williams and Douglas allege that because they were unable to go to the law library during "count" time, they were denied their constitutional right of access to the courts. We disagree. The constitutionally relevant benchmark is meaningful, not total or unlimited, access to the courts. *Id. at 823*. Prison officials can satisfy the Constitution by providing law libraries [*9] or other forms of legal assistance. Id. Therefore, lack of direct access to the law library for a limited period of time does not render a prison's legal-access program per se unconstitutional; rather, a prison may limit inmates' access to the main law library for security reasons as long as a system is in place by which inmates can obtain relevant materials. *Caldwell v. Miller, 790 F.2d 589, 606 (7th Cir. 1986)*.

Williams and Douglas do not allege that they were denied meaningful access to the courts when Monroe and Northine canceled their "outcount" privileges. Instead, they allege that they were deprived of unrestricted access to the law library during "count" times. This clearly falls short of alleging a constitutional violation and therefore the district court correctly concluded that the suggested complaint failed to state a claim against Monroe and Northine.

Finally, Williams and Douglas allege in the proffered amended complaint that "W. Hartley" violated their rights under the Due Process Clause of the Fourth Amendment by informing them that their stamps would be destroyed at some point in the future. This allegation fails to make out [*10] a "case or controversy" within the meaning of Article III, Section 2 of the Constitution. *Warth v. Seldin, 422 U.S. 490, 499 (1975)*. The only act that Williams and Douglas allege that Hartley engaged in is informing them that their stamps would be destroyed by some unnamed person at some unspecified time in the future. Neither Williams nor Douglas was deprived of his stamps or was in imminent danger of being deprived of them and, as such, neither suffered [HN6] a "distinct and palpable injury" that is a predicate requirement of Article III. *Id. at 501*. Thus the district court correctly concluded that the proposed complaint failed to allege a claim against Hartley.

The district court properly refused to certify that this case proceed as a class action and correctly concluded that the original complaint failed to state a claim upon which relief could be granted. The court also properly denied leave to amend the complaint, for the proffered amended complaint could not survive a motion to dismiss. The district court's judgment therefore is AFFIRMED.

LEXSEE 2006 US APP LEXIS 24898

**JAMES E. FOSTER, Appellant v. JLG INDUSTRIES, INC.; MR. CLIFFORD B. GEIGER; MR. DUANE SOUDERS, Manager, JLG; EUGENE SWOPE, Manager, JLG; SAMUEL SWOPE, V.P. Human Resources, JLG; JEANNE WAKEFIELD, Human Resources, JLG; KOLLMAN & SAUCIER; FRANK KOLLMAN; PETER SAUCIER**

**NO. 06-1537**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*199 Fed. Appx. 90; 2006 U.S. App. LEXIS 24898*

**September 22, 2006, Submitted Under Third Circuit LAR 34.1(a)**
**October 4, 2006, Filed**

**NOTICE:** [*1] RULES OF THE THIRD COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the Middle District of Pennsylvania. (D.C. Civ. No. 03-cv-2088). District Judge: Honorable Sylvia H. Rambo.

*Foster v. JLG Indus., 372 F. Supp. 2d 792, 2005 U.S. Dist. LEXIS 14873 (M.D. Pa., 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee appealed orders of the United States District Court for the Middle District of Pennsylvania awarding judgment to defendants, the former employer, four employees, the law firm representing the company, and three attorneys in the firm, in his action alleging civil rights violations under *42 U.S.C.S. §§ 1983, 2000e-3*, civil conspiracy under *42 U.S.C.S. § 1985*, retaliation under *29 U.S.C.S. § 623(d)*, and state tort claims.

**OVERVIEW:** The court held that the district court properly dismissed the employee's *42 U.S.C.S. §§ 1983* and *1985* claims, without leave to refile, because amendment of the claims would have been futile. The employee sued entirely private actors and named no state actors as defendants such that a *42 U.S.C.S. § 1983* claim might lie. He also alleged no cognizable federal violation that could form the basis of civil conspiracy under *42 U.S.C.S. § 1985*. The district court also properly dismissed the employee's Title VII of the Civil Rights Act of 1964 claim alleging retaliation for his filing an Age Discrimination in Employment Act claim, reporting leakage of hazardous waste, and reporting sexual harassment of other coworkers to his employer. However, neither of the first two claims fell within the purview of Title VII, *42 U.S.C.S. § 2000e-2*, which prohibited discrimination based upon race, color, religion, sex, or national origin. Further, the employee's claim based on the sexual harassment complaints was unexhausted as his two complaints filed with the Pennsylvania Human Relations Commission did not allege that he was terminated because he reported sexual harassment of other coworkers.

**OUTCOME:** The court affirmed the district court's judgment.

**CORE TERMS:** retaliation, terminated, intentional infliction of emotional distress, correctly, sexual harassment, subpoenas, age discrimination, pretrial conference, protected activity, extension of time, adverse action, witness list, defamation, deposition, reporting, defamation claim, retaliated, co-worker, granting summary judgment, age discrimination claim, abuse of discretion, reasonable belief, civil conspiracy, hazardous waste, quasi-judicial, claimant, manage, appellate brief, damaging, forgery

**LexisNexis(R) Headnotes**

199 Fed. Appx. 90; 2006 U.S. App. LEXIS 24898, *

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN1] Under *Fed. Rule of Civ. P. 15(a)*, litigants should be granted leave to amend "when justice so requires." However, there are reasons to curtail or deny a request for leave to amend, including where there is repeated failure to cure deficiencies by amendments previously allowed and there would be "futility of amendment."

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Absolute Privileges*
[HN2] Pennsylvania Human Relations Commission proceedings are quasi-judicial, and statements made in the normal course of those proceedings are absolutely privileged.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
[HN3] Title VII of the Civil Rights Act of 1964 prohibits discrimination based upon race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2.*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges*
[HN4] A Title VII of the Civil Rights Act of 1964 claimant must exhaust administrative remedies prior to seeking relief in federal court. A complaint does not state a claim upon which relief may be granted unless it asserts the satisfaction of the precondition to the suit specified by Title VII: prior submission of the claim to the Equal Employment Opportunity Commission or conciliation or resolution.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN5] To demonstrate a prima facie case of retaliation under the McDonnell Douglas framework, an employee must allege: (1) that he engaged in a protected activity; (2) that he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action.

*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*
[HN6] In the absence of direct evidence of retaliation, retaliation claims under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act ordinarily proceed under the McDonnell Douglas framework.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
[HN7] An employee's own words under oath completely preclude him from establishing the third of the three prongs necessary to prevail in a retaliation case.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
[HN8] An employee need not prove the merits of the underlying discrimination complaint but only that he was acting under a good faith, reasonable belief that a violation existed.

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN9] The court of appeals applies an abuse of discretion standard when reviewing orders regarding the scope and conduct of discovery.

*Civil Procedure > Pretrial Matters > Conferences > Case Management*
[HN10] The district court has discretion to manage its caseload, and within those duties, *Fed. R. Civ. P. 16(c)* notes that at any pretrial conference, the court may consider and take appropriate action with respect to the avoidance of unnecessary proof and cumulative evidence, and limitations or restrictions on the use of testimony under *Fed. R. Evid. 702* and the identification of witnesses and documents. *Fed. R. Civ. P. 16(c)(4)* and (7).

*Civil Procedure > Pretrial Matters > Conferences > Case Management*
[HN11] Ordering a litigant to provide a witness list prior to a pretrial conference is not an abuse of discretion. It is entirely in accordance with the federal rules and is often a necessary requirement in order for district courts to manage cases effectively.

**COUNSEL:** JAMES E. FOSTER, Appellant, Pro se, Harrisonville, PA.

199 Fed. Appx. 90; 2006 U.S. App. LEXIS 24898, *

For JLG IND INC, CLIFFORD B. GEIGER, DUANE SOUDERS, EUGENE SWOPE, Manager, JLG, SAMUEL SWOPE, V.P. Human Resources, JLG, JEANNE WAKEFIELD, Human Resources, JLG, KOLLMAN & SAUCIER, FRANK KOLLMAN, PETER SAUCIER, Appellees: Thomas B. Sponaugle, Griffith, Strickler, Lerman, Solymos & Calkins, York, PA; Clifford B. Geiger, Kollman & Saucier, Baltimore, MD.

CLIFFORD B. GEIGER, Appellee, Pro se, Kollman & Saucier, Baltimore, MD.

**JUDGES:** Before: FISHER, ALDISERT AND WEIS, CIRCUIT JUDGES.

**OPINION:** PER CURIAM

James E. Foster appeals the orders of the United States District Court for the Middle District of Pennsylvania awarding judgment to the defendants in his lawsuit. In February 2005, Foster filed a third amended complaint against JLG Industries, Inc., four of its employees, the law firm representing [*2] JLG, and three of the law firm's attorneys. n1 Foster alleged civil rights violations under *42 U.S.C. §§ 1983* and *2000e-3*, civil conspiracy in violation of *42 U.S.C. § 1985*, retaliation in violation of *29 U.S.C. § 623(d)*, and state tort law claims including defamation, fraud, and intentional infliction of emotional distress. n2 He maintains that the district court erred in dismissing all claims except one (the Age Discrimination in Employment Act ("ADEA") (*29 U.S.C. § 623(d)*) claim against JLG), and erred by later granting summary judgment to JLG on the ADEA claim. He further contends that the district court abused its discretion when it denied his motion for extension of time to compel depositions and a request for extension of time to turn over his witness list prior to a pre-trial conference. Finding no error with the district court's actions, we will affirm.

[*3]

n1 Foster filed his initial complaint in November 2003. When he sought to amend it, the district court provided Foster with several opportunities to file an amended complaint that would comport with federal and local rules and the district court's orders.

n2 In his appellate brief, Foster claims that he wants the law for "forgery" to be applied to his case, however, Foster did not assert a forgery claim in his third amended complaint and we

need not consider what, if any, applicability such law would have to his case.

I. Dismissal of claims on June 6, 2005

After the defendants moved to dismiss all claims, the district court dismissed Foster's claims under *§ 1983*, *§ 1985* and Title VII, and his claims for fraud, intentional infliction of emotional distress and defamation. We agree with the district court's assessment and dismissal of these claims.

