IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNIVERSITY OF DELAWARE | § § | |
| Plaintiff, | § § | C.A. No. 05-842-GMS |
| v. | § § | |
| | § § | **TRIAL BY JURY OF** |
| PHENOMENEX, INC., | § § | **TWELVE DEMANDED** |
| Defendant. | § § § | |

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff University of Delaware (the "University"), by and through undersigned counsel, McCarter & English, LLP, against Defendant Phenomenex, Inc. ("Phenomenex"), and avers as follows:

### *The Parties*

1.    The University is the largest university located within the State of Delaware, and maintains its principal place of business in Newark, Delaware.

2.    Defendant Phenomenex is a California corporation having its corporate headquarters located at 411 Madrid Avenue, Torrance, California, 90501-1430.  Phenomenex may be served by serving the Delaware Secretary of State.

3.    Phenomenex was founded over two decades ago by Fasha Mahjoor ("Mahjoor"), who is still the acting director and president of the company.  Phenomenex now has a global presence, and sells products in the United States, Australia, Canada, Germany, New Zealand and the United Kingdom.   Phenomenex develops, manufactures and supplies laboratory columns and accessories for the separation, analysis and purification of chemicals, biochemicals and medical

grade proteins. Specifically, Phenomenex develops, manufactures and supplies High Pressure Liquid Chromatography ("HPLC") columns and supplies, including Phenomenex's Jupiter brand column.

4. Phenomenex maintains the leading position in the North Eastern United States market for HPLC columns specifically designed for the analysis of basic drugs, polymers, carbohydrates, enantiomers, proteins and environmental pollutants.

5. Phenomenex markets and sells its HPLC columns nationwide and directly markets and sells such columns to customers in the State of Delaware.

6. Research Corporation Technologies ("RCT") is a technology investment, development and marketing company which partners with affiliated institutions in an effort to license patentable and patented processes, products and procedures to third parties such as Phenomenex. RCT has its principal place of business at 101 North Wilmot Road, Suite 600, Tucson, Arizona 85711-3365.

7. RCT agreed with the University to market protected intellectual property to third parties like Phenomenex, and to cultivate, manage and monitor third party usage of such intellectual property developed by the University in exchange for a fee, while paying the University a royalty for any and all such third party usage.

8. Through a series of assignment transactions, the University now holds all right title and interest to U.S Patent No. 5,599,625 (the "'625 Patent"), including without limitation, the right to sue for damages for past infringement.

*Jurisdiction, Venue and Service of Process*

9. Jurisdiction in this Honorable Court is proper pursuant to 28 U.S.C. §§1331, 1332, 1338(a)-(b), and 1367. The issues and controversy herein present a federal question, seek

2

damages in excess of $75,000.00 exclusive of attorneys' fees and costs, and are between diverse citizens.

10.   Venue is proper before this Honorable Court pursuant to 28 U.S.C. §§1391 and 1400(b).

11.   The statutory predicate for the Federal relief requested arises under the patent laws of the United States, Title 35 of the United States Code.

### *The Discovery and the Patent*

12.   In or around 1991, Dr. Mary Wirth ("Dr. Wirth"), was working in the Department of Chemistry and Biochemistry of the University.  Dr. Wirth left the employ of the University in 2004.

13.   In or around 1991, Dr. Hafeez O. Fatunmbi ("Dr. Fatunmbi"), was working as a graduate student (and was later awarded his Ph.D.), in the Department of Chemistry and Bio-Chemistry of the University (Wirth and Fatunmbi are both collectively referred to as the "Inventors").  Dr. Fatunmbi left the employ of the University in 1992.

14.   In or around 1991, Drs. Wirth and Fatunmbi were deeply entrenched in the study of surface chemistries relating to substrates such as silica beads used in chromatographic processes, the end result of this research being the discovery of an invention worthy of a patent.

### *The Marketing Agreement*

15.   On April 1, 1990, the University agreed to grant RCT certain rights to market and promote the University's proprietary technologies developed by the Inventors, wherein the University allowed RCT to permit interested third parties to review and evaluate such technologies (the "Marketing Agreement").  Pursuant to the Marketing Agreement, on June 17,

3

1992, RCT filed U.S. Patent Application Serial Number 07/900,215 (the "Patent Application"), to protect the Inventors' research.

16.    Pursuant to the Marketing Agreement, RCT agreed to expend all reasonable efforts to commercialize each accepted Invention (as defined in the Marketing Agreement) and corresponding Patent Applications and Patents (as defined in the Marketing Agreement) and to secure reasonable revenue from such commercialization.