Prior to Foster's filing a third amended complaint, the district court issued an order on December 21, 2004, specifically identifying certain claims that it would permit Foster to file in a third amended complaint. The court had previously rejected Foster's *§§ 1983* and *1985* claims, and so it did not permit Foster to re-file these claims. To permit amendment of these claims would have been futile, first, because Foster sued entirely private actors' he named no state actors as defendants such that [*4] a *§ 1983* claim might lie. Also, Foster alleged no cognizable federal violation that could form the basis of civil conspiracy under *§ 1985*. The district court correctly dismissed these claims in its June 6, 2005 order.

In addition, the district court's December 2004 order did not grant Foster leave to file claims for fraud or intentional infliction of emotional distress. Foster's third amended complaint containing these claims was, therefore, appropriately restricted by the district court. [HN1] Under *Fed. Rule of Civ. P. 15(a)*, litigants should be granted leave to amend "when justice so requires." However, there are reasons to curtail or deny a request for leave to amend, including where, such as here, there is "repeated failure to cure deficiencies by amendments previously allowed" and there would be "futility of amendment." *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. The district court had provided Foster with ample opportunities to amend in the year and a half that Foster's action had been pending; the third amended complaint was Foster's fourth attempt at an amended complaint. The court also wisely determined [*5] that these latest amendments also would have caused undue delay and "undue prejudice to the opposing party by virtue of allowance of the amendment." Id. n3

n3 We also agree with the district court that Foster failed to state a claim on either the fraud or intentional infliction of emotional distress claims. As noted in the district court's memorandum opinion, this Court has opined how "extremely rare" it is "to find conduct in the employment context that will rise to the level of outrageousness necessary" for a claim of intentional infliction of emotional distress. *Cox v. Keystone Car-*

199 Fed. Appx. 90; 2006 U.S. App. LEXIS 24898, *

bon, 861 F.2d 390, 395 (3d Cir. 1988). Additionally, Foster's fraud claim fell short of the specificity required for allegations of fraud. See Fed. R. Civ. P. 9(b).

As for his defamation claim, Foster asserted that the defendants (several or all of them) defamed him when they opposed his claim for unemployment benefits by representing that he had sexually harassed [*6] a female co-worker. Foster was initially denied benefits, but the Pennsylvania Unemployment Compensation Board of Review ("PUCBR") reversed that decision on appeal because the sexual harassment allegations were based upon hearsay. Foster need not have proved his defamation claim in the pleadings stage, but his allegations in the complaint on this charge could hardly be deemed enough to overcome a motion to dismiss: in the defamation count, Foster merely states that "he is an Identifiable Victim" and that "[t]his determination is supported by the Pennsylvania Unemployment Compensation Board of Review - Referee's Decision." But these statements alone do not assert a viable defamation claim against the numerous defendants named in this action, even affording the complaint wide latitude. n4

> n4 Alternatively, the statements made to the PUBCR (or to the Pennsylvania Human Relations Commission ("PHRC"), as suggested in Foster's brief on appeal) would likely be considered privileged by Pennsylvania courts because proceedings before these bodies are quasi-judicial in character. See Milliner v. Enck, 709 A.2d 417, 419 n.1 (Pa. Super. Ct. 1998); see also Giusto v. Ashland Chemical Co., 994 F. Supp. 587, 593-94 (E.D. Pa. 1998) (holding that [HN2] PHRC proceedings are quasi-judicial and statements made in the normal course of those proceedings are absolutely privileged).

[*7]

The district court also dismissed Foster's Title VII claim. Foster maintained that the defendants violated Title VII by retaliating against him for filing an ADEA claim, reporting leakage of hazardous waste, and reporting sexual harassment of other co-workers to his employer in late 1995. Neither of the first two claims falls within the purview of [HN3] Title VII, which prohibits discrimination based upon race, color, religion, sex or national origin. See 42 U.S.C. § 2000e-2. n5

> n5 We address below Foster's claim that he was retaliated against under the ADEA. Foster

did not raise any issue regarding retaliation for reporting hazardous waste in his brief on appeal.

More to the point, the district court correctly noted that Foster's claim based on the sexual harassment complaints was unexhausted. Foster's two complaints filed with the PHRC (one in 1997 and another in 2001) do not allege that he was terminated because he reported sexual harassment of other co-workers. Rather, they allege, [*8] respectively, that JLG terminated Foster because of his age, and that defendants later retaliated against him for filing the first Pennsylvania Human Relations Act ("PHRA") complaint by giving negative employment references. [HN4] A Title VII claimant must exhaust administrative remedies prior to seeking relief in federal court. "A complaint does not state a claim upon which relief may be granted unless it asserts the satisfaction of the precondition to the suit specified by Title VII: prior submission of the claim to the EEOC or conciliation or resolution." Robinson v. Dalton, 107 F.3d 1018, 1022 (3d Cir. 1997) (internal quotations omitted). Foster did not demonstrate that he exhausted this claim with the EEOC.

II. Grant of Summary Judgment to JLG on ADEA Retaliation Claim on January 30, 2006 n6

> n6 In an order entered on June 16, 2005, the district court clarified that the only remaining defendant after the June 6 dismissal order was JLG. The court's December 21, 2004 order had limited Foster to filing an ADEA claim against JLG only, since the additional defendants were not individually liable under the ADEA. See Violanti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1257 (M.D. Pa. 1994).

[*9]

Foster alleged that, after he filed an age discrimination claim with the PHRC, JLG retaliated against him by failing to provide positive employment references for him. n7 The district court correctly disposed of this claim because Foster failed to demonstrate [HN5] a prima facie case of retaliation under the McDonnell Douglas framework, namely: (1) that he engaged in a protected activity; (2) that he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (noting that [HN6] in the absence of direct evidence of retaliation, retaliation claims under the ADEA and the PHRA ordinarily proceed under the McDonnell Douglas framework).

199 Fed. Appx. 90; 2006 U.S. App. LEXIS 24898, *

n7 In his amended complaint, Foster also alleged that he was terminated in retaliation for filing the age discrimination complaint with the PHRC. Considering that Foster was terminated on January 20, 1997, and he filed his complaint in the PHRC on January 24, 1997, the district court correctly dismissed this part of Foster's ADEA claim on June 6, 2005, because "it would have been impossible for Defendants to retaliate against an action that had not already occurred." District Court 6/6/05 Op., at 17.

[*10]

Foster made a series of damaging admissions with respect to this claim, as highlighted by the district court in its January 30, 2006, opinion. See District Court 1/30/06 Opinion, at 6-7. Specifically, Foster admitted at his deposition that he believed that JLG had terminated him because of personal vendettas against him, none of which involved age. Foster further stated that the theory he had been terminated for age was the view of his former attorney, and that he did not share that view. He also admitted to a JLG Vice President that age discrimination "had nothing to do" with his filing of the PHRA complaint, but that he needed to file something because he did not have insurance.

Like another case decided by this Court in which the retaliation claimant made damaging admissions under oath, we find that [HN7] "[h]is own words under oath completely preclude him from establishing the third of the three prongs necessary to prevail in a retaliation case." *Glanzman v. Metro. Management Corp., 391 F.3d 506, 511 (3d Cir. 2004)*. Stated otherwise, Foster could not establish causation even if he had produced some evidence of an adverse action, which he did not. Furthermore, [*11] the district court rightly determined that Foster's statements belied that he had a good faith, reasonable belief when he pursued the age discrimination claim with the PHRC. See *Aman v. Cort Furniture Rental Co., 85 F.3d 1074, 1085 (3d Cir. 1996)* ([HN8] "A plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed."). The district court's order granting summary judgment to JLG was well-justified.

III. Denial of Motion for Extension of Time to File a Motion to Compel Depositions

Months after the district court dismissed all claims except for the ADEA claim against JLG, Foster filed a motion for an extension of time to file a motion to compel depositions. The district court denied it on November 18, 2005. Foster had sought to depose two witnesses (who refused to appear unless compelled to by valid subpoenas) but failed to personally serve the subpoenas, properly sign them, and to include the required witness fee and mileage.

We discern no abuse of discretion with respect to the denial of Foster's discovery motion. *Petrucelli v. Bohringer and Ratzinger, 46 F.3d 1298, 1310 (3d Cir. 1995)* [*12] ([HN9] applying abuse of discretion standard "when reviewing orders regarding the scope and conduct of discovery"). Contrary to Foster's assertions, the required criteria for subpoenas were not "mere technicalities" used to deny Foster the extension; in addition to the fact that the subpoenas were invalid, Foster apparently sought to compel information that was irrelevant to the sole remaining claim in the case, the ADEA claim. We would also point out that Foster's case had been pending since November 2003, and the case had been ongoing for approximately two years. The district court's denial of the motion was entirely reasonable.

Finally, in his appellate brief, Foster states that the district court required him to submit a witness list prior to a pretrial conference. He does not identify any specific order related to this contention, nor does he elaborate further on this claim. We would simply note that [HN10] the district court has discretion to manage its caseload, and, within those duties, *Federal Rule of Civil Procedure 16(c)* notes that at any pretrial conference, the court may consider and take appropriate action with respect to "the avoidance of [*13] unnecessary proof and cumulative evidence, and limitations or restrictions on the use of testimony under *Rule 702 of the Federal Rules of Evidence*," and "the identification of witnesses and documents." Id. at (4) and (7). [HN11] Ordering a litigant to provide a witness list prior to a pretrial conference is *not* an abuse of discretion. It is entirely in accordance with the federal rules and is often a necessary requirement in order for district courts to manage cases effectively.

LEXSEE 2004 US DIST LEXIS 19966


SICOM SYSTEMS LTD., Plaintiff, v. AGILENT TECHNOLOGIES, INC.,
TEKTRONIX, INC., and LECROY CORPORATION, Defendant.