17.    Also pursuant to the Marketing Agreement, RCT agreed to pay the University fifty-seven and one-half percent (57.5%) of the gross income received from the marketing and use of the University's proprietary technology pursuant to the Marketing Agreement including, Patent Applications, Patents and the subject matter of same.

### The Materials Agreement

18.    Following both execution of the Marketing Agreement and filing of the Patent Application, Phenomenex contacted RCT and the University to request a sample of the product that was the subject of the Patent Application.   To that end, on August 28, 1992, RCT and Phenomenex entered into a Materials Treatment Agreement ("Materials Agreement"), whereby the Inventors would manufacture a sample of the product that was the subject of the Patent Application, and send it to Phenomenex for evaluation.

19.    Phenomenex expressly agreed in the Materials Agreement that it was granted access to the licensed technology and trade secrets "solely for research purposes," and that Phenomenex would never use the proprietary technology "for any commercial or non-academic purpose."

### The Evaluation Agreement

20.    Thereafter, on March 29, 1993, RCT and Phenomenex entered into an Evaluation License Agreement and Right of First Refusal (the "Evaluation Agreement"), as licensor and

4

licensee respectively, for the evaluation of the technology which is the subject of the Patent Application (the "Licensed Technology"). The Evaluation Agreement was a limited license of short duration which expired by its terms six months from its effective date.

21.    Phenomenex expressly agreed in the Evaluation Agreement that "[t]he Evaluation License does <u>not</u> give Licensee the right to sell Licensed Products or to use Licensed Products or Licensed Processes for any purpose other than evaluation of the Invention." (*emphasis in original*).

22.    The Evaluation Agreement further expressly provided that "Licensee acknowledges that certain proprietary information belonging to Licensor will be disclosed to Licensee pursuant to this Agreement."

23.    Phenomenex also expressly agreed in the Evaluation Agreement that it would maintain in confidence all proprietary information regarding the Licensed Technology, that it would return such proprietary information at the end of the six month evaluation period,  and that it would maintain all such information it learned or received as strictly confidential.

24.    The Evaluation Agreement defines as a non-curable breach of that Agreement Phenomenex's use of the Licensed Technology for any purpose other than research and evaluation, such as for use in internal operations, commercial use and/or commercial sale.

25.    After their execution of the Evaluation Agreement, Mahjoor and Phenomenex contacted Dr. Fatunmbi to request his assistance in the evaluation of the Licensed Technology. Dr. Fatunmbi, while still in the employ of the University, then spent approximately three weeks in the Phenomenex laboratory teaching Phenomenex and its employees/agents the use and application of the Licensed Technology. As a result of this visit, Phenomenex obtained access to

5

the University's confidential information, as well as trade secrets and know-how associated with the Licensed Technology.

26.  At the expiration of the Evaluation Agreement, Phenomenex notified RCT and the Inventors that it was not interested in further use of the Licensed Technology. On September 29, 1993, the Evaluation Agreement expired by its terms and Phenomenex declined to enter into a commercialization agreement.  Phenomenex thereafter had no further right to the Licensed Technology or trade secrets for any purpose whatsoever.

*The Infringement*

27.  On February 4, 1997, United States Letters Patent Number 5,599,625, entitled "Products Having Multiple-Substituted Polysiloxane Monolayer" issued in the name of the Inventors from U.S. Patent Application Number 07/900,215 (see Exhibit A).  The '625 Patent is directed to the research performed by the Inventors specifically relating to the formation of specialized siloxane monolayers on substrates, such as silica beads, which are susceptible to damage upon exposure to acidic or basic environments when used, for example, in chromatography processes.

28.  The University and UDTC's subsequent investigation revealed that the performance of Phenomenex's HPLC Jupiter columns is not possible absent employment of the technology disclosed and claimed in the '625 Patent, and that Phenomenex has been selling Jupiter HLPC columns around the globe, as though it owned the technology disclosed and claimed in the '625 Patent.

29.  As noted above, the University currently holds title to the '625 Patent, which UD Technology Corporation ("UDTC") -- the University's predecessor-in-interest -- assigned to the University on or about June 27, 2008.

6

30.   On June 1, 2005, UDTC sent Phenomenex a letter demanding that Phenomenex cease and desist its wrongful use of the '625 Patent.  Phenomenex has not stopped using, marketing or selling HPLC columns that infringe the '625 Patent.