Civil Action No. 03-1171-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 19966*

**October 5, 2004, Decided**

**SUBSEQUENT HISTORY:** Subsequent appeal at, Judgment entered by *Sicom Sys. v. Agilent Techs., Inc., 2005 U.S. App. LEXIS 22371 (Fed. Cir., Oct. 18, 2005)*

**PRIOR HISTORY:** *Sicom Sys. v. Agilent Techs., Inc., 2003 U.S. Dist. LEXIS 21339 (D. Del., Nov. 20, 2003)*

**DISPOSITION:** [*1] Defendants' Motion To Dismiss was granted and action was dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporations filed a motion to dismiss plaintiff licensee's action for alleged patent infringement.

**OVERVIEW:** After the licensee's first infringement action was dismissed for lack of standing, the licensee and the patentee amended an agreement to grant the licensee the exclusive right to initiate commercial infringement actions. The court concluded that the licensee did not possess the substantial rights necessary to be an effective patentee for purposes of granting it standing to sue for infringement. The patentee retained the right to sue for any infringement, which was not commercial. The amendment did not expressly grant the licensee the right to sue for past infringement, and the amendment was only effective as of the date it was signed. The licensee's right to sue was limited in that it had to notify the patentee before bringing suit, it had to consult with the patentee to jointly determine the steps to be taken in the event of litigation, and it could not make any admission of liability, nor offer or conclude settlement without the prior written consent of the patentee. Because the licensee's ability to assign the patent was restricted, the licensee's interest in the patent was limited to that of a licen-

see, and therefore, it did not have standing to bring an infringement lawsuit.

**OUTCOME:** The court granted the corporations' motion to dismiss.

**CORE TERMS:** infringement, licensee, patent, exclusive right, assign, patentee, standing to bring, effective, assignee, lawsuit, exclusive license, legal title, license, non-commercial, transform, bare, reasons discussed

**LexisNexis(R) Headnotes**


*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN1] Standing to sue is a threshold requirement in every federal action.


*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN2] Standing must be present at the time the suit is brought.


*Civil Procedure > Justiciability > Standing > General Overview*
[HN3] The party bringing the action bears the burden of establishing that it has standing.

2004 U.S. Dist. LEXIS 19966, *

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Ownership > Conveyances > Licenses*
[HN4] Under *35 U.S.C.S. § 100*, the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > Assignments*
[HN5] A licensee does not have standing to sue without the joinder of the patentee, unless the patentee makes an assignment of all substantial rights under the patent such that the assignee may be deemed the effective patentee under *35 U.S.C.S. § 281*, and thus may have standing to maintain an infringement suit in its own name.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > General Overview*
[HN6] An exclusive license may be treated like an assignment for purposes of creating standing, if it conveys to the licensee all substantial rights.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > General Overview*
[HN7] To determine if an exclusive license is sufficient to grant standing to the licensee, the court must ascertain the intention of the parties and examine the substance of what the licensing agreement granted.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > General Overview*
[HN8] A "right to sue" provision within a license cannot, of its own force, confer standing on a bare licensee.

*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Ownership > Conveyances > Licenses*
*Patent Law > Ownership > Patents as Property*
[HN9] Just as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment. Limits on the right to assignment weigh against a finding that the licensor transferred to the licensee all substantial rights in the patent.

**COUNSEL:** Steven T. Margolin, Esquire and Tiffany Geyer Lydon, Esquire of ASHBY & GEDDES, Wilmington, Delaware.

Of Counsel: Edward W. Goldstein, Esquire and Corby R. Vowell, Esquire of GOLDSTEIN & FAUCETT, L.L.P., Houston, Texas. Attorneys for Plaintiff Sicom Systems Ltd.

Josy W. Ingersoll, Esquire, and Adam W. Poff, Esquire of YOUNG, CONAWAY, STARGATT, & TAYLOR, LLP, Wilmington Delaware.

Of Counsel: James Galbraith, Esquire, Thomas F. Meagher, Esquire, and John C. Vetter, Esquire of KENYON & KENYON, New York, New York.

Philip J. McCabe, Esquire, and Susan A. Smith, Esquire of KENYON & KENYON, San Jose, California. Attorneys for Defendant Agilent Technologies, Inc.

N. Richard Powers, Esquire of CONNOLLY, BOVE, LODGE & HUTZ LLP, Wilmington, Delaware.

Of Counsel: John M. Romary, Esquire, and Michael R. Kelly, Esquire of FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, District of Columbia. Attorneys for Defendant Tektronix, Inc.

John T. Meli, Jr., Esquire, and Kevin M. Baird, Esquire of FISH & RICHARDSON, P.C., Wilmington, Delaware. Attorneys for Defendant LeCroy [*2] Corporation.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Farnan

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge**

Presently before the Court is a Motion To Dismiss (D.I. 15) filed by Defendants Agilent Technologies, Inc., Tektronix, Inc., and LeCroy Corporation (collectively, "Defendants") requesting the Court to dismiss with prejudice the Complaint filed by Sicom Systems Ltd. ("Sicom"). For the reasons discussed, the Court has granted Defendants' Motion and dismissed this action with prejudice.

### BACKGROUND

This action is Sicom's second attempt to sue Defendants for alleged infringement of *U.S. Patent No. 5,333,147* ("'*147 patent*"). The Court dismissed Sicom's first action on the grounds that Sicom lacked standing to sue for infringement as a licensee of the Canadian government ("Canada"). In reaching this decision, the Court concluded that, as a result of the 1998 License Agreement (the "Agreement") between Sicom and Canada, Canada retained substantial rights to the patent to a degree sufficient to preclude Sicom from bringing an infringement action. *Sicom Sys. Ltd. v. Agilent Techs., Inc., 2003 U.S. Dist. LEXIS 21339 (D. Del. 2003).* [*3]

Since the Court's decision, Sicom and Canada amended the Agreement (the "Amendment") to (1) grant Sicom the exclusive right to initiate commercial infringement actions related to the '*147 patent*, and (2) extend the term of the Agreement to coincide with the term of the '*147 patent*. Sicom filed this action shortly after the Amendment was executed.

### DISCUSSION

By their Motion, Defendants contend that the Amendment is insufficient to provide Sicom with the standing necessary to bring an infringement action. Defendants contend that Canada retains legal title to the '*147 patent* and continues to hold important rights with regard to sub-licensing and infringement lawsuits. Because Sicom's rights with respect to the '*147 patent* are limited, Defendants contend that Sicom lacks standing to sue despite the Amendment.

In response, Sicom contends that the Amendment demonstrates that Sicom has been granted all substantial rights in the '*147 patent*, with Canada retaining only legal title and other insignificant rights which do not affect Sicom's exclusive right to sue. Sicom contends that under the Amendment, its right to sue is exclusive and covers actions for past, present and future infringement. [*4] Sicom also contends that Canada is not a necessary party to the litigation, and therefore, Canada need not be joined in this lawsuit to permit Sicom to proceed.

[HN1] Standing to sue is a threshold requirement in every federal action. *Pfizer Inc. v. Elan Pharms. Research Corp., 812 F. Supp. 1352, 1356 (D. Del. 1993).* [HN2] Standing must be present at the time the suit is

brought. See *Procter & Gamble Co. v. Paragon Trade Brands, Inc. 917 F. Supp. 305, 309-10 (D. Del. 1995).* [HN3] The party bringing the action bears the burden of establishing that it has standing. *Pfizer, 812 F. Supp. at 1356.*

[HN4] Under *35 U.S.C. § 100*, "the owner of a patent or the owner's assignee can commence an action for patent infringement, but a licensee alone cannot." *Calgon Corp. v. Nalco Chemical Co. 726 F. Supp. 983, 985 (D. Del. 1989).* Thus, [HN5] a licensee does not have standing to sue without the joinder of the patentee, unless the patentee makes an assignment of all substantial rights under the patent such that "the assignee may be deemed the effective patentee under *35 U.S.C. § 281*, and thus may have standing to [*5] maintain an infringement suit in its own name." *Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000).* [HN6] An exclusive license may be treated like an assignment for purposes of creating standing, if it conveys to the licensee all substantial rights. See *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 875 (Fed. Cir. 1991).* [HN7] To determine if an exclusive license is sufficient to grant standing to the licensee, the court "must ascertain the intention of the parties and examine the substance of what [the licensing agreement] granted." *Prima Tek II, L.L.C., 222 F.3d at 1378.*

After reviewing the Amendment in light of the applicable legal principles, the Court concludes that Sicom does not possess the substantial rights necessary to be an "effective patentee" for purposes of granting Sicom standing to sue for infringement of the '*147 patent*. Under the terms of the Agreement, both Canada and Sicom "shall be at liberty to defend or take any proceedings at its own expense and shall be entitled to retain anything flowing from the proceedings." (Art. 11, Cl. 2). Although the Amendment expands Sicom's right [*6] to sue by granting it "the exclusive right to sue for commercial infringement" of the '*147 patent* in the United States, the Court concludes that this expansion of rights does not grant Sicom the exclusive rights necessary to transform its license into an assignment. See *Textile Prods v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir. 1998)* [HN8] ("A 'right to sue' provision within a license cannot, of its own force, confer standing on a bare licensee."); *Calgon, 726 F. Supp. at 986*. The qualifier of "non-commercial infringement" contained in the Amendment coupled with the provisions of Article 11, cl. 2 of the Agreement, still give Canada the right to sue for any alleged infringement which is not commercial. Thus, Canada may still be able to pursue non-commercial customers of Defendants like governmental entities, the military and universities, thereby creating multiple risk of litigation over the same patent, a result which is inconsistent with a genuine exclusive right to sue. Further, the Amendment does not

expressly grant Sicom the right to sue for past infringement, and the Amendment is only effective as of the date it was signed. *Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574 n.9 (Fed. Cir. 1991).* [*7] In addition, Sicom's right to sue is still limited despite the Amendment, in that Sicom (1) must notify Canada before bringing suit, (2) must consult with Canada for the purpose of jointly determining the steps to be taken in the event of actual or threatened litigation, and (3) may not "make any admission of liability, nor offer or conclude settlement" without the prior written consent of Canada. n1 (Art. 11, cl. 1).

        n1 Sicom urges the Court to consider the letter of Erick K. Fresque on behalf of Canada for purposes of interpreting the Amendment. The Court is not persuaded that this letter is relevant to the rights of Sicom and Canada under the Agreement and the Amendment. The letter is not signed by both parties, and thus, cannot be considered to amend the Agreement. (Art. 17). As such, Canada is not bound by this letter and can repudiate it at any time. Further, the Court finds the import of the Amendment to be clear, and therefore, the Court concludes that extrinsic evidence is not needed to illuminate its terms.