31.   As a direct and proximate result of its prior, current and continuing use, marketing and sale of the University's patented technology, Phenomenex was and is infringing upon the '625 Patent causing the University irreparable harm and monetary damages.

### *The Reexamination*

32.   After the commencement of this litigation, Phenomenex requested an *ex parte* reexamination of the '625 Patent (the "Reexamination") by the United States Patent and Trademark Office ("PTO").  On September 1, 2009, the PTO issued a reexamination certificate. On December 15, 2009, the PTO issued a certificate of correction for the '625 Patent, confirming claims 6 and 21-30 as patentable, and adding new claims 56-58.  Claims 54 and 55 were not reexamined.  A copy of the '625 Patent, as modified by the Reexamination and certificate of correction, is attached hereto as Exhibit B.

### COUNT I -- The University v. Phenomenex
### PATENT INFRINGEMENT PURSUANT TO 35 U.S.C.§§284, *et seq.*

33.   Plaintiff hereby repeats, repleads and incorporates herein by reference as though fully set forth herein each and every allegation contained in paragraphs 1 though 32, inclusive, of this Complaint.

34.   Upon information and belief, and it is therefore upon that basis alleged, Phenomenex has infringed and continues to infringe one or more claims of the '625 Patent by its manufacture, use, offer for sale and/or sale of certain Phenomenex HPLC columns, including, but not limited to Phenomenex's "Jupiter" Column and/or products manufactured, used, offered for sale and/or sold under a Phenomenex owned or licensed name.

7

35.     Upon information and belief, and it is therefore upon that basis alleged, Phenomenex has actively induced and currently is actively inducing others to infringe one or more claims of the '625 Patent through the sale of certain of Phenomenex's HPLC column products, including, *inter alia*, the "Jupiter" Column, including other products marketed under a Phenomenex owned or licensed name.

36.     Upon information and belief, Phenomenex has contributorily infringed the '625 Patent by its offer of sale and sale of certain HPLC columns, including HPLC columns marketed under the name Jupiter.

37.     Upon information and belief, Phenomenex's infringement, inducement of infringement and contributory infringement have and continue to be willful.

38.     As a result of Phenomenex's actions, the University has suffered and continues to suffer substantial injury, including irreparable injury, and such actions have and will continue to result in damages to the University, including loss of sales, revenues and profits, which the University would have made but for the infringement by Phenomenex unless Phenomenex is enjoined by this Honorable Court.

WHEREFORE, the University prays for judgment against Phenomenex as follows:

A.      That a judgment be entered that Phenomenex has infringed United States Letters Patent No. 5,599,625;

B.      That a judgment be entered that Phenomenex has actively induced others to infringe, and/or contributorily infringed United States Letters Patent No. 5,599,625;

C.      That Phenomenex, its agents, sales representatives, distributors, servants and employees, attorneys, affiliates, subsidiaries, successors and assigns, and any and all persons acting at, through, under or in active concert or in participation with any or

8

ME1 10432282v.1

all of them, be enjoined and restrained preliminarily during the pendancy of this action, and thereafter permanently, from infringing, actively inducing others to infringe, and/or contributorily infringing United States Letters Patent No. 5,599,625;

D.      That an accounting for all uses and damages resulting from Phenomenex's infringement, inducement and/or contributory infringement be ordered;

E.      That judgment be entered that Phenomenex be required to pay over to the University all damages sustained by the University due to such patent infringement and that such damages be trebled pursuant to 35 U.S.C. § 284 for willful acts of infringement complained herein;

F.      That this case be adjudged and decreed exceptional under 35 U.S.C. §285, entitling the University to an award of its reasonable attorneys' fees and that such reasonable attorneys' fees be awarded;

G.      That the University be awarded its costs and prejudgment interest on all damages;

H.      That Phenomenex be required to file with the Court within 30 days after entry of final judgment of this cause, a written statement under oath setting forth the manner in which Phenomenex has complied with the final judgment;

I.      That the University be awarded such other and further relief as this Honorable Court deems equitable and just.

ME1 10432282v.1

**McCARTER & ENGLISH, LLP**

Michael P. Kelly (DE Id. No. 2295)
A. Richard Winchester (DE Id. No. 2641)
Daniel M. Silver (DE Id. No. 4758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com

*Attorneys for University of Delaware*

Dated:  August 31, 2010

10

ME1\5360729.1