[*8]

In addition to the limitations on Sicom's purported exclusive right to sue, the Court also finds the restriction on Sicom's right to assign to be a fatal reservation of rights by Canada for purposes of attempting to grant Sicom standing to sue. [HN9] "Just as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment." *Calgon, 726 F. Supp. at 988.* Limits on the

right to assignment weigh against a finding that the licensor transferred to the licensee all substantial rights in the patent. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc. 248 F.3d 1333 at 1345.* In this case, the Amendment does not alter the Agreement's provision that Sicom cannot assign the *'147 patent* without the written consent of Canada. (Art. 2, cl. 9). Because Sicom's ability to assign the patent is restricted, Sicom's interest in the patent is limited to that of a licensee, and therefore, Sicom does not have standing to bring an infringement lawsuit. See *Calgon, 726 F. Supp. at 988; Pfizer, Inc. v. Elan Pharmaceutical Research Corp., 812 F. Supp. 1352, 1373.*

In sum, the Court concludes that the Amendment is not sufficient to grant Sicom the [*9] substantial rights necessary to transform Sicom from a bare licensee to an assignee with the requisite standing to bring this action. Legal title to the patent rests with Canada and Sicom has not been granted the exclusive right to sue or the unrestricted right to assign the *'147 patent.* Because Sicom is no more than a licensee under the Agreement and Amendment, it lacks standing to bring this action. Further, Sicom has not contested Defendants' assertion that any dismissal by the Court of this action should be with prejudice, because Sicom has twice attempted and twice failed to establish standing. Accordingly, for these reasons, the Court has granted Defendants' Motion To Dismiss and dismissed this action with prejudice.

## CONCLUSION

For the reasons discussed, the Court has granted Defendants' Motion To Dismiss and dismissed this action with prejudice.

An appropriate Order has been entered.

LEXSEE 1995 US APP LEXIS 23766


RICHARD P. WENTNER, Plaintiff-Appellant, v. RIDGEWOOD ENERGY
CORPORATION; ROBERT SWANSON, HALL-HOUSTON OFFSHORE, HALL-
HOUSTON OIL CO.; DOES 1 - 10, Defendants-Appellee.

No. 94-15345

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*1995 U.S. App. LEXIS 23766*

June 12, 1995, Argued and Submitted, San Francisco, California
August 9, 1995, FILED

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *62 F.3d 1427, 1995 U.S. App. LEXIS 29291.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California (San Francisco). D.C. No. CV-90-02720-DLJ. D. Lowell Jensen, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**


**PROCEDURAL POSTURE:** Plaintiff employee challenged the judgment of the United States District Court for the Northern District of California which held in favor of defendant employer and dismissed employee's securities law claims for failure to state a claim; the complaint failed to plead fraud with the particularity required under *Fed. R. Civ. P. 9(b).* The district court also granted summary judgment in favor of employer as to employee's state law claims.

**OVERVIEW:** Employee worked for employer as a securities wholesaler, marketing investment projects. Employee had a personal investment in one project. Employee alleged that employer made false and misleading projections in its offering materials. The court affirmed the dismissal of employee's securities claims because the claims were grounded in fraud and were subject to the special pleading requirements of *Fed. R. Civ. P. 9(b).* The court held that employee's complaint did not specify why the results of prior programs supported an inference that the current program projections were false when they were made. Employee's complaint did not allege sufficient facts to connect prior investment programs to the current program; therefore, the complaint failed to explain why employer should have known that its projections were false when made. The district court did not abuse its discretion in denying employee's subsequent request for leave to amend because he was instructed that there was an insufficient nexus between the prior programs and the current program, and he failed to cure this deficiency in his third amended complaint. Dismissal of employee's state law claims was also proper.

**OUTCOME:** The court affirmed the dismissal of employee's securities claims, as well as his state law claims.

**CORE TERMS:** projection, securities law, summary judgment, state law, projected, reconsideration, terminated, wholesaler, wrongful termination, particularity, termination, implied-in-fact, contemporaneous, whistle-blower, defamation, discharged, privileged, false and misleading, partnership, intentional infliction of emotional distress, continued employment, misrepresentation, subjective, provably, grounded, deposition testimony, constituting, investors, failure to state a claim, litigation privilege

**LexisNexis(R) Headnotes**

1995 U.S. App. LEXIS 23766, *

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN1] Projection constitutes misrepresentation if plaintiff shows that defendant had no reasonable basis for projection.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] We review the district court's dismissal of a complaint at the pleadings stage de novo.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN3] *Fed. R. Civ. P. 9(b)* provides: In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN4] *Fed. R. Civ. P. 9(b)* requires particularized allegations of the circumstances constituting fraud. To meet this requirement, the plaintiff must do more than plead the time, place, and content of an alleged misrepresentation. The plaintiff must also set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN5] The appellate court reviews a district court's denial of leave to amend for an abuse of discretion.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN6] Where the denial of a motion for reconsideration is an implicit denial of a request for leave to amend, we

review the district court's action for abuse of discretion, mindful of the strong policy in favor of permitting amendment.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Labor & Employment Law > Employment Relationships > General Overview*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN7] We review a district court's grant of summary judgment de novo.

*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN8] To recover in tort for wrongful discharge in violation of public policy, the plaintiff must show that the employer violated a substantial policy that affects society at large and is grounded in a statutory or constitutional provision.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Types of Contracts > General Overview*
[HN9] Oblique language will not, standing alone, be sufficient to establish agreement; instead, totality of the circumstances determines the nature of the contract.

*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*
*Torts > Intentional Torts > Defamation > Procedure*
[HN10] Whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion is a question of law. A subjective opinion will not support a judgment for defamation because it does not imply a provably false factual assertion.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN11] For communications to be absolutely privileged they must be (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.

**JUDGES:** Before: HUG, ALARCON, and TROTT, Circuit Judges.

1995 U.S. App. LEXIS 23766, *

## OPINION:

### MEMORANDUM *

> * This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

Richard P. Wentner appeals from the district court's judgment in favor of defendants Ridgewood Energy Corporation, Robert Swanson, Hall-Houston Offshore, and Hall-Houston Company (collectively "Ridgewood"). The district court dismissed Wentner's securities law claims for failure to state a claim on the ground that the complaint fails to plead fraud with the particularity required under *Rule 9(b) of the Federal Rules of Civil Procedure.* [*2] The district court also granted summary judgment in favor of Ridgewood Energy Corporation and Swanson as to Wentner's state law claims for wrongful termination, breach of employment contract, fraud in employment promises, defamation, intentional infliction of emotional distress, and breach of investment contract.

Wentner contends that the district court erred in dismissing his securities law claims. Wentner asserts that his third amended complaint pleads fraud with sufficient particularity because it alleges that the defendants knowingly made false and misleading projections about an investment program. Wentner further contends that the district court abused its discretion in denying his request for leave to amend his complaint and in denying his motion for reconsideration. Finally, Wentner contends that the district court erred in granting summary judgment in favor of Ridgewood Energy Corporation and Swanson as to Wentner's state law claims.

We affirm the district court's judgment dismissing Wentner's securities law claims because the complaint fails to plead the circumstances constituting fraud as required under Rule 9(b). We also affirm the district court's grant of summary [*3] judgment as to Wentner's state law claims because there is insufficient evidence to create a triable issue of fact regarding these claims.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Ridgewood Energy Corporation employed Wentner as a securities wholesaler from January of 1989 through June of 1990. As a wholesaler, Wentner marketed Ridgewood's investment products to broker-dealers who, in turn, marketed them to potential investors. Beginning in 1986, Ridgewood offered, as investment products, a series of "drilling and completion" programs, designated by names such as "1986-I" and "1986-II." Program investors purchase a limited partnership interest in a series

of "projects" which involve the exploration and drilling of natural gas wells in the Gulf of Mexico. Hall-Houston Oil Company, an independent oil and gas company, operates Ridgewood Energy Corporation's projects. Wentner's personal investment of $ 94,500 in the "1989-II" program forms the basis of his securities law claims.

Wentner began doubting the estimated returns projected for Ridgewood's investment programs in early 1990. As a result, he asked for information concerning the programs' decline curves and reserve studies. [*4] Wentner also informed his supervisors that Minerex, a company hired by Ridgewood to perform reserve studies, had been dishonest with him in the past. In May of 1990, Charles Harmon, Wentner's immediate supervisor, notified Wentner at a dinner meeting that his employment would terminate at the end of June.

On August 17, 1990, Wentner filed an action in state court against Ridgewood Energy Corporation and its president, Robert Swanson, alleging wrongful termination and defamation. The defendants removed the case to the district court on the basis of diversity jurisdiction. Wentner amended his complaint to add the securities law claims and to join Hall-Houston Offshore and Hall-Houston Oil Company as defendants to those claims.

On December 10, 1991, the district court dismissed Wentner's securities law claims for failure to state a claim. The district court granted Wentner's request for leave to amend his complaint. Wentner filed a third amended complaint on January 17, 1992. n1 The district court subsequently dismissed Wentner's securities law claims with prejudice. Discovery proceeded regarding Wentner's state law claims. On July 22, 1993, Wentner moved for reconsideration of the [*5] dismissal of his securities law claims seeking deletion of all "with prejudice" references. The district court denied Wentner's motion for reconsideration.

> n1 Wentner submitted a proposed second amended complaint in response to Ridgewood's motion to dismiss the first amended complaint. In its December 10, 1991 order, the district court granted Wentner's "motion for leave to file his second amended complaint." The court then considered Ridgewood's motion to dismiss the first amended complaint moot, and proceeded to dismiss the claims as stated in the proposed second amended complaint.

On July 22, 1993, Ridgewood moved for summary judgment of Wentner's state law claims. On January 20, 1994, the district court granted partial summary judgment in favor of Ridgewood on all claims except for one aspect of his breach of contract claim. On the same date,

the district court entered a judgment in favor of Wentner on the remaining breach of contract claim pursuant to the parties' stipulation.

## II. DISMISSAL OF SECURITIES [*6] LAW CLAIMS

Wentner's third amended complaint alleges violations of federal and state securities laws. n2 The essence of Wentner's securities claims is that Ridgewood made false and misleading projections in its offering materials for the 1989-II program. See *Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1113 (9th Cir. 1989),* cert. denied, *496 U.S. 943, 110 L. Ed. 2d 676, 110 S. Ct. 3229 (1990)* ([HN1] projection constitutes misrepresentation if plaintiff shows that defendant had no reasonable basis for projection). Specifically, the complaint alleges that the following projections constitute misrepresentations: (1) defendants projected an annual cash flow from the program for 9 to 10 years, with the production decline curve in the 5 to 10% range; (2) defendants projected a payout from the program of 298.25%; (3) defendants projected the reserve potential of the wells to be 165 billion cubic feet; and (4) defendants projected a payout of 2.5 to 3.0% per month on the investment.

> n2 Specifically, the complaint alleges violations of the Securities Exchange Act of 1934 § 10(b), *15 U.S.C. § 78j*(b) (1988), the Securities Act of 1933 § 12(2), *15 U.S.C. 771* (1988), and the *Cal. Corp. Code §§ 25400(d)*, 25401, and 25504.1 (West 1977 & Supp. 1995). The state law claims incorporate by reference the allegations for the federal law claims. Wentner does not contend on appeal that the state claims should be subject to an analysis separate from the federal claims. Accordingly, our reference in this section to Wentner's "securities" claims incorporates the federal and state law securities claims.

[*7]

The district court dismissed Wentner's securities law claims for failure to state a claim, in part on the basis that the pleadings did not comply with *Rule 9(b) of the Federal Rules of Civil Procedure.* n3 [HN2] We review the district court's dismissal of a complaint at the pleadings stage de novo. *Everest & Jennings v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994).* On review, we accept all of Wentner's allegations of material fact as true and construe them in the light most favorable to Wentner to determine whether it is "beyond doubt that [he] can prove no set of facts in support of his . . . claim." Id. (citations omitted).

> n3 The district court considered Wentner's complaint deficient in several respects other than the failure to plead fraud with particularity. However, because we conclude that the complaint does not meet the requirements of Rule 9(b), we need not discuss the other grounds for dismissal relied upon by the district court.

Wentner's securities law claims are premised [*8] on the allegation that "the defendants engaged in a common fraudulent scheme in connection with the offer and sale of limited partnership interests in the 1989-II program." These claims are grounded in fraud and thus are subject to the special pleading requirements of Rule 9(b). n4 *Decker v. Glenfed, Inc. (In re Glenfed, Inc. Sec. Litig.), 42 F.3d 1541, 1545 (9th Cir. 1994)* (en banc).

> n4 [HN3] *Fed. R. Civ. P. 9(b)* provides:
>
> > In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

[HN4]

Rule 9(b) requires particularized allegations of the circumstances constituting fraud. *Glenfed, 42 F.3d at 1545, 1547.* To meet this requirement, the plaintiff must do more than plead the time, place, and content of an alleged misrepresentation. *Id. at 1548.* The plaintiff must also "set forth, as part of the circumstances constituting fraud, an explanation as [*9] to why the disputed statement was untrue or misleading when made." *Id. at 1549.* One way the plaintiff can meet this burden is by indentifying inconsistent contemporaneous statements or information available to the defendants, such as internal reports. Id.

Where the plaintiff relies on inconsistent contemporaneous information, we have considered pleadings in compliance with Rule 9(b) if such information is directly inconsistent with the alleged misrepresentation. See, e.g., *Glenfed, 42 F.3d at 1550* (defendant's statement that it expected no loss on its subsidiaries' sale inconsistent with contemporaneous statements at board meetings and in strategic plan that loss appeared likely); *Greenwald v. Wells Fargo & Co. (In re Wells Fargo Sec. Litig.), 12 F.3d 922, 926-27 (9th Cir. 1993),* cert. denied, *130 L. Ed. 2d 209, 115 S. Ct. 295 (1994)* (plaintiffs' allegations

that defendants failed to disclose the problematic status of specific loans extended to identified borrowers sufficient to demonstrate that defendants fraudulently understated loan loss reserves).

Wentner contends that his complaint complies with Rule 9(b) because it alleges that the 1989-II program [*10] projections were false and misleading when they were made. Wentner relies on his allegations that the defendants possessed internal contemporaneous reports indicating that prior investment programs failed to meet their projections. For example, the complaint states that "Ridgewood and Hall-Houston previously promoted similar partnerships that had not performed as projected by Hall-Houston's geological and economic analyses." n5

n5 In addition, the complaint states:

Defendants Ridgewood and Swanson knew or should have known that the decline curve for its prior similar investments in the Gulf of Mexico had averaged 30-50% per year, and that the results of prior Programs did not support the 9 to 10 year projected cash flow, and therefore that the projections and other material information given to plaintiff in connection with the 1989-II Program were false and misleading and made without reasonable basis.

The financial projections in the Program Summary indicate that the expected return for a $ 70,000 investment is $ 208,775, or a payout of 298.25%. Defendants Ridgewood and Swanson knew or should have known that as of January 1, 1989, 19 other operating partnerships of defendant Ridgewood, operated by Hall-Houston in the Gulf of Mexico, and which were similar to the 1989-II Program, did not support the return projections, and therefore that the projections and other material information given to plaintiff in connection with the 1989-II Program were false and misleading and made without reasonable basis.

Defendant Hall-Houston and defendants Ridgewood and Swanson knew or should have known that the prior similar partnerships had produced on average 3.5 to 9.5 BCF per prospect and did not support the estimated reserves[.]

[*11]

In dismissing Wentner's securities law claims, the district court concluded that the complaint did not "specify the failure of the other programs to meet projected returns should have alerted defendants that the 1989-II Program could not meet its projected returns." The district court further stated that Wentner had not "pleaded a sufficient connection between [the prior program] wells and the 1989-II wells." After carefully considering the allegations contained in Wentner's third amended complaint, we affirm the district court's dismissal of Wentner's securities law claims for failure to comply with the pleading requirements of Rule 9(b).

Wentner's complaint does not specify why the results from prior programs support an inference that the 1989-II program projections were false when they were made. We are unpersuaded by Wentner's contention that Ridgewood's reference to previous investment programs as "substantially similar" to the 1989-II program, in offering and related materials, supports such an inference.

The investment programs at issue consist of a group of investors who purchase an interest in the extraction of natural gas from wells in the Gulf of Mexico. The [*12] 1989-II Program Summary states that the partnership "will invest in a minimum of five separate Gulf of Mexico multi-well projects, with a total of approximately 10 to 15 wells. Project operations will include: the construction of production platforms and pipelines for successful wells[;] the completion of successful wells[;] [and] the drilling of developmental and exploratory wells." The accuracy of projections for such investment programs will depend upon the characteristics of the designated multi-well projects. Wentner's complaint is deficient because it fails to allege a similarity between the nature of the wells in the prior programs and the wells designated for the 1989-II program. Moreover, there is no indication in the complaint that the geographic location of the wells and the area of exploration identified for the 1989-II program is similar to the location of prior programs, aside from the fact that all of the wells are in the Gulf of Mexico.

We recognize that in identifying the above deficiencies we are placing a burden on Wentner to set forth evi-

dentiary facts in his complaint not normally required at the pleadings stage. However, this burden stems from Rule 9(b), [*13] which requires particularity as to the circumstances of the alleged fraud. We are not free to ignore the added pleading requirements of this rule where the claims at issue are grounded in fraud. *Glenfed, 42 F.3d at 1547-48 n.7.*

The speculative nature of Ridgewood's investment programs is suggested by the statement in the 1989-II Program Summary that 12% of the wells drilled during previous programs were "dry." In hindsight, Ridgewood's 1989-II projections were inaccurate because they forecasted a greater return than investors would actually receive. However, given the speculative nature of the investment and the lack of inconsistent contemporaneous information regarding the 1989-II program, we find no allegation in the complaint to support an inference that the defendants engaged in fraud.

In sum, Wentner's complaint does not allege sufficient facts to connect Ridgewood's prior investment programs to the 1989-II program. The complaint thus fails to explain why Ridgewood should have known that its 1989-II program projections were false when made. Accordingly, we conclude that the district court did not err in dismissing Wentner's securities law claims because the complaint does [*14] not plead fraud with the particularity required under *Fed. R. Civ. P. 9(b).*

Denial of Leave to Amend

The district court dismissed Wentner's securities law claims with prejudice because "Wentner's causes of action [could] not be remedied by amending his pleading again; allegation of other facts consistent with these claims would not cure the deficiency." [HN5] We review a district court's denial of leave to amend for an abuse of discretion. *National Abortion Fed'n v. Operation Rescue, 8 F.3d 680, 681 (9th Cir. 1993).*

In granting the first motion to amend the complaint, the district court spelled out the complaint's deficiencies. Wentner was instructed by the court that there was an insufficient nexus between the prior programs and the 1989-II program to satisfy the pleading requirements of Rule 9(b). He failed to cure this deficiency in his third amended complaint.

"The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990)* (citations omitted). Accordingly, we conclude that the district court did not abuse its discretion in denying [*15] Wentner's subsequent request for leave to amend. See *Allen, 911 F.2d at 373* ("absent a definite and firm conviction that the district court committed a clear error of judgment, [the

reviewing court] will not disturb the district court's decision [to deny leave to amend]").

Motion for Reconsideration

Wentner filed a motion for reconsideration fifteen months after the district court dismissed the securities law claims, seeking deletion of all "with prejudice" references. Wentner contends that the district court erred in denying his motion for reconsideration because the newly acquired evidence set forth in support of his motion connects the prior programs to the 1989-II program. [HN6] Where the denial of a motion for reconsideration is an implicit denial of a request for leave to amend, we review the district court's action for abuse of discretion, mindful of the strong policy in favor of permitting amendment. *CHoPP Computer Corp. v. United States, 5 F.3d 1344, 1350 (9th Cir. 1993),* cert. denied, *130 L. Ed. 2d 20, 115 S. Ct. 63 (1994).*

The new evidence that assertedly provides a connection between the prior investment programs and the 1989-II program includes:  [*16]  (1) deposition testimony by Ridgewood executives that the 1989-II projections were based on a model that remained unchanged throughout the period from the 1986-I program through the 1989-II program; and (2) deposition testimony by Ridgewood executives that Ridgewood's projections for the 1989-II program were less optimistic because of reserve studies concerning Ridgewood's prior programs which were in Ridgewood's possession prior to the marketing of the 1989-II program.

The allegation that Ridgewood used the same methods to make projections for the 1989-II program as it used for prior programs does not allege facts showing whether the characteristics of the prior programs were similar to the characteristics of the 1989-II program. The newly acquired evidence does not contain facts showing that the wells and geographic location identified for the 1989-II program were similar to the wells and locations of prior programs. Because there is no basis from which to conclude that the 1989-II and prior programs were similar in respects material to the calculation of the projections, this allegation does not support an inference that the 1989-II program projections were false when made. [*17]

For the same reason, the fact that the 1989-III program projections were more conservative than prior projections does not support the inference that the defendants knew that the 1989-II program projections were false when made. Accordingly, we conclude that the district court did not abuse its discretion in denying Wentner's motion for reconsideration.

**III. SUMMARY JUDGMENT OF STATE LAW CLAIMS**

The district court granted summary judgment in favor of Ridgewood and Swanson ("Ridgewood") n6 as to Wentner's state law claims for wrongful termination, breach of contract, fraud in employment promises, defamation, and intentional infliction of emotional distress. [HN7] We review a district court's grant of summary judgment de novo. *Jones v. Union Pacific R.R., 968 F.2d 937, 940 (9th Cir. 1992).*

> n6 For purposes of this section, "Ridgewood" refers only to Ridgewood Energy Corporation and Robert Swanson.

In considering whether summary judgment was properly granted, we review the record in the light most favorable [*18] to Wentner to determine whether any genuine issues of material fact exist regarding his claims. Id. We affirm the district court's grant of summary judgment because we conclude that there are no genuine issues of material fact and Ridgewood is entitled to judgment as a matter of law regarding each claim.

A. Wrongful Termination in Violation of Public Policy

Wentner contends that Ridgewood wrongfully terminated him because he began asking questions about Ridgewood's investment programs. Wentner theorizes that his termination violated public policy because Ridgewood fired him in order to prevent him from discovering, and then reporting, Ridgewood's alleged securities law violations. Wentner's argument is a novel variation on the policy against firing whistle-blowers, grounded in *California Labor Code § 1102.5(b),* "which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency . . .". *Collier v. Superior Court, 228 Cal. App. 3d 1117, 1123, 279 Cal. Rptr. 453 (1991)* (emphasis added).

The record indicates that Ridgewood terminated Wentner subsequent to his request for information [*19] already released to persons outside the company. Wentner did not report, or threaten to report, any alleged securities law violations until long after his discharge. Wentner's deposition testimony establishes that he was unaware of any alleged violations at the time he was terminated because he continued to be "gung ho on [Ridgewood's investment] programs," even after he was notified that he was being terminated. In fact, the first time Wentner mentioned such violations was forty-five days after his termination in a demand letter sent to Ridgewood.

The California Supreme Court has not squarely decided whether a plaintiff can support a claim for wrongful termination based on a whistle-blower theory where

the employee was unaware of and did not report an alleged illegality until long after his discharge. Where an issue of state law is unresolved, a federal court must consider "all available data," including appellate court decisions in California or decisions from other jurisdictions, to anticipate how the California Supreme Court would decide the issue. *DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).*

The California courts have clearly extended protection [*20] under the whistle-blower statute to employees who report illegalities to their employers, where the violation implicates the public interest. *Collier, 228 Cal. App. 3d at 1123, 1127;* see e.g., *Hentzel v. Singer Co., 138 Cal. App. 3d 290, 298, 188 Cal. Rptr. 159 (1982)* (employee discharged after complaining about unsafe working conditions to employer). However, California courts have not protected employees who, like Wentner, were unaware of and did not report an alleged violation prior to their termination. See *Pugh v. See's Candies, Inc., 116 Cal. App. 3d 311, 323, 171 Cal. Rptr. 917 (1981)* (appellant's theory failed where "there was no evidence that appellant ever communicated to [his employer] his belief or opinion that the existing contract" violated the law).

The cases Wentner relies upon to buttress his theory are inapposite. In each of these cases, the employer discharged the plaintiff for reporting an alleged violation of law, or attempting to enforce a law implicating fundamental state public policy, or both. See e.g., *Gould v. Maryland Sound Indus., Inc., 31 Cal. App. 4th 1137, 1149 (1995)* (plaintiff informed management that he and co-workers were not [*21] being paid overtime wages); *Parada v. City of Colton, 24 Cal. App. 4th 356, 360-61 (1994)* (plaintiff reported to supervisor that a building inspector was allowing violations of building codes); *Holmes v. General Dynamics, Corp., 17 Cal. App. 4th 1418, 1432 (1993)* (plaintiff disclosed to manager that the company had overcharged the government); *Shoemaker v. Myers, 2 Cal. App. 4th 1407, 1414 (1992)* (plaintiff reported that officials of the Department of Health Services improperly approved funding for health centers utilizing unlicensed personnel to perform medical functions); *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc., 3 Cal. App. 4th 382, 388-89 (1992)* (plaintiff terminated in retaliation for attempts to eliminate illegal employment discrimination); *McQuary v. Bel Air Convalescent Home, Inc., 69 Ore. App. 107, 684 P.2d 21, 23 (Or. 1984)* (plaintiff threatened to report patient abuse by nursing home administrator).

We decline the invitation to extend protection under the California whistle-blower statute to an employee who is terminated before he or she has reported, or even become aware of, an alleged violation of law. There is no precedent in California case law, [*22] nor is there a

compelling policy consideration, to justify such an extension.

In addition to his whistle-blower theory, Wentner contends that he was wrongfully terminated for exercising his statutory right as a general partner, and for performing his legal duty of due diligence. An employer may violate public policy by discharging an employee for exercising a statutory right or performing a statutory obligation. *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 824 P.2d 680, 684 (Cal. 1992).

[HN8] To recover in tort for wrongful discharge in violation of public policy, the plaintiff must show that the employer violated a substantial policy that affects society at large and is grounded in a statutory or constitutional provision. Id. California courts have recognized wrongful discharge actions implicating fundamental policy concerns such as health, safety, or crime prevention. See cases cited in *DeSoto, 957 F.2d at 659*. Wentner's alleged attempts to act as a fiduciary to the 1989-II program's limited partners, and to exercise due diligence, do not implicate a substantial public policy concern which justifies a wrongful termination claim.

B. Breach of Implied-in-Fact Employment [*23] Contract

Wentner's employment with Ridgewood was not subject to a written agreement. Wentner contends, however, that he presented sufficient evidence to create a genuine issue of material fact regarding whether Ridgewood made a legally enforceable promise to him of continuing employment. See *Pugh, 116 Cal. App. at 320, 324-25* (presumption that an unspecified employment term may be terminated at the will of either party is subject to contrary evidence that the parties expressly or impliedly agreed that the employee could only be discharged for good cause).

In determining whether an implied-in-fact promise for continued employment exists, the California Supreme Court has considered the following factors: the personnel policies or practices of the employer; the employee's longevity of service; the actions or communications of the employer reflecting assurances of continued employment; and the practices of the industry in which the employee is engaged. *Foley v. Interactive Data Corp., 47 Cal. 3d 654, 680, 254 Cal. Rptr. 211, 765 P.2d 373 (1988)* (citing *Pugh, 116 Cal. App. 3d at 327*).

Wentner contends that Ridgewood's statements such as ". . . we'll always have something [*24] good for you to sell" and "[you can] make a lot of money" reflect assurances of continued employment. On the contrary, such statements contain oblique language insufficient to demonstrate the existence of an implied agreement. "[HN9] 'Oblique language will not, standing alone, be

sufficient to establish agreement'; instead, totality of the circumstances determines the nature of the contract." *47 Cal. 3d at 681* (quoting *Pugh, 116 Cal. App. 3d at 329*).

Ridgewood employed Wentner as a wholesaler for sixteen months, during which time he won three $ 1,000 sales awards. Ridgewood maintains no written termination policies for this position. From 1988 to June 1, 1990, Ridgewood discharged eight of the fourteen wholesalers hired during that time. Wentner presented no evidence that Ridgewood's normal termination practices no evidence that Ridgewood's normal termination practices create an inference of an implied-in-fact agreement, other than his testimony that wholesalers typically remain in a job for "around five years" because it takes time to develop a customer base. Such facts are insufficient to create a genuine issue of material fact regarding whether Ridgewood and Wentner had an implied-in-fact [*25] agreement of continued employment. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (existence of mere scintilla of evidence in support of nonmoving party's position is insufficient to withstand summary judgment).

A review of the facts presented in cases which found an implied-in-fact agreement illustrates the insufficiency of Wentner's evidence. See e.g., *Foley, 47 Cal. 3d at 681* (plaintiff received repeated oral assurances of job security, consistent promotions, salary increases, and bonuses over six years and nine months of employment); *Pugh, 116 Cal. App. 3d at 316-18* (company had practice of not terminating administrative personnel absent good cause, plaintiff received numerous promotions to significant positions, and plaintiff received no formal criticism over 32 years of employment); *Thomka v. Fin. Corp., 15 Cal. App. 4th 877, 885 (1993)* (company had custom and practice of treating all account executives as permanent "non-probationary" employees, and employer added "at-will" language to sales regulations without notifying employees); *Morishige v. Spencecliff Corp., 720 F. Supp. 829, 835 n.10 (D. Haw. 1989)* [*26] (employee "guide-book" explicitly stated that employees would be discharged for cause); *Forman v. BRI Corp., 532 F. Supp. 49, 50-51 (E.D. Pa. 1982)* (plaintiff informed of employer's five-year growth plan and moved, at employer's expense, to different city to begin employment).

C. Fraud in Employment Promises

To sustain his claim for fraud in employment promises, Wentner had to present evidence sufficient to create an inference that Ridgewood promised him continuing employment, absent good cause for discharge. See *Bondi v. Jewels by Edwar, Ltd., 267 Cal. App. 2d 672, 677, 73 Cal. Rptr. 494 (1968)* (essential element of false promise claim is that defendant made a promise regarding a material fact). The evidence is insufficient to support Went-

ner's fraud claim for the same reasons it was insufficient to support his claim for breach of implied-in-fact employment contract.

D. Defamation

Wentner's defamation claim is based on Ridgewood's communications to Wentner when he was terminated, n7 and to Capital Concepts, Wentner's subsequent employer. [HN10] Whether a "reasonable fact finder could conclude that the published statements imply a provably false factual assertion" [*27] is a question of law. *Moyer v. Amador Valley Joint Union High School Dist., 225 Cal. App. 3d 720, 724, 275 Cal. Rptr. 494 (1990).* A subjective opinion will not support a judgment for defamation because it does not imply a provably false factual assertion. *Id. at 725.*

> n7 We assume without deciding that these statements meet the publication requirement of a defamation claim because it was foreseeable to Ridgewood that Wentner would "repeat these slanders to third parties;" i.e., when interviewing for future jobs. *McKinney v. County of Santa Clara, 110 Cal. App. 3d 787, 796, 168 Cal. Rptr. 89 (1980).*

Statements that Wentner could not "get the job done" and that his wholesaling was not "proceeding in a manner that was satisfactory" constitute Ridgewood management's subjective opinions. Similarly, Swanson's statement that "production wasn't exactly what he had hoped for" is a subjective expression of disappointment regarding Wentner's job performance. Accordingly, we conclude that as a matter of [*28] law Ridgewood's communications to Wentner did not contain provably false factual assertions. Recent California case law is in accord with this conclusion. See e.g., *Moyer, 225 Cal. App. 3d at 725* (statement that plaintiff "is the worst teacher at FHS" is an expression of speaker's subjective judgment containing no verifiable facts); *Botos v. Los Angeles County Bar Ass'n., 151 Cal. App. 3d 1083, 1088-90, 199 Cal. Rptr. 236 (1984)* (rating judge "not qualified" is local bar association's collective judgment of his qualifications, not an actionable statement of fact).

Wentner asserts that Ridgewood's attorney, Bob Gold, referred to him as a "poor wholesaler" in telephone conversations with William Dixon, the vice-president, and John Dixon, a registered representative, of Capital Concepts. William and John Dixon testified during their depositions that they could not remember any specifics regarding their conversations with Gold. Wentner's deposition testimony contained only vague recollections of what William Dixon relayed to him concerning Gold's

statements. n8 Absent any corroboration in the record, we find Wentner's testimony insufficient to create a genuine issue regarding [*29] whether Ridgewood referred to him as a poor wholesaler. See *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991)* (plaintiff must "set forth specific facts showing that there is a genuine issue for trial" to withstand summary judgment) (quoting *Fed. R. Civ. P. 56(e)*).

> n8 We recognize that Wentner's testimony concerning Gold's statements to Dixon is inadmissible because it fails to satisfy the personal knowledge requirement of *Rule 56(e) of the Federal Rules of Civil Procedure.* It is also double hearsay. Because Ridgewood failed to object in the district court, however, it is a part of the record we must consider. *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co., 953 F.2d 478, 484-85 (9th Cir. 1992).*

Because we conclude that Wentner has failed to present evidence sufficient to support a reasonable inference that certain statements were made, or that other statements contained provably false factual assertions, Ridgewood is entitled to summary judgment on Wentner's [*30] defamation claim.

E. Intentional Infliction of Emotional Distress

Wentner claims that Ridgewood's communications to Capital Concepts and to himself caused him severe emotional distress. Ridgewood contends that Wentner's claim for intentional infliction of emotional distress is barred because such communications are subject to the litigation privilege. *Lerette v. Dean Witter Organization, Inc., 60 Cal. App. 3d 573, 576, 131 Cal. Rptr. 592 (1976)* (*California Civil Code § 47(2)*, confers absolute privilege upon communications related to litigation).

[HN11] For communications to be absolutely privileged they must be "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson, 50 Cal. 3d 205, 786 P.2d 365, 368, 266 Cal. Rptr. 638 (Cal. 1990)* (citations omitted).

We conclude that Ridgewood's communications to Wentner are privileged as statements related to the present litigation. The statement "we'll destroy you," within the context of a settlement discussion, is protected under the litigation [*31] privilege as an attempt to achieve the objects of the litigation. See *50 Cal 3d at 214* (litigation privilege "promotes the effectiveness of judicial proceed-

ings by encouraging attorneys to zealously protect their clients' interests.").

Ridgewood threatened litigation against Wentner and Capital Concepts concerning Wentner's allegedly defamatory statements to brokers at Capital Concepts. The "privilege relating to statements regarding prospective litigation is qualified rather than absolute; the prospective litigation must be contemplated in good faith and under serious consideration." *Laffer v. Levinson, 34 Cal. App. 4th 117, 124 (1995).* We conclude that Ridgewood's communications to Capital Concepts are privileged as statements related to prospective litigation.

Wentner's assertion that Ridgewood's threatened litigation was not contemplated seriously and in good faith is without merit. Wentner has not identified any facts in the record which support this contention. In fact, Wentner testified during his deposition that he had told brokers at Capital Concepts that Ridgewood was mis-

leading the public in its offering materials. Accordingly, we conclude that the prospective [*32] litigation was contemplated in good faith. Cf. *Herzog v. "A" Co., 138 Cal. App. 3d 656, 660-61, 188 Cal. Rptr. 155 (1982)* (defendant's letter to plaintiff threatening litigation if he accepted employment with competitor not privileged because litigation not contemplated in good faith where such employment would not violate non-competition agreement).

Finally, Ridgewood's threats to sue Capital Concepts are privileged as attempts to achieve the objects of prospective litigation. See *Lerette, 60 Cal. App. 3d at 579* (demand letter sent to plaintiff's new employer accusing plaintiff of intentional misrepresentation of certain facts and threatening to sue plaintiff and his employer privileged).

AFFIRMED.

LEXSEE 2002 US DIST LEXIS 10566

**WILLOW BAY ASSOCIATES, LLC, a Nevada limited liability company, Plaintiff,
v. IMMUNOMEDICS INC., a Delaware corporation, et al., Defendant.**

**C.A. No. 00-99-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 10566*

**June 12, 2002, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, Summary judgment denied by, Summary judgment granted by, Claim dismissed by *Willow Bay Assocs., LLC v. Immunomedics, Inc., 2003 U.S. Dist. LEXIS 4426* (D. Del., Mar. 21, 2003)

**DISPOSITION:** The Plaintiff's Motion for Reconsideration wass GRANTED. The Court's order entering summary judgment in favor of the defendants was VACATED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a limited liability company, sued defendant corporation for breach of contract. The corporation's motion to dismiss was converted to a summary judgment motion during oral arguments. The motion was granted. The company moved for reconsideration arguing that the court made a procedural error in converting the motion to dismiss into a motion for summary judgment without prior notice to the company.

**OVERVIEW:** The company also argued that substantive errors flowed from the procedural error of converting the motion to dismiss to one for summary judgment, as the company was effectively prohibited from presenting evidence to support its position. The corporation argued that even if the court made a procedural error, the company was not prejudiced by such error because the statute of frauds defense was previously raised in this case. Additionally, it contended that there were no new facts the company could present that would remove the contract from the purview of the New York statute of frauds. A review of the complaint indicated that there was probably a set of facts under which the company might prevail. Since the court concluded that there was a set of facts under which the company could prevail and therefore survive a motion to dismiss, the court concluded that the conversion of the motion to dismiss into a motion for summary judgment without notice to the plaintiff was not harmless error.

**OUTCOME:** The company's motion for reconsideration was granted, and the order entering summary judgment in the corporation's favor was vacated. The corporation's motion to strike the company's reply was dismissed as moot.

**CORE TERMS:** motion to dismiss, summary judgment, reconsideration, oral argument, notice, conversion, dispositive, opportunity to present, procedural error, re-open, prevail, manifest injustice, failure to provide, quantum meruit, harmless error, scheduled, endless, survive, statute of limitations defense, entry of summary judgment, granting summary judgment, facts necessary, letter brief, prior notice, converting, briefing, deadline, vacate

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] As a general rule, motions for reconsideration should be granted only sparingly. In fact, those types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*

2002 U.S. Dist. LEXIS 10566, *

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Judgments > Relief From Judgment > Newly Discovered Evidence*
[HN2] A district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when there (1) has been an intervening change in the controlling law, (2) is newly discovered evidence which was not available to the moving party at the time of the judgment, or (3) is a need to correct a legal or factual error which has resulted in a manifest injustice.

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN3] Motions for reconsideration should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.

*Civil Procedure > Summary Judgment > Notices*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN4] A motion for reconsideration may be granted where there is a need to correct a legal or factual error which has resulted in a manifest injustice.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
[HN5] Fed. R. Civ. P. 12(b) dictates that if a motion to dismiss is treated as a motion for summary judgment under Fed. R. Civ. P. 56, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN6] Fed. R. Civ. P. 56 permits a party opposing summary judgment to present affidavits in support of its position. Fed. R. Civ. P. 56(c).

*Civil Procedure > Dismissals > General Overview*
*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > Harmless Error Rule*
*Civil Procedure > Appeals > Standards of Review > Reversible Errors*

[HN7] A district court's failure to provide notice to parties of a conversion of a Fed. R. Civ. P. 12(b)(6) motion to dismiss to one for summary judgment under Fed. R. Civ. P. 56 can constitute reversible error under certain circumstances. However, the failure to provide notice is harmless error if the complaint would not survive a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN8] In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the factual allegations of the complaint must be accepted as true. Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN9] A court should dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

**COUNSEL:** [*1] For WILLOW BAY ASSOCIATES, LLC, plaintiff: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., defendant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For THE ZANETT SECURITIES CORPORATION, counter-claimant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

For IMMUNOMEDICS INC., counter-claimant: W. Harding Drane, Jr., William J. Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE.

For WILLOW BAY ASSOCIATES, LLC, counter-defendant: Denise Seastone Kraft, David S. Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On February 17, 2000, the plaintiff, Willow Bay Associates, LLC ("Willow Bay") filed a complaint in this court alleging that the defendant, Immunomedics, had breached its contract (a "non-circumvention" or [*2] "reciprocal confidentiality agreement") with Willow Bay. The court entered a schedule setting the dispositive motion deadline at February 15, 2001. The Pre-Trial conference was held on June 16, 2001. By this time, the dispositive motion deadline had lapsed, and the court directed the parties not to file any dispositive motions. Thus, no dispositive motions were filed.

The court scheduled the two day bench trial for Thursday, April 18, 2002 and Friday, April 19, 2002. n1 On Monday, April 15, 2002, the defendant wrote a letter-brief to the court which the defendant maintains was intended to bring a newly discovered case, *Bronner v. Park Place Entertainment Corp., 137 F. Supp. 2d 306 (S.D.N.Y. 2001),* to the court's attention. However, the letter also asked the court to dismiss the case pursuant to the New York statute of frauds. n2 The plaintiff responded to the motion to dismiss on the next day, Tuesday, April 16, 2002. The plaintiff contended that the "motion to dismiss" should not be granted because, *inter alia,* "a whole host of factual issues" remained to be resolved by a jury.

> n1 The trial was rescheduled twice to accommodate the schedules of the court and the parties.

[*3]

> n2 The parties agree that New York law governs this dispute.

The court held a telephone conference with the parties on Tuesday afternoon. During that teleconference, the court told the parties that it would hear oral argument on Wednesday, April 17, at 12:30 p.m. The court also directed the defendant to reply to the plaintiff's letter brief prior to oral argument.

During introductory remarks made during oral argument, the court indicated for the first time that it would consider the motion to dismiss as a motion for summary judgment. (D.I. 104 at 2.) The court heard argument from both parties. Although the plaintiff did not object to the court's conversion of the defendant's motion to dismiss

into a motion for summary judgment, the plaintiff did state that it felt that genuine issues of fact precluding summary judgment remained. (*Id.* at 24.) After briefly adjourning the proceedings to take the arguments under advisement, the court returned to the bench and announced that it would grant the defendant's motion for summary judgment. (*Id.* at 28.) The court fully explained the reasons for [*4] its ruling. (*Id.* at 28-34.)

Presently before the court is the plaintiff's motion for reconsideration of the court's decision. The plaintiff argues that the court made a procedural error in converting the motion to dismiss into a motion for summary judgment without prior notice to the plaintiff. The plaintiff also argues that substantive errors flowed from this procedural defect, as the plaintiff was effectively prohibited from presenting evidence to support its position. The defendant argues that even if the court made a procedural error, the plaintiff was not prejudiced by such error because the statute of frauds defense was previously raised in this case. Additionally, the defendant contends that there were no new facts the plaintiff could present that would remove this contract from the purview of the New York statute of frauds.

After reviewing the parties' submissions, the transcripts of record, and the applicable law, the court will grant the plaintiff's motion. Upon reconsideration, the court agrees that the plaintiff should have been afforded an opportunity to present any necessary facts to the court in opposition to the defendant's summary judgment motion. In order to [*5] correct this error, the court will vacate the April 17 order granting summary judgment and re-open the case. However, to balance the plaintiff's interest in presenting facts with the defendant's interest in raising the statute of frauds defense, the court will allow either party to submit a motion for summary judgment stating that it is entitled to judgment in its favor as a matter of law. In support of or in opposition to any such motion, the plaintiff will be permitted to present any necessary facts. The court will now explain its reasoning.

**II. STANDARD OF REVIEW**

[HN1] As a general rule, motions for reconsideration should be granted only "sparingly." *See Karr v. Castle, 768 F. Supp. 1087, 1090 (D. Del. 1991).* In fact, these types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. *See, e.g., Brambles USA, Inc. v. Blocker, 735 F. Supp. 1239, 1240 (D. Del. 1990)* (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983)); [*6] see also Karr, 768 F. Supp. at 1090* (citing same).

2002 U.S. Dist. LEXIS 10566, *

In addition, the Third Circuit has explained that [HN2] a district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of the judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)* (relying on *North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).*

Nevertheless, as the *Brambles* court made clear, [HN3] motions for reconsideration "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *735 F. Supp. at 1240.* In these situations, such a motion should be denied because any other ruling would effectively encourage parties to engage in an endless debate with the court and, thus, delay the ultimate resolution of [*7] the litigation. *See Oglesby v. Penn Mut. Life Ins. Co., 877 F. Supp. 872, 892 (D. Del. 1994)* (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic between the litigants and the court"); *Brambles, 735 F. Supp. at 1240* ("The procedural mechanism provided by the rule should not be undermined to allow for endless debate between the parties and the [court.").*

## III. DISCUSSION

[HN4] A motion for reconsideration may be granted where there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood, 176 F.3d at 677.* In this case, the court made a procedural error in converting the motion to dismiss to a motion for summary judgment without providing notice to the plaintiff. [HN5] *Rule 12(b) of the Federal Rules of Civil Procedure* dictates that if a motion to dismiss is treated as a motion for summary judgment under Rule 56, "all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56." *FED. R. CIV. P. 12(b).* [HN6] Rule 56 also permits a party opposing summary judgment to present affidavits in support [*8] of its position. *See FED. R. CIV. P. 56(c).* The Third Circuit has stated that the [HN7] district court's failure to provide notice to parties can constitute reversible error under certain circumstances. *See In re: Rockefeller Center Properties, Inc. Securities Litigation, 184 F.3d 280, 289 (3d Cir. 1999).* However, the failure to provide notice is harmless error if the complaint would not survive a motion to dismiss. *See id.*

The court concludes that at minimum, the plaintiff's complaint might have survived a motion to dismiss.

[HN8] In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).* Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).* [HN9] A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be [*9] proved consistent with the allegations." *See Graves, 117 F.3d at 726; Nami, 82 F.3d at 65* (both citing *Conley v. Gibson, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99-46 (1957)).*

A review of the plaintiff's complaint indicates that there is probably a set of facts under which the plaintiff might prevail. Although the defendant has raised the statute of frauds as a defense, in both its April 16 letter brief and the April 17 oral argument, the plaintiff stated that there may be a set of facts under which the statute of limitations defense would be inapplicable. Since the court concludes that there is a set of facts under which the plaintiff could prevail and therefore survive a motion to dismiss, the court concludes that the conversion of the motion to dismiss into a motion for summary judgment without notice to the plaintiff was not harmless error.

The defendant contends that the plaintiff suffered no prejudice as a result of the court's conversion because the statute of limitations issue had previously been introduced into the case. The court agrees that the statute of limitations defense was raised well before the April 17 oral argument. However, the plaintiff [*10] does not request reconsideration because the issue was newly presented at oral argument. The basis for the plaintiff's request is that the court's conversion of the motion to dismiss into a motion for summary judgment without prior notice deprived the plaintiff of the opportunity to present its version of the facts to the court. The defendant has not cited any authority stating that the plaintiff does not have the right to such notice or the right to present facts prior to the entry of summary judgment. Moreover, even if the statute of frauds issue was known to the plaintiff, it was raised anew a mere three days before trial. Given the fact that the plaintiff had such a short period of time in which to defend the motion to dismiss and the fact that the court only told the plaintiff at the beginning of oral argument that it would convert the motion to dismiss, it is unfair to conclude that the plaintiff had a sufficient opportunity to present all facts necessary to resist the defendant's motion. n3

n3 The court notes that the plaintiff did not raise the notice issue during oral argument and

thus the notice issue could be considered waived. However, given the fact that the rapid evolution of events may not have given the plaintiff the opportunity to object to the conversion and the fact that the plaintiff did oppose the entry of summary judgment, the court finds that the plaintiff sufficiently preserved the notice issue for purposes of reconsideration.

[*11]

## IV. CONCLUSION

For all of these reasons, the court will vacate its April 17, 2002 order granting summary judgment in favor of the defendant and will re-open this case to permit the plaintiff to present any additional facts necessary to support its claim. However, both the plaintiff and the defendant will be prohibited from introducing new causes of action or new defenses not previously raised in this litigation. n4 Additionally, to ensure that both the plaintiff and the defendant are given a fair opportunity to fully address their claims and defenses, either party will be permitted to submit a motion for summary judgment for the court's consideration. The parties are directed to agree to a briefing schedule and submit it to the court within thirty (30) days of this order. If the court finds that the statute of frauds is inapplicable, this case will be scheduled for trial.

    n4 For instance, the plaintiff's motion for reconsideration argues that the plaintiff might prevail on a quantum meruit theory. However, the plaintiff's complaint does not seek recovery based on quantum meruit - only breach of contract. At this late stage in the litigation, the plaintiff will not be permitted to pursue a cause of action which is not contained in the complaint and is

therefore new to this litigation. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc., 15 F. Supp. 2d 406, 409 (D. Del. 1998)* (noting that a motion for reconsideration "may not be used as a vehicle to advance additional arguments that a party could have made before judgment but neglected to do so").

[*12]

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The Plaintiff's Motion for Reconsideration (D.I. 105) is GRANTED.

2. The Court's April 17, 2002 order entering summary judgment in favor of the defendants (D.I. 101) is VACATED.

3. The parties are hereby directed to submit a stipulated summary judgment briefing schedule to the court within thirty (30) days from the date of this order.

4. The clerk's office shall re-open this case.

5. The defendant's motion to strike the plaintiff's reply brief (D.I. 110) is DISMISSED as MOOT.

Dated: June 12, 2002

    Gregory M. Sleet

    UNITED STATES DISTRICT JUDGE